IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY 2 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JEWISH WAR VETERANS OF THE UNITED )
STATES OF AMERICA, INC., RICHARD A. SMITH, )
MINA SAGHEB, and JUDITH M. COPELAND, )
                                   )
c/o Jonathan H. Siegelbaum )
1875 Pennsylvania Ave. NW )
Washington, DC 20006 )
                          Plaintiffs, )

                              Case: 1:07-mc-00220
v.                             Assigned To : Bates, John D.
                              Assign. Date : 5/23/2007
ROBERT M. GATES,                    Description: MISC.
Secretary of Defense, in his official capacity,

                                     )
c/o Heide L. Herrmann, Esq. )
U.S. Department of Justice )
P.O. Box 663 )
Washington, DC 20044-0663 )
                          Defendant. )

## PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENAS

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), Plaintiffs Jewish War Veterans of the United

States of America, Inc., Richard A. Smith, Mina Sagheb, and Judith M. Copeland ("Plaintiffs")

hereby move this Court for an Order compelling Rep. Darrell Issa to fully respond to Plaintiffs'

subpoenas served on March 26, 2007. This Motion is supported by the Memorandum of Points

and Authorities in Support of Plaintiffs' Motion to Compel Production of Documents Responsive

to Subpoenas filed by Plaintiffs contemporaneously herewith. Pursuant to LCvR 7(m), Plaintiffs

hereby state that they have conferred with counsel for Rep. Issa in a good faith attempt to

determine whether there is opposition to the relief sought and to narrow the areas of

disagreement. This motion is opposed.

T. Jeremy Gunn (Bar No. 417222)
Daniel I. Mach (Bar No. 461652)
ACLU PROGRAM ON FREEDOM OF
    RELIGION AND BELIEF
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St., N.W., Suite 600
Washington, D.C.  20005
Telephone:  (202) 675-2330
Facsimile:  (202) 546-0738

A. Stephen Hut, Jr. (Bar No. 192856)
Jonathan H. Siegelbaum (Bar No. 474837)
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.   20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs Jewish War Veterans
of the United States of America, Inc., David
A. Smith, Mina Sagheb, and Judith M.
Coleman*

May 23, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEWISH WAR VETERANS OF THE UNITED ) 
STATES OF AMERICA, INC., RICHARD A. SMITH, ) 
MINA SAGHEB, and JUDITH M. COPELAND, )
                  )
c/o Jonathan H. Siegelbaum )
1875 Pennsylvania Ave. NW )
Washington, DC 20006 )
                         Plaintiffs, )
                  )
v. )      Case No.
                  )
ROBERT M. GATES, )
Secretary of Defense, in his official capacity, )
                  )
c/o Heide L. Herrmann, Esq. )
U.S. Department of Justice )
P.O. Box 663 )
Washington, DC  20044-0663 )
                  )
                      Defendant. )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENAS

Congressmen Duncan Hunter, Brian Bilbray, and Darrell Issa ("Members"), as the sponsors of federal legislation taking control of the 43-foot high, 24-ton Latin cross on the top of Mt. Soledad in San Diego, were active participants in the events underlying this litigation, which challenges the governmental display of the Cross as a violation of the Establishment Clause. Yet after attending meetings at the White House, lobbying municipal officials, giving speeches, and issuing press releases about "saving" the Mt. Soledad Cross, they now insist that they have no discoverable documents, and refuse to comply with Plaintiffs' subpoenas. Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), Plaintiffs Jewish War Veterans of the United States of America, Inc., Richard A. Smith, Mina Sagheb, and Judith M. Copeland ("Plaintiffs") hereby ask this Court to compel the Members to respond to those subpoenas.

# I.    FACTUAL BACKGROUND

The underlying issue in this case is whether the federal government's display of the Mt. Soledad Cross ("Cross") violates the Establishment Clause. After President Bush signed the act that the Members had sponsored to "take" the Cross on August 14, 2006, the Plaintiffs sued the Secretary of Defense (the custodian of the Cross under the statute), challenging the Secretary's display of the Cross. On March 21, 2007, Plaintiffs served subpoenas on the Members for production of documents under Rule 45 of the Federal Rules of Civil Procedure, seeking documents related to their role in the federal government's acquisition of the Cross. The subpoenas sought only those materials critical to the Establishment Clause inquiry in this case, and were drafted narrowly to avoid both undue burden and any infringement on the Members' constitutional privileges. On April 9, 2007, the Members objected to Plaintiffs' requests on a panoply of grounds, including relevance, overbreadth, vagueness, cumulativeness, duplicativeness, burdensomeness, and privilege under the Speech or Debate Clause of the Constitution, and refused to produce any documents. Plaintiffs conferred with the Members in a good faith attempt to resolve the Members' objections, *see* LCvR 7(m), but the Members persisted in refusing to produce a single responsive document. For the reasons discussed below, the Members have no valid legal basis for this objection and refusal to produce.

## The History of the Mt. Soledad Cross

The boundaries of the City of San Diego ("the City") were enlarged to include Mt. Soledad in the nineteenth century. In 1916, the City dedicated the property on which the Cross rests as Mt. Soledad Nature Park. In 1952, the City authorized a private entity, the Mount Soledad Memorial Association ("MSMA"), to erect the current cross on Mt. Soledad. The MSMA dedicated the Latin cross during a Christian religious ceremony held on Easter Sunday in

1954. The MSMA bulletin, published that day, observed the dedication of the Cross to "Our Lord and Savior Jesus Christ."

Since the 1954 dedication, the City has granted MSMA a permit every Easter Sunday to conduct a sunrise service celebrating the resurrection of Jesus. As the MSMA's bulletins for those services explained, "the gleaming white cross … serves as a reminder of God's promise to man of everlasting life." Since the 1954 dedication, moreover, the Mt. Soledad Cross has served as the setting for numerous other religious events, such as weddings and baptisms. Up until 1989 — the year the government's display of the Cross was first challenged in court — every annual publication of the Thomas Brothers Map for the area referred to the location as the "Mt. Soledad Easter Cross." Until 1992, there was no marker indicating the presence of a veterans' memorial at Mt. Soledad Nature Park or at the site of the Cross. It was only after the onset of litigation challenging the constitutionality of the cross that the MSMA asked Thomas Brothers to remove the "Easter" reference from the map, and installed a marker with a "Veterans" memorial inscription at the site of the cross.

During the last decade, the MSMA built a war memorial around the Cross. The Association erected a large American flag and installed twenty-three bollards honoring community and veterans' organizations. The MSMA also built six concentric walls that currently hold more than 1,800 black granite plaques purchased by donors to the MSMA and that are engraved with the names and photographs of individual veterans.

### Previous Legal Challenges to the Mt. Soledad Cross

In 1989, a private citizen sued the City in the United States District Court for the Southern District of California, alleging that the Cross's presence on City property violated the California and United States Constitutions. The court held that, in a case like this, "[w]here … the Latin cross appears as a permanent, salient symbol on public property and on a public

- 3 -

imprimatur, California's constitution will not permit it to continue to stand." *Murphy v. Bilbray*, 782 F. Supp. 1420, 1438 (S.D. Cal. 1991). The court ordered the City to remove the Cross and gave the City three months to comply. The Ninth Circuit upheld the district court's order, holding that the Cross is a "sectarian war memorial [that] carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1527-1528 (9th Cir. 1993), *cert. denied*, 513 U.S. 925 (1994).

In October 1994, following the Ninth Circuit's affirmance, the City made its first attempt to address the constitutional violation through a ballot initiative in which it urged voters to "SAVE THE CROSS ON MOUNT SOLEDAD." The initiative authorized a no-bid sale of a 222-square-foot parcel of land under the cross to the MSMA. The federal district court invalidated the sale, holding that its "primary purpose ... was to save the Mt. Soledad cross from removal and/or destruction," and that San Diego "clearly show[ed] a governmental preference for the Christian religion" by "tak[ing] the position of trying to 'save' such a preeminent Christian symbol." *Murphy v. Bilbray*, 1997 WL 754604, at *10 (S.D. Cal. Sept. 18, 1997). Following this decision, the MSMA sold the parcel back to the City.

The City then published a notice soliciting bids on approximately one-half acre in Mt. Soledad Nature Park "for the purpose of maintaining a historic war memorial." To achieve that purpose, bidders were required to explain their plans for "maintain[ing] a historic war memorial on the site." The City accepted the MSMA's bid. But the Ninth Circuit, sitting *en banc*, also held that this sale violated the California Constitution because it "was structured to provide a direct, immediate, and substantial financial advantage to bidders who had the sectarian purpose of preserving the cross." *Paulson v. City of San Diego*, 294 F.3d 1124, 1133 (9th Cir. 2002) (en banc), *cert. denied*, 538 U.S. 978 (2003).

- 4 -

After the Ninth Circuit's *en banc* decision, a dispute arose regarding the ownership of the Cross. On October 12, 2004, the district court ruled that the City (rather than the MSMA) owned the Cross and the land beneath it. At that time, the court admonished the parties to "[s]ettle this case! It's time to move the cross from public land to private land and comply with the laws of our great country instead of trying to find sneaky ways to get around them to pander to a certain group or to satisfy an out-of-state group's religious agenda." Several weeks of discussion led to a settlement agreement under which the Cross would be moved 1000 yards to a nearby church. The MSMA would maintain an interest in the Mt. Soledad property and the war memorial, and the Cross would be replaced with a nonsectarian symbol honoring all veterans.

Rather than accepting the settlement outright, the San Diego City Council attempted one last sale to the highest bidder, who would be permitted to decide what to do with the Cross. The Council voted to put "Proposition K," which would permit the sale, on the ballot over the objection of the MSMA and veterans' groups, and stated that the reason for their vote was to allow the Cross to remain on Mt. Soledad. *See Paulson v. Abdelnour*, No. GIC-849667, slip op. at 27-28 (Cal. App. Dep't Super. Ct. Oct. 7, 2005). One council member cited his membership in the "Jesus Christ fan club" as the reason for his vote. *Id.* at 27. The City's voters rejected Proposition K, however, and directed the City Attorney to enter into the settlement.

The City did not comply with the rejection of Proposition K. The Thomas More Law Center ("TMLC"), an advocacy group whose stated mission is the "promotion of the religious freedom of Christians" and the protection of "Christians and their beliefs in the public square," sought federal intervention to ensure the continued display the Cross on government land. The TMLC sent a letter to then-Rep. Randy "Duke" Cunningham, a Member of Congress representing the City, asking him to help override the referendum and the corresponding

- 5 -

settlement by declaring the Cross a national war memorial. The TMLC said that this was necessary because "religion and morality are the foundation of our country" and the Cross is "one of the most visible symbols of [our Christian faith]."

Less than a month later, then-Rep. Cunningham — with the assistance of Rep. Hunter — inserted a rider into the 2005 omnibus budget legislation. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447. The rider designated the Mt. Soledad Veterans Memorial a national veterans memorial, authorized the Department of the Interior to accept donation of the memorial from the City, and directed the National Park Service to agree to a memorandum of understanding with the MSMA for the maintenance and administration of the memorial. *Id.* § 116, 118 Stat. 2809, 3346 (codified at 16 U.S.C. § 431 note (2004)). Rep. Cunningham acknowledged that he was trying to "save the Cross" as a religious landmark, and the TMLC called his effort "an act of God." President Bush signed the budget bill that included the Cunningham rider on December 8, 2004.

Then-Rep. Cunningham, Rep. Hunter, and the TMLC then urged San Diego Mayor Dick Murphy to add to the City Council agenda the proposed donation of the Cross to the federal government. Before the City Council meeting, San Diego City Attorney Michael Aguirre formally opined that the donation would violate the California Constitution. Furthermore, he observed that, "based on current case law, such a transaction would also violate the federal Constitution … and provide fodder for additional legal proceedings against the City." On March 8, 2005, after a six-hour public hearing, the City Council voted against donating the Cross to the federal government based on the MSMA's request, the City Attorney's recommendation, and the recognition that the City had an obligation to enter into the settlement after Proposition K failed.

Undeterred, the TMLC began a petition and referendum drive through an affiliated group called "San Diegans for the Mt. Soledad National War Memorial." The effort used 75 paid contractors to collect signatures for a TMLC-drafted petition styled "You Can Save Our Cross." Sermons from the site of the Cross and Easter Sunday events urged civil disobedience to flout the court order and save the religious symbol.

The City Council considered the petition on May 17, 2005. Two Council members agreed to switch their votes and again send the issue — whether to donate the Cross to the federal government — to a public referendum as "Proposition A." After the City Council vote was announced, Cross supporters sang "Onward Christian Soldiers" in the council chamber. Proposition A passed. It was then struck down as unconstitutional in a California state court. *See Paulson v. Abdelnour*, No. GIC-849667.[1]

On May 4, 2006, the federal district court stated that it was "now time, and perhaps long overdue, for this Court to enforce its initial permanent injunction forbidding the presence of the Mount Soledad Cross on City property." *Paulson v. City of San Diego*, No. 89-0820GT, slip. op. at 1 (S.D. Cal. May 3, 2006). The court ordered the City to remove the Cross within 90 days or be fined $5000 per day. *See id.* The City sought a stay of that order pending appeal. The Ninth Circuit denied the stay. *See Order, Paulson v. City of San Diego*, 294 F.3d 1124 (2006). On July 7, 2006, Justice Kennedy, as Circuit Justice, granted a stay to preserve the status quo pending the appeal of the 90-day-order and appeal of the decision finding Proposition A unconstitutional.

---

[1]     In late 2006, California's Court of Appeal, Fourth Appellate District reversed this ruling on state constitutional grounds, permitting the City's transfer under Proposition A but refusing to opine on whether the federal taking or current display violates the California Constitution or the Establishment Clause. *See Paulson v. Abdelnour*, 51 Cal. Rptr. 3d 575 (Cal. Ct. App. 4th 2006).

*See San Diegans for the Mt. Soledad Nat'l War Memorial v. Paulson*, 126 S. Ct. 2856 (2006) (Kennedy, J.).

### Recent Federal Action

At the same time that the City worked in the courts to stave off the injunction ordering that the Cross be moved, it was lobbying the federal government to intervene. The City's new Mayor, Jerry Sanders, asked the President and the Congress to have the federal government acquire the Cross. Following Rep. Cunningham's resignation from Congress on November 28, 2005, Reps. Hunter, Bilbray, and Issa assumed leadership of the efforts to have the federal government take the Cross. On May 10, 2006 — just a week after the order enforcing the injunction — Rep. Hunter asked President Bush to "use the authority found in 40 U.S.C. 3113 to begin immediate condemnation proceedings" concerning the Cross. Soon thereafter, Rep. Hunter continued his lobbying of the Executive Branch. He scheduled a midair meeting with Vice President Cheney on a flight from California to Washington to discuss the Cross. Rep. Hunter's staff remained closely involved with the efforts of LiMandri and the American Family Association to lobby the White House to "take" the Cross. On May 22, 2006, members of Rep. Hunter's staff and Mayor Sanders met with senior White House officials about the Cross.

After Rep. Hunter's request that the President seize the land by eminent domain through executive order apparently was rebuffed, Reps. Hunter, Bilbray, and Issa began to pursue legislative measures to transfer the cross to federal control. Rep. Hunter introduced H.R. 5683, 109th Cong. (2nd Sess. 2006), the "Preservation of Mt. Soledad Veterans Memorial" ("Act"), on June 27, 2006, with Reps. Bilbray and Issa serving as consponsors. The bill sought to "effectuate the purpose" of Rep. Cunningham's earlier bill by "vest[ing] in the United States all right, title, and interest in and to, and the right to immediate possession of, the Mt. Soledad

Veterans Memorial in San Diego, California." *Id.* §2(a). Upon acquisition of the property by the United States, "the Secretary of Defense [would] manage the property and … enter into a memorandum of understanding with the [MSMA] for the continued maintenance of the Mt. Soledad Veterans Memorial by the Association." *Id.* § 2(c). A press release announcing the introduction of the bill described how Reps. Bilbray and Issa were joining Rep. Hunter in preventing "a self-proclaimed atheist" from successfully challenging the Cross. Rep. Issa was quoted as saying that the legislation was necessary to ensure the founder's vision of "a nation where freedom of worship would be respected, not a nation devoid of religious expression."

As part of their efforts to catalyze federal action to ensure the continued display of the Cross on government property, each Member spoke out publicly – and repeatedly – about the Cross. Rep. Hunter issued press statements about the Cross in March 2005, May 2005, June 2006, July 2006, and August 2006. Rep. Bilbray, after campaigning on a platform of saving the Cross during a special election in June 2006, issued press releases about the Cross later that month, and again in July and August 2006. Rep. Issa was quoted in the other Members' press releases, and issued his own in July 2006. In May 2006, Rep. Issa spoke at a service at the foot of the Cross.

The House passed the Act on July 19, 2006, and the Senate passed its equivalent on August 1, 2006. President Bush signed the Act into law on August 14, 2006. Reps. Hunter, Issa, and Bilbray joined the president at an Oval Office signing ceremony (along with TMLC counsel LiMandri), and spoke to the press outside the White House following the signing.

After the legislation was passed, the Members continued their involvement in issues relating to the Cross. The legislative directors from the offices of Reps. Hunter and Bilbray met with Defense Department employees in early October 2006 to discuss the Cross. Rep. Bilbray

held a press conference at the foot of the Cross in November 2006 to announce a series of meetings between the MSMA and representatives of the Navy concerning the operation and management of Mt. Soledad.

### The Present Court Challenge to the Federal Taking and Display of the Latin Cross

On August 24, 2006, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against the Secretary of Defense in his official capacity in the United States District Court for the Southern District of California. *See* Exhibit A. The Complaint challenges the taking and continued display of the Cross on federal property as a violation of the Establishment Clause. It requests permanent relief enjoining the continued display of the Cross on federal land.

In light of the Members' numerous non-legislative activities regarding the Cross, Plaintiffs served subpoenas for production of documents on the Members on March 26, 2007. *See* Exhibit B. Accompanying the subpoenas were requests for documents relating to four general categories: the Members' public statements about the Cross; the Members' communications with interest groups about the Cross; the Members' communications with the Executive Branch about the Cross; and the Members' communications with the City about the Cross.

Plaintiffs drafted their document requests narrowly to avoid any infringement on the Members' constitutional privileges and any undue burden on the Members. In particular, the requests explicitly exclude "any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived." The instructions to the subpoena clearly state:

> These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause. If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you

are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

On April 9, 2007, each Member objected to Plaintiffs' requests on a number of grounds: relevance, overbreadth, vagueness, cumulativeness, duplicativeness, burdensomeness, and privilege under the Speech or Debate Clause of the Constitution. *See* Exhibit C. The Members did not provide the requested list of documents for which Speech or Debate Clause privilege was claimed. Plaintiffs asked counsel for the Members whether these objections meant that the Members would be withholding some documents, or whether the Members would refuse to produce any documents. Members' counsel confirmed that the Members refused to produce any responsive documents. *See* Exhibit D. Pursuant to LCvR 7(m), Plaintiffs conferred with the Members in a good-faith effort to resolve the objections or narrow the range of disagreements, but were unable to reach agreement with the Members.

## I.    THE REQUESTED DOCUMENTS ARE RELEVANT TO THE CLAIM IN THE PRESENT ACTION

As this Court has observed, refusing to require compliance with a subpoena "is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005). Members of Congress are not immune from judicial process such as subpoenas, and accordingly cannot issue blanket refusals to produce discoverable information. *See Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992); *Gravel v. United States*, 408 U.S. 606, 614-615 (1972); *United States v. Cooper*, 4 U.S. 341, (4 Dall. 341) 859 (1800). While some documents in the hands of Members may be privileged by virtue of the Speech or Debate Clause, that privilege covers only documents that reflect "legislative acts." *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421

- 11 -

(D.C. Cir. 1995). If a document is not protected from disclosure by that constitutional privilege, then a Member must produce it in response to a subpoena, just like any other citizen.

The Members object to Plaintiffs' discovery requests on the grounds that the items requested are not relevant under Federal Rule of Civil Procedure 26 or House Rule VIII. This objection has no merit, and serves solely to conceal the potentially crucial documents the Members possess. The requested documents go to the core legal inquiries in this case: the purpose of federal actions regarding the Cross, the effect of those actions, and the degree of entanglement between governmental and religious institutions. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971). The Members are likely to possess documents that could be highly relevant, or even determinative, of the Establishment Clause inquiry – and for the reasons discussed below, they have no basis for refusing to produce those documents to Plaintiffs.

## A.    The Standard of Relevance for Discovery Is Broad and Liberally Construed.

When determining whether to require a non-party to comply with a subpoena, courts first determine whether the information sought is "relevant to the claim or defense of any party" pursuant to Fed. R. Civ. P. 26. *See* Fed. R. Civ. P. 26(b)(1) ("[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ."); *see also Heat & Control, Inc. v. Hester Indus. Inc.,* 785 F.2d 1017, 1023-1024 (Fed. Cir. 1986) (noting that "rule 45(b)(1) must be read in light of Rule 26(b)"); *Exxon Shipping Co. v. United States Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (applying Rule 26 and Rule 45 standards to rule on a motion to quash a subpoena).

Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978); *see also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) (pretrial discovery is "to be accorded a broad and liberal treatment");

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 2007 WL 1020785, *4 (D.D.C. Mar. 29, 2007) ("The term relevance at the discovery stage is a broadly construed term and is given very liberal treatment.").

Moreover, this already lenient relevancy requirement is even more relaxed where − as here − an order to force compliance with a subpoena is sought from a court located outside the forum in which the underlying lawsuit is being litigated. As this Court has explained, "[a] court with jurisdiction over a discovery dispute for an action pending in a different district generally has limited exposure to and understanding of the primary action. A court in such a situation should hence be cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery." *Flanagan,* 231 F.R.D. at 103 (citations omitted).

### B.    The Requested Documents Are Crucial to the Establishment Clause Inquiry.

Plaintiffs are entitled to compliance with the subpoenas because the requested documents unquestionably "bear[] on, or . . . reasonably could lead to other matter that could bear on, any issue that is or may be" at issue in a case involving the constitutionality of the federal government's display of the Cross under the Establishment Clause. *Oppenheimer Fund,* 437 U.S. at 351. The issue in this case is whether the United States' taking and continued display of a Latin cross on Mt. Soledad, now federal property, violates the Establishment Clause. The Supreme Court has directed lower courts to ask three questions in Establishment Clause cases: whether the government action at issue has a secular legislative purpose; whether its primary effect is one that advances or inhibits religion; and whether it fosters government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. at 612-613. Plaintiffs have asked the Members for documents that bear on, or reasonably could lead to other matters that bear on, each of these questions.

1.    **The Requested Documents Bear on the Purpose of the Display of the Cross.**

As the Supreme Court has repeatedly held, documents relating to the non-legislative conduct of legislative sponsors may be highly relevant to proving the government's religious purpose. *See McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 863-66 (2005); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000); *Edwards v. Aguillard*, 482 U.S. 578, 594-595 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 56-58 (1985). While a statute's text, legislative history, and implementation can help show its purpose, the cases make clear that overall historical context and the sequence of events leading to the official act also bear on and illuminate purpose. *See McCreary*, 545 U.S. at 862; *see also Edwards*, 482 U.S. at 594-595 (proper purpose inquiry considers, in addition to "the statute's words" and "contemporaneous legislative history," its "context," "the historical context of the statute," and "the specific sequence of events leading to passage of the statute").

The Members were deeply involved in – and helped develop – "the historical context" surrounding the Act, and the requested documents are relevant to "the specific sequence of events leading to passage of the statute." For example, before legislation was even introduced, Rep. Hunter lobbied the Mayor of San Diego and the White House to take action that would perpetuate the display of the Cross on government property. Before legislation was introduced (and before he was even elected), Rep. Bilbray campaigned throughout San Diego about the need for federal action to take the Cross. And before legislation was introduced, Rep. Issa spoke at a service at the foot of the Cross. All of these actions bear on the historical context and the specific sequence of events leading to passage of the statute, and accordingly are explicitly relevant to the *Lemon* test's purpose inquiry. *See McCreary*, 545 U.S. at 862; *Edwards*, 482 U.S. at 594-95.

- 14 -

These documents are particularly vital where, as here, the Members appear to have managed their message carefully, speaking in code about the threats to the "war memorial" when only the Cross on top of the Mt. Soledad memorial has been the subject of litigation. "While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere, and not a sham." *Edwards*, 482 U.S. at 586-87; *see also Santa Fe Independent School Dist.*, 530 U.S. at 308 ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.'") (quoting *Wallace*, 472 U.S. at 75). Plaintiffs therefore are entitled to probe behind the press releases and public events to determine to what extent (if any), the Members may have sought to conceal or display the religious intent of their actions.

**2.    The Requested Documents Bear on the Effect of the Display of the Cross.**

The documents sought are also relevant because they bear on whether the acquisition and display of the Cross has an impermissible religious effect. *See Allegheny County v. ACLU*, 492 U.S. 573, 597 (1989) (under "effect" prong of *Lemon*, court must determine "whether the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices") (citation omitted). Determining the effect of a display "depends upon the message that the government's practice communicates," and this "inquiry, of necessity, turns upon the context in which the contested object appears . . . ." *Id.* at 595.

The Members' documents are crucial to the "effect" inquiry because the Members have been the leaders in crafting public messages about the Cross. The "reasonable observer" from whose perspective the effects of government action must be judged — "informed as well as

reasonable[,] . . . familiar with the history of the government practice at issue," *Kreisner v. City of San Diego*, 1 F.3d 775, 784 (9th Cir. 1993) — is likely to have her perception whether government action is an endorsement shaped by the public statements of the government officials who brought about the action. Therefore, "whether the challenged government action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices," *id.* at 597 (quoting *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985)), to a large degree depends upon how the Members communicated to adherents and nonadherents about those actions. With repeated press conferences, media interviews, constituent letters, fundraising appeals, and campaign literature, the Members provided the public with messages that informed their views of what the government was doing with regard to the Cross.

In *McCreary*, for example, the Court noted that a reasonable observer would understand a religious message in the fact that the Ten Commandments dedication by a local official included remarks by a pastor. *See McCreary*, 545 U.S. at 869. Similarly, the effect of the display of the Cross is influenced by the association between the Members trying to ensure its continued display and religious figures and organizations. If the Members chose to associate themselves with religious figures or to invoke religious language in their support for the Cross, those actions and words bear on the reasonable observer's perception of their actions inside the Congress.

In *Allegheny County*, the Court took into account events held at the religious site in determining the display's effect. *See Allegheny County*, 492 U.S. at 599. Similarly, events — press conferences, religious services, and memorials — at which the Members spoke at or about the Cross are relevant to the message sent by display of the Cross. As governmental and community leaders who repeatedly opined on the meaning of the Cross, the Members' actions

- 16 -

and words are without doubt part of the context that determines "the message that the government's practice communicates." *Id.* at 595.

### 3.    The Requested Documents Bear on the Degree of Government Entanglement with Religion.

The documents Plaintiffs seek are further relevant because they may demonstrate an excessive government entanglement with religion.  *See Lemon*, 403 U.S. at 612-613 (to withstand Establishment Clause challenge, "statute must not foster 'an excessive government entanglement with religion'") (citations omitted); *see also Lynch v. Donnelly*, 465 U.S. 668, 687-688 (1984) (O'Connor, J., concurring) ("[E]xcessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to government or governmental powers not fully shared by nonadherents of the religion, and foster the creation of political constituencies defined along religious lines.").  For instance, Plaintiffs' Request No. 3 asks for documents relating to the Members' contacts with numerous interest groups with religious affiliations, and Plaintiffs' Request No. 5 will determine whether the Members have assisted religious organizations in establishing contacts within the Executive Branch in a manner that demonstrates government entanglement with religious institutions.

### C.    The Members Have No Valid Basis for Claiming That the Requested Documents Are Irrelevant to the Establishment Clause Inquiry.

The Members' only asserted basis for claiming that the documents requested by Plaintiffs are irrelevant is a decision by a magistrate judge in a case consolidated with Plaintiffs'.  In that decision, the magistrate judge denied an effort by a plaintiff to depose Rep. Hunter regarding his legislative purpose in passing H.R. 5683.  *See* Exhibit E (the "Hunter Deposition Decision").[2] The discovery request at issue in the Hunter Deposition Decision sought different *information*

---

[2]       Plaintiffs did not join that motion.

for a different *purpose* through different *means*.   Before the hearing on the motion to compel the
Hunter deposition, Plaintiffs informed the court of their subpoena requests of the Members
pending before this Court, and the court did not express any disapproval of those requests in the
Hunter Deposition Decision.

In the Hunter Deposition Decision, at 7, Magistrate Judge McCurine described the issue
before him as "whether a party is entitled to, or needs, to depose the sponsors of the state [sic]
statute being challenged as violative of the Establishment Clause." He found that Establishment
Clause jurisprudence usually focused on official legislative records to determine purpose, such
that those plaintiffs did not need to depose Rep. Hunter regarding his purpose.[3]  The issue before
the magistrate judge was different from the issue before this Court in three critical ways:

- In that case, the plaintiff sought to depose Rep. Hunter to ask him about a single topic:
  the purpose of H.R. 5683.  In this case, Plaintiffs seek *different information*: documents
  that establish, *inter alia*, the historical context, sequence of events leading to the bill's
  passage, messages communicated to the public, and the involvement of religious

---

[3]      Moreover, the Hunter Deposition Decision rested on a misunderstanding of Supreme
Court precedent.  Key to the court's conclusion that Supreme Court Establishment Clause cases
look only to the "legislative record, the events leading up to the passage of the challenged
statute[,] and the statute's plain language" was its reading of *Wallace v. Jaffree*, 472 U.S. 38
(1985).  In *Wallace v. Jaffree*, the Supreme Court relied on the district court testimony of a
statute's lead sponsor as evidence of the statute's purpose.  *Id.* at 58.  The magistrate judge
appears to have incorrectly understood that fact when he wrote:

> [*Wallace v. Jaffree*]  indicates, without stating or clarifying, that Sen. Holmes presented
> "testimony". It is unclear from the case whether the senator's testimony was given in a
> legislative session, in the District Court, or some other setting. *Id.* at 58. There is nothing
> in the Court's opinion which indicates, or lends support to the notion, that the sponsor's
> *testimony* was compelled by court process or necessary for the Court's conclusion.

But *Wallace v. Jaffree* is clear that the sponsor's testimony was taken in court.  *See Wallace*, 472
U.S. at 43 (bill's "prime sponsor" testified before district court during "an evidentiary hearing on
appellees' motion for a preliminary injunction"); *id.* at 57 (bill's sponsor testified before district
court about purpose of bill).  And the Supreme Court relied on this testimony as evidence of
whether the bill had a secular legislative purpose.  *See id.* (quoting sponsor's district court
testimony).

organizations in the federal actions at issue. The documents sought here touch on many of the factual determinations essential to the legal inquiry under the Establishment Clause, not merely on the subjective purpose of one legislative sponsor.

- In that case, the plaintiff admittedly sought to depose Rep. Hunter only to obtain information relevant to the purpose inquiry of the *Lemon* test. Plaintiffs here seek to obtain information relevant to every facet of the Establishment Clause analysis. Furthermore, unlike the plaintiff in the Hunter Deposition Decision, Plaintiffs seek the Members' documents to establish the historical context and the sequence of events leading to passage of the bill, which the Supreme Court has explicitly stated are relevant to the purpose inquiry.

- In that case, the plaintiff sought oral testimony through the deposition of Rep. Hunter. Plaintiffs here have chosen to employ written document requests, which are far less burdensome and provide the Members easier means of asserting constitutional privilege. *See, e.g., Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C. 1998) (rather than a deposition, "any required further inquiry should be done through less burdensome means such as interrogatories and requests for production"); Hunter Deposition Decision, at 10 (refusing to grant deposition, in part, for failure to demonstrate that "anticipated testimony is unavailable through other sources or *less burdensome avenues like written discovery*") (emphasis added).

Plaintiffs have asked the Members, who have long asserted the importance of their actions in the battle to "save the Cross," to produce documents in their possession that bear on all aspects of the Establishment Clause inquiry at the heart of this case. The Members' meetings with the Vice President, press conferences steps from the Oval Office after the signing ceremony, intense lobbying of the City, and regular consultations with Christian activists all bear testament to their influence over the fate of the Cross. Their assertion that their role in the Cross's recent history is not relevant to the Establishment Clause inquiry in this litigation is meritless.

## II.    THE SPEECH OR DEBATE CLAUSE DOES NOT BAR PLAINTIFFS' REQUESTS.

The Members have also objected to Plaintiffs' requests on the ground that "[s]ome of the discovery sought...is privileged under the Speech or Debate Clause of the Constitution," *see* Ex. C, but they have failed to identify *which* discovery sought is privileged, and have instead chosen

to withhold *all* discovery. The Members' Speech or Debate Clause argument is misplaced, however, because none of the materials Plaintiffs seek reflect legislative matters. The Members should not be allowed to use the Clause as a shield from legitimate inquiry into non-legislative activities.

The Speech or Debate Clause states that "for any Speech or Debate in either House, [the senators and representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Though the term "Speech or Debate in either House" has been broadened to encompass other legislative acts, the Supreme Court's cases "make perfectly apparent . . . that everything a Member of Congress may regularly do is not a legislative act within the protection of the [Clause]." *Doe v. McMillan*, 412 U.S. 306, 313 (1973). The Clause provides members of Congress with immunity from civil and criminal suits relating to their legislative acts. *See, e.g., United States v. Helstoski*, 442 U.S. 477 (1979) (criminal); *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) (civil). More importantly for these purposes, the Clause also establishes a privilege against oral testimony and the production of documents under certain circumstances. *See Gravel*, 408 U.S. at 622; *Brown & Williamson Tobacco Corp.*, 62 F.3d at 421.

However, the Clause's scope is confined to the "legislative sphere," *Gravel*, 408 U.S. at 624-625, and covers only "purely legislative acts." *United States v. Brewster*, 408 U.S. 501, 512 (1972). The Clause does not transform Members of Congress into supercitizens untouchable by ordinary judicial processes, nor does it make all the Members' official actions "legislative" in nature. These subpoenas in no way request documents that relate to "legislative acts," and as a result, the Members may not claim Speech or Debate Clause protection from them.

- 20 -

A.    **Plaintiffs Only Request Documents Pertaining to Non-legislative Acts, Which Are Not Covered by the Clause.**

As the Supreme Court has emphasized, "legislative acts" of the sort covered by the Speech or Debate Clause "are not all-encompassing." *Gravel*, 408 U.S. at 625. Rather, they are limited to those "things generally done in a session of the House by one of its members in relation to the business before it." *Brewster*, 408 U.S. at 512 (citing *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)). Beyond "the heart of the Clause," which "is speech or debate in either House," the Clause can only be construed to reach matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625; *see also United States v. McDade*, 28 F.3d 283, 299 (3d Cir. 1994) (Alito, J.) (Members' conduct that is a "necessary precondition for the performance of [legislative] acts" is not necessarily "integral" to the legislative process). None of the categories of documents requested in these subpoenas reflect "legislative acts" under this standard.

1)    **Communications With the Press and Public Are Not Exempt From Discovery**

Plaintiffs' Request Nos. 1 and 2 ask for documents describing contacts with news organizations or reporters concerning Mt. Soledad. In *Brewster*, the Supreme Court made clear that press relations do not constitute "legislative activity." *Brewster*, 408 U.S. at 512. The Court recognized "that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause," such as "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." *Id.* These activities are "entirely legitimate," but are "political in nature rather than legislative," such

- 21 -

that "*it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause.*" *Id.* (emphasis added). Accordingly, the Members cannot seriously contend today that documents related to press relations — an indisputably "political" activity — are protected by the Clause.

Similarly, Request No. 4 asks for documents regarding "speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials" about the Mt. Soledad Cross. As noted above, "speeches delivered outside the Congress," "news releases," and "'news letters to constituents'" are not protected by the Clause. *Brewster*, 408 U.S. at 512. More generally, "the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process. As a result, transmittal of such information by press releases and newsletters is not protected by the Speech or Debate Clause." *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979); *see also McSurely v. McClellan*, 553 F.2d 1277, 1297 (D.C. Cir. 1976) (Members "not immune from inquiry as to dissemination of [documents in their possession] to individuals or agencies outside of Congress"). Similarly, "fundraising" is not a "legislative act," *cf. United States v. Rose*, 28 F.3d 181, 188-189 (D.C. Cir. 1994); *FEC v. Wright*, 777 F. Supp. 525, 529 (N.D. Tex. 1991), and "political campaign materials" are by definition "political" rather than "legislative."

### 2) Communications With Interest Groups Are Not Exempt from Discovery

The Members' assertion that all documents within Request No. 3 – documents reflecting communications between the Members and outside religious or activist groups concerning the Cross – are protected by the Clause is plainly wrong. As explained above, "it has never been seriously contended" that "preparing so-called 'news letters' to constituents, news releases, and

- 22 -

speeches delivered outside the Congress" are protected by the Clause. *Brewster*, 408 U.S. at 512; *see also Hutchinson*, 443 U.S. at 133; *McSurely*, 553 F.2d at 1297 (holding that Members are "not immune from inquiry as to dissemination of [documents in their possession] to individuals or agencies outside of Congress"). Public communications, even those that directly address federal legislation, are not covered by the Clause. *See, e.g., Hutchinson*, 443 U.S. at 116-117.

Of course, members of Congress regularly meet and strategize with special interest groups, their leaders, and their actual members. But merely because "[Members] generally perform certain acts in their official capacity as [Members] does not necessarily make all such acts legislative in nature." *Gravel*, 408 U.S. at 625. For any document reflecting a communication with an interest group to be covered by the Clause, it must reflect "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings...." *Id.* For a part to be "integral," it must be *necessary* to make the whole complete. It is not enough that the action is merely "related to" the legislative process; it must be "clearly a part of the legislative process — the due functioning of the process." *Brewster*, 408 U.S. at 515-516. By these standards, communications with activist groups, their lobbyists, and their leaders cannot be covered by the Clause, as these communications are at the periphery of the legislative process. This is particularly true where, as here, many of the communications were initiated by the interest groups, rather than the Members. As this Court has held, discovery "that seek[s] to elicit information about contacts or communications initiated by noncongressional sources, including [discovery] about any discussions that ensued between the source and a congressional staff member, are proper and shall be answered." *Tavoulareas v. Piro*, 527 F. Supp. 676, 681 (D.D.C. 1981).

Activist groups undoubtedly contribute to the political process, but their activities — and their interactions with legislators — certainly cannot be said to be "integral" to the legislative process as a categorical matter.  The constitutional process for enacting legislation neither requires nor depends on the involvement of special interest organizations.  At most, the Members can claim that communications with constituents or outside activist groups about the Cross are steps taken in preparation for the Members' legislative activities, by informing their judgment about which legislation to introduce, how to vote, or how they might persuade other Members to support their legislation.  But the Supreme Court warned in *Gravel* that the Clause does not protect activities that merely prepare for, but are not themselves part of, the legislative process: "While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law *in preparing for* or implementing legislative acts." *Gravel*, 408 U.S. at 626 (emphasis added).  Any assertion that a run-of-the-mill constituent letter or a strategy session with outside activists is "integral" to the Members' participation in House proceedings defies common sense and constitutional principles.  Such a position, if accepted, would render virtually *all* of a Members' official duties "legislative" in nature, a position that cannot be squared with the Supreme Court's depiction of the scope of the Clause.  *See Brewster*, 408 U.S. at 512.

### 3) Communications With the Executive Branch Are Not Exempt From Discovery

Plaintiffs' Request Nos. 5 through 7 each asks for documents reflecting the Members' communications with the Executive Branch.  Request No. 5 asks for documents relating to the arrangement, scheduling, or coordination of Executive Branch meetings regarding the Cross.  In *Brewster*, the Supreme Court held that "the making of appointments with Government agencies"

- 24 -

is a "political matter[]" beyond "the protection afforded by the Speech or Debate Clause." 408

U.S. at 512. Request No. 5 squarely asks for documentation of these "political matters," which

are not protected by the Clause. *See McSurely*, 553 F.2d at 1285-1286 ("Even though Members

of Congress or their aides frequently intercede on behalf of constituents with agencies of the

Executive Branch . . ., such conduct falls outside of legislative immunity." (footnotes omitted)).

Plaintiffs' Request No. 6 asks for "documents concerning or relating to your contacts,

communications, discussions, or interactions with the any person in the Executive Branch of the

United States Government regarding the administration or implementation of H.R. 5683."

Again, the Supreme Court has denied Speech or Debate Clause protection to these non-

legislative acts. In *Gravel*, the Court explained that merely because "Senators generally perform

certain acts in their official capacity as Senators does not necessarily make all such acts

legislative in nature." 408 U.S. at 625. As its prime example, the Court noted that "Members of

Congress are constantly in touch with the Executive Branch of the Government and with

administrative agencies — they may cajole, and exhort with respect to the administration of a

federal statute — but such conduct, though generally done, is not protected legislative activity."

*Id.* As support for this point, the Court cited *United States v. Johnson*, 383 U.S. 169 (1966),

which "decided at least this much," *Gravel*, 408 U.S. at 625, when it determined that it did not

"think that it could be successfully contended … that the Speech or Debate Clause reaches

conduct, such as was involved in the attempt to influence the Department of Justice, that is in no

wise related to the due functioning of the legislative process." *Johnson*, 383 U.S. at 172.

Plaintiffs' Request No. 7 similarly asks for "documents concerning or relating to your

contacts, communications, discussions, or interactions with any person in the Executive Branch

of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross." As

noted above, the frequency with which Members communicate with the Executive Branch does not transform *ipso facto* those communications into "legislative" conduct. "Members of Congress may frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct 'though generally done, is not protected legislative activity." *Doe v. McMillan*, 412 U.S. at 313 (quoting *Gravel*, 408 U.S. at 625); *Johnson*, 383 U.S. at 172; *see also Brewster*, 408 U.S. at 512; *Chastain v. Sundquist*, 833 F.2d 311, 314-315 (D.C. Cir. 1987) (Member of Congress' letters to Attorney General not covered by Clause); *United States v. Eilberg*, 465 F. Supp. 1080, 1084 (E.D. Pa. 1979) ("legislator-to-executive contact" not protected by Speech or Debate Clause). Under our system of separation of powers, the Executive Branch cannot be considered an "integral part" of the means by which Members fulfill their constitutional duty to enact legislation.

Indeed, any attempt to assert the Speech or Debate Clause as a means of shielding contact with the Executive Branch would be strange, given the Clause's historical origins as a bulwark against infringement upon legislative prerogatives *by the Executive Branch*. *See Gravel*, 408 U.S. at 616 ("The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch."). The Clause accordingly exists in large measure to maintain the separation of the Executive and Legislative branches. To invoke the Clause in a manner that undermines this separation would subvert the Clause's purpose and origins.

### 4) Communications With the City Are Not Exempt

Plaintiffs' Request Nos. 8 and 9 ask for documents regarding communications with the City about "the administration or implementation of H.R. 5683" or "Mt. Soledad or the Mt. Soledad Latin Cross." The Supreme Court has not squarely addressed the issue whether contacts between a Member and a municipal government constitute "Speech or Debate," but the cases

- 26 -

regarding contacts with the Executive Branch of the federal government effectively settle the issue. If Members' attempts to influence the Executive Branch are "in no wise related to the due functioning of the legislative process," *Johnson*, 383 U.S. at 172, then Members' attempts to influence a local government cannot reasonably be considered part of the legislative process either. The full range of the Members' interactions with the City, whether couched as lobbying, coordination, or fact-finding, are peripheral enough that they cannot be considered "integral" to the communicative and deliberative process by which Members participate in House proceedings.

**B.    The Members' Speech or Debate Clause Objections Are Legally Untenable and Overbroad.**

The Members claim that three blanket categories of requested documents are specifically protected by the Clause, but none of these categorical assertions is valid. First, the Members claim that the Clause protects "documents reflecting communications with constituents and other members of the public regarding legislation that concerned the Mt. Soledad issue," presumably with respect to Plaintiffs' Request No. 3, which seeks documents demonstrating communications between the Members and outside religious or activist groups concerning the Cross. The Members' categorical statement that *all* documents within this category are protected is plainly wrong. *See* Part II.B.1(b), *supra*. To be protected, such a document must reflect "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . ." *Gravel*, 408 U.S. at 625. Communications with constituents and representatives of interest groups, while perhaps related to the legislative process, are not integral to it.

Second, the Members also err when they claim categorical protection for "[d]ocuments, mostly in the form of emails, reflecting communications between members of the

Congressman's staff and other congressional offices, both House and Senate, regarding legislation that concerned the Mt. Soledad issue." To begin, it is unclear to which of Plaintiffs' requests this objection refers. Plaintiffs have not sought (and recognize that they are not entitled to) intralegislative communications regarding the drafting, proposal, discussion, or negotiation of legislation. But to the extent that Members' offices communicate regarding non-legislative matters (*e.g.*, the talking points for a press conference discussing the Cross, or a strategy for cajoling the Defense Department to continue the display of the Cross), those communications are not privileged by the Clause and must be disclosed.

Finally, the Members claim protection for "[d]ocuments the Congressm[e]n collected to inform [themselves] about the Mt. Soledad issue for the purpose of formulating legislation or otherwise carrying out [their] legislative responsibilities." Again, it is unclear which of Plaintiffs' requests would cover these sorts of documents. The Members' asserted claim could immunize all sorts of information merely related to but not integral to the legislative process. In *Brewster*, the Court stated that it had never "treated the Clause as protecting all conduct relating to the legislative process. In every case thus far before th[e] Court, the Speech or Debate Clause ha[d] been limited to an act which was clearly a part of the legislative process – the due functioning of the process." *Brewster*, 408 U.S. at 515-516 (footnotes omitted). Collecting documents with an eye toward future legislation is "related to" the legislative process, but as the *Brewster* Court stated, "we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process." *Id.* at 516. Declining "to make Members of Congress super-citizens," the Court emphasized that an act must be "clearly a part of . . . the due functioning of the process" to be protected. *Id.* This Court

should not indulge the Members' attempt to claim "super-citizen" status by refusing to respond to Plaintiffs' requests on this basis.

## III. THE MEMBERS' REMAINING BOILERPLATE OBJECTIONS HAVE NO BASIS.

In addition to their relevance and Speech or Debate Clause arguments, the Members offer a laundry list of other objections to Plaintiffs' requests, each of which is without merit.

### A. The Members' Objection on Grounds of Vagueness and Overbreadth Are Themselves Vague and Overbroad.

The Members assert without explanation that Plaintiffs' requests are "unreasonably vague and overbroad." Yet the Members do not describe which terms they believe to be vague, nor which requests they believe to be overbroad. Even if Plaintiffs' requests were overbroad, this would be no cause for outright refusal to comply with the subpoena. *See Heat & Control, Inc.*, 785 F.2d at 1024 ("When a court is confronted with a motion to quash, its duty is not to deny discovery altogether, but to reduce the demand to a reasonable level, considering the parties' concerns."). In the absence of any identification of which definitions or instructions trouble the Members, Plaintiffs cannot meaningfully respond to the objection, which should, accordingly, be rejected.

### B. The Members Have Failed To Identify Which Requests Are "Unreasonably Cumulative and Duplicative."

The Members again assert without explanation that Plaintiffs' requests are "unreasonably cumulative and duplicative." Yet the Members do not identify which requests they believe to duplicate other requests, or which materials Plaintiffs request have already been collected. The Members are likely to have crucial, unique documents that go directly to the Establishment Clause analysis. Such documents cannot be fairly characterized as duplicative or cumulative.

- 29 -

**C.    The Members Have Not Demonstrated That the Requested Documents Are Obtainable From Other Sources.**

The Members again assert without explanation that Plaintiffs' requests are "obtainable from other sources that are more convenient and less burdensome."  As examples of other sources, they cite the Members' official websites and the Federal Election Commission's disclosure website.  The limited information provided on these public websites can neither answer Plaintiffs' inquiries nor provide the court deciding this case with the facts necessary to analyze the Establishment Clause issues surrounding the Cross.  To the extent that the Members claim that the requested documents are publicly available, they are required to identify which documents are publicly available and where they can be found.  The Members have failed to do so.

## CONCLUSION

Plaintiffs' requests are reasonable, and narrowly crafted, to uncover information essential to each facet of the Establishment Clause inquiry — an inquiry that will be dispositive of their litigation in the federal court in San Diego. Plaintiffs have made every effort to protect the Members' constitutional privilege while discovering this critical information. The Plaintiffs therefore ask this Court to order the Members to comply with the Plaintiffs' requests.

Respectfully submitted,

T. Jeremy Gunn (Bar No. 417222)
Daniel L. Mach (Bar No. 461652)
ACLU PROGRAM ON FREEDOM OF
    RELIGION AND BELIEF
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St., N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 675-2330
Facsimile: (202) 546-0738

A. Stephen Hut, Jr. (Bar No. 192856)
Jonathan H. Siegelbaum (Bar No. 474837)
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs Jewish War Veterans of the United States of America, Inc., David A. Smith, Mina Sagheb, and Judith M. Coleman*

May 23, 2007

- 31 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, <br><br> c/o Jonathan H. Siegelbaum <br> 1875 Pennsylvania Ave. NW <br> Washington, DC 20006 <br><br>             Plaintiffs, <br><br> v. <br><br> ROBERT M. GATES, <br> Secretary of Defense, in his official capacity, <br><br> c/o Heide L. Herrmann, Esq. <br> U.S. Department of Justice <br> P.O. Box 663 <br> Washington, DC 20044-0663 <br><br>             Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENA**

**EXHIBITS TO THE MEMORANDUM**

PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENAS

# EXHIBIT A

1   David Blair-Loy  SBN 229235
    ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
2   P.O. Box 87131
    San Diego, CA  92138-7131
3   Telephone:  (619) 232-2121
    Facsimile:  (619) 232-0036
4
    Daniel Mach
5   T. Jeremy Gunn
    ACLU PROGRAM ON FREEDOM OF RELIGION AND BELIEF
6   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
7   915 15th St., N.W., Suite 600
    Washington, D.C.  20005
8   Telephone:  (202) 675-2330
    Facsimile: (202) 546-0738
9   [pro hac vice applications to be filed]

10  A. Stephen Hut, Jr.
    Jonathan H. Siegelbaum
11  Ryan P. Phair
    WILMER CUTLER PICKERING HALE & DORR LLP
12  1875 Pennsylvania Ave., N.W.
    Washington, D.C.  20006
13  Telephone: (202) 663-6000
    Facsimile: (202) 663-6363
14  [pro hac vice applications to be filed]

15
    Attorneys for Plaintiffs
16
                IN THE UNITED STATES DISTRICT COURT
17        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

18  JEWISH WAR VETERANS OF THE UNITED         )   CASE NO.
    STATES OF AMERICA, INC., RICHARD A.       )
19  SMITH, MINA SAGHEB, and JUDITH M.         )   06CV 1728    JAH NLS
    COPELAND,                                 )
20                                            )
                         Plaintiffs,          )   COMPLAINT FOR
21                                            )   DECLARATORY AND
                      v.                      )   INJUNCTIVE AND RELIEF
22                                            )
    DONALD H. RUMSFELD, Secretary of Defense, )   [ESTABLISHMENT CLAUSE OF
23  in his official capacity,                 )   THE FIRST AMENDMENT TO
                                              )   THE UNITED STATES
24                                            )   CONSTITUTION]
                         Defendant.           )
25                                            )
                                              )
26                                            )

27

28
                                   1

# INTRODUCTION

1.   This is an action for declaratory and injunctive relief challenging the continuing display of a 43-foot Latin cross on government property on Mt. Soledad, San Diego, on the ground that it violates the Establishment Clause of the First Amendment to the United States Constitution.

2.   Religious symbols, including those prominently displayed, are an important and constitutionally protected form of religious expression in the American public sphere.   The First Amendment guarantees that houses of worship, homes and businesses may erect religious symbols and display them visibly to the public.  But there is a dramatic difference between constitutionally protected religious expression by private individuals, families, and religious communities and the constitutionally prohibited use of governmental power, authority, financing, and property to promote the religious expression of some American citizens to the exclusion of others.

3.   There has long been a perfectly satisfactory and constitutional remedy to the unconstitutional display of the Latin cross on Mt. Soledad:  moving it to a non-governmental site.  For decades, however, many supporters of the Latin cross have rejected reasonable efforts to resolve the constitutional dispute, sometimes with the explicitly articulated purpose of promoting sectarian religious symbols, and at other times with thinly veiled attempts to suggest that the Latin cross is simply a monument to honor veterans.

4.   Most recently, in a transparent effort to evade a long series of unfavorable decisions by the federal and California state courts invalidating the City of San Diego's display of the Mt. Soledad cross, the United States obtained title to the Latin cross and its surrounding property through a legislative taking.  H.R. 5683, 109th Cong. (2006).  The federal acquisition of the Latin cross, however, does nothing to cure the ongoing constitutional violation.  When any

2

government entity – federal, state, or local – uses taxpayer funds to acquire and prominently display a religious symbol that is sacred to some, but not all, religious believers, it disregards the religious diversity in our society and violates the fundamental right to religious liberty guaranteed by the First Amendment.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiffs seek to redress the violation by Defendant under the First Amendment to the United States Constitution.

6.   Venue is appropriate in this District under 28 U.S.C. §1391(e), because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of California.

## PARTIES

7.   Plaintiff Jewish War Veterans of the United States, Inc. ("JWV"), organized in 1896 by Jewish Veterans of the Civil War, is the oldest active national veterans' service association in America.  JWV is a federally chartered patriotic organization which has among its purposes a continuing commitment to maintain true allegiance to the United States of America; to foster and perpetuate true Americanism; to uphold the fair name of Jews and fight their battles wherever unjustly assailed; to encourage the doctrine of universal liberty, equal rights, and full justice to all men and women; to combat the powers of bigotry and darkness wherever originating and whatever the target; and to preserve the memories and records of patriotic service performed by the men and women of the Jewish faith and honor their memory.  In furtherance of its organizational purposes, JWV engages in extensive advocacy in support of religious liberty.  As part of that advocacy, JWV has publicly opposed the government's display of the Latin cross, both on Mt. Soledad and elsewhere.  *See, e.g., Jewish War Veterans of the United States v.*

3

*United States*, 695 F. Supp. 3 (D.D.C. 1988). JWV is a membership organization with tens of thousands of members nationwide. JWV maintains a considerable presence in San Diego County, with three separate JWV Posts in the San Diego area. JWV's members include individuals who pay taxes regularly that are owed to the United States and state and local governments, and who oppose government funding that promotes religion, including the funding of the federal taking and continued display of the Latin cross on Mt. Soledad. JWV's members also include individuals based in the San Diego area who regularly view the Latin cross on Mt. Soledad, and who are offended by the government's communication of favoritism and endorsement of the majority faith at the expense of citizens and veterans of other faiths who died in the service of their country.

    8.   Plaintiff Richard A. Smith is a resident of La Jolla, California, where he has lived in the same home since 1969. Smith is a taxpayer who pays taxes regularly that are owed to the United States and state and local governments. Smith is a veteran of the United States Navy, having served from 1969 to 1971 as the head of the Neurology Branch of the Navy's Neuropsychiatric Research Unit in San Diego. His best friend, a physician, was killed in the Tet Offensive during the Vietnam War. Smith, who is Jewish, has great respect for all religious faiths, but is discomfited by the presence of a sectarian religious symbol on public property. Specifically, he believes that the Latin cross on Mt. Soledad demonstrates a government preference for certain forms of Christianity above all other religions, and that the message the Latin cross sends is that non-Christians like himself are not full members of the political community. He also believes that, to the extent the Latin cross serves in part to honor the service of veterans, such an overtly Christian religious memorial devalues the contributions of veterans like himself who are not Christian. Smith regularly sees the Mt. Soledad Latin cross from numerous vantage points around San Diego. Among other things, he makes weekly visits to a

4

1  sister-in-law who lives in a house where the Mt. Soledad Latin cross can be seen from the

2  windows and the backyard.  These weekly visits bring him into a position where he can directly

3  view the Latin cross and the unwelcome and exclusionary message he believes it communicates.

4  But for the presence of the Latin cross, Smith would visit Mt. Soledad again to enjoy the scenery

5  and to pay tribute to the war dead honored at the site.

6

7      9.  Plaintiff Mina Sagheb is a resident of La Jolla, California, and has lived in the San

8  Diego area since 1990.  She is a taxpayer who pays taxes regularly that are owed to the United

9  States and state and local governments.  Sagheb has been married to Plaintiff Smith for four

10  years, and is Muslim.  She has no objection to public displays of religious faith made by

11  individuals.  However, she objects to government sanctioning of religious displays, since she

12  believes that the government should not favor one religion over another.  Sagheb makes weekly

13  visits to a sister who lives in a house where the Mt. Soledad Latin cross can be seen from the

14  windows and the backyard.  These weekly visits bring her into a position where she can directly

15  view the Latin cross and the unwelcome and exclusionary message she believes it communicates.

16  Sagheb has visited Mt. Soledad on at least one occasion, and, but for the presence of the Latin

17  cross, she would visit Mt. Soledad again to enjoy the scenery and to pay tribute to the war dead

18  honored at the site.  Sagheb is an immigrant to the United States from Iran, a country she fled in

19  part because of its religious intolerance and the government's promoting of the religious beliefs

20  of some at the expense of others.

21

22     10. Plaintiff Judith M. Copeland has been a resident of San Diego, California since 1974.

23  She is a taxpayer who pays taxes regularly that are owed to the United States and state and local

24  governments.  She has no objection to public displays of religious faith made by individuals.

25  However, she objects to government sanctioning of religious displays, since she believes that the

26  government should not favor one religion over another.  Copeland sees the Latin cross

27

28

5.

1    approximately twice a week while driving on Interstate 5, and is discomfited by the presence of a

2    sectarian religious symbol on public property. She has visited Mt. Soledad on at least one

3    occasion, and, but for the presence of the Latin cross, she would visit Mt. Soledad again to enjoy

4    the scenery and to pay tribute to the war dead honored at the site.

5

6        11. Defendant Donald H. Rumsfeld is the Secretary of the United States Department of

7    Defense. Pursuant to recently enacted federal legislation, *see* H.R. 5683, 109th Cong., § 2(c)

8    (2006), Secretary Rumsfeld manages the property containing the Mt. Soledad Veterans

9    Memorial in San Diego, California. Secretary Rumsfeld is sued in his official capacity.

10                            **FACTUAL BACKGROUND**

11            **Description and History of the Mt. Soledad Latin cross**

12        12. The Mt. Soledad Latin Cross ("Latin cross" or "Cross"), a structure measuring 43 feet

13    in height with a 12-foot arm spread, is located on now-federal property at the top of Mt. Soledad

14    in San Diego, California. The Latin cross sits atop an 822-foot high hill and can be seen from

15    several miles away, including from Interstate 5, a public freeway that passes less than a half-mile

16
17    from Mt. Soledad.

18        13. The City of San Diego ("City") first took possession of Mt. Soledad in the nineteenth

19    century. In 1916, the San Diego City Council ("City Council") dedicated the property on which

20    the Latin cross rests, as well as 170 adjoining acres of property, as the Mt. Soledad Nature Park.

21    Although most of the 170-acre parcel is undeveloped and maintained in its natural state, the top

22    of the mountain has been cleared. Between 1913 and 1934, several crosses were erected atop

23    Mt. Soledad.

24

25        14. In 1952, the City Council authorized a private entity, the Mt. Soledad Memorial

26    Association ("MSMA"), to erect and maintain a sizeable Latin cross on top of Mt. Soledad. The

27    Cross was designed to replace predecessor crosses that were previously built on top of Mt.

28
                                    6

Soledad but that were no longer standing. The MSMA constructed the Cross, consisting of reinforced concrete and weighing approximately 24 tons, between 1952 and 1954.

15. The Latin cross is a sacred and revered symbol to many Americans and to many Christians throughout the world. It is not, however, a symbol of the United States. Nor is it a favored symbol of many devout Christians of a number of denominations. Many other religious faiths have revered symbols that are given no status, no government support, and no placement on Mt. Soledad.

16. On April 18, 1954, the MSMA dedicated the Latin cross during a Christian religious ceremony held on Easter Sunday. During that ceremony, the Latin cross was explicitly dedicated to "Our Lord and Savior Jesus Christ" in an MSMA dedication bulletin.

17. Since the Latin cross's initial dedication in 1954, the City of San Diego has granted the MSMA a permit each year to conduct a sunrise service on Easter morning for Christians to celebrate the resurrection of Jesus Christ.

18. Every annual publication of the Thomas Brothers Map for the San Diego area from 1954 to 1989 – the year the government's display of the Latin cross was first challenged in court – presented a geographic legal description of the location as the "Mt. Soledad Easter Cross."

19. Throughout the past fifty years, the Latin cross has served not only as a religious symbol but also as the site of numerous religious events, such as weddings, baptisms, and Easter sunrise services.

20. For 38 years, there was no placard or marker indicating the presence of a veterans memorial either on Mt. Soledad Natural Park or at the site of the Latin cross. The MSMA installed such a marker with a "Veterans" memorial inscription only in 1992, after the onset of litigation challenging the constitutionality of the display of the Latin cross on City-owned property.

7

21. No secular or non-Christian symbols of comparable physical significance are present at Mt. Soledad to moderate the sectarian Christian message conveyed by the Latin cross, which towers above the rest of the memorial.

22. The predominant purpose of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote one particular sectarian Christian symbol.

23. The predominant effect of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote certain forms of the Christian religion.

24. The Latin cross's presence on top of government-owned property on Mt. Soledad is a governmental endorsement of a particular form of religion and its symbols.

25. The Latin cross's presence on top of government-owned property on Mt. Soledad gives official preference for certain sects within the Christian religion above all others.

26. The Latin cross's presence on top of government-owned property on Mt. Soledad fosters an excessive governmental entanglement with religion.

### Early Litigation and Potential Settlement

27. In 1989, a private individual sued the City in this Court over the Latin cross's presence on top of Mt. Soledad, alleging that it violated the "No Preference" Clause of the California Constitution, Cal. Const. art. I, § 4, as well as the Establishment Clause of the United States Constitution, U.S. Const., amend. I.  This Court found that "[w]here . . . the Latin cross appears as a permanent, salient symbol on public property and on a public imprimatur, California's constitution will not permit it to continue to stand." *Murphy v. Bilbray*, 782 F. Supp. 1420, 1438 (S.D. Cal. 1991) (Thompson, J.).  The Court ordered the City to remove the Latin cross, and gave the City three months to comply with its order.  On appeal, the Ninth Circuit upheld the district court's determination and concluded that, even assuming the Mt. Soledad Latin cross could properly be characterized as war memorial, it is "[a] sectarian war

memorial [that] carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1527-28 (9th Cir. 1993), *cert. denied*, 513 U.S. 925 (1994).

28. In October 1994, following this Court's decision and the Ninth Circuit's affirmance of that decision, the City made its first attempt to remedy the constitutional violation via a ballot initiative in which it urged voters to "SAVE THE CROSS ON MOUNT SOLEDAD," not by the constitutionally permissible means of moving it to a non-governmental site, but by authorizing a no-bid sale of a 222-square foot parcel of land under the Latin cross to the MSMA. This Court subsequently declared the sale invalid under the No Preference Clause as well as article XVI, section 5 of the California Constitution, which "strictly prohibits any governmental support for religious purposes." *Murphy v. Bilbray*, Nos. 90-134 GT, 89-820 GT, 1997 WL 754604, at ** 9-11 (S.D. Cal. Sept. 18, 1997) (Thompson, J.). The Court reasoned that it was readily apparent that "the primary purpose for the sale . . . was to save the Mt. Soledad cross from removal and/or destruction," and that the City "clearly show[ed] a governmental preference for the Christian religion" by "tak[ing] the position of trying to 'save' such a preeminent Christian symbol." *Id.* at * 10. Following this decision, the Association sold the 222 square foot parcel back to the City.

29. After this decision, the City published a notice soliciting bids on about a half-acre of land in Mt. Soledad Park, and expressly stated that the sale of the parcel was "for the purpose of maintaining a historic war memorial." To this end, the City established a bidding process that required applicants to explain their plans for "maint[aining] a historic war memorial on the site." Subsequently, the City announced that it accepted the MSMA's bid as the winning bid. The Ninth Circuit, sitting *en banc*, invalidated this sale as well, finding that it "was structured to provide a direct, immediate, and substantial financial advantage to bidders who had the sectarian purpose of preserving the [C]ross," and accordingly violated article XVI, section 5 of the

9

1    California Constitution. *Paulson v. City of San Diego*, 294 F.3d 1124, 1133 (9th Cir. 2002) (en

2    banc), *cert. denied*, 538 U.S. 978 (2003).

3          30. Following the Ninth Circuit's *Paulson* decision, a dispute arose in this Court as to

4    who actually owned the Latin cross. On October 12, 2004, this Court ruled that the City of San

5    Diego — and not the MSMA — owned the land under and around the Latin cross. The Court

6    further implored the parties to "[s]ettle this case! It's time to move the cross from public land to

7

8    private land and comply with the laws of our great country instead of trying to find sneaky ways

9    to get around them to pander to a certain group or to satisfy an out-of-state group's religious

10   agenda."

11         31. The parties engaged in extensive settlement discussions over the course of several

12   weeks and agreed to settle the case by moving the Latin cross 1,000 yards to a nearby church.

13
     Under the terms of the settlement, the MSMA would be allowed to maintain an interest in the
14
     Mt. Soledad property and war memorial, and the Latin cross would be replaced with a non-
15
16   sectarian symbol that would appropriately recognize all veterans in exchange for an end to

17   litigation. These settlement terms would be perfectly acceptable to Plaintiffs here and would

18   have preserved the continued existence of the Latin cross — but in a constitutional way. The

19
     settlement terms were presented to the City Council on July 20 and 27, 2004. But instead of
20
     accepting the settlement outright, the Council attempted one last sale to the highest bidder, who
21
22   alone could decide whether to keep, remove, or replace the Latin cross. At the public meeting of

23   the City Council, the Mayor and four of five Council members, who voted to put the proposition

24   (known as Proposition K) on the ballot over strong MSMA and prominent veterans-group

25   opposition, expressly stated that the reason for their vote was to allow the Latin cross to remain

26   on Mt. Soledad. *See Paulson v. Abdelnour*, No. GIC-849667 at 27-28 (Cal. Sup. Ct. Oct. 7,

27

28                                                  10

2005).  One Councilmember even cited his membership in the "Jesus Christ fan club" as a reason for his vote.  *Id.* at 27.

32. On November 2, 2004, a substantial majority of San Diego voters — over 250,000 in total — rejected Proposition K and directed the City Attorney to enter into the settlement agreement.

### Overriding of the Settlement and the Intervention of (former) Congressman Randy "Duke" Cunningham to "Save the Cross"

33.  Undeterred by the will of San Diego voters and this Court's prior exhortation to settle the case consistently with constitutional requirements, the City refused to comply with the binding ordinance.  Instead, with the active encouragement of the Thomas More Law Center ("TMLC"), an advocacy group whose stated mission is the "promotion of the religious freedoms of Christians" and the protection of "Christians and their beliefs in the public square," the City began its ongoing campaign to circumvent its constitutional obligations.

34. After San Diego voters overwhelmingly rejected Proposition K, the TMLC sought to scuttle the binding settlement agreement and secure the intervention of the federal government — all to save the Latin cross as a religious symbol.

35. On November 10, 2004, the TMLC sent a letter to Representative Randy "Duke" Cunningham, a Congressman from San Diego and a member of the powerful House Appropriations Committee, to solicit his help in convincing the federal government to override the San Diego referendum and corresponding settlement agreement by declaring the Latin cross a national war memorial.  In so doing, the TMLC made clear that the principal reason for taking such action was because "religion and morality are the foundation of our country" and the Mt. Soledad Latin cross was "one of the most visible symbols of [our Christian faith]."

11

36. Acknowledging that there was "unfortunately" a local initiative whereby San Diego voters overwhelmingly agreed to resolve the matter by entering into a settlement agreement, the TMLC nonetheless asserted that "the culture war will continue to be fought on many fronts" no matter what. Accordingly, the TMLC asked Representative Cunningham to "save the Cross" and help "preserve this ... religious landmark" by declaring it a national war memorial.

37. Less than a month later, during the night of November 21, 2004, Representative Cunningham inserted an eleventh-hour rider into the voluminous $388 billion Fiscal Year 2005 Omnibus Appropriations Act (Pub. L. No. 108-447). The rider, which few had seen before Representative Cunningham inserted it into the appropriations bill, (1) designated the Mt. Soledad Veterans Memorial a national veterans memorial; (2) authorized the Department of the Interior to accept the donation of the Memorial from the City of San Diego; and (3) directed the National Park Service to enter into a memorandum of understanding with the MSMA for the maintenance and administration of the memorial. Pub. L. No. 108-447, § 116, 118 Stat. 3346, *codified at* 16 U.S.C. § 431 note (2004). Representative Cunningham acknowledged that he had not asked for a written legal opinion from an attorney on whether the bill would allow the Latin cross to remain at its current location, and that he was trying to "save the Cross" as a religious landmark. The TMLC hailed Cunningham's effort as "an act of God."

38. With the exception of the TMLC, however, all parties to the long-running dispute acknowledged that Representative Cunningham's proposed legislation would not solve the constitutional problem that the California state and federal courts had unanimously reaffirmed multiple times over the preceding 13 years. The press has reported that William Kellogg, Executive Director of the Mount Soledad Memorial Association, candidly acknowledged that he did not see how Cunningham's legislation would solve the underlying constitutional impediments. Likewise, the press reported that the MSMA's attorney, Charles Berwanger, said

12

that officials of the U.S. Department of Veterans Affairs had advised him that such a move would run afoul of the First Amendment and had reaffirmed that opinion in the wake of Rep. Cunningham's rider.

39. On December 8, 2004, President Bush signed the omnibus appropriation bill, with Representative Cunningham's rider intact, into law. Soon thereafter, the TMLC and Representative Cunningham successfully pressed San Diego Mayor Dick Murphy to add the proposed federalization of the Latin cross by way of donation promptly to the City Council Agenda.

40. Prior to the City Council meeting, however, San Diego City Attorney Michael Aguirre issued a formal legal opinion that the federalization of the Latin cross by way of donation would be a violation of the California Constitution and fall far short of a remedy that would be deemed acceptable by the California state and federal courts. Mr. Aguirre's opinion further observed that, "based on current case law, such a transaction would also violate the federal Constitution and . . . provide fodder for additional legal proceedings against the City." Kimberly Edds, *San Diego to Move Giant Cross; City Council Votes to End Suit Over Religious Symbol*, Wash. Post (May 10, 2005).

41. On March 8, 2005, after a six-hour public hearing, the San Diego City Council voted against donating the Latin cross to the federal government based on the MSMA's request, City Attorney Aguirre's legal recommendation, and the recognition that the City had a binding obligation to enter into the MSMA settlement agreement once Proposition K failed.

42. In a subsequent letter to the editor of the *San Diego Union-Tribune*, MSMA President Bill Kellogg reiterated his "strong support" for the City Council's decision to reject federalization of the Cross, saying he was "convinced it was the right decision for our community and for our veterans." Mr. Kellogg stated accurately that the constitutional issue

13

"had already been litigated to the fullest extent possible," that the Ninth Circuit's decision in *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004), in which the Ninth Circuit invalidated a nearly identical attempt arising out of a war memorial in the Mojave Desert Preserve, "was directly on point," and that "only the patience of the courts has prevented the [original] order from being carried out." To those who "supported the federalization of the park [who] say they don't care about the cross itself; they care about 'not caving in to a minority,'" Kellogg contrasted the MSMA's deep commitment to "the cross and the walls" and its equal commitment "to ensuring that both remain standing in a public place where they can be enjoyed by all." "Only by moving the cross to another location" pursuant to the original MSMA settlement agreement, Kellogg argued, could the Cross truly "be saved."

43. Soon after the City Council's decision, the TMLC and others, spurred on by Rep. Cunningham and Mayor Murphy, spearheaded a petition and referendum drive under the aegis of a TMLC-affiliated group called "San Diegans for the Mt. Soledad National War Memorial" to rescind the Council vote. This wide-ranging and well-financed effort included 75 paid signature gatherers, massive fundraising efforts, and a petition written by the TMLC that began with the proposition, "You Can Save Our Cross." Press reports described sermons from the Latin cross site and other public and religious venues, including events at Qualcomm Stadium and Cox Arena on Easter Sunday, that urged civil disobedience to flout the original Court order and save the Latin cross.

44. At a May 17, 2005 meeting to consider the petition, two City Council members, while expressing misgivings about the mounting legal costs the City was incurring, agreed to switch their initial vote and to send the issue back to the voters. The Council accordingly voted 6-3 to allow a public referendum, Proposition A, on the Latin cross. The vote on Proposition A was scheduled to coincide with the July 26, 2005 special election to replace Mayor Murphy. After

14

1    the City Council's vote was announced, Latin cross supporters sang "Onward Christian Soldiers"

2    in the Council chamber.

3                              **Further Litigation Over the Latin cross**

4        45. A private individual then challenged the proposed referendum on donating the Latin

5    cross to the federal government on the grounds that the donation would violate article I, section

6    IV (the No Preference Clause) and article XVI, section V (the No Aid Clause) of the California

7    Constitution. Soon after Proposition A passed, California Superior Court Judge Patricia Cowett

8    issued a temporary restraining order preventing the donation and a tentative ruling that any such

9    donation would be unconstitutional.

10       46. Following Judge Cowett's order, City Attorney Aguirre reportedly reiterated that

11   Proposition A was "clearly unconstitutional."

12       47. Seeking to overcome its inability to continue to bankroll the Latin cross litigation —

13   which to that point had been ongoing for 13 years — the City deputized the TMLC's lead

14   attorney, Charles LiMandri, as a special deputy city attorney who agreed to work for free.

15       48. On October 7, 2005, Judge Cowett issued a 35-page final decision striking down

16   Proposition A as unconstitutional. *Paulson v. Abdelnour*, No. GIC-849667 (Cal. Sup. Ct. Oct. 7,

17   2005). The decision recounts the extensive legal history of the dispute and the consistent and

18   unequivocal rulings by state and federal courts over the years. Based on "the consistent,

19   repeated, and numerous references to saving the Cross as the basis for deciding whether to

20   donate the memorial to the United States," Judge Cowett held that "one conclusion is

21   inescapable: this transfer is again an unconstitutional preference of the Christian religion to the

22   exclusion of other religions and non-religious beliefs in violation of the No Preference Clause of

23   the California Constitution." *Id.* at 28. In addition, Judge Cowett ruled that the City's attempt

24   "to go so far as to transfer away valuable land for no compensation for the purpose of saving the

                                           15

1    cross is also an unconstitutional aid to the Christian religion in violation of the California

2    Constitution." *Id.*

3        49. Judge Cowett likewise observed that maintaining the Latin cross as a part of a

4    national veterans memorial would "run[] afoul of the Establishment Clause of the United States

5    Constitution." *Id.*   Citing the Supreme Court's recent decision in *McCreary County v. ACLU*,

6    125 S.Ct. 2722 (2005), Judge Cowett concluded: "Even today, it still can be said that at best the

7    Mt. Soledad Memorial has a secondary secular purpose (or at worst is but a sham secular

8    purpose) and that the predominant purpose of the memorial is a religious purpose." *Id.* at 34-35.

9    Judge Cowett concluded by stating Judge Thompson's initial pronouncement back in 1991 – that

10   if the City "truly wish[ed] to honor the war dead, then it should do so other than with the Latin

11   cross which it has permitted to stand atop Mt. Soledad" — "still stands the test of time and

12   history as related to this cross." *Id.* at 35.

13       50. On May 4, 2006, this Court ordered the City of San Diego finally to remove the Latin

14   cross within 90 days or be fined $5,000 a day.  The Court held that "[c]onsistently, every court

15   that has addressed the issue has ruled that the presence of the Latin cross on Mount Soledad, land

16   which is owned by the City of San Diego … violates Article I Section 4 of the California

17   Constitution." *Paulson v. City of San Diego*, No. 89-0820GT, at 2 (S.D. Cal. May 3, 2006).

18   Having given the City 17 years to remedy the problem and expressing utter frustration with "the

19   long and torturous legal history" of the case, the Court stated that it was "now time, and perhaps

20   long overdue, for this Court to enforce its initial permanent injunction forbidding the presence of

21   the Mount Soledad Cross on City property." *Id.*

22       51. In response to the Court's order, San Diego City Attorney Aguirre once again

23   recommended that city officials stop politicizing the issue and incurring unnecessary legal costs

24   in a futile effort to save the Latin cross on appeal.  MSMA President William Kellogg likewise

25

26

27

28

1  reiterated that the private war memorial organization was prepared to move the Latin cross to

2  nearby private property and replaced at the memorial with another fitting symbol for veterans of

3  the Korean War: "We feel it's very important that the cross be saved. The location of the cross is

4  not the primary issue."

5

6      52. The City sought a stay of Judge Thompson's order pending appeal. On June 21,

7  2006, the Ninth Circuit denied the stay request. On July 7, 2006, Justice Kennedy, as the Circuit

8  Justice for the Ninth Circuit, granted a stay to preserve the status quo pending the respective

9  appeals of Judge Thompson's and Judge Cowett's decisions. *San Diegans for the Mt. Soledad*

10 *Nat'l War Memorial v. Paulson*, 126 S. Ct. 2856 (July 7, 2006) (Kennedy, J.).

11                            **Recent Federal Intervention**

12

13     53. At the same time, Mayor Sanders and certain organizations lobbied the President and

14 Congress to help them evade the effects of the California Constitution by condemning and

15 effectuating a taking of the Mt. Soledad Latin cross by the federal government. On May 10,

16 2006, Congressman Duncan Hunter, who assumed leadership on the Latin cross issue in

17 Congress after Rep. Cunningham's departure, asked the President to "use the authority found in

18 40 U.S.C. 3113 to begin immediate condemnation proceedings" concerning the Latin cross.

19     54. On June 27, 2006, Rep. Hunter introduced H.R. 5683. Stating an intent to "effectuate

20 the purpose" of Rep. Cunningham's previous bill from 2004, H.R. 5683 declares that "there is

21 hereby vested in the United States all right, title, and interest in and to, and the right to

22 immediate possession of, the Mt. Soledad Veterans Memorial in San Diego, California." H.R.

23 5683, 109th Cong., § 2(a) (2006). H.R. 5683 directs the United States to pay "just compensation

24 to any owner of the property." *Id.* § 2(b). The bill states that upon acquisition of the memorial

25 by the United States, "the Secretary of Defense shall manage the property and shall enter into a

26

27

28                                    17

memorandum of understanding with the Mt. Soledad Memorial Association for the continued

maintenance of the Mt. Soledad Veterans Memorial by the Association." *Id.* § 2(c).

55. The bill passed the House on July 19, 2006 and the Senate on August 1, 2006. The

President signed H.R. 5683 into law on August 14, 2006.

## CLAIM FOR RELIEF

### (Establishment Clause Violation)

56. Plaintiffs repeat and reallege paragraphs 1 through 55.

57. The Establishment Clause of the First Amendment to the U.S. Constitution provides

that "Congress shall make no law respecting an establishment of religion."

58. Based on the allegations set forth above, Defendants have violated and continue to

violate Plaintiffs' rights protected by the Establishment Clause.

59. An actual and present controversy between the parties exists such that declaratory

relief is appropriate.

60. The continued display of the Latin cross on federal land will cause irreparable harm

to Plaintiffs.

61. Plaintiffs lack an adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)    A declaratory judgment that the taking of the Mt. Soledad Latin cross and

its continued display on federally owned land violates the Establishment

Clause of the First Amendment of the United States Constitution;

(b)    The entry of a preliminary and permanent injunctive relief enjoining the

continued display of the Mt. Soledad Latin cross on federally owned land;

18

1        (c)    Encourage and permit the Latin cross to be moved, at the expense of

2              individual citizens who believe that the Latin cross should be preserved, to

3              an appropriate non-governmental site;

4        (d)    An award to Plaintiffs of their costs, expenses, and attorneys' fees; and

5        (e)    Such further and other relief as this Court deems just and proper.

6

7  DATED:  August 24, 2006

8                            David Blair-Loy  SBN 229235

9                            ACLU FOUNDATION OF SAN DIEGO &
                                  IMPERIAL COUNTIES

10                         P.O. Box 87131
                         San Diego, CA  92138-7131

11                         Telephone:  (619) 232-2121
                         Facsimile:  (619) 232-0036

12

13                         Daniel Mach
                         T. Jeremy Gunn

14                         ACLU PROGRAM ON FREEDOM OF
                                    RELIGION AND BELIEF

15                         AMERICAN CIVIL LIBERTIES UNION
                                    FOUNDATION

16                         915 15th St., N.W., Suite 600

17                         Washington, D.C.  20005
                         Telephone:  (202) 675-2330

18                         Facsimile:  (202) 546-0738
                         [*pro hac vice* application to be filed]

19

20                         A. Stephen Hut, Jr.
                         Jonathan H. Siegelbaum

21                         Ryan P. Phair
                         WILMER CUTLER PICKERING HALE &

22                                    DORR LLP

23                         1875 Pennsylvania Ave., N.W.
                         Washington, D.C.  20006

24                         Telephone: (202) 663-6000
                         Facsimile: (202) 663-6363

25                         [*pro hac vice* applications to be filed]

26                         *Attorneys for Plaintiffs Jewish War Veterans*
                         *of the United States of America, Inc., David*

27                         *A. Smith, Mina Sagheb, and Judith M.*
                         *Coleman*

28

19

PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENAS

# EXHIBIT B

WILMERHALE

March 21, 2007

A. Stephen Hut, Jr.

+1 202 663 6235 (t)
+1 202 663 6363 (f)
stephen.hut@wilmerhale.com

The Honorable Duncan Hunter
U.S. House of Representatives
2265 Rayburn House Office Building
Washington, DC 20515

Re:    *Trunk v. City of San Diego*, **Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)**

Dear Congressman Hunter:

I am writing you, as co-counsel for the plaintiffs in the above-captioned action, to provide you
with a courtesy copy of the subpoena we are serving today on the Office of General Counsel of
the House of Representatives relating to documents within your possession, custody, or control.
Our subpoena seeks certain documents related to your public statements and efforts regarding the
designation of the Mt. Soledad Veterans Memorial as a national war memorial. We have tailored
the requests contained in this subpoena as narrowly as possible, and expressly are not seeking
documents protected from disclosure by the Speech and Debate Clause of the United States
Constitution. Nonetheless, if you have any questions or concerns about the scope of the
subpoena, we would be happy to discuss them.

Thank you very much for your attention to this matter.

Very truly yours,

A. Stephen Hut, Jr.

A. Stephen Hut, Jr.

Enclosures

cc: Kerry W. Kircher, Esq., Deputy General Counsel, U.S. House of Representatives
    Parties in Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc., et al.

**SUBPOENA IN A CIVIL CASE**

V.

Robert M. Gates

Case Number:[1]  06-CV-1728 BTM (S.D. Cal.)

TO:  The Honorable Duncan Hunter
U.S. House of Representatives
2265 Rayburn House Office Building
Washington, D.C. 20515

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE | Wilmer Cutler Pickering Hale and Dorr LLP | DATE AND TIME |
|---|---|---|
|  | 1875 Pennsylvania Avenue, N.W., Washington, DC  20006 | 4/4/2007 5:00 pm |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| A. Stephen Hut, Jr. /s/  Attorney for Plaintiff | March 21, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A. Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave., N.W., Washington, DC  20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                    DATE                              SIGNATURE OF SERVER

                                                 _____
                                                 ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received it of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## ATTACHMENT A

## DEFINITIONS

The following definitions shall apply to each of the instructions and requests set forth herein:

1.    "Duncan Hunter," "you" or "your" shall refer to Duncan Lee Hunter and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.    "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure.

3.    "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure.

4.    "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.    "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.    "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile.

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public.

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations.

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

11.    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Duncan Hunter.

13.    "H.R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H.R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property.

2

15. "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a base stem that is longer than its three other arms, that is more than 25 feet in height and that rests on the highest point of Mt. Soledad.

## INSTRUCTIONS

1. These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause. If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

2. No paragraph shall be construed with reference to any other paragraph for purposes of limitation.

3. The terms "and" and "or" shall be construed to mean both "and" and "or."

4. The terms "any" and "all" shall be construed to mean both "any" and "all."

5. The singular shall be construed to include the plural and the plural shall be construed to include the singular.

6. Each requested document shall be produced in its entirety, including any drafts or non-identical copies. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7. Each request for documents is continuing in nature. If, after responding to these requests, you obtain or become aware of further documents responsive to any document request, such documents shall be supplied promptly.

3

8. All documents are to be produced that are in your custody, possession, or control. If it is claimed that a document responsive to any request is privileged, work product, or otherwise protected from disclosure, state the nature and basis for any such claim of privilege, protection, or other ground for nondisclosure and identify: (a) the general subject matter of any such document; (b) the author of the document and each person to whom the original or a copy of the document was sent; and (c) the date of the document.

## DOCUMENTS TO BE PRODUCED

1.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

2.    All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

3.    All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

4.    All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

4

1   5.    All documents concerning or relating to your arrangement, scheduling, or

2   coordination of meetings or appointments between any person or entity and any other person in

3   the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad

4   Latin Cross.

5   6.    All documents concerning or relating to your contacts, communications,

6   discussions, or interactions with the any person in the Executive Branch of the United States

7

8   Government regarding the administration or implementation of H.R. 5683.

9   7.    All documents concerning or relating to your contacts, communications,

10  discussions, or interactions with any person in the Executive Branch of the United States

11  Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

12  8.    All documents concerning or relating to your contacts, communications,

13  discussions, or interactions with the City of San Diego regarding the administration or

14

15  implementation of H.R. 5683.

16  9.    All documents concerning or relating to your contacts, communications,

17  discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad

18  Latin Cross.

19

20

21

22

23

24

25

26

27

28

WILMERHALE

March 21, 2007

A. Stephen Hut, Jr.

+1 202 663 6235 (t)
+1 202 663 6363 (f)
stephen.hut@wilmerhale.com

The Honorable Brian Bilbray
U.S. House of Representatives
227 Cannon House Office Building
Washington, D.C. 20515

Re:    *Trunk v. City of San Diego*, Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)

Dear Congressman Bilbray:

I am writing you, as co-counsel for the plaintiffs in the above-captioned action, to provide you with a courtesy copy of the subpoena we are serving today on the Office of General Counsel of the House of Representatives relating to documents within your possession, custody, or control. Our subpoena seeks certain documents related to your public statements and efforts regarding the designation of the Mt. Soledad Veterans Memorial as a national war memorial. We have tailored the requests contained in this subpoena as narrowly as possible, and expressly are not seeking documents protected from disclosure by the Speech and Debate Clause of the United States Constitution. Nonetheless, if you have any questions or concerns about the scope of the subpoena, we would be happy to discuss them.

Thank you very much for your attention to this matter.

Very truly yours,

A. Stephen Hut, Jr.

Enclosures

cc: Kerry W. Kircher, Esq., Deputy General Counsel, U.S. House of Representatives
    Parties in Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc., et al.

V.

Robert M. Gates

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  06-CV-1728 BTM (S.D. Cal.)

TO:  The Honorable Brian Bilbray
U.S. House of Representatives
227 Cannon House House Office Building
Washington, D.C. 20515

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE | Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W., Washington, DC 20006 | DATE AND TIME<br>4/4/2007 5:00 pm |
|---|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| A. Stephen Hut, Jr. pro Attorney for Plaintiff | March 21, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A. Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave., N.W., Washington, DC 20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**ATTACHMENT A**

**DEFINITIONS**

The following definitions shall apply to each of the instructions and requests set forth herein:

1.    "Brian Bilbray," "you" or "your" shall refer to Brian Phillip Bilbray and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.    "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure.

3.    "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure.

4.    "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.    "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.    "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile.

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public.

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations.

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

11.    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Brian Bilbray.

13.    "H.R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H.R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property.

2

15.    "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a base stem that is longer than its three other arms, that is more than 25 feet in height and that rests on the highest point of Mt. Soledad.

## INSTRUCTIONS

1. These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause.  If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

2. No paragraph shall be construed with reference to any other paragraph for purposes of limitation.

3. The terms "and" and "or" shall be construed to mean both "and" and "or."

4. The terms "any" and "all" shall be construed to mean both "any" and "all."

5. The singular shall be construed to include the plural and the plural shall be construed to include the singular.

6. Each requested document shall be produced in its entirety, including any drafts or non-identical copies.  If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7. Each request for documents is continuing in nature.  If, after responding to these requests, you obtain or become aware of further documents responsive to any document request, such documents shall be supplied promptly.

8. All documents are to be produced that are in your custody, possession, or control. If it is claimed that a document responsive to any request is privileged, work product, or otherwise protected from disclosure, state the nature and basis for any such claim of privilege, protection, or other ground for nondisclosure and identify: (a) the general subject matter of any such document; (b) the author of the document and each person to whom the original or a copy of the document was sent; and (c) the date of the document.

## DOCUMENTS TO BE PRODUCED

1.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

2.    All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

3.    All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

4.    All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

4

1        5.     All documents concerning or relating to your arrangement, scheduling, or

2   coordination of meetings or appointments between any person or entity and any other person in

3   the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad

4   Latin Cross.

5        6.     All documents concerning or relating to your contacts, communications,

6   discussions, or interactions with the any person in the Executive Branch of the United States

7   Government regarding the administration or implementation of H.R. 5683.

8

9        7.     All documents concerning or relating to your contacts, communications,

10  discussions, or interactions with any person in the Executive Branch of the United States

11  Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

12       8.     All documents concerning or relating to your contacts, communications,

13  discussions, or interactions with the City of San Diego regarding the administration or

14  implementation of H.R. 5683.

15

16       9.     All documents concerning or relating to your contacts, communications,

17  discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad

18  Latin Cross.

19

20

21

22

23

24

25

26

27

28

WILMERHALE

March 21, 2007

A. Stephen Hut, Jr.

+1 202 663 6235 (t)
+1 202 663 6363 (f)
stephen.hut@wilmerhale.com

The Honorable Darrell Issa
U.S. House of Representatives
227 Cannon House Office Building
Washington, D.C. 20515

Re:    *Trunk v. City of San Diego*, Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)

Dear Congressman Issa:

I am writing you, as co-counsel for the plaintiffs in the above-captioned action, to provide you with a courtesy copy of the subpoena we are serving today on the Office of General Counsel of the House of Representatives relating to documents within your possession, custody, or control. Our subpoena seeks certain documents related to your public statements and efforts regarding the designation of the Mt. Soledad Veterans Memorial as a national war memorial. We have tailored the requests contained in this subpoena as narrowly as possible, and expressly are not seeking documents protected from disclosure by the Speech and Debate Clause of the United States Constitution. Nonetheless, if you have any questions or concerns about the scope of the subpoena, we would be happy to discuss them.

Thank you very much for your attention to this matter.

Very truly yours,

A. Stephen Hut, Jr.

Enclosures

cc: Kerry W. Kircher, Esq., Deputy General Counsel, U.S. House of Representatives
    Parties in Case Nos. 06-CV-1597, 06-CV-1728 (S.D. Cal.)

AO88 (Rev. 12/06) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc., et al.

**SUBPOENA IN A CIVIL CASE**

V.

Robert M. Gates

Case Number:[1]   06-CV-1728 BTM (S.D. Cal.)

TO:   The Honorable Darrell Issa
U.S. House of Representatives
211 Cannon House Office Building
Washington, D.C. 20515

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE   Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W., Washington, DC 20006 | DATE AND TIME<br>4/4/2007 5:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *A. Stephen Hut, Jr.*  Attorney for Plaintiff | March 21, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A. Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave., N.W., Washington, DC 20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

                          DATE                                       SIGNATURE OF SERVER

                                                          ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## ATTACHMENT A

## DEFINITIONS

The following definitions shall apply to each of the instructions and requests set forth herein:

1.     "Darrell Issa," "you" or "your" shall refer to Darrell E. Issa and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.     "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure.

3.     "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure.

4.     "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.      "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.     "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

1

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile.

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public.

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations.

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

11.    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Darrell Issa.

13.    "H.R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H.R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property.

2

1    15.    "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a

2    base stem that is longer than its three other arms, that is more than 25 feet in height and that rests

3    on the highest point of Mt. Soledad.

## INSTRUCTIONS

1. These requests have been narrowly tailored not to seek documents that are protected

from production by the Speech or Debate Clause.  If notwithstanding this narrow tailoring you

believe that any responsive document is protected by the Speech or Debate Clause, and you

choose not to waive that protection, then in lieu of producing such documents you are instructed

to list each such document on a schedule describing its date, author, recipient(s), copyees, subject

matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate

Clause immunity.

2. No paragraph shall be construed with reference to any other paragraph for purposes of

limitation.

3. The terms "and" and "or" shall be construed to mean both "and" and "or."

4. The terms "any" and "all" shall be construed to mean both "any" and "all."

5. The singular shall be construed to include the plural and the plural shall be construed

to include the singular.

6. Each requested document shall be produced in its entirety, including any drafts or

non-identical copies.  If a document responsive to any request cannot be produced in full, it shall

be produced to the extent possible with an explanation stating why production of the remainder

is not possible.

7. Each request for documents is continuing in nature.  If, after responding to these

requests, you obtain or become aware of further documents responsive to any document request,

such documents shall be supplied promptly.

3

1    8. All documents are to be produced that are in your custody, possession, or control. If it

2    is claimed that a document responsive to any request is privileged, work product, or otherwise

3    protected from disclosure, state the nature and basis for any such claim of privilege, protection,

4    or other ground for nondisclosure and identify: (a) the general subject matter of any such

5    document; (b) the author of the document and each person to whom the original or a copy of the

6

7    document was sent; and (c) the date of the document.

8                              **DOCUMENTS TO BE PRODUCED**

9

10    1.    All documents concerning or relating to your contacts, communications,

11    discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the

12    Mt. Soledad Latin Cross.

13    2.    All documents concerning or relating to any press conference regarding Mt.

14    Soledad or the Mt. Soledad Latin Cross.

15

16    3.    All documents concerning or relating to your contacts, communications,

17    discussions, lobbying of, financial contributions to or received, or interactions with the Thomas

18    More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon

19    Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad

20    National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group

21    regarding Mt. Soledad or the Mt. Soledad Latin Cross.

22

23    4.    All documents concerning or relating to your speeches, public statements,

24    newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt.

25    Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in

26    proceedings of the United States House of Representatives.

27

28                                       4

5.    All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

6.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.

7.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

8.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding the administration or implementation of H.R. 5683.

9.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

5

# EXHIBIT C

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

U.S. HOUSE OF REPRESENTATIVES
OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6532
(202) 225–9700
FAX: (202) 226–1360

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

    Re:    *Jewish War Veterans v. Gates*, No. 06-CV-1597 BTM (S.D. Calif.)

Dear Mr. Siegelbaum:

       Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Duncan Hunter, U.S. Representative for the 52nd congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

       1.  The discovery sought from Congressman Hunter is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

       2.  The discovery sought from Congressman Hunter is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

       3.  The subpoena to Congressman Hunter is unreasonably vague and overbroad.

       4.  The discovery sought from Congressman Hunter is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

       5.  The discovery sought from Congressman Hunter is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* **http://www.fec.gov/finance/disclosure/norcansea.shtml,**

DOCS# 15114

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,
http://www.house.gov/hunter/.

        6. Some of the discovery sought from Congressman Hunter is privileged from
production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1,
including documents that fall into the following categories:

        A. Documents the Congressman collected to inform himself about the Mt.
        Soledad issue for the purpose of formulating legislation or otherwise carrying out
        his legislative responsibilities.

        B. Documents, mostly in the form of emails, reflecting communications between
        members of the Congressman's staff and other congressional offices, both House
        and Senate, regarding legislation that concerned the Mt. Soledad issue.

        C. Documents reflecting communications with constituents and other members of
        the public regarding legislation that concerned the Mt. Soledad issue.


                                Sincerely,

                                Kerry W. Kircher
                                Counsel for Non-Party Duncan Hunter


                                Duncan Hunter
                                Member of Congress, Pro Se with Respect to Requests for
                                Information about Campaign and Fund-Raising Activities

cc:     Kevin Webb, Esq.


DOCS# 15114

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

U.S. HOUSE OF REPRESENTATIVES
OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6532
(202) 225–9700
FAX: (202) 226–1360

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

    **Re:    Jewish War Veterans v. Gates, No. 06-CV-1597 BTM (S.D. Calif.)**

Dear Mr. Siegelbaum:

        Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Darrell E. Issa, U.S. Representative for the 49th congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

        1.  The discovery sought from Congressman Issa is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

        2.  The discovery sought from Congressman Issa is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

        3.  The subpoena to Congressman Issa is unreasonably vague and overbroad.

        4.  The discovery sought from Congressman Issa is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

        5.  The discovery sought from Congressman Issa is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* http://www.fec.gov/finance/disclosure/norcansea.shtml,

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

**http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,**
**http://www.house.gov/issa/.**

     6. Some of the discovery sought from Congressman Issa is privileged from production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1, including documents that fall into the following categories:

     A. Documents the Congressman collected to inform himself about the Mt. Soledad issue for the purpose of formulating legislation or otherwise carrying out his legislative responsibilities.

     B. Documents, mostly in the form of emails, reflecting communications between members of the Congressman's staff and other congressional offices, both House and Senate, regarding legislation that concerned the Mt. Soledad issue.

     C. Documents reflecting communications with constituents and other members of the public regarding legislation that concerned the Mt. Soledad issue.

     Sincerely,

     Kerry W. Kircher
     Counsel for Non-Party Darrell E. Issa

     Darrell E. Issa
     Member of Congress, Pro Se with Respect to Requests for
     Information about Campaign and Fund-Raising Activities

cc:    Kevin Webb, Esq.

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

U.S. HOUSE OF REPRESENTATIVES
OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6532
(202) 225–9700
FAX: (202) 226–1360

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

     **Re:**    **Jewish War Veterans v. Gates, No. 06-CV-1597 BTM (S.D. Calif.)**

Dear Mr. Siegelbaum:

     Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Brian P. Bilbray, U.S. Representative for the 50th congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

     1. The discovery sought from Congressman Bilbray is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

     2. The discovery sought from Congressman Bilbray is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

     3. The subpoena to Congressman Bilbray is unreasonably vague and overbroad.

     4. The discovery sought from Congressman Bilbray is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

     5. The discovery sought from Congressman Bilbray is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* **http://www.fec.gov/finance/disclosure/norcansea.shtml,**

DOCS# 15121

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

**http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,**
**http://www.house.gov/bilbray/.**

6. Some of the discovery sought from Congressman Bilbray is privileged from production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1, including documents that fall into the following categories:

 A. Documents the Congressman collected to inform himself about the Mt. Soledad issue for the purpose of formulating legislation or otherwise carrying out his legislative responsibilities.

 B. Documents, mostly in the form of emails, reflecting communications between members of the Congressman's staff and other congressional offices, both House and Senate, regarding legislation that concerned the Mt. Soledad issue.

 C. Documents reflecting communications with constituents and other members of the public regarding legislation that concerned the Mt. Soledad issue.

Sincerely,

Kerry W. Kircher
Counsel for Non-Party Brian P. Bilbray

Brian P. Bilbray
Member of Congress, Pro Se with Respect to Requests for
Information about Campaign and Fund-Raising Activities

cc: Kevin Webb, Esq.

DOCS# 15121

# EXHIBIT D

-----Original Message-----
**From:** Kircher, Kerry [mailto:Kerry.Kircher@mail.house.gov]
**Sent:** Monday, April 09, 2007 5:13 PM
**To:** Siegelbaum, Jonathan
**Subject:** RE: Mt. Soledad Case - Document Subpoenas to Hunter, Issa, Bilbray

Confirmed.

*Kerry W. Kircher*
*Deputy General Counsel*
*Office of the General Counsel*
*U.S. House of Representatives*
*219 Cannon HOB*
*Washington, D.C. 20515*
*202/225-9700 (phone)*
*202/226-1360 (fax)*

---

**From:** Siegelbaum, Jonathan [mailto:Jonathan.Siegelbaum@wilmerhale.com]
**Sent:** Monday, April 09, 2007 4:50 PM
**To:** Kircher, Kerry
**Cc:** Webb, Kevin (ENRD)
**Subject:** RE: Mt. Soledad Case - Document Subpoenas to Hunter, Issa, Bilbray

Kerry:  Please confirm whether or not these letters mean that you will not be producing any documents in response to our subpoenas.

Thanks.

-----Original Message-----
**From:** Kircher, Kerry [mailto:Kerry.Kircher@mail.house.gov]
**Sent:** Monday, April 09, 2007 4:14 PM
**To:** Siegelbaum, Jonathan
**Cc:** 'Webb, Kevin (ENRD)'
**Subject:** Mt. Soledad Case - Document Subpoenas to Hunter, Issa, Bilbray

FYI.

*Kerry W. Kircher*
*Deputy General Counsel*
*Office of the General Counsel*
*U.S. House of Representatives*
*219 Cannon HOB*
*Washington, D.C. 20515*

5/22/2007

*202/225-9700 (phone)*
*202/226-1360 (fax)*

5/22/2007

# EXHIBIT E

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9        SOUTHERN DISTRICT OF CALIFORNIA

10

11  STEVE TRUNK and PHILIP K. PAULSON,    )    Case No. 06 CV 1597 BTM (WMc)
                                          )
12              Plaintiffs,               )    **ORDER DENYING PLAINTIFF'S**
                                          )    **REQUEST TO COMPEL THE**
13  v.                                    )    **DEPOSITIONS OF SAN DIEGO**
                                          )    **MAYOR JERRY SANDERS AND**
14  CITY OF SAN DIEGO, UNITED STATES      )    **REPRESENTATIVE DUNCAN**
    OF AMERICA, DONALD H. RUMSFELD,       )    **HUNTER**
15  Secretary of Defense and DOES 1 through )
    100, Inclusive                        )
16                                        )
                Defendants.               )
17                                        )
    MOUNT SOLEDAD MEMORIAL               )
18  ASSOCIATION, Real Parties in interest. )
                                          )
19  JEWISH WAR VETERANS OF THE           )
    UNITED STATES OF AMERICA, INC.,       )
20  RICHARD A. SMITH, MINA SAGHEB, and    )
    JUDITH M. COPELAND,                   )
21                                        )
                Plaintiffs                )
22                                        )
    v.                                    )
23                                        )
    DONALD H. RUMSFELD, Secretary of      )
24  Defense, in his official capacity,    )
                                          )
25              Defendant.                )

26

27  ///

28  ///

# I.

## INTRODUCTION

Plaintiff Trunk has requested the right to depose Congressional Representative Duncan Hunter and the City of San Diego Mayor Jerry Sanders. The U.S. Attorney's Office and the Office of the City Attorney denied Plaintiff's requests.[1] On March 27, 2007, the Court heard oral argument on Plaintiff's Request to Compel the Depositions of Mayor Sanders and Representative Hunter. After hearing from counsel of record as well as careful consideration of Plaintiff's request to compel, all opposition briefs, and the reply briefs, for the reasons set forth below Plaintiff's Request to Compel the Depositions of Representative Hunter and Mayor Sanders is **DENIED without prejudice**.

# II.

## BACKGROUND

This case arises out of an action brought by Plaintiff Steve Trunk under the Establishment Clause of the First Amendment to the United States Constitution seeking to "declare the transfer of the Mt. Soledad cross, the memorial surrounding it and the land under it to the U.S.A., void *ab initio* in that the transfer was unconstitutional." [Doc. No.30 - FAC, para.14.]

Mayor Sanders wrote a May 11, 2006 letter to President George W. Bush in support of the City's transfer of the Mt. Soledad National War Memorial to the National Park Service. [ Doc. No. 93-2, Exh. 10 to P's Request to Compel.] Representative Hunter co-sponsored H.R. 5683, 109th Cong. (2nd Sess.2006), a bill that was subsequently passed and is now the law at issue in this litigation which authorized the United States to acquire the Mount Soledad Veterans Memorial. [Doc. No.98-1, Hunter's Opposition, p2, ln.19-24.]

Plaintiff informally asked to depose Representative Hunter and Mayor Sanders and was refused. It appears that, at least as to Representative Hunter, Plaintiff did not follow his informal request for a deposition with a formal deposition subpoena to the U.S. Attorney's office. [Doc. No. 93-1, p.2, ln.14-18.; Doc. 98-1, p.1, ln. 24-25]

---

[1] By order of the Honorable Barry T. Moskowitz, this case has been consolidated with *Jewish War Veterans vs. Donald H. Rumsfeld, et al., 06cv1728.* Plaintiff Jewish War Veterans ("JWV") joins in the motion of Plaintiff Trunk. Thus, when the Court refers to "Plaintiff" it shall be referring to both Trunk and JWV.

# III.

# ARGUMENTS

### A. Plaintiff Trunk's Request to Depose Representative Hunter and Mayor Sanders

Plaintiff requests the right to depose Representative Hunter and Mayor Sanders in order to question the lawmakers about "the purpose of [H.R. 5683] legislation" they sponsored or endorsed. [Doc. No. 93-1, p.1, ln.26 - p.2, ln.6.] Plaintiff contends that his proposed line of questioning "may be dispositive on the issue of whether such a transfer violates both the California and United States Constitutions." [Doc. No. 93-1, p.2, ln.7-10.] Plaintiff further argues that the deposition testimony he requests is relevant to the information analyzed by the courts under the purpose prong of the three-part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). [Doc. No. 93-1, p.11, ln.15-18.]

Plaintiff proposes "limited" depositions for both Representative Hunter and Mayor Sanders, covering only the issues of "purpose, intent, preference and aid" with respect to H.R. 5683. [Doc. No. 93-1, p.19, ln.4-7.]

### B. Defendants' Arguments

#### 1. Opposition of Representative Hunter

Congressman Hunter objects to Plaintiff's Request to Compel on the ground that Plaintiff failed to issue or serve him with a deposition notice or subpoena. [Doc. No. 98-1, p.1, ln.24-26.] Congressman Hunter also argues that: (1) the testimony Plaintiff seeks to elicit is privileged and barred absolutely by the Speech or Debate Clause of the Constitution, and (2) Plaintiff has failed to establish the exceptional circumstances necessary to compel a sitting Member of Congress to appear for a non-party deposition. [Doc. No. 98-1, p.2, ln.2-11.]

#### 2. Opposition of the United States and Secretary of Defense ("Federal Defendants")

Federal Defendants argue that Supreme Court and Ninth Circuit case law hold a legislator's post-enactment statements are irrelevant to the determination of legislative purpose. [Doc. No. 99, p.4, ln.15 - p.5, ln.23.] Further, Federal Defendants assert that case law applying the improper purpose inquiry under *Lemon v. Kurtzman*, 403 U.S. 602 (1971) support a denial of Plaintiff's

3

06cv1597 / 06cv1728 BTM (WMc)

1    request to compel because such case law suggests that the Establishment Clause analysis must be

2    conducted by reviewing the plain language of the statute, contemporaneous legislative history,

3    historical context and the sequence of events leading to the passage of the statute. [Doc. No. 99, p.6,

4    ln.20-27.]

5    **3. Opposition of Mayor Sanders**

6         Mayor Sanders notes that while Plaintiff has moved to compel his deposition, Plaintiff has

7    not pursued any other methods of discovery from the Mayor including written interrogatories,

8    requests for admission or requests for production of documents. [Doc. No. 100, p. 3, ln.13-15.]

9    Further, Mayor Sanders argues that it does not oppose joint discovery from Plaintiff Trunk and the

10   JWV Plaintiffs, and it is therefore premature for the Court to order a deposition before a joint

11   discovery plan is even established. [Doc. No. 100, p. 7, ln.13-15.]

12        The Mayor also notes that he has now assumed all of the executive responsibilities

13   previously assigned to the City Manager under the"Strong Mayor" form of government set forth in

14   Article XV of the City of San Diego Charter, which took effect on January 1, 2006. [Doc. No. 100,

15   p. 4, ln.11-16.] He argues that Plaintiff has not presented compelling reasons to require his

16   deposition, nor has Plaintiff shown that the information he seeks from the Mayor is unavailable from

17   other sources. [Doc. No. 100, p. 5, ln.20 - p. 6, ln. 2.] Finally, the Mayor joins in the arguments

18   posited by Congressman Hunter and the Federal Defendants arguing that Plaintiff should not be

19   allowed to depose him regarding his conversations with federal lawmakers and thereby circumvent

20   the privilege afforded by Speech or Debate Clause. [Doc. No. 100, p. 7, ln.17-19.]

21                                        **IV.**

22                                   **STANDARDS**

23   **A.    Subpoenas - Fed.R. Civ. P. 45**

24        Under Rule 45 of the Federal Rules of Civil Procedure a subpoena is required to command

25   non-parties to attend and give testimony at a deposition. Fed. R. Civ. P. 45(a)(2)(B).

26   **B.    Discovery Under Fed. R.Civ. P. 26**

27        In general, a party has the right to discovery of any matter, not privileged, that is relevant to

28   the claim or defense of any party. Fed. R. Civ. P. 26(b)(1). Thus, the scope of discovery under Rule

1   26 is broad. Discovery may be sought of relevant information not admissible at trial if the discovery

2   appears reasonably calculated to lead to the discovery of admissible evidence. *Id.* The Court,

3   however, may limit discovery if it can be obtained from another source that is more convenient, less

4   burdensome or less expensive or if the proposed discovery is overly burdensome. Fed. R. Civ. P.

5   26(b)(2).

6   **C.     Privileges**

7        **1.     Speech or Debate Privilege - U.S. Const. Art. I, § 6, cl. 1.**

8        The Speech or Debate Clause of the United States Constitution provides: "For any Speech

9   or Debate in either House [Senators and Representatives] shall not be questioned in any other

10   Place." U.S. Const. Art. I, § 6, cl. 1. The privilege protects speech and other activities undertaken

11   by members of Congress who are acting within a legitimate legislative sphere. *Eastland v. United*

12   *States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975). The legislative sphere includes those

13   activities that: (1) are an integral part of the deliberative and communicative processes by which

14   Members participate in House proceedings and (2) address proposed legislation. *Miller v.*

15   *Transamerican Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983). Examples of protected legislative

16   activities include obtaining information regarding possible legislation or committee investigations.

17   *Id.* at 530. In addition, the Speech or Debate clause precludes inquiry into the motivation or

18   purposes of a legislative act. *Id.; see also U.S. v. Brewster*, 408 U.S. 501, 525 (1972)("[T]he Speech

19   or Debate Clause protects against inquiry into the acts that occur in the regular course of the

20   legislative process and into the motivation for those acts.")

21        **2.     General Privilege of Limited Immunity From Deposition For**

22             **Top Government Officials**

23        Federal courts recognize the general rule that high-ranking government executives are not

24   normally subject to deposition, especially where they have no personal knowledge essential to the

25   case at issue. *Kyle Engineering Co. V. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979); *Green v. Baca*,

26   226 F.R.D. 624, 648 (C.D. Cal. 2005); *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12

27   (D. Mass. 1990); *Hankins v. City of Philadelphia*, 1996 WL 524223, *1 E.D. Pa.).

28        Immunity from deposition is granted in order to allow top officials freedom to perform their

1   jobs without disruption from the discovery process. *Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D.

2   Wis. 1994.) The exception to this rule applies where the government official whose deposition is

3   sought has "direct personal factual information pertaining to material issues in the action [and]

4   where the information to be gained is not available through any other source." *Green*, 226 F.R.D.

5   at 649 (citing *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12 ( D. Mass. 1990.); see also

6   *Hankins*, 1996 WL 524334, *1 (E.D. Pa.) ("A party seeking the deposition of a high ranking

7   government official must demonstrate that his testimony is likely to lead to the discovery of

8   admissible evidence, is essential to that party's case and that his evidence is not available through

9   any alternative source or less burdensome means.")

10                          **V. DISCUSSION**

11   **A.    The Deposition of Representative Hunter Is Precluded Under the Speech or**

12   **Debate Clause.**

13          To the extent the statements of Congressman Hunter were reported and appear in a

14   legislative record and were the result of his legislative and communicative functions,

15   Congressman Hunter is immune from liability. *Hutchinson vs. Proxmire*, 443 U.S. 111, 123-128

16   (1979*)*. It follows that he should also be protected from being deposed based on such protected

17   statements. In other words, the immunity should not simply protect the Congressman from

18   liability, but also from the expense and burden of being subjected to civil discovery.[2]  Therefore,

19   the Court finds that the testimonial privilege afforded by the Speech or Debate Clause of the U.S.

20   Constitution prevents Plaintiff from deposing Representative Hunter regarding his motivations

21   behind, or reasons for supporting, H.R. 5683. *U.S. v. Brewster*, 408 U.S. 501, 525 (1972)*; see*

22   *also City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (citing *Michael M. v.*

23   *Superior Court*, 450 U.S. 464, 469-70 (1981); *United States v. O'Brien*, 391 U.S. 367, 383-84

24   (1968); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Arizona v. California*, 283 U.S. 423,

25   455 (1931); *Soon Hing v. Crowley*, 113 U.S. 703, 710-11 (1885); *Fletcher v. Peck*, 10 U.S. 87,

26   130-31 (1810); *May v. Cooperman*, 572 F.Supp. 1561, 1564 n.2 (D.N.J. 1983) (state legislators

27   _____

28          [2]  Of course, any member of Congress may *voluntarily* submit himself or herself to civil discovery or other forms of
     civil testimony.

1    could not be deposed to determine the purpose of a "moment of silence" law challenged under

2    the First Amendment).) Moreover, statements or information an official inserted into the

3    legislative record are covered by the privilege and questions delving into their motives for such

4    statements or inclusion are protected from discovery. *Miller v. Transamerican Press, Inc.*, 709

5    F.2d 524, 529 (9th Cir. 1983).

6         Notwithstanding the above rule, the testimonial privilege embedded in the Speech of

7    Debate Clause does not cover statements made in press releases or newsletters prepared by, or on

8    behalf of, the official. *Id.* However valuable or praiseworthy, an official's transmittal of

9    information by press release or newsletters to inform his constituents of some noteworthy event

10    or decision are "not part of the legislative function or the deliberations that make up the

11    legislative process." *Id.* at 133.

12      **B.**     **The Requested Information Sought from Congressman Hunter and Mayor**

13            **Sanders Is Not Relevant to the Inquiry Under the Establishment Clause**

14         The courts employ a three prong test to determine whether a state statute violates the

15    Establishment Clause. First, did the legislature have a secular purpose in adopting the law? This

16    prong "asks whether government's actual purpose is to endorse or disapprove religion." Second,

17    is the principal or primary effect of the law to advance or inhibit religion? Third, does the statute

18    "result in an excessive entanglement of government with religion"? *Lemon vs. Kurtzman,* 403

19    U.S. 602,612-613 (1971). A law that violates any of these prongs violates the Establishment

20    Clause. *Edwards vs. Aguillard,* 482 U.S. 578, 583 (1987).

21         Plaintiff has not cited any cases which support his contention that he is entitled to, or

22    needs, the requested depositions in order to prosecute his claim under the Establishment Clause.

23    None of the cases Plaintiff cites involve the specific issue before this Court: whether a party is

24    entitled to, or needs, to depose the sponsors of the state statute being challenged as violative of

25    the Establishment Clause.

26         The cases make it clear that, in determining the purpose of a challenged state law or act,

27    the courts can, and do, look to numerous *objective* factors. "A court's finding of improper

28    purpose behind a statute is appropriately determined by the statute on its face, *its legislative*

1   *history.... the plain meaning of the statute's words*, enlightened by their context and the

2   *contemporaneous legislative history* can control the determination of legislative purpose....

3   Moreover, in determining the legislative purpose of a statute, the Court has also considered the

4   historical context of the statute...and the specific sequence of events *leading to passage* of the

5   statute...." *Edwards*, 482 U.S. at 594-595 [Citations omitted.] [Emphasis added.]. *See also*

6   *McCreary vs. ACLU*, 545 U.S. 844, 862 (2005).

7       In *Wallace v. Jaffree*, 472 U.S. 38 (1985), the U.S. Supreme Court held as violative of

8   the Establishment Clause an Alabama statute which authorized a daily period of silence in public

9   schools for meditation or silent prayer. State Senator Donald Holmes, the law's sponsor, had

10   placed in the legislative record "a statement indicating that the legislation was an effort to return

11   voluntary prayer to the public schools." *Wallace*, 472 U.S. at 56-57. Later, after the bill had

12   become law, and in a proceeding before the District Court, Senator Holmes "confirmed this

13   purpose." *Id.* Key to the Court's decision was the fact that Senator Holmes' *statement in the*

14   *legislative record* occurred "without dissent." The Court concluded, based on the legislative

15   record and the senator's testimonial and non-testimonial statements, that the statute had no

16   *secular* purpose and was entirely religious. *Id.* at 57-60. In holding the statute unconstitutional

17   the Court concluded that "[t]he unrebutted evidence of legislative intent contained in the

18   legislative record and in the testimony of the sponsor ...is confirmed by a consideration of the

19   relationship between this statute and th two other measures that were considered in this case.

20   The District Court found that the 1981 statute and its 1982 sequel had a common, nonsecular

21   purpose. The wholly religious character of the later enactment is plainly evident from its text."

22   *Id.* at 58. The clear focus of the Court is on the legislative record, the events leading up to the

23   passage of the challenged statute and the statute's plain language.[3] In other words, the Court

24   focuses on events leading up to and contemporarenous with the bill's passage.

25       *Foley vs. City of Las Vegas*, 747 F.2d 1294 (9th Cir. 1984), is also instructive. In that

26

27       [3] The decision indicates, without stating or clarifying, that Sen. Holmes presented "testimony". It is unclear from
the case whether the senator's testimony was given in a legislative session in the District Court or some other setting. *Id.* at

28   58. There is nothing in the Court's opinion which indicates, or lends support to the notion, that the sponsor's *testimony* was
compelled by court process or necessary for the Court's conclusion.

               06cv1597 / 06cv1728 BTM (WMc)

1   case, the City of Las Vegas moved the District Court in mandamus for a protective order

2   prohibiting a corporation from deposing city officials to determine their motives in enacting a

3   zoning ordinance which restricted the location of sexually oriented businesses.   The corporation

4   argued that it needed the depositions in order to support its challenge that the First and

5   Fourteenth Amendments rendered the ordinance unconstitutional.   In rejecting the corporation's

6   arguments, the Ninth Circuit stated that "[t]he relevant governmental interest is determined by

7   *objective factors* as taken from the face of the statue, the effect of the statute, comparison to prior

8   law, facts surrounding enactment of the statute, the stated purpose, and the record of

9   proceedings."   *Id.* at 1297.   Although not a case dealing with the Establishment Clause, the

10  factors the Court must consider in determining governmental interest are identical to the factors

11  on which the Supreme Court focused in both *McCreary*, *Edwards* and *Wallace*.   Not surprising

12  since all these cases turn on the First Amendment.   The Ninth Circuit went on to say in *Foley*:

13  "The Supreme Court has held that an otherwise constitutional statute will not be invalidated on

14  the basis of an alleged illicit legislative motive....The Court prevents inquiry into the motives of

15  legislators because it recognizes that such inquiries are a hazardous task.   Individual legislators

16  may vote for a particular statute for a variety of reasons....The diverse character of such motives,

17  and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes

18  all such inquiries as impracticable and futile."   747 F.2d., at *1297- 1298.*   (Citations omitted.)

19      Furthermore, under the rationale of *Foley*, as well as *Edwards, Wallace* and *McCreary,*

20  the requested discovery is not relevant to the determination the District Court must make.

21  "Allowing discovery of legislative motives, as Lydo suggests, would not only create a major

22  departure from the precedent rejecting the use of legislative motives, but is also inconsistent with

23  basic analysis under the First Amendment which has not turned on the motives of the legislators,

24  but on the effect of the regulation."   *Id.* at 1297-1298.   (Citations omitted.)

25      **C.   Even If the Requested Information Were Relevant, the Court Exercises Its**

26  **Discretion to Prohibit the Depositions.**

27      Plaintiff has not presented exceptional circumstances which would warrant overriding the

28  Speech or Debate privilege, and a significant amount of alternative source material, other than

1    deposition testimony, is available for Plaintiff to reference with respect to his claims.    As

2    explained by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987), courts

3    determine the improper purpose behind a statute by evaluating the plain language of the statute

4    on its face, its contemporaneous legislative history and the historical context of the statute - all of

5    which is available to Plaintiff.

6        The court has discretion to determine whether to grant a motion to compel.    *See Garrett*

7    *v. City and County of San Francisco*, 818 F.2d 1515, 1519 (9th Cir, 1987); *see also Kyle*

8    *Engineering Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979) (reserving deposition of the

9    executive of the Small Business Administration until the end of discovery and ordering answers

10   to interrogatories in lieu of deposition.)

11       In exercising such discretion, the Court may limit discovery under Federal Rules of Civil

12   Procedure, Rule 26, if: (i) the discovery sought is unreasonably cumulative or duplicative, or is

13   obtainable from some other source that is more convenient, less burdensome, or less expensive;

14   (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain

15   the information sought; or (iii) the burden or expense of the proposed discovery outweighs its

16   likely benefit, taking into account the needs of the case, the amount in controversy, the parties'

17   resources, the importance of the issues at stake in the litigation, and the importance of the

18   proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2).

19       Plaintiff's exhibits in support of his request to Compel demonstrate that he has a

20   significant amount of source material available to him on the issue of legislative purpose

21   including letters, legislative minutes, transcripts of recorded council meetings and quotation-

22   filled press releases.    [Doc. No. 93-2, pp. 2-65.]    Accordingly, the information Plaintiff seeks

23   through deposition will be unnecessarily duplicative.    Fed. R. Civ. P. 26(b)(2)(i).

24       Similarly, the Court finds Plaintiff has not demonstrated that the Mayor's anticipated

25   testimony is unavailable through other sources or less burdensome avenues like written

26   discovery. *Green v. Baca*, 226 F.R.D. 624, 649 (C.D. Cal. 2005.) As discussed above, Plaintiff

27   has an abundance of legislative history and other source material to which he can he refer, and

28   indeed to which he did refer in his request to compel, to support his constitutional claims. [Doc.

1    /////

2    No. 93-2, pp. 2-65.]

3         Accordingly, Plaintiff's request to depose Congressman Hunter and Mayor Sanders, is

4    **DENIED**.

5                                            **VI.**

6                          **CONCLUSION AND ORDER THEREON**

7         In light of the foregoing, Plaintiff's Request to Compel the Depositions of Representative

8    Duncan Hunter and Mayor Jerry Sanders is **DENIED**.

9         **IT IS SO ORDERED**.

10

11   DATED: April 2, 2007

12

13                                        Hon. William McCurine, Jr.
                                          U.S. Magistrate Judge
14                                        United States District Court

15

16   COPY TO:

17   HONORABLE BARRY T. MOSKOWITZ, U.S. DISTRICT JUDGE

18   ALL PARTIES AND COUNSEL OF RECORD

19

20

21

22

23

24

25

26

27

28

06cv1597 / 06cv1728 BTM (WMc)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 23rd day of May, 2007, a copy of the foregoing was this date served upon the following by electronic mail and by first-class mail, postage pre-paid:

Kerry W. Kircher
Deputy General Counsel
Office of the General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515

James McElroy, Esq.
625 Broadway, Suite 1400
San Diego, CA 92101

Heide L. Herrmann, Esq.
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, DC 20044-0663

George Schaefer, Esq.
Office of the City Attorney
1200 Third Avenue, Suite 700
San Diego, CA 92101

Charles V. Berwanger, Esq.
Gordon and Rees
101 W. Broadway, Suite 2000
San Diego, CA 92101

Jonathan H. Siegelbaum