**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:07-mc-00220 (JB) |
| v. | ) ) ) | Case No. 1:07-mc-00221 (JB) Case No. 1:07-mc-00222 (JB) |
| ROBERT M. GATES, Secretary of Defense, in His Official Capacity, | ) ) ) | |
| Defendant. | ) ) ) | |

**CONSOLIDATED OPPOSITION OF CONGRESSMEN**
**DARRELL E. ISSA, BRIAN P. BILBRAY AND DUNCAN HUNTER**
**TO PLAINTIFFS' MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS**

GERALDINE R. GENNET
  General Counsel
KERRY W. KIRCHER
  Deputy General Counsel
CHRISTINE DAVENPORT
  Assistant Counsel
JOHN FILAMOR
  Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700

Counsel for Congressmen Darrell E. Issa,
Brian P. Bilbray and Duncan Hunter

June 13, 2007

DARRELL E. ISSA
  Member of Congress
BRIAN P. BILBRAY
  Member of Congress
DUNCAN HUNTER
  Member of Congress

Pro Se with Respect to Requests for
Information About Their Campaign and
Fund-Raising Activities

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................iii

EXHIBIT LIST...............................................................................................................ix

INTRODUCTION............................................................................................................1

ARGUMENT..................................................................................................................5

I.    The Documents the JWV Plaintiffs Seek Are Not Material or Relevant to the
      Underlying Litigation.............................................................................................6

      A.    *Lemon* Does Not Apply to the JWV Plaintiffs' Challenge to the Secretary's
            Display of the Cross......................................................................................6

      B.    The April 2 Order Is the Law of the Case and Precludes the JWV Plaintiffs
            from Arguing that the Documents Sought Are Relevant to the Purpose of
            the Memorial Preservation Act.......................................................................8

      C.    The Documents the JWV Plaintiffs Seek Are Not Relevant Even If *Lemon*
            Applies to Their Claims.................................................................................10

            1.    The Discovery Sought Does Not Bear on the Purpose Prong of the
                  *Lemon* Test.......................................................................................10

            2.    The Discovery Sought Does Not Bear on the Effects Prong of the
                  *Lemon* Test.......................................................................................14

            3.    The Discovery Sought Does Not Bear on the Entanglement Prong
                  of the *Lemon* Test.............................................................................16

II.   Some of the Documents Sought Are Absolutely Privileged From Production
      Under the Speech or Debate Clause......................................................................18

      A.    Brief Constitutional Overview: The Speech or Debate Clause Bars
            Interference with, and Inquiry into, Legislative Activities.............................20

            1.    History and Purpose of the Clause.......................................................20

            2.    The Scope of the Clause.....................................................................22

            3.    The Functioning of the Clause.............................................................22

i

B.    The Speech or Debate Clause Protects Information of All Sorts Gathered by Members in Furtherance of Their Legislative Responsibilities............24

III.    Some Documents Are Obtainable From Other Sources........................................31

CONCLUSION.........................................................................................................32

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*11126 Baltimore Blvd. v. Prince George's County, Maryland*, 886 F.2d 1415 (4th Cir. 1989),
   *vacated and remanded on other grounds*, 495 U.S. 901 (1990)........................................12

*Agostini v. Felton*, 521 U.S. 203 (1997)........................................16, 17

*Allegheny County v. ACLU*, 492 U.S. 573 (1989)........................................14-15

*Arizona v. California*, 460 U.S. 605 (1983)........................................8

*Barr v. Matteo*, 360 U.S. 564 (1959)........................................24

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226 (1990)........................................11

\* *Brown & Williamson Tobacco Corp. v. Williams*,
   62 F.3d 408 (D.C. Cir. 1995)........................................21, 23, 25, 26, 27, 30, 31

*Cammack v. Waihee*, 932 F.2d 765 (9th Cir. 1991)........................................11

*Chastain v. Sundquist*, 833 F.2d 311 (D.C. Cir. 1987)........................................28-29

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988)........................................8

*City of Las Vegas v. Foley*, 747 F.2d 1294 (9th Cir. 1984)........................................8, 11

*Concrete Sys., Inc. v. Pavestone Co.*, 112 Fed. Appx. 67 (1st Cir. 2004)........................................12

*Consumer's Union of the United States, Inc. v. Periodical Correspondent's Ass'n*,
   515 F.2d 1341 (D.C. Cir. 1975), *cert. denied*, 423 U.S. 1051 (1976)........................................6

*Dennis v. Sparks*, 449 U.S. 24 (1980)........................................23

*Doe v. McMillan*, 412 U.S. 306 (1973)........................................21, 22, 28

*Durand v. IDC Bellingham, LLC*, 793 N.E.2d 359 (Mass. 2003)........................................12

\* *Eastland v. United States Serviceman's Fund*,
   421 U.S. 491 (1975)........................................20, 21, 22, 23, 24, 25, 27, 28, 29, 30

*Edwards v. Aguillard*, 482 U.S. 578 (1987)........................................8, 10, 11, 13-14

*Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98 (D.D.C. 2005)........................................8-9

* Authorities upon which we chiefly rely are marked with asterisks.

iii

*Gov't of the Virgin Islands v. Lee,*
    775 F.2d 514 (3rd Cir. 1985)......................................................24, 26

*Grand Rapids v. Ball,* 473 U.S. 373 (1985)...............................................15

\*  *Gravel v. United States,*
    408 U.S. 606 (1972)................................20, 21, 22, 23, 24, 26, 27, 28, 30

*Helstoski v. Meanor,* 442 U.S. 500 (1979)..............................................21

*Hutchinson v. Proxmire,* 443 U.S. 111 (1979).....................................28, 29

*Kilbourn v. Thompson,*103 U.S. 168 (1881)...........................................25

*Kreisner v. City of San Diego,* 1 F.3d 775 (9th Cir. 1993) ...........................15

*Lee v. Weisman,* 505 U.S. 577 (1992).....................................................7

*Lemon v. Kurtzman,* 403 U.S. 602 (1971)..........................................6, 16, 17

*Lynch v. Donnelly,* 465 U.S. 668 (1984)...........................................15, 16

*Maddox v. Williams,* 855 F. Supp. 406 (D.D.C. 1994),
    *aff'd, Brown & Williamson Tobacco Co. v. Williams,*
    62 F.3d 408 (D.C. Cir. 1995).........................................................31

*McCreary County, Kentucky v. ACLU,* 545 U.S. 844 (2005).........................13

*McGrain v. Daugherty,* 273 U.S. 135 (1927)...........................................22

*McSurely v. McClellan,*
    553 F.2d 1277 (D.C. Cir. 1976) (en banc),
    *cert. granted,* 434 U.S. 888 (1977),
    *cert. dismissed sub nom. McAdams v. McSurely,* 438 U.S. 189 (1978)..........23, 25, 28

*Meek v. Rideoutte,* 1990 WL 322973 (D.S.C.)..........................................11

*Miller v. Transamerican Press, Inc.,*
    709 F.2d 524 (9th Cir. 1983)........................................23, 24, 25, 26, 30, 31

*MINPECO, S.A. v. Conticommodity Services, Inc.,*
    844 F.2d 856 (D.C. Cir. 1988)......................................................23, 27

*Mueller v. Allen,* 463 U.S. 388 (1983)..................................................11

\* Authorities upon which we chiefly rely are marked with asterisks.

*Palmer v. Thompson*, 403 U.S. 217 (1971) ................................................................................. 12

*Pentagen Technologies Int'l, Ltd v. Committee on Appropriations*,
   20 F. Supp.2d 41 (D.D.C. 1998),
   *aff'd*, 194 F.3d 174 (D.C. Cir. 1999) (per curiam) ................................................ 23

*Randolph v. Willis*, 220 F. Supp. 355 (S.D. Cal. 1963) ............................................................. 6

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) .......................................................... 13

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) ................................................ 7

*Shape of Things to Come, Inc. v. County of Kane*, 588 F. Supp. 1192 (N.D. Ill. 1984) .......... 6

*South Carolina Educ. Ass'n v. Campell*, 883 F.2d (1251) (4th Cir. 1989) ............................. 12

*Stone v. Graham*, 499 U.S. 39 (1980) ...................................................................................... 7

*Tavoulareas v. Piro*, 527 F. Supp. 676 (D.D.C. 1981) ................................................. 25-26, 31

*Tenny v. Brandhove*, 341 U.S. 367 (1951) .............................................................................. 20

*United States v. Ballin*, 144 U.S. 1 (1892) .............................................................................. 6

*United States v. Brewster*, 408 U.S. 501 (1972) ........................................................ 13, 26, 28

*United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973) ..................................................... 27, 29

*United States v. Eilberg*, 465 F. Supp. 1080 (E.D. Pa. 1979) ................................................ 29

*United States v. Helstoski*, 442 U.S. 477 (1979) ................................................................ 22, 23

*United States v. Johnson*, 383 U.S. 169 (1966) ............................................. 20, 21, 26, 27, 28

*United States v. McDade*, 28 F.3d 283 (3rd Cir. 1994) .......................................................... 29

*United States v. Myers*, 635 F.2d 932 (2nd Cir. 1980) ............................................................ 20

*United States v. O'Brien*, 391 U.S. 367 (1968) ...................................................................... 12

*United States v. Peoples Temple of the Disciples of Christ*,
   515 F. Supp. 246 (D.D.C. 1981) ................................................................................. 23

*United States v. Smith*, 286 U.S. 6 (1932) ............................................................................. 6

\* Authorities upon which we chiefly rely are marked with asterisks.

*United Transp. Union v. Springfield Terminal Ry. Co.*,
   113 Lab. Cas. ¶ 11,643 (D. Maine 1989)............................................................26

*Van Orden v. Perry*, 545 U.S. 677 (2005)....................................................................6-7

*Vernon v. Los Angeles*, 27 F.3d 1385 (9th Cir. 1994)................................................17

*Walker v. Jones*, 733 F.2d 923 (D.C. Cir. 1984),
   *cert. denied*, 469 U.S. 1036 (1984)..........................................................6, 28

*Wallace v. Jaffree*, 472 U.S. 38 (1984).............................................................9-10, 13, 14

*Webster v. Sun Company, Inc.*,
   561 F. Supp. 1184 (D.D.C. 1983),
   *vacated and remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984)..............25, 30

*Youngblood v. DeWeese*, 352 F.3d 836 (3rd Cir. 2003)..............................................20

## STATUTES

Fed. R. Civ. P. 26(b)................................................................................5, 8, 31

Fed. R. Civ. P. 72(a)......................................................................................4

2 U.S.C. § 72a............................................................................................25

2 U.S.C. § 166(d).........................................................................................24

2 U.S.C. § 441(b).........................................................................................32

2 U.S.C. § 602............................................................................................24

28 U.S.C. § 636(b)(1)......................................................................................4

31 U.S.C. § 717...........................................................................................24

## OTHER AUTHORITIES

U.S. Const. art. I, § 5, cl. 2.............................................................................6

*  U.S. Const. art. I, § 6, cl. 1.........................................................................1, 18

U.S. Const. art. I, § 7, cl. 2............................................................................29

\* Authorities upon which we chiefly rely are marked with asterisks.

Consolidated Appropriations Act of 2005, Pub. L. No. 108-447,
    Div. J, Title I, § 116, 118 Stat. 2809, 3346 (2004)..............................................2

Mt. Soledad Veterans Memorial Preservation Act, Pub. L. No. 109-272,
    120 Stat. 770 (2006).......................................................................................1, 3

H.R. 5683, 109th Cong. (2nd Sess. 2006)..........................................................2

H.R. Res. 167, 105th Cong. (1997) ..................................................................24

152 Cong. Rec. H4554 (June 26, 2006)............................................................2

152 Cong. Rec. H5433-34 (July 19, 2006).........................................................2

152 Cong. Rec. S8044 (July 20, 2006)...............................................................2

152 Cong. Rec. S8550 (August 1, 2006).............................................................2

Rule VIII, Rules of the U.S. House of Representatives, (110th Cong.),
    *available at* http://www.rules.house.gov/ruleprec/110th.pdf.........................5

Rule X.9, Rules of the U.S. House of Representatives, (110th Cong.),
    *available at* http://www.rules.house.gov/ruleprec/110th.pdf.......................25

S.D. Cal. Local Rule 26.1(e)..............................................................................4

Order in *Stupak v. Hoffman-LaRoche, Inc.*, No. 8:05-cv-926-T-30-TBM (M.D. Fla. April 28,
    2006)..........................................................................................................21

Order in *U.S. v. Moussaoui*, No. 01-455-A (E.D. Va.) (March 2, 2006)..............26, 29

Congressional Organizations, Committee on House Administration,
    *available at*
    http://cha.house.gov/index.php?option=com_content&task=view&id=45&Itemid=37..............25

Member's Handbook, 110th Cong.,
    *available at*
    http://cha.house.gov/index.php?option=com_content&task=view&id=49&Itemid=37..............25

Walter Oleszek, *The Legislative Framework*, Congressional Research Service,
    Dec. 2006.......................................................................................................31

Harold Hulme, *The Winning of Freedom of Speech by the House of Commons*,
    61 Am. Hist. Rev. 825 (1956)...........................................................................21

* Authorities upon which we chiefly rely are marked with asterisks.

John Reeve, *The Arguments in King's Bench in 1629 Concerning the Imprisonment of John Selden and Other Members of the House of Commons*, 25 J. Brit. Stud. 264 (1986) .................................................... 21

* Authorities upon which we chiefly rely are marked with asterisks.

## EXHIBIT LIST

| | |
|---|---|
| Exhibit MC1 | Order Consolidating Cases, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. Sept.22, 2006) |
| Exhibit MC2 | Mt. Soledad Veterans Memorial Preservation Act, Pub. L. No. 109-272, 120 Stat. 770 (2006) |
| Exhibit MC3 | Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, Div. J, Title I, § 116, 118 Stat. 2809, 3346 (2004) |
| Exhibit MC4 | First Amended Complaint for Declaratory Relief and Injunctive Relief, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. Sept. 8, 2006) |
| Exhibit MC5 | Complaint for Declaratory and Injunctive Relief, *Jewish War Veterans of the United States of America, Inc., et al. v. Gates*, No. 06-cv-1728 (S.D. Cal. Aug. 24, 2006) |
| Exhibit MC6 | Plaintiff's Request to Compel the Deposition of San Diego Mayor Jerry Sanders and Representative Duncan Hunter, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. Feb. 22, 2007) |
| Exhibit MC7 | Order Denying Plaintiff's Request to Compel the Deposition of San Diego Mayor Jerry Sanders and Representative Duncan Hunter, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. Apr. 2, 2007) |
| Exhibit MC8 | Subpoena Duces Tecum to The Honorable Duncan Hunter, Subpoena Duces Tecum to The Honorable Darrell Issa, Subpoena Duces Tecum to The Honorable Brian Bilbray (March 21, 2007) |
| Exhibit MC9 | Objection Letters to Jonathan Siegelbaum from Kerry Kircher and Duncan Hunter, Darrell Issa, and Brian Bilbray, Members of Congress (Apr. 9, 2007) |
| Exhibit MC10 | Order to Show Cause Re: Justiciability, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. June 4, 2007) |
| Exhibit MC11 | Order, *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (S.D. Cal. May 22, 2007) |
| Exhibit MC12 | Order, *Stupak v. Hoffman-LaRoche, Inc.*, No. 8:05-cv-926-T-30TBM (M.D. Fla. Apr. 28, 2006) |
| Exhibit MC13 | Order, *U.S. v. Moussaoui*, No. 01-455-A 9 (E.D. Va. Mar. 2, 2006) |

Exhibit MC14          Walter Oleszek, *The Legislative Framework*, Congressional Research
                      Service, Dec. 2006

Exhibit MC15          Communication from JWV Plaintiffs (Apr. 20, 2007)

**CONSOLIDATED OPPOSITION OF CONGRESSMEN
DARRELL E. ISSA, BRIAN P. BILBRAY AND DUNCAN HUNTER
TO PLAINTIFFS' MOTIONS TO COMPEL PRODUCTION OF DOCUMENTS**

Non-parties the Honorable Darrell E. Issa, U.S. Representative for California's 49th congressional district, the Honorable Brian P. Bilbray, U.S. Representative for California's 50th congressional district, and the Honorable Duncan Hunter, U.S. Representative for California's 52nd congressional district, respectfully oppose Plaintiffs' Motions to Compel Production of Documents Responsive to Subpoenas, all filed May 23, 2007, in these three consolidated miscellaneous matters.

## INTRODUCTION

The underlying lawsuit, *Jewish War Veterans of the United States, Inc., et al v. Gates*, No. 06-cv-1728, is pending in the U.S. District Court for the Southern District of California, and is consolidated there with *Trunk, et al v. City of San Diego, et al.*, No. 06-cv-1597. *See* Order Consolidating Cases (Sept. 22, 2006), attached as Exhibit MC 1. Those two consolidated cases challenge, on Establishment Clause grounds, (i) the Secretary of Defense's "display" of a cross that has long been part of the Mt. Soledad Veterans Memorial in San Diego, and (ii) the transfer to the United States of the land on which the memorial is located effectuated by the Mt. Soledad Veterans Memorial Preservation Act, Pub. L. No. 109-272, 120 Stat. 770 (2006) ("Memorial Preservation Act"), attached as Exhibit MC 2.

The matter now before the Court concerns the propriety of the efforts of the *Jewish War Veterans* case plaintiffs ("JWV Plaintiffs") to obtain broad and intrusive document discovery from three Members of the House who originally sponsored the bill that eventually became the Memorial Preservation Act. The three motions to compel should be denied in their entirety because none of the documents sought are relevant to the JWV Plaintiffs' claims in the underlying lawsuit. In addition, the motions to compel should be denied as to those documents – some but less than all of those sought – that are legislative and therefore absolutely privileged under the Speech or Debate Clause. U.S. Const. art. I, § 6, cl. 1 ("for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place"). Finally, the motions to compel should be denied as to those documents that are readily obtainable from other sources that are more convenient and less burdensome.

**Relevant Factual Background**

Congressmen Hunter, Issa and Bilbray all represent portions of the City and County of San Diego which are home to a large population of active duty and retired military personnel and to numerous major military installations and institutions (including the Marine Corps base at Camp Pendleton in the 49th congressional district, and the Marine Corps air station at Miramar in the 50th and 52nd congressional districts).

Congressman Hunter, an Army and Vietnam War veteran, has served in the U.S. House of Representatives since January 1981. He is the Ranking Member – and formerly was the Chairman – of the House Armed Services Committee. His principal legislative interests include military personnel and preparedness and veteran's affairs. Congressman Issa, also an Army veteran, has served in the House since January 2001. He currently serves on the House Permanent Select Committee on Intelligence and the House Committees on the Judiciary and Oversight and Government Reform. His core legislative interests include national security and veterans affairs. Congressman Bilbray has served in the House since June 2006 (and served previously from January 1995 through January 2001). He currently serves on the House Committees on Veterans Affairs, Science and Technology, and Oversight and Government Reform, and his principal legislative interests also include national security and veterans affairs.

In 2004, Congress passed legislation designating the Mt. Soledad Veterans Memorial in San Diego "a national memorial honoring veterans of the United States Armed Forces." Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, Div. J, Title I, § 116, 118 Stat. 2809, 3346 (2004), attached as Exhibit MC 3. Subsequently, during the 109th Congress, Congressmen Hunter, Issa and Bilbray co-sponsored the bill that became the Memorial Preservation Act "to effectuate the purpose" of the 2004 legislation designating the Mt. Soledad Veterans Memorial a national memorial. Their bill, H.R. 5683, 109th Cong. (2nd Sess. 2006), was introduced in the House on June 26, 2006, 152 Cong Rec. H4554 (2006); passed the House by a vote of 349-74 on July 19, 152 Cong Rec. at H5433-34; was introduced in the Senate the following day, 152 Cong Rec. at S8044; passed the Senate by unanimous consent on August 1, 152 Cong Rec. at S8550; and was signed into law by the President on August 14.

After making specific findings about the significance of the Mt. Soledad Veterans

Memorial, the Memorial Preservation Act (i) vests in the United States title to the land on which the memorial is located; (ii) obligates the United States to pay just compensation for the land; and (iii) vests in the Secretary of Defense responsibility for managing the property. Pub. L. No. 109-272, § 2(a)-(c).

### Relevant Procedural Background

On August 9, 2006 – before the President had even signed the bill – the *Trunk* case plaintiffs ("Trunk Plaintiffs") filed their complaint, which was subsequently amended, challenging the Memorial Preservation Act itself and the Secretary's display of the cross. *See* First Amended Complaint for Declaratory Relief and Injunctive Relief at 11 in *Trunk, et al. v. City of San Diego, et al.*, No. 06-cv-1597 (Sept. 8, 2006), attached as Exhibit MC 4. On August 24, the JWV Plaintiffs followed suit. *See* Complaint for Declaratory and Injunctive Relief at 18 in *Jewish War Veterans of the United States of America, Inc., et al. v. Gates*, No. 06-cv-1728 (Aug. 24, 2006) ("JWV Plaintiffs' Complaint"), attached as Exhibit MC 5.[1]

On February 22, 2007, Steve Trunk, a *Trunk* case plaintiff, filed with the District Court in San Diego Plaintiff's Request to Compel the Deposition of . . . Representative Hunter ("Trunk Motion to Compel"), attached as Exhibit MC 6. Trunk sought court authorization to depose Congressman Hunter for the express purpose of seeking "testimony . . . which will tend to confirm that the purpose of legislation [the Congressman] sponsored [*i.e.*, H.R. 5683] . . . was to preserve the presence of the Mount Soledad Latin cross on public property." Trunk Motion to

---

[1] The JWV Plaintiffs say, in their Request for Relief, that the court should declare "that the *taking of the Mt. Soledad Latin cross* and its continued display on federally owned land violates the Establishment Clause . . . ." JWV Plaintiffs' Complaint at 18 (emphasis added). We are not entirely certain what the italicized language means since (i) the Memorial Preservation Act "took" the land on which the memorial is located, not the cross as such; (ii) the JWV Plaintiffs, unlike the Trunk Plaintiffs, do not specifically ask the court to invalidate Memorial Preservation Act; and (iii) we have trouble conceiving how a court could invalidate the taking of the cross without invalidating the taking of the land itself. Notwithstanding this ambiguity, we construe the JWV Plaintiffs' Complaint as challenging the constitutionality of the Memorial Preservation Act itself (as well as the cross's display by the Secretary), primarily because, in their Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Compel Production of Documents Responsive to Subpoena at 10, 13-15 (May 23, 2007) ("Plaintiffs' Memorandum"), the JWV Plaintiffs extend their arguments about the supposed relevance of the documents they seek to the validity of the legislation itself.

Compel at 1-2. The District Court denied that motion on the grounds, among others, that the testimony sought (i) was not relevant to the Establishment Clause inquiry; (ii) was constitutionally privileged under the Speech or Debate Clause; and (iii) was unnecessarily duplicative. *See* Order Denying Plaintiff's Request to Compel the Depositions of . . . Representative Duncan Hunter at 7-9, 6-7, 10 (April 2, 2007) ("April 2 Order"), attached as Exhibit MC 7 [2]

Shortly before that, the JWV Plaintiffs served document subpoenas, attached as Exhibit MC 8, on Congressmen Hunter, Issa and Bilbray. The three subpoenas sought an identical set of nine categories of documents: Requests 1 and 2 sought press statements; Request 3 sought communications with groups that supported the legislation; Request 4 sought constituent communications and newsletters, and campaign and fund-raising materials; Requests 5-7 sought communications with the executive branch; and Requests 8-9 sought communications with the City of San Diego.

The three subpoenas were served effective March 26, 2007, and counsel agreed on a return date of April 9, 2007. On April 9, the three Members served written objections, attached collectively as Exhibit MC 9. Thereafter, pursuant to Local Rule 7(m), counsel tried hard to resolve this discovery dispute so that the Court would not be burdened with unnecessary litigation. The three Members, notwithstanding their objections, ultimately offered in writing to produce to the JWV Plaintiffs many of the non-privileged documents the latter had identified as most important to them. The JWV Plaintiffs rejected that offer, did not counter or otherwise engage in further discussions, and instead opted to litigate. Accordingly, the JWV Plaintiffs' characterization of the Members as having "persisted in refusing to produce a single responsive

---

[2] The April 2 Order was entered by Magistrate Judge William McCurine, Jr. *See* Local Rule of Practice for U.S. District Court for the S.D. California 26.1(e) (assigning to magistrate judges all motions to compel discovery). The Trunk and JWV Plaintiffs had 10 days to serve and file objections to the April 2 Order. 28 U.S.C. 636(b)(1); Fed.R.Civ.P. 72(a). Because neither did so, the April 2 Order is now final, *id.*, and the law of the case in the consolidated *Trunk* and *Jewish War Veterans* cases.

4

document," Plaintiffs' Memorandum at 2, is misleading.[3]

On June 1, 2007, Judge Burns of the District Court in San Diego directed the Trunk Plaintiffs to show cause by June 22 why certain aspects of their complaint should not be dismissed. *See* Order to Show Cause Re: Justiciability (June 1, 2007), attached as Exhibit MC 10. In pertinent part, the Show Cause Order expresses concerns about the justiciability of the Establishment Clause challenge to the "taking" of land effectuated by the Memorial Preservation Act (as distinct from the challenge to the cross' display). *See id.* at 5 ("[I]t is not clear why these Plaintiffs have standing to challenge the taking itself, or why such a matter is justiciable at all "), 6-7 (raising political question doctrine concerns about the challenge to the taking). While the Show Cause Order is directed only to the Trunk Plaintiffs, the resolution of the issues raised in that order about the Trunk Plaintiffs' challenge to the "taking" of the land will also affect the JWV Plaintiffs to the extent they have asserted the same claim. *See supra* note 1. Accordingly, unless the JWV Plaintiffs assert in their Reply that they are *not* challenging the constitutionality of the Memorial Preservation Act itself, this Court may wish to defer ruling on the three motions to compel until after Judge Burns rules on the justiciability of that claim.

## ARGUMENT

The JWV Plaintiffs' efforts to obtain information from Congressmen Hunter, Issa and Bilbray is limited by Rule 26(b)(1) to matters relevant to their claims or defenses, and by House Rule VIII, available at http://www.rules.house.gov/ruleprec/110th.pdf, which governs the receipt and disposition of subpoenas that "relat[e] to the official functions of the House," and that are directed to, among others, Members of the House. Rule VIII.3 authorizes Members of the House to respond to judicial subpoenas only if the information sought "is a proper exercise of jurisdiction by the court, is material and relevant, and is consistent with the privileges and rights

---

[3] The JWV Plaintiffs also misleadingly suggest that Magistrate Judge McCurine blessed their subpoenas in some way. *See* Plaintiffs' Memorandum at 18 (the Magistrate Judge "did not express any disapproval of those requests in the [April 2 Order]"). The April 2 Order did not address the three duces tecum subpoenas because there was no issue regarding those subpoenas before that court. The Magistrate Judge's failure to comment on an issue that (i) had not even matured, and (ii) could not have been raised before that court in any event, obviously has no bearing here.

of the House."[4]

In this case, there is no question as to this Court's jurisdiction. However, compliance with the subpoena is not consistent with the rights and privileges of the House because none of the documents the JWV Plaintiffs seek are material or relevant (Section I), many of the documents sought are constitutionally privileged (Section II), and some of the discovery requested is obtainable from other sources that are more convenient and less burdensome (Section III). Accordingly, the three motions to compel should be denied.

## I.     The Documents the JWV Plaintiffs Seek Are Not Material or Relevant to the Underlying Litigation.

### A.     *Lemon* Does Not Apply to the JWV Plaintiffs' Challenge to the Secretary's Display of the Cross.

The JWV Plaintiffs assert, without discussion, that the three-pronged Establishment Clause test announced by the Supreme Court more than 30 years ago in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) – "statute must have a secular legislative purpose; . . . its principal or primary effect must be one that neither advances nor inhibits religion; . . . the statute must not foster 'an excessive government entanglement with religion'" – applies to their challenge to the Secretary's display of the cross that is part of the Mt. Soledad Veterans Memorial. Plaintiffs' Memorandum at 12. In fact, the Supreme Court's most recent case law suggests otherwise. *Van Orden v. Perry*, 545 U.S. 677 (2005), upheld the display of a monument inscribed with the words of the Ten Commandments on the grounds of the Texas State Capitol. A four-justice plurality specifically held that *Lemon* is "not useful in dealing with the sort of passive monument that

---

[4] Rule VIII was duly adopted by the 110th Congress pursuant to the Rulemaking Clause of the Constitution, art. I, § 5, cl. 2, which is a "broad grant of authority," *Consumer's Union of the U.S., Inc. v. Periodical Correspondent's Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975), *cert. denied*, 423 U.S. 1051 (1976), that sits "[a]t the very core of our constitutional separation of powers." *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir. 1984) (MacKinnon, J., concurring in part and dissenting in part), *cert. denied*, 469 U.S. 1036 (1984). Rules promulgated pursuant to the Rulemaking Clause, within constitutional limitations, are "absolute and beyond the challenge of any other body or tribunal." *U.S. v. Ballin*, 144 U.S. 1, 5 (1892). *See also U.S. v. Smith*, 286 U.S. 6, 33 (1932) (same); *Shape of Things to Come, Inc. v. County of Kane*, 588 F. Supp. 1192, 1193 (N.D. Ill. 1984) (rules promulgated pursuant to Rulemaking Clause "have the force of law"); *Randolph v. Willis*, 220 F. Supp. 355, 358 (S.D. Cal. 1963) (same).

Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation's history." *Id.* at 686.[5] Justice Breyer, the fifth justice in the five-justice majority, also did not apply the *Lemon* test (although he acknowledged that application of that test might have led him to the same conclusion). *Id* at 700, 703-04. Instead, Justice Breyer analyzed the display itself and its context – including the circumstances surrounding the display and its physical setting – in light of the basic purposes of the Establishment Clause. *Id.*

As in *Van Orden*, the JWV Plaintiffs challenge the display of a long-standing "passive monument." (The cross has stood on Mt. Soledad since 1954; the Ten Commandments monument was erected on the grounds of the Texas State Capitol in 1961.) Thus, *Van Orden*, not *Lemon*, governs their challenge to the Secretary's display of the cross. And, regardless of whether the trial court analyzes the JWV Plaintiffs' display claim under the *Van Orden* plurality's "nature of the monument and our Nation's history" standard, Justice Breyer's "display and context" standard, or some combination of both, the document discovery sought from the three Members is not relevant. *See Van Orden*, 545 U.S. at 686-92 (plurality focused on specific examples of official acknowledgment of role of religion in American life; specific examples of official acknowledgment and displays of Ten Commandments; and nature of particular display of Ten Commandments at issue in *Van Orden*); 700-04 (Justice Breyer focused on history of monument's display, its physical setting and passage of time without legal challenge to monument, all in light of underlying purposes of Establishment Clause).

Accordingly, as an initial matter, the three motions to compel must be denied on relevance grounds with respect to the JWV Plaintiffs' "challenge [to] the governmental display of the Cross as a violation of the Establishment Clause." Plaintiffs' Memorandum at 1.

---

[5] The plurality distinguished a "passive monument" from other more active religious displays and activities, *Van Orden*, 545 U.S. at 691-92, such as a statute that required the Ten Commandments to be posted on the wall of each public school classroom (*Stone v. Graham*, 499 U.S. 39 (1980)); a statute that required Bible readings at each public school at the beginning of each school day (*Sch Dist of Abington Twp. v Schempp*, 374 U.S. 203 (1963)); and a statute that permitted school officials to invite clergy to offer prayer at public school graduations *(Lee v Weisman*, 505 U.S. 577 (1992)).

**B.    The April 2 Order Is the Law of the Case and Precludes the JWV Plaintiffs from Arguing that the Documents Sought Are Relevant to the Purpose of the Memorial Preservation Act.**

In light of *Van Orden*, *Lemon*, to the extent it applies at all here, only applies to the JWV Plaintiffs' challenge to the Memorial Preservation Act itself. And, to the extent the JWV Plaintiffs are seeking documents from the three Members that they contend are relevant to that claim, this Court should defer to the relevance determinations made by Magistrate Judge McCurine in his April 2 Order.

The April 2 Order focused exclusively on the purpose prong of the *Lemon* test and held that the purpose of a challenged statute is (i) determined only by objective factors such as legislative history, the plain meaning of the statute's words, the historical context of the statute, and the specific sequence of events leading to passage of the statute, April 2 Order at 7-8 (citing *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987)); (ii) determined only by events leading up to and contemporaneous with the bill's passage (and not with post-enactment events), April 2 Order at 8; and (iii) not determined by legislators' motives which are not relevant. *Id.* at 9 ("'Allowing discovery of legislative motives . . . would not only create a major departure from the precedent rejecting the use of legislative motives, but is also inconsistent with basic analysis under the First Amendment which has not turned on the motives of the legislators . . . .'") (quoting *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297-98 (9th Cir. 1984)).

The April 2 Order also determined that "Plaintiff's exhibits in support of his request to Compel demonstrates that he has a significant amount of source material available to him on the issue of legislative purpose . . . . Accordingly, the information Plaintiff seeks through deposition will be unnecessarily duplicative." April 2 Order at 10 (citing Fed.R.Civ.P. 26(b)(2)(C)(i)).

Those determinations are now the law of this case. The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.' . . . [T]he doctrine applies as much to the decision of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). *See also Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98 (D.D.C. 2005) (deferring, on basis of law of the case doctrine, to relevance determination made by District

Court for Virgin Islands – where underlying litigation was pending – in denying motion to quash deposition subpoena issued by D.D.C., which motion argued that testimony sought was not relevant to underlying litigation).

Here, the law of the case doctrine dictates that this Court disregard the JWV Plaintiffs' arguments that the discovery they seek is relevant "to proving the government's religious purpose." Plaintiffs' Memorandum at 14. The April 2 Order has already determined that resolution of *Lemon's* purpose prong turns on an analysis of objective factors only. April 2 Order at 7-8. And the documents the JWV Plaintiffs seek go well beyond and are well outside of those objective factors.

Furthermore, the April 2 Order has determined explicitly that legislators' motives are not relevant. *Id.* at 9. Since the JWV Plaintiffs' candidly admit that that is precisely what they seek – "Plaintiffs . . . entitled to probe behind the press releases and public events to determine to what extent (if any), the Members may have sought to conceal or display the religious intent of their actions," Plaintiffs' Memorandum at 15 – this Court must disregard their attempts to justify a fishing expedition into the Members' files on the basis of the purpose prong of the *Lemon* test.

Finally, the April 2 Order – coupled with a May 22, 2007 Order, attached as Exhibit MC 11, making discovery taken in one of the consolidated cases available for use in the other – has effectively determined that the JWV Plaintiffs already have sufficient material available to them on the issue of legislative purpose such that additional discovery on that issue "will be unnecessarily duplicative." April 2 Order at 10.[6]

_____

[6] The JWV Plaintiffs try to discredit the April 2 Order by asserting that it "rested on a misunderstanding of [*Wallace v. Jaffree*, 472 U.S. 38 (1985)]." Plaintiffs' Memorandum at 18, n.3. This argument refers to the Magistrate Judge's confusion as to the *setting* in which the sponsor of legislation provided testimony in that case. *See* April 2 Order at 8 n.3. *Wallace* in fact makes clear that the testimony was given in court, 472 U.S. at 43, 57, as the JWV Plaintiffs correctly assert. However, that fact is non-essential, and the Magistrate Judge's confusion on this point does not undercut his holding. What was important about *Wallace*, for purposes of the Trunk Motion to Compel [Congressman Hunter's Deposition Testimony], was the fact that "[t]here is nothing in the [*Wallace*] Court's opinion which indicates, or lends support to the notion, that the sponsor's *testimony* was compelled by court process or necessary for the Court's conclusion." April 2 Order at 8 n.3 (emphasis in original). On those two critical points, the Magistrate Judge was absolutely correct. *Wallace* never indicates whether the sponsor's

(continued...)

**C.    The Documents the JWV Plaintiffs Seek Are Not Relevant Even If *Lemon* Applies to Their Claims.**

The JWV Plaintiffs say that *Lemon* applies to their challenge to the Secretary's display of the cross, as well as to their challenge to the Memorial Preservation Act. Plaintiffs' Memorandum at 13-17. While we believe *Lemon* does not apply to the former, *supra* at Section I.A., and that the April 2 Order obviates the need for this Court to consider the JWV Plaintiffs' "purpose" arguments, *supra* at Section I.B., we nevertheless respond in detail and on the merits to all of the JWV Plaintiffs' *Lemon*-based arguments. However, the short answer to those arguments is that the JWV Plaintiffs have cited no case that holds that an Establishment Clause case plaintiff may rummage through the private legislative and political files of individual legislators – even legislators who sponsored legislation alleged to violate the Clause – in hopes of finding something that might possibly be relevant. There are sound reasons for this absence of precedent, as we now show.

**1.    The Discovery Sought Does Not Bear on the Purpose Prong of the *Lemon* Test.**

The JWV Plaintiffs' assertion that the subpoenaed documents are relevant to the purpose prong appears to relate only to their challenge to the Memorial Preservation Act, Plaintiffs' Memorandum at 14-15, and it rests entirely on two arguments. First, they say they are "entitled to probe behind the press releases and public events to determine to what extent (if any), the Members may have sought to conceal or display the religious intent of their actions." *Id.* at 15. In other words, the JWV Plaintiffs claim entitlement to discover the subjective motivations of

---

[6](...continued)

testimony was compelled. It merely indicates that he testified. 472 U.S. at 43, 57. Equally as important, nothing in the opinion suggests that the Supreme Court viewed the testimony as critical to its analysis of the statute's purpose. *Id.* at 58 (pointing to "legislative intent contained in the legislative record" as a source of evidence of statutory purpose). *See also id.* at 65 (Powell, J., concurring), 75, 77 (O'Connor, J., concurring) (both specifically rejecting sponsor's testimony as aide to ascertaining legislative purpose). Indeed, two years later, in *Edwards*, 482 U.S. at 596 n.19, the Supreme Court specifically stated that "[t]he Court has previously found the postenactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute. See *Wallace*, 472 U.S. at . . . 75 . . . (O'Connor, J., concurring in judgment)."

Congressmen Hunter, Issa and Bilbray. Second, the JWV Plaintiffs claim their discovery is relevant because "[t]he Members were deeply involved in – and helped develop – 'the historical context' surrounding the Act, and the requested documents are relevant to 'the specific sequence of events leading to passage of the statute.'" *Id.* at 14. Both arguments are wrong.

In evaluating whether a challenged statute has a legitimate secular purpose, courts are "reluctant to attribute unconstitutional motives to the [government], particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute." *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983). *See also Cammack v. Waihee*, 932. F.2d 765, 774 (9th Cir. 1991) ("statute will fail the purpose prong only if it is motivated wholly by an impermissible purpose").[7] Accordingly, in applying the purpose test, the bar is set high and the courts look only to "objective manifestations of legislative purpose," not "subjective motivations of individual legislators." *City of Las Vegas*, 747 F.2d at 1299. These objective indicators include the "plain meaning of the statute's words, enlightened by the context and the contemporaneous legislative history [and] the historical context of the statute, . . . and the specific sequence of events leading to its passage." *Edwards*, 482 U.S. at 594-95.

In light of these objective standards, the JWV Plaintiffs' first argument – that they are entitled to discover the subjective motivations of three particular Members because those Members happen to have sponsored a bill that eventually made its way into law – is flatly contradicted by the case law. "[W]hat is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislator who enacted the law." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 249 (1990). "Allowing discovery of legislative motives . . . would not only create a major departure from the precedent rejecting the use legislative motives, but is also inconsistent with basic analysis under the Fist Amendment." *City of Las Vegas*, 747 F.2d at 1298. *See also Meek v. Rideoutte*, 1990 WL 322973 (D.S.C.) (denying discovery into motivations of legislators who voted in favor of or against legislative enactment).

Individual legislators' motives are not relevant for good reason. A legislature is a

---

[7] The Memorial Preservation Act has a facially legitimate secular purpose, *i.e.*, to make the Secretary of Defense responsible for managing a congressionally designated and historically significant veterans memorial.

collective body, and "[i]f motivation is pertinent it is the motivation of the entire legislature, not the motivation of a handful of valuable members, that is relevant." *South Carolina Educ. Ass'n v. Campell*, 883 F.2d 1251, 1262 (4th Cir. 1989). Indeed, taken to its logical conclusion, the JWV Plaintiffs' argument would necessarily require discovery of all Members who voted in favor of the legislation – in this case, 349 House Members and 100 Senators. And that is as untenable as the notion that the subjective motivations of three particular Members bears some special relevance to the purpose of the underlying legislation.[8]

Furthermore, individual Members' motivations are inherently complex and difficult to determine, and more than one court has cautioned about the hazards of trying to ascertain such motives. *See, e g., U.S. v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment."); *Concrete Sys., Inc. v. Pavestone Co.*, 112 Fed.Appx. 67, 70 (1st Cir. 2004) (such an inquiry is complicated by '[t]he diverse character of [the legislators'] motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth.'" (quoting *Durand v. IDC Bellingham, LLC*, 793 N.E.2d 359, 365 (Mass. 2003)); *11126 Baltimore Blvd. v. Prince George's County, Maryland*, 886 F.2d 1415, 1426 (4th Cir. 1989), *vacated and remanded on other grounds*, 495 U.S. 901 (1990) ("legislators may have multiple, unexpressed purposes for enacting legislation"); *South Carolina Educ. Ass'n*, 883 F.2d at 1261 ("Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed.").

Accordingly, short of putting the three Members on a couch or in a deposition room –

---

[8]  The potentially sweeping ramifications of the JWV Plaintiffs' contention that sponsors' motives are particularly relevant is underscored by the fact that the passage of legislation is rarely as straightforward as it was in this case. More frequently, legislation is amended – in committees and subcommittees of the House or Senate, on the floor of the House or Senate, or in conference committee – by individual Members or groups of Members, or by individual Members or groups of Members at the behest of other branches of the government, or constituents or interest groups. In other words, enacted legislation frequently has very many legislative "sponsors," all of whom would potentially be subject to discovery if the JWV Plaintiffs have their way here.

neither of which is permissible, *Wallace*, 472 U.S. at 74 (O'Connor, J., concurring) ("a court has no license to psychoanalyze the legislators"); *U S v Brewster*, 408 U.S. 501, 525 (1972) ("[T]he Speech or Debate Clause protects against inquiry into . . . the motivation for [legislative] acts.") – individual legislators' motivations for particular legislative actions remain unknowable and undiscoverable.[9]

The JWV Plaintiffs' second argument, that "[t]he Members were deeply involved in – and helped develop – 'the historical context' surrounding the Act," Plaintiffs' Memorandum at 14, fares no better. The JWV Plaintiffs cite *McCreary*, 545 U.S. 844, *Santa Fe Indep Sch Dist v Doe*, 530 U.S. 290 (2000), *Edwards*, 482 U.S. 578, and *Wallace*, 472 U.S. 38. However, none of those cases suggest that the kind of documents the JWV Plaintiffs seek – press releases, campaign and fund-raising records, and private communications between legislators and their constituents, supporters and the executive branch about legislative language and strategy – are part of what the Supreme Court considers the "historical context" or the "specific sequence of events" leading to passage of legislation.

*McCreary* examined the text of the challenged statute, the public history of the display at issue (including the counties' modifications), and the display itself, to determine purpose. 545 U.S. at 868-73. The Court also suggested that "historical context" refers to "publicly available data." *Id.* at 862-63. *Santa Fe* examined the public history of the school prayer policy, including past traditions of prayer recitation at school-sponsored functions (although primarily in the context of the effects analysis). 530 U.S. at 308-10, 314-17. *Edwards* resolved the purpose issue on the basis of the plain meaning and legislative history of the statute at issue in that case. 482 U.S. at 586-89. And *Wallace* relied on legislative history and the texts of past statutes to

---

[9] Even if the JWV Plaintiffs' premise that "the Members appear to have managed their message carefully, speaking in code about the threats to the 'war memorial,'" Plaintiffs' Memorandum at 15, were correct, the subpoenaed documents would still not be relevant. First, the issue of "sham" purpose concerns the legislature's purpose, not the subjective motivations of individual legislators. *See Wallace*, 472 U.S. at 75 (Powell, J., concurring). Furthermore, "[i]f someone in the government hides religious motive so well that the 'objective observer, acquainted with the text, legislative history, and implementation of the statute . . . cannot see it,' . . . [then it is] no reason for great constitutional concern." *McCreary County, Kentucky v ACLU*, 545 U.S. 844, 863 (2005) (quoting *Wallace*, 472 U.S. at 76).

resolve the purpose issue. 472 U.S. at 56-60.

In other words, the Supreme Court appears to view "historical context" largely as a matter of public events that are widely known and reported, and "specific sequence of events" as largely synonymous with some combination of historical context and legislative history. Nothing about the reported decisions that have used these terms supports the notion that they are intended to render discoverable anything and everything that ever occurred before the passage of a particular statute.

Moreover, of course, as a matter of law and simple logic, those words cannot cover information about events that occur *after* a statute's enactment, such as, for example, the documents sought in this case by Requests 6 and 8. *See, e.g., Edwards*, 482 U.S. at 596 n.19 ("post enactment elucidation of the meaning of a statute . . . [is] of little relevance in the determining the intent of the legislature").

The irony here, of course, is that the JWV Plaintiffs already are familiar with the history of the cross' display and the events leading to passage of the Memorial Preservation Act. *See* Plaintiffs' Memorandum at 2-11. Whether or not that information is relevant to their claims, the new discovery they now seek from the three Members most assuredly is not.

### 2.    The Discovery Sought Does Not Bear on the Effects Prong of the *Lemon* Test.

While the JWV Plaintiffs' effort to justify their discovery on the basis of *Lemon*'s purpose prong focuses entirely on their challenge to the statute, their effort to justify the discovery on the basis of *Lemon*'s effects prong focuses almost entirely on their display claim. Plaintiffs' Memorandum at 15-17. The cross' display is a matter within the Secretary's control, has never been a matter within the three Members' control, and is not mandated by the Memorial Preservation Act. While the *Lemon* test has no bearing on the JWV Plaintiffs' display claim, *see supra* at Section I.A., it would not justify the discovery sought even if it did.

The "effects" prong of the *Lemon* test has evolved over time, and its thrust now is "whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" *Allegheny County v. ACLU*, 492 U.S. 573, 597 (1989)

(quoting *Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985)). *See also Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring) ("a government practice [should] not have the effect of communicating a message of government endorsement or disapproval of religion") Resolution of this question calls for application of a "reasonable observer" standard. *Kreisner v. City of San Diego*, 1 F.3d 775, 784 (9th Cir. 1993) (citing *Allegheny*, 492 U.S. at 620). The "reasonable observer" is "informed and reasonable; we assume that he or she is familiar with the history of the government practice at issue." *Id.* It is, in other words, essentially an objective legal standard. *See Lynch*, 465 U.S. at 693-94 (O'Connor, J., concurring) ("the question is, like the question of whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts").

In light of this standard, the JWV Plaintiffs can do no more than argue by fiat. They baldly decree, for example, that:

- the reasonable observer "is likely to have her perception whether government action is an endorsement shaped by the public statements of the government officials who brought about the action";

- what the reasonable observer perceives "depends on how the Members communicated to adherents and nonadherents about those actions";

- "the Members provided the public with messages that informed their views of what the government was doing with regard to the Cross"; and

- "the effect of the display of the Cross is influenced by the association between the Members trying to ensure its continued display and religious figures and organizations."

Plaintiffs' Memorandum at 16. The Court has absolutely no reason to assume that any of these cut-from-whole-cloth declarations is true. Furthermore, none are anchored in any case law that even purports to authorize the sort of broad and intrusive discovery into legislators' private congressional files that the JWV Plaintiffs advocate here.

The JWV Plaintiffs also ignore the fact that the three Members did not bring about, and are not responsible for, the display of the cross. And, finally, all of the JWV Plaintiffs' bald assertions ignore the fact that the vast majority of the discovery they seek is non-public

information (in particular the information sought by Requests 3 and 5-9). There is no legal or logical basis upon which the JWV Plaintiffs could claim that a "reasonable observer's" views could have been shaped by such non-public information.

The very most the JWV Plaintiffs could possibly justify discovering here under the banner of the *Lemon* effects prong would be the Members' press and other public statements – and of course they already have those. *See, e g*, Plaintiffs' Memorandum at 8-10; Trunk Motion to Compel, Exhibits 6, 13. And even then, the Court would have to create new law to permit the JWV Plaintiffs to take such discovery.

### 3.   The Discovery Sought Does Not Bear on the Entanglement Prong of the *Lemon* Test.

When it comes to *Lemon's* entanglement prong, the JWV Plaintiffs throw up their hands and eschew any serious effort to justify the discovery they seek. Their argument pretty much begins and ends with the bald assertion that "[t]he documents Plaintiffs seek are further relevant because they may demonstrate an excessive government entanglement with religion." Plaintiffs' Memorandum at 17.

The entanglement question focuses on the "character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Lemon* 403 U.S. at 615. In making this assessment, the courts have examined various factors. In *Agostini v. Felton*, 521 U.S. 203, 233 (1997) (an aid to parochial schools case), for example, the Supreme Court, found that the entanglement issue turned on whether (i) "pervasive monitoring" by public authorities would be required to ensure that the program in question did not inculcate religion; (ii) the program required "administrative cooperation" between the board of education and religious schools; and (iii) the program might increase the dangers of "political divisiveness."

In *Lynch* (a nativity scene display case), the Supreme Court conceptualized the entanglement issue as having two aspects: (i) "administrative entanglement between religion and state," and (ii) "political divisiveness" or political entanglement. 465 U.S. at 683. With respect to administrative entanglement, the Court examined the city administrators' contact with church authorities regarding the content of a display, government expenditures with respect to the

16

display, and ongoing interaction between church and state.[10] (The political entanglement issue is largely a matter of judicial judgment.)

Entanglement, in other words, is an issue about the connections or contacts between the *executive authority* responsible for executing a particular program or mandate, or creating or maintaining a particular object or display, on the one hand, and religious institutions on the other hand. In this case, if the entanglement issue is relevant at all to the display claim – and we have suggested elsewhere that it is not, *see supra* at Section I.A. – it turns on the Secretary's interactions with religious institutions regarding the display. Accordingly, the JWV Plaintiffs' suggestion that if Members "assisted religious organizations in establishing contacts within the Executive Branch," then documents that reflected that would be relevant, Plaintiffs' Memorandum at 17 (referring to Request 5), is simply too far afield.[11] The entanglement issue is about more than whether religious organizations, or religiously-motivated individuals, meet or talk with government officials. *See generally Agostini*, 521 U.S. at 233 ("Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable . . . and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause."); *Lemon*, 403 U.S. at 614 ("Some relationship between government and religious organizations is inevitable.").

And there is no suggestion in any of the cases that the entanglement question turns on connections or contacts between *legislators* and individuals or groups supporting passage of legislation, even if those individuals or groups have some religious affiliation. Accordingly, the JWV Plaintiffs' suggestion that "documents relating to the Members' contacts with numerous

---

[10] The lower courts have parsed the entanglement issue in a similar manner. *See, e.g., Vernon v. Los Angeles*, 27 F.3d 1385, 1399 (9th Cir. 1994) (administrative entanglement involves "first, the character and purpose of the religious institution affected by government action; second, the nature of the activity that the government mandates; and third, the resulting relationship between the government and religious institution").

[11] It is also silly for the JWV Plaintiffs to ask Members of Congress about introductions they may have provided to the Secretary when they can directly ask the Secretary – who is the defendant after all – about his interactions, if any, with religious institutions.

interest groups with religious affiliations," Plaintiffs' Memorandum at 17 (referring to Request

3), is even further afield.[12]

## II.    Some of the Documents Sought Are Absolutely Privileged From Production Under the Speech or Debate Clause.

Aside from the fact, as discussed above, that none of the documents responsive to the

subpoena are relevant to the underlying litigation, some responsive documents are also absolutely

privileged from production under the Speech or Debate Clause.  U.S. Const. art. I, § 6, cl. 1.

While the JWV Plaintiffs seem to believe the three Members have asserted Speech or Debate as

to *all* responsive documents, Plaintiffs' Memorandum at 19-29, that is not in fact accurate.

Instead, the Members only assert Speech or Debate as to many – but not all – documents

that appear to be responsive to Requests 3, 5, 7 and 9,[13] and they do not assert Speech or Debate

---

[12]  The JWV Plaintiffs appear to implicitly concede that documents that fall within the other categories of their subpoenas – press statements (Requests 1 and 2), constituent communications and newsletters, and campaign and fund-raising materials (Request 4), communications with the executive branch (Requests 6-7), and communications with the City of San Diego (Requests 8-9) – are not relevant to the entanglements inquiry.

[13]  Requests 3, 5, 7 and 9 are as follows:

3. All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with [various organizations] regarding Mt. Soledad or the Mt. Soledad Latin Cross.

5. All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross

7. All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

9. All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

Subpoena to Congressman Hunter, Attachment A at 4-5; Subpoena to Congressman Issa,

(continued...)

as to any documents responsive to Requests 1, 2, 4, 6 and 8 (as we previously advised the JWV Plaintiffs' counsel during our Rule 7(m) discussions).[14]

Those documents that are responsive to Requests 3, 5, 7 and 9, and that are privileged, fall into the following categories:

- Documents – mostly in the form of emails – reflecting communications between the Members and/or their staffs and other congressional offices, both House and Senate, regarding legislation that concerned Mt. Soledad.

- Information collected by the Members – including communications with the executive branch, the City of San Diego and other constituents, and interested organizations and members of the public – to inform themselves about the Mt. Soledad issue for the purpose of formulating legislation, formulating strategies for passing legislation, or otherwise carrying out their legislative responsibilities.

With respect to the first of these categories – intralegislative communications – it appears there is no dispute. The JWV Plaintiffs acknowledge "that they are not entitled to intralegislative communications regarding the drafting, proposal, discussion, or negotiations of legislation." Plaintiffs' Memorandum at 28. And we agree with their assertion that "to the extent that Members' offices communicate regarding non-legislative matters . . . those communications are not privileged." *Id.* Accordingly, we do not discuss this category further.

To assist the Court in addressing the Speech or Debate issue with respect to the second category – information collected in furtherance of legislative activities – we first provide a brief overview of the history, scope, purpose and functioning of the Clause (Part A); then we explain why the documents that fall within the second category are absolutely privileged (Part B).

---

[13](...continued)
Attachment A at 4-5; Subpoena to Congressman Bilbray, Attachment A at 4-5 (Exhibit MC 8).

[14] Accordingly, we do not address any Speech or Debate arguments in Plaintiffs' Memorandum that address Requests 1, 2, 4, 6 or 8. *See, e.g.*, Plaintiffs' Memorandum at 21-22 (Requests 1, 2 and 4), 25 (Request 6).

A.    **Brief Constitutional Overview:  The Speech or Debate Clause Bars Interference with, and Inquiry into, Legislative Activities.**

1.    **History and Purpose of the Clause**

The Speech or Debate privilege is rooted in the epic struggle for parliamentary independence in 16th- and 17th-century England:

> Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators.

*U.S. v. Johnson*, 383 U.S. 169, 178 (1966).

> As Parliament achieved increasing independence from the Crown, its statement of the privilege grew stronger. In 1523, Sir Thomas More could make only a tentative claim. . . . In 1668, after a long and bitter struggle, Parliament finally laid the ghost of Charles I, who had prosecuted Sir John Elliot and others for "seditious" speeches in Parliament. . . . In 1689, the Bill of Rights declared in unequivocal language: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament."

*Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). As a result of the English experience, "[f]reedom of speech and action in the legislature was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause of our Constitution. *Id.*

The purpose of the Speech or Debate Clause

> is to insure that the legislative function the Constitution allocates to Congress may be performed independently.
>
> [T]he "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary. . . ."

*Eastland v. United States Serviceman's Fund*, 421 U.S. 491, 502 (1975) (quoting *Gravel v. U.S.*, 408 U.S. 606, 617 (1972)). "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *Johnson*, 383 U.S. at 178. *See also Youngblood v. DeWeese*, 352 F.3d 836, 839 (3rd Cir. 2003) ("Ensuring a strong and independent legislative branch was essential to the framers' notion of separation of powers . . . . The Speech or Debate Clause is one manifestation of this practical security for protecting the independence of the legislative branch."); *U.S. v. Myers*, 635 F.2d 932, 935-36 (2nd Cir. 1980) ("Like the Speech or Debate Clause, the doctrine of separation

20

of powers serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen.").

Because "the guarantees of th[e Speech or Debate] Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501. *See also Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 624; *Johnson*, 383 U.S. at 179.

This broad reading has included extending the protections of the Clause "not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618. It has also included extending the protections of the Clause beyond the criminal context where it originated, *Johnson*, 383 U.S. at 180-82,[15] to the private civil context because a "private civil action . . . creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks . . . ." *Eastland*, 421 U.S. at 503. *See also Brown & Williamson Tobacco v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) ("The Speech or Debate Clause applies in civil cases as well as criminal prosecutions. . . . The Clause states, after all, that Members shall not be called to account 'in any other Place' – not just a criminal court.").[16]

_____

[15] *See also* Harold Hulme, *The Winning of Freedom of Speech by the House of Commons*, 61 Am. Hist. Rev. 825, 836 (1956); John Reeve, *The Arguments in King's Bench in 1629 Concerning the Imprisonment of John Selden and Other Members of the House of Commons*, 25 J. Brit. Stud. 264, 265 (1986).

[16] The subpoenas requested a privilege log for any responsive document the Members claimed were Speech or Debate protected. Subpoena to Congressman Hunter, Attachment A at 3; Subpoena to Congressman Issa, Attachment A at 3; Subpoena to Congressman Bilbray, Attachment A at 3 (Exhibit MC 8). However, a privilege log is inconsistent with the purposes of the Clause and not supportable in light of *Helstoski's* direction that the courts treat the Clause "with the sensitivity that such important values require." 442 U.S. at 506. *See, e.g.*, Order at 6 in *Stupak v. Hoffman-LaRoche, Inc.*, No. 8:05-cv-926-T-30TBM (M.D. Fla. April 28, 2006),

(continued...)

### 2.    The Scope of the Clause

The protections afforded to Members of Congress by the Speech or Debate Clause apply

to *all* activities "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*,

408 U.S. at 624-25), which encompasses all activities that are

> "an integral part of the deliberative and communicative processes
> by which Members participate in committee and House
> proceedings with respect to the consideration and passage or
> rejection of proposed legislation or with respect to other matters
> which the Constitution places within the jurisdiction of either
> House."

*Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625).

The courts, broadly construing the concept of legislative activity, "have plainly not taken

a literalistic approach in applying the privilege. . . . Committee reports, resolutions, and the act of

voting are equally covered," *Gravel*, 408 U.S. at 617; as are committee investigations and

hearings, *Eastland*, 421 U.S. 491; as is information gathering in furtherance of legislative

responsibilities because "'[a] legislative body cannot legislate wisely or effectively in the absence

of information respecting the conditions which the legislation is intended to affect or change.'"

*Id.* at 504 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).

### 3.    The Functioning of the Clause

In practice, the Speech or Debate privilege has three broad components. First, the Clause

provides immunity for all actions "within the 'legislative sphere,' . . . even though the[] conduct,

if performed in other than legislative contexts, would in itself be unconstitutional or otherwise

contrary to criminal or civil statutes." *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S.

at 624-25). Second, the Clause bars prosecutors in a criminal case – and parties to a civil suit –

against a Member of Congress from advancing their case by "[r]evealing information as to a

legislative act." *U.S. v. Helstoski*, 442 U.S. 477, 490 (1979). These two protections are of

limited relevance here.

---

[16](...continued)
attached as Exhibit MC 12 (requiring Member to submit privilege log "is contrary to the purpose
of the Speech or Debate Clause"). Instead, In the Speech or Debate context, Members routinely
make representations adequate to enable the requestor and the court to understand what is being
withheld as privileged and why – just as Congressmen Hunter, Issa and Bilbray have done here.

Third, and of considerable importance here, the Clause provides a non-disclosure privilege. *Gravel*, 408 U.S. 606; *Helstoski*, 442 U.S. at 484-86. This aspect of the privilege – sometimes referred to misleadingly as a "testimonial" privilege – operates to protect Members of Congress against having to testify as to privileged matters and having to produce privileged documents.[17]

The non-disclosure aspect of the privilege is vitally important for obvious reasons. If Members of Congress could be forced to disclose information about their legislative activities, that would (i) undercut congressional independence by chilling the candid exchange of views and information among Members, their staffs, and others from whom Members seek advice on pending or proposed legislation; (ii) interfere with Congress' ability to obtain information by discouraging cooperation with Congress and discouraging vigorous congressional investigation and oversight; and (iii) interfere with Congress' functioning by enabling outside parties to drown congressional offices in a flood of subpoenas. *Peoples Temple of the Disciples of Christ*, 515 F. Supp. at 249. Indeed, the Ninth Circuit held, in quashing a deposition subpoena to a *former* Member of Congress, that "*[a]ny* questioning about legislative acts . . . would 'interfere' [with legislative activities] by having a chilling effect on Congressional freedom of speech." *Miller*, 709 F.2d at 528 (emphasis added). *See also Brown & Williamson*, 62 F.3d at 419 ("[A]ny probing of legislative acts is sufficient to trigger the immunity.").

The courts draw no distinctions between these three component of the Clause. *Id.* at 421 ("A party is no more entitled to compel congressional testimony – or production of documents – than it is to sue congressmen."); *MINPECO*, 844 F.2d at 859-61. Rather, the Supreme Court has stated unequivocally that when the Speech or Debate Clause applies, it is "absolute."

---

[17] <u>Testimony</u>: *Dennis v. Sparks*, 449 U.S. 24, 30 (1980) (dicta); *Gravel*, 408 U.S. at 615-16; *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 528-29 (9th Cir. 1983) (quashing subpoena to nonparty former Congressman). <u>Documents</u>: *Brown & Williamson*, 62 F.3d 408; *MINPECO v. Conticommodity Services, Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988); *McSurely v. McClellan*, 553 F.2d 1277, 1296-97 (D.C. Cir. 1976) (en banc), *cert. granted*, 434 U.S. 888 (1977), *cert. dismissed sub nom. McAdams v. McSurely*, 438 U.S. 189 (1978); *Pentagen Technologies Int'l, Ltd. v. Committee on Appropriations*, 20 F. Supp.2d 41, 43-44 (D.D.C. 1998), *aff'd*, 194 F.3d 174 (D.C. Cir. 1999); *U.S. v. Peoples Temple of the Disciples of Christ*, 515 F. Supp. 246, 248-49 (D.D.C. 1981).

> The question to be resolved is whether the actions of the petitioners fall within the "sphere of legitimate legislative activity." If they do, the petitioners "shall not be questioned in any other Place" about those activities since the prohibitions of the Speech or Debate Clause are absolute.

*Eastland*, 421 U.S. at 501. *See also id.* at 503, 509-10, 510 n.16; *Gravel*, 408 U.S. at 623 n.14;

*Barr v. Matteo*, 360 U.S. 564, 569 (1959).

### B.   The Speech or Debate Clause Protects Information of All Sorts Gathered by Members in Furtherance of Their Legislative Responsibilities.

The documents responsive to Requests 3, 5, 7 and 9 which the Members assert are privileged – information collected by the Members to inform themselves about the Mt. Soledad issue for the purpose of formulating legislation, formulating strategies for passing legislation, or otherwise carrying out their legislative responsibilities – encompass such things as historical materials; press clippings; memoranda; communications between Members (and/or their staffs) and the executive branch, the City of San Diego, other constituents, and interested organizations or members of the public about the legislation, legislative strategies, and the like. This information is constitutionally protected for the following reasons.

1   First, as noted above, information gathered by Members "respecting the conditions which the legislation is intended to affect or change," *Eastland*, 421 U.S. at 504, is integral to the legislative process and therefore Speech or Debate protected. *See also Gov't of the Virgin Islands v. Lee*, 775 F.2d 514, 521 (3rd Cir. 1985); *Miller*, 709 F.2d at 530. In the House, the process of gathering information about issues on which the House is legislating or may legislate goes on continuously and is extremely broad in scope. It is done formally through House committee hearings, document subpoenas and, occasionally, other means such as depositions, interrogatories and letters rogatory. *See, e.g.*, H.R. Res. 167, 105th Cong. (1997). Information is also gathered informally, both on an institutional[18] and an individual level.[19]

---

[18] House committees routinely seek information informally before resorting to more formal means to inform their Members about legislative issues, as well as to prepare themselves for hearings and investigations. For example, committees seek information informally from congressional support offices (Congressional Research Service, 2 U.S.C. § 166(d); Congressional Budget Office, 2 U.S.C. § 602; Government Accountability Office, 31 U.S.C. § 717(b), executive branch agencies, non-governmental organizations, party organizations (*e.g.*, House

(continued...)

When Members do gather information in furtherance of their legislative duties, that activity is protected by the Speech or Debate Clause – regardless of the informality of the process – as every court that has seriously considered the issue has so held. *See, e.g., Brown & Williamson*, 62 F.3d 408 (documents voluntarily delivered to committee by private citizen protected); *McSurely*, 553 F.2d at 1287 ("[A]cquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the [Speech or Debate] privilege so that congressmen are able to discharge their constitutional duties properly."); *Webster v. Sun Company, Inc.*, 561 F. Supp. 1184, 1189-90 (D.D.C. 1983), *vacated and remanded on other grounds*, 731 F.2d 1 (D.C. Cir. 1984) (Congressional Research Service analyst's receipt of information from lobbyist protected); *Miller*, 709 F.2d at 530 ("Obtaining information pertinent to potential legislation or investigation is one of the 'things generally done in a session of the House,' . . . concerning matters within the 'legitimate legislative sphere.' . . . [For example, c]onstituents may provide data to document their views when urging the Congressman to initiate or support some legislative action.") (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881), and *Eastland*, 421 U.S. at 503); *Gov't of the Virgin Islands*, 775 F.2d at 520-01 (fact-finding by individual legislator protected); *Tavoulareas v. Piro*, 527 F. Supp. 676, 680 (D.D.C. 1981) ("[A]cquisition of information by congressional staff, whether formally or

---

[18](. . .continued)
Republican Conference and Democratic Caucus), and private individuals. Committees also hire professional staffers who are often themselves important sources of information. *See* 2 U.S.C. § 72a(b); Rule X.9, Rules of the House of Representatives (110th Cong.), available at http://clerk.house.gov/legislative/rules110/index.html.

[19]  Because institutional information gathering is not always adequate to satisfy the need for information of individual House Members, individual Members often find it necessary to obtain information on their own. Like committees, they obtain information from congressional support offices, governmental agencies, non-governmental organizations, party organizations, private individuals and staffers. They also band together in ad hoc groups to advance their information-gathering needs. *See* Committee on House Administration, Congressional Organizations, available at http://cha.house.gov/index.php?option=com_content&task=view&id=45&Itemid=37 (listing Congressional Member Organizations in 110th and prior Congresses). Finally, Members obtain information from their constituents, both directly and through informal devices such as the "town hall meeting." *See* Committee on House Administration, Member's Handbook at "Official and Representational Expenses – Town Hall Meetings," 110th Cong., available at http://cha.house.gov/index.php?option=com_content&task=view&id=49&Itemid=37.

informally, is an activity within the protective ambit of the speech or debate clause."); *United Transp. Union v. Springfield Terminal Ry. Co.*, 113 Lab. Cas. ¶ 11,643 (D. Me. 1989) (information gathering, and monitoring of labor relations, by congressional staff that related to pending and proposed legislation protected); Order in *U.S. v. Moussaoui*, No. 01-455-A (E.D. Va.) (March 2, 2006) (quashing on Speech or Debate grounds subpoena to House Member that sought, among other things, documents Member obtained from Defense Department, and testimony about communications with Department), attached as Exhibit MC 13.

These cases appropriately hold, in short, that information – like the information at issue here – gathered by Members informally in furtherance of legislative interests and initiatives is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," *Gravel*, 408 U.S. at 625, and is therefore Speech or Debate protected.[20]

2. Second, the Speech or Debate Clause precludes inquiry into legislators' motivations for legislative activities. *See, e.g.*, *Brewster*, 408 U.S. at 525 ("It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts."); *Johnson*, 383 U.S. at 180 (motivation behind a "Congressman's conduct . . . is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry"); *Gov't of the Virgin Islands*, 775 F.2d at 522 ("[L]egislative immunity precludes inquiry into the motives or purposes of a legislative act."); *Miller*, 709 F.2d at 530 ("Th[e] proscription [of the Speech or Debate Clause] includes questions about [the Member's] motive or legislative purpose.").

The information at issue here necessarily reflects the Members' motivations for drafting, sponsoring and pushing for passage of H.R. 5683. As we noted above, the JWV Plaintiffs candidly admit that they seek to determine the three Members' legislative "intent." Plaintiffs' Memorandum at 15. However, documents that reflect such legislative intent are decidedly off

---

[20] The D.C. Circuit has also framed the privilege in this context as protecting Congress' ability "to use materials in its possession without judicial interference. . . . In this context, the privilege operates to insulate materials held by Congress from claims based on actions or occurrences other than Congress' present use." *Brown & Williamson*, 62 F.3d at 416.

limits to the JWV Plaintiffs. "[M]otivation for the [legislative] action taken, as well as the detail of the acts performed, are immune from judicial inquiry." *U.S. v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973).

3. Third, preparations for legislative activities such as meetings, hearings, speeches and the like, are just as absolutely protected by the Speech or Debate privilege as those specific activities themselves. *See, e.g., Johnson*, 383 U.S. at 173-77 (Speech or Debate privilege precluded inquiring into the motivations for, preparation of, and ingredients of a speech delivered by a Member on the House floor); *Gravel*, 408 U.S. at 629 (Speech or Debate Clause precludes questioning "concerning any act . . . performed by the Senator, or by his aides in course of their employment, in preparation for the subcommittee hearing");[21] *MINPECO*, 844 F.2d at 861 ("preparation of the statement for publication in the subcommittee report was part of the legislative process"); *Dowdy*, 479 F.2d at 223-24 (preparation for hearing protected).

This is sound as a matter of constitutional law since virtually every specific legislative action – whether it be an oversight hearing, a speech on the floor of the House, the publication of a report, or a meeting with constituents about some legislative matter – entails some advance preparation. And compelled questioning of a Member or his aide about such preparatory activities can reveal what a Member "is doing, or might be about to do," which is precisely what the Speech or Debate Clause prohibits. *Brown & Williamson*, 62 F.3d at 420. *See also id.* at 419 ("any probing of legislative acts is sufficient to trigger the immunity").

Accordingly, documents that fall within the scope of Requests 3, 5, 7 and 9 that constitute preparations for meetings or appointments that were legislative in nature – for example, calendar entries and email confirmations of meetings – are Speech or Debate protected.

4. In light of the foregoing, the JWV Plaintiffs' arguments are readily disposed of.

a. First, their argument that information gathering by Members is not integral, but only "related," to the legislative process, Plaintiffs' Memorandum at 28-29, manifests a profound

---

[21] While *Gravel* suggested that there might be an exception to its holding barring inquiry into "preparation for a [legislative] hearing" for investigations that concerned "possible third-party crime," 408 U.S. at 629, such an exception, if it exists at all, obviously has no relevance here. *Cf. Eastland*, 421 U.S. at 501, 503, 507, 509-10, 510 n.16 (implicitly casting doubt on existence of any third-party crime exception); *Brown & Williamson*, 62 F.3d at 419-20 (same).

lack of understanding of the critical role that information gathering – both formal and informal – plays in the legislative process, and is directly contradicted by the case law cited above at Section II.B.1  This argument, which would essentially confine the privilege to a narrow band of formal legislative activities like floor debates, votes, and formal committee hearings, is also contradicted more generally by the Supreme Court's direction that the Speech or Debate Clause be interpreted "broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.

Furthermore, the privileged "information-gathering" documents at issue here, which can only fairly be described as essential to legislating because they "significantly inform[ed] or influence[d] the shaping of our nation's laws," *Walker*, 733 F.2d at 931, are qualitatively different from the kinds of activities the courts have said are "related," but not integral, to the legislative process. These merely related activities include constituent casework, *Brewster*, 408 U.S. at 512; private republication of legislative papers, *Gravel*, 408 U.S. at 626; press statements and newsletters, *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979); and congressional restaurant administration, *Walker*, 733 F.2d at 931.

b.  The JWV Plaintiffs also appear to argue that *all* contacts between the executive and legislative branch are non-legislative. Plaintiffs' Memorandum at 26 ("Under our system of separation of powers, the Executive Branch cannot be considered an 'integral part' of the means by which Members fulfill their constitutional duty to enact legislation."). If that is the argument, it rests on a glaring misreading of the case law.

Any number of cases, including those cited by the JWV Plaintiffs, have noted that *non-legislative* contacts between Members of Congress and executive branch agencies are not Speech or Debate protected. *Brewster*, for example, noted in dicta that "Members . . . engage in many activities other than purely legislative activities protected by the Speech or Debate Clause . . . includ[ing] a wide range of legitimate 'errands' performed for constituents, [such as] the making of appointments with Government agencies, assistance in securing Government contracts . . . ." 408 U.S. at 512. *McSurely* said essentially the same thing, 553 F.2d at 1285 (citing *Brewster*).

Similarly, *Gravel* noted, also in dicta, that Members' communications with the executive branch regarding the administration or implementation of existing statutes are not legislative activities. 408 U.S at 625. *See also McMillan*, 412 U.S. at 313 (same, citing *Gravel*); *Johnson*,

383 U.S. at 172 (effort to influence Department of Justice to dismiss pending indictments not covered); *Chastain v. Sundquist*, 833 F.2d 311, 312-14 (D.C. Cir. 1987) (letter to Attorney General complaining that legal aid organization might be obstructing existing federal statute not covered); *U.S. v. Eilberg*, 465 F. Supp. 1080, 1084 (E.D. Pa. 1979) (communication with federal agency regarding release of federal funds to constituent not covered, citing *Gravel* and *Brewster*).

However, it does not follow that because *some* legislative branch-executive branch contacts – including constituent service-type contacts and contacts aimed at persuading the executive branch to exercise its executive authority – are not Speech or Debate protected, that therefore *all* legislative branch-executive branch contacts are not covered. *See, e.g., Dowdy*, 479 F.2d at 223-24 (Member's informal gathering of information from federal agencies in furtherance of his legislative functions protected); Order in *U.S. v. Moussaoui*, No. 01-455-A (E.D. Va.) documents Member obtained from Defense Department protected) (Exhibit MC 13).[22]

Other legal and common sense considerations dictate the same result. The protections of the Speech or Debate Clause extend to all activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation . . . ." *Eastland*, 421 U.S. at 504. Given the size and central role of the executive branch in our federal structure, the executive's historic role in proposing legislation, and the President's constitutional role in the presentment process, U.S. Const. art. I, § 7, cl. 2, it is – or ought to be – self-evident that communicating with that branch will be an essential part of the process by which Members carry out their legislative responsibilities. In furtherance of those responsibilities, Members of the legislative branch routinely communicate with the executive branch about oversight matters, information needed by Congress to formulate legislation and

---

[22] *See also Hutchinson*, 443 U.S. at 121 n.10 (implying that efforts by Members to obtain information from executive branch about legislative activities protected), *id.* at 136 (Stewart, J., concurring in part and dissenting in part) ("telephone calls to federal agencies are a routine and essential part of the congressional oversight function" and therefore protected); *U.S. v. McDade*, 28 F.3d 283, 302, 303-04 (3rd Cir. 1994) (Scirica, J., concurring in part and dissenting in part) (courts have "not held that all contacts with executive branch agencies are outside the privilege"); *Chastain*, 833 F.2d at 315 (suggesting that communications with executive branch that "seek information or otherwise attempt to aid a congressional investigation" protected).

legislative judgments, the legislative needs and desires of the executive branch, the workability of proposed legislation, the executive's support for proposed legislation, strategies for securing passage of proposed legislation, and the like. All of those activities are necessarily protected.

      c. The JWV Plaintiffs' suggestion that the Members' invocation of the privilege to protect communications with the executive branch "would subvert the Clause's purposes and origins," Plaintiffs' Memorandum at 26, is just dead wrong. At the most basic level, the purpose of the Speech or Debate Clause "is to insure that the legislative function the Constitution allocates to Congress may be performed independently." *Eastland*, 421 U.S. at 502. Certainly one important aspect of ensuring legislative independence is preventing the executive branch from prosecuting or suing Members for their legislative activities, or from compelling disclosure of legislative records. *See supra* at Section II.A. However, another important aspect of ensuring legislative independence, as the Supreme Court has repeatedly made clear, is preventing "'accountability before a possibly hostile judiciary. . . .'" *Eastland*, 421 U.S. at 502 (quoting *Gravel*, 408 U.S. at 617).

      In this case, private litigants seek to invoke the authority of the federal judiciary to compel Members of Congress to disclose communications about their legislative activities with the executive branch. Prohibiting this not only does not subvert the Clause's purposes, it is perfectly consistent with those purposes. *See, e.g., Brown & Williamson*, 62 F.3d 416 ("The privilege also permits Congress to conduct investigations and obtain information without interference from the courts . . . .").

      d. The JWV Plaintiffs' only argument with respect to the three Members' communications with constituents (including the City of San Diego) and other members of the public is that those activities are not "related" to the due functioning of the legislative process, or are at the "periphery" of that process. Plaintiffs' Memorandum at 22-24, 26-27 (citing no case law that is on point). We have largely addressed this argument elsewhere. *See supra* at Section II.B.4.a. (citing, in particular, *Brown & Williamson*, 62 F.3d 408; *Webster*, 561 F. Supp. at 1189-90; *Miller*, 709 F.2d at 530). It is not surprising that the courts have held that information-gathering activities involving, and communications with, constituents and other members of the public, like those at issue here, are fully protected. Ours, after all, is a representative democracy,

and that fact, coupled with the First Amendment's guarantee of the right to petition the government, necessarily presupposes the active participation of the citizenry in the legislative process.[23]

The JWV Plaintiffs' reliance on *Tavoularas*, 527 F. Supp. at 680-81, for the proposition that the passive receipt of information by Congress from outside sources is not an integral part of the legislative process, Plaintiffs' Memorandum at 23, is misplaced. That aspect of *Tavoularas* is no longer good law in light of *Brown & Williamson*, 62 F.3d at 423 ("Brown & Williamson's claim at bottom, is to a right to engage in a broad scale discovery of documents in a congressional file that comes from third parties [documents that, in the *Brown & Williamson* case, were delivered unsolicited to the committee by a private citizen]. The Speech or Debate Clause bars that claim."). *See also Miller*, 709 F.2d at 530-31 (rejecting *Tavoularas*' passive receipt holding on grounds that (i) "there are practical difficulties in separating the acts of a noncongressional source from the responsive communication of the Congressman or his staff"; (ii) "the *Tavoularas* reading inevitably results in an intrusion into the area protected by the privilege"; and (iii) permitting questioning or disclosure of documents "would chill speech and debate on the floor"); *Maddox v. Williams*, 855 F. Supp. 406, 412 (D.D.C. 1994) (rejecting *Tavoularas*' passive receipt holding as "not correctly stat[ing] the law . . . . This Court considers *Miller* the better reasoned opinion."), *aff'd, Brown & William*son, 62 F.3d 408.

e. Finally, the JWV Plaintiffs' argument that *all* documents covered by Request No. 5 – "[a]ll documents concerning or relating to [the Members'] arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch . . . regarding Mt. Soledad or the Mt. Soledad Latin Cross" – are political in nature and therefore, not privileged, Plaintiffs' Memorandum at 24-25, is based on the same misreading of dicta in *Brewster* and *McSurely* that we have addressed above at Section II.B.4.b. *See also supra* at Section II.B.3. (preparations for legislative activities protected).

---

[23] *See generally* Walter Oleszak, *The Legislative Framework*, Congressional Research Service, Dec. 2006, at 3, attached as Exhibit MC 14 (discussing "plebiscitary quality" to congressional policymaking brought about by ability of citizenry to quickly and easily communicate their views through modern technology).

### III.    Some Documents Are Obtainable From Other Sources.

Some subpoenaed documents – in particular certain of those responsive to Requests 1 and 3 – are obtainable from other sources that are more convenient and less burdensome, Fed.R.Civ.P. 26(b)(2)(C)(i), as we have previously informed the JWV Plaintiffs. *See* April 9, 2007 Objection Letters, Objection 5 (Exhibit MC 9).

All three Members, for example, post press releases on their web sites. *See* http://www.house.gov/hunter/news.shtml (Hunter); http://issa.house.gov/index.cfm?FuseAction=PressOffice.List&ContentRecordType_id=1&CFID=1022278&CFTOKEN=75630209 (Issa); and http://www.house.gov/bilbray/releases.shtml (Bilbray). The JWV Plaintiffs can obtain directly from those web sites any press releases that they deem responsive to Request 1. (Indeed, we assume they have already done so.)

Request 3 seeks, among things, information about financial contributions the three Members may have received from certain organizations. Those organizations appear to be prohibited by federal law from contributing to the Members' campaigns. *See* 2 U.S.C. § 441b. However, to the extent the JWV Plaintiffs seek information about contributions made by *individuals* associated with those organizations – *see* Communication from JWV Plaintiffs attached as Exhibit MC 15[24] – that information is available on the Federal Election Commission's web site. *See* http://www.fec.gov/disclosure.shtml, http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep.

---

[24] In light of the information contained in Exhibit MC 15, the Members withdraw their vagueness objection.

## CONCLUSION

For all the foregoing reasons, plaintiffs' three Motions to Compel should be denied.

Respectfully submitted,

GERALDINE R. GENNET, General Counsel
s/Kerry W. Kircher
KERRY W. KIRCHER, Deputy General Counsel
CHRISTINE DAVENPORT, Assistant Counsel
JOHN FILAMOR, Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700 (telephone)
E-mail: kerry.kircher@mail.house.gov

Counsel for Congressmen Darrell E. Issa, Brian P.
Bilbray and Duncan Hunter

Darrell E. Issa
Member of Congress, Pro Se with Respect to
Requests for Information about Campaign and
Fund-Raising Activities

Brian P. Bilbray
Member of Congress, Pro Se with Respect to
Requests for Information about Campaign and
Fund-Raising Activities

Duncan Hunter
Member of Congress, Pro Se with Respect to
Requests for Information about Campaign and
Fund-Raising Activities

June 13, 2007

33

## CERTIFICATE OF SERVICE

I certify that on June 13, 2007, I served the foregoing Consolidated Opposition of Congressmen Darrell E. Issa, Brian P. Bilbray and Duncan Hunter to Plaintiffs' Motions to Compel Production of Documents through the electronic case filing system on the following:

Jonathan H Siegelbaum, Esq.
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania N.W.
Washington, D.C.  20006
Email: jonathan.siegelbaum@wilmerhale.com

Lane Dilg, Esq.
ACLU Program on Freedom of Religion and Belief
915 15th Street North West
Suite 600
Washington, D.C.  20005
Email: ldilg@aclu.org

A Stephen Hut, Jr., Esq.
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Email: stephen.hut@wilmerhale.com

James E McElroy, Esq.
Law Offices of James E McElroy
625 Broadway
Suite 1400
San Diego, CA  92101
Email: jim@jmcelroylaw.com

George F Schaefer, Deputy City Attorney
Office of the City Attorney
1200 Third Avenue
Suite 1100
San Diego, CA 92101-4100
Email: Gschaefer@sandiego.gov

David Negri,Trial Attorney
U.S. Department of Justice, ENRD
Natural Resources Section
c/o Office of the U.S Attorney for the District of Idaho
Washington Group Plaza IV
800 Park Boulevard, Suite 600
Boise, ID 83712-9903
Email: David.Negri@usdoj.gov

Heide Hermann, Trial Attorney
U.S. Department of Justice, ENRD
Natural Resources Section
601 D Street NW
P.O. Box 663
Washington, D.C.  20044-0663
Email: Heide.Hermann@usdoj.gov

Charles V. Berwanger, Esq.
Gordon and Rees
101 West Broadway
Suite 2000
San Diego, CA 92101
Email: cberwanger@gordonrees.com

John David Blair-Loy, Esq.
ACLU of San Diego and Imperial Counties
P.O. Box 87131
San Diego, CA   92138
Email: dblairloy@aclusandiego.org

Peter Dominick Lepiscopo, Esq.
Law Offices of Peter D Lepiscopo
2635 Camino del Rio South
Suite 109
San Diego, CA   92108
Email: plepiscopo@att.net

                         s/Kerry W. Kircher
                         Kerry W. Kircher
                         E-mail: kerry.kircher@mail.house.gov

Exhibit MC1

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   STEVE TRUNK and PHILIP K.              CASE NO. 06cv1597 BTM(WMc)
     PAULSON,
12                                          **ORDER CONSOLIDATING CASES**
                              Plaintiffs,
13         vs.

14   CITY OF SAN DIEGO, UNITED STATES
     OF AMERICA, DONALD H. RUMSFELD,
15   Secretary of Defense and DOES 1
     through 100, Inclusive,
16
                              Defendants.
17
     MOUNT SOLEDAD MEMORIAL
18   ASSOCIATION, Real parties in interest.

19                                          CASE NO.  06cv1728 BTM(WMc)
     JEWISH WAR VETERANS OF THE
20   UNITED STATES OF AMERICA, INC.,
     RICHARD A. SMITH, MINA SAGHEB,
21   and JUDITH M. COPELAND,

22                             Plaintiffs,

23         vs.

24   DONALD H. RUMSFELD, Secretary of
     Defense, in his official capacity,
25
                              Defendant.
26

27         Paulson v. City of San Diego, et al., Case No. 06cv1597 BTM(WMc) and Jewish War

28   Veterans of the Unites States of America, Inc. v. Rumsfeld, 06cv1728 BTM(WMc) are hereby

                                            1

1 │ consolidated for all pretrial proceedings. The caption page on all future filings shall contain

2 │ both captions and shall list the case number as: Case No. 06cv1597 BTM(WMc)

3 │ (consolidated with 06cv1728). All future docketing will be done in Case No. 06cv1597, which

4 │ shall be the main file.

5 │ **IT IS SO ORDERED.**

6 │

7 │ DATED: September 22, 2006

8 │                                          Hon. Barry Ted Moskowitz
                                             United States District Judge

9 │

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

Exhibit MC2

PUBLIC LAW 109–272—AUG. 14, 2006

MT. SOLEDAD VETERANS MEMORIAL
ACQUISITION

120 STAT. 770    PUBLIC LAW 109–272—AUG. 14, 2006

Public Law 109–272
109th Congress

An Act

Aug. 14, 2006
[H.R. 5683]

To preserve the Mt. Soledad Veterans Memorial in San Diego, California, by pro-
viding for the immediate acquisition of the memorial by the United States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

16 USC 431 note.

**SECTION 1. FINDINGS.**

Congress makes the following findings:

(1) The Mt. Soledad Veterans Memorial has proudly stood overlooking San Diego, California, for over 52 years as a tribute to the members of the United States Armed Forces who sac-rificed their lives in the defense of the United States.

(2) The Mt. Soledad Veterans Memorial was dedicated on April 18, 1954, as "a lasting memorial to the dead of the First and Second World Wars and the Korean conflict" and now serves as a memorial to American veterans of all wars, including the War on Terrorism.

(3) The United States has a long history and tradition of memorializing members of the Armed Forces who die in battle with a cross or other religious emblem of their faith, and a memorial cross is fully integrated as the centerpiece of the multi-faceted Mt. Soledad Veterans Memorial that is replete with secular symbols.

(4) The patriotic and inspirational symbolism of the Mt. Soledad Veterans Memorial provides solace to the families and comrades of the veterans it memorializes.

(5) The Mt. Soledad Veterans Memorial has been recognized by Congress as a National Veterans Memorial and is considered a historically significant national memorial.

(6) 76 percent of the voters of San Diego supported donating the Mt. Soledad Memorial to the Federal Government only to have a superior court judge of the State of California invali-date that election.

(7) The City of San Diego has diligently pursued every possible legal recourse in order to preserve the Mt. Soledad Veterans Memorial in its entirety for persons who have served in the Armed Forces and those persons who will serve and sacrifice in the future.

**SEC. 2. ACQUISITION OF MT. SOLEDAD VETERANS MEMORIAL, SAN DIEGO, CALIFORNIA.**

(a) ACQUISITION.—To effectuate the purpose of section 116 of division E of Public Law 108–447 (118 Stat. 3346; 16 U.S.C. 431 note), which, in order to preserve a historically significant war memorial, designated the Mt. Soledad Veterans Memorial in San

Diego, California, as a national memorial honoring veterans of the United States Armed Forces, there is hereby vested in the United States all right, title, and interest in and to, and the right to immediate possession of, the Mt. Soledad Veterans Memorial in San Diego, California, as more fully described in subsection (d).

(b) COMPENSATION.—The United States shall pay just compensation to any owner of the property for the property taken pursuant to this section, and the full faith and credit of the United States is hereby pledged to the payment of any judgment entered against the United States with respect to the taking of the property. Payment shall be in the amount of the agreed negotiated value of the property or the valuation of the property awarded by judgment and shall be made from the permanent judgment appropriation established pursuant to section 1304 of title 31, United States Code. If the parties do not reach a negotiated settlement within one year after the date of the enactment of this Act, the Secretary of Defense may initiate a proceeding in a court of competent jurisdiction to determine the just compensation with respect to the taking of such property.

(c) MAINTENANCE.—Upon acquisition of the Mt. Soledad Veterans Memorial by the United States, the Secretary of Defense shall manage the property and shall enter into a memorandum of understanding with the Mt. Soledad Memorial Association for the continued maintenance of the Mt. Soledad Veterans Memorial by the Association.

Memorandum

(d) LEGAL DESCRIPTION.—The Mt. Soledad Veterans Memorial referred to in this section is all that portion of Pueblo lot 1265 of the Pueblo Lands of San Diego in the City and County of San Diego, California, according to the map thereof prepared by James Pascoe in 1879, a copy of which was filed in the office of the County Recorder of San Diego County on November 14, 1921, and is known as miscellaneous map No. 36, more particularly described as follows: The area bounded by the back of the existing inner sidewalk on top of Mt. Soledad, being also a circle with radius of 84 feet, the center of which circle is located as follows: Beginning at the Southwesterly corner of such Pueblo Lot 1265, such corner being South 17 degrees 14'33" East (Record South 17 degrees 14'09" East) 607.21 feet distant along the westerly line of such Pueblo lot 1265 from the intersection with the North line of La Jolla Scenic Drive South as described and dedicated as parcel 2 of City Council Resolution No. 216644 adopted August 25, 1976; thence North 39 degrees 59'24" East 1147.62 feet to the center of such circle. The exact boundaries and legal description of the Mt. Soledad Veterans Memorial shall be determined by survey prepared by the Secretary of Defense. Upon acquisition

120 STAT. 772          PUBLIC LAW 109–272—AUG. 14, 2006

of the Mt. Soledad Veterans Memorial by the United States, the boundaries of the Memorial may not be expanded.

Approved August 14, 2006.

LEGISLATIVE HISTORY—H.R. 5683:

CONGRESSIONAL RECORD, Vol. 152 (2006):
    July 19, considered and passed House.
    Aug. 1, considered and passed Senate.

○

Exhibit MC3

PUBLIC LAW 108–447—DEC. 8, 2004      118 STAT. 2809

Public Law 108–447
108th Congress

## An Act

Making appropriations for foreign operations, export financing, and related programs for the fiscal year ending September 30, 2005, and for other purposes

Dec. 8, 2004
[H.R. 4818]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Consolidated Appropriations Act, 2005

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Consolidated Appropriations Act, 2005".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title
Sec. 2. Table of contents
Sec. 3. References
Sec. 4. Statement of appropriations

DIVISION A—AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2005

Title I—Agricultural Programs
Title II—Conservation Programs
Title III—Rural Development Programs
Title IV—Domestic Food Programs
Title V—Foreign Assistance and Related Programs
Title VI—Related Agencies and Food and Drug Administration
Title VII—General Provisions

DIVISION B—DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATIONS ACT, 2005

Title I—Department of Justice
Title II—Department of Commerce and Related Agencies
Title III—The Judiciary
Title IV—Department of State and Related Agency
Title V—Related Agencies
Title VI—General Provisions
Title VII—Rescissions
Title VIII—Patent and Trademark Fees
Title IX—Oceans and Human Health Act

DIVISION C—ENERGY AND WATER DEVELOPMENT APPROPRIATIONS ACT, 2005

Title I—Department of Defense—Civil
Title II—Department of the Interior
Title III—Department of Energy
Title IV—Independent Agencies
Title V—General Provisions
Title VI—Reform of the Board of Directors of the Tennessee Valley Authority

DIVISION D—FOREIGN OPERATIONS, EXPORT FINANCING, AND RELATED PROGRAMS APPROPRIATIONS ACT, 2005

Title I—Export and Investment Assistance

Title II—Bilateral Economic Assistance
Title III—Military Assistance
Title IV—Multilateral Economic Assistance
Title V—General Provisions

DIVISION E—DEPARTMENT OF THE INTERIOR AND RELATED AGENCIES
APPROPRIATIONS ACT, 2005

Title I—Department of the Interior
Title II—Related Agencies
Title III—General Provisions
Title IV—Urgent Wildland Fire Suppression Activities
Title V—General Reduction

DIVISION F—DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES,
AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2005

Title I—Department of Labor
Title II—Department of Health and Human Services
Title III—Department of Education
Title IV—Related Agencies
Title V—General Provisions

DIVISION G—LEGISLATIVE BRANCH APPROPRIATIONS ACT, 2005

Title I—Legislative Branch Appropriations
Title II—General Provisions

DIVISION H—TRANSPORTATION, TREASURY, INDEPENDENT AGENCIES,
AND GENERAL GOVERNMENT APPROPRIATIONS ACT, 2005

Title I—Department of Transportation
Title II—Department of the Treasury
Title III—Executive Office of the President and Funds Appropriated to the Presi-
dent
Title IV—Independent Agencies
Title V—General Provisions
Title VI—General Provisions

DIVISION I—DEPARTMENTS OF VETERANS AFFAIRS AND HOUSING AND
URBAN DEVELOPMENT, AND INDEPENDENT AGENCIES APPROPRIA-
TIONS ACT, 2005

Title I—Department of Veterans Affairs
Title II—Department of Housing and Urban Development
Title III—Independent Agencies
Title IV—General Provisions

DIVISION J—OTHER MATTERS

Title I—Miscellaneous Provisions and Offsets
Title II—225th Anniversary of the American Revolution Commemoration Act
Title III—Rural Air Service Improvement Act of 2004
Title IV—L–1 Visa and H–1B Visa Reform Act
Title V—National Aviation Heritage Area Act
Title VI—Oil Region National Heritage Area Act
Title VII—Mississippi Gulf Coast National Heritage Area Act
Title VIII—Federal Lands Recreation Enhancement Act
Title IX—Satellite Home Viewer Extension and Reauthorization Act of 2004
Title X—Snake River Water Rights Act of 2004

DIVISION K—SMALL BUSINESS

1 USC 1 note.

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

**SEC. 4. STATEMENT OF APPROPRIATIONS.**

The following sums in this Act are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2005.

PUBLIC LAW 108–447—DEC. 8, 2004          118 STAT. 3341

SEC. 426. (a) WAIVER OF REQUIREMENTS.—Subject to subsection
(b), the limitation on the release of funds in section 104(g)(2) of
the Housing and Community Development Act of 1974 (42 U.S.C.
5304) shall not apply to the Village of Chickasaw Sewer Collection
and Treatment System, located in the Village of Chickasaw, Mercer
County, Ohio.

(b) APPLICABILITY.—Subsection (a) only applies to the grant
that was awarded to the Village of Chickasaw (Ohio Small Cities
CDBG Grant # C–W–03–283–1), for the period beginning September
1, 2003, and ending October 31, 2005, and in the amount of
$600,000.

(c) ENVIRONMENTAL REVIEWS.—Notwithstanding the provisions
of this section, the Village of Chickasaw must complete all appro-
priate environment reviews in a timely manner and to the satisfac-
tion of the State of Ohio.

This division may be cited as the "Departments of Veterans
Affairs and Housing and Urban Development, and Independent
Agencies Appropriations Act, 2005".

## DIVISION J—OTHER MATTERS

### TITLE I—MISCELLANEOUS PROVISIONS AND OFFSETS

Miscellaneous
Appropriations
and Offsets Act,
2005.

SEC. 101. For an additional amount for the Department of
Energy for the weatherization assistance program pursuant to 42
U.S.C. 6861 et seq. and notwithstanding section 3003(d)(2) of Public
Law 99–509, $230,000,000, to remain available until expended.

SEC. 102. Section 1201(a) of the Ronald W. Reagan National
Defense Authorization Act for Fiscal Year 2005 (Public Law 108–
375) is amended by striking "$300,000,000" in the matter preceding *Ante, p. 2077.*
paragraph (1) and inserting "$500,000,000".

SEC. 103. (a) The District of Columbia Appropriations Act,
2005 (Public Law 108–335) is amended as follows:

(1) The paragraph under the heading "CAPITAL OUTLAY" *Ante, p. 1338.*
is amended by striking "For construction projects, an increase
of $1,087,649,000, of which $839,898,000 shall be from local
funds, $38,542,000 from Highway Trust funds, $37,000,000
from the Rights-of-way funds, $172,209,000 from Federal grant
funds, and a rescission of $361,763,000 from local funds appro-
priated under this heading in prior fiscal years, for a net
amount of $725,886,000, to remain available until expended;"
and inserting "For construction projects, an increase of
$1,102,039,000, of which $839,898,000 shall be from local funds,
$38,542,000 from Highway Trust funds, $51,390,000 from the
Rights-of-way funds, $172,209,000 from Federal grant funds,
and a rescission of $361,763,000 from local funds appropriated
under this heading in prior fiscal years, for a net amount
of $740,276,000, to remain available until expended;".

(2) Section 340(a) is amended to read as follows:          *Ante, p. 1348.*
"(a) Section 603(e)(3)(E) of the Student Loan Marketing Associa-
tion Reorganization Act of 1996 (20 U.S.C. 1155(e)(3)(E)) is
amended—

"(1) by striking 'and' at the end of subclause (II);

"(2) by striking the period at the end of subclause (III)
and inserting '; and'; and

"(3) by adding at the end the following new subclause:

SEC. 113. Direct loans, credits, insurance and guarantees of the Export-Import Bank or its agents may be made available for or in Libya, notwithstanding section 507 or similar provisions in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2005, or prior acts making appropriations for foreign operations, export financing, and related programs, if the President determines that to do so is important to the national security interests of the United States.

*Ante, p. 444.*

SEC. 114. (a) Section 146 of Public Law 108–199 is amended—

(1) by striking "section 386 of the Energy Policy Act of 2003" and inserting "section 116 of division C of Public Law 108–324";

(2) by striking ", except that upon that Act becoming law, section 386 is amended through this Act:" and inserting "and section 116 of division C of Public Law 108–324 is amended:";

(3) by striking "paragraph 386(b)(1)" and inserting "paragraph (b)(1) of section 116 of division C of Public Law 108–324";

(4) by striking "paragraph 386(c)(2)" and inserting "paragraph (a)(2) of section 116 of division C of Public Law 108–324"; and

(5) by striking "paragraph 386(g)(4)" and inserting "paragraph (g)(4) of section 116 of division C of Public Law 108–324.

*Ante, p. 1226.*

(b) Section 116 (b) of division C of Public Law 108–324, the Military Construction bill, is amended by adding a new paragraph as follows:

"(4) Such loan guarantee may be utilized only by the project chosen by the Federal Energy Regulatory Commission as the qualified project.".

SEC. 115. Any unobligated amount appropriated pursuant to section 353(b) of the Department of the Interior and Related Agencies Appropriations Act, 1999 (Public Law 105–277; 112 Stat. 2681–303), shall be made available to complete the project described in section 353(a) of that Act.

*California.*
*16 USC 431 note.*

SEC. 116. (a) DESIGNATION OF NATIONAL VETERANS MEMORIAL.—The Mt. Soledad Veterans Memorial located within the Soledad Natural Park in San Diego, California, which consists of a 29 foot-tall cross and surrounding granite memorial walls containing plaques engraved with the names and photographs of veterans of the United States Armed Forces, is hereby designated as a national memorial honoring veterans of the United States Armed Forces.

*Deadline.*

(b) ACQUISITION AND ADMINISTRATION BY UNITED STATES.—Not later than 90 days after the date on which the City of San Diego, California, offers to donate the Mt. Soledad Veterans Memorial to the United States, the Secretary of the Interior shall accept, on behalf of the United States, all right, title, and interest of the City in and to the Mt. Soledad Veterans Memorial.

(c) ADMINISTRATION OF MEMORIAL.—Upon acquisition of the Mt. Soledad Veterans Memorial by the United States, the Secretary of the Interior shall administer the Mt. Soledad Veterans Memorial as a unit of the National Park System, except that the Secretary shall enter into a memorandum of understanding with the Mt. Soledad Memorial Association for the continued maintenance by the Association of the cross and surrounding granite memorial walls and plaques of the Memorial.

(d) LEGAL DESCRIPTION.—The Mt. Soledad Veterans Memorial referred to in this section is all that portion of Pueblo lot 1265 of the Pueblo Lands of San Diego in the City and County of San Diego, California, according to the map thereof prepared by James Pascoe in 1879, a copy of which was filed in the office of the County Recorder of San Diego County on November 14, 1921, and is known as miscellaneous map NO. 36, more particularly described as follows: The area bounded by the back of the existing inner sidewalk on top of Mt. Soledad, being also a circle with a radius of 84 feet, the center of which circle is located as follows: Beginning at the Southwesterly corner of such Pueblo Lot 1265, such corner being South 17 degrees 14′33″ East (Record South 17 degrees 14′09″ East) 607.21 feet distant along the westerly line of such Pueblo lot 1265 from the intersection with the North line of La Jolla Scenic Drive South as described and dedicated as parcel 2 of City Council Resolution NO. 216644 adopted August 25, 1976; thence North 39 degrees 59′24″ East 1147.62 feet to the center of such circle. The exact boundaries and legal description of the Mt. Soledad Veterans Memorial shall be determined by a survey prepared jointly by the City of San Diego and the Secretary of the Interior. Upon acquisition of the Mt. Soledad Veterans Memorial by the United States, the boundaries of the Memorial may not be expanded.

SEC. 117. Notwithstanding any other provision of law, except section 551 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2005, $80,000,000 of the funds appropriated for the Department of Defense for fiscal year 2005 may be transferred with the concurrence of the Secretary of Defense to the Department of State under "Peacekeeping Operations".

SEC. 118. In addition, for construction and related expenses of a facility for the United States Institute of Peace, $100,000,000, to remain available until expended.

SEC. 119. Notwithstanding any other provision of law, in addition to amounts otherwise provided in this or any other Act for fiscal year 2005, the following amounts are appropriated: $2,000,000 for the Helen Keller National Center for Deaf-Blind Youths and Adults for activities authorized under the Helen Keller National Center Act; and for the Department of Health and Human Services, Health Resources and Services Administration, $1,000,000 for the Hospital for Special Surgery to establish a National Center for Musculoskeletal Research, New York, New York, for facilities and equipment; and for the Department of Health and Human Services, Health Resources and Services Administration, $1,000,000 for the Jesse Helms Nursing Center at Union Regional Medical Center, Union County, North Carolina for facilities and equipment.

SEC. 120. In addition to any amounts provided in this or any other Act for fiscal year 2005, $1,000,000 is appropriated for necessary expenses of the Benjamin A. Gilman Institute for Political and International Studies program at the State University of New York's Orange County Community College in Orange, New York.

### SEC. 121. WEIGHT LIMITATIONS.

The next to the last sentence of section 127(a) of title 23, United States Code, is amended by striking "Interstate Route 95" and inserting "Interstate Routes 89, 93, and 95".

Exhibit MC4

1   JAMES E. McELROY, State Bar No. 079313
    LAW OFFICES OF JAMES E. McELROY
2   625 Broadway, Suite 1400
    San Diego, CA 92101
3
  (619) 232-6686
4
  Attorneys for Plaintiffs
5

6

7

8               **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   STEVE TRUNK and PHILIP K.     )  CASE NO. 06-CV-1597 BTM (WMc)
    PAULSON                   )
12                       )  **FIRST AMENDED COMPLAINT FOR**
       Plaintiffs,         )  **DECLARATORY RELIEF AND**
13                       )  **INJUNCTIVE RELIEF**
    vs.                     )
14                       )
    CITY OF SAN DIEGO, UNITED     )
15   STATES OF AMERICA, DONALD   )
    H. RUMSFELD, Secretary of Defense )
16   and DOES 1 through 100, Inclusive,  )
                      )
17        Defendants.         )
                      )
18   MOUNT SOLEDAD MEMORIAL   )
    ASSOCIATION, Real parties in    )
19   interest.                  )
    _____)
20                       **I.**

21            **STATEMENT OF JURISDICTION**

22         1.     This action arises under the Establishment Clause of the First Amendment

23 to the United States Constitution, the No Preference Clause of the California Constitution

24 and the No Aid Clause of the California Constitution. The Court has jurisdiction under

25 28 U.S.C. § 1331, § 1343 and 42 U.S.C. §1983.

26         2.     The Court may grant declaratory relief under 28 U.S.C. § 2201 and Fed. R.

27 Civ. P. 57. The Court may grant injunctive relief under Fed. R. Civ. P. 65.

28

                             - 1 -             First Amended Complaint

## II.

## PARTIES AND VENUE

3.     Plaintiff STEVE TRUNK is a citizen and resident of the United States and resides and is domiciled in the City of San Diego, San Diego County, California. He served his country in the United States Navy from 1972-73, spending most of that time in the Southeast Asia (Vietnam) theater. He is not a Christian. He pays state, local and federal taxes.

4.     Plaintiff PHILIP K. PAULSON is a citizen and resident of the United States and resides and is domiciled in the City of San Diego, San Diego County, California. He served in Viet Nam between 1966 and 1968. As an infantryman he engaged in many firefights and fought in one of the bloodiest battles of the Vietnam conflict, the battle of Dak To in November of 1967. He personally witnessed U.S. soldiers die in battle who were close to him and whom he knew were not Christians. He is not a Christian. He pays state, local and federal taxes.

5.     Defendant CITY OF SAN DIEGO is an incorporated municipality organized and existing under the laws of the State of California. Acts and omissions of the CITY of SAN DIEGO alleged herein include those of any agent, officer, or employee thereof.

6.     Defendant UNITED STATES OF AMERICA is, and at all times mentioned herein was, a governmental entity organized under Federal law with the capacity to sue and be sued. Acts and omissions of the UNITED STATES OF AMERICA alleged herein include those of any agent, officer, or employee thereof.

7.     Defendant, DONALD RUMSFELD, is the Secretary of the United States Department of Defense (DOD). Pursuant to the legislative action authorizing the taking of the Mt. Soledad property and the cross (H.R. 5683, 109th Cong. [2006] ), the DOD is now responsible for managing the Mt. Soledad property and the cross. Secretary Rumsfeld is sued in his official capacity.

8.     All acts and omissions of the federal Defendants set forth in the Complaint

1    occurred under color of federal law.

2    9.    Defendant MT. SOLEDAD MEMORIAL ASSOCIATION (MSMA), is an

3    unincorporated association doing business in the City of San Diego. MSMA built the

4    Cross that currently stands on Mt. Soledad, built the improvements around the cross

5    consisting of walls, pavers, bollards and a flagpole. The Association sells plaques to be

6    placed on the walls that surround the cross to veterans and their families. The plaques

7    recognize living and deceased veterans, navel ships and various  military units. The

8    Association claims an ownership or has an equitable interest in the property taken by the

9    United States pursuant to (H.R. 5683, 109th Cong. [2006] ). The Association was also a

10    party to a settlement between the City and Paulson, which called for moving the cross to

11    private land, preferably a church near its existing location, for the Association to replace

12    the cross with a secular symbol that recognized not just Christians but all veterans, for the

13    Association to maintain some interest in the land under the cross and ownership of the

14    cross and the  improvements  and for Paulson to dismiss his lawsuit. As of this date, the

15    City has  refused to honor that binding settlement agreement.  The Association is a real

16    party in interest in this action.

17    10.    Both STEVE TRUNK and PHILIP PAULSON served in Vietnam to protect

18    the United States from our enemies and to protect our freedoms, including those freedoms

19    guaranteed by the U.S. and California Constitutions. They served and defended America

20    as Americans, not as Christians or Jews or Atheists. As such they are offended by a "war

21    memorial" that sends a message that only Christian war veterans are being honored or

22    remembered. This makes them feel as if their government is treating them  like second

23    class citizens because they are not Christians and is not respecting or honoring their

24    service as Americans, equal to all others who served.  Because of these feelings neither

25    man is comfortable going to Mt. Soledad in the presence of the cross.  Neither enjoys the

26    publically owned park their tax dollars support . Neither Plaintiff is comfortable at the

27    "war memorial" because, as the courts have held repeatedly, it is a sectarian memorial

28    which demonstrates the government's preference for one religion over all other religions

- 3 -

First Amended Complaint

1    and beliefs. Both men believe that religious symbols should not communicate the

2    government's preference for one religion over all others as does the Mt. Soledad cross.

3    As such, each would visit the park and would go to the memorial to pay tribute to the

4    soldiers that served our country, as they did, but for the fact that the huge cross towering

5    over the memorial sends a message to them that their government does not feel their

6    service was as respected or worthy as that of Christians that served.

7         11.    Plaintiffs are informed and believe, and upon that basis allege, that at all

8    times mentioned herein each Defendant was and is the agent of each other Defendant and,

9    in doing or failing to do the things complained of, was acting within the scope of said

10   authority.

11        12.    All relevant acts and omissions at issue occurred in this judicial district.

12        13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a

13   substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in

14   the Southern District of California, and because some Defendants reside in the Southern

15   District of California.

### III.

### INTRODUCTION

18        14.    This action seeks to declare the transfer of the Mt. Soledad cross, the

19   memorial surrounding it and the land under it to the U.S.A., void *ab initio* in that the

20   transfer was unconstitutional and the acts taken in its furtherance by both Defendant City

21   and U.S.A. violated the Establishment Clause of the of the U.S. Constitution and the No

22   Preference and No Aid clauses of the California Constitution. This action further seeks to

23   have the law authorizing the transfer declared unconstitutional in that the First

24   Amendment to the United States Constitution states that Congress shall make no law

25   respecting an establishment of religion", yet the purpose and intent of HR 5683 was

26   explicitly to "save the cross", the preeminent and most powerful religious symbol in our

27   country on the apex of public park and memorial. The Plaintiffs also bring this action to

28   enjoin  the display of the Latin cross, a sectarian symbol that shows preference for one

- 4 -

First Amended Complaint

1    religion over all others, on federal land.

2                                            IV.

3                          STATEMENT OF FACTS

4        15.    The present version of the Mt. Soledad cross was built by the Mt. Soledad

5    Memorial Association and erected on a pedestal at the apex of the 170 acre Mt Soledad

6    Park in 1954, with the permission of the City of San Diego. It was dedicated on Easter

7    Sunday during a Christian religious service and not on Memorial Day which falls just a

8    few weeks later.  It has served as the site for Easter Sunrise services , prayer meetings,

9    church organized "save the cross" rallies,  religious events and gatherings as well as

10   Christian weddings and baptisms.

11       16.    In 1989, Plaintiff Paulson and others sued the City of San Diego claiming

12   that the presence of the Mt Soledad cross on public property violated the U.S. and

13   California Constitutions.

14       17.    Defendant CITY OF SAN DIEGO has engaged in herculean efforts to keep

15   the Mt. Soledad cross standing on the top of Mt. Soledad during the last 17 years of

16   litigation using various schemes and delay tactics, in spite of  the admonition of several

17   courts that government attempts to save the Mt. Soledad Cross are unconstitutional. After

18   three attempts to sell the property to private parties, Defendant CITY OF SAN DIEGO

19   agreed to enter into a binding settlement with Paulson and MSMA calling for the

20   movement of the cross to private property, preferably on church grounds approximately

21   1000 yards from where it currently stands, but when it came time to perform under the

22   agreement, it refused to comply. Instead it began acting in concert in with the Defendant

23   UNITED STATES OF AMERICA (U.S.A.) and Christian advocacy groups in attempts to

24   save the cross by federalizing the cross and the land under it in hopes that through a type

25   of  "forum shopping", the CITY OF SAN DIEGO and the U. S. A. could stop 17 years of

26   adverse court decisions by invoking the Establishment Clause of the U.S. Constitution

27   instead of the No Aid/No Preference Clause of the California Constitution.

28       18.    Defendants' CITY OF SAN DIEGO and UNITED STATES OF

                                    - 5 -                          First Amended Complaint

1  AMERICA'S first scheme was to have the CITY OF SAN DIEGO give the land to the
2  federal government. U.S.A. passed legislation agreeing to accept the land if it was
3  offered to it by the City. These efforts were pursued even though the City Attorney for
4  the City of San Diego advised the City in writing that such a transfer would be
5  unconstitutional. When the San Diego Superior Court invalidated the City's attempt to
6  gift the land to the U.S.A. as unconstitutional, these defendants then attempted to have
7  Defendant U. S. A. take the property, for the sole purpose of keeping the cross on public
8  land. Defendants then expedited the taking by invoking the seldom used "legislative
9  taking" in order to avoid a lawful order by the federal trial court requiring that the cross
10 be moved off of public land within 90 days.
11        19.    In furtherance of this plan, the Mayor of Defendant City, in his official
12 capacity, wrote to the President of the United States, traveled to the White House and met
13 with other officials of the U.S.A. on several occasions in order to act in concert with them
14 to violate the constitutional rights of Plaintiffs and others by attempting to save the
15 preeminent and most powerful symbol of Christianity, on public land. That the plan of
16 the Defendants, acting in concert, was to save this 43 foot 20 ton cross is beyond dispute
17 and is supported by a plethora of public records, not the least of which is the legislative
18 record which includes the introduction of the bill in the Senate by Senator Sessons
19 wherein he stated; "Madam President, I recently introduced a bill to preserve the cross
20 that stands at the center of the Mt. Soledad Veterans Memorial...This bill would preserve
21 the cross by having the U.S. Government purchase the property..." One of the authors and
22 key proponents of the bill, Representative Duncan Hunter, has made it clear on his
23 official government web site that his intent in authoring, introducing and promoting this
24 bill was to preserve the cross on public property because it is a religious symbol.
25        20.    On or about August 1, 2006, President Bush signed HR 5683 into law.
26        21.    The Mt. Soledad cross has been the subject matter of significant litigation
27 over the past several years. The Ninth Circuit has ruled on two occasions that the
28 presence of the Cross on public land is unconstitutional and the United States Supreme

1    Court has denied cert on both occasions. In the initial trial court decision before Judge

2    Gordon Thompson, the court held that the Latin cross is the principal symbol and a

3    universally recognized symbol of Christianity and that "Not only is the cross a profoundly

4    religious symbol; it also is an exceedingly powerful symbol..." *Murphy* v. *Bilbray* 782

5    F.Supp at 1429-1430. Further, "It's commanding presence...at the very summit of Mt.

6    Soledad render it the focal point of the public park in which it stands–so much so that

7    may be said, as between the Latin cross and the park, it is not clear which is meant to

8    adorn which.." *Id* at 36. As to the contention of the City that the cross was primarily a

9    secular war memorial, the court responded, "even if one strains to view the cross in the

10    context of a war memorial its primary effect is to give the impression that only

11    Christians...are being honored ...The City is directed that, if it truly wishes to honor the

12    war dead, then it should do so other than with the Latin cross which it has permitted to

13    stand atop Mt. Soledad." (*Murphy, supra,* 782 F Supp. at 1436-38. ) The Ninth Circuit

14    subsequently declared, "However, even if we were to agree that the cross has always been

15    explicitly recognized and referred to as a war memorial, that would not obviate the

16    appearance of preference." *Ellis v. City of La Mesa,* 990 F.2d 1518, 1528 (9th Circ.

17    1993). Following the second attempted sale of the land by the City , the Ninth Circuit

18    again confirmed that the presence of the cross on Mt. Soledad was unconstitutional and

19    ruled "In view of our holding in *Ellis* that the Mt. Soledad cross is a sectarian symbol that

20    conveys a religious message, governmental conduct that operates affirmatively to

21    preserve the cross aids a sectarian purpose: the preservation of a symbol that conveys a

22    specifically Christian message." *Paulson v. City of San Diego,* 294 F.3d 1124, 1132 (9th

23    Circ 2002).

24      After the 9th Circuit decided the Paulson case, it decided *Buono v. Norton* 371 F3d

25    543, which had strikingly similar facts. In that case, in order to save a Latin cross built in

26    1934 by private parties on federal land , Congress passed legislation declaring it a

27    National War Memorial. The court ruled that the presence of the cross on federal land

28    violated the Establishment Clause even if the purpose in maintaining the display was

     First Amended Complaint

1  secular.

2       22.  After the second sale of the land by the City was ruled unconstitutional, on

3  remand the District Court found the actual transfer of the land from the City to the buyer

4  to be void *ab initio*. The Court held , "It is axiomatic that any law passed in violation of

5  the Constitution is "null and void *ab initio*. *United States v Munoz-Flores* 863 F. 2d 654,

6  661 (9th Cir. 1988)" Decision and Order Filed Oct. 12th, 2004 Civ. No. 89-0820GT.

7       23.   The presence of religious symbols in government cemeteries that are chosen

8  by the veteran or the veteran's family to mark his or her grave do not offend the Plaintiffs

9  or the Constitution. But when the government chooses the symbol, sponsors the symbol

10 and mandates that one religious symbol will dominate over the entire memorial display so

11 that the display communicates that Christianity is being supported and preferred by the

12 government, the Constitution and the rights of the Plaintiffs are violated.

13      24.   The presence of the Latin Cross on government owned Mt Soledad is for

14 the predominate purpose of promoting one religion over all others and that is the

15 predominate effect it has on the reasonable observer.  The transfer of the property was

16 done by the two governmental entities in order to save the cross on public property

17 because it is a religious symbol. The acts of the City of San Diego in initiating,

18 facilitating and promoting the transfer aided a specific religion over all others and

19 demonstrated a preference for one religion over all other by the City of San Diego. The

20 presence of the cross on Mt Soledad fosters excessive entanglement with religion on the

21 part of all government Defendants.

22                                    **V.**

23                                **CLAIMS**

24                         **FIRST OF CAUSE OF ACTION**

25  **VIOLATION OF THE ESTABLISHMENT CLAUSE (U.S. CONST., 1ST
    AMEND.) AND THE NO PREFERENCE AND NO AID CLAUSES OF THE**
26  **CALIFORNIA CONSTITUTION (CAL. CONST. ARTICLE ONE AND
    ARTICLE SIXTEEN.)**

27

28      25.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 24

                                    - 8 -                    First Amended Complaint

1  inclusive of this complaint as though fully set forth herein.

2      26.    The acts of the Defendants violate the rights of Plaintiffs under the

3  Establishment Clause of the U. S. Constitution and the No Aid and No Preference clauses

4  of the California Constitutions, by attempting to keep a sectarian symbol on public

5  property and by transferring the symbol and the land under it from the City to the federal

6  government. .

7      27.    Defendants know that the actions they are taking are unconstitutional

8  because federal courts across this country have unanimously held that the presence of a

9  permanent Latin cross on public property violates the constitutional rights of all of our

10  citizens. More specifically, the District Court for the Southern District of California, the

11  Ninth Circuit Court of Appeals and the San Diego Superior Court have all held that the

12  Mt. Soledad cross, whether part of a war memorial or not, is a powerful sectarian symbol

13  that improperly conveys government preference for one religion over all others.

14  Defendants know that the actions they are taking are unconstitutional because the courts

15  have addressed that issue specifically as it relates to the presence of the Mt. Soledad cross

16  on public property but continue to violate the constitutional rights of Plaintiffs and all

17  citizens with impunity.

18      28.    Plaintiffs will suffer irreparable injury by the federal government

19  maintaining a war memorial where they, as non Christians veterans are treated as

20  outsiders, second class citizens and not respected for the service they provided their

21  country. They cannot comfortably enjoy the park or the memorial because they are not

22  Christians. The cross as the centerpiece of the monument communicates to them that the

23  federal government does not feel their service to the country was of equal value as that

24  service provided by Christians. There are no other freestanding displays, religious or

25  otherwise in the area that are in any way comparable to the cross which dominates the

26  entire park.

27      29.    No secular purpose is served by the legislative taking of the Mt. Soledad

28  cross. The legislative taking of the Mt. Soledad Cross has the purpose and effect of

1  promoting religion and constitutes an endorsement of religion, as well as promoting
2  Christianity, while excluding other religious faiths.
3      30.    Thus, Plaintiffs have been deprived of rights, privileges and immunities
4  secured by both the United States and California Constitutions. Specifically, Defendants,
5  and each of them have acted in concert to invoke the aforementioned legislative taking for
6  the sole unconstitutional purpose of maintaining a Latin cross on government property.

**SECOND CAUSE OF ACTION**

**INJUNCTIVE AND DECLARATORY RELIEF**

9      31.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 30
10  inclusive of this complaint as though fully set forth herein.
11      32.    The continued display of the cross on government property will cause
12  irreparable injury to Plaintiffs.
13      33.    An actual controversy has arisen between the parties.
14      34.    If the land is transferred to the federal government, Plaintiffs will suffer
15  immediate and irreparable harm.
16      35.    Plaintiffs have no adequate remedy at law.
17      36.    Plaintiffs request a declaration from the court that the presence of the Mt.
18  Soledad cross on federal land violates the Establishment clause.
19      37.    The legislative transfer of the Mt. Soledad cross is in violation of both the
20  California and United States Constitutions. As such, Plaintiffs seek injunctive and
21  declaratory relief in the form of a court order rendering the legislation and the transfer
22  *void ab initio.*
23      38.    The aforementioned legislative transfer is *void ab initio* because CITY OF
24  SAN DIEGO officials acting within the scope and purview of their capacity as government
25  officials and acting in concert with federal and state officials, including all Defendants,
26  made a willful and conscious effort to transfer the land to the federal government in order
27  to save the cross on public land. The City and federal officials have acted in concert and
28  conspired to "save the cross" through unconstitutional means.

- 10 -

1  39. Thus, Plaintiffs have been deprived of rights, privileges and immunities

2 secured by both the United States and California Constitutions. Specifically, Defendants,

3 and each of them have acted in concert to invoke the aforementioned legislative taking for

4 the sole unconstitutional purpose of maintaining a Latin cross on government property.

5          **VI.**

6      **REQUEST FOR RELIEF**

7  WHEREFORE, Plaintiffs respectfully request the Court to enter judgment against

8 the CITY OF SAN DIEGO, DONALD RUMSFELD and the UNITED STATES OF

9 AMERICA as follows:

10  1. Declaring that the transfer of the land to the federal government violates

11    Plaintiffs' federal and California constitutional rights. Specifically, that the

12    legislative taking and the statute that authorized it be rendered *void ab initio*;

13  2. Preliminarily and permanently enjoining the Defendants from displaying the

14    cross on government property;

15  3. Encourage the parties to honor the settlement agreement that was entered

16    into;

17  4. For an award of attorney's fees and costs to Plaintiffs; and

18  5. For such further relief as this Court deems just and equitable.

19

20 Dated: September 8, 2006    LAW OFFICES OF JAMES E. McELROY

21

22           By

23            JAMES E. McELROY, ESQ.
              Attorneys for Plaintiffs

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STEVE TRUNK and PHILIP K. PAULSON | ) | CASE NO. 06-CV-1597 BTM (Wmc) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF SAN DIEGO, UNITED STATES OF | ) | PROOF OF SERVICE |
| AMERICA, DONALD H. RUMSFELD, Secretary | ) | |
| of Defense and DOES 1 through 100, Inclusive | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MOUNT SOLEDAD MEMORIAL | ) | |
| ASSOCIATION, Real parties in interest. | ) | |
| | ) | |

I, JUDITH MADSON, certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made. I further certify that on September ___8___, 2006, I served a copy of the following documents(s):

## FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

[X]  Mail Service - Regular, first class United States mail, postage fully prepaid, addressed to: SEE ATTACHED MAILING LIST

[ ]  Facsimile - By faxing a copy thereof.

[ ]  Personal Service - By leaving documents with the following named person or an officer or agent of the person at:  SEE ATTACHED MAILING LIST

   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  September ___8___, 2006

                                        JUDITH MADSON

                  Business Address:    625 Broadway, Suite 1400
                                        San Diego, CA 92101

SERVICE LIST

MICHAEL AGUIRRE, City Attorney
DAVID J. KARLIN, ESQ.
Deputy City Attorney
Civil Division
1200 Third Avenue, Ste. 1200
San Diego, CA 92101
Phone: (619) 533-5800
Fax:   (619) 533-5847

Attorneys for Defendant
CITY OF SAN DIEGO


CHARLES V. BERWANGER, ESQ.
Gordon & Rees LLP
101 West Broadway, Suite 1600
San Diego, CA 92101
Phone:(619) 696-6700
Fax:   (619) 696-7124

Attorney for MT. SOLEDAD
MEMORIAL ASSOCIATION


UNITED STATES ATTORNEY'S
OFFICE
880 Front Street, Room 6293
San Diego, CA 92101
Phone: (619) 557-5610
Fax:   (619) 557-5551

Attorneys for Defendant
UNITED STATES OF AMERICA


PETER D. LEPISCOPO, ESQ.
James M. GRIFFITHS, ESQ.
LAW OFFICES OF
PETER D. LEPOSCOPO
2635 Camino del Rio South,
Suite 109
San Diego,CA 92108
Phone: (619) 299-5343
Fax:   (619) 299-4767

Attorneys for Proposed
Intervenor and Defendant
PACIFIC JUSTICE INSTITUTE

Exhibit MC5

1   David Blair-Loy  SBN 229235
    ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
2   P.O. Box 87131
    San Diego, CA  92138-7131
3   Telephone: (619) 232-2121
    Facsimile: (619) 232-0036
4
    Daniel Mach
5   T. Jeremy Gunn
    ACLU PROGRAM ON FREEDOM OF RELIGION AND BELIEF
6   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
7   915 15th St., N.W., Suite 600
    Washington, D.C.  20005
8   Telephone:  (202) 675-2330
    Facsimile:  (202) 546-0738
9   [pro hac vice applications to be filed]

10  A. Stephen Hut, Jr.
    Jonathan H. Siegelbaum
11  Ryan P. Phair
    WILMER CUTLER PICKERING HALE & DORR LLP
12  1875 Pennsylvania Ave., N.W.
    Washington, D.C.  20006
13  Telephone: (202) 663-6000
    Facsimile: (202) 663-6363
14  [pro hac vice applications to be filed]  **ORIGINAL**
15
    Attorneys for Plaintiffs
16
            **IN THE UNITED STATES DISTRICT COURT**
17          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

18  JEWISH WAR VETERANS OF THE UNITED    ) CASE NO.
    STATES OF AMERICA, INC., RICHARD A.  )
19  SMITH, MINA SAGHEB, and JUDITH M.    ) **'06 CV 1728    JAH NLS**
    COPELAND,                            )
20                                       )
                          Plaintiffs,    ) **COMPLAINT FOR**
21                                       ) **DECLARATORY AND**
                                         ) **INJUNCTIVE AND RELIEF**
22             v.                        )
                                         ) [ESTABLISHMENT CLAUSE OF
23  DONALD H. RUMSFELD, Secretary of Defense, ) THE FIRST AMENDMENT TO
    in his official capacity,            ) THE UNITED STATES
24                                       ) CONSTITUTION]
                          Defendant.     )
25  _____  )
                                         )
26
27
28

# INTRODUCTION

1.  This is an action for declaratory and injunctive relief challenging the continuing display of a 43-foot Latin cross on government property on Mt. Soledad, San Diego, on the ground that it violates the Establishment Clause of the First Amendment to the United States Constitution.

2.  Religious symbols, including those prominently displayed, are an important and constitutionally protected form of religious expression in the American public sphere. The First Amendment guarantees that houses of worship, homes and businesses may erect religious symbols and display them visibly to the public. But there is a dramatic difference between constitutionally protected religious expression by private individuals, families, and religious communities and the constitutionally prohibited use of governmental power, authority, financing, and property to promote the religious expression of some American citizens to the exclusion of others.

3.  There has long been a perfectly satisfactory and constitutional remedy to the unconstitutional display of the Latin cross on Mt. Soledad: moving it to a non-governmental site. For decades, however, many supporters of the Latin cross have rejected reasonable efforts to resolve the constitutional dispute, sometimes with the explicitly articulated purpose of promoting sectarian religious symbols, and at other times with thinly veiled attempts to suggest that the Latin cross is simply a monument to honor veterans.

4.  Most recently, in a transparent effort to evade a long series of unfavorable decisions by the federal and California state courts invalidating the City of San Diego's display of the Mt. Soledad cross, the United States obtained title to the Latin cross and its surrounding property through a legislative taking. H.R. 5683, 109th Cong. (2006). The federal acquisition of the Latin cross, however, does nothing to cure the ongoing constitutional violation. When any

2

government entity – federal, state, or local – uses taxpayer funds to acquire and prominently

display a religious symbol that is sacred to some, but not all, religious believers, it disregards the

religious diversity in our society and violates the fundamental right to religious liberty

guaranteed by the First Amendment.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331, and

the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek to redress the

violation by Defendant under the First Amendment to the United States Constitution

6.  Venue is appropriate in this District under 28 U.S.C. §1391(e), because a substantial

portion of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern

District of California

## PARTIES

7.  Plaintiff Jewish War Veterans of the United States, Inc. ("JWV"), organized in 1896

by Jewish Veterans of the Civil War, is the oldest active national veterans' service association in

America. JWV is a federally chartered patriotic organization which has among its purposes a

continuing commitment to maintain true allegiance to the United States of America; to foster and

perpetuate true Americanism; to uphold the fair name of Jews and fight their battles wherever

unjustly assailed; to encourage the doctrine of universal liberty, equal rights, and full justice to

all men and women; to combat the powers of bigotry and darkness wherever originating and

whatever the target; and to preserve the memories and records of patriotic service performed by

the men and women of the Jewish faith and honor their memory. In furtherance of its

organizational purposes, JWV engages in extensive advocacy in support of religious liberty. As

part of that advocacy, JWV has publicly opposed the government's display of the Latin cross,

both on Mt. Soledad and elsewhere. *See, e.g., Jewish War Veterans of the United States v.*

3

1  *United States*, 695 F. Supp. 3 (D.D.C. 1988). JWV is a membership organization with tens of

2  thousands of members nationwide. JWV maintains a considerable presence in San Diego

3  County, with three separate JWV Posts in the San Diego area. JWV's members include

4  individuals who pay taxes regularly that are owed to the United States and state and local

5  governments, and who oppose government funding that promotes religion, including the funding

6  of the federal taking and continued display of the Latin cross on Mt. Soledad. JWV's members

7  also include individuals based in the San Diego area who regularly view the Latin cross on Mt.

8  Soledad, and who are offended by the government's communication of favoritism and

9  endorsement of the majority faith at the expense of citizens and veterans of other faiths who died

10 in the service of their country.

11

12    8.  Plaintiff Richard A. Smith is a resident of La Jolla, California, where he has lived in

13 the same home since 1969. Smith is a taxpayer who pays taxes regularly that are owed to the

14 United States and state and local governments. Smith is a veteran of the United States Navy,

15 having served from 1969 to 1971 as the head of the Neurology Branch of the Navy's

16 Neuropsychiatric Research Unit in San Diego. His best friend, a physician, was killed in the Tet

17 Offensive during the Vietnam War. Smith, who is Jewish, has great respect for all religious

18 faiths, but is discomfited by the presence of a sectarian religious symbol on public property.

19 Specifically, he believes that the Latin cross on Mt. Soledad demonstrates a government

20 preference for certain forms of Christianity above all other religions, and that the message the

21 Latin cross sends is that non-Christians like himself are not full members of the political

22 community. He also believes that, to the extent the Latin cross serves in part to honor the service

23 of veterans, such an overtly Christian religious memorial devalues the contributions of veterans

24 like himself who are not Christian. Smith regularly sees the Mt. Soledad Latin cross from

25 numerous vantage points around San Diego. Among other things, he makes weekly visits to a

26

27

28

4

sister-in-law who lives in a house where the Mt. Soledad Latin cross can be seen from the windows and the backyard. These weekly visits bring him into a position where he can directly view the Latin cross and the unwelcome and exclusionary message he believes it communicates. But for the presence of the Latin cross, Smith would visit Mt. Soledad again to enjoy the scenery and to pay tribute to the war dead honored at the site.

9. Plaintiff Mina Sagheb is a resident of La Jolla, California, and has lived in the San Diego area since 1990. She is a taxpayer who pays taxes regularly that are owed to the United States and state and local governments. Sagheb has been married to Plaintiff Smith for four years, and is Muslim. She has no objection to public displays of religious faith made by individuals. However, she objects to government sanctioning of religious displays, since she believes that the government should not favor one religion over another. Sagheb makes weekly visits to a sister who lives in a house where the Mt. Soledad Latin cross can be seen from the windows and the backyard. These weekly visits bring her into a position where she can directly view the Latin cross and the unwelcome and exclusionary message she believes it communicates. Sagheb has visited Mt. Soledad on at least one occasion, and, but for the presence of the Latin cross, she would visit Mt. Soledad again to enjoy the scenery and to pay tribute to the war dead honored at the site. Sagheb is an immigrant to the United States from Iran, a country she fled in part because of its religious intolerance and the government's promoting of the religious beliefs of some at the expense of others.

10. Plaintiff Judith M. Copeland has been a resident of San Diego, California since 1974. She is a taxpayer who pays taxes regularly that are owed to the United States and state and local governments. She has no objection to public displays of religious faith made by individuals. However, she objects to government sanctioning of religious displays, since she believes that the government should not favor one religion over another. Copeland sees the Latin cross

5

approximately twice a week while driving on Interstate 5, and is discomfited by the presence of a

sectarian religious symbol on public property. She has visited Mt. Soledad on at least one

occasion, and, but for the presence of the Latin cross, she would visit Mt. Soledad again to enjoy

the scenery and to pay tribute to the war dead honored at the site.

11. Defendant Donald H. Rumsfeld is the Secretary of the United States Department of

Defense. Pursuant to recently enacted federal legislation, *see* H.R. 5683, 109th Cong., § 2(c)

(2006), Secretary Rumsfeld manages the property containing the Mt. Soledad Veterans

Memorial in San Diego, California. Secretary Rumsfeld is sued in his official capacity.

## FACTUAL BACKGROUND

### Description and History of the Mt. Soledad Latin cross

12. The Mt. Soledad Latin Cross ("Latin cross" or "Cross"), a structure measuring 43 feet

in height with a 12-foot arm spread, is located on now-federal property at the top of Mt. Soledad

in San Diego, California. The Latin cross sits atop an 822-foot high hill and can be seen from

several miles away, including from Interstate 5, a public freeway that passes less than a half-mile

from Mt. Soledad.

13. The City of San Diego ("City") first took possession of Mt. Soledad in the nineteenth

century. In 1916, the San Diego City Council ("City Council") dedicated the property on which

the Latin cross rests, as well as 170 adjoining acres of property, as the Mt. Soledad Nature Park.

Although most of the 170-acre parcel is undeveloped and maintained in its natural state, the top

of the mountain has been cleared. Between 1913 and 1934, several crosses were erected atop

Mt. Soledad.

14. In 1952, the City Council authorized a private entity, the Mt. Soledad Memorial

Association ("MSMA"), to erect and maintain a sizeable Latin cross on top of Mt. Soledad. The

Cross was designed to replace predecessor crosses that were previously built on top of Mt.

6

1   Soledad but that were no longer standing. The MSMA constructed the Cross, consisting of

2   reinforced concrete and weighing approximately 24 tons, between 1952 and 1954.

3       15. The Latin cross is a sacred and revered symbol to many Americans and to many

4   Christians throughout the world. It is not, however, a symbol of the United States. Nor is it a

5   favored symbol of many devout Christians of a number of denominations. Many other religious

6
7   faiths have revered symbols that are given no status, no government support, and no placement

8   on Mt. Soledad.

9       16. On April 18, 1954, the MSMA dedicated the Latin cross during a Christian religious

10  ceremony held on Easter Sunday. During that ceremony, the Latin cross was explicitly dedicated

11  to "Our Lord and Savior Jesus Christ" in an MSMA dedication bulletin.

12      17. Since the Latin cross's initial dedication in 1954, the City of San Diego has granted

13
14  the MSMA a permit each year to conduct a sunrise service on Easter morning for Christians to

15  celebrate the resurrection of Jesus Christ.

16      18. Every annual publication of the Thomas Brothers Map for the San Diego area from

17  1954 to 1989 – the year the government's display of the Latin cross was first challenged in court

18  – presented a geographic legal description of the location as the "Mt. Soledad Easter Cross."

19      19. Throughout the past fifty years, the Latin cross has served not only as a religious

20  symbol but also as the site of numerous religious events, such as weddings, baptisms, and Easter

21
22  sunrise services.

23      20. For 38 years, there was no placard or marker indicating the presence of a veterans

24  memorial either on Mt. Soledad Natural Park or at the site of the Latin cross. The MSMA

25  installed such a marker with a "Veterans" memorial inscription only in 1992, after the onset of

26  litigation challenging the constitutionality of the display of the Latin cross on City-owned

27  property.

28

21. No secular or non-Christian symbols of comparable physical significance are present at Mt. Soledad to moderate the sectarian Christian message conveyed by the Latin cross, which towers above the rest of the memorial.

22. The predominant purpose of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote one particular sectarian Christian symbol.

23. The predominant effect of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote certain forms of the Christian religion.

24. The Latin cross's presence on top of government-owned property on Mt. Soledad is a governmental endorsement of a particular form of religion and its symbols.

25. The Latin cross's presence on top of government-owned property on Mt. Soledad gives official preference for certain sects within the Christian religion above all others.

26. The Latin cross's presence on top of government-owned property on Mt. Soledad fosters an excessive governmental entanglement with religion.

<u>Early Litigation and Potential Settlement</u>

27. In 1989, a private individual sued the City in this Court over the Latin cross's presence on top of Mt. Soledad, alleging that it violated the "No Preference" Clause of the California Constitution, Cal. Const. art. I, § 4, as well as the Establishment Clause of the United States Constitution, U.S. Const., amend. I. This Court found that "[w]here ... the Latin cross appears as a permanent, salient symbol on public property and on a public imprimatur, California's constitution will not permit it to continue to stand." *Murphy v. Bilbray*, 782 F. Supp. 1420, 1438 (S.D. Cal. 1991) (Thompson, J.). The Court ordered the City to remove the Latin cross, and gave the City three months to comply with its order. On appeal, the Ninth Circuit upheld the district court's determination and concluded that, even assuming the Mt. Soledad Latin cross could properly be characterized as war memorial, it is "[a] sectarian war

8

memorial [that] carries an inherently religious message and creates an appearance of honoring

only those servicemen of that particular religion." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1527-

28 (9th Cir. 1993), *cert. denied*, 513 U.S. 925 (1994).

28. In October 1994, following this Court's decision and the Ninth Circuit's affirmance

of that decision, the City made its first attempt to remedy the constitutional violation via a ballot

initiative in which it urged voters to "SAVE THE CROSS ON MOUNT SOLEDAD," not by the

constitutionally permissible means of moving it to a non-governmental site, but by authorizing a

no-bid sale of a 222-square foot parcel of land under the Latin cross to the MSMA. This Court

subsequently declared the sale invalid under the No Preference Clause as well as article XVI,

section 5 of the California Constitution, which "strictly prohibits any governmental support for

religious purposes." *Murphy v. Bilbray*, Nos. 90-134 GT, 89-820 GT, 1997 WL 754604, at ** 9-

11 (S.D. Cal. Sept. 18, 1997) (Thompson, J.) The Court reasoned that it was readily apparent

that "the primary purpose for the sale . . . was to save the Mt. Soledad cross from removal and/or

destruction," and that the City "clearly show[ed] a governmental preference for the Christian

religion" by "tak[ing] the position of trying to 'save' such a preeminent Christian symbol." *Id.* at

* 10. Following this decision, the Association sold the 222 square foot parcel back to the City.

29. After this decision, the City published a notice soliciting bids on about a half-acre of

land in Mt. Soledad Park, and expressly stated that the sale of the parcel was "for the purpose of

maintaining a historic war memorial." To this end, the City established a bidding process that

required applicants to explain their plans for "maint[aining] a historic war memorial on the site."

Subsequently, the City announced that it accepted the MSMA's bid as the winning bid. The

Ninth Circuit, sitting *en banc*, invalidated this sale as well, finding that it "was structured to

provide a direct, immediate, and substantial financial advantage to bidders who had the sectarian

purpose of preserving the [C]ross," and accordingly violated article XVI, section 5 of the

9

1    California Constitution. *Paulson v City of San Diego*, 294 F.3d 1124, 1133 (9th Cir. 2002) (en

2    banc), *cert. denied*, 538 U.S. 978 (2003).

3        30. Following the Ninth Circuit's *Paulson* decision, a dispute arose in this Court as to

4    who actually owned the Latin cross. On October 12, 2004, this Court ruled that the City of San

5    Diego — and not the MSMA — owned the land under and around the Latin cross. The Court

6    further implored the parties to "[s]ettle this case! It's time to move the cross from public land to

7    private land and comply with the laws of our great country instead of trying to find sneaky ways

8    to get around them to pander to a certain group or to satisfy an out-of-state group's religious

9    agenda."

10   agenda."

11       31. The parties engaged in extensive settlement discussions over the course of several

12   weeks and agreed to settle the case by moving the Latin cross 1,000 yards to a nearby church.

13   Under the terms of the settlement, the MSMA would be allowed to maintain an interest in the

14   Mt. Soledad property and war memorial, and the Latin cross would be replaced with a non-

15   sectarian symbol that would appropriately recognize all veterans in exchange for an end to

16   litigation. These settlement terms would be perfectly acceptable to Plaintiffs here and would

17   have preserved the continued existence of the Latin cross — but in a constitutional way. The

18   settlement terms were presented to the City Council on July 20 and 27, 2004. But instead of

19   accepting the settlement outright, the Council attempted one last sale to the highest bidder, who

20   alone could decide whether to keep, remove, or replace the Latin cross. At the public meeting of

21   the City Council, the Mayor and four of five Council members, who voted to put the proposition

22   (known as Proposition K) on the ballot over strong MSMA and prominent veterans-group

23   opposition, expressly stated that the reason for their vote was to allow the Latin cross to remain

24   on Mt. Soledad. *See Paulson v Abdelnour*, No. GIC-849667 at 27-28 (Cal. Sup. Ct. Oct. 7,

25

26

27

28

                                        10

2005). One Councilmember even cited his membership in the "Jesus Christ fan club" as a reason for his vote. *Id.* at 27.

32. On November 2, 2004, a substantial majority of San Diego voters — over 250,000 in total — rejected Proposition K and directed the City Attorney to enter into the settlement agreement.

### Overriding of the Settlement and the Intervention of (former) Congressman Randy "Duke" Cunningham to "Save the Cross"

33. Undeterred by the will of San Diego voters and this Court's prior exhortation to settle the case consistently with constitutional requirements, the City refused to comply with the binding ordinance. Instead, with the active encouragement of the Thomas More Law Center ("TMLC"), an advocacy group whose stated mission is the "promotion of the religious freedoms of Christians" and the protection of "Christians and their beliefs in the public square," the City began its ongoing campaign to circumvent its constitutional obligations.

34. After San Diego voters overwhelmingly rejected Proposition K, the TMLC sought to scuttle the binding settlement agreement and secure the intervention of the federal government — all to save the Latin cross as a religious symbol.

35. On November 10, 2004, the TMLC sent a letter to Representative Randy "Duke" Cunningham, a Congressman from San Diego and a member of the powerful House Appropriations Committee, to solicit his help in convincing the federal government to override the San Diego referendum and corresponding settlement agreement by declaring the Latin cross a national war memorial. In so doing, the TMLC made clear that the principal reason for taking such action was because "religion and morality are the foundation of our country" and the Mt. Solemad Latin cross was "one of the most visible symbols of [our Christian faith]."

11

36. Acknowledging that there was "unfortunately" a local initiative whereby San Diego voters overwhelmingly agreed to resolve the matter by entering into a settlement agreement, the TMLC nonetheless asserted that "the culture war will continue to be fought on many fronts" no matter what. Accordingly, the TMLC asked Representative Cunningham to "save the Cross" and help "preserve this … religious landmark" by declaring it a national war memorial.

37. Less than a month later, during the night of November 21, 2004, Representative Cunningham inserted an eleventh-hour rider into the voluminous $388 billion Fiscal Year 2005 Omnibus Appropriations Act (Pub. L. No. 108-447). The rider, which few had seen before Representative Cunningham inserted it into the appropriations bill, (1) designated the Mt. Soledad Veterans Memorial a national veterans memorial; (2) authorized the Department of the Interior to accept the donation of the Memorial from the City of San Diego; and (3) directed the National Park Service to enter into a memorandum of understanding with the MSMA for the maintenance and administration of the memorial. Pub. L. No. 108-447, § 116, 118 Stat. 3346, *codified at* 16 U.S.C. § 431 note (2004). Representative Cunningham acknowledged that he had not asked for a written legal opinion from an attorney on whether the bill would allow the Latin cross to remain at its current location, and that he was trying to "save the Cross" as a religious landmark. The TMLC hailed Cunningham's effort as "an act of God."

38. With the exception of the TMLC, however, all parties to the long-running dispute acknowledged that Representative Cunningham's proposed legislation would not solve the constitutional problem that the California state and federal courts had unanimously reaffirmed multiple times over the preceding 13 years. The press has reported that William Kellogg, Executive Director of the Mount Soledad Memorial Association, candidly acknowledged that he did not see how Cunningham's legislation would solve the underlying constitutional impediments. Likewise, the press reported that the MSMA's attorney, Charles Berwanger, said

12

1    that officials of the U.S. Department of Veterans Affairs had advised him that such a move

2    would run afoul of the First Amendment and had reaffirmed that opinion in the wake of Rep.

3    Cunningham's rider.

4        39. On December 8, 2004, President Bush signed the omnibus appropriation bill, with

5    Representative Cunningham's rider intact, into law. Soon thereafter, the TMLC and

6    Representative Cunningham successfully pressed San Diego Mayor Dick Murphy to add the

7    proposed federalization of the Latin cross by way of donation promptly to the City Council

8

9    Agenda.

10        40. Prior to the City Council meeting, however, San Diego City Attorney Michael

11    Aguirre issued a formal legal opinion that the federalization of the Latin cross by way of

12    donation would be a violation of the California Constitution and fall far short of a remedy that

13

14    would be deemed acceptable by the California state and federal courts. Mr. Aguirre's opinion

15    further observed that, "based on current case law, such a transaction would also violate the

16    federal Constitution and . . . provide fodder for additional legal proceedings against the City."

17    Kimberly Edds, *San Diego to Move Giant Cross; City Council Votes to End Suit Over Religious*

18    *Symbol*, Wash. Post (May 10, 2005).

19        41. On March 8, 2005, after a six-hour public hearing, the San Diego City Council voted

20    against donating the Latin cross to the federal government based on the MSMA's request, City

21    Attorney Aguirre's legal recommendation, and the recognition that the City had a binding

22

23    obligation to enter into the MSMA settlement agreement once Proposition K failed.

24        42. In a subsequent letter to the editor of the *San Diego Union-Tribune*, MSMA President

25    Bill Kellogg reiterated his "strong support" for the City Council's decision to reject

26    federalization of the Cross, saying he was "convinced it was the right decision for our

27    community and for our veterans." Mr. Kellogg stated accurately that the constitutional issue

28

"had already been litigated to the fullest extent possible," that the Ninth Circuit's decision in *Buono v Norton*, 371 F.3d 543 (9th Cir. 2004), in which the Ninth Circuit invalidated a nearly identical attempt arising out of a war memorial in the Mojave Desert Preserve, "was directly on point," and that "only the patience of the courts has prevented the [original] order from being carried out." To those who "supported the federalization of the park [who] say they don't care about the cross itself; they care about 'not caving in to a minority,'" Kellogg contrasted the MSMA's deep commitment to "the cross and the walls" and its equal commitment "to ensuring that both remain standing in a public place where they can be enjoyed by all." "Only by moving the cross to another location" pursuant to the original MSMA settlement agreement, Kellogg argued, could the Cross truly "be saved."

43. Soon after the City Council's decision, the TMLC and others, spurred on by Rep. Cunningham and Mayor Murphy, spearheaded a petition and referendum drive under the aegis of a TMLC-affiliated group called "San Diegans for the Mt. Soledad National War Memorial" to rescind the Council vote. This wide-ranging and well-financed effort included 75 paid signature gatherers, massive fundraising efforts, and a petition written by the TMLC that began with the proposition, "You Can Save Our Cross." Press reports described sermons from the Latin cross site and other public and religious venues, including events at Qualcomm Stadium and Cox Arena on Easter Sunday, that urged civil disobedience to flout the original Court order and save the Latin cross.

44. At a May 17, 2005 meeting to consider the petition, two City Council members, while expressing misgivings about the mounting legal costs the City was incurring, agreed to switch their initial vote and to send the issue back to the voters. The Council accordingly voted 6-3 to allow a public referendum, Proposition A, on the Latin cross. The vote on Proposition A was scheduled to coincide with the July 26, 2005 special election to replace Mayor Murphy. After

14

1    the City Council's vote was announced, Latin cross supporters sang "Onward Christian Soldiers"

2    in the Council chamber.

3                           **Further Litigation Over the Latin cross**

4        45. A private individual then challenged the proposed referendum on donating the Latin

5    cross to the federal government on the grounds that the donation would violate article I, section

6    IV (the No Preference Clause) and article XVI, section V (the No Aid Clause) of the California

7    Constitution. Soon after Proposition A passed, California Superior Court Judge Patricia Cowett

8    issued a temporary restraining order preventing the donation and a tentative ruling that any such

9    donation would be unconstitutional.

10

11        46. Following Judge Cowett's order, City Attorney Aguirre reportedly reiterated that

12    Proposition A was "clearly unconstitutional."

13        47. Seeking to overcome its inability to continue to bankroll the Latin cross litigation —

14    which to that point had been ongoing for 13 years — the City deputized the TMLC's lead

15    attorney, Charles LiMandri, as a special deputy city attorney who agreed to work for free.

16

17        48. On October 7, 2005, Judge Cowett issued a 35-page final decision striking down

18    Proposition A as unconstitutional. *Paulson v Abdelnour*, No. GIC-849667 (Cal. Sup. Ct. Oct. 7,

19    2005). The decision recounts the extensive legal history of the dispute and the consistent and

20    unequivocal rulings by state and federal courts over the years. Based on "the consistent,

21    repeated, and numerous references to saving the Cross as the basis for deciding whether to

22    donate the memorial to the United States," Judge Cowett held that "one conclusion is

23    inescapable: this transfer is again an unconstitutional preference of the Christian religion to the

24    exclusion of other religions and non-religious beliefs in violation of the No Preference Clause of

25    the California Constitution." *Id.* at 28. In addition, Judge Cowett ruled that the City's attempt

26    "to go so far as to transfer away valuable land for no compensation for the purpose of saving the

27

28                                              15

1   cross is also an unconstitutional aid to the Christian religion in violation of the California

2   Constitution." *Id*

3       49. Judge Cowett likewise observed that maintaining the Latin cross as a part of a

4   national veterans memorial would "run[] afoul of the Establishment Clause of the United States

5   Constitution." *Id*   Citing the Supreme Court's recent decision in *McCreary County v ACLU*,

6   125 S.Ct. 2722 (2005), Judge Cowett concluded:  "Even today, it still can be said that at best the

7   Mt. Soledad Memorial has a secondary secular purpose (or at worst is but a sham secular

8   purpose) and that the predominant purpose of the memorial is a religious purpose." *Id* at 34-35.

9   Judge Cowett concluded by stating Judge Thompson's initial pronouncement back in 1991 – that

10   if the City "truly wish[ed] to honor the war dead, then it should do so other than with the Latin

11   cross which it has permitted to stand atop Mt. Soledad" — "still stands the test of time and

12   history as related to this cross." *Id* at 35.

13
14       50. On May 4, 2006, this Court ordered the City of San Diego finally to remove the Latin

15   cross within 90 days or be fined $5,000 a day.  The Court held that "[c]onsistently, every court

16   that has addressed the issue has ruled that the presence of the Latin cross on Mount Soledad, land

17   which is owned by the City of San Diego ... violates Article I Section 4 of the California

18   Constitution." *Paulson v. City of San Diego*, No. 89-0820GT, at 2 (S.D. Cal. May 3, 2006).

19   Having given the City 17 years to remedy the problem and expressing utter frustration with "the

20   long and torturous legal history" of the case, the Court stated that it was "now time, and perhaps

21   long overdue, for this Court to enforce its initial permanent injunction forbidding the presence of

22   the Mount Soledad Cross on City property." *Id*

23
24       51. In response to the Court's order, San Diego City Attorney Aguirre once again

25   recommended that city officials stop politicizing the issue and incurring unnecessary legal costs

26   in a futile effort to save the Latin cross on appeal.  MSMA President William Kellogg likewise

27

28                                              16

reiterated that the private war memorial organization was prepared to move the Latin cross to nearby private property and replaced at the memorial with another fitting symbol for veterans of the Korean War: "We feel it's very important that the cross be saved. The location of the cross is not the primary issue."

52. The City sought a stay of Judge Thompson's order pending appeal. On June 21, 2006, the Ninth Circuit denied the stay request. On July 7, 2006, Justice Kennedy, as the Circuit Justice for the Ninth Circuit, granted a stay to preserve the status quo pending the respective appeals of Judge Thompson's and Judge Cowett's decisions. *San Diegans for the Mt Soledad Nat'l War Memorial v Paulson*, 126 S. Ct 2856 (July 7, 2006) (Kennedy, J.).

### Recent Federal Intervention

53. At the same time, Mayor Sanders and certain organizations lobbied the President and Congress to help them evade the effects of the California Constitution by condemning and effectuating a taking of the Mt. Soledad Latin cross by the federal government. On May 10, 2006, Congressman Duncan Hunter, who assumed leadership on the Latin cross issue in Congress after Rep. Cunningham's departure, asked the President to "use the authority found in 40 U.S.C. 3113 to begin immediate condemnation proceedings" concerning the Latin cross.

54. On June 27, 2006, Rep. Hunter introduced H.R. 5683. Stating an intent to "effectuate the purpose" of Rep. Cunningham's previous bill from 2004, H.R. 5683 declares that "there is hereby vested in the United States all right, title, and interest in and to, and the right to immediate possession of, the Mt. Soledad Veterans Memorial in San Diego, California." H.R. 5683, 109th Cong , § 2(a) (2006). H.R. 5683 directs the United States to pay "just compensation to any owner of the property." *Id* § 2(b). The bill states that upon acquisition of the memorial by the United States, "the Secretary of Defense shall manage the property and shall enter into a

17

1    memorandum of understanding with the Mt. Soledad Memorial Association for the continued

2    maintenance of the Mt. Soledad Veterans Memorial by the Association." *Id.* § 2(c).

3       55. The bill passed the House on July 19, 2006 and the Senate on August 1, 2006. The

4    President signed H.R. 5683 into law on August 14, 2006.

5                                **CLAIM FOR RELIEF**

6                             (Establishment Clause Violation)

7

8       56. Plaintiffs repeat and reallege paragraphs 1 through 55.

9       57. The Establishment Clause of the First Amendment to the U.S. Constitution provides

10   that "Congress shall make no law respecting an establishment of religion."

11      58. Based on the allegations set forth above, Defendants have violated and continue to

12   violate Plaintiffs' rights protected by the Establishment Clause.

13      59. An actual and present controversy between the parties exists such that declaratory

14
15   relief is appropriate.

16      60. The continued display of the Latin cross on federal land will cause irreparable harm

17   to Plaintiffs.

18      61. Plaintiffs lack an adequate remedy at law.

19                               **PRAYER FOR RELIEF**

20   WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

21
22      (a)   A declaratory judgment that the taking of the Mt. Soledad Latin cross and

23            its continued display on federally owned land violates the Establishment

24            Clause of the First Amendment of the United States Constitution;

25      (b)   The entry of a preliminary and permanent injunctive relief enjoining the

26            continued display of the Mt. Soledad Latin cross on federally owned land;

27

28                                      18

1     (c)    Encourage and permit the Latin cross to be moved, at the expense of

2             individual citizens who believe that the Latin cross should be preserved, to

3             an appropriate non-governmental site;

4     (d)    An award to Plaintiffs of their costs, expenses, and attorneys' fees; and

5     (e)    Such further and other relief as this Court deems just and proper.

6

7 DATED: August 24, 2006

8                                             David Blair-Loy  SBN 229235

9                                             ACLU FOUNDATION OF SAN DIEGO &
                                                  IMPERIAL COUNTIES

10                                             P.O. Box 87131
                                            San Diego, CA  92138-7131

11                                             Telephone: (619) 232-2121
                                            Facsimile: (619) 232-0036

12

13                                             Daniel Mach
                                            T. Jeremy Gunn

14                                             ACLU PROGRAM ON FREEDOM OF
                                               RELIGION AND BELIEF

15                                             AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION

16                                             915 15th St., N.W., Suite 600
                                            Washington, D.C.  20005

17                                             Telephone: (202) 675-2330
                                            Facsimile: (202) 546-0738

18                                             [*pro hac vice* application to be filed]

19

20                                             A. Stephen Hut, Jr.
                                            Jonathan H. Siegelbaum

21                                             Ryan P. Phair
                                            WILMER CUTLER PICKERING HALE &

22                                                DORR LLP
                                            1875 Pennsylvania Ave., N.W.

23                                             Washington, D.C.  20006
                                            Telephone: (202) 663-6000

24                                             Facsimile: (202) 663-6363

25                                             [*pro hac vice* applications to be filed]

26                                             *Attorneys for Plaintiffs Jewish War Veterans*
                                            *of the United States of America, Inc., David*

27                                             *A. Smith, Mina Sagheb, and Judith M.*
                                            *Coleman*

28

                                            19

Exhibit MC6

1  JAMES E. McELROY (#079313)
   LAW OFFICES OF JAMES E. McELROY
2  625 Broadway, Suite 1400
   San Diego, CA 92101
3  Phone (619) 232-6686

4  Attorney for Plaintiff
   PHILIP K. PAULSON

5

6

7              UNITED STATES DISTRICT COURT

8              SOUTHERN DISTRICT OF CALIFORNIA

9

10  STEVE TRUNK and PHILIP K.          )   CASE NO. 06-CV-1597 BTM (WMc)
    PAULSON,                           )
11                                     )   PLAINTIFF'S REQUEST TO COMPEL
                                       )   THE DEPOSITION OF SAN DIEGO
12             Plaintiffs,             )   MAYOR JERRY SANDERS AND
                                       )   REPRESENTATIVE DUNCAN
13                                     )   HUNTER
    v.                                 )
14                                     )
                                       )   Magistrate Judge William McCurine
15  CITY OF SAN DIEGO, UNITED          )
    STATES OF AMERICA, DONALD H.       )   Date:      March 22, 2007
16  RUMSFELD, Secretary of Defense and )
    DOES 1 through 100, Inclusive      )   Time:      2:00 p.m.
17                                     )
                                       )
18             Defendants.             )
                                       )
19  MT SOLEDAD MEMORIAL               )
    ASSOCIATION, AS REAL PARTIES      )
20  IN INTEREST.                       )
                                       )
21  _____)

22

23

24

25

26

27

28

.

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS................................................ i

TABLE OF AUTHORITIES............................................. ii

I.    INTRODUCTION.............................................. 2

II.   STATEMENT OF FACTS....................................... 2

III   THE   ACTIONS AND STATEMENTS OF GOVERNMENT
      REPRESENTATIVES ARE RELEVANT AND ADMISSIBLE EVIDENCE
      IN ESTABLISHMENT CLAUSE CASES TO ASCERTAIN "PURPOSE"... 10

IV.   EVIDENCE OF THE ACTS AND STATEMENTS OF GOVERNMENT
      OFFICIALS ARE RELEVANT, ADMISSIBLE AND PERHAPS
      DISPOSITIVE OF THE ISSUES ESTABLISHING VIOLATIONS OF
      THE CALIFORNIA CONSTITUTION BY DEFENDANT CITY OF SAN
      DIEGO................................................... 14

V.    CONCLUSION............................................... 18

### TABLE OF AUTHORITIES

CASES                                                                    PAGE

Barnes-Wallace v. Boy Scouts of America
    275 F.Supp.2d. 1259, 1276 (S.D. Cal. 2003)............ 15

Buono v. Norton
    371 F.3d 543 (9th Cir. 2004), 364 F.Supp.2d 1175,
    1182 (C.D. Cal. 2005)..................................... 13

California Educ. Facilities Auth. v. Priest
    12 Cal. 3d 593, 607 n. 12 (1974). .................... 15

Edwards v Aguillard
    482 U S. +578, 594-595.............................. 12,13,19

Ellis v. City of La Mesa
    990 F.2d 1518 (9th Cir.1993)cert. denied,
    512 U.S. 1220 (1994)................................... 2,3

Epperson v. Arkansas
    393 U.S,. 97 (1968)..................................... 10

Feminist Women's Health Ctr., Inc. v. Philadelphia
    157 Cal App.3d 1076, 1093 (1984).................... 15

Fox v. City of Los Angeles
    22 Cal.3d 792, 587 P.2d 663,
    150 Cal. Rptr. 867(1978).......................... 15,16,17

Hewitt v. Joyner
    940 F.2d 1561, 1567, 1569 (9th Cir. 1991)............ 15

Lemon v. Kurtzman
    403 U.S. 602, 612-613 (1971).......................... 10

McCreary v. ACLU
    125 S.Ct. 2722, 2733 (2005)...................10,11,12,19

Murphy v. Bilbray
    782 F.Supp. 1420, 1438 (S.D. Cal. 1991)............. 4,7

Murphy v. Bilbray
    No. 90-134 GT, 1997 WL 754604 at 11 (S.D. Cal.)....... 4

Paulson v. City of San Diego
    294 F.3d 1124, 1126, 1132(9TH Cir. 2002)............ 4,5,16

Sands v. Morongo Unified School Dist.
    53 Cal.3d 863, 809 P.2d 809, 281 Cal. Rptr. 34 (1991)
    (quoting 25 Op.Cal.Atty.Gen. 316, 319 (1955)......... 14

Sante Fe Independent School Dist. v. Doe
    530 U S. 290, 315 (2000)............................... 11

Separation of Church and State v. City of Eugene (SCSC)
    93 F.3d 617 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

Wallace v. Jaffree
    472 U.S. 38, 56(1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10,11,19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

JAMES E. McELROY (#079313)
LAW OFFICES OF JAMES E. McELROY
625 Broadway, Suite 1400
San Diego, CA 92101
Phone (619) 232-6686

Attorney for Plaintiff
PHILIP K. PAULSON

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE TRUNK and PHILIP K. PAULSON, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN DIEGO, UNITED STATES OF AMERICA, DONALD H. RUMSFELD, Secretary of Defense and DOES 1 through 100, Inclusive <br><br> Defendants. <br><br> MT SOLEDAD MEMORIAL ASSOCIATION, AS REAL PARTIES IN INTEREST. | CASE NO. 06-CV-1597 BTM (WMc) <br><br> PLAINTIFF'S REQUEST TO COMPEL THE DEPOSITION OF SAN DIEGO MAYOR JERRY SANDERS AND REPRESENTATIVE DUNCAN HUNTER <br><br> Magistrate Judge William McCurine <br><br> Date:  March 22, 2007 <br> Time:  2:00 p.m. |

## I.

## INTRODUCTION

Plaintiff STEVE TRUNK ("Trunk") hereby requests an order permitting him to take the depositions of San Diego Mayor Jerry Sanders ("Sanders") and Congressman Duncan Hunter ("Hunter") within the next 30 days. Plaintiff intends to elicit testimony from Representative Hunter which will tend to confirm that the purpose of legislation he sponsored, culminating in House Resolution 5683 which authorized the federal government to take the cross and the land beneath it by eminent domain, was to preserve the presence of

1

1  the Mount Soledad Latin cross on public property. Plaintiff also intends to elicit testimony

2  from Mayor Sanders which will tend to support Plaintiff's claim that the purpose of

3  Defendant City's actions regarding the taking were to save the Latin cross on public property

4  and also that the City's actions in regard to the taking demonstrate a preference for one

5  religion over all others, create an impermissible appearance of preference for Christianity

6  and aid religion.

7       The government's "purpose" in taking the property, government preference for one

8  religion above all others or even the appearance of such a preference, may be dispositive on

9  the issue of whether such a transfer violates both the California and United States

10 Constitutions. Every court to consider this matter over the last 17 years has held that the Mt

11 Soledad cross is a powerful sectarian symbol that conveys a religious message and that as

12 such, *any government conduct that operates affirmatively to preserve the cross aids a*

13 *sectarian purpose and thus is unconstitutional* (See discussion below)

14      Plaintiff Trunk requested the deposition of Representative Hunter through the U.S

15 Attorney's Office, however that request was denied. Likewise, Plaintiff requested the

16 deposition of Mayor Sanders through his legal representatives at the City Attorney's Office,

17 and that request was denied as well. (McElroy Dec. ¶1) Plaintiff now requests this court

18 issue an order compelling the depositions of Representative Hunter and Mayor Sanders.

19                                         II.

20                          STATEMENT OF FACTS

21      The ownership of the cross and the Mount Soledad Natural Park is an issue that is

22 currently being litigated in this case. The federal government claims to have taken the

23 property and the cross by legislative eminent domain. Trunk alleges the taking was done to

24 save the cross, a sectarian symbol, and as such is unconstitutional and therefore the transfer is

25 void *ab initio* The land has been owned (and Trunk contends is currently owned) by the City

26 of San Diego ("City"). It is made up of approximately 170 acres of land forming a mountain

27 with a flat, cleared area at the top. At the apex of the mountain, in the center of the cleared

28 area, sits the 43 foot tall, 24 ton Latin cross. This concrete cross was erected by the Mount

2

1   Soledad Memorial Association ("Association") in 1954 with the permission of the City.

2   Seventeen years ago, Plaintiff Paulson initiated a suit against the City of San Diego

3   challenging the constitutionality of the Latin cross on City property. In that suit, Paulson

4   alleged that the cross amounted to a violation of the Establishment Clause of the First

5   Amendment to the United States Constitution, the No Preference Clause of the California

6   Constitution, and the No Aid Clause of the California Constitution.

7        Two years later, the District Court in 1991 issued a permanent injunction in this

8   matter, prohibiting the presence of the cross on public property and giving the City 90 days to

9   comply with the injunction. Murphy v. Bilbray, 782 F.Supp. 1420, 1438 (S.D. Cal. 1991).

10  The court held that "[n]ot only is the cross is a profoundly religious symbol; it is also an

11  exceedingly powerful symbol" Id. at 1430. Although the City appealed the decision of the

12  District Court, the Ninth Circuit Court upheld the injunction. Ellis v. City of La Mesa (9th

13  Cir. 1993) 990 F.2d 1518, cert. denied, 512 U.S. 1220 (1994).

14       Although the District Court issued a permanent injunction in 1991, as of this date, the

15  Latin cross is still situated on City or federal property, a full fifteen years after the original

16  injunction forbidding the presence of the cross public property was issued.

17       The Latin cross is visible to occupants of the approximately 300,000 thousand

18  vehicles that travel interstate 5 in that location on a daily basis and to thousands of others

19  who can see it from various San Diego neighborhoods miles away. In addition, all persons

20  who wish to enjoy the public park or visit the memorial plaques currently in place, including

21  veterans of all faiths and those of no religious belief, are compelled to do so in the shadow

22  of the enormous sectarian symbol.

23       In response to the Court's 1991 injunction, the City placed Proposition F on the ballot

24  seeking voter authorization for a sale of the land under the cross. The argument in favor of

25  Proposition F advised voters that a "yes" vote would "save the cross." The "save the cross"

26  ballot argument was signed by then City mayor, Maureen O'Connor and several City council

27  persons. After Proposition F passed and the City sold the property to the Association,

28  Plaintiff challenged the constitutionality of the sale. The District Court found that the sale

3

1    failed to cure the constitutional infirmities outlined in the injunction, and itself evidenced an

2    unconstitutional preference for religion. Murphy v. Bilbray, No. 90-134 GT, 1997 WL

3    754604 at 11 (S.D. Cal.). The City's implicit endorsement of the "save the cross" campaign,

4    based on the support of Proposition F by the Mayor was, among other factors, significant to

5    the courts' determination that the sale violated California's constitutional prohibition against

6    government preference for religion. Id. at 10.

7        Undiscouraged, the City fashioned yet another sale. In an *en banc* decision, the Ninth

8    Circuit found this sale also failed to cure the constitutional infirmities outlined in the 1991

9    injunction and that the structure of the sale evidenced an unconstitutional aid to religion.

10   Paulson v. City of San Diego 294 F.3d 1124, 1132 (9th Cir. 2002). The court explained, "In

11   view of our holding in Ellis that the Mt. Soledad cross is a sectarian symbol that conveys a

12   religious message, *governmental conduct that operates affirmatively to preserve the cross*

13   *aids a sectarian purpose: the preservation of a symbol that conveys a specifically Christian*

14   *message."* Id (emphasis added). Earlier, Judge Thompson ruled, "even if one strains to

15   view the cross in the context of a war memorial its primary effect is to give the impression

16   that only Christians...are being honored." Murphy, supra, 782 F. Supp. at 1437. In addition,

17   Judge Thompson wrote, "[t]he City is directed that, if it truly wishes to honor the war dead,

18   then it should do so other than with the Latin cross which it has permitted to stand atop Mt.

19   Soledad." Id. at 1436-38.

20        In response to the *en banc* decision and the Supreme Court's denial of cert, the parties

21   entered into negotiations to fashion a constitutional remedy that would finally end 15 years of

22   litigation over the cross on Mt. Soledad. The parties agreed to move the cross to a nearby

23   church, preferably one 1000 yards from where the cross currently stands. The Association

24   was going to retain its interest in the memorial, continue the improvements and agreed to

25   replace the cross with a non sectarian symbol that represented all veterans, not just

26   Christians. (McElroy Dec ¶ 2) In exchange for this settlement, Plaintiffs agreed to dismiss

27   their lawsuit. Senior Deputy City Attorneys participated in the negotiations and indicated

28   they were acting with the authority and concurrence of the City Attorney. They agreed that

4

1   after 15 years of litigation, moving the cross was the only legal and practical way to settle

2   the case.

3        When the settlement was presented to the City Council in an open session, however,

4   Mayor Richard Murphy and several council persons announced their desire to save the cross.

5   One council person claiming that as a member of the "Jesus Christ fan club ...he would never

6   support that cross coming off of Mt. Soledad." (Ex. 1) Instead of entering into the

7   agreement, the City passed yet another ordinance which proposed a third sale of an

8   unidentified amount of the land under and around the cross to the Association. That sale

9   would also have to be approved by the voters (Proposition K) pursuant to the City Charter.

10  The text of the Ordinance that the City Council passed, further specified that if Proposition K

11  failed to pass, the City would enter into the previously described settlement.

12       "SHOULD VOTERS REJECT THE PROPOSAL (proposition K) ,CITY
         ATTORNEY *SHALL* ENTER INTO THE SETTLEMENT AGREEMENT NOW
13       WITH THE MT SOLEDAD MEMORIAL ASSOCIATION AND PLAINTIFFS "
         (Ex.2, emphasis added)
14
         Proposition K needed a 2/3 "yes" vote to pass. However, it failed by nearly a 2/3
15
    margin, with 60% of voters opposing the proposition. Following the failure of Proposition
16
    K, the Association and Paulson demanded that the City comply with the settlement
17
    agreement. However, the City steadfastly refused to obey the ordinance it had passed.
18
         Rather than entering into the settlement agreement, the City entered into a scheme
19
    with representatives of the U.S government and a Christian advocacy group designed to save
20
    the cross by declaring it a National War Memorial, after which time the City would give the
21
    land to the federal government. The Thomas More Law Center ("TMLC"), is a group
22
    dedicated to protecting Christians and their religious beliefs, including promoting
23
    Christianity in the public square.(Ex. 3). The West Coast director of the TMLC, Charles
24
    LiMandri, wrote to Representatives Duke Cunningham and Duncan Hunter ("Hunter") and
25
    urged them to save the cross precisely because it was such an important symbol of the
26
    Christian faith.
27
         "...*[R]eligion* and morality are the foundation of our country... On the issue of *religion*
28       and values...there was, unfortunately, a local election that turned out in a way
         that was not consistent with the will of the people. I am referring to Proposition K

1    which concerned *the preservation of the Mt. Soledad cross* ...The Thomas More Law

2    Center *promotes the religious freedom of Christians...* This culture war will continue
     to be fought on many fronts ...The battle to preserve religious freedom in America has

3    largely focused on the *symbols of our faith.* For us in San Diego, the *Mt. Soledad
     Cross is one of the most visible of these symbols......* I am asking for your help to

4    ...preserve this important ...*religious landmark ...to preserve the Mt. Soledad
     cross*...We believe *our best hope to preserve the Mt. Soledad Cross* is to have it

5    declared a Federal National Memorial Park... I believe that this final step [federalizing
     the land and the monument] should ultimately prove successful *in saving the Cross* for

6    the following reasons. First, the California State Constitution provides stronger
     arguments....This is because the California Constitution ... has been interpreted more

7    broadly than the 'establishment clause." I understand that the cross is expected to be
     removed in the next 60 days if we do not act. Therefore, any further action taken on

8    this matter must be begun without delay. President Reagan, I think we all know where
     he would have stood on the issue of *saving the Cross.* " (Ex.4)

9

10   Mr LiMandri would later explain to the court that he worked with Mr Hunter's office

11   in promoting this legislation (Ex 5)

12   Within a month of this letter being sent, Representatives Cunningham and Hunter

13   buried an eleventh hour rider in a 300 billion dollar omnibus appropriations bill. The bill

14   attempted to designate the site, including the cross, as a National Veterans Memorial and

15   compelled the Secretary of the Interior to accept the property, should the City of San Diego

16   offer to donate it to the federal government. It specifically called for the continued

17   maintenance of the cross by the Memorial Association. Both Congressman issued press

18   releases making clear their intent in pressing this legislation was to save the cross (Ex.6)

19   Shortly thereafter, the City Council considered the issue of whether to donate the

20   property so that the federal government could accept it pursuant to the Cunningham/Hunter

21   legislation. However, a majority of the City Council refused to donate the land to the federal

22   government due to the advice of the City Attorney that such an act would be unconstitutional

23   and would also violate the settlement agreement that the City promised to enter if Proposition

24   K failed. (Ex. 7) In response, the Mayor along with several council members supported a

25   petition and referendum drive to rescind the City Council's vote and allow the transfer of the

26   property to the federal government. Despite a formal written opinion by the City Attorney

27   advising both the Mayor and the Council that the proposed transfer to the Federal

28   Government would violate both the state and federal constitutions, and in spite of the binding

     settlement agreement requiring the cross be moved to private property upon the failure of

6

1  Prop K, the Council nevertheless decided to put the question of whether to transfer the land
2  and the cross to the federal government to a public vote. The measure, Proposition A, was
3  put on the ballot for the July 26, 2005 special election. Fewer people voted for Proposition A
4  (190,000) than voted against Proposition K (250,000).

5       Paulson initiated an action in Superior Court challenging the validity of Proposition A.
6  On October 7, 2005, the Superior Court ruled that the proposed transfer of the land, cross and
7  memorial to the federal government by the City was unconstitutional. Specifically, the Court
8  found "...the ordinance placing Proposition A on the ballot and Proposition A
9  unconstitutional, and therefore invalid and unenforceable. Maintenance of the Latin Cross as
10  it is on the property in question, is found to be an unconstitutional preference of religion in
11  violation of Article I, Section 4, of the California Constitution, and the transfer of the
12  memorial with the cross as its centerpiece to the federal government to save the cross as it is,
13  where it is, is an unconstitutional aid to religion in violation of Article XVI, Section 5, of the
14  California Constitution." (Ex. 8. at p 1-2.) That decision was reversed by the Fourth District
15  Court of Appeal based in large part on that Court's belief that it couldn't determine "what
16  was in the mind of each voter" who voted for the referendum. A Petition for Review has
17  been filed with the California Supreme Court.

18       Meanwhile, in the District Court (prior to the vote on Prop A and to the Superior
19  Court's decision on the merits of the transfer), Plaintiff requested that the District Court
20  enforce the fifteen year old injunction and/or enforce the settlement agreement the parties
21  entered into. On May 3 2006, federal district court Judge Gordon Thompson ruled " [i]n
22  1991 this Court issued a 'permanent injunction forbidding the permanent presence'" of the
23  Mt. Soledad cross on public property. Murphy, 782 F. Supp. at 1438. At that time this Court
24  granted the defendant "three months within which to comply with this order." Id. "Almost
25  15 years later, the cross still stands atop Mount Soledad... Notably two companion cases in
26  the original action ...have long since been resolved and the constitutional infirmities cured. .
27  It is now time, and perhaps long overdue, for this court to enforce its initial permanent
28  injunction. The City has 90 days within which to comply with this order with the additional

7

1    provision that the City shall be fined $5,000 a per day for each day the cross remains on City

2    property after the 90 days have expired." Id.

3        Instead of complying with the order of the District Court to remove the cross by

4    August 3, 2006, the City, federal government, and TMLC plotted yet another scheme to save

5    the Latin cross  This latest scheme involves Defendant U.S A. taking the property in an

6    expedited fashion by invoking the seldom used "legislative taking," initiated for the sole

7    purpose of keeping the cross on public property and avoiding the lawful court order  In order

8    to accomplish this scheme, the Mayor of Defendant City Jerry Sanders ("Sanders") acted in

9    concert with officials of the U.S.A., primarily Congressman Duncan Hunter, on several

10   occasions in order to violate the constitutional rights of Plaintiffs and others by attempting to

11   save the preeminent and most powerful symbol of Christianity, a huge Latin cross, on public

12   land in San Diego. In furtherance of this plan, Mayor Sanders and Representative Hunter

13   wrote to the President of the United States recommending that the federal government take

14   the property on which the cross is located by eminent domain. (Exs. 9, 10.) Mayor Sanders

15   also traveled to the White House and met with other officials of the U.S.A. in his official

16   capacity on several occasions for the purpose of acting in concert with them to save the cross.

17   (Ex. 11) Apparently the President, perhaps dissuaded by the Justice Department, declined to

18   initiate the requested action so Congressman Hunter, with the full and complete cooperation

19   and assistance of the Mayor, acting in his official capacity, became the primary author and

20   proponent of the bill.

21       That the plan of the Defendants, acting in concert, was to save this 43 foot 20 ton

22   cross is also supported by a number of public records, most of which are set forth in the

23   Superior Court's ruling invalidating the attempt by the City to give the land to the federal

24   government  (See e g , Ex. 12) In addition, the author and key proponents of the

25   congressional bill, Representative Duncan Hunter, has noted on his official government  web

26   site that his intent in authoring, introducing and promoting this bill was to preserve the cross

27   on public property because it is a religious symbol  (Ex. 6, 13) Representative Hunter, along

28   with most of the other supporters of this plan, often spoke about saving the cross initially,

8

1    however now rarely mention the cross and instead only talk about saving the "memorial," as

2    they became more aware that such statements were anathema to their legal case. However,

3    the "memorial" obviously refers to the cross because the prior court orders and settlement

4    agreement specifically call for removing only the cross and for keeping the granite plaques

5    which surround the cross as a Veterans' Memorial under the continued ownership and

6    maintenance of the Association. This creatively worded ruse did not fool the one Judge who

7    has handled this case for over 17 years. Judge Thompson recently wrote:

8         Proposition A asked voters to decide whether or not to donate the Mt. Soledad
          Veterans Memorial Property, including the cross, to the federal government in order to
9         "save the cross". . . .Essentially, at this stage of the litigation, enforcement of this
          Court's injunction requires removal of the cross from the City owned parkland. . .
10        .Applicant is simply attempting to "save the cross," under the guise of litigating the
          legality of Proposition A. . . .Stylizing the argument as an effort to maintain the Mt.
11        Soledad Veterans Memorial "as it is, where it is," does noting to hide the true
          motivation to "save the cross." (Ex. 14)

12        Also, Duncan Hunter's early press releases show his true intent in acting to save the

13    cross, as well as the real purpose of the government (Ex. 6) "We can't allow anti-religious

14    groups.. to continue to remove crosses and other religious symbols from war and veterans

15    memorials. .If anti religious groups are successful in removing the cross from Mt Soledad,

16    what will stop them from going after other memorials with religious symbols." In fact, when

17    the bill was introduced on the floor of the Senate, Senator Sessions (who apparently hadn't

18    been briefed about the legal consequences of his statements in a case such as this) made the

19    candid admission, " . I recently introduced a bill to preserve the cross that stands at the center

20    of the Mt Soledad Veterans memorial in San Diego, CA. That is under attack by the ACLU

21    to remove the cross. This bill would preserve that cross...Congressman Duncan Hunter has

22    led the effort in the House." (Ex.12) In Mr. Hunter's comments on the floor, he referred first

23    and foremost to the support of Mayor Sanders and submitted in the congressional record a

24    letter supporting the eminent domain action signed by Mayor Sanders in his official capacity

25        On August 14, 2006, President Bush signed House Resolution 5683 into law, now

26    codified at 120 Stat. 770. Those present at the ceremonial signing of this bill, not

27    surprisingly, included Representative Hunter and Charles Li Mandri from the TMLC. This

28    government action, perpetuated by the concerted actions of the City, through the actions of

9

1    Mayor Sanders, and the U.S.A., through the actions of Representative Hunter, is

2    unconstitutional, the law itself is unconstitutional, the transfer is unconstitutional and the

3    permanent presence of the cross on federal land is also unconstitutional.

III.

THE ACTIONS AND STATEMENTS OF GOVERNMENT REPRESENTATIVES ARE RELEVANT AND ADMISSIBLE EVIDENCE IN ESTABLISHMENT CLAUSE CASES TO ASCERTAIN "PURPOSE"

The First Amendment to the United States Constitution states that "Congress shall

make no law respecting an establishment of religion, or prohibiting the free exercise

thereof..." U.S. Const., Amend. 1. In analyzing the First Amendment, the Supreme Court

has recently explained "[t]he touchstone of our analysis is the principle that the 'First

Amendment mandates government neutrality between religion and religion, and between

religion and nonreligion.'" McCreary v. ACLU, 125 S.Ct. 2722, 2733 (2005) quoting

Epperson v. Arkansas, 393 U.S. 97 (1968). "When the government acts with the ostensible

and predominant purpose of advancing religion, it violates that central Establishment Clause

value of official religious neutrality, there being no neutrality when the government's

ostensible object is to take sides." Id. To determine whether a statute violates the

Establishment Clause, the Court fashioned a three part test which it clarified in Lemon v.

Kurtzman. 403 U.S. 602, 612-613 (1971). The first part of the Lemon test considers

whether the government action has a predominantly secular rather than sectarian purpose. Id.

If a statute does not have a clearly secular purpose, it is unconstitutional, and no further

analysis is necessary. Wallace v. Jaffree 472 U.S. 38, 56 (1985).

The United States Supreme Court has recently weighed in at some considerable length

on the issue of how courts must go about determining government purpose in Establishment

Clause cases. McCreary, 125 S. Ct. at 2722. In determining whether a display of the Ten

Commandments in Kentucky violated the Establishment Clause, the Court authorized a broad

and far reaching examination of government purpose. Id. "After declining the invitation to

abandon concern with purpose wholesale, we also have to avoid the Counties alternative tack

of trivializing the enquiry into it. The Counties would read the cases as if purpose enquiry

10

1   were so naive that any transparent claim to secularity would satisfy it, and they would cut

2   context out of the enquiry, to the point of ignoring history, no matter what bearing it actually

3   had on the significance of the current circumstances  There is no precedent for the Counties'

4   arguments, or reason supporting them." McCreary, 125 S Ct. at 2735.

5       The Court continued "[t]he Counties' second proffered limitation can be dispatched

6   quickly. They argue that purpose in a case like this one should be inferred, if at all, only

7   from the latest news about the last in a series of governmental actions, however close they all

8   may be in time and subject.  But the world is not made brand new every morning, and the

9   Counties are simply asking us to ignore perfectly probative evidence; they want an

10   absentminded observer, not one presumed to be familiar with the history of the government's

11   actions and competent to learn what history has to show[.] The Counties' position just bucks

12   common sense: reasonable observers have reasonable memories, and our precedents sensibly

13   forbid an observer to 'turn a blind eye to the context in which [the] policy arose.'" Id. at

14   2736-2737 (quoting Sante Fe Independent School Dist. v. Doe, 530 U.S. 290, 315 (2000).

15       In analyzing the government's conduct and motive as required by the purpose prong

16   of the Lemon test in Establishment Clause cases, the Supreme Court has made it abundantly

17   clear that courts can rely on the statements and conduct of elected officials who supported the

18   legislation. Edwards v. Aguillard 482 U S. 578, 594-595; Wallace v. Jaffree, supra at 57-58

19   "And in Edwards, we relied on a statute's text and the detailed public comments of its

20   sponsor, when we sought the purpose of a state law requiring creationism to be taught

21   alongside evolution." McCreary 2734.  "In applying the purpose test, it is appropriate to ask

22   'whether government's actual purpose is to endorse or disapprove of religion.'" Wallace at

23   56  In Wallace, the U. S. Supreme Court specifically looked past the facially neutral statute

24   and examined the comments of the sponsor of the bill at issue and those of the Governor of

25   Alabama in commenting on the bill and concluded that the real purpose of the neutral statute

26   was to unconstitutionally promote prayer in public schools. The court specifically referred to

27   Senator Holmes' testimony before the District Court regarding his purpose and the admission

28   of the Governor of Alabama regarding the purpose of the legislation. Id. at 57,58  Similarly,

11

1  in the present case, the Plaintiffs wish to present relevant evidence regarding the purpose of

2  the legislation through the testimony of the two government agents most responsible for its

3  enactment. As clearly demonstrated by the evidence presented in this motion, Plaintiff has a

4  good faith belief based on the above that these short, non intrusive depositions will provide

5  relevant, useful and perhaps dispositive evidence for the court. "We hold that the counties'

6  manifest objective may be dispositive of the constitutional enquiry, and that the development

7  of the presentation should be considered when determining its purpose." McCreary. at 2728.

8      McCreary, decided within the last year, cited Edwards and Wallace with approval.

9  All three are United State Supreme Court cases. There are no cases dealing with

10 Establishment clause challenges, that hold differently. The City has in the past, cited to cases

11 restricting inquiry into the motive or purpose as expressed by government agents but those

12 cases are inapposite. As the Supreme Court informed us in McCreary:

13     "While heightened deference to legislatures is appropriate for the review of economic
       legislation, an approach that credits any valid purpose, no matter how trivial, has not
14     been the way the court has approached government action that implicates
       establishment." Id. at 2736.

15
       "An implausible claim that government purpose has changed should not carry the day
16     in a court of law any more than in a head of common sense. The divisiveness of
       religion in current public life is inescapable. This is no time to deny the precedence of
17     understanding the Establishment Clause to require the government to stay neutral on
       religious belief, which is reserved for the conscience of the individual." Id. at 2742

18

19     The court in the present case, is required to do a thorough examination of historical

20 context, legislative history, the events leading to enactment, public comments of government

21 officials and other traditional indicia of legislative purpose. Id. at 2734; see also Edwards v.

22 Aguillard, supra, at 594- 595 [in determining the legislative purpose of a statute, the Court

23 has also considered the historical context of the statute and the specific sequence of events

24 leading to passage of the statute]. In particular, the court should look to the *detailed public*

25 *comments of a bill's sponsor.* Id. The only way to efficiently ascertain what comments were

26 made, who made them and the context in which they were made is to ask the sponsors some

27 questions under oath.

28     The District Court in an earlier incarnation of this case has relied heavily on

1    statements made by elected officials in finding that the City's first attempted sale of the cross
2    was an unconstitutional endorsement of religion. The court especially relied on the
3    statements of the then mayor of San Diego as evidence of the government's motive for the
4    first sale. That analysis was affirmed on appeal. Ellis, supra, 990 F. 2d 1527 (cite and quote
5    Prop F) Similarly in this case, the statements and conduct of the current Mayor who
6    supported the legislation authorizing the federal government to take the cross are pertinent
7    and may be significant in this court's analysis of the government's motive under the purpose
8    prong of the Lemon test. In order to present evidence to this court regarding the
9    government's purpose for legislatively taking the cross, plaintiffs must be allowed to gather
10   the information by asking the questions to those government officials who initiated and
11   facilitated and this taking. The depositions requested are crucial to plaintiffs' ability to
12   demonstrate why the federal government's taking of the cross owned by the City and the
13   City's acquiescence of that taking violates the Establishment Clause of the Constitution.
14         Buono v. Norton, 371 F.3d 543 (9th Cir. 2004) and Separation of Church and State v.
15   City of Eugene (SCSC), 93 F.3d 617 (9th Cir. 1996) establish that large Latin crosses on
16   public property are an unconstitutional endorsement of religion in violation of the
17   Establishment Clause of the U.S. Constitution. Like the instant case, the crosses in Buono
18   and SCSC were designated as memorials to veterans. Recently, the district court in Buono
19   issued an opinion on remand, finding that the history of the government's efforts to preserve
20   and maintain the Latin cross a significant factor in determining the government's purpose in
21   a proposed land transfer to a private party. (364 F.Supp.2d 1175, 1182 (C.D. Cal. 2005).)
22   The court enjoined the transfer citing the government's "herculean efforts" to save the cross
23   as proof that the proposed transfer was just another such attempt. Id. In this case, the acts
24   and statements of Representative Hunter and Mayor Sanders, which demonstrate the
25   government's "herculean efforts" to save the Latin cross on Mount Soledad, can only be fully
26   discovered through their depositions.
27         Representative Hunter, in sponsoring and supporting House Resolutions 5683 and
28   2229, has said. "[w]e cannot allow anti-religious groups. including the American Civil

13

1    Liberties Union (ACLU), to continue their campaign to remove crosses and other religious

2    symbols from war and veteran memorials. Specifically, H.R. 2229 expressly stipulates that

3    the inclusion of religious symbols on war and veterans memorials is authorized by Congress.

4    Further, it limits the jurisdiction of the federal courts to hear or decide any questions

5    pertaining to the interpretation or validity of this authorization under the Constitution." (See

6    Ex.6) On another occasion, Hunter blamed "liberal judges" and their interpretation of the

7    California Constitution for the pending removal of the cross from city property. (See Exs. 9,

8    13) In yet another press release apparently referring to the Mt Soledad cross, Hunter noted

9    "[i]t is important that we exhaust every possible option for preserving this revered Memorial

10    and ensuring its continued presence atop Mt. Soledad." (Ex. 13.) As mentioned earlier, no

11    party, no court, no commentator has ever suggested that the walls, plaques or flag or any part

12    of the memorial other than the cross would be moved. It is the 17 year long battle over the

13    location of the cross that is the issue. In fact, the cross stood alone on Mt Soledad until 2002

14    so that prior to that time there was not any "revered memorial" except for the lone cross

15    dedicated on Easter Sunday and used as the backdrop for Easter sunrise services every year

16    until the litigation commenced. Thus, Representative Hunter alludes to taking any action

17    necessary to preserve the cross's continued presence, which is not a neutral government

18    action as required by the Establishment Clause, but rather a government endorsement of

19    religion. The Ninth circuit has already established that the Mt Soledad cross is a powerful

20    sectarian symbol and that efforts to preserve it by the government are unconstitutional. The

21    U.S Supreme Court denied cert and that decision is final.

22                                     IV.

23    **EVIDENCE OF THE ACTS AND STATEMENTS OF GOVERNMENT OFFICIALS ARE RELEVANT, ADMISSIBLE AND PERHAPS DISPOSITIVE OF THE ISSUES**

24    **ESTABLISHING VIOLATIONS OF THE CALIFORNIA CONSTITUTION BY DEFENDANT CITY OF SAN DIEGO.**

25       The California Constitution guarantees the "[f]ree exercise and enjoyment of religion

26    without discrimination or preference." Cal. Const. Art. I, § 4. The Attorney General of this

27    state has observed that "[i]t would be difficult to imagine a more sweeping statement of the

28    principle of governmental impartiality in the field of religion" than that found in the "no-

1   preference" clause, and California courts have interpreted the clause as being more protective

2   of the principle of separation than the federal guarantee. Sands v. Morongo Unified School

3   Dist., 53 Cal.3d 863 (1991) (quoting 25 Op.Cal Atty.Gen. 316, 319 (1955) and citing Fox v.

4   City of Los Angeles, 22 Cal.3d 792 (1978).) The California courts have interpreted the no

5   preference clause to require that government action in question does not endorse the religious

6   views or beliefs of a particular religion or give "favored status to religion in general."

7   Barnes-Wallace v. Boy Scouts of America, 275 F.Supp.2d 1259, 1276 (S.D. Cal. 2003). The

8   no preference clause even prohibits the government from acts that create the **appearance** of

9   preference. Hewitt v. Joyner, 940 F.2d 1561, 1567, 1569 (9th Cir. 1991).

10        Article XVI, section 5 of the California Constitution, known as the "No Aid Clause,"

11  provides in pertinent part:

13        "Neither the legislature, nor any county, city... shall... grant anything to or in aid
          of any religious sect, church, creed, or sectarian purpose...nor shall any grant or
14        donation of personal property or real estate ever be made by the state, or any
          city... for any religious creed, church, or sectarian purpose whatever."

15  Cal. Const. art. XVI, § 5.

16        The scope of the No Aid Clause has been construed broadly. Paulson, supra, 294 F.3d

17  at 1129-31. The California Supreme Court has held that the clause "bans any official

18  involvement, whatever its form, which has the direct, immediate, and substantial effect of

19  promoting religious purposes." California Educ. Facilities Auth. v. Priest, 12 Cal. 3d 593,

20  607 n. 12 (1974). According to the California Supreme Court, this section was intended by

21  its framers "to guarantee that the power, authority, and financial resources of the government

22  shall never be devoted to the advancement or support of religious or sectarian purposes."

23  Paulson, at 1130 (citing Priest, 12 Cal. 3d at 605.) In addition, the California Constitution's

24  No Aid provision "admits of no de minimus exception." Fox, supra.. In fact, the No Aid

25  Clause is so broad that the City need not provide any financial benefit or tangible aid but

26  violates the provision by doing no more than lending its prestige and power to a sectarian

27  purpose. Feminist Women's Health Ctr., Inc. v. Philadelphia, 157 Cal.App.3d 1076, 1093

28

15

(1984).

The California Supreme Court has authorized a far reaching search to determine the actual purpose of government legislation which was challenged as unconstitutional. Fox, 22 Cal. 3d at 794. The Court in Fox held, "[w]hile some of the resolutions adopted by the City Council contain self-serving recitals that the display of the cross is predicated upon it being a symbol of the spirit of peace and good fellowship...on an inter-faith basis, other evidence, including matter of common knowledge of which the Court can and does take judicial notice, makes it clear that the real purpose is a religious one." Id. The Fox court then examined letters and reports upon which the City Council's resolutions, among other evidence, to determine that the primary purpose for the display was religious. Id.

In order to aid the court in determining the actual purpose of the City of San Diego's involvement in the transfer of the land and the cross from the City, plaintiffs need to inquire into Mayor Sanders' actions and intent in facilitating the passage of this legislation. Defendant City of San Diego has aided religion, engaged in repeated acts of preference and has created the appearance of preference for the Christian religion often in its seventeen-year quest to "save the cross" located on Mount Soledad. Most recently, the City, by and through the acts of Mayor Sanders, has acted in concert with Defendant United States of America to transfer the Latin cross to the federal government for the purpose of evading the lawful inunction issued in 1989 which calls for the removal of the cross from Mount Soledad and the more recent enforcement action calling for the cross to be removed within 90 days. Throughout the seventeen-year protracted litigation over the constitutionality of the Mount Soledad Latin cross, many courts have held that the City has not acted in a religiously neutral fashion as required by both the United States and California Constitutions. Instead, the City has repeatedly chosen to act in a way that demonstrates a preference for Christianity over other religions or non-religions.

Just a sampling of Mayor Sanders' acts and statements, as an employee and agent of

16

1  the Defendant City, allude to his preference for one religion, and appearance of a preference.

2  In a May 11, 2006 letter to President Bush, Mayor Sanders wrote . "a Federal District Court

3  has ordered that an important element of the Memorial, a cross, be taken down within 90

4  days...Duncan Hunter wrote to you recommending that the Federal Government take the

5  property on which the Memorial is located by eminent domain. I commend Congressman

6  Hunter for doing everything possible to preserve the integrity of this important shrine to

7  fallen soldiers and support the Congressman's recommendation." (Ex.15). On yet another

8  occasion, Mayor Sanders discuses the reasons for his impending trip to Washington, D.C.,

9  noting "[o]ne of the most important will be the preservation of this national war memorial."

10  (Ex. 16) In a press release dated May 6, 2006, Mayor Sanders notes that he "will fight hard

11  to keep Mount Soledad national war memorial as it is." (See Ex. 17) Is he really saying he

12  will work hard to save the cross? It seems so but that can better be determined after asking

13  him a few questions, under oath, about that statement. While Mayor Sanders later goes on to

14  say "[t]his is not about a Christian symbol . .The cross has been here for almost 100 years and

15  the war memorial has been here for over 50 years. It's part of our social and cultural fabric,"

16  the cross stood alone on the hill until 2002, well after the litigation was initiated. Mayor

17  Sanders has learned as have others such as Representative Hunter that speaking of saving the

18  cross was anathema to the City's case. Instead, supporters of the cross speak in terms of

19  saving the war memorial, however as mentioned earlier, the war memorial is not in need of

20  being saved. (See Eisenberg, Disproportionate Impact and Illicit Motive: Theories of

21  Constitutional Adjudication, 52 N.Y.U. L. REV. 36, 163 (1977) ("Some legislators have

22  learned their lessons well, becoming quite sophisticated in drafting legislation that does not

23  smack of sectarian purposes.")

24      Through his efforts to have the Latin cross federalized in order to preserve the status

25  and location of the cross on public land, Mayor Sanders abandoned the required

26  governmental neutrality required by the California Constitution, and instead engaged in acts

27

28

1   of preference, as well as the appearance of preference, for the Christian religion. The efforts

2   engaged in by Mayor Sanders to save the Latin cross, the preeminent symbol of Christianity,

3
4   are relevant and admissible evidence which support a finding that the City has not acted

5   religiously neutral, instead demonstrating its preference for one religion over all others. The

6   conduct and statements of government officials like Mayor Sanders can and have been used

7
8   as evidence of the government's preference for one religion and appearance of preference, as

9   well as to demonstrate government aid to religion. Mayor Sanders' actions and statements

10  demonstrating a preference for Christianity over all others religions and non-religions, as

11
12  well as the appearance of preference for Christianity are dispositive in determining whether

13  Defendant City Plaintiffs violated the "no preference clause" of the California Constitutions.

14  It is therefore imperative that Plaintiffs have the opportunity to depose Mayor Sanders in

15
16  order to establish his preference and appearance of preference for Christianity in his attempts

17  to save the Latin cross. The No Aid Clause is so broad that the City need not provide any

18  financial benefit or tangible aid but violates the provision by doing no more than lending its

19
20  prestige and power to a sectarian purpose. Feminist Women's Health Ctr., supra, 157

21  Cal.App.3d at 1093.

22                                              V.

23                                        CONCLUSION

24          The United States Supreme Court has authorized , in fact it seems to require, that

25  courts closely examine the context, history, development of the display, and specifically the

26  comments of government officials who initiate or sponsor legislation that raises

27  constitutional Establishment Clause issues (McCreary, Wallace and Edwards). The

28  California Supreme Court is in accord (Fox) . Short depositions, at a time and place

                                            18

1  convenient to the deponents, of Mayor Sanders and Representative Hunter will insure that
2  the court is able to have the true facts before it regarding the purpose and intent of the
3  government actions which have managed to preserve the cross on public property.
4      The scope of the questions will be limited and designed only to explore the deponents
5  acts and statements as they relate to "purpose", "intent", "preference" and "aid" as those
6  words are used in the cases cited above.
7
8      Dated: 2-22-07                    LAW OFFICES OF JAMES E. McELROY
9
10
11                                       BY:
12                                       JAMES E. McELROY
13                                       Attorneys for Plaintiff
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

1  JAMES E. McELROY (#079313)
   SHANNON R. NUGENT (#185648)
2  LAW OFFICES OF JAMES E. McELROY
   625 Broadway, Suite 1400
3  San Diego, CA 92101
   Phone (619) 232-6686
4  Fax (619) 696-9305

5  Attorneys for Petitioner PHILIP PAULSON

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF SAN DIEGO

10

11  PHILIP PAULSON,                    )    CASE NO. GIC 849667
                                       )
12                Petitioner,          )    DECLARATION OF GENEVIEVE R.
                                       )    GABRIEL
13                                     )
                                       )
14          v.                         )
                                       )    Date:      7/13/05
15                                     )    Time:      10:00 a.m.
    CHARLES ABDELNOUR, in his          )    Dept:      67
16  official capacity as City Clerk of the )  Judge:   Hon. Patricia A. Y. Cowett
    City of San Diego, SALLY           )
17  McPHERSON, in her official         )
    capacity as Registrar of Voters for the )
18  County of San Diego, and          )
    DOES 1 to 10, Inclusive.           )
19                                     )
                                       )
20                Respondents          )
                                       )
21  _____)

22

23  \\\\

24  \\\\

25  \\

26  \\

27  \\

28  \\

                                   I

                                                       000044

1   I, GENEVIEVE R. GABRIEL, declare as follows:

2      1.   I am an employee of the Law Offices of James E. McElroy. I work for the

3   attorney of record for Petitioner herein. I am aware of the facts set forth below and could and

4   would testify to them if called upon to do so.

5      2.   I went on the Internet to the City of San Diego's Official Website

6   (www.sandiego.gov) and listened to the archived recordings of the city council meeting held on

7   May 17, 2005. I then typed verbatim portions of the meeting as I heard them over the Internet.

8   The following are typed portions from the May 17, 2005 meeting from Council Person Tony

9   Young, Council Person Brian Maienschein and Mayor Dick Murphy:

10

11   "I remember, also, when I was chief of staff to Charles Lewis, who obviously supported this

12   cross, and he said, something to the effect, some of you might remember it, as long as he sits on
that seat that cross is going to stay up there. You remember that? Well, I think that, I feel the

13   same way. I feel the exact same way. I can't help to think that the reason why I am here, in part,
is to support the Mt.Soledad cross. I'm here as a council member to make this decision. Maybe

14   it's the only reason why I am here. Maybe that's the only reason why I've been put in this
position to make this one decision here and to encourage my colleges to do the same.

15   Regardless, of what this council does today, you continue to fight, you continue to do without
fear, because we know, we feel strongly about this, strongly enough we will protect this cross as

16   strongly as we can. So I want to let you all know that I will support Mr.Madaffer's
recommendation wholeheartedly and I'm with you and I believe this is the right thing to do."

17                         -Council Person Tony Young

18

19   "I have to say, as I've done since I've been elected, what I think is upon reflection and upon
thought and based on my beliefs and my values, I've sat up here trying to do the right thing and

20   I believe the right thing to do is to preserve the cross on Mt. Soledad."
                           -Council Person Brian Maienschein

21

22

23   "I think those of you that have followed this, know that I support keeping the Mt. Soledad war
memorial, which includes the cross on Mt. Soledad in perpetuity."

24                              -Mayor Murphy

25      3.   I went to the Internet to the City San Diego's Official Website (www.sandiego.gov) and

26   listened to the archived recordings of the city council meeting held on July 20, 2004. I then typed

27   verbatim portions of the meeting as I heard them over the Internet. The following are typed

28   portions from the July 20, 2004 meeting from Council Person Charles Lewis and Mayor Dick

000045

1    Murphy.

2        "I think as Christians, we also have rights. It's not about imposing the religion on somebody,
         it's about somebody trying to take something away from us. I don't have a problem if you want
3        to put another religious symbol up on Mt. Soledad. I embrace diversity. Whatever you want
         I think is okay. And I'll let you know, cause the gentleman said, 'that Jesus Christ fan club', I
4        want you to know that this counsel member is so proud to be apart of that fan club. I know
         sometimes that we have to go against the grain. I understand my colleague from District 8,
5        talking about the court and the constitutional- and I guess today the politically correct thing
         would be to go ahead with the settlement- but today, I am not going to be politically correct
6        because as long as this counsel member is sitting here, he will never support that cross coming
         off of Mt. Soledad. And so if I may lose votes or be voted out of the office for that reason, I
7        think I have to stay with my principals today."

8                                                                -Council Person Charles Lewis

9        "I stand for keeping the cross on Mt. Soledad. It's a fifty year old historic monument. It's a war
         memorial to military veterans. And I believe that the city should do everything possible to
10       preserve that civic landmark. The best way to do that is to support Casey's proposal. If the
         public votes for it, we have a chance to keep this landmark on Mt. Soledad. If the public votes
11       it down, I think we will probably have to file something along the lines of what Mr. Peters has
         suggested. I'm not sure there are five votes to put this on the ballot today as I sit here and
12       listen."

13                                                                -Mayor Murphy

14       I declare under penalty of perjury the foregoing is true and correct

15

    Dated:    6/20/05
16
                                        LAW OFFICES OF JAMES E. McELROY
17

18                                      BY: _____
                                            GENEVIEVE R. GABRIEL
19

20

21

22

23

24

25

26

27

28

                                            3

# EXHIBIT 2

by attorney                    6:92'  '215;         05/18/05  3:32PM; Jeff  #933; Page 4/6

Minutes of the Council of the City of San Diego
for the Regular Meeting of Tuesday, July 27, 2004                    Page 47

FILE LOCATION:        MEET

COUNCIL ACTION:       (Time duration: 2:27 p.m.—5:32 p.m.;
                       6:00 p.m.—6:11 p.m.)

Motion by Frye not to consider introduction and adoption of the ordinance in Subitem A,
and approval of related actions in Subitems B, C, and D. Second by Zucchet. Failed by
the following vote: Peters-nay, Zucchet-yea, Atkins-not present, Lewis-nay,
Maienschein-nay; Frye-yea; Madaffer-nay, Inzunza-yea, Mayor Murphy-nay.

Motion by Inzunza to continue to Tuesday, August 10, 2004, for further review. Second
by Frye. Failed by the following vote: Peters-nay, Zucchet-yea, Atkins-not present,
Lewis-nay, Maienschein-nay; Frye-yea; Madaffer-nay, Inzunza-yea, Mayor Murphy-nay.

MOTION BY PETERS TO INTRODUCE, DISPENSE WITH THE READING AND
ADOPT THE ORDINANCE AS AMENDED TO: 1) EXCLUDE THE WORD "WAR"
FROM THE MOUNT SOLEDAD MEMORIAL ASSOCIATION LANGUAGE; 2)
PLACE THE PROPOSAL ON THE BALLOT; 3) REFRAIN FROM ANY
RESCISSION OR ATTEMPT TO RESCIND THE DEED OF SALE PENDING THE
OUTCOME OF THE VOTE; 4) DEFER ANY ATTEMPT TO GAIN A JUDICIAL
DETERMINATION OF THE OWNERSHIP OF THE CROSS PENDING THE
OUTCOME OF THE VOTE; 5) COOPERATE TO MAINTAIN EXISTING LEGAL
POSITIONS OF ALL THE PARTIES. INCLUDING THE PRESERVATION OF ALL
RIGHTS OF PLAINTIFFS AND MOUNT SOLEDAD MEMORIAL ASSOCIATION
TO ANY CHALLENGES THAT COULD OR SHOULD HAVE BEEN RAISED
PRIOR TO THE VOTE SO THAT THEY CAN BE RAISED THEREAFTER; 6) CITY
ATTORNEY SHALL ENTER INTO A LONG TERM LEASE OF THE PLAQUE
MEMORIAL TO MOUNT SOLEDAD MEMORIAL ASSOCIATION IN THE EVENT
OF ANY FUTURE RESCISSION OF THE DEED; AND 7) SHOULD VOTERS
REJECT THE PROPOSAL, CITY ATTORNEY SHALL ENTER INTO THE
SETTLEMENT AGREEMENT NOW WITH MOUNT SOLEDAD MEMORIAL
ASSOCIATION AND PLAINTIFFS. Second by Madaffer. Passed by the following
vote: Peters-yea, Zucchet-nay, Atkins-not present, Lewis-yea, Maienschein-yea; Frye-
nay; Madaffer-yea, Inzunza-nay, Mayor Murphy-yea.

MOTION BY PETERS TO: 1) DIRECT THE CITY ATTORNEY TO PREPARE AN
IMPARTIAL ANALYSIS; 2) DIRECT THE CITY MANAGER TO PREPARE A
FISCAL ANALYSIS; AND 3) DESIGNATE COUNCIL MEMBER MADAFFER TO
BE IN CHARGE OF THE AUTHORSHIP OF THE BALLOT ARGUMENT WITH

000051

Minutes of the Council of the City of San Diego
for the Regular Meeting of Tuesday, July 27, 2004                    Page 46


<u>TODAY'S ACTIONS ARE:</u>

Consider introduction and adoption of the ordinance in Subitem A, and approval of related
actions in Subitems B, C, and D.  NOTE: As an alternative to adoption of the ordinance in
Subitem A, and approval of Subitems B, C, and D, direct the City Attorney to take other action
related to the disposition of Paulson versus City of San Diego.

      Subitem-A:  (O-2005-19)    INTRODUCED AND ADOPTED AS AMENDED AS
                               ORDINANCE O-19306 (New Series)

           Introduction and adoption of an Ordinance submitting to the qualified voters of
           the City of San Diego at the Municipal Election consolidated with the Statewide
           General Election to be held on November 2, 2004, one proposition authorizing the
           City of San Diego to ~~sell a portion of Mt. Soledad Natural Park, including land
leased to the Mt. Soledad War Memorial Association for maintenance of its war
memorial, for fair market value to a private owner, preserving the ability of the
War Memorial Association to maintain existing improvements but giving the new
owner the sole right to decide whether to keep or remove the cross, relocate the
cross, or replace the cross with another landmark of similar size and scale.~~
           remove from dedicated park status and sell to the highest bidder a portion of
           Mount Soledad Natural Park, subject to a lease to the Mount Soledad War
           Memorial Association to preserve and maintain the existing granite walls and
           plaques, and to transfer ownership of the cross to the new buyer who will
           determine whether to maintain, relocate, or remove the cross or to replace it
           with another appropriate monument.

      Subitem-B:                    DIRECTION GIVEN

           In the matter of Council direction regarding the City Attorney's impartial analysis
           of the ballot measure

      Subitem-C:                    DIRECTION GIVEN

           In the matter of Council direction regarding the City Manager's fiscal analysis of
           the ballot measure.

      Subitem-D:                    DIRECTION GIVEN

           In the matter of Council direction regarding authorship of the ballot argument

000050

Minutes of the Council of the City of San Diego
for the Regular Meeting of Tuesday, July 27, 2004

Page 48

THE STIPULATION IF CITY ATTORNEY CASEY GWINN WANTS TO BE A
SIGNATOR, IT WOULD HAVE TO COME BACK TO COUNCIL FOR
CONSIDERATION ON MONDAY, AUGUST 2, 2004. Second by Madaffer    Passed by
the following vote: Peters-yea, Zucchet-not present, Atkins-not present, Lewis-yea,
Maienschein-yea; Frye-nay; Madaffer-yea, Inzunza-not present, Mayor Murphy-yea

NON-DOCKET ITEMS:

None

ADJOURNMENT:

The meeting was adjourned by Mayor Murphy at 8:00 p.m.

FILE LOCATION:        MINUTES

COUNCIL ACTION:       (Time duration: 8:00 p.m.)

# EXHIBIT 3

Case 1:07-mc-00220-JDB    Document 8-3    Filed 06/13/2007    Page 34 of 48
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 10 of 65
Thomas More Law Center
Page 1 of 1



**HOME**    **ABOUT**    **RESOURCES**    **ISSUES**    **NEWSROOM**    **DONATE**    **CONTACT US**

Receive TMLC News
Updates
*(enter your email address below)*

[GO]

Defending the
Religious Freedom of
Christians

Restoring Time
Honored Family Values

Protecting the Sanctity
of Human Life

How can I help?

Sign up as a Pro-Bono
Attorney

Refer a case

Make TMLC your
homepage

Search

[GO]

*The Thomas More Law Center is on the cutting edge of the cultural war raging across the U.S. They are fighting for the rights of Christians and their ability to worship.*

— Dr. D. James
Kennedy
Coral Ridge Ministries

## About Us

The Thomas More Law Center is a not-for-profit public interest law firm dedicated to the defense and promotion of the religious freedom of Christians, time-honored family values, and the sanctity of human life. Our purpose is to be the sword and shield for people of faith, providing legal representation without charge to defend and protect Christians and their religious beliefs in the public square. We achieve this goal principally through litigation, seeking out significant cases, consistent with our mission, where our expertise can be of service to others. We also defend and promote faith and family through media and educational efforts. Above all, the lawyers of the Thomas More Center seek to meet the highest moral and ethical standards of our Christian faith and our legal profession.

Our ministry was inspired by the recognition that the issues of the cultural war being waged across America, issues such as abortion, pornography, school prayer, and the removal of the Ten Commandments from municipal and school buildings, are not being decided by elected legislatures, but by the courts.

These court decisions, largely insulated from the democratic process, have been inordinately influenced by legal advocacy groups such as the American Civil Liberties Union (ACLU) which seek to systematically subvert the religious and moral foundations of our nation. Recent examples of the federal courts' pivotal role in the cultural war are the cases of *Stenberg v. Carhart* in which the U.S. Supreme Court held Nebraska's ban on partial birth abortion unconstitutional, in effect nullifying similar bans in 30 other states and *Santa Fe Independent School District v. Doe* which prohibited students from leading stadium crowds in prayer before high school football games.

History
About the Chief C
Advisory Board
Board of Legal Re
Who is Thomas M

Thomas More Law Center · 24 Frank Lloyd Wright Drive · P.O. Box 393 · Ann Arbor, MI 48106 · Ph (734) 827-2001 · Fax (734) 930-71

© 2005 Thomas More Law Center                    home | about us | resources | issues | newsroom | donate | cont

000057

Case 1:07-mc-00220-JDB    Document 8-3    Filed 06/13/2007    Page 35 of 48
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 11 of 65
Page 1 of 1



THOMAS MORE
Law Center

The Sword and Shield for People of Faith

HOME    ABOUT US    RESOURCES    ISSUES    NEWS ROOM    DONATE    CONTACT US

(enter your email
address below)

[GO!]

**MISSION**

Defending the
Religious Freedom of
Christians

Restoring Time
Honored Family Values

Protecting the Sanctity
of Human Life

**TOOLS**

How can I help?

Sign up as a Pro-Bono
Attorney

Refer a case

Make THLC your
homepage

Search
[GO!]

"One of the very
strongest voices for us
to be able to express
our beliefs, is in fact,
the Thomas More Law
Center."

— Fr. Frank Pavone
Priests For Life

## Defending Religious Freedom

We live in a culture increasingly hostile to Christians and their faith. America has become a nation where public school students are prohibited from praying, acknowledging their dependence upon God, and forming religious clubs; where schools and communities are challenged from displaying nativity scenes, the Ten Commandments, and other symbols of our religious and moral heritage. The Thomas More Law Center affirms the right of Christians to publicly practice their religion and freely express their religious beliefs. Our Founding Fathers fought for a nation built on a foundation of religion and morality. Our lawyers are committed to restoring and preserving that foundation.

View Law Center activities defending and promoting the religious freedom of Christians

Thomas More Law Center · 24 Frank Lloyd Wright Drive · P.O. Box 393 · Ann Arbor, MI 48106 · Ph. (734) 827-2001 · Fax (734) 930-7160

© 2005 Thomas More Law Center                    home | about us | resources | issues | newsroom | donate | contact us

000058

EXHIBIT 4

From: "MSPC" <mspc@mountsoledad.org>
Subject: Fw: Congressmen.001.2
Date: November 12, 2004 9:36:09 AM PST
To: "Mark Slomka" <mark@mountsoledad.org>
1 Attachment, 2.7 KB

----- Original Message -----
From: John
To: Mark Slomka
Sent: Thursday, November 11, 2004 8:15 PM
Subject: Congressmen.001.2

Mark--FYI--John Steel

*Law Offices of*

# CHARLES S. LiMANDRI

MAILING ADDRESS:
BOX 9120
RANCHO SANTA FE, CALIFORNIA 92067
TELEPHONE: (858) 759-9930
FACSIMILE: (858) 759-9938
WEBSITE: www.limandri.com

CHARLES S. LiMANDRI*

MARK A. CINELLA
STERLING J. STIRES
DANIEL M. DIRE†
TERESA L. MENDOZA

RICHARD SALPIETRA
Of Counsel

*BOARD CERTIFIED CIVIL TRIAL ADVOCATE;
ALSO ADMITTED TO THE DISTRICT OF COLUMBIA BAR
†ALSO ADMITTED TO THE MONTANA AND COLORADO STATE BARS

OFFICE LOCATION:
16236 SAN DIEGUITO ROAD
BUILDING 3, SUITE 3-15
RANCHO SANTA FE, CALIFORNIA 92067

CARMEN SERRANO
Office Administrator

November 10, 2004

Via Facsimile & U.S. Mail (760) 737-9132

Hon. Duke Cunningham
613 West Valley Parkway, Ste 320
Escondido, CA 92025

00006.?

Via Facsimile & U.S. Mail (619) 579-2251

Hon. Duncan Hunter
366 South Pierce Street
El Cajon, CA 92020-4136

Via Facsimile & U.S. Mail (760) 599-1178

Hon. Darrell Issa
1800 Thibodo Road, #310
Vista, CA 92083

  Re:  Mt. Soledad Cross

Dear Honorable Sirs:

  Congratulations on your recent re-election to serve the people of San Diego County in the United States Congress. As a member of the National Republican Congressional Committee ("RNCC") and a Life Member of the Republican National Committee ("RNC"), I take great pride in the stellar victories our party achieved throughout the nation. Moreover, as a father of five young children, these Republican victories give me renewed hope for the future of our country. I believe that November 2, 2004 will be remembered as a great date, particularly for people of faith who believe, as did our founding fathers, that religion and morality are the foundation of our country.

  On the issue of religion and values, there was, unfortunately, a local election that turned out in a way that was not consistent with the will of the people otherwise expressed in San Diego and throughout the nation. I am referring to Proposition "K," which concerned the preservation of the Mt. Soledad Cross. As you may know, the Mt. Soledad Cross has been a war memorial in San Diego for over 50 years. I am a native San Diegan who first visited the Mt. Soledad Cross over 30 years ago. Along with most San Diegans, I treasure it as an important cultural and historical landmark,

as well as a fitting symbol of our faith and the sacrifice of the Veterans who gave their lives in service to our country. As Veterans yourselves, I know you understand just how great those sacrifices were and how important they have been for the preservation of our precious liberties.

  About 18 months ago, I volunteered my services, pro bono, to the Thomas More Law Center, which is a national public interest law firm based in Ann Arbor, Michigan. The Thomas More Law Center was founded by Dominos Pizza billionaire, Tom Monaghan, as a Christian answer to the ACLU. The Thomas More Law Center promotes traditional family values, the sanctity of human life, and the religious freedom of Christians. It does this through litigation and educational programs. As the west coast office of the Thomas More Law Center, we represented the Catholic League in submitting a brief to the United States Supreme Court to preserve the words "Under God" in the Pledge of Allegiance. As you well know, groups like the ACLU have made a concerted effort to dismantle the religious and moral foundation of our country. This culture war will continue to be fought on multiple fronts, including battles over issues such as partial birth abortion and same-sex marriage.

  The battle to preserve religious freedom in America has largely focused on the symbols of our faith. For us in San Diego, the Mt. Soledad Cross is one of the most visible of these symbols. The issue

000063

has a much broader significance, however, since it has been closely watched by interested observers around the nation. Those seeking to force their liberal anti-God agenda on the rest of the country are greatly encouraged every time their use of the legal system causes the rest of us to make significant concessions on issues of religious freedom. That is why, as the West Coast Regional Director of the Thomas More Law Center, I decided it was time to act when I learned that the Mt. Soledad Memorial Association was willing to agree with the atheist Phillip Paulson, who brought the original suit, and his attorney, to remove the Mt. Soledad Cross. I still find it hard to believe that American Veterans would join with an atheist to dismantle the centerpiece of a historic war memorial that has meant so much, to so many people, for so long a time.

At the recommendation of City Attorney Casey Gwinn, the San Diego City Council voted to place the matter on the November ballot. Unfortunately, there was very little time in which to mount a successful campaign so as to properly educate the people of San Diego as to the significance of a "Yes" versus a "No" vote on the issue. The opposition purposely set out to mislead people into believing that a "No" vote on Proposition "K" 'would save the Mt. Soledad Cross." What the voters did not understand was that their view of "saving" the Cross was to move it 1,000 yards down the hill to a local Presbyterian Church. Even assuming the 50 year old non-reinforced concrete cross would survive the trip of over one-half mile down the hill, this would certainly not comport with the typical voter's understanding of what is meant by "saving" the Mt. Soledad Cross.

Indeed, I personally heard two local news commentators announce that the result of a majority of people voting "No" on Proposition "K" now meant that the Cross would "stay put." I have also been informed this result was incorrectly announced by pastors, to their churches, because of the common misunderstanding promoted by the opposition. I am enclosing a memo I received on November 4, 2004 from a couple I do not know, Glenis and David Marsh. It explains their frustration, along with many of their friends, who mistakenly voted "No" on Proposition "K," because of the misleading statements made by the opposition. I can tell you that many other people who knew that I was fighting to save the Cross have also come up to me and said that they, too, thought they were voting to keep the Cross in its present location by voting "No" on Proposition "K." One of the last people to tell me this was a very successful conservative businessman in Rancho Santa Fe who is a graduate of Annapolis Naval Academy.

As the West Coast Regional Director of the Thomas More Law Center, and a very concerned San Diego Republican supporter. I am asking for your help to try and redress this injustice and to preserve this important cultural, historical, and religious landmark, which is an integral part of the Veterans Memorial on top of Mt. Soledad. We believe our last hope to preserve the Mt. Soledad Cross is to have it, along with the walls and plaques around it, declared a Federal National Memorial Park. In order to accomplish this task, I will need your help. If this is not done, and the Cross comes down, there will be millions of unhappy people in San Diego, many of them Veterans, who will see this as yet another victory for those misguided few who are vehemently opposed to our vision for America.

Making the Mt. Soledad Cross part of a Federal national memorial will probably not end the attacks against it by the atheist and his attorney. Yet, I believe that this final step should ultimately prove successful in saving the Cross for the following reasons. First, the California State Constitution provides stronger arguments for atheists challenging religious symbols, such as the Mt. Soledad Cross, then does the Federal Constitution. This is because the California Constitution prohibits government action which "aids" or shows a "preference" for religion. This has been interpreted more broadly than the "establishment clause" in the Federal Constitution which, as you know, when properly interpreted, was only intended to prohibit the United States Congress from creating a state sponsored national religion.

000264

I also believe that the federalizing of the Mt. Soledad Memorial property has a very good chance of keeping the memorial intact because of the addition of the memorial walls and plaques by the Mt. Soledad Memorial Association in recent years. The Cross has now been made the central part of a world class memorial. This should make it easier to withstand further constitutional challenges since it is no longer a stand alone "religious" symbol on public property. Third, as you probably know, the United States Supreme Court has recently agreed to hear two cases next year involving the constitutionality of displaying the Ten Commandments on public property. There is a good chance that the Supreme Court's decision in those cases will have legal significance to religious displays in general on public property, including the Mt. Soledad Cross.

The recent election makes it clear that there continues to be strong public support in this country in favor of traditional values, particular with respect to matters of faith and morals. Despite what some legal scholars may like to think, it should be obvious that the Supreme Court does not decide such matters of public significance in a vacuum. It will certainly be cognizant of the desire of the great majority of our citizens to continue to show proper respect for the symbols of our faith, which are such an essential part of our nation's heritage, and were of great importance to our founding fathers.

In any event, I firmly believe that we should not give up the fight to save the Cross until we have exhausted all legal avenues. If I truly believed that the will of public was fairly reflected in the result of Proposition "K," I would not be approaching you with this pressing matter at this time. If you were to ask your constituents, I am sure you find that at least 75% of them would consider the removal of the Mt. Soledad Cross to be the wrong result for San Diego and for our country. I am enclosing a copy of the ballot statements on Proposition "K" which, as you can see, are far from a model of clarity. I am also including the last editorial that the San Diego Union-Tribune published on the issue before the election. That editorial explains how the opponents of Proposition "K" had confused the issue by urging a "No" vote to "preserve the Mt. Soledad Cross."

I can tell you that I have already had three people offer to pledge $100,000.00 each to purchase the land to preserve the Mt. Soledad Cross if Proposition "K" had passed. This was before we even sought public support for this purpose. In short, the widespread public support in favor of preserving the memorial intact is overwhelming. It is my understanding that it is one of the most visited spots in the entire county and it is particularly important to veterans such as yourselves, and Dr. John Steel who we represent. Like Duke Cunningham, Dr. Steel is a retired Navy fighter pilot. He firmly believes the Mt. Soledad Cross should not be sacrificed to appease the atheist Paulson.

Although the Mt. Soledad Memorial Association has sought to make a deal with atheist Paulson and his attorney to remove the Cross, almost every individual veteran, when you ask them, does not want to see the Cross moved. Therefore, despite the opposition of the current leadership of the Mt. Soledad Memorial Association, I honestly believe you will be serving the interests of all the veterans by assisting in trying to keep the memorial intact, with the Cross as its centerpiece, where it has been for over 50 years. Indeed, as things presently stand, the Mt. Soledad Memorial Association does not even own the land nor does it have a lease. Therefore, what we are proposing should be very much in their interests both in the short and the long terms.

Finally, I wish to thank you for your kind assistance in this important matter. On Veterans Day, November 11, 2004, a new plaque will be added to the Mt. Soledad Memorial for our beloved President Reagan. I think we all know where he would have stood on the issue of saving the Cross. I have recently

000065

been awarded the Ronald Reagan Republican Gold Medal by the RNCC and the RNC. I would be greatly saddened if the November 11, 2004 ceremony is the last of its type to take place in the shadow of this great Cross on the top of Mt Soledad. I understand that the Cross is expected to be removed within the next 60 days if we do not act. Therefore, any further action taken on this matter must be begun without delay.

If efforts are undertaken to make the Mt Soledad property into a Federal National Memorial Park for Veterans, then we will go into federal court to seek to stop the removal of the Cross. I will ask the court to stay execution of the removal of the Cross at least until the process is completed to make it a Federal National Park, and after the United States Supreme Court has had an opportunity to decide the related Ten Commandment display cases which are currently pending before it.

If you wish any additional information on the Thomas More Law Center, you can find it at www.thomasmore.org. Information about my law firm, which is located in Rancho Santa Fe, can be found at www.limandri.com. I hope to hear from you in further regard to this matter in the very near future. In the meantime, congratulations again and, on behalf of the grateful citizens of San Diego County, thank you so much for your past and future great service to our country.

Sincerely,

LAW OFFICES OF CHARLES S. LiMANDRI

Charles S. LiMandri

CSL/kad
Enclosure

cc:   Richard Thompson, President & Chief Counsel
      Thomas More Law Center                            Via Facsimile (734) 930-7160

      Anthony J. Principi
      Secretary for Veterans Affairs                    Via Facsimile (202) 273-6709

      John Steel
      Former Navy Fighter Pilot & Medical Officer       Via E-Mail jsteel1@san.rr.com

# EXHIBIT 5

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT 67; HON. PATRICIA A.Y. COWETT, JUDGE


| | |
|---|---|
| PHILIP K. PAULSON, | ) |
| PLAINTIFF, | ) |
| VS. | ) CASE NO. GIC 849667 |
| CHARLES ABDELNOUR, ETC., ET AL., | ) |
| DEFENDANTS. | ) |


REPORTER'S TRANSCRIPT

MONDAY, OCTOBER 3, 2005


APPEARANCES:

FOR THE PLAINTIFF:    LAW OFFICES OF JAMES E. MC ELROY
                      BY:  JAMES. E. MC ELROY, ESQ.
                      625 BROADWAY, SUITE 1400
                      SAN DIEGO, CALIFORNIA  92101
                      (619) 232-6686


FOR THE DEFENDANT:    OFFICE OF THE CITY ATTORNEY
CHARLES ABDELNOUR     BY:  DAVID J. KARLIN, ESQ.
                           -- AND --
                           CHARLES S. LI MANDRI, ESQ.
                      1200 THIRD AVENUE
                      SUITE 1100
                      SAN DIEGO, CALIFORNIA  92101
                      (619) 533-5800


STEVEN LEE KOSMATA, CSR NO. 7253
OFFICIAL REPORTER
SAN DIEGO SUPERIOR COURT
SAN DIEGO, CALIFORNIA  92101

UNSIGNED - CERTIFIED TRANSCRIPT

001434

1    EVIDENCE REGARDING THE COMMENTS BY COUNCILPERSON LEWIS.

2    THANK YOU.

3             THE COURT:  THANK YOU VERY MUCH.

4             MR. LI MANDRI:  MAY I HAVE A FEW MINUTES TO

5    RESPOND?

6             THE COURT:  YES, YOU MAY.

7             MR. LI MANDRI:  THANK YOU, YOUR HONOR.

8                 WITH REGARD TO THE CITY ATTORNEY'S DECISION

9    AS TO A SPECIAL ASSISTANT, I THINK IT'S A VERY DANGEROUS

10   PROPOSITION THAT SOMEHOW AN ATTORNEY'S PERSONAL BELIEFS

11   CAN BE USED AGAINST HIS CLIENT.

12                THIS CASE I AM WORKING PRO BONO, BUT I

13   SUPPOSE IN MOST CASES SOMEONE COULD ALWAYS SAY TO THE

14   CLIENT, YOU KNOW, YOUR ATTORNEY IS BEING PAID BY YOU.

15   OBVIOUSLY HE DOESN'T BELIEVE IN WHAT YOU ARE SAYING OR YOU

16   WOULDN'T HAVE TO PAY HIM TO SAY IT.  THAT WOULD NEVER BE A

17   PROPER ARGUMENT.

18                BUT MR. MC ELROY IS TURNING THAT ARGUMENT

19   ON ITS HEAD BY SAYING WELL, THE PEOPLE ARE NOT PAYING ME.

20   THEREFORE, I MUST REALLY BELIEVE IN THEIR CAUSE, AND

21   SOMEHOW THAT MAKES THEIR CAUSE UNJUST.

22                I MEAN, THIS IS A TERRIBLE ROAD HE IS

23   ASKING THE COURT TO GO DOWN.  ONCE AGAIN, WE'VE OBJECTED

24   BECAUSE THE PURPOSE PRONG WAS NEVER INTENDED TO CHILL A

25   RIGHT TO FREE SPEECH OR TO CHILL THE RIGHT TO ADDRESS

26   GOVERNMENT OFFICIALS.  AND WHEN I WROTE THE LETTER TO

27   CONGRESSMAN DARRELL ISSA AND DUKE CUNNINGHAM AND DUNCAN

28   HUNTER -- AND I WORK WITH DUNCAN HUNTER'S OFFICE ALMOST

                 UNSIGNED - CERTIFIED TRANSCRIPT

1   ENTIRELY WITH THIS -- I DIDN'T JUST TALK ABOUT CHRISTIAN

2   ISSUES.  ALTHOUGH THAT WAS OBVIOUSLY PART AND PARCEL OF

3   THE CONCERNS.  BUT A SENTENCE IN THE LETTER THAT HE HAS

4   NOT QUOTED IS I AM ASKING FOR YOUR HELP TO TRY TO REDRESS

5   THIS INJUSTICE AND TO PRESERVE THIS IMPORTANT CULTURAL,

6   HISTORICAL AND RELIGIOUS LANDMARK, WHICH IS AN INTEGRAL

7   PART OF THE VETERANS MEMORIAL ON TOP OF MT. SOLEDAD; SO

8   IT'S ALL OF THOSE THINGS.

9            NOW, WE HAVE BEEN TALKING ABOUT THE

10  CULTURAL AND HISTORICAL ASPECTS OF THE CROSS THROUGH THE

11  DEBATE NOW FOR THE BETTER PART OF THE YEAR.  I ASSUME,

12  BECAUSE I AM FAMILIAR WITH THE ISSUES AND BECAUSE I DO

13  FEEL PASSIONATELY ABOUT IT AND BECAUSE I HAVE, LIKE TO

14  THINK, SOME EXPERTISE IN THIS AREA, THAT I WAS QUALIFIED

15  TO ADDRESS THE COURT ON THESE ISSUES.  THE COURT WILL HAVE

16  TO MAKE THAT DETERMINATION.  BUT I DON'T -- CERTAINLY

17  DON'T THINK THAT IT'S APPROPRIATE TO SAY ANY ATTORNEY

18  SHOULD BE DISQUALIFIED BECAUSE OF THEIR PERSONAL BELIEFS,

19  WHICH IS BASICALLY WHAT MR. MC ELROY IS INSINUATING BY HIS

20  COMMENTS.

21            AND IT'S VERY UNFAIR TO TAKE SELECTIVE AND

22  BIASED EXCERPTS FROM EVERY SINGLE DOCUMENT HE CAN GET HIS

23  HANDS ON AND IGNORE ALL THE OTHER STATEMENTS MADE.

24            NOW, FOR EXAMPLE, HE WANTS TO INSERT INTO

25  THE RECORD A STATEMENT BY COUNCILPERSON LEWIS WHICH HAS

26  BEEN SUBMITTED ON AT LEAST ONE PRIOR OCCASION, BECAUSE I

27  REREAD HIS PAPERS LAST WEEK AND I THINK HE QUOTED THAT TWO

28  OR THREE TIMES, AND I KNOW I REMEMBER READING IT MORE THAN

UNSIGNED - CERTIFIED TRANSCRIPT

# EXHIBIT 6

# CONGRESSMAN
# DUNCAN
# HUNTER

*Proudly Serving the 52nd District of California*



*www.house.gov/hunter*

FOR IMMEDIATE RELEASE: *May 16, 2005*    CONTACT: *Joe Kasper (202) 225-5672*

## HUNTER INTRODUCES LEGISLATION TO PROTECT THE MOUNT SOLEDAD VETERANS MEMORIAL

**Washington, D.C.** – Last week, Congressman Duncan Hunter (CA-52), Chairman of the House Armed Services Committee, introduced H.R. 2229, The War Memorial Preservation Act of 2005. This legislation permits the inclusion of religious symbols on memorials commemorating the service of our military personnel.

"Throughout our history, America has always recognized and honored the service of those who wore a uniform in our nation's defense," said Congressman Hunter. "We cannot allow anti-religous groups, including the American Civil Liberties Union (ACLU), to continue their campaign to remove crosses and other religious symbols from war and veterans memorials."

Specifically, H.R. 2229 expressly stipulates that the inclusion of religious symbols on war and veterans memorials is authorized by Congress. Further, it limits the jurisdiction of the federal courts to hear or decide any questions pertaining to the interpretation or validity of this authorization under the Constitution.

For over a decade, the ACLU has fought for the removal of the 42-foot cross atop the Mt. Soledad Veterans Memorial in San Diego, California, for

EXHIBIT 00

what they charge is a symbol of religious faith on public property. Even after the memorial was designated a national landmark as part of the Fiscal Year 2005 Omnibus Appropriations Act, the ACLU is still pursuing the destruction of the cross at the Mt. Soledad Memorial

The memorial at Mt. Soledad was originally constructed in the early 1950's to commemorate the service of Korean War veterans and, to this day, remains a source of local pride for San Diegans. In fact, members from each branch of our nation's military are recognized on the memorial by surrounding plaques designed by family members, several of which include a variety of religious symbols

"When returning seaman enter the Port of San Diego, the first thing they see is the cross, signaling to them that they are home," added Hunter. "For the rest of us, the veterans memorial at Mt. Soledad is a source of cultural and community pride, and serves as a reminder of those who had the courage to be part of something bigger than themselves.

"If anti-religious groups are successful in removing the cross from Mt. Soledad, what will stop them from going after other memorials with religious symbols?"

H.R. 2229 awaits consideration by the House Resources Committee.

# # #

EXHIBIT 7

FEB-24-2005  12:02PM  HP LASERJET 3200

551 P.2

3/8

000135

OFFICE OF
THE CITY ATTORNEY
CITY OF SAN DIEGO

1200 THIRD AVENUE, SUITE 1620
SAN DIEGO, CALIFORNIA 92101-4178
TELEPHONE (619) 236-6220
FAX (619) 236-7215

Michael J. Aguirre
CITY ATTORNEY

## MEMORANDUM OF LAW

DATE:       February 24, 2005

TO:         Mayor Dick Murphy

FROM:       City Attorney

SUBJECT:    Donation of the Mt. Soledad Memorial Property to the Federal National
            Park System

### INTRODUCTION

By memorandum dated December 3, 2004, the Mayor requested our advice regarding
federal legislation recently enacted authorizing the federal government to accept a transfer of the
property atop Mt. Soledad, including the existing cross and war memorial, to the National Park
System for preservation as a national memorial honoring veterans of the United States Armed
Forces. This Memorandum identifies and addresses the legal issues implicated by such a transfer.

### QUESTIONS PRESENTED

1.   Does the City have the legal authority to transfer the Memorial Property as
     dedicated park land to the federal government?

2.   Would the transfer of the Memorial Property to the federal government for the
     purpose of preserving the cross violate the California Constitution?

3.   If the Memorial Property is transferred, would the presence of the cross on federal
     land violate the United States Constitution?

### SHORT ANSWERS

1.   Yes, the City has the legal authority to transfer the Memorial Property, but it does
     not presently have the ability to make such a transfer because the City does not
     hold clear title to the property. Based on the Ninth Circuit Court of Appeal's
     ruling, the District Court has declared the second sale void, but has not re-vested
     title in the City. Should the City regain title to the Memorial Property, the City
     could, consistent with Charter section 55, transfer the property into the National

000102

000136

Mayor Dick Murphy                              -2-

       Park System for its continued use as parkland, upon a resolution of the City
Council.

2.    Yes, the Ninth Circuit Court of Appeal has held that the Mount Soledad cross is a
sectarian symbol that conveys a religious message and has stated that
governmental action that works to preserve the cross violates article XVI, section
5 (the no aid to religion clause) of the California Constitution.

3.    Yes, based on existing case law, the presence of the cross on federal property
would likely be held to be unconstitutional.

## BACKGROUND

       On June 26, 2002, an *en banc* panel of the Ninth Circuit Court of Appeals ruled that the
City of San Diego's second sale of public land surrounding the Mt. Soledad cross "violated
Article XVI, Section 5 of the California Constitution" because the manner of the sale provided
financial benefit to parties who intended to maintain the cross on the property as opposed to
those who would remove it. *Paulson v. City of San Diego*, 294 F.3d 1124, 1132 (9th Cir. 2002).
In its ruling, the Ninth Circuit observed "there are several possible ways to cure [the] violation"
and left it to the parties and the United States District Court to devise "a remedy for the
constitutional violation." *Id.* at 1134; City Att'y Rep. No. RC-2004-16 (June 28, 2004).

       In the City Attorney Report analyzing the *Paulson* decision, this Office recommended as
a remedy to the constitutional violation that the City lease the footprint of the existing Mt.
Soledad War Memorial and conduct a third sale of one-half acre of land atop Mt. Soledad [the
Memorial Property] subject to the lease. City Att'y Rep. No. RC-2004-16, pp. 6-8. The lease
would not include any rights to the cross but would preserve the substantial improvements that
had been made to the Memorial by the Mt. Soledad Memorial Association [the Memorial
Association] and its contributors. *Id.* This Office recommended that the sale be authorized by the
electorate through the passage of a new proposition that does not seek to preserve the cross but
only to sell the land through an open and neutral process. *Id.*

       On July 27, 2004, the City Council adopted an ordinance authorizing the placement on
the November ballot of a new proposition, Proposition K, as recommended. Additionally,
among other items, the Council's action provided that should the voters reject Proposition K, the
City would enter into the settlement agreement proffered by Memorial Association and the
Plaintiffs in the *Paulson* litigation, calling for the removal of the cross from the Memorial
Property. Proposition K failed.

       Subsequently, after the November 2nd election, on November 20, 2004, the United States
Congress adopted Bill No. 4818 [the Bill], calling for the designation of the Mt. Soledad
Veterans Memorial as a national memorial honoring veterans of the United States Armed Forces.
The Bill was signed into law on December 8, 2004. Section 116 of the Bill states that the

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 4 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 28 of 65

JR UL 2UUJ 1Z:UZFM    HP LHSEKJE1 JZUU                                          P. 4

000137

Memorial "consists of a 29 foot-tall cross and surrounding granite memorial walls containing plaques engraved with the names and photographs of veterans of the United States Armed Forces." Section 116 incorporates the same legal description as that for the Memorial Property. The Bill provides that upon donation of the Memorial from the City to the United States, the Secretary of the Interior shall accept all right, title and interest to the Memorial and that the Secretary shall enter into a memorandum of understanding with the Mt. Soledad Memorial Association [the Memorial Association] for the continued maintenance of the cross and surrounding memorial walls and plaques

## DISCUSSION

I.    Does the City Have the Legal Authority to Transfer Title to the Federal Government?

   A.    Current Title to the Memorial Property.

The City does not currently hold clear title to the Memorial Property. In 1998, the Association took title to the Memorial Property as the high bidder in the second sale. It is this sale that the Ninth Circuit Court of Appeals found unconstitutional.

> The second sale of the Mt. Soledad land on which the cross stands
> was structured to provide a direct, immediate, and substantial
> financial advantage to bidders who had the sectarian purpose of
> preserving the cross. For that reason, the sale violated article XVI,
> section 5, of the California Constitution

*Paulson,* 294 F.3d at 1132. The Ninth Circuit remanded the case to the District Court for the District Court and the parties "to devise a remedy for the constitutional violation." *Id.* at 1134.

The District Court declared the second sale void *ab initio,* but did not vest title to the Memorial Property back in the City. Instead, the Court further ordered that the parties "brief the issue of the various rights and interests of the parties in the improvements made to the land and the cross or submit a written stipulation as to such rights and interests."[1] To date, no briefing schedule has been set by the District Court. Further, both the plaintiff Phillip Paulson and the Memorial Association have filed Notices of Appeal from the District Court's decision voiding the second sale of the Memorial Property. Accordingly, at this time the City does not have clear

---

[1]As discussed in the City Attorney's Report, since the sale of the Memorial Property in 1998, the Memorial Association has expended over $900,000 improving the site with extensive landscaping and walls of granite plaques engraved with the names and photographs of veterans of various wars, and have equitable rights based on those expenditures. City Att'y Rep. No. RC-2004-16 at pp. 2, 4.

## 000138

Mayor Dick Murphy                                    -4-

title to the Memorial Property. Without clear title to the Memorial Property, the City cannot effectuate a land transfer.

    B.    Legal Authority for Sale of the Property

    Assuming that the City of San Diego regains clear title to the Memorial Property in the course of the District Court proceedings, the next question is whether the City has the legal authority to transfer the property to the federal government. The City, as a municipal corporation, generally has the power to "sell, lease, convey, exchange, manage and dispose of" its property. San Diego Charter § 1. Specific restrictions apply to the City's ability to transfer parkland (Charter § 55), pueblo lands (Charter § 219), and property of 80 or more contiguous acres (Charter § 221).

    Soledad Natural Park, which includes the Memorial Property, is dedicated parkland. Charter section 55 provides that dedicated parkland "shall not be used for any but park, recreation or cemetery purposes without such changed use or purpose having been first authorized or later ratified by a vote of two-thirds of the qualified electors of the City voting at an election for such purpose." In an effort to comply with Charter section 55, the City has twice sought the approval of the electorate for the sale of the Memorial Property.

    1.    Authorization for a Sale Under Propositions F and K.

    In 1992, City of San Diego voters passed Proposition F, which provided:

> Shall the removal from dedicated park status of that portion of Mt. Soledad Natural Park necessary to maintain the property as an historic war memorial, and the transfer of the same parcel by The City of San Diego to a private non-profit corporation for not less than fair market value be ratified?

    Although the specific language of Proposition F did not mention the cross or preservation of the cross, in finding against the City in *Paulson*, the Ninth Circuit considered the broader purpose of Proposition F, as stated by its proponents:

> They explained that the purpose of Proposition F was to authorize the transfer of the land under the Mt. Soledad cross to the Association in order to "SAVE THE CROSS." The argument described the cross as a "historic landmark and a dedicated war memorial," and they urged a "YES" vote on the measure to "SAVE THE MOUNT SOLEDAD CROSS SAVE OUR HISTORY."

Case 1:07-mc-00220-JDB    Document 2-4    Filed 06/13/2007    Page 6 of 44

DEC 02 2005 12:04PM    HP LASERJET 3200                                    P.6

# 000139

Mayor Dick Murphy                          -5-


*Paulson*, 294 F.3d at 1126. In its opinion, the Ninth Circuit cited this sectarian purpose of preserving the cross in its analysis of the constitutionality of the sale and in reaching its ultimate conclusion that the second sale was unconstitutional. 294 F.3d at 1131-1132, 1134.

Accordingly, in November 2004, the City of San Diego submitted Proposition K to the voters seeking new authority to sell the Memorial Property. Proposition K provided:

> Shall the City be authorized to remove from dedicated park status and sell to the highest bidder a portion of Mount Soledad Natural Park, subject to a lease to the Mount Soledad Memorial Association to preserve and maintain the existing granite walls and plaques, and to transfer ownership of the cross to the new buyer who will determine whether to maintain, relocate, or remove the cross or to replace it with another appropriate monument?

Proposition K failed.

More importantly, neither the language of Propositions F or K would serve the City in a transfer of the Memorial Property to the federal government. Proposition F only authorized the sale of the Memorial Property "to a private non-profit corporation for not less than fair market value." Whereas in both previous sale attempts, the Memorial Property was to be sold to a private non-profit organization for fair market value, the Bill contemplates a transfer to the United States as a donation.

2.    Compliance with Charter Section 55.

Although Propositions F and K were submitted to the electorate in an effort to comply with section 55 of the City's Charter, the relevant language of that section applies to any change in use of parkland, not strictly to a transfer or sale of parkland. If the park use will be preserved as part of the land transfer, and the use of the land will not be changed, then a vote of the electorate is not required. 1981 Op. City Att'y 16, 18.

The transfer contemplated by the Bill enacted by Congress provides for the Memorial Property to become part of the National Park System and retain its current use as a war memorial. Monuments and memorials have long been recognized as park uses. 1986 City Att'y MOL 561, 562, *citing In re Central Parkway, City of Schenectady*, 251 N.Y.S. 577, 580 (1931). Accordingly, a strict reading of Charter Section 55 allows the City to transfer the Memorial Property to the federal government for its continued use as a war memorial without a two-thirds vote of the people.

000106

Case 4:07-mc-00220-JDB    Document 22-2    Filed 06/13/2007    Page 7 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 31 of 65
MAR 02 2005  12:03PM  HP LASERJET 3200                                    P. 7

000140

Mayor Dick Murphy                    -6-

3.    Compliance with the Municipal Code.

San Diego Municipal Code section 22.0907 authorizes the direct sale of City property to another public entity "whenever the Council shall find that lands belonging to the City are required for public purposes" and provided "that the sale shall be at such price and upon such terms as the Council shall deem to be fair and equitable and in the public interest." Accordingly, a proposed transfer of the Memorial Property would require the adoption of a resolution by the City Council setting forth the purpose and terms of the transaction, and the Council's finding that the transaction is fair, equitable, and in the public interest.

A donative transfer as contemplated by the Bill would not be viewed as a gift of public funds, because the property would be transferred to a public entity to be used for a public purpose. *County of Alameda v. Janssen*, 16 Cal. 2d 276, 281 (1940). "[I]t is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be used for a 'public' or a 'private' purpose." *Id.* If the funds are for a public purpose, they are not a gift within the meaning of section 31 of article IV of the California Constitution. *Id.*

II.   Would Transfer of the Memorial Property to the Federal Government for the Purpose of Preserving the Cross Violate the California Constitution?

In its *en banc* opinion, the Ninth Circuit focused its analysis on the "No Aid to Religion" Clause of the California Constitution, article XVI, section 5. Citing the breadth of the prohibition against government aid to religion, the Court stated:

> It is possible for the government's transfer of "anything" to violate the provision if the transfer is "in aid of" any "sectarian purpose." Therefore, all forms of governmental "aid" are subject to scrutiny.

Drawing from its opinion earlier in the history of the matter (*Murphy v. Bilbray*, 782 F.Supp 1420, 1438 (S.D. Cal. 1991), *aff'd sub nom Ellis v. City of La Mesa*, 990 F.2d 1518 (9th Cir. 1993)), the Court identified preservation of the Mt. Soledad cross as a sectarian purpose.

> In view of our holding in *Ellis* that the Mt. Soledad cross is a sectarian symbol that conveys a religious message, governmental conduct that operates affirmatively to preserve the cross aids a sectarian purpose: the preservation of a symbol that conveys a specifically Christian message.

*Paulson*, 294 F.3d at 1132. In doing so, the Court left only one question to be resolved in its analysis: whether, through its structure of the sale, the City aided the sectarian purpose of preserving the cross. *Id.*

000107

000141

Mayor Dick Murphy                              -7-

The transfer of the Memorial Property to the federal government poses the same question: would the City, in transferring the Memorial Property pursuant to the Bill, directly, immediately, and substantially aid the sectarian purpose of preserving the cross? Like Proposition F, the Bill seeks to preserve the cross. The Bill specifically identifies the cross and provides for its continued maintenance and preservation. Transferring the Memorial Property to the federal government as provided in the Bill, even if done by the City for a secular purpose such as defraying maintenance costs, could arguably be viewed as directly, immediately, and substantially aiding in the preservation of the cross by allowing the federal government to pursue that purpose. As the Ninth Circuit Court has determined that preservation of the cross is a sectarian purpose, the City's action substantially in aid of that purpose, would violate the California Constitution.

III.   The Presence of the Cross on the Memorial Property, Even if Transferred to the United States, Will Likely Violate the United States Constitution.

If the Memorial Property were transferred to the National Park System, based on existing case law, the presence of the cross on federal property would probably not survive scrutiny under the United States Constitution. See, e.g., Buono v. Norton, 371 F.3d 543 (9th Cir. 2004). In Buono, the Ninth Circuit Court of Appeal held that a Latin cross located on federally-owned land in the Mojave National Preserve and managed by the National Park Service violated the Establishment Clause.

However, although the Buono case follows a long line of similar cases and holdings, there is new uncertainty as to whether the law will remain the same or vastly change directions. Two "Ten Commandments" cases (ACLU v. McCreary County, 354 F.3rd 438 (6th Cir. 2003), cert. granted 125 S. Ct. 310 (2004), and Van Orden v. Perry, 351 F.3d 173 (5th Cir. 2003), cert granted 160 S. Ct. 346 (2004)), are currently set for argument on March 2, 2005, before the United States Supreme Court. While the Court in Buono considered both the effects prong of Lemon v. Kurtzman, 403 U.S. 602 (1971), and the endorsement test from Justice O'Connor's concurrence in Lynch v. Donnelly, 465 U.S. 658, 687 (1984) (as did many of the other holdings), the McCreary case questions whether the Lemon test should be overruled. Such a ruling may allow cases such as the City's transfer to be viewed in a different manner and conceivably pass constitutional review.

RECOMMENDATION

It is the opinion of the City Attorney that the proposed donation of the Memorial Property to the federal government as contemplated by section 116 of Bill No. 4818 would, based on the Ninth Circuit's ruling, be for a religious purpose and as such would be unconstitutional. The legislation adopted by Congress specifically identifies the cross as part of the Memorial, and seeks to preserve it through a maintenance agreement with the Memorial Association. It was this same purpose and intent that caused the Ninth Circuit in Paulson to fault the City's efforts for the sale of the Memorial Property under Proposition F.

000108

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 9 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 33 of 65
P. 9

000142

Mayor Dick Murphy                    -8-                    February 24, 2005

Further, based on current case law, such a transaction would also violate the federal constitution and, in all likelihood, provide fodder for additional legal proceedings against the City. If the plaintiffs prevailed in those proceedings and recovered attorney's fees, the proposed donation would conclude as a futile and very costly endeavor.

To stop the continued expenditure of City funds on this matter, the City Attorney recommends that the City Council follow through on its July 27, 2004, action and immediately enter into the proposed settlement agreement with the Memorial Association and the *Paulson* plaintiffs to remove the cross from the Memorial Property.

MICHAEL J. AGUIRRE, City Attorney

Michael J. Aguirre
City Attorney

MJA:min
ML-2005-4
MMS#1396

# EXHIBIT 8

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO

DATE: October 7, 2005   DEPT. 67   REPORTER A: Not Reported    CSR#
                                 REPORTER B:                         CSR#

PRESENT HON. PATRICIA YIM COWETT,
                  JUDGE

CLERK: Candace Cheely
BAILIFF: None Assigned          REPORTER'S ADDRESS: P. O. Box 120128
                                            San Diego, CA 92112-4104

GIC 849667        PHILIP PAULSON,
                         Petitioner,

        VS.

        CHARLES ABDELNOUR, in his capacity as
        City Clerk of the City of San Diego, et al.,
                      Respondents.

## O R D E R

The Court having considered all documents on file herein, having heard oral argument on the tentative ruling on October 3, 2005, and taken the Motion for Writ of Mandate; Writ of Prohibition; Injunctive and Declaratory Relief under submission, the Court now rules as follows:

Preliminarily, this Court grants Amicus Curiae's, San Diegans for the Mt Soledad National War Memorial's, request of judicial notice of documents filed July 18, 2005 in the United States District Court, Southern District of California by Philip Paulson in case number 89-0820 GT  The Court denies the request for a stay because none of Paulson's motions for an order to enforce injunction, enforce settlement, and determine ownership of the Mt Soledad cross are currently before this court.

The association of attorney Charles LiMandri as Special Assistant to the City Attorney, joining Deputy City Attorney David J Karlin in the defense of respondent Abdelnour in his capacity as City Clerk of the City of San Diego is recognized

The Court denies the application of Mike Shelby for leave to intervene as a real party in interest/indispensable/necessary party

The Court grants petitioner's motion to amend the petition adding the City of San Diego as a party respondent

The Court hereby finds the ordinance placing Proposition A on the ballot and Proposition A constitutional, and therefore invalid and unenforceable  Maintenance of this Latin Cross as it is on the

1

property in question, is found to be an unconstitutional preference of religion in violation of Article I, Section 4, of the California Constitution, and the transfer of the memorial with the cross as its centerpiece to the federal government to save the cross as it is, where it is, is an unconstitutional aid to religion in violation of Article XVI, Section 5, of the California Constitution.

The Court incorporates by reference the 35 page opinion.

IT IS SO ORDERED.

Dated: October 7, 2005

PATRICIA YIM COWETT
Judge of the Superior Court

2

# EXHIBIT 9

DUNCAN HUNTER
52D DISTRICT CALIFORNIA

CHAIRMAN
COMMITTEE ON ARMED SERVICES



2265 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-0552
(202) 225-5672
FAX: (202) 225-0235

366 SEAGATE COURT #275
EL CAJON, CA 92020
(619) 440-1273
FAX: (619) 449-2251

## U.S. House of Representatives
### Washington, DC 20515—0552

May 10, 2006

President George W. Bush
The White House
1600 Pennsylvania Ave
Washington, DC 20500

Dear Mr. President:

I am writing to request your urgent assistance. Since 1954, the Mt. Soledad Memorial, honoring casualties and veterans of both World Wars and the Korean War, has stood atop Mount Soledad in San Diego California. Part of this Memorial is a graceful 29-foot cross that can be seen as a welcoming symbol to sailors as they return to their homeport at North Island, just outside the city.

Unfortunately, this beloved Memorial has been under siege by a single individual and his team of lawyers who have ignored the broader historical context and community support for the Memorial in order to make a political point. He has sued repeatedly to remove the Memorial's centerpiece cross due to its location on City of San Diego property. The City has taken every step possible to meet the court's demands, while still protecting the integrity of the Memorial. However, despite these efforts, liberal judges have continued to rely on their interpretation of the California State Constitution to justify the removal of this historic Memorial.

In order to protect the Memorial for future generations of veterans and San Diego visitors and residents, Congress passed and you signed into law a provision that designated the Mt. Soledad Veterans Memorial as a national veterans memorial. Upon the City's donation of the land, the Secretary of Interior was tasked with accepting the Memorial and working with the local community to administer its upkeep. Sadly, the then-City Council voted against donating the property. The citizens of San Diego were outraged and quickly demanded a city-wide referendum on donating the property. An unprecedented 76% of San Diego residents voted to donate the land to the Department of Interior, only to have a California State judge declare the vote a violation of the State Constitution.

The residents of San Diego have clearly indicated their desire to adhere to the

legislative mandate and they need your help to comply. Please use the authority found in 40 U.S.C. 3113 to begin immediate condemnation proceedings and bring this national Veterans' Memorial into the federal park system. This matter deserves your urgent attention as a District Judge recently ruled that the Mt. Soledad Memorial Cross must be removed from City property within 90 days, or the City will face a daily fine of $5,000.

Thank you for your time and attention to this very important matter. It would be a national travesty to have this veterans' memorial dismantled against the wishes of the overwhelming majority of San Diego residents and federal legislative intent. I have enclosed a copy of the Mt. Soledad Memorial chronology and I look forward to working with you to save this national memorial.

Sincerely,

Duncan Hunter
Member of Congress

Enclosure

cc: The Honorable Jerry Sanders, Mayor of San Diego

# EXHIBIT 10



JERRY SANDERS
MAYOR

May 11, 2006

The Honorable George W. Bush
President of the United States
The White House
Washington, D.C. 20500

Re:    Mt. Soledad National War Memorial

Dear President Bush:

I want to reinforce the importance of the Mt. Soledad National War Memorial to the citizens of San Diego. This nationally registered War Memorial has been caught up in a long series of court actions that threaten its future. A recent California State Court action has questioned the validity of our City's transfer of the Memorial to the National Park Service. Additionally, a Federal District Court has ordered that an important element of the Memorial, a cross, be taken down within 90 days.

Last night, Congressman Duncan Hunter wrote you recommending that the Federal Government take the property on which the Memorial is located by eminent domain. I commend Congressman Hunter for doing everything possible to preserve the integrity of this important shrine to our fallen soldiers and support the Congressman's recommendation.

The Mt. Soledad National War Memorial is a Federally registered, multi-faceted national war memorial that recognizes veterans of all wars and of all faiths. San Diego is the home of the largest concentration of active duty and retired military service members in the country. Our region has a proud history of paying tribute to our fallen soldiers. This particular memorial has been part of San Diego's landscape for more than 50 years.

I thought that it was very important to continue to make you aware of the facts and uncertain future of this important national memorial. The citizens of San Diego have repeatedly demonstrated their support for maintaining the memorial. It would be truly unfortunate to lose this sacred monument.

As always, I appreciate your consideration and support.

Sincerely,

JERRY SANDERS
Mayor

# EXHIBIT 11



## Office of Mayor Jerry Sanders

FOR IMMEDIATE RELEASE
May 22, 2006
Contact: Fred Sainz  858-442-8914
Eileen Brennan 619-990-0812

## Mayor Sanders Visits White House on Behalf of Mount Soledad War Memorial

### *Statement from Mayor Sanders on His Visit to the White House*

Washington DC -- "This morning members of Congressman Duncan Hunter's staff and I met with senior White House staff members regarding the Mount Soledad National War Memorial. President Bush clearly appreciates the importance of the memorial to San Diego. While no commitments were made, the White House officials present committed to studying the limited options that may be available to us at this late hour

I have committed to do everything possible to preserve the integrity of the War Memorial. I urge the City Council to vote in favor of the judicial stay, as well as the filing of an appeal at their meeting tomorrow.

Also today, I have participated in meetings with officials from the State Department, the Department of Homeland Security and the General Services Administration regarding border infrastructure projects, as well as our homeland security priorities "

### ###

# EXHIBIT 12

| .IS SEARCH | THIS DOCUMENT | THIS CR ISSUE | GO TO |
|---|---|---|---|
| Next Hit | Forward | Next Document | New CR Search |
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

| Congressional Record article 3 of 310 | Printer Friendly Display - 11,459 bytes. [Help] |
|---|---|

## UNANIMOUS-CONSENT REQUEST--H.R. 5683 -- (Senate - July 27, 2006)

[Page: S8364]  *GPO's* *PDF*

- - -

Mr. SESSIONS. Madam President, I recently introduced a bill to preserve the cross that stands at the center of the Mt . Soledad Veterans Memorial in San Diego, CA, that is under attack by the ACLU to remove the cross. This bill would preserve that cross by having the U.S. Government purchase the property, as it stands, from the city of San Diego  This acquisition is the action that the U.S. Department of Justice tells us is eded to preserve this cross as a part of a memorial that has secular monuments also.

Congressman *Duncan Hunter* has led the effort in the House. He is a San Diego Representative, chairman of the Armed Services Committee in the House. It passed 349 to 74 in the House. So we are trying to pass that in the Senate. It was called up for clearance by unanimous consent recently--I believe last night--and there was an objection from the Democratic side.

It is time for us to move forward. I don't think there will be overwhelming opposition to it, as there was not in the House of Representatives.

Therefore, I ask unanimous consent that the Senate proceed to the immediate consideration of H.R. 5683, the House bill, which was received from the House. I ask unanimous consent that the bill be read a third time and passed, the motion to reconsider be laid upon the table, and that any statements relating to the bill be printed in the **RECORD**.

The PRESIDING OFFICER. Is there objection?

Mr. NELSON of Florida. I object. It has not been cleared.

The PRESIDING OFFICER. Objection is heard.

# EXHIBIT 13

Legislation Introduced | Congressman Duncan Hunter | Page 1 of 3
Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 23 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 47 of 65

# CONGRESSMAN DUNCAN HUNTER



*Proudly Serving the 52nd District of California*

*www.house.gov/hunter*

---

FOR IMMEDIATE RELEASE: *June 27, 2006*    CONTACT: *Joe Kasper (202) 225-5672*

# Hunter Introduces Legislation Protecting Mount Soledad Veterans Memorial

**Washington, D.C.** – Late last evening, Congressman Duncan Hunter (R-CA) introduced H.R. 5683, the Mt. Soledad Veterans Memorial Protection Act. The legislation preserves the Mt. Soledad Veterans Memorial in San Diego, California by transferring possession of the Memorial to the federal government.

"The Mt. Soledad Veterans Memorial has been a fixture of our local community for over 50 years, honoring veterans of all wars, including the Global War on Terrorism," said Congressman Hunter. "Unfortunately, this Memorial and its proud history has been identified as offensive and in violation of the California State Constitution by liberal judges who have sided with a self-proclaimed atheist receiving legal and financial support from the ACLU.

"Despite its recognition as a National Veterans Memorial by Congress and the voters of San Diego, the City has been given until August to remove the Memorial or face fines for each day it continues to stand. This ruling ignores the mandate delivered by the people of San Diego County and turns this beloved Memorial into a political test case for liberal

Legislation Introduced Protecting Mt. Soledad

Case 1:07-mc-00220-JDB   Document 8-4   Filed 06/13/2007   Page 24 of 41   Page 2 of 3
Case 3:06-cv-01597-LAB-WMC   Document 93-2   Filed 02/22/2007   Page 48 of 65

activists and their agenda.

"The fight to save the Mt. Soledad Veterans Memorial is not about religion. It's about protecting a symbol of our freedom and honoring those who have chosen to defend it all costs. Removing this long recognized and respected landmark is an insult to the men and women memorialized on its walls and the service and sacrifice of those who have worn a uniform in defense of our nation.

"It is important that we exhaust every possible option for preserving this revered Memorial and ensuring its continued presence atop Mt. Soledad. As part of this process, the legislation will supplement any administrative efforts to protect the Memorial."

Congressman Hunter is joined in the effort to protect the Mt. Soledad Veterans Memorial by San Diego Congressmen Darrel Issa (R-CA) and Brian Bilbray (R-CA). As an original cosponsor of H.R. 5683, Congressman Bilbray said, "We must defend and protect the Memorial for those who defended and protected us."

Also an original cosponsor, Congressman Issa added, "Our founding fathers envisioned a nation where freedom of worship would be respected, not a nation devoid of religious expression. This legislation will protect the rights of the many veterans and families who support the Mt. Soledad Cross that has stood for 52 years."

The Mount Soledad Veterans Memorial, which includes plaques marked with the religious emblems of various faiths and possesses a concrete cross as its centerpiece, was initially dedicated on April 18, 1954 as a lasting memorial to the dead of the First and Second World Wars and the Korean conflict. The Memorial now stands as a tribute to all veterans.

Following action by Congress requiring that the memorial be donated to the federal government and a vote in support of the transfer by 76 percent of San Diego voters, a California state judge invalidated the transfer, ruling it violated the State Constitution. As a result, H.R. 5683 transfers possession of the Memorial to the federal government. The legislation requires that the property be managed by the Secretary of Defense and maintenance be conducted by the Mt. Soledad Memorial Association.

Legislation Introduced Protecting Artist Names

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 25 of 41 3 of 3
Case 3:06-cv-01587-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 49 of 65

H.R. 5683 has been referred to the House Committees on Judiciary, Armed Serves and Resources for consideration.

# # #

# EXHIBIT 14

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 27 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 26 of 31
Case 3:89-cv-00820-GT-POR    Document 394    Filed 06/19/2006    Page 2 of 9



ORIGINAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PHILIP K. PAULSON,                          )  Civ. No. 89-0820GT(LSP)
                                            )
              Plaintiff,                    )
                                            )
         v.                                 )  ORDER
                                            )
CITY OF SAN DIEGO, MOUNT SOLEDAD            )
MEMORIAL ASSOCIATION, INC.,                 )
                                            )
              Defendants                    )
                                            )

     On June 19, 2006, the San Diegans for the Mt. Soledad National War Memorial
("Applicant") Motion to Intervene came on for hearing before the Court. The Court has fully
considered this matter, including the briefs filed, the authorities cited therein and the arguments
presented. For the reasons stated below, Applicant's Motion to Intervene is DENIED

//
//
//

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 28 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 52 of 65
Case 3:89-cv-00820-GT-POR    Document 394    Filed 06/19/2006    Page 39 of 65

1   Federal Rules of Civil Procedure 24 provides for intervention of right and permissive

2   intervention. Applicant has filed a motion to intervene on both grounds. The Ninth Circuit reviews

3   *de novo* the district court's denial of intervention by right, with the exception of the timeliness

4   prong of its four part test, which it reviews for abuse of discretion. Southwest Ctr. For Biological

5   Diversity v. Berg, 268 F.3d 810, 817 (9th Cir. 2001). Denial of permissive intervention is reviewed

6   under an abuse of discretion standard. Venegas v. Skagges, 867 F.2d 527, 529 (9th Cir. 1989), *aff'd*

7   495 U.S. 82 (1990).

8                           **INTERVENTION AS OF RIGHT**

9       Under F.R.C.P. Rule 24(a), the Ninth Circuit applies a four part test to determine whether

10   a party may intervene as of right. The four prongs are: "(1) the application for intervention

11   must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the

12   property or transaction that is the subject of the action; (3) the applicant must be so situated that

13   the disposition of the action may, as a practical matter, impair or impede the applicant's ability

14   to protect that interest; (4) the applicant's interest must not be adequately represented by the

15   existing parties in the lawsuit." Id. Rule 24(a) is generally construed liberally in favor of

16   intervention. Southwest Ctr., 268 F.3d at 818. Ninth Circuit review is "guided primarily by

17   practical considerations" and not technical distinctions. Id. (Citations omitted).

18   **I. Timeliness**

19       Three factors are weighed in determining the timeliness of a motion to intervene: "(1) the

20   stage of the proceeding at which applicant seeks to intervene; (2) the prejudice to other parties;

21   and (3) the reason for and length of delay." County of Orange v. Air California, 799 F.2d 535,

22   537 (9th Cir. 1986).

23       **A. Stage of Proceedings**

24       Almost 15 years ago, this Court issued a permanent injunction, forbidding the presence of

25   the Mt. Soledad cross, a Latin cross which is the preeminent symbol of Christianity, on public

26   property, specifically, parkland belonging to the City of San Diego ("City"). The order issuing

27   the permanent injunction was affirmed by the Ninth Circuit and *cert.* was denied by the

28   Supreme Court. Thereafter, on numerous occasions, the City has tried to divest itself of the

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 29 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 53 of 65
Case 3:89-cv-00820-GT-POR    Document 394    Filed 06/19/2006    Page 4 of 9

1    land under the Mt. Soledad cross while still trying to "save the cross." Repeatedly, this Court,

2    the Ninth Circuit and the state court have found these attempts to "save the cross' to be

3    unconstitutional. Finally, after years of protracted litigation, this Court has ordered that the

4    original injunction be enforced. Now after 17 years of this extensive litigation, in the district

5    court, through the Appellate process and state court action, Applicant now seeks to intervene as

6    of right. At this stage of the proceedings, the constitutional issues have long been decided by

7    this Court and affirmed by the Ninth Circuit, remedies have been attempted and repeatedly

8    found unconstitutional, it is much too late to permit another party to intervene and re-litigate the

9    same issues or introduce new issues.

10    Applicant states that it seeks to intervene for the sole purpose of filing a notice of appeal

11    and seeking a stay of this Court's order from the Ninth Circuit and not re-litigate the legality of

12    the original injunction. However, Applicant also argued, in its *amicus* brief, that circumstances

13    surrounding the cross on Mt. Soledad have significantly changed to the point that conditions

14    "actually warrant[] modification or vacation of the original injunction." Applicant also states

15    since these arguments were ignored by this Court, these arguments "now must be made to the

16    Ninth Circuit." It is evident from these statements and others made by Applicant that it seeks to

17    re-litigate the legality of the original injunction if so allowed. The Court holds that after 17

18    years of extensive and costly litigation, it is too late to intervene now.

19    **B. Prejudice to Other Parties**

20    For over 17 years, Plaintiff has litigated this case through numerous courts and has

21    prevailed on almost all occasions. To allow the Applicant to intervene and reopen many of the

22    previously decided constitutional issues because of alleged changed circumstances would

23    severely prejudice the Plaintiff and undermine all his prior efforts. Additionally, the City would

24    also be prejudiced. The City has incurred significant costs in this litigation and is subject to

25    being fined $5000.00 per day if it does not comply with this Court's order. To allow Applicant

26    to intervene and introduce new issues and re-litigate previously decided issues would subject

27    the City to more litigation costs, money it can ill afford to spend.

28    //

3

89CV0820

Case 1:07-mc-00220-JDB   Document 8-4   Filed 06/13/2007   Page 30 of 41
Case 3:06-cv-01597-LAB-WMC   Document 93-2   Filed 02/22/2007   Page 54 of 65
Case 3:89-cv-00820-GT-POR   Document 394   Filed 06/19/2006   Page 3 of 4

### C. Reason for and Length of Delay

Applicant argues this motion was filed within weeks of this Court's order to enforce the injunction, therefore it is timely. Yet Applicant ignores the fact that there is a very long protracted history of litigation in this case. As stated previously, the constitutional issues were decided almost 15 years ago, that decision appealed and affirmed, and *cert* denied by the Supreme Court. This Court now is merely enforcing a decision made long ago.

Additionally, Applicant argues that since it was only formed as an organization a little over a year ago and appeared as *amicus* within weeks of its formation, there has been no delay. However, for 15 years the protracted litigation and the City's efforts to "save the cross," had, and still have, extensive media coverage at every step of the proceedings. Consistently, all the courts to consider the issue found that the Mt. Soledad cross sitting atop the City's public parkland to be unconstitutional. Now, in yet another attempt to "save the cross," Applicant's organization was formed a little over a year ago. However, as stated above, it is just too late to re-open and re-argue the underlying issues.

In conclusion, the Court holds that Applicant's Motion to Intervene is untimely. The constitutional issues have been fully litigated, appealed and upheld. It is time to enforce the original injunction. Additionally, both the Plaintiff and the City would be prejudiced by the addition of a new party and possibly new issues at this stage of the case. Finally, after 17 years of litigation, it is time for some finality in this case.

### II. Significantly Protectable Interest

The Ninth Circuit has held that "[w]hether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established." Greene v. United States, 996 F.2d 973, 976 (9th Cir. 1993)(*citing* Portland Audubon Soc'y v. Hold, 866 F.2d 302, 308 (9th Cir. 1989). "It is generally enough that the interest [asserted] is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." Sierra Club v. United States EPA, 995 F.2d 1478, 1484 (9th Cir. 1993). A "significantly protectable interest" is demonstrated when "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon a

4

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 31 of 41
Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 55 of 65
Case 3:89-cv-00820-GT-PGR    Document 394    Filed 06/13/2006    Page 99 of 65

1    third party's legally protectable interests." <u>Forest Conservation Council ("FCC") v. United</u>

2    <u>States Forest Serv.</u>, 66 F.3d 1489, 1493 ((th Cir. 1995).

3        Applicant argues that the enforcement of this Court's injunction would have a direct and

4    harmful effect on its interest in litigating the legality of Proposition A in state court. Applicant

5    therefore concludes it has a "legally protectable interest" in this case. The Court disagrees.

6        In brief, Proposition A asked voters to decide whether or not to donate the Mt. Soledad

7    Veterans Memorial Property, including the cross, to the federal government in order to "save

8    the cross." The state court ruled that both the ordinance placing Proposition A on the ballot and

9    Proposition A itself an unconstitutional aid to religion in violation of Article XVI, Section 5, of

10   the California Constitution. That order is now on appeal in state court. Applicant was and still

11   is an aggrieved party in that litigation. The enforcement of this Court's injunction would not

12   interfere or harm Applicant's ability to support Proposition A in the state court system.

13       Essentially, at this stage of the litigation, enforcement of this Court's injunction requires

14   removal of the cross from the City owned parkland. Applicant is simply attempting to "save

15   the cross," under the guise of litigating the legality of Proposition A. "Saving the cross" on

16   City parkland is not a "legally protectable interest," and in fact, has been held to be

17   unconstitutional on numerous occasions. Stylizing the argument as an effort to maintain the

18   Mt. Soledad Veterans Memorial "as it is, where it is," does nothing to hide the true motivation

19   to "save the cross."

20       In short, Applicant does not have a "legally protectable interest" in "saving the cross" on

21   City parkland.

22   **III. Protection of Interest**

23       Since the Court has ruled that Applicant does not have a "legally protectable interest" in

24   "saving the cross" on City parkland, there is no interest to protect.

25       Applicant argues that removal of the cross would, in effect, destroy the Mt. Soledad

26   Veterans Memorial. However, Applicant also argues that there have been significant changes

27   made to the Mt. Soledad Veterans Memorial. Applicant states that though the cross is the

28   centerpiece, the war memorial now is a "multi-faceted, fully integrated, world class veterans

1    memorial." The Court does not see how replacing the Latin cross, a preeminent symbol of

2    Christianity, with a more neutral symbol could destroy such a well developed war memorial

3    **IV. Adequate Representation**

4        The final prong of the test for intervention as of right is whether or not the applicant's

5    interest is adequately represented by the existing parties. Applicant states that it seeks "to

6    intervene for purposes of appealing and seeking a stay in the Ninth Circuit Court of Appeals to

7    preserve the status quo." However, the City has filed an appeal and also filed an "Urgent

8    Motion for Stay Pending Appeal." Accordingly, Applicant's stated interest to intervene for the

9    purpose of filing an appeal and a stay pending an appeal is adequately represented by the City.

10    Hence, Applicant does not meet this prong of the four part test.

11    **V. Conclusion**

12        In short, the Court denies Applicant's Motion to Intervene as of right. First and foremost,

13    the Motion is untimely. The underlying constitutional issues have long been decided and

14    upheld. This Court is merely enforcing an injunction ordered almost 15 years ago. Second,

15    Applicant does not have a "legally protected" interest in "saving the cross" on public parkland.

16    And finally, the City has already filed a notice of appeal and an urgent motion for stay of this

17    Court's order, which is the stated reason for Applicant's Motion to Intervene. Accordingly,

18    Applicant's Motion to Intervene as of right is DENIED.

19                                    **PERMISSIVE INTERVENTION**

20        Permissive intervention under Fed.R.Civ.P. Rule 24(b) is allowed "when an applicant's

21    claim or defense and the main action have a question of law or fact in common ... In exercising

22    its discretion the court shall consider whether the intervention will unduly delay or prejudice the

23    adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). The primary purpose

24    of Rule 24(b) is "intervention for the purpose of litigating a claim on the merits." Beckman

25    Indus., Inc. V. International Ins. Co., 966 F.2d 470, 472 (9th Cir. 1992). Under current Ninth

26    Circuit law, permissive intervention requires "(1) an independent ground for jurisdiction; (2) a

27    timely motion; and (3) a common question of law and fact between movant's claim or defense

28    and the main action." Beckman Indus., Inc. v. International Ins. Co., 966 F.2d 470, 473 (9th Cir.

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 33 of 41

Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 57 of 65
Case 3:89-cv-00820-GT-POR    Document 394    Filed 06/19/2006    Page 8 of 9

1992). Applicant fails this three part test.

First, there is no independent ground for jurisdiction. Permissive intervention normally requires "independent jurisdictional grounds." *Id.* Applicant claims that since it is only now seeking to stay the present order and not litigating a claim on its merits, there is no need for an independent jurisdictional ground. Citing *Beckman Indus.*, Applicant asserts that the Court is simply exercising powers it already has. However, in *Beckman Indus.*, the Applicant only sought a modification of the court's protective order. It did not ask the district court to rule on additional claims or seek to become a party to the action.

Unlike the Interveners in *Beckman. Indus.*, Applicant has presented new arguments to the Court both in its *amicus* briefs and the Motion to Intervene. Specifically, Applicant argues that the circumstances surrounding the Mt. Soledad Memorial have changed considerably and that these "constitutionally significant conditions actually warrant[] modification or vacation of the original injunction." Additionally, Applicant also states intervention will "preserve [its] ability to secure future relief from this Court's injunction." Although Applicant states it is seeking to intervene only for the purpose of filing a notice of appeal and a stay of this Court's most recent order, it appears Applicant is actually seeking to re-adjudicate previously decided constitutional issues without an independent ground for jurisdiction. Accordingly, the first prong of the three part test fails.

Secondly, for the reasons stated above, the Court has found this motion to be untimely. Hence, the second prong of the test fails.

Thirdly, there is not a common question of law or fact presented to this Court. Applicant states its intended purpose is to simply file a notice of appeal and request a stay. Yet, Applicant also presents the argument that the circumstances surrounding the Mt. Soledad War Memorial have changed to such an extent that modification or vacation of the original injunction may be warranted. Although the constitutionality of a Latin cross sitting on public property is a common issue of law, Applicant has not submitted a "pleading setting forth the claim or defense for which intervention is sought" as required by Fed.R.Civ.P. 24(c). Hence, Applicant fails this third prong.

7

89CV0820

Case 1:07-mc-00220-JDB    Document 8-4    Filed 06/13/2007    Page 34 of 41

Case 3:06-cv-01597-LAB-WMC    Document 93-2    Filed 02/22/2007    Page 9 of 9
Case 3:89-cv-00820-GT-POR    Document 394    Filed 06/19/2006    Page 9 of 9

1      Finally, as stated above, both Plaintiff and the City would be severely prejudiced at this

2   point if permissive intervention was granted to the Applicant. After 17 years of protracted and

3   expensive litigation, to re-open previously decided issues would seriously delay the remedy

4   sought by plaintiff and add to the already incurred costs of the City. Therefore, this Court

5   denies Applicant's request for permissive intervention. Accordingly,

6      **IT IS ORDERED** that Applicant's Motion to Intervene both as of right or with

7   permission is **DENIED.**

8      IT IS SO ORDERED.

9

10

11   *June 19, 2006*                    GORDON THOMPSON, JR.

     date                              United States District Judge

12

13   cc: All counsel and parties without counsel

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

89CV0820

EXHIBIT 15



JERRY SANDERS
MAYOR

May 11, 2006

The Honorable George W. Bush
President of the United States
The White House
Washington, D.C. 20500

Re:     Mt. Soledad National War Memorial


Dear President Bush:

I want to reinforce the importance of the Mt. Soledad National War Memorial to the citizens of San Diego. This nationally registered War Memorial has been caught up in a long series of court actions that threaten its future. A recent California State Court action has questioned the validity of our City's transfer of the Memorial to the National Park Service. Additionally, a Federal District Court has ordered that an important element of the Memorial, a cross, be taken down within 90 days.

Last night, Congressman Duncan Hunter wrote you recommending that the Federal Government take the property on which the Memorial is located by eminent domain. I commend Congressman Hunter for doing everything possible to preserve the integrity of this important shrine to our fallen soldiers and support the Congressman's recommendation.

The Mt. Soledad National War Memorial is a Federally registered, multi-faceted national war memorial that recognizes veterans of all wars and of all faiths. San Diego is the home of the largest concentration of active duty and retired military service members in the country. Our region has a proud history of paying tribute to our fallen soldiers. This particular memorial has been part of San Diego's landscape for more than 50 years.

I thought that it was very important to continue to make you aware of the facts and uncertain future of this important national memorial. The citizens of San Diego have repeatedly demonstrated their support for maintaining the memorial. It would be truly unfortunate to lose this sacred monument.

As always, I appreciate your consideration and support.

Sincerely,

JERRY SANDERS
Mayor

# EXHIBIT 16



Memorandum
Office of Mayor Jerry Sanders

DATE:    May 22, 2006

TO:    San Diego City Councilmembers

FROM:    Mayor Jerry Sanders

SUBJECT:    National War Memorial at Mt. Soledad

---

I am unable to attend today's meeting of the San Diego City Council because I am working with federal officials in Washington DC on a number of issues important to our City, including the preservation of the Mt. Soledad War Memorial. I am writing to encourage you to vote in favor of the stay and the appeal you are set to discuss today

Seventy-six percent of San Diego voters voted last year to keep this property as a War Memorial. I will continue to fight to support the will of the voters.

This is not about a Christian symbol. This is about preserving a nationally registered War Memorial that is an integral part of San Diego history. It's part of our social and cultural fabric.

San Diego is home to the largest concentration of active duty and retired military in the world. We have a proud tradition of honoring our military that should continue.

The site, which honors veterans of the Korean War, has been a war memorial for over 50 years. A cross has been on the exact site for almost 100 years (1913).

For these reasons alone we should preserve the integrity of the memorial site.

Again, I would have preferred to join the Council's discussion of this important issue but must continue working on the City's behalf here in Washington DC

EXHIBIT 17



FOR IMMEDIATE RELEASE
May 6, 2006

Contact    Fred Sainz
           858-442-8914

# SANDERS: "I WILL **FIGHT HARD** TO KEEP MOUNT SOLEDAD NATIONAL WAR MEMORIAL AS IT IS"

## *MAYOR RECOMMEND PURSUING STAY, APPEAL TO CITY COUNCIL*

San Diego – Vowing to implement the will of San Diego voters, who just last July voted by 76% to preserve the Mount Soledad National War Memorial, Mayor Jerry Sanders today said that he would fight hard, and do everything within his power, to preserve the Monument just as it is today

Mayor Sanders recommended that the City seek a stay to the Judge's ruling from the 9th Circuit Court of Appeals and that the City simultaneously pursue an appeal  The City Council will consider this issue at their meeting on Monday, May 21st   The deadline to file the appeal is June 2nd

The transfer of the land to the National Park Service is already on appeal at the State Court level and the Mayor believes that case should be allowed to proceed  Mayor Sanders believes the City will have a good case to make to both courts

"Some say this debate is about the cross  I could not disagree more," commented the Mayor  "This is <u>not</u> about a Christian symbol  What this boils down to is preserving a nationally registered War Memorial that is an integral part of San Diego history  The cross has been here for almost 100 years and the war memorial has been here for over 50 years  It's part of our social and cultural fabric

' The Mount Soledad National War Memorial is a true, multi-faceted, national war memorial designated as such by the Federal government  The courts have routinely approved secular monuments that have crosses as an element of the monument "

Veterans of all faiths, dating back to the Civil War from all branches of the armed services are honored at the Memorial

The City Attorney has informed the Mayor that he too will fight to implement the will of the voters  The City Attorney has not yet determined how the City will be represented on this case A number of public interest law firms, including the Thomas More Law Center and the American Center for Law and Justice, have offered to represent the City  There is a risk that the City could lose its appeal and be forced to pay legal fees  San Diegans for the Mount Soledad National War Memorial have also offered to raise money to pay for those fees should that happen

### ###

Exhibit MC7

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          SOUTHERN DISTRICT OF CALIFORNIA

10

11   STEVE TRUNK and PHILIP K. PAULSON,    )   Case No. 06 CV 1597 BTM (WMc)
                                           )
12              Plaintiffs,                )   **ORDER DENYING PLAINTIFF'S**
                                           )   **REQUEST TO COMPEL THE**
13   v.                                    )   **DEPOSITIONS OF SAN DIEGO**
                                           )   **MAYOR JERRY SANDERS AND**
14   CITY OF SAN DIEGO, UNITED STATES      )   **REPRESENTATIVE DUNCAN**
     OF AMERICA, DONALD H. RUMSFELD,       )   **HUNTER**
15   Secretary of Defense and DOES 1 through )
     100, Inclusive                        )
16                                         )
                Defendants.                )
17                                         )
     MOUNT SOLEDAD MEMORIAL                )
18   ASSOCIATION, Real Parties in interest. )
                                           )
19   JEWISH WAR VETERANS OF THE            )
     UNITED STATES OF AMERICA, INC.,       )
20   RICHARD A. SMITH, MINA SAGHEB, and    )
     JUDITH M. COPELAND,                   )
21                                         )
                Plaintiffs                 )
22                                         )
     v.                                    )
23                                         )
     DONALD H. RUMSFELD, Secretary of      )
24   Defense, in his official capacity,    )
                                           )
25              Defendant.                 )

26

27   ///

28   ///

**I.**

**INTRODUCTION**

Plaintiff Trunk has requested the right to depose Congressional Representative Duncan Hunter and the City of San Diego Mayor Jerry Sanders. The U.S. Attorney's Office and the Office of the City Attorney denied Plaintiff's requests.[1] On March 27, 2007, the Court heard oral argument on Plaintiff's Request to Compel the Depositions of Mayor Sanders and Representative Hunter. After hearing from counsel of record as well as careful consideration of Plaintiff's request to compel, all opposition briefs, and the reply briefs, for the reasons set forth below Plaintiff's Request to Compel the Depositions of Representative Hunter and Mayor Sanders is **DENIED without prejudice.**

**II.**

**BACKGROUND**

This case arises out of an action brought by Plaintiff Steve Trunk under the Establishment Clause of the First Amendment to the United States Constitution seeking to "declare the transfer of the Mt. Soledad cross, the memorial surrounding it and the land under it to the U.S.A., void *ab initio* in that the transfer was unconstitutional." [Doc. No.30 - FAC, para.14.]

Mayor Sanders wrote a May 11, 2006 letter to President George W. Bush in support of the City's transfer of the Mt. Soledad National War Memorial to the National Park Service. [ Doc. No. 93-2, Exh. 10 to P's Request to Compel.] Representative Hunter co-sponsored H.R. 5683, 109th Cong. (2nd Sess.2006), a bill that was subsequently passed and is now the law at issue in this litigation which authorized the United States to acquire the Mount Soledad Veterans Memorial. [Doc. No.98-1, Hunter's Opposition, p2, ln.19-24.]

Plaintiff informally asked to depose Representative Hunter and Mayor Sanders and was refused. It appears that, at least as to Representative Hunter, Plaintiff did not follow his informal request for a deposition with a formal deposition subpoena to the U.S. Attorney's office. [Doc. No. 93-1, p.2, ln.14-18.; Doc. 98-1, p.1, ln. 24-25]

---

[1] By order of the Honorable Barry T. Moskowitz, this case has been consolidated with *Jewish War Veterans vs Donald H. Rumsfeld. et al. 06cv1728* Plaintiff Jewish War Veterans ("JWV") joins in the motion of Plaintiff Trunk. Thus, when the Court refers to "Plaintiff" it shall be referring to both Trunk and JWV

### III.

### ARGUMENTS

**A. Plaintiff Trunk's Request to Depose Representative Hunter and Mayor Sanders**

Plaintiff requests the right to depose Representative Hunter and Mayor Sanders in order to question the lawmakers about "the purpose of [H.R. 5683] legislation" they sponsored or endorsed. [Doc. No. 93-1, p.1, ln.26 - p.2, ln.6.] Plaintiff contends that his proposed line of questioning "may be dispositive on the issue of whether such a transfer violates both the California and United States Constitutions." [Doc. No. 93-1, p.2, ln.7-10.] Plaintiff further argues that the deposition testimony he requests is relevant to the information analyzed by the courts under the purpose prong of the three-part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). [Doc. No. 93-1, p.11, ln.15-18.]

Plaintiff proposes "limited" depositions for both Representative Hunter and Mayor Sanders, covering only the issues of "purpose, intent, preference and aid" with respect to H.R. 5683. [Doc. No. 93-1, p.19, ln.4-7.]

**B. Defendants' Arguments**

**1. Opposition of Representative Hunter**

Congressman Hunter objects to Plaintiff's Request to Compel on the ground that Plaintiff failed to issue or serve him with a deposition notice or subpoena. [Doc. No. 98-1, p.1, ln.24-26.] Congressman Hunter also argues that: (1) the testimony Plaintiff seeks to elicit is privileged and barred absolutely by the Speech or Debate Clause of the Constitution, and (2) Plaintiff has failed to establish the exceptional circumstances necessary to compel a sitting Member of Congress to appear for a non-party deposition. [Doc. No. 98-1, p.2, ln.2-11.]

**2. Opposition of the United States and Secretary of Defense ("Federal Defendants")**

Federal Defendants argue that Supreme Court and Ninth Circuit case law hold a legislator's post-enactment statements are irrelevant to the determination of legislative purpose. [Doc. No. 99, p.4, ln.15 - p.5, ln.23.] Further, Federal Defendants assert that case law applying the improper purpose inquiry under *Lemon v. Kurtzman*, 403 U.S. 602 (1971) support a denial of Plaintiff's

1  request to compel because such case law suggests that the Establishment Clause analysis must be

2  conducted by reviewing the plain language of the statute, contemporaneous legislative history,

3  historical context and the sequence of events leading to the passage of the statute. [Doc. No. 99, p.6,

4  ln.20-27.]

5      **3. Opposition of Mayor Sanders**

6      Mayor Sanders notes that while Plaintiff has moved to compel his deposition, Plaintiff has

7  not pursued any other methods of discovery from the Mayor including written interrogatories,

8  requests for admission or requests for production of documents. [Doc. No. 100, p. 3, ln.13-15.]

9  Further, Mayor Sanders argues that it does not oppose joint discovery from Plaintiff Trunk and the

10  JWV Plaintiffs, and it is therefore premature for the Court to order a deposition before a joint

11  discovery plan is even established. [Doc. No. 100, p. 7, ln.13-15.]

12      The Mayor also notes that he has now assumed all of the executive responsibilities

13  previously assigned to the City Manager under the "Strong Mayor" form of government set forth in

14  Article XV of the City of San Diego Charter, which took effect on January 1, 2006. [Doc. No. 100,

15  p. 4, ln.11-16.] He argues that Plaintiff has not presented compelling reasons to require his

16  deposition, nor has Plaintiff shown that the information he seeks from the Mayor is unavailable from

17  other sources. [Doc. No. 100, p. 5, ln.20 - p. 6, ln. 2.] Finally, the Mayor joins in the arguments

18  posited by Congressman Hunter and the Federal Defendants arguing that Plaintiff should not be

19  allowed to depose him regarding his conversations with federal lawmakers and thereby circumvent

20  the privilege afforded by Speech or Debate Clause. [Doc. No. 100, p. 7, ln.17-19.]

21                                      IV.

22                                 **STANDARDS**

23  **A.   Subpoenas - Fed.R. Civ. P. 45**

24      Under Rule 45 of the Federal Rules of Civil Procedure a subpoena is required to command

25  non-parties to attend and give testimony at a deposition. Fed. R. Civ. P. 45(a)(2)(B).

26  **B.   Discovery Under Fed. R.Civ. P. 26**

27      In general, a party has the right to discovery of any matter, not privileged, that is relevant to

28  the claim or defense of any party. Fed. R. Civ. P. 26(b)(1). Thus, the scope of discovery under Rule

1  26 is broad. Discovery may be sought of relevant information not admissible at trial if the discovery

2  appears reasonably calculated to lead to the discovery of admissible evidence. *Id.* The Court,

3  however, may limit discovery if it can be obtained from another source that is more convenient, less

4  burdensome or less expensive or if the proposed discovery is overly burdensome. Fed. R. Civ. P.

5  26(b)(2).

6  **C.    Privileges**

7     **1.    Speech or Debate Privilege - U.S. Const. Art. I, § 6, cl. 1.**

8     The Speech or Debate Clause of the United States Constitution provides: "For any Speech

9  or Debate in either House [Senators and Representatives] shall not be questioned in any other

10  Place." U.S. Const. Art. I, § 6, cl. 1. The privilege protects speech and other activities undertaken

11  by members of Congress who are acting within a legitimate legislative sphere. *Eastland v. United*

12  *States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975). The legislative sphere includes those

13  activities that: (1) are an integral part of the deliberative and communicative processes by which

14  Members participate in House proceedings and (2) address proposed legislation. *Miller v.*

15  *Transamerican Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983). Examples of protected legislative

16  activities include obtaining information regarding possible legislation or committee investigations.

17  *Id.* at 530. In addition, the Speech or Debate clause precludes inquiry into the motivation or

18  purposes of a legislative act. *Id.; see also U.S. v. Brewster*, 408 U.S. 501, 525 (1972)("[T]he Speech

19  or Debate Clause protects against inquiry into the acts that occur in the regular course of the

20  legislative process and into the motivation for those acts.")

21     **2.    General Privilege of Limited Immunity From Deposition For**

22        **Top Government Officials**

23     Federal courts recognize the general rule that high-ranking government executives are not

24  normally subject to deposition, especially where they have no personal knowledge essential to the

25  case at issue. *Kyle Engineering Co. V. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979); *Green v. Baca*,

26  226 F.R.D. 624, 648 (C.D. Cal. 2005); *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12

27  (D. Mass. 1990); *Hankins v. City of Philadelphia*, 1996 WL 524223, *1 E.D. Pa.).

28     Immunity from deposition is granted in order to allow top officials freedom to perform their

1 | jobs without disruption from the discovery process. *Warzon v Drew*, 155 F.R.D. 183, 185 (E.D.

2 | Wis. 1994.) The exception to this rule applies where the government official whose deposition is

3 | sought has "direct personal factual information pertaining to material issues in the action [and]

4 | where the information to be gained is not available through any other source." *Green*, 226 F.R.D

5 | at 649 (citing *Church of Scientology of Boston v IRS*, 138 F.R.D. 9, 12 ( D. Mass. 1990.); see also

6 | *Hankins*, 1996 WL 524334, *1 (E.D. Pa.) ("A party seeking the deposition of a high ranking

7 | government official must demonstrate that his testimony is likely to lead to the discovery of

8 | admissible evidence, is essential to that party's case and that his evidence is not available through

9 | any alternative source or less burdensome means.")

## V. DISCUSSION

10 |

11 | A.    **The Deposition of Representative Hunter Is Precluded Under the Speech or**

12 |       **Debate Clause.**

13 |        To the extent the statements of Congressman Hunter were reported and appear in a

14 | legislative record and were the result of his legislative and communicative functions,

15 | Congressman Hunter is immune from liability. *Hutchinson vs. Proxmire,* 443 U.S. 111, 123-128

16 | (1979) It follows that he should also be protected from being deposed based on such protected

17 | statements. In other words, the immunity should not simply protect the Congressman from

18 | liability, but also from the expense and burden of being subjected to civil discovery.[2]   Therefore,

19 | the Court finds that the testimonial privilege afforded by the Speech or Debate Clause of the U.S

20 | Constitution prevents Plaintiff from deposing Representative Hunter regarding his motivations

21 | behind, or reasons for supporting, H.R. 5683. *U.S v. Brewster*, 408 U.S. 501, 525 (1972), *see*

22 | *also City of Las Vegas v Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (citing *Michael M v*

23 | *Superior Court*, 450 U.S. 464, 469-70 (1981); *United States v O'Brien*, 391 U.S. 367, 383-84

24 | (1968); *Tenney v Brandhove*, 341 U.S. 367, 377 (1951); *Arizona v California*, 283 U.S. 423,

25 | 455 (1931); *Soon Hing v Crowley*, 113 U.S. 703, 710-11 (1885); *Fletcher v Peck*, 10 U.S. 87,

26 | 130-31 (1810); *May v Cooperman*, 572 F.Supp. 1561, 1564 n.2 (D.N.J. 1983) (state legislators

27 |

28 |        [2] Of course, any member of Congress may *voluntarily* submit himself or herself to civil discovery or other forms of civil testimony

1  could not be deposed to determine the purpose of a "moment of silence" law challenged under

2  the First Amendment).) Moreover, statements or information an official inserted into the

3  legislative record are covered by the privilege and questions delving into their motives for such

4  statements or inclusion are protected from discovery. *Miller v. Transamerican Press, Inc.*, 709

5  F.2d 524, 529 (9th Cir. 1983).

6       Notwithstanding the above rule, the testimonial privilege embedded in the Speech of

7  Debate Clause does not cover statements made in press releases or newsletters prepared by, or on

8  behalf of, the official. *Id.* However valuable or praiseworthy, an official's transmittal of

9  information by press release or newsletters to inform his constituents of some noteworthy event

10 or decision are "not part of the legislative function or the deliberations that make up the

11 legislative process." *Id.* at 133.

12       **B.    The Requested Information Sought from Congressman Hunter and Mayor**

13            **Sanders Is Not Relevant to the Inquiry Under the Establishment Clause**

14       The courts employ a three prong test to determine whether a state statute violates the

15 Establishment Clause. First, did the legislature have a secular purpose in adopting the law? This

16 prong "asks whether government's actual purpose is to endorse or disapprove religion." Second,

17 is the principal or primary effect of the law to advance or inhibit religion? Third, does the statute

18 "result in an excessive entanglement of government with religion"? *Lemon vs. Kurtzman,* 403

19 U.S. 602,612-613 (1971). A law that violates any of these prongs violates the Establishment

20 Clause. *Edwards vs. Aguillard,* 482 U.S. 578, 583 (1987).

21       Plaintiff has not cited any cases which support his contention that he is entitled to, or

22 needs, the requested depositions in order to prosecute his claim under the Establishment Clause.

23 None of the cases Plaintiff cites involve the specific issue before this Court: whether a party is

24 entitled to, or needs, to depose the sponsors of the state statute being challenged as violative of

25 the Establishment Clause.

26       The cases make it clear that, in determining the purpose of a challenged state law or act,

27 the courts can, and do, look to numerous *objective* factors. "A court's finding of improper

28 purpose behind a statute is appropriately determined by the statute on its face, *its legislative*

1  *history ... the plain meaning of the statute's words*, enlightened by their context and the

2  *contemporaneous legislative history* can control the determination of legislative purpose....

3  Moreover, in determining the legislative purpose of a statute, the Court has also considered the

4  historical context of the statute...and the specific sequence of events *leading to passage* of the

5  statute...." *Edwards*, 482 U.S. at 594-595 [Citations omitted.] [Emphasis added.]. *See also*

6  *McCreary vs ACLU*, 545 U.S. 844, 862 (2005).

7         In *Wallace v. Jaffree*, 472 U.S. 38 (1985), the U.S. Supreme Court held as violative of

8  the Establishment Clause an Alabama statute which authorized a daily period of silence in public

9  schools for meditation or silent prayer. State Senator Donald Holmes, the law's sponsor, had

10 placed in the legislative record "a statement indicating that the legislation was an effort to return

11 voluntary prayer to the public schools." *Wallace*, 472 U.S. at 56-57. Later, after the bill had

12 become law, and in a proceeding before the District Court, Senator Holmes "confirmed this

13 purpose." *Id* Key to the Court's decision was the fact that Senator Holmes' *statement in the*

14 *legislative record* occurred "without dissent." The Court concluded, based on the legislative

15 record and the senator's testimonial and non-testimonial statements, that the statute had no

16 *secular* purpose and was entirely religious. *Id* at 57-60. In holding the statute unconstitutional

17 the Court concluded that "[t]he unrebutted evidence of legislative intent contained in the

18 legislative record and in the testimony of the sponsor ...is confirmed by a consideration of the

19 relationship between this statute and th two other measures that were considered in this case.

20 The District Court found that the 1981 statute and its 1982 sequel had a common, nonsecular

21 purpose. The wholly religious character of the later enactment is plainly evident from its text."

22 *Id* at 58. The clear focus of the Court is on the legislative record, the events leading up to the

23 passage of the challenged statute and the statute's plain language.[3] In other words, the Court

24 focuses on events leading up to and contemporarenous with the bill's passage.

25         *Foley vs City of Las Vegas*, 747 F.2d 1294 (9th Cir. 1984), is also instructive. In that

26

27    _____

       [3]  The decision indicates, without stating or clarifying, that Sen. Holmes presented "testimony"  It is unclear from

28 the case whether the senator's testimony was given in a legislative session in the District Court or some other setting. *Id* at 58  There is nothing in the Court's opinion which indicates, or lends support to the notion, that the sponsor's *testimony* was compelled by court process or necessary for the Court's conclusion.

1   case, the City of Las Vegas moved the District Court in mandamus for a protective order

2   prohibiting a corporation from deposing city officials to determine their motives in enacting a

3   zoning ordinance which restricted the location of sexually oriented businesses.    The corporation

4   argued that it needed the depositions in order to support its challenge that the First and

5   Fourteenth Amendments rendered the ordinance unconstitutional.  In rejecting the corporation's

6   arguments, the Ninth Circuit stated that "[t]he relevant governmental interest is determined by

7   *objective factors* as taken from the face of the statue, the effect of the statute, comparison to prior

8   law, facts surrounding enactment of the statute, the stated purpose, and the record of

9   proceedings." *Id* at 1297  Although not a case dealing with the Establishment Clause, the

10  factors the Court must consider in determining governmental interest are identical to the factors

11  on which the Supreme Court focused in both *McCreary*, *Edwards* and *Wallace*.  Not surprising

12  since all these cases turn on the First Amendment.   The Ninth Circuit went on to say in *Foley*:

13  "The Supreme Court has held that an otherwise constitutional statute will not be invalidated on

14  the basis of an alleged illicit legislative motive....The Court prevents inquiry into the motives of

15  legislators because it recognizes that such inquiries are a hazardous task.  Individual legislators

16  may vote for a particular statute for a variety of reasons....The diverse character of such motives,

17  and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes

18  all such inquiries as impracticable and futile." 747 F.2d., at *1297- 1298*  (Citations omitted.)

19       Furthermore, under the rationale of *Foley*, as well as *Edwards, Wallace* and *McCreary,*

20  the requested discovery is not relevant to the determination the District Court must make.

21  "Allowing discovery of legislative motives, as Lydo suggests, would not only create a major

22  departure from the precedent rejecting the use of legislative motives, but is also inconsistent with

23  basic analysis under the First Amendment which has not turned on the motives of the legislators,

24  but on the effect of the regulation." *Id* at 1297-1298. (Citations omitted.)

25       **C.  Even If the Requested Information Were Relevant, the Court Exercises Its**

26  **Discretion to Prohibit the Depositions.**

27       Plaintiff has not presented exceptional circumstances which would warrant overriding the

28  Speech or Debate privilege, and a significant amount of alternative source material, other than

1    deposition testimony, is available for Plaintiff to reference with respect to his claims.    As

2    explained by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987), courts

3    determine the improper purpose behind a statute by evaluating the plain language of the statute

4    on its face, its contemporaneous legislative history and the historical context of the statute - all of

5    which is available to Plaintiff.

6        The court has discretion to determine whether to grant a motion to compel. *See Garrett*

7    *v. City and County of San Francisco*, 818 F.2d 1515, 1519 (9th Cir, 1987); *see also Kyle*

8    *Engineering Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979) (reserving deposition of the

9    executive of the Small Business Administration until the end of discovery and ordering answers

10    to interrogatories in lieu of deposition.)

11        In exercising such discretion, the Court may limit discovery under Federal Rules of Civil

12    Procedure, Rule 26, if: (i) the discovery sought is unreasonably cumulative or duplicative, or is

13    obtainable from some other source that is more convenient, less burdensome, or less expensive;

14    (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain

15    the information sought; or (iii) the burden or expense of the proposed discovery outweighs its

16    likely benefit, taking into account the needs of the case, the amount in controversy, the parties'

17    resources, the importance of the issues at stake in the litigation, and the importance of the

18    proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2).

19        Plaintiff's exhibits in support of his request to Compel demonstrate that he has a

20    significant amount of source material available to him on the issue of legislative purpose

21    including letters, legislative minutes, transcripts of recorded council meetings and quotation-

22    filled press releases.    [Doc. No. 93-2, pp. 2-65.]    Accordingly, the information Plaintiff seeks

23    through deposition will be unnecessarily duplicative. Fed. R. Civ. P. 26(b)(2)(i).

24        Similarly, the Court finds Plaintiff has not demonstrated that the Mayor's anticipated

25    testimony is unavailable through other sources or less burdensome avenues like written

26    discovery. *Green v. Baca*, 226 F.R.D. 624, 649 (C.D. Cal. 2005.) As discussed above, Plaintiff

27    has an abundance of legislative history and other source material to which he can he refer, and

28    indeed to which he did refer in his request to compel, to support his constitutional claims. [Doc.

1  /////

2  No. 93-2, pp. 2-65.]

3      Accordingly, Plaintiff's request to depose Congressman Hunter and Mayor Sanders, is

4  **DENIED.**

5                                    **VI.**

6                    **CONCLUSION AND ORDER THEREON**

7      In light of the foregoing, Plaintiff's Request to Compel the Depositions of Representative

8  Duncan Hunter and Mayor Jerry Sanders is **DENIED.**

9      **IT IS SO ORDERED**

10

11  DATED: April 2, 2007

12

13                                    Hon. William McCurine, Jr.
                                      U.S. Magistrate Judge
14                                    United States District Court

15

16  COPY TO:

17  HONORABLE BARRY T. MOSKOWITZ, U.S. DISTRICT JUDGE

18  ALL PARTIES AND COUNSEL OF RECORD

19

20

21

22

23

24

25

26

27

28

06cv1597 / 06cv1728 BTM (WMc)

Exhibit MC8

AO88 (Rev. 12/06) Subpoena in a Civil Case

### Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc., et al.

V.

Robert M. Gates

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  06-CV-1728 BTM (S.D. Cal.)

TO:  The Honorable Duncan Hunter
U.S. House of Representatives
2265 Rayburn House Office Building
Washington, D.C. 20515

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE   Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W., Washington, DC 20006 | DATE AND TIME<br>4/4/2007 5:00 pm |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>A. Stephen Hut, Jr. /s/    Attorney for Plaintiff | DATE<br>March 21, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A. Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave., N.W., Washington, DC 20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45. Federal Rules of Civil Procedure, Subdivisions (c). (d), and (e). as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction. which may include, but is not limited to, lost earnings and a reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books. papers. documents or tangible things. or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition. hearing or trial

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection  copying, testing, or sampling may. within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service. serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested  If objection is made, the party serving the subpoena shall not be entitled to inspect. copy  test. or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying. testing. or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection. copying. testing, or sampling commanded

(3) (A) On timely motion. the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person. except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research. development or commercial information. or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party  or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial. the court may. to protect a person subject to or affected by the subpoena, quash or modify the subpoena or. if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated. the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(B) If a subpoena does not specify the form or forms for producing electronically stored information. a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost  On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)  The court may specify conditions for the discovery

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials. the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material. the person making the claim may notify any party that received the information of the claim and the basis for it  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved  A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified. it must take reasonable steps to retrieve it  The person who produced the information must preserve the information until the claim is resolved

(e) CONTEMPT  Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued  An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A)

**ATTACHMENT A**

**DEFINITIONS**

The following definitions shall apply to each of the instructions and requests set forth herein:

1.    "Duncan Hunter," "you" or "your" shall refer to Duncan Lee Hunter and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.    "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure.

3.    "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure.

4    "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.    "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.    "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

1

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile.

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public.

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations.

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

11    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Duncan Hunter.

13.    "H.R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H.R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property.

2

15    "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a base stem that is longer than its three other arms, that is more than 25 feet in height and that rests on the highest point of Mt. Soledad.

## INSTRUCTIONS

1. These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause. If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

2. No paragraph shall be construed with reference to any other paragraph for purposes of limitation.

3. The terms "and" and "or" shall be construed to mean both "and" and "or."

4. The terms "any" and "all" shall be construed to mean both "any" and "all."

5. The singular shall be construed to include the plural and the plural shall be construed to include the singular.

6. Each requested document shall be produced in its entirety, including any drafts or non-identical copies. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7. Each request for documents is continuing in nature. If, after responding to these requests, you obtain or become aware of further documents responsive to any document request, such documents shall be supplied promptly.

3

8. All documents are to be produced that are in your custody, possession, or control. If it is claimed that a document responsive to any request is privileged, work product, or otherwise protected from disclosure, state the nature and basis for any such claim of privilege, protection, or other ground for nondisclosure and identify: (a) the general subject matter of any such document; (b) the author of the document and each person to whom the original or a copy of the document was sent; and (c) the date of the document.

## DOCUMENTS TO BE PRODUCED

1. All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

2. All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

3. All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

4. All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

4

5  All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

6.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.

7.  All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

8.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding the administration or implementation of H.R. 5683.

9.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

5

AO88 (Rev. 12/06) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc., et al.

v.

Robert M. Gates

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]    06-CV-1728 BTM (S.D. Cal.)

TO: The Honorable Darrell Issa
U.S. House of Representatives
211 Cannon House Office Building
Washington, D.C. 20515

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE    Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W., Washington, DC 20006 | DATE AND TIME<br>4/4/2007 5:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6)

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| a. Stephen Hut, Jr. Esb.    Attorney for Plaintiff | March 21, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A. Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave., N.W., Washington, DC 20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45. Federal Rules of Civil Procedure, Subdivisions (c), (d). and (e). as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction. which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information. books. papers, documents or tangible things. or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition. hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection. copying, testing, or sampling may. within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service. serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect. copy, test. or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may. upon notice to the person commanded to produce. move at any time for an order to compel the production. inspection. copying, testing. or sampling. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection. copying, testing, or sampling commanded.

(3) (A) On timely motion. the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person. except that. subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may. in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research. development, or commercial information. or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party. or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial. the court may. to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated. the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information. a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made. the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications. or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return. sequester. or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified. it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A)

**ATTACHMENT A**

**DEFINITIONS**

The following definitions shall apply to each of the instructions and requests set forth herein:

1.      "Darrell Issa," "you" or "your" shall refer to Darrell E. Issa and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.      "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure

3.      "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure

4.      "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.      "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.      "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

1

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf

11.    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Darrell Issa

13.    "H R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property

2

15. "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a base stem that is longer than its three other arms, that is more than 25 feet in height and that rests on the highest point of Mt. Soledad.

## INSTRUCTIONS

1. These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause. If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

2. No paragraph shall be construed with reference to any other paragraph for purposes of limitation.

3. The terms "and" and "or" shall be construed to mean both "and" and "or."

4. The terms "any" and "all" shall be construed to mean both "any" and "all."

5. The singular shall be construed to include the plural and the plural shall be construed to include the singular.

6. Each requested document shall be produced in its entirety, including any drafts or non-identical copies. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7. Each request for documents is continuing in nature. If, after responding to these requests, you obtain or become aware of further documents responsive to any document request, such documents shall be supplied promptly.

3

8. All documents are to be produced that are in your custody, possession, or control. If it is claimed that a document responsive to any request is privileged, work product, or otherwise protected from disclosure, state the nature and basis for any such claim of privilege, protection, or other ground for nondisclosure and identify: (a) the general subject matter of any such document; (b) the author of the document and each person to whom the original or a copy of the document was sent; and (c) the date of the document.

## DOCUMENTS TO BE PRODUCED

1. All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

2. All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

3. All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

4. All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

4

5.    All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

6.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.

7.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

8.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding the administration or implementation of H.R. 5683.

9.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

AO88 (Rev. 12/06) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

Jewish War Veterans of the USA, Inc , et al.

V.

Robert M. Gates

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]    06-CV-1728 BTM (S.D. Cal.)

TO:  The Honorable Brian Bilbray
     U S House of Representatives
     227 Cannon House House Office Building
     Washington, D C 20515

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A.

| PLACE    Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N W , Washington, DC 20006 | DATE AND TIME<br>4/4/2007 5:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify  Federal Rules of Civil Procedure, 30(b)(6)

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>A. Stephen Hut, Jr for    Attorney for Plaintiff | DATE<br>March 21, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
A Stephen Hut, Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Ave , N.W , Washington, DC 20006
(202) 663-6000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

AO88  (Rev. 12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct

Executed on _____          _____
                    DATE                              SIGNATURE OF SERVER

                                        _____
                                        ADDRESS OF SERVER

---

Rule 45. Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things  or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises—or to producing electronically stored information in the form or forms requested  If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling  Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost  On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)  The court may specify conditions for the discovery

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material  the person making the claim may notify any party that received the information of the claim and the basis for it  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved  A receiving party may promptly present the information to the court under seal for a determination of the claim  If the receiving party disclosed the information before being notified  it must take reasonable steps to retrieve it  The person who produced the information must preserve the information until the claim is resolved

(e) CONTEMPT  Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued  An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A)

**ATTACHMENT A**

**DEFINITIONS**

The following definitions shall apply to each of the instructions and requests set forth herein:

1.     "Brian Bilbray," "you" or "your" shall refer to Brian Phillip Bilbray and his representatives, agents, assigns, employees, contractors, attorneys, and all other such persons acting or purporting to act on his behalf.

2.     "Documents" shall include, without limitation, all documents, electronically stored information, and things discoverable under the Federal Rules of Civil Procedure.

3.     "Electronically stored information" shall include, without limitation, all electronically stored information discoverable under the Federal Rules of Civil Procedure.

4.     "Communication" shall mean the transmission of information in any and all forms, whether written or oral, direct or indirect, or expressed or implied.

5.     "Concerning" and "relating to" mean, without limitation, mentioning, discussing, evidencing, constituting, describing, involving, comprising, or referring to, but do not extend to any and all documents protected by the Speech or Debate Clause to the Constitution to the extent that the Clause's protections are not waived.

6.     "Person" shall mean and include a natural person, individual, proprietorship, firm, estate, receiver, public corporation, municipal corporation, corporation, association, trust, partnership, joint venture, consortium, commercial entity, governmental or public or quasi-public entity, citizens group or association, commission, United States Government, State, political subdivision of a State, and any other form of organization or association.

1

7.    "News organization" shall mean any individual, partnership, corporation, or other association engaged in the business of publishing a newspaper or other periodical that reports news events or engaged in the business of broadcasting news to the public by wire, radio, television, or facsimile.

8.    "Reporter" shall mean any person engaged in the business of collecting or writing news for publication or presentation to the public.

9.    "Press conference" means any meeting or event called for the purpose of issuing a public statement to reporters or news organizations.

10.    "Executive Branch of the United States Government" shall refer to the executive branch of the United States Government and its components, officers, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

11.    "City of San Diego" shall refer to the government of the City of San Diego and its components, officers, councilors, representatives, agents, assigns, agencies, branches, employees, contractors, attorneys, and all other such persons acting or purporting to act on its behalf.

12.    "Possession, custody, or control" means within the actual or constructive possession, custody, or control or within the right of possession, custody, or control of Brian Bilbray.

13    "H.R. 5683" refers to the legislation entitled "Preservation of Mt. Soledad Veterans Memorial," enacted into law on August 14, 2006 (Pub. L. 109-272, 120 Stat. 770).

14.    "Mt. Soledad" refers to the property described in Section 2(d) of H.R. 5683 and encompasses the Mt. Soledad Latin cross, the Mt. Soledad Veterans Memorial, the Mt. Soledad Nature Park, and any related land, improvements, or other property.

2

15.    "Mt. Soledad Latin cross" or "Cross" refers to the cross-shaped structure, with a base stem that is longer than its three other arms, that is more than 25 feet in height and that rests on the highest point of Mt. Soledad.

## INSTRUCTIONS

1    These requests have been narrowly tailored not to seek documents that are protected from production by the Speech or Debate Clause. If notwithstanding this narrow tailoring you believe that any responsive document is protected by the Speech or Debate Clause, and you choose not to waive that protection, then in lieu of producing such documents you are instructed to list each such document on a schedule describing its date, author, recipient(s), copyees, subject matter, and a brief statement of your reasons for concluding that it is subject to Speech or Debate Clause immunity.

2.    No paragraph shall be construed with reference to any other paragraph for purposes of limitation.

3.    The terms "and" and "or" shall be construed to mean both "and" and "or."

4.    The terms "any" and "all" shall be construed to mean both "any" and "all."

5.    The singular shall be construed to include the plural and the plural shall be construed to include the singular.

6.    Each requested document shall be produced in its entirety, including any drafts or non-identical copies. If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7.    Each request for documents is continuing in nature. If, after responding to these requests, you obtain or become aware of further documents responsive to any document request, such documents shall be supplied promptly.

3

8. All documents are to be produced that are in your custody, possession, or control. If it is claimed that a document responsive to any request is privileged, work product, or otherwise protected from disclosure, state the nature and basis for any such claim of privilege, protection, or other ground for nondisclosure and identify: (a) the general subject matter of any such document; (b) the author of the document and each person to whom the original or a copy of the document was sent; and (c) the date of the document.

## DOCUMENTS TO BE PRODUCED

1.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.

2.    All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.

3.    All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with the Thomas More Law Center, the Pacific Justice Institute, American Center for Law & Justice, Horizon Christian Fellowship, St. Vincent DePaul Management, San Diegans for the Mt. Soledad National War Memorial, the Admiral Jeremiah Denton Foundation, or any other interest group regarding Mt. Soledad or the Mt. Soledad Latin Cross.

4.    All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mt. Soledad or the Mt. Soledad Latin Cross, excepting any speeches or public statements made in proceedings of the United States House of Representatives.

4

5.    All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

6.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.

7.    All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.

8.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding the administration or implementation of H.R. 5683.

9.    All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

Exhibit MC9

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

U.S. HOUSE OF REPRESENTATIVES
OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6532
(202) 225-9700
FAX: (202) 226-1360

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Re:    **Jewish War Veterans v. Gates, No. 06-CV-1597 BTM (S.D. Calif.)**

Dear Mr. Siegelbaum:

Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Duncan Hunter, U.S. Representative for the 52nd congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

1. The discovery sought from Congressman Hunter is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

2. The discovery sought from Congressman Hunter is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

3. The subpoena to Congressman Hunter is unreasonably vague and overbroad.

4. The discovery sought from Congressman Hunter is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

5. The discovery sought from Congressman Hunter is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* **http://www.fec.gov/finance/disclosure/norcansea.shtml,**

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,
http://www.house.gov/hunter/.

 6  Some of the discovery sought from Congressman Hunter is privileged from
production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1,
including documents that fall into the following categories:

> A.  Documents the Congressman collected to inform himself about the Mt.
> Soledad issue for the purpose of formulating legislation or otherwise carrying out
> his legislative responsibilities.

> B.  Documents, mostly in the form of emails, reflecting communications between
> members of the Congressman's staff and other congressional offices, both House
> and Senate, regarding legislation that concerned the Mt. Soledad issue.

> C.  Documents reflecting communications with constituents and other members of
> the public regarding legislation that concerned the Mt. Soledad issue.

Sincerely,

Kerry W. Kircher
Counsel for Non-Party Duncan Hunter

Duncan Hunter
Member of Congress, Pro Se with Respect to Requests for
Information about Campaign and Fund-Raising Activities

cc: Kevin Webb, Esq

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

## U.S. HOUSE OF REPRESENTATIVES
### OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6532
(202) 225-9700
FAX: (202) 226-1360

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Re:    Jewish War Veterans v. Gates, No. 06-CV-1597 BTM (S.D. Calif.)**

Dear Mr. Siegelbaum:

Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Darrell E. Issa, U.S. Representative for the 49th congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

1.  The discovery sought from Congressman Issa is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

2.  The discovery sought from Congressman Issa is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

3.  The subpoena to Congressman Issa is unreasonably vague and overbroad.

4.  The discovery sought from Congressman Issa is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

5.  The discovery sought from Congressman Issa is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* http://www.fec.gov/finance/disclosure/norcansea.shtml,

DOCS# 15124

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,
http://www.house.gov/issa/.

　　6.  Some of the discovery sought from Congressman Issa is privileged from production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1, including documents that fall into the following categories:

> A.  Documents the Congressman collected to inform himself about the Mt. Soledad issue for the purpose of formulating legislation or otherwise carrying out his legislative responsibilities.

> B.  Documents, mostly in the form of emails, reflecting communications between members of the Congressman's staff and other congressional offices, both House and Senate, regarding legislation that concerned the Mt. Soledad issue.

> C.  Documents reflecting communications with constituents and other members of the public regarding legislation that concerned the Mt. Soledad issue.

Sincerely,

Kerry W. Kircher
Counsel for Non-Party Darrell E. Issa

Darrell E. Issa
Member of Congress, Pro Se with Respect to Requests for Information about Campaign and Fund-Raising Activities

cc:　　Kevin Webb, Esq.

DOCS# 15124

GERALDINE R. GENNET
GENERAL COUNSEL

KERRY W. KIRCHER
DEPUTY GENERAL COUNSEL

DAVID PLOTINSKY
ASSISTANT COUNSEL

CHRISTINE DAVENPORT
ASSISTANT COUNSEL

JOHN D. FILAMOR
ASSISTANT COUNSEL

## U.S. HOUSE OF REPRESENTATIVES
### OFFICE OF THE GENERAL COUNSEL
219 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6532
(202) 225-9700
FAX: (202) 226-1360

April 9, 2007

**BY E-MAIL AND FIRST-CLASS MAIL**

Jonathan Siegelbaum, Esq.
Wilmer, Cutler, Pickering, Hale and Dorr, LLP
1875 Pennsylvania Avenue, N W
Washington, D C. 20006

    Re:    **Jewish War Veterans v. Gates, No. 06-CV-1597 BTM (S.D. Calif.)**

Dear Mr. Siegelbaum:

    Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, non-party Brian P. Bilbray, U.S. Representative for the 50th congressional district of California, respectfully objects to the subpoena duces tecum directed to him and dated March 21, 2007, as follows:

    1. The discovery sought from Congressman Bilbray is neither relevant to the litigation, nor reasonably calculated to the lead to the discovery of admissible evidence, within the meaning of Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

    2. The discovery sought from Congressman Bilbray is not material and relevant within the meaning of Rule VIII of the Rules of the House of Representatives (110th Cong.). *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 7-9 (April 2, 2007).

    3. The subpoena to Congressman Bilbray is unreasonably vague and overbroad.

    4. The discovery sought from Congressman Bilbray is unreasonably cumulative and duplicative, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See also* Order Denying Plaintiff's Request to Compel the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter at 10 (April 2, 2007).

    5. The discovery sought from Congressman Bilbray is obtainable from other sources that are more convenient and less burdensome, within the meaning of Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure. *See, e.g.,* **http://www.fec.gov/finance/disclosure/norcansea.shtml,**

DOCS# 15121

Jonathan Siegelbaum, Esq.
April 9, 2007
Page 2

http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep,
http://www.house.gov/bilbray/.

    6. Some of the discovery sought from Congressman Bilbray is privileged from
production under the Speech or Debate Clause of the Constitution, U.S. Const., art. I, § 6, cl. 1,
including documents that fall into the following categories:

        A. Documents the Congressman collected to inform himself about the Mt.
        Soledad issue for the purpose of formulating legislation or otherwise carrying out
        his legislative responsibilities.

        B. Documents, mostly in the form of emails, reflecting communications between
        members of the Congressman's staff and other congressional offices, both House
        and Senate, regarding legislation that concerned the Mt. Soledad issue.

        C. Documents reflecting communications with constituents and other members of
        the public regarding legislation that concerned the Mt. Soledad issue.

                            Sincerely,

                            Kerry W. Kircher
                            Counsel for Non-Party Brian P. Bilbray

                            Brian P. Bilbray
                            Member of Congress, Pro Se with Respect to Requests for
                            Information about Campaign and Fund-Raising Activities

cc:    Kevin Webb, Esq.

Exhibit MC10

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                  **SOUTHERN DISTRICT OF CALIFORNIA**
10
11    STEVE TRUNK and PHILIP K.              CASE NO. 06cv1597-LAB (WMc)
      PAULSON,                               (Consol. w/06cv1728-LAB (WMc)
12
                              Plaintiffs,    **ORDER TO SHOW CAUSE RE:**
13          vs.                              **JUSTICIABILITY**

14    CITY OF SAN DIEGO, UNITED STATES
      OF AMERICA, DONALD H. RUMSFELD,
15    Secretary of Defense and DOES 1
      through 100, inclusive,
16
                              Defendants.
17    _____

18    MOUNT SOLEDAD MEMORIAL
      ASSOCIATION,
19
                  Real Parties in Interest.
20    _____

21    JEWISH WAR VETERANS OF THE
      UNITED STATES OF AMERICA, INC.,
22    RICHARD A. SMITH, MINA SAGHEB,
      and JUDITH M. COPELAND,
23
                              Plaintiffs,
24
            vs.
25
      DONALD H. RUMSFELD, Secretary of
26    Defense, in his official capacity,

27                              Defendant.

28

                              - 1 -                                    06cv1597

1    On September 8, 2006, Plaintiffs Steve Trunk and Philip Paulson filed their First
2  Amended Complaint ("FAC") seeking declaratory and injunctive relief. Specifically, Plaintiffs
3  seek a declaration that transfer of the land which is the subject of this litigation to the federal
4  government violates Plaintiffs' rights under the U.S. and California constitutions, and that the
5  statute authorizing it be declared void *ab initio*. Plaintiffs sought both a preliminary and
6  permanent injunction prohibiting Defendants from displaying the cross on government
7  property. Plaintiffs request the Court "[e]ncourage the parties to honor the settlement
8  agreement that was entered into . . . ." Finally, Plaintiffs seek an award of fees and costs,
9  and any other relief the Court deems just and equitable.

10    The FAC was subject to a motion to dismiss for lack of jurisdiction, filed October 10,
11  2006. Amicus Pacific Justice Institute filed a brief on October 13, 2006 in support of
12  Defendants' motion to dismiss. The Court issued an order on November 7, 2006, noting the
13  amicus brief had raised the issue of Article III standing, and directed the parties to address
14  this issue either in their briefing on the motion to dismiss, or in a subsequent motion. The
15  Court denied the motion to dismiss on November 29, 2006 by minute order following a
16  hearing.

17    On May 8, 2007, Judge Barry Moskowitz recused and the case was reassigned to
18  Judge Napoleon Jones, who in turn recused on May 15, 2007. The case was then
19  reassigned to Judge Larry Burns. In spite of the reassignment, it is not the Court's intention
20  at this time to revisit the issues briefed and ruled on previously. However, upon reviewing
21  the record, questions present themselves regarding the standing of Plaintiffs Trunk and
22  Paulson, and about the Court's jurisdiction more generally. These Plaintiffs seek, in addition
23  to other remedies, the Court's encouragement of the parties to honor the settlement
24  previously reached between the City of San Diego (the "City") and Plaintiffs Trunk and
25  Paulson; and avoidance of the transfer by invalidation of the federal statute which effected
26  it. While it appears some of these issues have been addressed obliquely, it is not clear at
27  this point that they have been addressed as fully as is required.

28  / / /

1    Furthermore, it appears that the protracted litigation of related matters has muddied

2   the waters somewhat, and the briefing in this case has not always identified the relevant

3   issues, legal standards, or authorities.  This was noted by the Court previously when it

4   directed the parties to address the issue of Article III standing.  To the extent possible, the

5   Court wishes to direct the parties to address the relevant questions and to avoid needless

6   briefing on matters not at issue here.

7   **I.    Legal Standards**

8    Standing is a jurisdictional requirement, and a party invoking federal jurisdiction has

9   the burden of establishing it.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct.

10   2130, 2136, 119 L.Ed.2d 351 (1992).  Standing is a "threshold question in every federal

11   case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Federal courts are required to examine

12   jurisdictional issues including standing, even *sua sponte* if necessary.  *B.C. v. Plumas

13   Unified School Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).

14    Even if Plaintiffs Trunk and Paulson have standing under California law, standing

15   sufficient to meet federal standards is a jurisdictional requirement imposed by Article III of

16   the U.S. Constitution and takes priority.  *Lee v. American Nat'l Ins. Co.*, 260 F.3d 997,

17   999 –1000, 1001–02 (9th Cir. 2001). *Accord  Wheeler v. Travelers Ins. Co.*, 22 F.3d 534,

18   537 (3d Cir. 1994) (*citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct.

19   2965, 2970, 86 L.Ed.2d 628 (1985)) (holding that standing to bring an action in federal court

20   is determined under federal, not state law).

21    To show they have standing, Plaintiffs must establish three things:

22    First [they must have] suffered an injury in fact — an invasion of a legally
       protected interest which is (a) concrete and particularized, and (b) actual or
23       imminent, not conjectural or hypothetical. Second, there must be a causal
       connection between the injury and the conduct complained of . . . . Third,
24       it must be likely, as opposed to merely speculative, that the injury will be
       redressed by a favorable decision.
25

26   *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted).

27   / / /

28   / / /

1 **II.    Discussion**

2     As Plaintiffs Trunk and Paulson have framed it, their injury consists of the imminent

3 harm they will suffer if the property at issue is taken by the United States and operated as

4 a veterans' memorial with the large cross in place. Their claimed injury does not consist

5 simply of the fact that a large cross is located on particular mountain, nor government

6 ownership or non-ownership of land on Mt. Soledad, nor mere efforts by officials or voters

7 who wished the cross to remain where it was. The parties are directed in their briefing to

8 focus on the elements of an Establishment Clause claim.

9     **A.    Request for Encouragement to Abide by the Settlement Agreement**

10     While courts in the course of making and explaining their rulings do incidentally

11 advise, admonish, exhort, or encourage parties to take various actions, it is unclear why

12 Plaintiffs Trunk and Paulson have standing to seek the issuance of an "encouragement" from

13 the Court as one of their remedies, or why the Court would have jurisdiction to rule on this

14 issue. Such an encouragement would have no force, and could not affect the parties' rights.

15 *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (holding that federal courts

16 lack the power to decide questions that cannot affect the rights of litigants in the case before

17 them) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)); *Duke Power Co. v. Carolina*

18 *Environmental Study Group, Inc.*, 438 U.S. 59, 79 (1978) (requiring a substantial likelihood

19 "that the judicial relief requested will prevent or redress the claimed injury").

20     **C.    Invalidation of the Transfer**

21     The briefing suggests the transfer of the land at issue here was effected by actions

22 taken by both the City, as part of its efforts to "save the Cross" and the United States, in

23 enacting H.R. 5683 as Public Law 190-272. Should the requested relief be granted,

24 ownership of the land would presumably revert to the City.

25     **1.    Questions Regarding Justiciability**

26     The Court notes several apparent issues bearing on the issues of standing and

27 justiciability generally. First, while the transfer was initially attempted by the City, the transfer

28 at issue here was apparently accomplished entirely by the United States when it enacted

Public Law 190-272, which effects a taking of the land.  Under the Supremacy Clause, no action taken by the City can invalidate a federal statute.  Public Law 109-272 is an act of the United States, not of the City.  *Paulson v. City of San Diego*, 475 F.3d 1047, 1049 (9th Cir 2007) (holding that the passage of Public Law 109-272 was not attributable to the City) (citing *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006)).  It therefore appears the transfer at issue consists only of the taking effected by Public Law 190-272, and the propriety of the City's actions is not justiciable.  In addressing the question of standing, the parties are specifically directed to focus on the U.S. government's actions and not the actions of the City or other parties unless such briefing would be relevant or provide needed explanatory background.

In enacting and enforcing its own statutes, the United States is of course not bound by California law, including the California constitution.  *Paulson*, 475 F.3d at 1048 ("[T]he United States is not subject to state constitutional authority.")  If Plaintiffs Trunk and Paulson have standing to challenge the taking, it will be solely to vindicate their federal rights.  Therefore, when the parties address this issue, they should rely on the United States Constitution and federal law, and need not address the hypothetical issue of whether the U.S. government's taking of the property would have violated California's constitution.

At this stage, Plaintiffs Trunk and Paulson are attempting to challenge the United States' taking of land.  What the United States may do with this land is to be addressed in later stages of this action.  However, at this point, it is not yet clear why these Plaintiffs have standing to challenge the taking itself, or why such a matter is justiciable at all.

Plaintiffs Trunk and Paulson identify themselves as veterans, and describe their interest as ensuring that the veterans' memorial is operated in a nonsectarian manner.  These Plaintiffs have not, however, identified any interest in having the memorial operated by the City rather than by the United States.

It seems clear Plaintiffs Trunk and Paulson would prefer to enforce the previously issued injunction rather than litigate anew against the United States.  While efficiency of litigation is a laudable goal and may be the subject of motions within a larger action, *see*

1   Fed. R. Civ. P. 1, the Court is unaware of any authority holding ease or convenience of

2   litigation by itself is a legally protected interest such as could support Article III standing. *See*

3   *Lujan*, 504 U.S. at 560.

4          Bearing in mind the injury these Plaintiffs have alleged, the taking puts an end to any

5   California constitutional violation by the City. Obviously, these Plaintiffs would prefer that the

6   violation was remedied by removing or altering the cross; but, as a matter of law, it appears

7   any means by which the alleged violation is brought to an end will suffice. *Paulson*, 475 F.3d

8   at 1048–49 (Plaintiffs' appeal became moot with the City's divestment of its interest in the

9   memorial) (citation omitted). *See also Palmer v. Thompson*, 403 U.S. 217, 227 (1971)

10  (declining to require city to continue to operate swimming pools after Constitutional problem

11  of operating pools in a racially segregated manner was brought to an end by closing the

12  pools); *Evans v. Abney*, 396 U.S. 435, 447 (1970) (declining to intervene further after

13  Constitutional violation was ended by state's decision to divest itself of park accepted on

14  condition that it be operated in a racially segregated manner). Therefore, it appears Plaintiffs

15  Trunk and Paulson have no legally protected interest in seeing that the memorial is operated

16  by the City and is subject to California law, rather than being taken by the federal

17  government

18         Assuming the taking is not invalidated, the United States will be required to abide by

19  the same U.S. Constitutional requirements as would the City. Assuming that violations of

20  the California constitution have ended and thus do not require redress, and any federal

21  Constitutional violations are unaffected by the transfer, it is unclear how invalidating the

22  transfer would redress any injury done to Plaintiffs Trunk and Paulson.

23         **2.    Political Question Doctrine**

24         It does not appear Plaintiffs Trunk and Paulson have argued that the mere taking of

25  land under the assumption that it will be used for a sectarian purpose, or the taking of land

26  with a religious symbol on it amounts to an Establishment Clause violation. If these Plaintiffs

27  do intend to raise this argument, however, the Court directs them to brief it, particularly

28  addressing the jurisdictional issue of the political question doctrine — *i.e.*, whether this Court

1  has the power to interfere with the federal government's Constitutionally-granted power to

2  acquire property either because of an existing condition on the land, or because of the

3  proposed use for which the property was acquired. *See Koohi v. United States*, 976 F.2d

4  1328, 1332 (9th Cir. 1992) (holding that the political question doctrine goes to the court's

5  "power to entertain the plaintiffs' action").

6        The Court has three particular concerns in this regard: 1) that Plaintiffs Trunk and

7  Paulson are asking it to invalidate the taking because the property cannot be used as

8  Congress intended when the taking was authorized — in other words, that this was an

9  unwise decision, 2) that prohibiting the political branches from acquiring land on which

10  religious symbols already exist would impermissibly interfere with the power committed to

11  them under the Takings Clause, and 3) that invalidating the taking on the basis of alleged

12  improper motives expresses lack of the respect due to the Executive and Legislative

13  branches. *See Arakaki v. Lingle*, 477 F.3d 1048, 1066–67 (9th Cir. 2007) (outlining bases

14  for application of the political question doctrine) (citations omitted). Should Plaintiffs Trunk

15  and Paulson fail to brief this argument, the Court will consider it abandoned.

16  **III.    Conclusion and Order**

17        Plaintiffs Trunk and Paulson are therefore **ORDERED TO SHOW CAUSE** why their

18  requests for declaratory relief, for "encouragement" to abide by the settlement agreement,

19  and for invalidation of Public Law 190-272 should not be dismissed as non-justiciable.

20  Plaintiffs Trunk and Paulson may do so by filing a joint memorandum of points and

21  authorities, no longer than 15 pages in length, not counting any appended or lodged

22  material, no later than 21 calendar days from the date this Order is entered in the docket.

23  Defendants may, if they wish, file a joint reply memorandum subject to the same length

24  limitations, no later than 35 calendar days from the date this Order is entered in the docket.

25  The amicus Pacific Justice Institute may, if it wishes, file a reply no longer than 5 pages in

26  length within the time permitted for reply. The Court does not require briefing from the other

27  parties; they may, however, join in the other parties' briefing with the consent of those

28  parties.

1      While, as noted above, it is not the Court's intention to revisit its previous ruling, the

2  Court has a continuing duty to examine its own jurisdiction.  Therefore, the parties are

3  admonished that, should the briefing disclose a basis for reconsidering the Court's previous

4  order denying Defendants' motion to dismiss for lack of jurisdiction, the Court may do so *sua*

5  *sponte*.  Therefore, the parties should include all authority and arguments relevant to

6  jurisdictional issues as previously briefed.  The parties are particularly encouraged, however,

7  to focus on the issues raised in this Order.  Appended or lodged material should be kept to

8  a minimum, its significance should be explained in the body of the memorandum, and

9  precise citations should be given.

10  **IT IS SO ORDERED.**

11  DATED:  June 1, 2007

12

13                     **HONORABLE LARRY ALAN BURNS**
                     United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -                        06cv1597

Exhibit MC11

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11    STEVE TRUNK and PHILIP K. PAULSON,    )    Case No. 06 CV 1597 J (WMc)
                                            )
12                      Plaintiffs,         )    **ORDER**
                                            )
13    v.                                    )
                                            )
14    CITY OF SAN DIEGO, UNITED STATES      )
      OF AMERICA, DONALD H. RUMSFELD,       )
15    Secretary of Defense and DOES 1 through )
      100, Inclusive                        )
16                                          )
                        Defendants.         )
17                                          )
      MOUNT SOLEDAD MEMORIAL                )
18    ASSOCIATION, Real Parties in interest. )
                                            )
19    JEWISH WAR VETERANS OF THE            )
      UNITED STATES OF AMERICA, INC.,       )
20    RICHARD A. SMITH, MINA SAGHEB, and    )
      JUDITH M. COPELAND,                   )
21                                          )
                       Plaintiffs           )
22                                          )
      v.                                    )
23                                          )
      DONALD H. RUMSFELD, Secretary of      )
24    Defense, in his official capacity,    )
                                            )
25                      Defendant.          )

26    _____

27    ///

28    ///

1    The Court held a telephonic discovery conference on May 22, 2007. Appearing for Plaintiff

2    Trunk was James McElroy. Appearing for the JWV Plaintiffs were Jonathan Siegelbaum, Lane Dilg

3    and David Blair-Loy. Appearing for Defendant, the United States, were Heidi Herrmann and Ryan

4    Nelson. Appearing for Defendant, the City of San Diego, was George Schaefer.

5        After hearing from counsel of record, the Court issues the following orders:

6        1.) Subject to the standard rules of evidence, discovery propounded in *Paulson v. City of San*

7    *Diego, et al.* may be used as though propounded in *Jewish War Veterans of the United States of*

8    *America v. Rumsfeld* and vice versa.

9        2.) Any party withholding documents based on a claim of privilege shall prepare a privilege

10   log. For further requirements concerning the format of an acceptable privilege log, the parties shall

11   contact Judge McCurine's law clerk at (619) 557-6624.

12       The Court will hold a further *telephonic* Discovery Conference on **June 6, 2007 at 9:15 a.m.**

13    Attorney Heidi Herrmann is ordered to contact all opposing counsel and initiate a joint call to the

14   Court at (619) 557-6624.

15       **IT IS SO ORDERED.**

16   DATED: May 22, 2007

17

18

19                          Hon. William McCurine, Jr.
                            U.S. Magistrate Judge
20                          United States District Court

21

22   COPY TO:

     HONORABLE LARRY A. BURNS, U.S. DISTRICT JUDGE

23   ALL PARTIES AND COUNSEL OF RECORD

24

25

26

27

28

2                                                           06cv1597 J (WMc)

Exhibit MC12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                                          Case No. 8:04-md-2523-T-30TBM
                                                MDL 1626 - ALL CASES
ACCUTANE PRODUCTS
LIABILITY LITIGATION,
_____/


LAURIE A. STUPAK,[1]

        Plaintiff,

v.                                              Case No. 8:05-cv-926-T-30TBM

HOFFMANN-LA ROCHE, INC., et al.,

        Defendants.
_____/


                            O R D E R

        THIS MATTER is before the court on the following motions:

    (1)    **U.S. Defendants' Motion to Compel Discovery from Plaintiff Laurie
           Stupak** (Doc. 7) and Plaintiff's response (Doc. 12); and

    (2)    **U.S. Defendants' Motion to Compel Discovery from Bartholomew Stupak,
           Sr.** (Doc. 8), Supplemental Brief in Support (Doc. 21), and non-party's
           Bartholomew Stupak's opposition (Doc. 23);

    (3)    **U.S. Defendants' Expedited Motion to Take Three (3) Additional Fact
           Depositions** (Doc. 28).

A hearing on these and other matters was conducted on April 20, 2006.

        By their first motion (Doc. 7), the U.S. Defendants seek an Order (1) requiring

Plaintiff to comply with the Case Management Order (hereinafter "CMO") and explain her

failure to produce documents and other requested items in a timely manner, (2) requiring

_____

[1]Plaintiff, Laurie A. Stupak, is the mother of Bartholomew Stupak, Jr., the decedent, in
this wrongful action. Her husband is Bartholomew Stupak Sr., a United States Congressman
representing the 1st district of Michigan.

Plaintiff to supplement her written discovery responses and to produce all documents in response to the U.S. Defendants' outstanding requests within ten days, (3) requiring Plaintiff's counsel to certify the accuracy and completeness of Plaintiff's supplemental discovery responses, (4) permitting Defendants to reopen up to three of the depositions already taken, at Plaintiff's expense, to inquire about documents and items that should have been produced prior to the initial depositions, and (5) requiring Plaintiff to pay the attorney's fees associated with the instant motion. In support of these requests, Defendants allege that testimony from certain depositions has revealed that Plaintiff has not fully complied with discovery requests with respect to producing all of the decedent's handwritten notes, all photographs of the decedent, and all videotapes on which the decedent appears.[2] At the hearing, counsel for the U.S. Defendants indicated that the disputed issues had been narrowed to the failure of the Plaintiff to produce certain notes found by the police on a table at the scene where the Plaintiff's son was found deceased, computer documents, and a school deficiency report purportedly issued to the Plaintiff's son. As for the remaining disputed items, Plaintiff protests that she cannot produce what she does not have. Thus, she is unaware of any notes on a table or that such notes may already been produced, the family no longer

---

[2]In her response, Plaintiff urges the court to deny Defendants' motion, asserting that she has supplemented her written responses and document production, the Federal Rules of Civil Procedure do not require her attorney to certify the completeness or accuracy of her responses, her discovery responses have not been untimely and Defendants have not been prejudiced by the timing of her supplemental responses, there is no need to re-depose any witnesses, and there is no basis to award attorney's fees on Defendants' instant motion. Plaintiff also explains her alleged untimely production of certain photographs and handwritten notes from her son and she denies that she has the particular notes that Defendants seek. As for the videotapes, Plaintiff indicates that her prior counsel informed her that all videotapes had been provided to the Defendants. Plaintiff certifies her responses by way of Affidavit. (Doc. 12, Ex. E).

has possession of any of the computers it had at the time of her son's death, and she is unaware of any grade deficiency notice from her son's teacher.

Upon consideration, the **U.S. Defendants' Motion to Compel Discovery from Plaintiff Laurie Stupak** (Doc. 7) is **GRANTED** in part. To the extent that Plaintiff may discover such items, she remains under a continuing duty to promptly them. Except as noted immediately below regarding depositions, the motion is denied in all other respects.[3]

By the **U.S. Defendants' Expedited Motion to Take Three (3) Additional Fact Depositions** (Doc. 28), the Defendants seek permission of the court to exceed the fifteen deposition limit established by the court's CMO. More particularly, the Defendants seek permission to depose (1) Amber Twork, allegedly a close friend of the decedent's, (2) Anne Barley, another close friend of the decedent recently discovered, and (3) Connie Swander, a member of the Michigan State Police crime laboratory. Plaintiff opposes the motion. Upon consideration, the motion (Doc. 28) is **GRANTED** in part. The U.S. Defendants may depose Anne Barley and Connie Swander. Neither of the two additional depositions shall exceed three (3) hours in total length, including a reasonable time for questions by Plaintiff's counsel. In all other respects, the motion (Doc. 28) is denied.

Regarding, the **U.S. Defendants' Motion to Compel Discovery from Bartholomew Stupak, Sr.**, (Doc. 8) as supplemented (Doc. 21), Defendants seek supplemental discovery from Plaintiff's husband, Congressman Bartholomew Stupak Sr. Defendants argue that he has improperly limited his testimony and document production based on an expansive and incorrect assertion of congressional privilege. By their supplement, Defendants indicate that

---

[3]The court has admonished Plaintiff's counsel to familiarize himself with the Court's procedural orders in the MDL 1626, Case No. 8:04-MD-2523-T-30TBM, in particular the operative Case Management Order (Doc. 190).

the issues have been narrowed somewhat,[4] however, they still maintain that Representative Stupak: (1) has waived any claim of privilege by failing to assert it in a proper and timely manner; (2) cannot preserve the privilege while *acting* as a private plaintiff; (3) has disseminated the material to third parties in such a fashion that the material so disseminated is discoverable; and (4) has improperly asserted the privilege when declining to answer questions concerning matters about which he may testify at the trial. Defendants seek an Order directing Representative Stupak to produce all of the documents related to Accutane he has accumulated as a representative, or alternatively, to produce all of the documents related to Accutane he has disseminated to third persons outside of Congress, or at a minimum an *in camera* review of such matters. Defendants also request that the court bar Representative Stupak from testifying at trial on any matters that he claims are subject to the congressional privilege and about which he has refused to speak at depositions.

At arguments, counsel for Representative Stupak responded that the documents the congressman and staff have accumulated related to Accutane have been carefully reviewed and Defendants have now been forwarded copies of almost all of the non-privileged

---

[4]The Defendants complain that Representative Stupak improperly invoked the privilege in five areas: conversations he had and documents he provided to his wife and her attorneys; conversations he had and documents he provided to expert witnesses in his wife's case; conversations he had and documents he provided to other Accutane plaintiffs and their attorneys; his efforts to influence federal agencies with respect to his oversight of Accutane; and matters about which he may be called to testify at trial. From the pleadings and arguments, it appears that Representative Stupak subsequently produced documents relating to his public statements on Accutane; his communications with plaintiffs, their lawyers, and their experts; and his attempts to lobby agencies; and he appeared for a second half-day of deposition on March 14, 2006. (Doc. 21 at 3-4). Thus, he claims he has produced 520 pages of his congressional records, as well as a comprehensive written description of what he withheld. (Doc. 23 at 6-7). Representative Stupak's counsel claims that upon his own independent review of the documents, all non-privileged documents have been produced.

4

Accutane-related documents requested.[5]  Counsel opposes any effort to label Representative

Stupak as a *de facto* Plaintiff in this cause and asserts that, even if he was such, he would

maintain his congressional privilege.  Fundamentally, counsel urges that the Defendants

misunderstand the privilege afforded by the Speech and Debate Clause of the U. S.

Constitution .  He urges further that the privilege cannot be waived absent extraordinary

circumstances and that it is impermissible in these circumstances to require either an *in

camera* review or for the congressman to provide a privilege log.

The congressional privilege stems from the protections afforded members of Congress

by the Speech and Debate Clause.[6]  These protections apply to all activities "within the

'legislative sphere,'" Gravel v. U.S., 408 U.S. 606, 624-25 (1972), and are absolute.  Eastland

v. U.S. Servicemen's Fund, 421 U.S. 491, 501 (1975).  The privilege permits Congress to,

among other things, "conduct investigations and obtain information without interference from

the courts . . ." Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 416 (D.C. Cir.

1995); see also Eastland, 421 U.S. at 504.  To the extent that it is possible for the Speech or

Debate privilege to be waived, it "can be found only after explicit and unequivocal

renunciation of the protection." U.S. v. Helstoski, 442 U.S. 477, 490-91 (1979).

Initially, I find that Representative Stupak has not waived the privileges afforded him

under the Speech or Debate Clause and clearly there has been no "explicit and unequivocal

---

[5]According to counsel, a vast majority of the documents that were shared with third persons have been produced.  For example, all but three documents *shared* with attorneys have been produced.  For the three, there is a claim that those were shared for legislative purposes and maintain the privilege.  On the other hand, there are several banker's boxes of material collected by the congressman which have not been shared and for which he asserts the privilege regardless of their source.

[6]The Speech or Debate Clause states in pertinent part, ". . . for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.

renunciation of this protection" by the representative. Although Defendants aptly urge that the privilege asserted in this case is done so broadly, it is not demonstrated on this motion that the expansive claim of privilege has not been corrected by the involvement of House of Representative counsel and through the production of documents determined appropriate for production. At this point, the court accepts counsel's representation that a thorough and careful review of the material collected by the representative and staff has been made and no further production is required.

The representative's assertion of the privilege at depositions to shield his disclosure of information on which he relies for his potential testimony at trial is more troubling. On the one hand, I agree with the Defendants that the representative may not use the privilege as both a sword and a shield when he assumes the role of an interested witness in the wrongful death action of his son. There is nothing "legislative" in that role. However, the Defendants cite no authority permitting the court to strike such witness's trial testimony at this stage of the proceedings solely because he has asserted the privilege. I agree with the representative's counsel that this is a trial matter that is more appropriately left to the determination of the trial judge. I would caution the representative, however, that the discovery period in this litigation is limited. His failure to give a full accounting of the matters he may testify to at trial and the basis for such testimony within the discovery period will likely have serious adverse consequences on the scope of his testimony at trial. He has been fairly warned.

Lastly, regarding an *in camera* review or the requirement of a privilege log, absent clear authority for compelling the same, I agree with Representative Stupak's counsel that requiring the holders of the privilege to submit to such is contrary to the purpose of the Speech or Debate Clause. See <u>Helstoski</u>, 442 U.S. at 491 (providing that purpose is to

preserve constitutional structure of separate, independent branches of government and noting

that any lesser standard would risk intrusion by the Executive and Judiciary into the sphere of

protected legislative activities); Eastland, 421 U.S. at 503 (reaffirming that once it is

determined that a congressman was acting within the "legitimate legislative sphere," the

Speech or Debate Clause is an absolute bar to interference).[7] Accordingly, the U.S.

**Defendants' Motion to Compel Discovery from Bartholomew Stupak, Sr.,** (Doc. 8) as

supplemented (Doc. 21) is **DENIED**.

**Done and Ordered** in Tampa, Florida, this 28th day of April 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
United States District Judge
Counsel of Record

_____

[7]As counsel notes, Mr. Stupak has provided a general, written description of broad categories of documents responsive to Defendants' October 20, 2005, subpoena duces tecum which were withheld on Speech or Debate grounds. Counsel argues that these descriptions are adequate to enable Defendants to understand what was withheld and why. (Doc. 23 at n. 10). At this point, I tend to agree.

Exhibit MC13

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   ) Criminal No. 01-455-A
v.                                 )
                                   )
ZACARIAS MOUSSAOUI,                )
                                   )
        Defendant.                 )

ORDER

Before the Court is the Motion of U.S. Representative Curt
Weldon to Quash Subpoena (Docket #1584), in which Representative
Weldon objects to being called to give testimony about or provide
documents collected during his investigation of the government's
"Able Danger" program.  The government has filed a related Motion
In Limine to Exclude the Testimony of Proposed Defense Witnesses
Related to the Able Danger Program (Docket #1619) ("Motion to
Exclude"), in which it seeks a ruling preventing the defense from
calling three witnesses with personal knowledge of the "Able
Danger" program.[1]

On January 23, 2006, a trial subpoena was issued to

---

[1]The government's Motion to Exclude was filed under seal,
because it reveals the names of potential defense witnesses.
Because the Motion to Quash was not filed under seal, without
objection from the defense, it is clearly a matter of public
knowledge that the defense may wish to call witnesses
knowledgeable about the "Able Danger" program.  Therefore, the
Court will address both motions in this unsealed Order.

Representative Weldon commanding him to appear at this court on
March 6, and to bring any documents in his possession referring
or relating to the "Able Danger" program, or to any of the
September 11 hijackers. Representative Weldon objects to the
subpoena on the grounds that as a member of Congress, his
privilege under the Speech and Debate Clause of the United States
Constitution immunizes him from being compelled to give testimony
or provide documents in this case.[2] Representative Weldon also
states that he is no longer in possession of the chart that the
defense seeks.[3] The defendant objects to the Motion to Quash
arguing that by discussing his knowledge of the "Able Danger"
program in public, non-legislative fora such as The Oprah Winfrey
Show, Representative Weldon has waived any privilege he may have
had.

   The Speech and Debate Clause provides a very strong
protection to members of Congress against being questioned about
activities that are "within the sphere of legitimate legislative
activity." Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 501
(1975). If the court finds that the activities at issue are

---

   [2]The Speech and Debate Clause provides that "for any Speech
or Debate in either House, [Senators and Representatives] shall
not be questioned in any other Place." U.S. Const. art. I, § 6,
cl.1.

   [3]Although the subpoena is more broadly written, the defense
has expressed a particular interest in a chart referenced by
Representative Weldon in his book, Countdown to Terror, and
described in various newspaper articles.

2

within the sphere of legitimate legislative activity, then "the
prohibitions of the Speech or Debate Clause are absolute" and the
representative may not be questioned about them, other than by
the Congress itself.  Id.  Legitimate legislative activity has
been defined by the Supreme Court as matters that are "an
integral part of the deliberative and communicative processes by
which Members participate in committee and House proceedings with
respect to the consideration and passage or rejection of proposed
legislation or with respect to other matters which the
Constitution places within the jurisdiction of either House."
Gravel v. United States, 408 U.S. 606, 625 (1972).  Much, if not
all, of the information responsive to the subpoena can be
expected to have come from Representative Weldon's legitimate
legislative activity of investigating a project that is clearly a
proper subject for Congressional legislation.

It is also clear that Representative Weldon's public
discussion of his "Able Danger" investigation is not sufficient
to waive the privilege of the Speech and Debate Clause in the
context of this subpoena.  The Supreme Court has held that any
such waiver "can be found only after explicit and unequivocal
renunciation of the protection." United States v. Helstoski, 442
U.S. 477, 491 (1979).  Representative Weldon's public statements
about the "Able Danger" program never referenced, let alone
renounced, the Representative's privilege under the Speech and

3

Debate Clause.  Based on these considerations, the Court does not find that the privilege has been waived.  Accordingly, the subpoena will be quashed.

This decision will not prejudice the defendant because clearly Representative Weldon possesses no first hand knowledge of the government's "Able Danger" program.  Anything he knows about the program either came from witnesses with more direct knowledge or the document which he no longer possesses.  That document can certainly be subpoenaed from Stephen Hadley, the person to whom Representative Weldon says he gave the document.  Moreover, as demonstrated by the government's Motion to Exclude, the defense has also subpoenaed three witnesses with first-hand knowledge of the "Able Danger" program.  These persons can provide much, if not all, of the information that the defense could expect to obtain from Representative Weldon.

In its Motion to Exclude, the government argues that the entire "Able Danger" issue is not relevant to this case, and, even if relevant, allowing the defense to raise this issue will cause substantial delay and confuse the jury.  The government also forcefully argues that no chart linking Mohammed Atta to Al Qaeda ever emerged from the "Able Danger" program, a contention disputed by the potential witnesses.[4]  What knowledge the

---

[4]This contention is also disputed by Representative Weldon, who has stated in press reports that he viewed such a chart.  <u>See</u> Deft's Opp. To Rep. Curt Weldon's Mot. to Quash Subpoena.

4

government possessed before September 11 regarding members of Al

Qaeda, and specifically links between Al Qaeda and the eventual

hijackers, is a key issue in dispute in this death penalty trial.

Accordingly, the Court finds that the information to be elicited

from the three "Able Danger" witnesses is sufficiently relevant

to the case, and that its relevance is not outweighed by

considerations of confusion and waste of time.   Therefore, the

government's Motion to Exclude is DENIED.   Accordingly, it is

hereby

     ORDERED that the Motion of U.S. Representative Curt Weldon

to Quash Subpoena be and is GRANTED, and the subpoena is hereby

QUASHED, and it is further

     ORDERED that the government's Motion to Exclude be and is

DENIED.

     The Clerk is directed to forward copies of this Order to

counsel of record.

     Entered this 2nd day of March, 2006.


                                        /s/

                                        _____
                                        Leonie M. Brinkema
                                        United States District Judge
Alexandria, Virginia


                                   5

Exhibit MC14



**Congressional Research Service**

*Legislative Issues & Procedures*
*The CRS Seminar for New Members*

# The Legislative Framework

Walter J. Oleszek
*Senior Specialist in the Legislative Process*

December 2006

## Introduction

Congressional policymaking is constantly subject to various changes, but it also has certain enduring features that affect the consideration of all legislation. Before spotlighting some aspects of the contemporary Congress that make it significantly different from its predecessors of several decades ago, it is worth discussing several of the more durable elements of the lawmaking process. They include a decentralized power structure, the existence of multiple decision points, the need for bargaining and compromise, and the 2-year congressional cycle.

## Broad Features of Congressional Policymaking

**Decentralized Power Structure** Congress's decentralized character reflects both political and structural realities. Politically, legislators owe their reelection to voters in widely different states and localities; structurally, the legislative branch has an elaborate division of labor to help it manage its immense workload. Responsibility for specific policy areas is dispersed among numerous committees, subcommittees, and informal work groups.

A system of "little legislatures" means that committees function as centers of policymaking,

oversight of the administration of laws, and public education (largely through the hearings process). Yet, structural decentralization suggests that broad policy issues are often divided into smaller components for consideration by several committees. Many House committees, for example, consider some aspect of health, trade, or energy policy. In brief, although there are a few committees that can act as policy coordinators, such as the House Budget and Rules Committees, Congress's committee system contributes to policy fragmentation simply because many bills cut across the jurisdictional responsibilities of several different panels.

Given the centrifugal influences of the fragmented committee system, it often falls to the congressional parties to provide the cohesive and coordinative force necessary to forge winning coalitions in committee or on the floor. Neither party, however, commands the consistent support of all its Members on all the measures deemed important to it. Too many countervailing pressures (constituency, individual conscience, region, career considerations, or committee loyalty) also influence the decisions of lawmakers. As a result, public policies often are enacted because diverse elements of both parties temporarily coalesce to achieve common goals.

**Multiple Decision Points** Although Congress can act quickly on legislation, normally measures have to work their way slowly through multiple decision points. After a bill is introduced, for example, it usually is referred to one or more standing committees and then frequently to appropriate subcommittees. The views of executive departments and agencies are often solicited by the various panels. Hearings and markups are held and then the bill may be "reported out" by the full committee(s) and scheduled for consideration by the House majority leadership. After floor debate and final action in one chamber, the same steps generally are repeated in the other house. At any point in this sequential process, the bill is subject to delay, defeat, or modification. Plainly, it is easier to defeat a bill in Congress than to pass it.

**Bargaining and Compromise** Congressional procedures require measures to receive majority approval at numerous stages in the lawmaking process. All along the procedural route, strategically located committees, groups, or individuals can delay, block, or change proposals if they can form majority coalitions. Bargaining and compromise are usually necessary at each juncture to build the majority coalition that advances the bill to the next step in the legislative process. Thus, advocates of a piece of legislation must attract not just one majority but several successive majorities at each of the critical intersections along the legislative route.

**The Two-Year Congressional Cycle** To become law, every measure introduced by a lawmaker must be passed by both the House and Senate in identical form within the 2-year term of a Congress. Because Congress normally adjourns prior to the end of its 2-year term—and the House and Senate regularly schedule breaks during its first and second sessions—bills usually have less than 2 full years to wend their way through the legislative process. Measures that have not completed the required procedural journey prior to the final adjournment of a Congress automatically die and must be reintroduced in a new Congress.

Legislative deadlines, frequently influence the pace and tone of congressional activity. As the time draws near for recesses, adjournments, or statutory dates for action, pressures mount for completion of various legislation and the power of delay increases. Many lawmakers plan purposefully to take advantage of impending deadlines, the so-called "end game," to achieve their goals.

## Congress In Change

**The "Outside Strategy"** Party leaders and rank-and-file lawmakers understand that media strategies to mobilize public support are essential to move or block legislation. No longer is the "inside" game—working behind-the-scenes to line up votes in committee or on the floor—usually sufficient to pass major and controversial legislation. Also necessary is the "outside" game—influencing public opinion and creating grassroots support for policy initiatives.

Both congressional parties employ "theme teams" or "message boards" to coordinate and transmit a clear and consistent message to the public about their policy priorities. A key objective is to frame the national debate in a way that mobilizes public support behind their congressional objectives and that rebuts attacks by opponents. In short, passing major legislation in today's House and Senate usually requires combining various external campaigning techniques with internal procedural coordination. The objective of these various efforts is straightforward: to build extra-political pressure to pass—or block, as the case might be—significant legislation.

**Sharp Partisanship** Parties have always been important in the modern Congress. Among other things, they organize the House and Senate and advocate substantive agendas. Recent Congresses, however, have witnessed heightened political rancor between the parties. On votes involving party priorities, large majorities of Republicans and Democrats frequently are on opposite sides of an issue. Various factors account for the polarization. For instance, some argue that it is rooted in electoral and demographic forces that have produced greater ideological homogeneity

within each major party, which makes it difficult at times to forge bipartisan consensus on legislation.

**Unconventional Lawmaking**    Today, unconventional lawmaking is commonplace on Capitol Hill. The textbook discussion of lawmaking—introduction, referral to committee, hearings and markup, floor deliberation and conference action, and presidential consideration—remains valid for much legislation. However, for many priority measures, unconventional lawmaking is the name of the game. Party leaders and Members find new uses for old rules, employ innovative devices, or bypass traditional procedures altogether to achieve their political and policy objectives. One example is the development of legislation by partisan or bipartisan task forces rather than by standing committees. Others include such techniques as the creation of outside commissions to develop policy options, the use of "megabills" as policymaking instrumentalities, or the preparation of party leadership substitutes for committee-reported recommendations.

**Congress and the Information Age** Congress is now "wired" to a high-tech world that enables Members, party leaders, and constituents to communicate quickly and politically to shape the legislative process. Internally, communications technology is employed, for instance, to facilitate committee and floor scheduling, to transmit messages through e-mail, or to tap into various data bases on the Internet. Externally, advances in electronic technology have added a plebiscitary quality to congressional policymaking. Today, many citizens can engage in electronic advocacy and almost instantaneously make their preferences known to lawmakers. Talk radio, faxes, teleconferencing, interactive opinion polls, and computerized bulletin boards are examples of the techniques employed that might advance or block legislation.

Congress, of course, is constantly adapting to change. New procedures and processes often arise in response to evolving conditions and circumstances. Some procedural innovations are incorporated formally in the House

Exhibit MC15

**FOR NEGOTIATION PURPOSES ONLY**
**PRIVILEGED FROM DISCLOSURE UNDER FED. R. EVID. 408**

### *SUBPOENAS TO REPS. HUNTER, BILBRAY, AND ISSA – REQUEST #3*

When a domain name is listed, it is requested that the Members disclose any e-mails from the domain name that relate to Mt. Soledad or the Mt. Soledad Cross.

**Admiral Jeremiah Denton Foundation**
@dentonfoundation.org

**American Family Association**
@afa.net

**American Center for Law & Justice**
@aclj.org

**American Legion**
@legion.org

**Becket Fund for Religious Liberty**
@becketfund.org

**Christian Coalition of America**
@cc.org

**East Clairemont Baptist Church**
pastor@eastclairemont.com

**Family Research Council**
@frc.org

**Faith and Action**
@faithandaction.org

**Focus on the Family**
@family.org

**Horizon Christian Fellowship**
@horizonsd.org

**Law Offices of Charles S. Li Mandri (Lawyer with the Thomas More Law Center)**
@limandrilaw.com

**Mission Valley Christian Fellowship**
@mvcf.com

**National Clergy Council**
@nationalclergycouncil.org

**FOR NEGOTIATION PURPOSES ONLY**
**PRIVILEGED FROM DISCLOSURE UNDER FED. R. EVID. 408**


**The Pacific Justice Institute**
@pacificjustice.org

**San Diegans for the Mt. Soledad National War Memorial**
@savesoledad.com

**St. Vincent DePaul Management**
@svdpv.org

**Thomas More Law Center**
@thomasmore.org

**Individuals associated with the above-listed organizations**
Jeremiah Denton
Don Wildmon
Tim Wildmon
Jay Sekulow
Robert W. "Skip" Ash
James M. Henderson, Sr.
Laura Brown Hernandez
Ann-Louise Lohr
Francis J. Manion
Colby M. May
Vincent P. McCarthy
Thomas P. Monaghan
Stuart J. Roth
John Tuskey
Walter M. Weber
Shannon Demos Woodruff
Thomas Bock
Seamus Hasson
Rob Schenck
Dane Rose
Peggy Birchfield
Allyson Black
James Dobson
Mike MacIntosh
Charles S. LiMandri
Mark A. Ginella
Sterling J. Stires
Daniel M. Dire
Teresa L Mendoza
Richard Salpietra
Rob Schenck
Brad W. Dacus

**FOR NEGOTIATION PURPOSES ONLY**
**PRIVILEGED FROM DISCLOSURE UNDER FED. R. EVID. 408**

Kevin Snider
Matthew McReynolds
Linda Losey
Cheryl Carroll
T.J. Zane
Phil Thalheimer
Myke Shelby
Chris Clark
Joe Carroll
Richard Thompson
Teresa Mendoza
Robert Muise
Brian Rooney
Bowie Kuhn
Jeremiah A. Denton
Mary Cunningham Agee
Alan Keyes
Megan O'Neill Nini
Paul Henkels
Richard Campbell
Charles Rice
Gerard Bradley