**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————
)
JEWISH WAR VETERANS OF THE )
UNITED STATES OF AMERICA, INC., )
RICHARD A. SMITH, MINA SAGHEB, )
and JUDITH M. COPELAND, )
)
     Plaintiffs, )    Case No. 1:07-mc-00220 (JDB)
)     Case No. 1:07-mc-00221 (JDB)
v. )     Case No. 1:07-mc-00222 (JDB)
)
ROBERT M. GATES, Secretary of )
Defense, in his official capacity, )
)
    Defendant. )
———————————————————)

**DEFENDANT ROBERT M. GATES' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS
RESPONSIVE TO SUBPOENAS**

       Defendant Robert M. Gates, Secretary of Defense ("Defendant") hereby files this

memorandum in opposition to Plaintiffs' Motion to Compel Production of Documents Responsive

to Subpoenas ("Motion to Compel" or "Motion").

## I.  INTRODUCTION

       Plaintiffs brought the action underlying their Motion to Compel in the Southern District of

California, claiming that the continued display on federal land of the Mt. Soledad Veterans

Memorial is unconstitutional under the federal Establishment Clause.  In that litigation, Plaintiffs

have already sought to depose Congressmen Hunter, one of the congressmen from whom they now

seek documents.  That request was squarely denied by the Southern District of California Magistrate

Judge, which held that under well-established Supreme Court precedent the motives of a particular

legislator are not relevant to a determination of legislative purpose, and that the discovery was

protected under the Speech and Debate Clause.  E.g., Order Denying Plaintiff's Request to Compel

the Depositions of San Diego Mayor Jerry Sanders and Representative Duncan Hunter, at 6-7, 10, attached as Exhibit A ("Deposition Order").  As the California court correctly explained, Plaintiffs can assess the purpose of the statutory text at issue by reference to the statute on its face, its legislative history, and the historical context.  Id.

That decision was not appealed.  Instead, Plaintiffs now collaterally attack the Magistrate's Order in this Court, and cast the discovery net even wider, by seeking document discovery from additional Congressmen.  Plaintiffs' repackaged discovery request before this Court, however, is nothing more than an attempt to end-run the prior Magistrate's decision and constitutes a second attempt to establish "improper legislative purpose" by impermissibly examining the motives of individual lawmakers.  The California court's decision rejecting this approach is well-supported by established precedent, and provides all the substantive reasons why this motion, too, must fail.  In an Establishment Clause case similar to this, the Supreme Court itself has held that an individual legislator's motivations are irrelevant to a determination of the legislative purpose of the challenged act.  Board of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 248-49 (1990).  District of Columbia and Ninth Circuit decisions likewise uniformly hold that extra-legislative statements of individual legislators are irrelevant to legislative purpose.  See, e.g., Petry v. Block, 697 F.2d 1169, 1171 (D.C. Cir. 1983); City of Las Vegas v. Foley, 747 F.2d 1294, 1997-98 (9th Cir. 1984).

In addition, the Supreme Court has recently reaffirmed "the corollary that Establishment Clause analysis does not look to the veiled psyche of government officers," and that courts examining such a claim should confine themselves to "openly available data" such as the statute itself and its legislative history.  McCreary County, Kentucky v. Am. Civil Liberties Union of Kentucky, 545 U.S. 844, 863 (2005).

2

Accordingly, with the California court having properly decided this issue, and with Plaintiffs having failed to appeal that ruling to the district court there, Plaintiffs should not now be permitted collaterally to attack that ruling in this Court. Further, because the particular Plaintiffs bringing this motion do not challenge the legality of the underlying federal legislation, their request for discovery directed at the Members is particularly ill-founded. For all these reasons, including those raised by the House Members, Plaintiffs' Motion to Compel should be denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On July 19, 2006, the United States House of Representatives ("House") passed House Resolution 5683, "to preserve the Mt. Soledad Veterans Memorial in San Diego, California, by providing for the immediate acquisition of the memorial by the United States," by a vote of 349 to 74.[1]  H.R. Res. 5683, 109th Cong. (2006) (enacted). On August 1, 2006, the United States Senate passed the bill without amendment by Unanimous Consent. And on August 14, 2006, the President of the United States signed the bill, which became Public Law 109-272 ("Mt. Soledad Veterans Memorial Preservation Act" or "Veterans Memorial Act"). The Act vests in the United States all right, title, and interest to, and the right to immediate possession of, the Mt. Soledad Veterans Memorial in San Diego, California, to provide for its preservation as a national war memorial honoring veterans. Pub. L. No. 109-272, 120 Stat 770 (2006).

Two actions, later consolidated, raised Establishment Clause challenges to the Mt. Soledad Veterans Memorial:  Trunk, et al. v. City of San Diego, et al., No. 06-cv-1597 (amended complaint

---

[1]     H.R. 5683 was introduced by Congressman Hunter and cosponsored by United States Representatives Brian P. Bilbray and Darrell E. Issa. United States Senators Jeff Sessions and John McCain sponsored separate bills in the United States Senate that were essentially identical to H.R. 5683. See S. 3683, 109th Cong. (2006); S. 3688, 109th Cong. (2006).

3

filed Sept. 8, 2006), see Exhibit B; and Jewish War Veterans of the United States, et al. v. Gates, No. 06-cv-1728 (complaint filed Aug. 24, 2006), see Exhibit C.  Plaintiffs in both cases contend that the United States' display of the Memorial violates the Constitution's Establishment Clause, and seek declaratory and injunctive relief to that effect.[2]  The two cases were consolidated by order of the California court on September 22, 2006.  See Exhibit D.

In August 2006, Plaintiff Trunk sought to depose Congressman Hunter regarding the "purpose" behind the Mt. Soledad Veterans Memorial Preservation Act.  The United States and Congressman Hunter opposed the deposition and Plaintiff Trunk moved to compel Congressman Hunter's deposition regarding the purpose of the Mt. Soledad Veterans Memorial Preservation Act. Deposition Order at 3.  The Jewish War Veteran ("JWV") Plaintiffs joined this motion.  See Deposition Order at 2 n.1; Exhibit E (March 26, 2007, letter from Jonathan Siegelbaum).

On April 2, 2007, the California federal court denied Plaintiffs' motion in all respects, stating three rationales for its ruling.  First, the deposition was precluded under the Speech or Debate clause of the United States Constitution.  Deposition Order at 6-7.  Second, the information sought by the deposition was not relevant to the Establishment Clause inquiry, as even the cases cited by Plaintiffs emphasize that courts should evaluate such a claim by reference to the statutory text, its legislative history and the statute's historical context–not by reference to the individual motivations of legislators.  Deposition Order at 6-9.  Third, the court exercised its discretion to deny the requested discovery as "unnecessarily duplicative," since Plaintiffs already have not only the statutory text and legislative history at issue, but a significant amount of other alternative source material too. Deposition Order at 9-11.

---

2       Although the JWV Plaintiffs do not challenge the acquisition of the Memorial by the United States, Plaintiffs in the consolidated case have brought such a challenge.

JWV Plaintiffs separately served subpoenas on three Members of Congress to produce documents relating to (1) public statements by the Members regarding the Veterans Memorial; and (2) communications by the Members with certain interest groups, with the Executive branch, and with the City of San Diego regarding the Veterans Memorial ("production requests"). Plaintiffs' Memorandum at 10. On April 9, 2007, the House Members objected to JWV Plaintiffs' subpoenas. Although no Plaintiff sought challenged the California federal court's ruling denying virtually similar discovery, see Fed. R. Civ. P. 72, Plaintiffs then filed the Motion to Compel with this Court.

## III.  ARGUMENT

Plaintiffs' motion here fails for any one of three reasons: (1) as the California federal court recently ruled in a decision not challenged by Plaintiffs, discovery directed to individual legislators about their motives or intent in passing a particular law is utterly irrelevant to the proper inquiry under the Establishment Clause; (2) that Plaintiffs are now bringing this motion in this Court, rather than challenging the California federal court's ruling on virtually the same issue, should likewise foreclose this motion, given the obvious collateral estoppel concerns prompted by Plaintiffs' efforts here; and (3) as with the California federal court, this Court should also reject Plaintiffs' motion as a discretionary matter, given that Plaintiffs already have the statutory text, legislative and other materials already bearing on the "historical context" surrounding passage of the 2006 federal legislation. That JWV Plaintiffs bringing this particular motion have not even directly challenged the federal takings legislation itself makes it all the more clear that Plaintiffs' discovery demand here is an unabashed fishing expedition, one that this Court should also reject.[3]

---

3    Additionally, Defendant Gates joins in the Non-Party's arguments, set forth in the Memorandum in Support of the Non-Parties' Opposition to Plaintiff JWV's Motion to Compel Production of Document Responsive to Subpoenas, that based upon the absolute privileged under the Speech or Debate Clause, this Court should reject Plaintiff JWV's discovery demand.

### A.    The Requested Discovery is Not Relevant to the Issues in This Case

#### 1.    Establishment Clause Background

As indicated above, Plaintiffs' liability theory under the Establishment Clause relies on the

Supreme Court's three-part test in Lemon v. Kurtzman, 403 U.S. 602 (1971): (1) that the statute

must have a secular legislative purpose; (2) that the primary or principal effect of the statute must

be one that neither advances nor inhibits religion; and (3) that the statute must not foster an

excessive government entanglement with religion. Id. at 612-13.

The so-called Lemon test is not the sole legal test under the Establishment Clause. See, e.g.,

Am. Civil Liberties Union of Kentucky v. Mercer County, Kentucky, 432 F.3d 624, 635 (6th Cir.

2005) (citing seven Supreme Court decisions since 1983 deciding Establishment Clause challenges

without applying Lemon). In Van Orden v. Perry, 545 U.S. 677 (2005), the Supreme Court

determined that, as to a Ten Commandments display on state Capitol grounds, the Lemon test "is

not useful." Id. at 686. The Court looked instead to the "nature of the monument and . . . our

Nation's history." Van Orden, 545 U.S. at 686. The Court also indicated that governmental purpose

may remain relevant, at least when there is clear evidence of a primarily religious purpose. See id.,

545 U.S. at 691 n. 11 ("[W]e need not decide in this case the extent to which a primarily religious

purpose would affect our analysis because it is clear from the record that there is no evidence of such

a purpose in this case.").

#### 2.    The Motives and Statements of Individual Legislators are Irrelevant to Any Determination of Legislative Purpose

Plaintiffs request documents relating to public statements by the Members and

communications by the Members with certain interest groups, with the Executive branch, and with

the City of San Diego. Plaintiffs' Memorandum at 10. All these requests share a common flaw:

they serve no purpose other than discerning the Members' motives in supporting the Mt. Soledad legislation and, as such, are an improper search for legislative motive. Because discovery of the motives of individual legislators is irrelevant to any determination of legislative purpose, these documents are not a proper subject for discovery.

In Board of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 248-49 (1990), the Supreme Court, in an Establishment Clause case, considered the very question at issue here, namely whether an individual legislator's motivations in enacting a statute are relevant to a determination of the legislative purpose of the challenged act. The Court held that even if some legislators were motivated by religious interests, "that alone would not invalidate the Act, because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law." Id. at 249. Thus, because Plaintiffs' production requests are likewise aimed at establishing subjective motives or considerations underlying the Mt. Soledad legislation, they too are entirely irrelevant to the objective legal purpose of the statute.

In accord with Mergens, Ninth Circuit precedent expressly precludes discovery of legislators' motives to determine legislative purpose. In City of Las Vegas v. Foley, 747 F.2d 1294 (9th Cir. 1984), the Ninth Circuit considered whether a party could depose city officials to determine their "motives" for enacting a zoning ordinance. Relying on long-standing Supreme Court precedent, the Ninth Circuit held that the legislative motives of individual legislators were not properly discoverable. Id. at 1297-98 (citing Michael M. v. Superior Court, 450 U.S. 464, 469-70 (1981); United States v. O'Brien, 391 U.S. 367, 383-84 (1968); Tenney v. Brandhove, 341 U.S. 367, 377 (1951); Arizona v. California, 283 U.S. 423, 455 (1931); Soon Hing v. Crowley, 113 U.S. 703, 710-11 (1885); Fletcher v. Peck, 10 U.S. 87, 130-31 (1810); May v. Cooperman, 572 F. Supp. 1561,

1564 n.2 (D.N.J. 1983) (state legislators could not be deposed to determine the purpose of a "moment of silence" law challenged under the First Amendment)).  In barring "inquiry into the motives of legislators," the Ninth Circuit reasoned that:

> such inquiries are a hazardous task.  Individual legislators may vote for a particular statute for a variety of reasons. 'The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.'

Foley, 747 F.2d at 1297-98 (quoting Soon Hing, 113 U.S. at 710-11) (internal citations omitted).

Just as inquiry into a legislator's motives is improper, extra-legislative statements by individual Members regarding legislation are not indicative of legislative purpose.  See, e.g., National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 639 n.34 (1967) (holding that postenactment remarks represent only the personal views of the legislators and do not serve as reliable indicators of congressional intent); Montana Wilderness Ass'n v. U.S. Forest Service, 655 F.2d 951, 956-57 n.10 (9th Cir. 1981) ("In general, off-the-record views of congressmen are not attributed to Congress as a whole."); Cook Inlet Native Ass'n v. Bowen, 810 F.2d 1471, 1475 (9th Cir. 1987) ("[S]tatements of a former legislator after a bill's passage are entitled to no weight"); Nevada Employees' Ass'n v. Bryan, 916 F.2d 1384, 1389 (9th Cir. 1990) (holding that postenactment statements by legislators are afforded little deference in the determination of legislative intent); Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1456-57 (9th Cir. 1992) (declining to consider remarks of sponsoring legislator and holding that such remarks cannot override the plain meaning of the statute).  In short, well-settled Supreme Court and Ninth Circuit precedent firmly establishes that any extra-legislative statements by the individual Members about their reasons for sponsoring the Mt. Soledad Veterans Memorial Preservation Act are irrelevant to a determination of its legislative purpose and should not be the subject of discovery.

The D.C. Circuit is in agreement that extra-legislative remarks by individual legislators are irrelevant to the legislative purpose of a statute. In Walsh v. Brady, 927 F.2d 1229, 1232-33 (D.C. Cir. 1991), for example, the court considered the language and legislative history of a 1988 amendment to the Trading With the Enemy Act. The appellant had offered a letter from the amendment's sponsor in support of his interpretation of the amendment. 927 F.2d at 1233. The court refused to consider this letter, describing it as "oxymoronic 'subsequent legislative history,'" and declaring that it could "add nothing" to its analysis of the purpose of the amendment. 927 F.2d at 1233 n.2. See also Petry v. Block, 697 F.2d 1169, 1171 (D.C. Cir. 1983) (reversed a district court decision because it had erroneously relied on extra-legislative statements of legislators involved in the enactment process) (citations omitted); Am. Fed'n of Gov't Employees v. Reno, 992 F.2d 331, 335 (1993) (extra-legislative remark by congressman entitled to little weight in interpreting statute).

Consistent with this authority, the California federal court appropriately denied Plaintiffs' attempt to compel the deposition of Congressman Hunter. The court held that First Amendment jurisprudence does not turn on the motives of legislators. Deposition Order at 9 (quoting Foley, 747 F. 2d at 1298). The court reasoned that its inquiry should consider objective factors indicating legislative purpose, and that the subjective motive of Congressman Hunter was irrelevant to such determination. Deposition Order at 7-9. The court concluded:

> Allowing discovery of legislative motives . . . would not only create a major departure form the precedent rejecting the use of legislative motives, but is also inconsistent with basic analysis under the First Amendment which has not turned on the motives of the legislators, but on the effect of the regulation.

Discovery Order at 9 (quoting Foley, 747 F.2d at 1297-98).

This reasoning applies with equal force to Plaintiffs' production requests. As explained above, Plaintiffs' attempt to distinguish the previous attempt at deposing Congressman Hunter is

9

illusory.  The documents which Plaintiffs request are simply irrelevant to legislative purpose; arguing that they indicate "historical context" does not cure this flaw.

Plaintiffs argue that "documents relating to the non-legislative conduct of legislative sponsors may be highly relevant to proving the government's religious purpose."  Plaintiffs' Memorandum at 14.  The cases cited by Plaintiffs, however, are off-point.  The Supreme Court in McCreary, in fact, made clear that the documents Plaintiffs seek have no relevance here.  In Establishment Clause cases, one does not "look to the veiled psyche of government officers." McCreary County, 545 U.S. at 863.  The Court explained:

> If someone in the government hides religious motive so well that the objective observer, acquainted with the text, legislative history, and implementation of the statute cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides.  A secret motive stirs up no strife and does nothing to make outsiders of nonadherents . . . .

Id. (internal citations omitted).  Thus, rather than a futile attempt to discover a "secret motive," the proper inquiry considers "openly available data."  Id.   Indeed, that is what the McCreary Court considered, relying on matters of public record, such as county resolutions and official ceremonies, and looking to the governmental action itself.  See 545 U.S. at 850-56.

The two recent Ten Commandment cases make clear that the documents requested by Plaintiffs have no role in this case.  The McCreary ruling focuses almost exclusively on legislative purpose and a requirement that such purpose be neutral as to religious belief.  See 545 U.S. at 873-75.  In Van Orden, the Court considered the nature of the monument at issue and historical analysis. 545 U.S. at 686.  None of Plaintiffs' requested documents have any bearing on any of these considerations.  Their motion should be denied accordingly.

### 3.    The Requested Documents Are Not Relevant to the Remaining *Lemon* Prongs

Nor do the remaining two prongs of the <u>Lemon</u> test make Plaintiffs' discovery demands any more relevant.  The second prong of <u>Lemon</u> – whether the governmental action has a primary or principal effect of advancing or disapproving of religion – considers whether the action is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." <u>Vasquez v. Los Angeles County</u>, No. 04-56973, 2007 WL 1412671, at *10 (9th Cir. 2007) (citation omitted).  The proper inquiry looks at the point of view of a "reasonable observer who is 'informed . . . [and] familiar with the history of the government practice at issue.'" <u>Id.</u>; see <u>Am. Jewish Cong. v. Corp. for Nat'l and Cmty. Serv.</u>, 399 F.3d 351, 356 (D.C. Cir. 2005).  The primary question is "whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." <u>Vision Church v. Village of Long Grove</u>, 468 F.3d 975, 993 (7th Cir. 2006); <u>see</u> <u>Am. Jewish Cong</u>, 399 F.3d at 356.

In other words, information which is not publicly available – not known by the "informed, reasonable observer" – is irrelevant to the Establishment Clause analysis. <u>McCreary County</u>, 545 U.S. at 863.  But again, Plaintiffs' production requests principally demand communications with the Executive branch and other parties that are not part of the public record.  As such, a "reasoned observer, familiar with the history of the government practice at issue," would <u>not</u> be aware of the contents of the communications Plaintiffs wish to discover.  The "secret effect" that Plaintiffs so diligently attempt to uncover is simply not relevant, because it is not the "openly available data" properly considered under the Establishment Clause inquiry. <u>See, e.g., id</u> .  To the degree that such

information is in fact part of the public record, Plaintiffs already have access to it and have no need to obtain it from the Members.

Plaintiffs' claims about needing such intrusive discovery for purposes of Lemon's "excessive-government-entanglement" prong fare no better. The government entanglement prong arises in cases (unlike here) involving government "programs, whose very nature is apt to entangle the state in details of administration." Jimmy Swaggart Ministries v. Bd. Of Equalization of California, 493 U.S. 378, 393 (1990) (quoting Walz v. Tax Comm'n of New York City, 397 U.S. 664, 695 (1970) (Harlan, J., concurring) (emphasis added). The test turns on government action that involves intrusive government participation in, supervision of, or inquiry into religious affairs. U.S. v. Indianapolis Baptist Temple, 224 F.3d 627, 631 (7th Cir. 2000).

Here, by contrast, Plaintiffs' discovery demands focus on communications and other alleged documents underlying the enactment of the subject federal legislation, legislation which Plaintiffs have not even challenged in their complaint. But passage of the Mt. Soledad Veterans Memorial Act does not require government contact with any religious organization, nor does it entail supervision or administration of religious affairs. Indeed, protection of a historically or culturally significant site, such as the Mt. Soledad War Memorial, does not result in excessive entanglement even if the site's importance derives in part from its sacredness to certain groups. See Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 976-977 (9th Cir. 2004). Plaintiffs' argument here effectively seeks to turn on its head the Supreme Court's established view that the Establishment Clause inquiries rely on an analysis of "openly available" and objective evidence such as statutory text and legislative history, not the "secret" legislative history that Plaintiffs are trying to compel here, see McCreary, 545 U.S. at 863 ("secret [legislative] motive stirs up no strife" and cannot support

Establishment Clause claim).  Not surprisingly, then, Plaintiffs' contrived entanglement rationale – that any contact by legislators with religious groups amounts to excessive entanglement – has no support in the case law.

4.    **Because Plaintiffs Have Not Directly Challenged the Constitutionality of the Mt. Soledad Veterans Memorial Act, Any Discovery Directed At the Members is Irrelevant**

Plaintiffs' Complaint challenges the display of a cross within the Mt. Soledad Veterans Memorial and requests injunctive relief against the "continued display" of the cross.  Plaintiffs' Complaint ¶ 1, p. 18 (Prayer for Relief).  However, Plaintiffs do not directly challenge the underlying legislation.  Because the legality of the Mt. Soledad Veterans Memorial Act is not put at issue by claims raised in Plaintiffs' Complaint, there is no basis for the Plaintiffs' attempts at obtaining discovery from the Members.  Public statements and communications by the Members have no bearing on the continued display of the Memorial and whether it comports with the Establishment Clause, the only issues raised by Plaintiffs' Complaint.  Accordingly, the Motion to Compel must be denied.[4]

5.    **The Legislative History of the Mt. Soledad Veterans Memorial Act is Readily and Publicly Available**

In its <u>Deposition Order</u>, the California federal court also precluded Plaintiffs' demand for House discovery, as a discretionary matter, because Plaintiffs not only had the statutory text and legislative history at issue, but also had significant amounts of alternative source material available. <u>Deposition Order</u> at 9-10.  This alternative material, all of which the court found available to

---

[4]    Although it is true that the California court has ordered that discovery in each of the consolidated cases shall be considered as propounded in the other, the court has also issued an order seriously questioning whether the challenge to the Veterans Memorial Act in the consolidated case is justiciable.  <u>See</u>, respectively, Exhibit F and Exhibit H.

Plaintiffs, includes the plain language of the Mt. Soledad Veterans Memorial Act itself, the contemporaneous legislative history of the Act, and the historical context of the statue. Deposition Order at 10. In fact, the court noted that Plaintiffs already possessed much of this material, and that it had been attached as exhibits to his brief. Id. This Court should similarly deny Plaintiffs' motion to compel here.

### B. Collateral Estoppel Bars Relitigation of this Issue

As noted above, Plaintiff Trunk moved before the California court, and JWV Plaintiffs joined this request, to order the deposition of Congressman Hunter "to question the lawmaker about 'the purpose of [the Mt. Soledad] legislation.'" Deposition Order at 3. Plaintiffs now seek documents from three Members relating to statements and communications by the Members concerning the same legislation. They admit that the discovery they now seek is relevant "to proving the government's religious purpose." Plaintiffs' Memorandum at 14. That Plaintiffs seek documentary evidence rather than deposition testimony is of no moment – both requests seek discovery from Members of Congress in an attempt to show that the Members acted with illicit purpose.

As explained earlier, the California court refused to order the depositions of lawmakers, holding that the subjective motive of Congressman Hunter (and San Diego Mayor Sanders) are irrelevant to the matters at issue in the case. Deposition Order at 7-9. Plaintiffs now attempt to distinguish the court's Deposition Order by arguing that they are not discovering the motives of the Members, but instead merely establishing the "historical context" and "sequence of events leading up to" the statute's passage. Plaintiffs' Memorandum at 17-19. But this parsing of words is not persuasive, particularly since Plaintiffs concede that, as with the attempt to depose Congressman Hunter, they are attempting to prove legislative purpose. Plaintiffs' Memorandum at 14-15. Indeed,

in a recent letter to the California Magistrate Judge, Plaintiffs emphasized the identical nature of the two discovery requests. See Exhibit E, p. 2 (noting that Plaintiffs' production requests seek the same information as that at issue in the Deposition Order).

In short, collateral estoppel and law-of-the-case principles bar Plaintiffs from relitigating this issue in this Court because (1) the same issue now being raised was contested and submitted for judicial determination in the prior case; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the prior case; and 3) preclusion in this case before this Court would not work a basic unfairness to JWV Plaintiffs. See Martin v. Dep't of Justice, No. 05-5207, 06-55048, 2007 WL 1574605, at *4 (D.C. Cir. 2007) (quoting Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)).[5]

First, as explained above, the underlying issue here is identical to that decided by the California federal court – whether discovery of the Members' motives in sponsoring the Mt. Soledad legislation is relevant to Plaintiffs' Establishment Clause claim. Second, the California court's Deposition Order actually, expressly and necessarily determined this issue in holding that evidence of the Members' motives is irrelevant. Deposition Order at 7-8.

Third, there is no indication that applying collateral estoppel would be unfair to the Plaintiffs. The underlying cases were consolidated well before the motion to compel the deposition was filed.

---

5    For collateral estoppel to apply, the judgment or order at issue must be final. See Consolidated Edison of NY v. Bodman, 449 F.3d 1254, 1258 (D.C. Cir. 2006). Because the Deposition Order was not objected to in a timely manner, the order is final and may not be challenged. See Fed. R. Civ. Pro. 72(a); see also 28 U.S.C. § 636(b)(1) (objections must be served and filed within ten days of magistrate judge's order). While this Court has questioned whether a Magistrate Judge's discovery order is a final order for purposes of collateral estoppel, In re Subpoena, 370 F. Supp. 2d 201, 205 (D.D.C. 2005), aff'd 439 F.3d 740 (D.C. Cir. 2006), the Court did not decide the issue and ruled on other grounds that collateral estoppel did not apply, 370 F. Supp. 2d at 206.

Cf. Exhibit D (Order Consolidating Cases 9/22/06) with Exhibit F (Request to Compel Deposition 2/22/07).  The California court has ordered that discovery in each of the consolidated cases shall be considered as propounded in the other.  See Exhibit G.  Plaintiffs are parties to the consolidated action in the California court and joined in moving the court to compel the deposition.  See Deposition Order at 2, n.1; Exhibit E.  Plaintiffs had every opportunity fully to participate in resolution of the deposition issue, and presented arguments in support of the deposition to the court. See id.  There is no question that Plaintiffs are bound by the court's Deposition Order.  Accordingly, they are collaterally estopped from relitigating that issue here.[6]

### IV. CONCLUSION

For all the reasons detailed in this memorandum, as well as those raised separately by the House Members, Plaintiffs' motion to compel is precluded by collateral estoppel and seeks irrelevant information.  Plaintiffs' Motion to Compel should be denied.

Dated: June 13, 2007

Respectfully Submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

RYAN D. NELSON
Deputy Assistant Attorney General

/s/ Jennifer L. Allaire
JENNIFER ALLAIRE, NJ Bar ##4419-2002
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 663

---

6    Plaintiffs' Memorandum makes clear that they are indeed attempting to relitigate the issue determined by the Deposition Order.  See Plaintiffs' Memorandum at 18 n. 3.

Washington, D.C.   20044-0063
Tel: (202) 305-0456
Fax: (202) 353-2021

DAVID NEGRI
U.S. Department of Justice
Environment and Natural Resources Division
c/o U.S. Attorney's Office, District of Idaho
800 Park Boulevard, Suite 600
Boise, ID 83712-9903
Tel: (208) 334-1936
Fac: (208) 334-1414

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing DEFENDANT'S

MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION

OF DOCUMENTS RESPONSIVE TO SUBPOENAS , and [PROPOSED] ORDER was served on

June 13, 2006, by Electronic Case Filing or by regular United States mail, first-class postage pre-

paid, and telefax or electronic mail, unless otherwise noted below, on the following counsel:

Jonathan H Siegelbaum, Esq.
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania N.W.
Washington, D.C.   20006
Email: jonathan.siegelbaum@wilmerhale.com

Kerry W. Kircher, Deputy General Counsel
Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.   20515
Email:  kerry.kircher@mail.house.gov

/s/ *Jennifer L. Allaire*
JENNIFER L. ALLAIRE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ) | |
| JEWISH WAR VETERANS OF THE ) | |
| UNITED STATES OF AMERICA, INC., ) | |
| RICHARD A. SMITH, MINA SAGHEB, ) | |
| and JUDITH M. COPELAND, ) | |
| ) | |
| Plaintiffs, ) | Case No. 1:07-mc-00220 (JDB) |
| ) | Case No. 1:07-mc-00221 (JDB) |
| v. ) | Case No. 1:07-mc-00222 (JDB) |
| ) | |
| ROBERT M. GATES, Secretary of ) | |
| Defense, in his official capacity, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**[PROPOSED] ORDER**

Upon consideration of Plaintiffs' Motion to Compel Production of Documents Responsive to Subpoenas ("Motion"), the Opposition of Non-Party the Honorable Darrell Issa, the Honorable Duncan Hunter, and the Honorable Brian Bilbray to Plaintiffs' Motion to Compel Production of Documents Responsive to Subpoenas, Defendant's Opposition to Plaintiffs' Motion to Compel Production of Documents Responsive to Subpoenas, and the entire record herein, the Motion is denied.

SO ORDERED.


Date: _____          _____

HON. JOHN D. BATES
United States District Judge

# EXHIBIT A

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11   STEVE TRUNK and PHILIP K. PAULSON,     )   Case No. 06 CV 1597 BTM (WMc)
                                            )
12                      Plaintiffs,         )   **ORDER DENYING PLAINTIFF'S**
                                            )   **REQUEST TO COMPEL THE**
13   v.                                     )   **DEPOSITIONS OF SAN DIEGO**
                                            )   **MAYOR JERRY SANDERS AND**
14   CITY OF SAN DIEGO, UNITED STATES       )   **REPRESENTATIVE DUNCAN**
     OF AMERICA, DONALD H. RUMSFELD,        )   **HUNTER**
15   Secretary of Defense and DOES 1 through)
     100, Inclusive                         )
16                                          )
                      Defendants.           )
17                                          )
     MOUNT SOLEDAD MEMORIAL                 )
18   ASSOCIATION, Real Parties in interest. )
                                            )
19   JEWISH WAR VETERANS OF THE             )
     UNITED STATES OF AMERICA, INC.,        )
20   RICHARD A. SMITH, MINA SAGHEB, and     )
     JUDITH M. COPELAND,                    )
21                                          )
                      Plaintiffs            )
22                                          )
     v.                                     )
23                                          )
     DONALD H. RUMSFELD, Secretary of       )
24   Defense, in his official capacity,     )
                                            )
25                    Defendant.            )
     _____)

26

27   ///

28   ///

## I.

## INTRODUCTION

Plaintiff Trunk has requested the right to depose Congressional Representative Duncan Hunter and the City of San Diego Mayor Jerry Sanders. The U.S. Attorney's Office and the Office of the City Attorney denied Plaintiff's requests.[1] On March 27, 2007, the Court heard oral argument on Plaintiff's Request to Compel the Depositions of Mayor Sanders and Representative Hunter. After hearing from counsel of record as well as careful consideration of Plaintiff's request to compel, all opposition briefs, and the reply briefs, for the reasons set forth below Plaintiff's Request to Compel the Depositions of Representative Hunter and Mayor Sanders is **DENIED without prejudice**.

## II.

## BACKGROUND

This case arises out of an action brought by Plaintiff Steve Trunk under the Establishment Clause of the First Amendment to the United States Constitution seeking to "declare the transfer of the Mt. Soledad cross, the memorial surrounding it and the land under it to the U.S.A., void *ab initio* in that the transfer was unconstitutional." [Doc. No.30 - FAC, para.14.]

Mayor Sanders wrote a May 11, 2006 letter to President George W. Bush in support of the City's transfer of the Mt. Soledad National War Memorial to the National Park Service. [ Doc. No. 93-2, Exh. 10 to P's Request to Compel.] Representative Hunter co-sponsored H.R. 5683, 109th Cong. (2nd Sess.2006), a bill that was subsequently passed and is now the law at issue in this litigation which authorized the United States to acquire the Mount Soledad Veterans Memorial. [Doc. No.98-1, Hunter's Opposition, p2, ln.19-24.]

Plaintiff informally asked to depose Representative Hunter and Mayor Sanders and was refused. It appears that, at least as to Representative Hunter, Plaintiff did not follow his informal request for a deposition with a formal deposition subpoena to the U.S. Attorney's office. [Doc. No. 93-1, p.2, ln.14-18.; Doc. 98-1, p.1, ln. 24-25]

---

[1] By order of the Honorable Barry T. Moskowitz, this case has been consolidated with *Jewish War Veterans vs. Donald H. Rumsfeld, et al., 06cv1728*. Plaintiff Jewish War Veterans ("JWV") joins in the motion of Plaintiff Trunk. Thus, when the Court refers to "Plaintiff" it shall be referring to both Trunk and JWV.

### III.

### ARGUMENTS

**A. Plaintiff Trunk's Request to Depose Representative Hunter and Mayor Sanders**

Plaintiff requests the right to depose Representative Hunter and Mayor Sanders in order to question the lawmakers about "the purpose of [H.R. 5683] legislation" they sponsored or endorsed. [Doc. No. 93-1, p.1, ln.26 - p.2, ln.6.] Plaintiff contends that his proposed line of questioning "may be dispositive on the issue of whether such a transfer violates both the California and United States Constitutions." [Doc. No. 93-1, p.2, ln.7-10.] Plaintiff further argues that the deposition testimony he requests is relevant to the information analyzed by the courts under the purpose prong of the three-part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). [Doc. No. 93-1, p.11, ln.15-18.]

Plaintiff proposes "limited" depositions for both Representative Hunter and Mayor Sanders, covering only the issues of "purpose, intent, preference and aid" with respect to H.R. 5683**.** [Doc. No. 93-1, p.19, ln.4-7.]

**B. Defendants' Arguments**

**1. Opposition of Representative Hunter**

Congressman Hunter objects to Plaintiff's Request to Compel on the ground that Plaintiff failed to issue or serve him with a deposition notice or subpoena. [Doc. No. 98-1, p.1, ln.24-26.] Congressman Hunter also argues that: (1) the testimony Plaintiff seeks to elicit is privileged and barred absolutely by the Speech or Debate Clause of the Constitution, and (2) Plaintiff has failed to establish the exceptional circumstances necessary to compel a sitting Member of Congress to appear for a non-party deposition. [Doc. No. 98-1, p.2, ln.2-11.]

**2. Opposition of the United States and Secretary of Defense ("Federal Defendants")**

Federal Defendants argue that Supreme Court and Ninth Circuit case law hold a legislator's post-enactment statements are irrelevant to the determination of legislative purpose. [Doc. No. 99, p.4, ln.15 - p.5, ln.23.] Further, Federal Defendants assert that case law applying the improper purpose inquiry under *Lemon v. Kurtzman*, 403 U.S. 602 (1971) support a denial of Plaintiff's

1   request to compel because such case law suggests that the Establishment Clause analysis must be

2   conducted by reviewing the plain language of the statute, contemporaneous legislative history,

3   historical context and the sequence of events leading to the passage of the statute. [Doc. No. 99, p.6,

4   ln.20-27.]

5        **3.  Opposition of Mayor Sanders**

6        Mayor Sanders notes that while Plaintiff has moved to compel his deposition, Plaintiff has

7   not pursued any other methods of discovery from the Mayor including written interrogatories,

8   requests for admission or requests for production of documents.  [Doc. No. 100, p. 3, ln.13-15.]

9   Further, Mayor Sanders argues that it does not oppose joint discovery from Plaintiff Trunk and the

10  JWV Plaintiffs, and it is therefore premature for the Court to order a deposition before a joint

11  discovery plan is even established.  [Doc. No. 100, p. 7, ln.13-15.]

12       The Mayor also notes that he has now assumed all of the executive responsibilities

13  previously assigned to the City Manager under the"Strong Mayor" form of government set forth in

14  Article XV of the City of San Diego Charter, which took effect on January 1, 2006. [Doc. No. 100,

15  p. 4, ln.11-16.]  He argues that Plaintiff has not presented compelling reasons to require his

16  deposition, nor has Plaintiff shown that the information he seeks from the Mayor is unavailable from

17  other sources.  [Doc. No. 100, p. 5, ln.20 - p. 6, ln. 2.] Finally, the Mayor joins in the arguments

18  posited by Congressman Hunter and the Federal Defendants arguing that Plaintiff should not be

19  allowed to depose him regarding his conversations with federal lawmakers and thereby circumvent

20  the privilege afforded by Speech or Debate Clause.  [Doc. No. 100, p. 7, ln.17-19.]

21                                          **IV.**

22                                      **STANDARDS**

23  **A.      Subpoenas  - Fed.R. Civ. P. 45**

24       Under Rule 45 of the Federal Rules of Civil Procedure a subpoena is required to command

25  non-parties to attend and give testimony at a deposition.  Fed. R. Civ. P. 45(a)(2)(B).

26  **B.      Discovery Under Fed. R.Civ. P. 26**

27       In general, a party has the right to discovery of any matter, not privileged, that is relevant to

28  the claim or defense of any party.  Fed. R. Civ. P. 26(b)(1).  Thus, the scope of discovery under Rule

4

1   26 is broad. Discovery may be sought of relevant information not admissible at trial if the discovery

2   appears reasonably calculated to lead to the discovery of admissible evidence. *Id.* The Court,

3   however, may limit discovery if it can be obtained from another source that is more convenient, less

4   burdensome or less expensive or if the proposed discovery is overly burdensome. Fed. R. Civ. P.

5   26(b)(2).

6   **C.    Privileges**

7        **1.    Speech or Debate Privilege - U.S. Const. Art. I, § 6, cl. 1.**

8        The Speech or Debate Clause of the United States Constitution provides: "For any Speech

9   or Debate in either House [Senators and Representatives] shall not be questioned in any other

10  Place." U.S. Const. Art. I, § 6, cl. 1. The privilege protects speech and other activities undertaken

11  by members of Congress who are acting within a legitimate legislative sphere. *Eastland v. United*

12  *States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975). The legislative sphere includes those

13  activities that: (1) are an integral part of the deliberative and communicative processes by which

14  Members participate in House proceedings and (2) address proposed legislation. *Miller v.*

15  *Transamerican Press, Inc*., 709 F.2d 524, 529 (9th Cir. 1983). Examples of protected legislative

16  activities include obtaining information regarding possible legislation or committee investigations.

17  *Id.* at 530. In addition, the Speech or Debate clause precludes inquiry into the motivation or

18  purposes of a legislative act. *Id.; see also U.S. v. Brewster,* 408 U.S. 501, 525 (1972)("[T]he Speech

19  or Debate Clause protects against inquiry into the acts that occur in the regular course of the

20  legislative process and into the motivation for those acts.")

21       **2.    General Privilege of Limited Immunity From Deposition For**

22         **Top Government Officials**

23       Federal courts recognize the general rule that high-ranking government executives are not

24  normally subject to deposition, especially where they have no personal knowledge essential to the

25  case at issue. *Kyle Engineering Co. V. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979); *Green v. Baca*,

26  226 F.R.D. 624, 648 (C.D. Cal. 2005); *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12

27  (D. Mass. 1990); *Hankins v. City of Philadelphia*, 1996 WL 524223, *1 E.D. Pa.).

28       Immunity from deposition is granted in order to allow top officials freedom to perform their

jobs without disruption from the discovery process.  *Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D. Wis. 1994.)  The exception to this rule applies where the government official whose deposition is sought has "direct personal factual information pertaining to material issues in the action [and] where the information to be gained is not available through any other source."  *Green*, 226 F.R.D. at 649 (citing *Church of Scientology of Boston v. IRS*, 138 F.R.D. 9, 12 ( D. Mass. 1990.); see also *Hankins*, 1996 WL 524334, *1 (E.D. Pa.) ("A party seeking the deposition of a high ranking government official must demonstrate that his testimony is likely to lead to the discovery of admissible evidence, is essential to that party's case and that his evidence is not available through any alternative source or less burdensome means.")

## V. DISCUSSION

### A.	The Deposition of Representative Hunter Is  Precluded Under the Speech or Debate Clause.

To the extent the statements of Congressman Hunter were reported and appear in a legislative record and were the result of his legislative and communicative functions, Congressman Hunter is immune from liability.  *Hutchinson vs. Proxmire,* 443 U.S. 111, 123-128 (1979*).  It follows that he should also be protected from being deposed based on such protected statements.  In other words, the immunity should not simply protect the Congressman from liability, but also from the expense and burden of being subjected to civil discovery.[2]  Therefore, the Court finds that the testimonial privilege afforded by the Speech or Debate Clause of the U.S. Constitution prevents Plaintiff from deposing Representative Hunter  regarding his  motivations behind, or reasons for supporting, H.R. 5683.  *U.S. v. Brewster,* 408 U.S. 501, 525 (1972)*; see also City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (citing *Michael M. v. Superior Court*, 450 U.S. 464, 469-70 (1981); *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Arizona v. California*, 283 U.S. 423, 455 (1931); *Soon Hing v. Crowley*, 113 U.S. 703, 710-11 (1885); *Fletcher v. Peck*, 10 U.S. 87, 130-31 (1810); *May v. Cooperman*, 572 F.Supp. 1561, 1564 n.2 (D.N.J. 1983) (state legislators

---

[2]  Of course, any member of Congress may *voluntarily* submit himself or herself to civil discovery or other forms of civil testimony.

could not be deposed to determine the purpose of a "moment of silence" law challenged under the First Amendment).)  Moreover, statements or information an official inserted into the legislative record are covered by the privilege and questions delving into their motives for such statements or inclusion are protected from discovery. *Miller v. Transamerican Press, Inc*., 709 F.2d 524, 529 (9th Cir. 1983).

Notwithstanding the above rule, the testimonial privilege embedded in the Speech of Debate Clause does not cover statements made in press releases or newsletters prepared by, or on behalf of, the official.  *Id.*   However valuable or praiseworthy, an official's transmittal of information by press release or newsletters to inform his constituents of some noteworthy event or decision are "not part of the legislative function or the deliberations that make up the legislative process." *Id.* at 133.

### B.   The Requested Information Sought from Congressman Hunter and Mayor Sanders Is Not Relevant to the Inquiry Under the Establishment Clause

The courts employ a three prong test to determine whether a state statute violates the Establishment Clause.  First, did the legislature have a secular purpose in adopting the law?  This prong "asks whether government's actual purpose is to endorse or disapprove religion."  Second, is the principal or primary effect of the law to advance or inhibit religion?  Third, does the statute "result in an excessive entanglement of government with religion"? *Lemon vs. Kurtzman,* 403 U.S. 602,612-613 (1971).  A law that violates any of these prongs violates the Establishment Clause.  *Edwards vs. Aguillard,* 482 U.S. 578, 583 (1987).

Plaintiff has not cited any cases which support his contention that he is entitled to, or needs, the requested depositions in order to prosecute his claim under the Establishment Clause. None of the cases Plaintiff cites involve the specific issue before this Court: whether a party is entitled to, or needs, to depose the sponsors of the state statute being challenged as violative of the Establishment Clause.

The cases make it clear that, in determining the purpose of a challenged state law or act, the courts can, and do, look to numerous *objective* factors.  "A court's finding of improper purpose behind a statute is appropriately determined by the statute on its face, *its legislative*

1    *history.... the plain meaning of the statute's words*, enlightened by their context and the

2    *contemporaneous legislative history* can control the determination of legislative purpose....

3    Moreover, in determining the legislative purpose of a statute, the Court has also considered the

4    historical context of the statute...and the specific sequence of events *leading to passage* of the

5    statute...." *Edwards,* 482 U.S. at 594-595 [Citations omitted.] [Emphasis added.]. *See also*

6    *McCreary vs. ACLU,* 545 U.S. 844, 862 (2005).

7           In *Wallace v. Jaffree,* 472 U.S. 38 (1985),  the U.S. Supreme Court held as violative of

8    the Establishment Clause an Alabama statute which authorized a daily period of silence in public

9    schools for meditation or silent prayer.  State Senator Donald Holmes, the law's sponsor,  had

10   placed in the legislative record "a statement indicating that the legislation was an effort to return

11   voluntary prayer to the public schools." *Wallace,* 472 U.S. at 56-57.  Later, after the bill had

12   become law, and in a proceeding before the District Court, Senator Holmes "confirmed this

13   purpose." *Id.*   Key to the Court's decision was the fact that Senator Holmes' *statement in the*

14   *legislative record* occurred "without dissent."  The Court concluded, based on the legislative

15   record and the senator's testimonial and non-testimonial statements, that the statute had no

16   *secular* purpose and was entirely religious.  *Id.* at 57-60.  In holding the statute unconstitutional

17   the Court concluded that  "[t]he unrebutted evidence of legislative intent contained in the

18   legislative record and in the testimony of the sponsor ...is confirmed by a consideration of the

19   relationship between this statute and th two other measures that were considered in this case.

20   The District Court found that the 1981 statute and its 1982 sequel had a common, nonsecular

21   purpose.  The wholly religious character of the later enactment is plainly evident from its text."

22   *Id.* at 58.  The clear focus of the Court is on the legislative record, the events leading up to the

23   passage of the challenged statute and the statute's plain language.[3]  In other words, the Court

24   focuses on events leading up to and contemporarenous with the bill's passage.

25           *Foley vs. City of Las Vegas,* 747 F.2d 1294 (9th Cir. 1984), is also instructive.  In that

26

27          [3]  The decision indicates, without stating or clarifying, that Sen. Holmes presented "testimony".   It is unclear from
     the case whether the senator's testimony was given in a legislative session in the District Court or some other setting.  *Id.* at
28   58.  There is nothing in the Court's opinion which indicates, or lends support to the notion, that the sponsor's *testimony* was
     compelled by court process or necessary for the Court's conclusion.

1   case, the City of Las Vegas moved the District Court in mandamus for a protective order

2   prohibiting a corporation from deposing city officials to determine their motives in enacting a

3   zoning ordinance which restricted the location of sexually oriented businesses.   The corporation

4   argued that it needed the depositions in order to support its challenge that the First and

5   Fourteenth Amendments rendered the ordinance unconstitutional.  In rejecting the corporation's

6   arguments, the Ninth Circuit stated that "[t]he relevant governmental interest is determined by

7   *objective factors* as taken from the face of the statue, the effect of the statute, comparison to prior

8   law, facts surrounding enactment of the statute, the stated purpose, and the record of

9   proceedings." *Id.* at 1297.  Although not a case dealing with the Establishment Clause, the

10  factors the Court must consider in determining governmental interest are identical to the factors

11  on which the Supreme Court focused in both *McCreary*, *Edwards* and *Wallace*.   Not surprising

12  since all these cases turn on the First Amendment.   The Ninth Circuit went on to say in *Foley*:

13  "The Supreme Court has held that an otherwise constitutional statute will not be invalidated on

14  the basis of an alleged illicit legislative motive....The Court prevents inquiry into the motives of

15  legislators because it recognizes that such inquiries are a hazardous task.  Individual legislators

16  may vote for a particular statute for a variety of reasons....The diverse character of such motives,

17  and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes

18  all such inquiries as impracticable and futile." 747 F.2d., at *1297- 1298.*  (Citations omitted.)

19         Furthermore, under the rationale of *Foley*, as well as *Edwards, Wallace* and *McCreary,*

20  the requested discovery is not relevant to the determination the District Court must make.

21  "Allowing discovery of legislative motives, as Lydo suggests, would not only create a major

22  departure from the precedent rejecting the use of legislative motives, but is also inconsistent with

23  basic analysis under the First Amendment which has not turned on the motives of the legislators,

24  but on the effect of the regulation." *Id.* at 1297-1298.  (Citations omitted.)

25         **C.  Even If the Requested Information Were Relevant, the Court Exercises Its**

26  **Discretion to Prohibit the Depositions.**

27         Plaintiff has not presented exceptional circumstances which would warrant overriding the

28  Speech or Debate privilege, and a significant amount of alternative source material, other than

1  deposition testimony, is available for Plaintiff to reference with respect to his claims.    As

2  explained by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987), courts

3  determine the improper purpose behind a statute by evaluating the plain language of the statute

4  on its face, its contemporaneous legislative history and the historical context of the statute - all of

5  which is available to Plaintiff.

6         The court has discretion to determine whether to grant a motion to compel.  *See Garrett*

7  *v. City and County of San Francisco*, 818 F.2d 1515, 1519 (9th Cir, 1987); *see also Kyle*

8  *Engineering Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979) (reserving deposition of the

9  executive of the Small Business Administration until the end of discovery and ordering answers

10  to interrogatories in lieu of deposition.)

11         In exercising such discretion, the Court may limit discovery under Federal Rules of Civil

12  Procedure, Rule 26, if: (i) the discovery sought is unreasonably cumulative or duplicative, or is

13  obtainable from some other source that is more convenient, less burdensome, or less expensive;

14  (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain

15  the information sought; or (iii) the burden or expense of the proposed discovery outweighs its

16  likely benefit, taking into account the needs of the case, the amount in controversy, the parties'

17  resources, the importance of the issues at stake in the litigation, and the importance of the

18  proposed discovery in resolving the issues.  Fed. R. Civ. P. 26(b)(2).

19         Plaintiff's exhibits in support of his request to Compel demonstrate that he has a

20  significant amount of source material available to him on the issue of legislative purpose

21  including letters, legislative minutes, transcripts of recorded council meetings and quotation-

22  filled press releases.   [Doc. No. 93-2, pp. 2-65.]  Accordingly, the information Plaintiff seeks

23  through deposition will be unnecessarily duplicative.  Fed. R. Civ. P. 26(b)(2)(i).

24         Similarly, the Court finds Plaintiff has not demonstrated that the Mayor's anticipated

25  testimony is unavailable through other sources or less burdensome avenues like written

26  discovery. *Green v. Baca*, 226 F.R.D. 624, 649 (C.D. Cal. 2005.)  As discussed above, Plaintiff

27  has an abundance of legislative history and other source material to which he can he refer, and

28  indeed to which he did refer in his request to compel, to support his constitutional claims. [Doc.

///// 

No. 93-2, pp. 2-65.]

Accordingly, Plaintiff's request to depose Congressman Hunter and Mayor Sanders, is **DENIED**.

## VI.

### CONCLUSION AND ORDER THEREON

In light of the foregoing, Plaintiff's Request to Compel the Depositions of Representative Duncan Hunter and Mayor Jerry Sanders is **DENIED**.

**IT IS SO ORDERED**.

DATED: April 2, 2007

_____
Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court

COPY TO:
HONORABLE BARRY T. MOSKOWITZ, U.S. DISTRICT JUDGE
ALL PARTIES AND COUNSEL OF RECORD

# EXHIBIT B

JAMES E. McELROY, State Bar No. 079313
LAW OFFICES OF JAMES E. McELROY
625 Broadway, Suite 1400
San Diego, CA 92101

(619) 232-6686

Attorneys for Plaintiffs

FILED

2006 SEP -8 PH 4: 24

*illegible stamp text*

*illegible stamp text*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

STEVE TRUNK and PHILIP K. PAULSON

Plaintiffs,

vs.

CITY OF SAN DIEGO, UNITED STATES OF AMERICA, DONALD H. RUMSFELD, Secretary of Defense and DOES 1 through 100, Inclusive,

Defendants.

MOUNT SOLEDAD MEMORIAL ASSOCIATION, Real parties in interest.

CASE NO. 06-CV-1597 BTM (WMc)

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

## I.

## STATEMENT OF JURISDICTION

1. This action arises under the Establishment Clause of the First Amendment to the United States Constitution, the No Preference Clause of the California Constitution and the No Aid Clause of the California Constitution. The Court has jurisdiction under 28 U.S.C. § 1331, § 1343 and 42 U.S.C. §1983.

2. The Court may grant declaratory relief under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57. The Court may grant injunctive relief under Fed. R. Civ. P. 65.

- 1 -

First Amended Complaint

## II.

## PARTIES AND VENUE

3.      Plaintiff STEVE TRUNK is a citizen and resident of the United States and resides and is domiciled in the City of San Diego, San Diego County, California. He served his country in the United States Navy from 1972-73, spending most of that time in the Southeast Asia (Vietnam) theater. He is not a Christian. He pays state, local and federal taxes.

4.      Plaintiff PHILIP K. PAULSON is a citizen and resident of the United States and resides and is domiciled in the City of San Diego, San Diego County, California. He served in Viet Nam between 1966 and 1968. As an infantryman he engaged in many firefights and fought in one of the bloodiest battles of the Vietnam conflict, the battle of Dak To in November of 1967. He personally witnessed U.S. soldiers die in battle who were close to him and whom he knew were not Christians. He is not a Christian. He pays state, local and federal taxes.

5.      Defendant CITY OF SAN DIEGO is an incorporated municipality organized and existing under the laws of the State of California. Acts and omissions of the CITY of SAN DIEGO alleged herein include those of any agent, officer, or employee thereof.

6.      Defendant UNITED STATES OF AMERICA is, and at all times mentioned herein was, a governmental entity organized under Federal law with the capacity to sue and be sued. Acts and omissions of the UNITED STATES OF AMERICA alleged herein include those of any agent, officer, or employee thereof.

7.      Defendant, DONALD RUMSFELD, is the Secretary of the United States Department of Defense (DOD). Pursuant to the legislative action authorizing the taking of the Mt. Soledad property and the cross (H.R. 5683, 109th Cong. [2006] ), the DOD is now responsible for managing the Mt. Soledad property and the cross. Secretary Rumsfeld is sued in his official capacity.

8.      All acts and omissions of the federal Defendants set forth in the Complaint

occurred under color of federal law.

9.     Defendant MT. SOLEDAD MEMORIAL ASSOCIATION (MSMA), is an unincorporated association doing business in the City of San Diego. MSMA built the Cross that currently stands on Mt. Soledad, built the improvements around the cross consisting of walls, pavers, bollards and a flagpole. The Association sells plaques to be placed on the walls that surround the cross to veterans and their families. The plaques recognize living and deceased veterans, navel ships and various  military units. The Association claims an ownership or has an equitable interest in the property taken by the United States pursuant to (H.R. 5683, 109th Cong. [2006] ). The Association was also a party to a settlement between the City and Paulson, which called for moving the cross to private land, preferably a church near its existing location, for the Association to replace the cross with a secular symbol that recognized not just Christians but all veterans, for the Association to maintain some interest in the land under the cross and ownership of the cross and the  improvements  and for Paulson to dismiss his lawsuit. As of this date, the City has  refused to honor that binding settlement agreement.  The Association is a real party in interest in this action.

10.     Both STEVE TRUNK and PHILIP PAULSON served in Vietnam to protect the United States from our enemies and to protect our freedoms, including those freedoms guaranteed by the U.S. and California Constitutions. They served and defended America as Americans, not as Christians or Jews or Atheists. As such they are offended by a "war memorial" that sends a message that only Christian war veterans are being honored or remembered. This makes them feel as if their government is treating them  like second class citizens because they are not Christians and is not respecting or honoring their service as Americans, equal to all others who served.  Because of these feelings neither man is comfortable going to Mt. Soledad in the presence of the cross.  Neither enjoys the publically owned park their tax dollars support . Neither Plaintiff is comfortable at the "war memorial" because, as the courts have held repeatedly, it is a sectarian memorial which demonstrates the government's preference for one religion over all other religions

- 3 -

1   and beliefs. Both men believe that religious symbols should not communicate the

2   government's preference for one religion over all others as does the Mt. Soledad cross.

3   As such, each would visit the park and would go to the memorial to pay tribute to the

4   soldiers that served our country, as they did, but for the fact that the huge cross towering

5   over the memorial sends a message to them that their government does not feel their

6   service was as respected or worthy as that of Christians that served.

7        11.    Plaintiffs are informed and believe, and upon that basis allege, that at all

8   times mentioned herein each Defendant was and is the agent of each other Defendant and,

9   in doing or failing to do the things complained of, was acting within the scope of said

10  authority.

11       12.    All relevant acts and omissions at issue occurred in this judicial district.

12       13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a

13  substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in

14  the Southern District of California, and because some Defendants reside in the Southern

15  District of California.

16                                    **III.**

17                              **INTRODUCTION**

18       14.    This action seeks to declare the transfer of the Mt. Soledad cross, the

19  memorial surrounding it and the land under it to the U.S.A., void *ab initio* in that the

20  transfer was unconstitutional and the acts taken in its furtherance by both Defendant City

21  and U.S.A. violated the Establishment Clause of the of the U.S. Constitution and the No

22  Preference and No Aid clauses of the California Constitution. This action further seeks to

23  have the law authorizing the transfer declared unconstitutional in that the First

24  Amendment to the United States Constitution states that Congress shall make no law

25  respecting an establishment of religion", yet the purpose and intent of HR 5683 was

26  explicitly to "save the cross", the preeminent and most powerful religious symbol in our

27  country on the apex of public park and memorial. The Plaintiffs also bring this action to

28  enjoin  the display of the Latin cross, a sectarian symbol that shows preference for one

                                    - 4 -                    First Amended Complaint

religion over all others, on federal land.

## IV.

### STATEMENT OF FACTS

15. The present version of the Mt. Soledad cross was built by the Mt. Soledad Memorial Association and erected on a pedestal at the apex of the 170 acre Mt Soledad Park in 1954, with the permission of the City of San Diego. It was dedicated on Easter Sunday during a Christian religious service and not on Memorial Day which falls just a few weeks later. It has served as the site for Easter Sunrise services , prayer meetings, church organized "save the cross" rallies, religious events and gatherings as well as Christian weddings and baptisms.

16. In 1989, Plaintiff Paulson and others sued the City of San Diego claiming that the presence of the Mt Soledad cross on public property violated the U.S. and California Constitutions.

17. Defendant CITY OF SAN DIEGO has engaged in herculean efforts to keep the Mt. Soledad cross standing on the top of Mt. Soledad during the last 17 years of litigation using various schemes and delay tactics, in spite of the admonition of several courts that government attempts to save the Mt. Soledad Cross are unconstitutional. After three attempts to sell the property to private parties, Defendant CITY OF SAN DIEGO agreed to enter into a binding settlement with Paulson and MSMA calling for the movement of the cross to private property, preferably on church grounds approximately 1000 yards from where it currently stands, but when it came time to perform under the agreement, it refused to comply. Instead it began acting in concert in with the Defendant UNITED STATES OF AMERICA (U.S.A.) and Christian advocacy groups in attempts to save the cross by federalizing the cross and the land under it in hopes that through a type of "forum shopping", the CITY OF SAN DIEGO and the U. S. A. could stop 17 years of adverse court decisions by invoking the Establishment Clause of the U.S. Constitution instead of the No Aid/No Preference Clause of the California Constitution.

18. Defendants' CITY OF SAN DIEGO and UNITED STATES OF

- 5 -

1   AMERICA'S first scheme was to have the CITY OF SAN DIEGO give the land to the

2   federal government. U.S.A. passed legislation agreeing to accept the land if it was

3   offered to it by the City. These efforts were pursued even though the City Attorney for

4   the City of San Diego advised the City in writing that such a transfer would be

5   unconstitutional. When the San Diego Superior Court invalidated the City's attempt to

6   gift the land to the U.S.A. as unconstitutional, these defendants then attempted to have

7   Defendant U. S. A. take the property, for the sole purpose of keeping the cross on public

8   land. Defendants then expedited the taking by invoking the seldom used "legislative

9   taking" in order to avoid a lawful order by the federal trial court requiring that the cross

10  be moved off of public land within 90 days.

11         19.    In furtherance of this plan, the Mayor of Defendant City, in his official

12  capacity, wrote to the President of the United States, traveled to the White House and met

13  with other officials of the U.S.A. on several occasions in order to act in concert with them

14  to violate the constitutional rights of Plaintiffs and others by attempting to save the

15  preeminent and most powerful symbol of Christianity, on public land. That the plan of

16  the Defendants, acting in concert, was to save this 43 foot 20 ton cross is beyond dispute

17  and is supported by a plethora of public records, not the least of which is the legislative

18  record which includes the introduction of the bill in the Senate by Senator Sessions

19  wherein he stated; "Madam President, I recently introduced a bill to preserve the cross

20  that stands at the center of the Mt. Soledad Veterans Memorial...This bill would preserve

21  the cross by having the U.S. Government purchase the property..." One of the authors and

22  key proponents of the bill, Representative Duncan Hunter, has made it clear on his

23  official government web site that his intent in authoring, introducing and promoting this

24  bill was to preserve the cross on public property because it is a religious symbol.

25         20.    On or about August 1, 2006, President Bush signed HR 5683 into law.

26         21.    The Mt. Soledad cross has been the subject matter of significant litigation

27  over the past several years. The Ninth Circuit has ruled on two occasions that the

28  presence of the Cross on public land is unconstitutional and the United States Supreme

- 6 -

First Amended Complaint

1   Court has denied cert on both occasions. In the initial trial court decision before Judge
2   Gordon Thompson, the court held that the Latin cross is the principal symbol and a
3   universally recognized symbol of Christianity and that "Not only is the cross a profoundly
4   religious symbol; it also is an exceedingly powerful symbol..." *Murphy* v. *Bilbray* 782
5   F.Supp at 1429-1430. Further, "It's commanding presence...at the very summit of Mt.
6   Soledad render it the focal point of the public park in which it stands–so much so that
7   may be said, as between the Latin cross and the park, it is not clear which is meant to
8   adorn which.." *Id* at 36. As to the contention of the City that the cross was primarily a
9   secular war memorial, the court responded, "even if one strains to view the cross in the
10  context of a war memorial its primary effect is to give the impression that only
11  Christians...are being honored ...The City is directed that, if it truly wishes to honor the
12  war dead, then it should do so other than with the Latin cross which it has permitted to
13  stand atop Mt. Soledad." (*Murphy, supra,* 782 F Supp. at 1436-38. ) The Ninth Circuit
14  subsequently declared, "However, even if we were to agree that the cross has always been
15  explicitly recognized and referred to as a war memorial, that would not obviate the
16  appearance of preference." *Ellis v. City of La Mesa,* 990 F.2d 1518, 1528 (9th Circ.
17  1993). Following the second attempted sale of the land by the City , the Ninth Circuit
18  again confirmed that the presence of the cross on Mt. Soledad was unconstitutional and
19  ruled "In view of our holding in *Ellis* that the Mt. Soledad cross is a sectarian symbol that
20  conveys a religious message, governmental conduct that operates affirmatively to
21  preserve the cross aids a sectarian purpose: the preservation of a symbol that conveys a
22  specifically Christian message." *Paulson v. City of San Diego,* 294 F.3d 1124, 1132 (9[th]
23  Circ 2002).
24      After the 9th Circuit decided the Paulson case, it decided *Buono v. Norton* 371 F3d
25  543, which had strikingly similar facts. In that case, in order to save a Latin cross built in
26  1934 by private parties on federal land , Congress passed legislation declaring it a
27  National War Memorial. The court ruled that the presence of the cross on federal land
28  violated the Establishment Clause even if the purpose in maintaining the display was

- 7 -

First Amended Complaint

1  secular.

2      22.  After the second sale of the land by the City was ruled unconstitutional, on

3  remand the District Court found the actual transfer of the land from the City to the buyer

4  to be void *ab initio*. The Court held , "It is axiomatic that any law passed in violation of

5  the Constitution is "null and void *ab initio*. *United States v Munoz-Flores* 863 F. 2d 654,

6  661 (9th Cir. 1988)" Decision and Order Filed Oct. 12th, 2004 Civ. No. 89-0820GT.

7      23.  The presence of religious symbols in government cemeteries that are chosen

8  by the veteran or the veteran's family to mark his or her grave do not offend the Plaintiffs

9  or the Constitution. But when the government chooses the symbol, sponsors the symbol

10 and mandates that one religious symbol will dominate over the entire memorial display so

11 that the display communicates that Christianity is being supported and preferred by the

12 government, the Constitution and the rights of the Plaintiffs are violated.

13     24.  The presence of the Latin Cross on government owned Mt Soledad is for

14 the predominate purpose of promoting one religion over all others and that is the

15 predominate effect it has on the reasonable observer.  The transfer of the property was

16 done by the two governmental entities in order to save the cross on public property

17 because it is a religious symbol. The acts of the City of San Diego in initiating,

18 facilitating and promoting the transfer aided a specific religion over all others and

19 demonstrated a preference for one religion over all other by the City of San Diego. The

20 presence of the cross on Mt Soledad fosters excessive entanglement with religion on the

21 part of all government Defendants.

22 **V.**

23 **CLAIMS**

24 **FIRST OF CAUSE OF ACTION**

25 **VIOLATION OF THE ESTABLISHMENT CLAUSE (U.S. CONST., 1ST
   AMEND.) AND THE NO PREFERENCE AND NO AID CLAUSES OF THE**

26 **CALIFORNIA CONSTITUTION (CAL. CONST. ARTICLE ONE AND
   ARTICLE SIXTEEN.)**

27

28     25.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 24

- 8 -

First Amended Complaint

1  inclusive of this complaint as though fully set forth herein.

2  26.  The acts of the Defendants violate the rights of Plaintiffs under the
3  Establishment Clause of the U. S. Constitution and the No Aid and No Preference clauses
4  of the California Constitutions, by attempting to keep a sectarian symbol on public
5  property and by transferring the symbol and the land under it from the City to the federal
6  government. .

7  27.  Defendants know that the actions they are taking are unconstitutional
8  because federal courts across this country have unanimously held that the presence of a
9  permanent Latin cross on public property violates the constitutional rights of all of our
10  citizens. More specifically, the District Court for the Southern District of California, the
11  Ninth Circuit Court of Appeals and the San Diego Superior Court have all held that the
12  Mt. Soledad cross, whether part of a war memorial or not, is a powerful sectarian symbol
13  that improperly conveys government preference for one religion over all others.
14  Defendants know that the actions they are taking are unconstitutional because the courts
15  have addressed that issue specifically as it relates to the presence of the Mt. Soledad cross
16  on public property but continue to violate the constitutional rights of Plaintiffs and all
17  citizens with impunity.

18  28.  Plaintiffs will suffer irreparable injury by the federal government
19  maintaining a war memorial where they, as non Christians veterans are treated as
20  outsiders, second class citizens and not respected for the service they provided their
21  country. They cannot comfortably enjoy the park or the memorial because they are not
22  Christians. The cross as the centerpiece of the monument communicates to them that the
23  federal government does not feel their service to the country was of equal value as that
24  service provided by Christians.  There are no other freestanding displays, religious or
25  otherwise in the area that are in any way comparable to the cross which dominates the
26  entire park.

27  29.  No secular purpose is served by the legislative taking of the Mt. Soledad
28  cross.  The legislative taking of the Mt. Soledad Cross has the purpose and effect of

First Amended Complaint

1   promoting religion and constitutes an endorsement of religion, as well as promoting

2   Christianity, while excluding other religious faiths.

3       30.     Thus, Plaintiffs have been deprived of rights, privileges and immunities

4   secured by both the United States and California Constitutions.  Specifically, Defendants,

5   and each of them have acted in concert to invoke the aforementioned legislative taking for

6   the sole unconstitutional purpose of maintaining a Latin cross on government property.

**SECOND CAUSE OF ACTION**

**INJUNCTIVE AND DECLARATORY RELIEF**

9       31.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 30

10  inclusive of this complaint as though fully set forth herein.

11      32.     The continued display of the cross on government property will cause

12  irreparable injury to Plaintiffs.

13      33.     An actual controversy has arisen between the parties.

14      34.     If the land is transferred to the federal government, Plaintiffs will suffer

15  immediate and irreparable harm.

16      35.     Plaintiffs have no adequate remedy at law.

17      36.     Plaintiffs request a declaration from the court that the presence of the Mt.

18  Soledad cross on federal land violates the Establishment clause.

19      37.     The legislative transfer of the Mt. Soledad cross is in violation of both the

20  California and United States Constitutions.  As such, Plaintiffs seek injunctive and

21  declaratory relief in the form of a court order rendering the legislation and the transfer

22  *void ab initio.*

23      38.     The aforementioned legislative transfer is *void ab initio* because CITY OF

24  SAN DIEGO officials acting within the scope and purview of their capacity as government

25  officials and acting in concert with federal and state officials, including all Defendants,

26  made a willful and conscious effort to transfer the land to the federal government in order

27  to save the cross on public land. The City  and federal officials have acted in concert and

28  conspired to "save the cross" through unconstitutional means.

- 10 -                                          First Amended Complaint

1     39.    Thus, Plaintiffs have been deprived of rights, privileges and immunities

2 secured by both the United States and California Constitutions.  Specifically, Defendants,

3 and each of them have acted in concert to invoke the aforementioned legislative taking for

4 the sole unconstitutional purpose of maintaining a Latin cross on government property.

5                                            **VI.**

6                           **REQUEST FOR RELIEF**

7        WHEREFORE, Plaintiffs respectfully request the Court to enter judgment against

8 the CITY OF SAN DIEGO, DONALD RUMSFELD and the UNITED STATES OF

9 AMERICA as follows:

10      1.     Declaring that the transfer of the land to the federal government violates

11             Plaintiffs' federal and California constitutional rights.  Specifically, that the

12             legislative taking and the statute that authorized it be rendered *void ab initio*;

13      2.     Preliminarily and permanently enjoining the Defendants from displaying the

14             cross on government property;

15      3.     Encourage the parties to honor the settlement agreement that was entered

16             into;

17      4.     For an award of attorney's fees and costs to Plaintiffs; and

18      5.     For such further relief as this Court deems just and equitable.

19

20 Dated:  September 8, 2006            LAW OFFICES OF JAMES E. McELROY

21

22                                     By:

23                                   JAMES E. McELROY, ESQ.
                                         Attorneys for Plaintiffs

24

25

26

27

28

                                         First Amended Complaint

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| STEVE TRUNK and PHILIP K. PAULSON | ) | CASE NO. 06-CV-1597 BTM (Wmc) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF SAN DIEGO, UNITED STATES OF | ) | PROOF OF SERVICE |
| AMERICA, DONALD H. RUMSFELD, Secretary | ) | |
| of Defense and DOES 1 through 100, Inclusive | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MOUNT SOLEDAD MEMORIAL | ) | |
| ASSOCIATION, Real parties in interest. | ) | |
| | ) | |

I, JUDITH MADSON, certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made. I further certify that on September __8__, 2006, I served a copy of the following documents(s):

## FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

[X]   Mail Service - Regular, first class United States mail, postage fully prepaid, addressed to: SEE ATTACHED MAILING LIST

[ ]   Facsimile - By faxing a copy thereof.

[ ]   Personal Service - By leaving documents with the following named person or an officer or agent of the person at: SEE ATTACHED MAILING LIST

   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: September __8__, 2006

JUDITH MADSON

Business Address:   625 Broadway, Suite 1400
San Diego, CA 92101

SERVICE LIST

MICHAEL AGUIRRE, City Attorney
DAVID J. KARLIN, ESQ.
Deputy City Attorney
Civil Division
1200 Third Avenue, Ste. 1200
San Diego, CA 92101
Phone: (619) 533-5800
Fax:   (619) 533-5847

Attorneys for Defendant
CITY OF SAN DIEGO


UNITED STATES ATTORNEY'S
OFFICE
880 Front Street, Room 6293
San Diego, CA 92101
Phone: (619) 557-5610
Fax:   (619) 557-5551

Attorneys for Defendant
UNITED STATES OF AMERICA


CHARLES V. BERWANGER, ESQ.
Gordon & Rees LLP
101 West Broadway, Suite 1600
San Diego, CA 92101
Phone:(619) 696-6700
Fax:  (619) 696-7124

Attorney for MT. SOLEDAD
MEMORIAL ASSOCIATION


PETER D. LEPISCOPO, ESQ.
James M. GRIFFITHS, ESQ.
LAW OFFICES OF
PETER D. LEPOSCOPO
2635 Camino del Rio South,
Suite 109
San Diego,CA 92108
Phone: (619) 299-5343
Fax: (619) 299-4767

Attorneys for Proposed
Intervenor and Defendant
PACIFIC JUSTICE INSTITUTE

# EXHIBIT C

USDC SCAN INDEX SHEET

















JPP   8/25/06    14:38

3:06-CV-01728   JEWISH WAR VETERANS V. SAGHEB

*1*

*CMP.*

1   David Blair-Loy  SBN 229235
    ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
2   P.O. Box 87131
    San Diego, CA  92138-7131
3   Telephone:  (619) 232-2121
    Facsimile:  (619) 232-0036
4
    Daniel Mach
5   T. Jeremy Gunn
    ACLU PROGRAM ON FREEDOM OF RELIGION AND BELIEF
6   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
7   915 15th St., N.W., Suite 600
    Washington, D.C.  20005
8   Telephone:  (202) 675-2330
    Facsimile:  (202) 546-0738
9   [pro hac vice applications to be filed]

10  A. Stephen Hut, Jr.
    Jonathan H. Siegelbaum
11  Ryan P. Phair
    WILMER CUTLER PICKERING HALE & DORR LLP
12  1875 Pennsylvania Ave., N.W.
    Washington, D.C.  20006
13  Telephone: (202) 663-6000
    Facsimile: (202) 663-6363
14  [pro hac vice applications to be filed]   **ORIGINAL**
15
    Attorneys for Plaintiffs
16
                IN THE UNITED STATES DISTRICT COURT
17          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

18  JEWISH WAR VETERANS OF THE UNITED        )   CASE NO.
    STATES OF AMERICA, INC., RICHARD A.      )
19  SMITH, MINA SAGHEB, and JUDITH M.        )   '06 CV 1728    JAH NLS
    COPELAND,                                )
20                                           )
                          Plaintiffs,        )   COMPLAINT FOR
21                                           )   DECLARATORY AND
                 v.                          )   INJUNCTIVE AND RELIEF
22                                           )
    DONALD H. RUMSFELD, Secretary of Defense,)   [ESTABLISHMENT CLAUSE OF
23  in his official capacity,                )   THE FIRST AMENDMENT TO
                                             )   THE UNITED STATES
24                                           )   CONSTITUTION]
                          Defendant.         )
25                                           )
26                                           )

27

28
                            1

# INTRODUCTION

1. This is an action for declaratory and injunctive relief challenging the continuing display of a 43-foot Latin cross on government property on Mt. Soledad, San Diego, on the ground that it violates the Establishment Clause of the First Amendment to the United States Constitution.

2. Religious symbols, including those prominently displayed, are an important and constitutionally protected form of religious expression in the American public sphere. The First Amendment guarantees that houses of worship, homes and businesses may erect religious symbols and display them visibly to the public. But there is a dramatic difference between constitutionally protected religious expression by private individuals, families, and religious communities and the constitutionally prohibited use of governmental power, authority, financing, and property to promote the religious expression of some American citizens to the exclusion of others.

3. There has long been a perfectly satisfactory and constitutional remedy to the unconstitutional display of the Latin cross on Mt. Soledad: moving it to a non-governmental site. For decades, however, many supporters of the Latin cross have rejected reasonable efforts to resolve the constitutional dispute, sometimes with the explicitly articulated purpose of promoting sectarian religious symbols, and at other times with thinly veiled attempts to suggest that the Latin cross is simply a monument to honor veterans.

4. Most recently, in a transparent effort to evade a long series of unfavorable decisions by the federal and California state courts invalidating the City of San Diego's display of the Mt. Soledad cross, the United States obtained title to the Latin cross and its surrounding property through a legislative taking. H.R. 5683, 109th Cong. (2006). The federal acquisition of the Latin cross, however, does nothing to cure the ongoing constitutional violation. When any

1    government entity – federal, state, or local – uses taxpayer funds to acquire and prominently

2    display a religious symbol that is sacred to some, but not all, religious believers, it disregards the

3    religious diversity in our society and violates the fundamental right to religious liberty

4    guaranteed by the First Amendment.

5

6                                    **JURISDICTION AND VENUE**

7         5.  This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331, and

8    the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiffs seek to redress the

9    violation by Defendant under the First Amendment to the United States Constitution.

10        6.  Venue is appropriate in this District under 28 U.S.C. §1391(e), because a substantial

11   portion of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern

12   District of California.

13

14                                          **PARTIES**

15        7.  Plaintiff Jewish War Veterans of the United States, Inc. ("JWV"), organized in 1896

16   by Jewish Veterans of the Civil War, is the oldest active national veterans' service association in

17   America.  JWV is a federally chartered patriotic organization which has among its purposes a

18   continuing commitment to maintain true allegiance to the United States of America; to foster and

19   perpetuate true Americanism; to uphold the fair name of Jews and fight their battles wherever

20   unjustly assailed; to encourage the doctrine of universal liberty, equal rights, and full justice to

21   all men and women; to combat the powers of bigotry and darkness wherever originating and

22   whatever the target; and to preserve the memories and records of patriotic service performed by

23   the men and women of the Jewish faith and honor their memory.  In furtherance of its

24   organizational purposes, JWV engages in extensive advocacy in support of religious liberty.  As

25   part of that advocacy, JWV has publicly opposed the government's display of the Latin cross,

26   both on Mt. Soledad and elsewhere.  *See, e.g.*, *Jewish War Veterans of the United States v.*

27

28

                                                  3

*United States*, 695 F. Supp. 3 (D.D.C. 1988). JWV is a membership organization with tens of thousands of members nationwide. JWV maintains a considerable presence in San Diego County, with three separate JWV Posts in the San Diego area. JWV's members include individuals who pay taxes regularly that are owed to the United States and state and local governments, and who oppose government funding that promotes religion, including the funding of the federal taking and continued display of the Latin cross on Mt. Soledad. JWV's members also include individuals based in the San Diego area who regularly view the Latin cross on Mt. Soledad, and who are offended by the government's communication of favoritism and endorsement of the majority faith at the expense of citizens and veterans of other faiths who died in the service of their country.

8. Plaintiff Richard A. Smith is a resident of La Jolla, California, where he has lived in the same home since 1969. Smith is a taxpayer who pays taxes regularly that are owed to the United States and state and local governments. Smith is a veteran of the United States Navy, having served from 1969 to 1971 as the head of the Neurology Branch of the Navy's Neuropsychiatric Research Unit in San Diego. His best friend, a physician, was killed in the Tet Offensive during the Vietnam War. Smith, who is Jewish, has great respect for all religious faiths, but is discomfited by the presence of a sectarian religious symbol on public property. Specifically, he believes that the Latin cross on Mt. Soledad demonstrates a government preference for certain forms of Christianity above all other religions, and that the message the Latin cross sends is that non-Christians like himself are not full members of the political community. He also believes that, to the extent the Latin cross serves in part to honor the service of veterans, such an overtly Christian religious memorial devalues the contributions of veterans like himself who are not Christian. Smith regularly sees the Mt. Soledad Latin cross from numerous vantage points around San Diego. Among other things, he makes weekly visits to a

4

1  sister-in-law who lives in a house where the Mt. Soledad Latin cross can be seen from the

2  windows and the backyard. These weekly visits bring him into a position where he can directly

3  view the Latin cross and the unwelcome and exclusionary message he believes it communicates.

4  But for the presence of the Latin cross, Smith would visit Mt. Soledad again to enjoy the scenery

5  and to pay tribute to the war dead honored at the site.

6

7  9.  Plaintiff Mina Sagheb is a resident of La Jolla, California, and has lived in the San

8  Diego area since 1990. She is a taxpayer who pays taxes regularly that are owed to the United

9  States and state and local governments. Sagheb has been married to Plaintiff Smith for four

10  years, and is Muslim. She has no objection to public displays of religious faith made by

11  individuals. However, she objects to government sanctioning of religious displays, since she

12  believes that the government should not favor one religion over another. Sagheb makes weekly

13  visits to a sister who lives in a house where the Mt. Soledad Latin cross can be seen from the

14  windows and the backyard. These weekly visits bring her into a position where she can directly

15  view the Latin cross and the unwelcome and exclusionary message she believes it communicates.

16  Sagheb has visited Mt. Soledad on at least one occasion, and, but for the presence of the Latin

17  cross, she would visit Mt. Soledad again to enjoy the scenery and to pay tribute to the war dead

18  honored at the site. Sagheb is an immigrant to the United States from Iran, a country she fled in

19  part because of its religious intolerance and the government's promoting of the religious beliefs

20  of some at the expense of others.

21

22  10. Plaintiff Judith M. Copeland has been a resident of San Diego, California since 1974.

23  She is a taxpayer who pays taxes regularly that are owed to the United States and state and local

24  governments. She has no objection to public displays of religious faith made by individuals.

25  However, she objects to government sanctioning of religious displays, since she believes that the

26  government should not favor one religion over another. Copeland sees the Latin cross

27

28

5

approximately twice a week while driving on Interstate 5, and is discomfited by the presence of a

sectarian religious symbol on public property.  She has visited Mt. Soledad on at least one

occasion, and, but for the presence of the Latin cross, she would visit Mt. Soledad again to enjoy

the scenery and to pay tribute to the war dead honored at the site.

11. Defendant Donald H. Rumsfeld is the Secretary of the United States Department of

Defense.  Pursuant to recently enacted federal legislation, *see* H.R. 5683, 109th Cong., § 2(c)

(2006), Secretary Rumsfeld manages the property containing the Mt. Soledad Veterans

Memorial in San Diego, California.  Secretary Rumsfeld is sued in his official capacity.

### FACTUAL BACKGROUND

### Description and History of the Mt. Soledad Latin cross

12. The Mt. Soledad Latin Cross ("Latin cross" or "Cross"), a structure measuring 43 feet

in height with a 12-foot arm spread, is located on now-federal property at the top of Mt. Soledad

in San Diego, California.  The Latin cross sits atop an 822-foot high hill and can be seen from

several miles away, including from Interstate 5, a public freeway that passes less than a half-mile

from Mt. Soledad.

13. The City of San Diego ("City") first took possession of Mt. Soledad in the nineteenth

century.  In 1916, the San Diego City Council ("City Council") dedicated the property on which

the Latin cross rests, as well as 170 adjoining acres of property, as the Mt. Soledad Nature Park.

Although most of the 170-acre parcel is undeveloped and maintained in its natural state, the top

of the mountain has been cleared.  Between 1913 and 1934, several crosses were erected atop

Mt. Soledad.

14. In 1952, the City Council authorized a private entity, the Mt. Soledad Memorial

Association ("MSMA"), to erect and maintain a sizeable Latin cross on top of Mt. Soledad.  The

Cross was designed to replace predecessor crosses that were previously built on top of Mt.

Soledad but that were no longer standing.  The MSMA constructed the Cross, consisting of reinforced concrete and weighing approximately 24 tons, between 1952 and 1954.

15. The Latin cross is a sacred and revered symbol to many Americans and to many Christians throughout the world.  It is not, however, a symbol of the United States.  Nor is it a favored symbol of many devout Christians of a number of denominations.  Many other religious faiths have revered symbols that are given no status, no government support, and no placement on Mt. Soledad.

16. On April 18, 1954, the MSMA dedicated the Latin cross during a Christian religious ceremony held on Easter Sunday.  During that ceremony, the Latin cross was explicitly dedicated to "Our Lord and Savior Jesus Christ" in an MSMA dedication bulletin.

17. Since the Latin cross's initial dedication in 1954, the City of San Diego has granted the MSMA a permit each year to conduct a sunrise service on Easter morning for Christians to celebrate the resurrection of Jesus Christ.

18. Every annual publication of the Thomas Brothers Map for the San Diego area from 1954 to 1989 – the year the government's display of the Latin cross was first challenged in court – presented a geographic legal description of the location as the "Mt. Soledad Easter Cross."

19. Throughout the past fifty years, the Latin cross has served not only as a religious symbol but also as the site of numerous religious events, such as weddings, baptisms, and Easter sunrise services.

20. For 38 years, there was no placard or marker indicating the presence of a veterans memorial either on Mt. Soledad Natural Park or at the site of the Latin cross.  The MSMA installed such a marker with a "Veterans" memorial inscription only in 1992, after the onset of litigation challenging the constitutionality of the display of the Latin cross on City-owned property.

7

21. No secular or non-Christian symbols of comparable physical significance are present at Mt. Soledad to moderate the sectarian Christian message conveyed by the Latin cross, which towers above the rest of the memorial.

22. The predominant purpose of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote one particular sectarian Christian symbol.

23. The predominant effect of the Latin cross's presence on top of government-owned property on Mt. Soledad is to promote certain forms of the Christian religion.

24. The Latin cross's presence on top of government-owned property on Mt. Soledad is a governmental endorsement of a particular form of religion and its symbols.

25. The Latin cross's presence on top of government-owned property on Mt. Soledad gives official preference for certain sects within the Christian religion above all others.

26. The Latin cross's presence on top of government-owned property on Mt. Soledad fosters an excessive governmental entanglement with religion.

### Early Litigation and Potential Settlement

27. In 1989, a private individual sued the City in this Court over the Latin cross's presence on top of Mt. Soledad, alleging that it violated the "No Preference" Clause of the California Constitution, Cal. Const. art. I, § 4, as well as the Establishment Clause of the United States Constitution, U.S. Const., amend. I. This Court found that "[w]here . . . the Latin cross appears as a permanent, salient symbol on public property and on a public imprimatur, California's constitution will not permit it to continue to stand." *Murphy v. Bilbray*, 782 F. Supp. 1420, 1438 (S.D. Cal. 1991) (Thompson, J.). The Court ordered the City to remove the Latin cross, and gave the City three months to comply with its order. On appeal, the Ninth Circuit upheld the district court's determination and concluded that, even assuming the Mt. Soledad Latin cross could properly be characterized as war memorial, it is "[a] sectarian war

8

memorial [that] carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1527-28 (9th Cir. 1993), *cert. denied*, 513 U.S. 925 (1994).

28. In October 1994, following this Court's decision and the Ninth Circuit's affirmance of that decision, the City made its first attempt to remedy the constitutional violation via a ballot initiative in which it urged voters to "SAVE THE CROSS ON MOUNT SOLEDAD," not by the constitutionally permissible means of moving it to a non-governmental site, but by authorizing a no-bid sale of a 222-square foot parcel of land under the Latin cross to the MSMA. This Court subsequently declared the sale invalid under the No Preference Clause as well as article XVI, section 5 of the California Constitution, which "strictly prohibits any governmental support for religious purposes." *Murphy v. Bilbray*, Nos. 90-134 GT, 89-820 GT, 1997 WL 754604, at ** 9-11 (S.D. Cal. Sept. 18, 1997) (Thompson, J.). The Court reasoned that it was readily apparent that "the primary purpose for the sale . . . was to save the Mt. Soledad cross from removal and/or destruction," and that the City "clearly show[ed] a governmental preference for the Christian religion" by "tak[ing] the position of trying to 'save' such a preeminent Christian symbol." *Id.* at * 10. Following this decision, the Association sold the 222 square foot parcel back to the City.

29. After this decision, the City published a notice soliciting bids on about a half-acre of land in Mt. Soledad Park, and expressly stated that the sale of the parcel was "for the purpose of maintaining a historic war memorial." To this end, the City established a bidding process that required applicants to explain their plans for "maint[aining] a historic war memorial on the site." Subsequently, the City announced that it accepted the MSMA's bid as the winning bid. The Ninth Circuit, sitting *en banc*, invalidated this sale as well, finding that it "was structured to provide a direct, immediate, and substantial financial advantage to bidders who had the sectarian purpose of preserving the [C]ross," and accordingly violated article XVI, section 5 of the

9

California Constitution. *Paulson v. City of San Diego*, 294 F.3d 1124, 1133 (9th Cir. 2002) (en banc), *cert. denied*, 538 U.S. 978 (2003).

30. Following the Ninth Circuit's *Paulson* decision, a dispute arose in this Court as to who actually owned the Latin cross. On October 12, 2004, this Court ruled that the City of San Diego — and not the MSMA — owned the land under and around the Latin cross. The Court further implored the parties to "[s]ettle this case! It's time to move the cross from public land to private land and comply with the laws of our great country instead of trying to find sneaky ways to get around them to pander to a certain group or to satisfy an out-of-state group's religious agenda."

31. The parties engaged in extensive settlement discussions over the course of several weeks and agreed to settle the case by moving the Latin cross 1,000 yards to a nearby church. Under the terms of the settlement, the MSMA would be allowed to maintain an interest in the Mt. Soledad property and war memorial, and the Latin cross would be replaced with a non-sectarian symbol that would appropriately recognize all veterans in exchange for an end to litigation. These settlement terms would be perfectly acceptable to Plaintiffs here and would have preserved the continued existence of the Latin cross — but in a constitutional way. The settlement terms were presented to the City Council on July 20 and 27, 2004. But instead of accepting the settlement outright, the Council attempted one last sale to the highest bidder, who alone could decide whether to keep, remove, or replace the Latin cross. At the public meeting of the City Council, the Mayor and four of five Council members, who voted to put the proposition (known as Proposition K) on the ballot over strong MSMA and prominent veterans-group opposition, expressly stated that the reason for their vote was to allow the Latin cross to remain on Mt. Soledad. *See Paulson v. Abdelnour*, No. GIC-849667 at 27-28 (Cal. Sup. Ct. Oct. 7,

2005).  One Councilmember even cited his membership in the "Jesus Christ fan club" as a reason for his vote.  *Id.* at 27.

32. On November 2, 2004, a substantial majority of San Diego voters — over 250,000 in total — rejected Proposition K and directed the City Attorney to enter into the settlement agreement.

### Overriding of the Settlement and the Intervention of (former) Congressman Randy "Duke" Cunningham to "Save the Cross"

33.  Undeterred by the will of San Diego voters and this Court's prior exhortation to settle the case consistently with constitutional requirements, the City refused to comply with the binding ordinance.  Instead, with the active encouragement of the Thomas More Law Center ("TMLC"), an advocacy group whose stated mission is the "promotion of the religious freedoms of Christians" and the protection of "Christians and their beliefs in the public square," the City began its ongoing campaign to circumvent its constitutional obligations.

34. After San Diego voters overwhelmingly rejected Proposition K, the TMLC sought to scuttle the binding settlement agreement and secure the intervention of the federal government — all to save the Latin cross as a religious symbol.

35. On November 10, 2004, the TMLC sent a letter to Representative Randy "Duke" Cunningham, a Congressman from San Diego and a member of the powerful House Appropriations Committee, to solicit his help in convincing the federal government to override the San Diego referendum and corresponding settlement agreement by declaring the Latin cross a national war memorial.  In so doing, the TMLC made clear that the principal reason for taking such action was because "religion and morality are the foundation of our country" and the Mt. Soledad Latin cross was "one of the most visible symbols of [our Christian faith]."

11

36. Acknowledging that there was "unfortunately" a local initiative whereby San Diego voters overwhelmingly agreed to resolve the matter by entering into a settlement agreement, the TMLC nonetheless asserted that "the culture war will continue to be fought on many fronts" no matter what. Accordingly, the TMLC asked Representative Cunningham to "save the Cross" and help "preserve this … religious landmark" by declaring it a national war memorial.

37. Less than a month later, during the night of November 21, 2004, Representative Cunningham inserted an eleventh-hour rider into the voluminous $388 billion Fiscal Year 2005 Omnibus Appropriations Act (Pub. L. No. 108-447). The rider, which few had seen before Representative Cunningham inserted it into the appropriations bill, (1) designated the Mt. Soledad Veterans Memorial a national veterans memorial; (2) authorized the Department of the Interior to accept the donation of the Memorial from the City of San Diego; and (3) directed the National Park Service to enter into a memorandum of understanding with the MSMA for the maintenance and administration of the memorial. Pub. L. No. 108-447, § 116, 118 Stat. 3346, *codified at* 16 U.S.C. § 431 note (2004). Representative Cunningham acknowledged that he had not asked for a written legal opinion from an attorney on whether the bill would allow the Latin cross to remain at its current location, and that he was trying to "save the Cross" as a religious landmark. The TMLC hailed Cunningham's effort as "an act of God."

38. With the exception of the TMLC, however, all parties to the long-running dispute acknowledged that Representative Cunningham's proposed legislation would not solve the constitutional problem that the California state and federal courts had unanimously reaffirmed multiple times over the preceding 13 years. The press has reported that William Kellogg, Executive Director of the Mount Soledad Memorial Association, candidly acknowledged that he did not see how Cunningham's legislation would solve the underlying constitutional impediments. Likewise, the press reported that the MSMA's attorney, Charles Berwanger, said

12

that officials of the U.S. Department of Veterans Affairs had advised him that such a move would run afoul of the First Amendment and had reaffirmed that opinion in the wake of Rep. Cunningham's rider.

39. On December 8, 2004, President Bush signed the omnibus appropriation bill, with Representative Cunningham's rider intact, into law. Soon thereafter, the TMLC and Representative Cunningham successfully pressed San Diego Mayor Dick Murphy to add the proposed federalization of the Latin cross by way of donation promptly to the City Council Agenda.

40. Prior to the City Council meeting, however, San Diego City Attorney Michael Aguirre issued a formal legal opinion that the federalization of the Latin cross by way of donation would be a violation of the California Constitution and fall far short of a remedy that would be deemed acceptable by the California state and federal courts. Mr. Aguirre's opinion further observed that, "based on current case law, such a transaction would also violate the federal Constitution and . . . provide fodder for additional legal proceedings against the City." Kimberly Edds, *San Diego to Move Giant Cross; City Council Votes to End Suit Over Religious Symbol*, Wash. Post (May 10, 2005).

41. On March 8, 2005, after a six-hour public hearing, the San Diego City Council voted against donating the Latin cross to the federal government based on the MSMA's request, City Attorney Aguirre's legal recommendation, and the recognition that the City had a binding obligation to enter into the MSMA settlement agreement once Proposition K failed.

42. In a subsequent letter to the editor of the *San Diego Union-Tribune*, MSMA President Bill Kellogg reiterated his "strong support" for the City Council's decision to reject federalization of the Cross, saying he was "convinced it was the right decision for our community and for our veterans." Mr. Kellogg stated accurately that the constitutional issue

13

"had already been litigated to the fullest extent possible," that the Ninth Circuit's decision in *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004), in which the Ninth Circuit invalidated a nearly identical attempt arising out of a war memorial in the Mojave Desert Preserve, "was directly on point," and that "only the patience of the courts has prevented the [original] order from being carried out." To those who "supported the federalization of the park [who] say they don't care about the cross itself; they care about 'not caving in to a minority,'" Kellogg contrasted the MSMA's deep commitment to "the cross and the walls" and its equal commitment "to ensuring that both remain standing in a public place where they can be enjoyed by all." "Only by moving the cross to another location" pursuant to the original MSMA settlement agreement, Kellogg argued, could the Cross truly "be saved."

43. Soon after the City Council's decision, the TMLC and others, spurred on by Rep. Cunningham and Mayor Murphy, spearheaded a petition and referendum drive under the aegis of a TMLC-affiliated group called "San Diegans for the Mt. Soledad National War Memorial" to rescind the Council vote. This wide-ranging and well-financed effort included 75 paid signature gatherers, massive fundraising efforts, and a petition written by the TMLC that began with the proposition, "You Can Save Our Cross." Press reports described sermons from the Latin cross site and other public and religious venues, including events at Qualcomm Stadium and Cox Arena on Easter Sunday, that urged civil disobedience to flout the original Court order and save the Latin cross.

44. At a May 17, 2005 meeting to consider the petition, two City Council members, while expressing misgivings about the mounting legal costs the City was incurring, agreed to switch their initial vote and to send the issue back to the voters. The Council accordingly voted 6-3 to allow a public referendum, Proposition A, on the Latin cross. The vote on Proposition A was scheduled to coincide with the July 26, 2005 special election to replace Mayor Murphy. After

14

1    the City Council's vote was announced, Latin cross supporters sang "Onward Christian Soldiers"

2    in the Council chamber.

3    ### Further Litigation Over the Latin cross

4    45. A private individual then challenged the proposed referendum on donating the Latin

5    cross to the federal government on the grounds that the donation would violate article I, section

6    IV (the No Preference Clause) and article XVI, section V (the No Aid Clause) of the California

7    Constitution. Soon after Proposition A passed, California Superior Court Judge Patricia Cowett

8    issued a temporary restraining order preventing the donation and a tentative ruling that any such

9

10   donation would be unconstitutional.

11   46. Following Judge Cowett's order, City Attorney Aguirre reportedly reiterated that

12   Proposition A was "clearly unconstitutional."

13

14   47. Seeking to overcome its inability to continue to bankroll the Latin cross litigation —

15   which to that point had been ongoing for 13 years — the City deputized the TMLC's lead

16   attorney, Charles LiMandri, as a special deputy city attorney who agreed to work for free.

17   48. On October 7, 2005, Judge Cowett issued a 35-page final decision striking down

18   Proposition A as unconstitutional. *Paulson v. Abdelnour*, No. GIC-849667 (Cal. Sup. Ct. Oct. 7,

19   2005). The decision recounts the extensive legal history of the dispute and the consistent and

20   unequivocal rulings by state and federal courts over the years. Based on "the consistent,

21   repeated, and numerous references to saving the Cross as the basis for deciding whether to

22   donate the memorial to the United States," Judge Cowett held that "one conclusion is

23   inescapable: this transfer is again an unconstitutional preference of the Christian religion to the

24   exclusion of other religions and non-religious beliefs in violation of the No Preference Clause of

25   the California Constitution." *Id.* at 28. In addition, Judge Cowett ruled that the City's attempt

26   "to go so far as to transfer away valuable land for no compensation for the purpose of saving the

27

28

15

cross is also an unconstitutional aid to the Christian religion in violation of the California Constitution." *Id.*

49. Judge Cowett likewise observed that maintaining the Latin cross as a part of a national veterans memorial would "run[] afoul of the Establishment Clause of the United States Constitution." *Id.* Citing the Supreme Court's recent decision in *McCreary County v. ACLU,* 125 S.Ct. 2722 (2005), Judge Cowett concluded: "Even today, it still can be said that at best the Mt. Soledad Memorial has a secondary secular purpose (or at worst is but a sham secular purpose) and that the predominant purpose of the memorial is a religious purpose." *Id.* at 34-35. Judge Cowett concluded by stating Judge Thompson's initial pronouncement back in 1991 – that if the City "truly wish[ed] to honor the war dead, then it should do so other than with the Latin cross which it has permitted to stand atop Mt. Soledad" — "still stands the test of time and history as related to this cross." *Id.* at 35.

50. On May 4, 2006, this Court ordered the City of San Diego finally to remove the Latin cross within 90 days or be fined $5,000 a day. The Court held that "[c]onsistently, every court that has addressed the issue has ruled that the presence of the Latin cross on Mount Soledad, land which is owned by the City of San Diego ... violates Article I Section 4 of the California Constitution." *Paulson v. City of San Diego,* No. 89-0820GT, at 2 (S.D. Cal. May 3, 2006). Having given the City 17 years to remedy the problem and expressing utter frustration with "the long and torturous legal history" of the case, the Court stated that it was "now time, and perhaps long overdue, for this Court to enforce its initial permanent injunction forbidding the presence of the Mount Soledad Cross on City property." *Id.*

51. In response to the Court's order, San Diego City Attorney Aguirre once again recommended that city officials stop politicizing the issue and incurring unnecessary legal costs in a futile effort to save the Latin cross on appeal. MSMA President William Kellogg likewise

16

1   reiterated that the private war memorial organization was prepared to move the Latin cross to

2   nearby private property and replaced at the memorial with another fitting symbol for veterans of

3   the Korean War: "We feel it's very important that the cross be saved. The location of the cross is

4   not the primary issue."

5       52. The City sought a stay of Judge Thompson's order pending appeal. On June 21,

6   2006, the Ninth Circuit denied the stay request. On July 7, 2006, Justice Kennedy, as the Circuit

7   Justice for the Ninth Circuit, granted a stay to preserve the status quo pending the respective

8   appeals of Judge Thompson's and Judge Cowett's decisions. *San Diegans for the Mt. Soledad*

9   *Nat'l War Memorial v. Paulson*, 126 S. Ct. 2856 (July 7, 2006) (Kennedy, J.).

**Recent Federal Intervention**

10       53. At the same time, Mayor Sanders and certain organizations lobbied the President and

11   Congress to help them evade the effects of the California Constitution by condemning and

12   effectuating a taking of the Mt. Soledad Latin cross by the federal government. On May 10,

13   2006, Congressman Duncan Hunter, who assumed leadership on the Latin cross issue in

14   Congress after Rep. Cunningham's departure, asked the President to "use the authority found in

15   40 U.S.C. 3113 to begin immediate condemnation proceedings" concerning the Latin cross.

16       54. On June 27, 2006, Rep. Hunter introduced H.R. 5683. Stating an intent to "effectuate

17   the purpose" of Rep. Cunningham's previous bill from 2004, H.R. 5683 declares that "there is

18   hereby vested in the United States all right, title, and interest in and to, and the right to

19   immediate possession of, the Mt. Soledad Veterans Memorial in San Diego, California." H.R.

20   5683, 109th Cong., § 2(a) (2006). H.R. 5683 directs the United States to pay "just compensation

21   to any owner of the property." *Id.* § 2(b). The bill states that upon acquisition of the memorial

22   by the United States, "the Secretary of Defense shall manage the property and shall enter into a

17

memorandum of understanding with the Mt. Soledad Memorial Association for the continued

maintenance of the Mt. Soledad Veterans Memorial by the Association." *Id.* § 2(c).

55. The bill passed the House on July 19, 2006 and the Senate on August 1, 2006.  The

President signed H.R. 5683 into law on August 14, 2006.

## CLAIM FOR RELIEF

(Establishment Clause Violation)

56. Plaintiffs repeat and reallege paragraphs 1 through 55.

57. The Establishment Clause of the First Amendment to the U.S. Constitution provides

that "Congress shall make no law respecting an establishment of religion."

58. Based on the allegations set forth above, Defendants have violated and continue to

violate Plaintiffs' rights protected by the Establishment Clause.

59. An actual and present controversy between the parties exists such that declaratory

relief is appropriate.

60. The continued display of the Latin cross on federal land will cause irreparable harm

to Plaintiffs.

61. Plaintiffs lack an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)     A declaratory judgment that the taking of the Mt. Soledad Latin cross and

its continued display on federally owned land violates the Establishment

Clause of the First Amendment of the United States Constitution;

(b)     The entry of a preliminary and permanent injunctive relief enjoining the

continued display of the Mt. Soledad Latin cross on federally owned land;

18

(c) Encourage and permit the Latin cross to be moved, at the expense of individual citizens who believe that the Latin cross should be preserved, to an appropriate non-governmental site;

(d) An award to Plaintiffs of their costs, expenses, and attorneys' fees; and

(e) Such further and other relief as this Court deems just and proper.

DATED: August 24, 2006

David Blair-Loy  SBN 229235
ACLU FOUNDATION OF SAN DIEGO &
     IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA  92138-7131
Telephone:  (619) 232-2121
Facsimile:  (619) 232-0036

Daniel Mach
T. Jeremy Gunn
ACLU PROGRAM ON FREEDOM OF
     RELIGION AND BELIEF
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION
915 15th St., N.W., Suite 600
Washington, D.C.  20005
Telephone:  (202) 675-2330
Facsimile:  (202) 546-0738
[*pro hac vice* application to be filed]

A. Stephen Hut, Jr.
Jonathan H. Siegelbaum
Ryan P. Phair
WILMER CUTLER PICKERING HALE &
     DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
[*pro hac vice* applications to be filed]

*Attorneys for Plaintiffs Jewish War Veterans
of the United States of America, Inc., David
A. Smith, Mina Sagheb, and Judith M.
Coleman*

19

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

I (a) PLAINTIFFS

Jewish War Veterans of the USA, Inc. Richard A. Smith, mina Sagheb, Judith M. Copeland

DEFENDANTS

Donald H. Rumsfeld, secretary of Defense, in his official capacity

11:10:06

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF District
(EXCEPT IN U.S. PLAINTIFF CASES) of Columbia

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT District of
(IN U.S. PLAINTIFF CASES ONLY) Columbia

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David Blair-Loy
ACLU Foundation of SD
P.O. Box 87131
San Diego CA 92138-7131

ATTORNEYS (IF KNOWN)

U.S. Attorney
880 front St.
San Diego CA 92101

06 CV 1728      JAH NLS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)     FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

First Amendment Establishment Clause claim vs. U.S. government 28 USC 2201, 2202

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 650 Airline Regs | SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | LABOR | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See instructions): JUDGE Barry T. Moskowitz   Docket Number 010-CV-1597

DATE 8/24/06   SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

128581   Sel 8/24/06   $350

# EXHIBIT D

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 STEVE TRUNK and PHILIP K. PAULSON, | CASE NO. 06cv1597 BTM(WMc) |
| 12 Plaintiffs, | **ORDER CONSOLIDATING CASES** |
| 13 vs. | |
| 14 CITY OF SAN DIEGO, UNITED STATES OF AMERICA, DONALD H. RUMSFELD, Secretary of Defense and DOES 1 through 100, Inclusive, | |
| 16 Defendants. | |
| 18 MOUNT SOLEDAD MEMORIAL ASSOCIATION, Real parties in interest. | |
| 19 JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, | CASE NO. 06cv1728 BTM(WMc) |
| 22 Plaintiffs, | |
| 23 vs. | |
| 24 DONALD H. RUMSFELD, Secretary of Defense, in his official capacity, | |
| 25 Defendant. | |

26

27      Paulson v. City of San Diego, et al., Case No. 06cv1597 BTM(WMc) and Jewish War

28 Veterans of the Unites States of America, Inc. v. Rumsfeld, 06cv1728 BTM(WMc) are hereby

1  consolidated for all pretrial proceedings.  The caption page on all future filings shall contain
2  both captions and shall list the case number as: Case No. 06cv1597 BTM(WMc)
3  (consolidated with 06cv1728).  All future docketing will be done in Case No. 06cv1597, which
4  shall be the main file.
5  **IT IS SO ORDERED.**
6
7  DATED:  September 22, 2006
8
9                                                    Hon. Barry Ted Moskowitz
                                                     United States District Judge
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

# EXHIBIT E

WILMERHALE

March 26, 2007

Jonathan Siegelbaum

+1 202 663 6559 (t)
+1 202 663 6363 (f)
jonathan.siegelbaum@wilmerhale.com

*VIA ELECTRONIC MAIL*

The Honorable William McCurine, Jr.
U.S. District Court for the Southern District of California
940 Front Street
San Diego, CA 92101

Re: *Trunk et al. v. City of San Diego et al.*, No. 06-CV-1597; *Jewish War Veterans of the United
   States of America, Inc. et al. v. Gates*, No. 06-CV-1728

Dear Judge McCurine:

I am writing to clarify *JWV* Plaintiffs' position with respect to co-Plaintiff Trunk's motions
to compel the depositions of Rep. Duncan Hunter and Mayor Jerry Sanders. To this point, *JWV*
Plaintiffs have not filed with the Court any statement on the issue. However, we felt obligated to
respond to the City of San Diego's opposition papers, which falsely suggest that *JWV* Plaintiffs'
failure to join Trunk's motions is an indication that we believe Trunk's position to be without
legal merit. *See* City of San Diego's Opp. to Pl. Trunk's Mot. to Compel the Deposition of San
Diego Mayor Jerry Sanders (Mar. 14, 2007), at 2-3.

Contrary to the City's suggestion, *JWV* Plaintiffs believe, substantially for the reasons
stated in Trunk's papers to the Court, that the law entitles him to the depositions he seeks. In
Establishment Clause cases, statements by the supporters of government action at issue are
relevant to proving unconstitutional legislative purpose. *See McCreary v. ACLU*, 125 S.Ct. 2722,
2733 (2005); *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987); *Wallace v. Jaffree*, 472 U.S. 38,
56-58 (1985).

Moreover, as Trunk has argued, the Speech or Debate Clause permits significant discovery
of relevant materials from members of Congress relating to their non-legislative acts. *See Gravel
v. United States*, 408 U.S. 606, 625 (1972) ("[l]egislative acts are not all-encompassing" and
include only "the deliberative and communicative processes by which Members participate in
committee and House proceedings"; to "cajole, and exhort with respect to the administration of a
federal statute . . . is not protected legislative activity"); *United States v. Brewster*, 408 U.S. 501,
512 (1972) ("'errands' performed for constituents, the making of appointments with Government
agencies, assistance in securing Government contracts, preparing so-called 'news letters' to
constituents, news releases, and speeches delivered outside the Congress" are "political matters"
outside "the protection afforded by the Speech or Debate Clause"); *Kilbourn v. Thompson*, 103
U.S. 168, 204 (1880) (legislative acts are those "things generally done in a session of the House
by one of its members in relation to the business before it").

WILMERHALE

The Honorable William McCurine, Jr.
March 26, 2007
Page 2

The Clause poses no obstacle to the deposition of Mayor Sanders, who cannot claim protection from the Speech or Debate Clause.   Nor it does it bar Trunk from questioning Representative Hunter about non-legislative activities.   *JWV* Plaintiffs' decision not to formally adopt Trunk's motions to compel should not be interpreted as support for the Defendants' position.   Indeed, *JWV* Plaintiffs have served their own Rule 45 subpoenas on three Members of Congress, Representatives Hunter, Bilbray, and Issa, seeking documents not covered by the Speech and Debate Clause relating to their involvement in the designation of Mt. Soledad as a federal veterans' memorial.[1]

Thank you very much for your consideration of our position on this matter.   Please let me know if you have any questions.

Respectfully submitted,

Jonathan H. Siegelbaum

cc:      Service List

---

[1]      As permitted by Rule 45(a)(2)(C) of the Federal Rules of Civil Procedure, these subpoenas were issued from the United States District Court for the District of Columbia, the jurisdiction in which the requested documents are most likely to be found.

# EXHIBIT F

1   JAMES E. McELROY (#079313)
    LAW OFFICES OF JAMES E. McELROY
2   625 Broadway, Suite 1400
    San Diego, CA 92101
3   Phone (619) 232-6686

4   Attorney for Plaintiff
    PHILIP K. PAULSON
5

6

7                   **UNITED STATES DISTRICT COURT**

8                  **SOUTHERN DISTRICT OF CALIFORNIA**

9

10  STEVE TRUNK and PHILIP K.          )    CASE NO. 06-CV-1597 BTM (WMc)
    PAULSON,                           )
11                                     )    PLAINTIFF'S REQUEST TO COMPEL
                                       )    THE DEPOSITION OF SAN DIEGO
12            Plaintiffs,              )    MAYOR JERRY SANDERS AND
                                       )    REPRESENTATIVE DUNCAN
13                                     )    HUNTER
    v.                                 )
14                                     )
                                       )    Magistrate Judge William McCurine
15  CITY OF SAN DIEGO, UNITED          )
    STATES OF AMERICA, DONALD H.       )    Date:      March 22, 2007
16  RUMSFELD, Secretary of Defense and )
    DOES 1 through 100, Inclusive      )    Time:      2:00 p.m.
17                                     )
                                       )
18            Defendants.              )
                                       )
19  MT SOLEDAD MEMORIAL                )
    ASSOCIATION, AS REAL PARTIES       )
20  IN INTEREST.                       )
    _____)
21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

PAGE

3

TABLE OF CONTENTS........................................... i

4

TABLE OF AUTHORITIES........................................ ii

5

I.    INTRODUCTION........................................... 2

6

II.   STATEMENT OF FACTS..................................... 2

7

III.  THE  ACTIONS AND STATEMENTS OF GOVERNMENT
      REPRESENTATIVES ARE RELEVANT AND ADMISSIBLE EVIDENCE

8

      IN ESTABLISHMENT CLAUSE CASES TO ASCERTAIN "PURPOSE"... 10

9

IV.   EVIDENCE OF THE ACTS AND STATEMENTS OF GOVERNMENT
      OFFICIALS ARE RELEVANT, ADMISSIBLE AND PERHAPS

10

      DISPOSITIVE OF THE ISSUES ESTABLISHING VIOLATIONS OF

11

      THE CALIFORNIA CONSTITUTION BY DEFENDANT CITY OF SAN
      DIEGO................................................. 14

12

V.    CONCLUSION............................................ 18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

Barnes-Wallace v. Boy Scouts of America
    275 F.Supp.2d. 1259, 1276 (S.D. Cal. 2003)............ 15

Buono v. Norton
    371 F.3d 543 (9th Cir. 2004), 364 F.Supp.2d 1175,
    1182 (C.D. Cal. 2005)................................. 13

California Educ. Facilities Auth. v. Priest
    12 Cal. 3d 593, 607 n. 12 (1974)..................... 15

Edwards v Aguillard
    482 U S. +578, 594-595............................ 12,13,19

Ellis v. City of La Mesa
    990 F.2d 1518 (9th Cir.1993)cert. denied,
    512 U.S. 1220 (1994)................................. 2,3

Epperson v. Arkansas
    393 U.S,. 97 (1968).................................. 10

Feminist Women's Health Ctr., Inc. v. Philadelphia
    157 Cal.App.3d 1076, 1093 (1984)..................... 15

Fox v. City of Los Angeles
    22 Cal.3d 792, 587 P.2d 663,
    150 Cal. Rptr. 867(1978).......................... 15,16,17

Hewitt v. Joyner
    940 F.2d. 1561, 1567, 1569 (9th Cir. 1991)............ 15

Lemon v. Kurtzman
    403 U.S. 602, 612-613 (1971)......................... 10

McCreary v. ACLU
    125 S.Ct. 2722, 2733 (2005)....................10,11,12,19

Murphy v. Bilbray
    782 F.Supp. 1420, 1438 (S.D. Cal. 1991).............. 4,7

Murphy v. Bilbray
    No. 90-134 GT, 1997 WL 754604 at 11 (S.D. Cal.)....... 4

Paulson v. City of San Diego
    294 F.3d 1124, 1126, 1132(9TH Cir. 2002)............ 4,5,16

Sands v. Morongo Unified School Dist.
    53 Cal.3d 863, 809 P.2d 809, 281 Cal. Rptr. 34 (1991)
    (quoting 25 Op.Cal.Atty.Gen. 316, 319 (1955)......... 14

Sante Fe Independent School Dist. v. Doe
    530 U.S. 290, 315 (2000)............................. 11

Separation of Church and State v. City of Eugene (SCSC)
    93 F.3d 617 (9th Cir. 1996)........................   13

Wallace v. Jaffree
    472 U.S. 38, 56(1985)............................ 10,11,19

iii

1  JAMES E. McELROY (#079313)
   LAW OFFICES OF JAMES E. McELROY
2  625 Broadway, Suite 1400
   San Diego, CA 92101
3  Phone (619) 232-6686

4  Attorney for Plaintiff
   PHILIP K. PAULSON

5

6

7                  **UNITED STATES DISTRICT COURT**

8                 **SOUTHERN DISTRICT OF CALIFORNIA**

9

10  STEVE TRUNK and PHILIP K.          )    CASE NO. 06-CV-1597 BTM (WMc)
    PAULSON,                           )
11                                     )    PLAINTIFF'S REQUEST TO COMPEL
                                       )    THE DEPOSITION OF SAN DIEGO
12              Plaintiffs,            )    MAYOR JERRY SANDERS AND
                                       )    REPRESENTATIVE DUNCAN
13                                     )    HUNTER
    v.                                 )
14                                     )
                                       )    Magistrate Judge William McCurine
15  CITY OF SAN DIEGO, UNITED          )
    STATES OF AMERICA, DONALD H.       )    Date:      March 22, 2007
16  RUMSFELD, Secretary of Defense and )
    DOES 1 through 100, Inclusive      )    Time:      2:00 p.m.
17                                     )
                                       )
18              Defendants.            )
                                       )
19  MT SOLEDAD MEMORIAL                )
    ASSOCIATION, AS REAL PARTIES       )
20  IN INTEREST.                       )
    _____)
21
                                      I.
22
                            **INTRODUCTION**
23
        Plaintiff STEVE TRUNK ("Trunk") hereby requests an order permitting him to take
24
    the depositions of San Diego Mayor Jerry Sanders ("Sanders") and Congressman Duncan
25
    Hunter ("Hunter") within the next 30 days. Plaintiff intends to elicit testimony from
26
    Representative Hunter which will tend to confirm that the purpose of legislation he
27
    sponsored, culminating in House Resolution 5683 which authorized the federal government
28
    to take the cross and the land beneath it by eminent domain, was to preserve the presence of

                                       1

1  the Mount Soledad Latin cross on public property.  Plaintiff also intends to elicit testimony

2  from Mayor Sanders which will tend to support Plaintiff's claim that the purpose of

3  Defendant City's actions regarding the taking were to save the Latin cross on public property

4  and also that the City's actions in regard to the taking demonstrate a preference for one

5  religion over all others, create an impermissible  appearance of preference for Christianity

6  and aid religion.

7      The government's "purpose" in taking the property, government preference for one

8  religion above all others or  even the appearance of such a preference, may be  dispositive on

9  the issue of whether such a transfer violates both the California and United States

10  Constitutions.  Every court to consider this matter over the last 17 years has held that the Mt.

11  Soledad cross is a powerful sectarian symbol that conveys a religious message and that as

12  such, *any government  conduct that operates affirmatively to preserve the cross aids a*

13  *sectarian purpose and thus is unconstitutional.* (See discussion below)

14      Plaintiff Trunk requested the deposition of Representative Hunter through the U.S.

15  Attorney's Office, however that  request was denied. Likewise, Plaintiff requested the

16  deposition of Mayor Sanders through his legal representatives at the City Attorney's Office,

17  and that request was denied as well. (McElroy Dec. ¶1)  Plaintiff now requests this court

18  issue an order  compelling the depositions of Representative Hunter and Mayor Sanders.

19                              **II.**

20                       **STATEMENT OF FACTS**

21      The ownership of the cross and the Mount Soledad Natural Park is an issue that is

22  currently being litigated in this case. The federal government claims to have taken the

23  property and the cross by legislative eminent domain. Trunk alleges the taking was done to

24  save the cross, a sectarian symbol, and as such is unconstitutional and therefore the transfer is

25  void *ab initio*. The land has been owned (and Trunk contends is currently owned) by the City

26  of San Diego ("City").  It is made up of approximately 170 acres of land forming a mountain

27  with a flat, cleared area at the top.  At the apex of the mountain, in the center of the cleared

28  area, sits the  43 foot tall, 24 ton Latin cross.  This concrete cross was erected by the Mount

2

1  Soledad Memorial Association ("Association") in 1954 with the permission of the City.

2  Seventeen years ago, Plaintiff Paulson initiated a suit against the City of San Diego

3  challenging the constitutionality of the Latin cross on City property.  In that suit, Paulson

4  alleged that the cross amounted to a violation of the Establishment Clause of the First

5  Amendment to the United States Constitution, the No Preference Clause of the California

6  Constitution, and the No Aid Clause of the California Constitution.

7      Two years later, the District Court in 1991 issued a permanent injunction in this

8  matter, prohibiting the presence of the cross on public property and giving the City 90 days to

9  comply with the injunction.  Murphy v. Bilbray, 782 F.Supp. 1420, 1438 (S.D. Cal. 1991).

10  The court held that "[n]ot only is the cross is a profoundly religious symbol; it is also an

11  exceedingly powerful symbol" Id. at 1430.  Although the City appealed the decision of the

12  District Court, the Ninth Circuit Court upheld the injunction. Ellis v City of La Mesa (9th

13  Cir. 1993) 990 F.2d 1518, cert. denied, 512 U.S. 1220 (1994).

14      Although the District Court issued a permanent injunction in 1991, as of this date,  the

15  Latin cross is still situated on City or federal property, a full fifteen years after the original

16  injunction forbidding the presence of the cross public property was issued.

17      The Latin cross is visible to occupants of the approximately  300,000 thousand

18  vehicles that travel interstate 5 in that location on a daily basis and to thousands of others

19  who can see it from various San Diego neighborhoods miles away.  In addition, all persons

20  who wish to enjoy the public park or visit the memorial plaques currently in place, including

21  veterans of all faiths and those of no religious belief, are compelled  to do so in the shadow

22  of the enormous sectarian symbol.

23      In response to the Court's 1991 injunction, the City placed Proposition F on the ballot

24  seeking voter authorization for a sale of the land under the cross.  The argument in favor of

25  Proposition F advised voters that a "yes" vote would "save the cross."  The "save the cross"

26  ballot argument was signed by then City mayor, Maureen O'Connor and several City council

27  persons.  After Proposition F passed and the City sold the property to the Association,

28  Plaintiff challenged the constitutionality of the sale.  The District Court found that the sale

1 failed to cure the constitutional infirmities outlined in the injunction, and itself evidenced an

2 unconstitutional preference for religion. Murphy v. Bilbray, No. 90-134 GT, 1997 WL

3 754604 at 11 (S.D. Cal.). The City's implicit endorsement of the "save the cross" campaign,

4 based on the support of Propostion F by the Mayor was, among other factors , significant to

5 the courts' determination that the sale violated California's constitutional prohibition against

6 government preference for religion. Id. at 10.

7 Undiscouraged, the City fashioned yet another sale. In an *en banc* decision, the Ninth

8 Circuit found this sale also failed to cure the constitutional infirmities outlined in the 1991

9 injunction and that the structure of the sale evidenced an unconstitutional aid to religion.

10 Paulson v. City of San Diego 294 F.3d 1124, 1132 (9th Cir. 2002). The court explained, "In

11 view of our holding in Ellis that the Mt. Soledad cross is a sectarian symbol that conveys a

12 religious message, *governmental conduct that operates affirmatively to preserve the cross*

13 *aids a sectarian purpose: the preservation of a symbol that conveys a specifically Christian*

14 *message."* Id (emphasis added). Earlier , Judge Thompson ruled, "even if one strains to

15 view the cross in the context of a war memorial its primary effect is to give the impression

16 that only Christians...are being honored." Murphy, supra, 782 F. Supp. at 1437. In addition,

17 Judge Thompson wrote, "[t]he City is directed that, if it truly wishes to honor the war dead,

18 then it should do so other than with the Latin cross which it has permitted to stand atop Mt.

19 Soledad." Id. at 1436-38.

20 In response to the *en banc* decision and the Supreme Court's denial of cert, the parties

21 entered into negotiations to fashion a constitutional remedy that would finally end 15 years of

22 litigation over the cross on Mt. Soledad. The parties agreed to move the cross to a nearby

23 church, preferably one 1000 yards from where the cross currently stands. The Association

24 was going to retain its interest in the memorial, continue the improvements and agreed to

25 replace the cross with a non sectarian symbol that represented all veterans, not just

26 Christians. (McElroy Dec. ¶ 2) In exchange for this settlement, Plaintiffs agreed to dismiss

27 their lawsuit. Senior Deputy City Attorneys participated in the negotiations and indicated

28 they were acting with the authority and concurrence of the City Attorney. They agreed that

4

1    after 15 years of litigation, moving the cross was the only legal and practical way to settle

2    the case.

3        When the settlement was presented to the City Council in an open session, however,

4    Mayor Richard Murphy and several council persons announced their desire to save the cross.

5    One council person claiming that as a member of the "Jesus Christ fan club...he would never

6    support that cross coming off of Mt. Soledad." (Ex. 1) Instead of entering into the

7    agreement, the City passed yet another ordinance which proposed a third sale of an

8    unidentified amount of the land under and around the cross to the Association. That sale

9    would also have to be approved by the voters (Proposition K) pursuant to the City Charter.

10    The text of the Ordinance that the City Council passed, further specified that if Proposition K

11    failed to pass, the City would enter into the previously described settlement.

12        "SHOULD VOTERS REJECT THE PROPOSAL (proposition K) ,CITY
ATTORNEY *SHALL* ENTER INTO THE SETTLEMENT AGREEMENT NOW

13        WITH THE MT SOLEDAD MEMORIAL ASSOCIATION AND PLAINTIFFS."
(Ex.2, emphasis added)

14

15        Proposition K needed a 2/3 "yes" vote to pass. However, it failed by nearly a 2/3

   margin, with 60% of voters opposing the proposition. Following the failure of Proposition
16

   K, the Association and Paulson demanded that the City comply with the settlement
17

   agreement. However, the City steadfastly refused to obey the ordinance it had passed.
18

19        Rather than entering into the settlement agreement, the City entered into a scheme

   with representatives of the U.S government and a Christian advocacy group designed to save
20

   the cross by declaring it a National War Memorial, after which time the City would give the
21

   land to the federal government. The Thomas More Law Center ("TMLC"), is a group
22

   dedicated to protecting Christians and their religious beliefs, including promoting
23

   Christianity in the public square.(Ex. 3). The West Coast director of the TMLC, Charles
24

   LiMandri, wrote to Representatives Duke Cunningham and Duncan Hunter ("Hunter") and
25

   urged them to save the cross precisely because it was such an important symbol of the
26

   Christian faith.
27

28        "...*[R]eligion* and morality are the foundation of our country... On the issue of *religion*
and values...there was, unfortunately, a local election that turned out in a way
that was not consistent with the will of the people...I am referring to Proposition K

1

2

3

4

5

6

7

8

which concerned *the preservation of the Mt. Soledad cross* ...The Thomas More Law Center...*promotes the religious freedom of Christians*... This culture war will continue to be fought on many fronts ...The battle to preserve religious freedom in America has largely focused on the *symbols of our faith*. For us in San Diego, the *Mt. Soledad Cross is one of the most visible of these symbols*..... I am asking for your help to ...preserve this important ...*religious landmark...to preserve the Mt. Soledad cross*...We believe *our best hope to preserve the Mt. Soledad Cross* is to have it declared a Federal National Memorial Park... I believe that this final step [federalizing the land and the monument] should ultimately prove successful *in saving the Cross* for the following reasons. First, the California State Constitution provides stronger arguments…This is because the California Constitution ... has been interpreted more broadly than the 'establishment clause." I understand that the cross is expected to be removed in the next 60 days if we do not act. Therefore, any further action taken on this matter must be begun without delay. President Reagan, I think we all know where he would have stood on the issue of *saving the Cross. "* (Ex.4)

9

10

11

Mr LiMandri would later explain to the court that he worked with Mr Hunter's office in promoting this legislation. (Ex 5)

12

13

14

15

16

17

18

Within a month of this letter being sent, Representatives Cunningham and Hunter buried an eleventh hour rider in a 300 billion dollar omnibus appropriations bill. The bill attempted to designate the site, including the cross, as a National Veterans Memorial and compelled the Secretary of the Interior to accept the property, should the City of San Diego offer to donate it to the federal government. It specifically called for the continued maintenance of the cross by the Memorial Association. Both Congressman issued press releases making clear their intent in pressing this legislation was to save the cross. (Ex.6)

19

20

21

22

23

24

25

26

27

28

Shortly thereafter, the City Council considered the issue of whether to donate the property so that the federal government could accept it pursuant to the Cunningham/Hunter legislation. However, a majority of the City Council refused to donate the land to the federal government due to the advice of the City Attorney that such an act would be unconstitutional and would also violate the settlement agreement that the City promised to enter if Proposition K failed. (Ex. 7) In response, the Mayor along with several council members supported a petition and referendum drive to rescind the City Council's vote and allow the transfer of the property to the federal government. Despite a formal written opinion by the City Attorney advising both the Mayor and the Council that the proposed transfer to the Federal Government would violate both the state and federal constitutions, and in spite of the binding settlement agreement requiring the cross be moved to private property upon the failure of

6

1 Prop K, the Council nevertheless decided to put the question of whether to transfer the land
2 and the cross to the federal government to a public vote. The measure, Proposition A, was
3 put on the ballot for the July 26, 2005 special election. Fewer people voted for Proposition A
4 (190,000) than voted against Proposition K (250,000).

5      Paulson initiated an action in Superior Court challenging the validity of Proposition A.
6 On October 7, 2005, the Superior Court ruled that the proposed transfer of the land, cross and
7 memorial to the federal government by the City was unconstitutional. Specifically, the Court
8 found "...the ordinance placing Proposition A on the ballot and Proposition A
9 unconstitutional, and therefore invalid and unenforceable. Maintenance of the Latin Cross as
10 it is on the property in question, is found to be an unconstitutional preference of religion in
11 violation of Article I, Section 4, of the California Constitution, and the transfer of the
12 memorial with the cross as its centerpiece to the federal government to save the cross as it is,
13 where it is, is an unconstitutional aid to religion in violation of Article XVI, Section 5, of the
14 California Constitution." (Ex. 8. at p 1-2.) That decision was reversed by the Fourth District
15 Court of Appeal based in large part on that Court's belief that it couldn't determine "what
16 was in the mind of each voter" who voted for the referendum. A Petition for Review has
17 been filed with the California Supreme Court.

18      Meanwhile, in the District Court (prior to the vote on Prop A and to the Superior
19 Court's decision on the merits of the transfer), Plaintiff requested that the District Court
20 enforce the fifteen year old injunction and/or enforce the settlement agreement the parties
21 entered into. On May 3 2006, federal district court Judge Gordon Thompson ruled " [i]n
22 1991 this Court issued a 'permanent injunction forbidding the permanent presence'" of the
23 Mt. Soledad cross on public property. Murphy, 782 F. Supp. at 1438. At that time this Court
24 granted the defendant "three months within which to comply with this order." Id. "Almost
25 15 years later, the cross still stands atop Mount Soledad... Notably two companion cases in
26 the original action ...have long since been resolved and the constitutional infirmities cured...
27 It is now time, and perhaps long overdue, for this court to enforce its initial permanent
28 injunction... The City has 90 days within which to comply with this order with the additional

1  provision that the City shall be fined $5,000 a per day for each day the cross remains on City
2  property after the 90 days have expired." Id.

3        Instead of complying with the order of the District Court to remove the cross by
4  August 3, 2006, the City, federal government, and TMLC plotted yet another scheme to save
5  the Latin cross. This latest scheme involves Defendant U.S.A. taking the property in an
6  expedited fashion by invoking the seldom used "legislative taking," initiated for the sole
7  purpose of keeping the cross on public property and avoiding the lawful court order. In order
8  to accomplish this scheme, the Mayor of Defendant City Jerry Sanders ("Sanders") acted in
9  concert with officials of the U.S.A., primarily Congressman Duncan Hunter, on several
10 occasions in order to violate the constitutional rights of Plaintiffs and others by attempting to
11 save the preeminent and most powerful symbol of Christianity, a huge Latin cross, on public
12 land in San Diego. In furtherance of this plan, Mayor Sanders and Representative Hunter
13 wrote to the President of the United States recommending that the federal government take
14 the property on which the cross is located by eminent domain. (Exs. 9, 10.) Mayor Sanders
15 also traveled to the White House and met with other officials of the U.S.A. in his official
16 capacity on several occasions for the purpose of acting in concert with them to save the cross.
17 (Ex. 11) Apparently the President, perhaps dissuaded by the Justice Department, declined to
18 initiate the requested action so Congressman Hunter, with the full and complete cooperation
19 and assistance of the Mayor, acting in his official capacity, became the primary author and
20 proponent of the bill.

21        That the plan of the Defendants, acting in concert, was to save this 43 foot 20 ton
22 cross is also supported by a number of public records, most of which are set forth in the
23 Superior Court's ruling invalidating the attempt by the City to give the land to the federal
24 government. (See e.g., Ex. 12) In addition, the author and key proponents of the
25 congressional bill, Representative Duncan Hunter, has noted on his official government web
26 site that his intent in authoring, introducing and promoting this bill was to preserve the cross
27 on public property because it is a religious symbol. (Ex. 6, 13) Representative Hunter, along
28 with most of the other supporters of this plan, often spoke about saving the cross initially,

8

1   however now rarely mention the cross and instead only talk about saving the "memorial," as

2   they became more aware that such statements were anathema to their legal case. However,

3   the "memorial" obviously refers to the cross because the prior court orders and settlement

4   agreement specifically call for removing only the cross and for keeping the granite plaques

5   which surround the cross as a Veterans' Memorial under the continued ownership and

6   maintenance of the Association. This creatively worded ruse did not fool the one Judge who

7   has handled this case for over 17 years. Judge Thompson recently wrote:

8     Proposition A asked voters to decide whether or not to donate the Mt. Soledad
Veterans Memorial Property, including the cross, to the federal government in order to
9     "save the cross". . . .Essentially, at this stage of the litigation, enforcement of this
Court's injunction requires removal of the cross from the City owned parkland. . .
10     .Applicant is simply attempting to "save the cross," under the guise of litigating the
legality of Proposition A. . . .Stylizing the argument as an effort to maintain the Mt.
11     Soledad Veterans Memorial "as it is, where it is," does noting to hide the true
motivation to "save the cross." (Ex.14)

12

13   Also, Duncan Hunter's early press releases show his true intent in acting to save the

14   cross, as well as the real purpose of the government (Ex.6) "We can't allow anti-religious

15   groups...to continue to remove crosses and other religious symbols from war and veterans

16   memorials...If anti religious groups are successful in removing the cross from Mt Soledad,

17   what will stop them from going after other memorials with religious symbols." In fact, when

18   the bill was introduced on the floor of the Senate, Senator Sessions (who apparently hadn't

19   been briefed about the legal consequences of his statements in a case such as this) made the

20   candid admission, "...I recently introduced a bill to preserve the cross that stands at the center

21   of the Mt Soledad Veterans memorial in San Diego, CA. That is under attack by the ACLU

22   to remove the cross. This bill would preserve that cross...Congressman Duncan Hunter has

23   led the effort in the House." (Ex.12) In Mr. Hunter's comments on the floor, he referred first

24   and foremost to the support of Mayor Sanders and submitted in the congressional record a

25   letter supporting the eminent domain action signed by Mayor Sanders in his official capacity.

26   On August 14, 2006, President Bush signed House Resolution 5683 into law, now

27   codified at 120 Stat. 770. Those present at the ceremonial signing of this bill, not

28   surprisingly, included Representative Hunter and Charles Li Mandri from the TMLC. This

  government action, perpetuated by the concerted actions of the City, through the actions of

9

1  Mayor Sanders, and the U.S.A., through the actions of Representative Hunter, is

2  unconstitutional, the law itself is unconstitutional, the transfer is unconstitutional and the

3  permanent presence of the cross on federal land is also unconstitutional.

### III.

**THE ACTIONS AND STATEMENTS OF GOVERNMENT REPRESENTATIVES ARE RELEVANT AND ADMISSIBLE EVIDENCE IN ESTABLISHMENT CLAUSE CASES TO ASCERTAIN "PURPOSE"**

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof..." U.S. Const., Amend. I. In analyzing the First Amendment, the Supreme Court has recently explained "[t]he touchstone of our analysis is the principle that the 'First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion.'" McCreary v. ACLU, 125 S.Ct. 2722, 2733 (2005) quoting Epperson v. Arkansas, 393 U.S. 97 (1968). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." Id.. To determine whether a statute violates the Establishment Clause, the Court fashioned a three part test which it clarified in Lemon v. Kurtzman. 403 U.S. 602, 612-613 (1971). The first part of the Lemon test considers whether the government action has a predominantly secular rather than sectarian purpose. Id. If a statute does not have a clearly secular purpose, it is unconstitutional, and no further analysis is necessary. Wallace v. Jaffree 472 U.S. 38, 56 (1985).

The United States Supreme Court has recently weighed in at some considerable length on the issue of how courts must go about determining government purpose in Establishment Clause cases. McCreary, 125 S. Ct. at 2722. In determining whether a display of the Ten Commandments in Kentucky violated the Establishment Clause, the Court authorized a broad and far reaching examination of government purpose, Id. "After declining the invitation to abandon concern with purpose wholesale, we also have to avoid the Counties alternative tack of trivializing the enquiry into it. The Counties would read the cases as if purpose enquiry

10

1    were so naive that any transparent claim to secularity would satisfy it, and they would cut

2    context out of the enquiry, to the point of ignoring history, no matter what bearing it actually

3    had on the significance of the current circumstances. There is no precedent for the Counties'

4    arguments, or reason supporting them." McCreary, 125 S.Ct. at 2735.

5          The Court continued "[t]he Counties' second proffered limitation can be dispatched

6    quickly.  They argue that purpose in a case like this one should be inferred, if at all, only

7    from the latest news about the last in a series of governmental actions, however close they all

8    may be in time and subject.  But the world is not made brand new every morning, and the

9    Counties are simply asking us to ignore perfectly probative evidence; they want an

10   absentminded observer, not one presumed to be familiar with the history of the government's

11   actions and competent to learn what history has to show[.] The Counties' position just bucks

12   common sense: reasonable observers have reasonable memories, and our precedents sensibly

13   forbid an observer to 'turn a blind eye to the context in which [the] policy arose.'" Id. at

14   2736-2737 (*quoting* Sante Fe Independent School Dist. v. Doe, 530 U.S. 290, 315 (2000).

15         In analyzing the government's conduct and motive as required by the purpose prong

16   of the Lemon test in Establishment Clause cases, the Supreme Court has made it abundantly

17   clear that courts can rely on the statements and conduct of elected officials who supported the

18   legislation. Edwards v. Aguillard 482 U S. 578, 594-595; Wallace v. Jaffree, supra at 57-58.

19   "And in Edwards, we relied on a statute's text and *the detailed public comments of its*

20   *sponsor,* when we sought the purpose of a state law requiring creationism to be taught

21   alongside evolution." McCreary 2734.  "In applying the purpose test, it is appropriate to ask

22   'whether government's actual purpose is to endorse or disapprove of religion.'" Wallace at

23   56.  In Wallace, the U. S. Supreme Court specifically looked past the facially neutral statute

24   and examined the comments of the sponsor of the bill at issue and those of the Governor of

25   Alabama in commenting on the bill and concluded that the real purpose of the neutral statute

26   was to unconstitutionally promote prayer in public schools. The court specifically referred to

27   Senator Holmes' testimony before the District Court regarding his purpose and the admission

28   of the Governor of Alabama regarding the purpose of the legislation. Id. at 57,58. Similarly,

11

1   in the present case, the Plaintiffs wish to present relevant evidence regarding the purpose of

2   the legislation through the testimony of the two government agents most responsible for its

3   enactment.  As clearly demonstrated by the evidence presented in this motion, Plaintiff has a

4   good faith belief based on the above that these short, non intrusive depositions will provide

5   relevant, useful and perhaps dispositive evidence for the court. "We hold that the counties'

6   manifest objective may be dispositive of the constitutional enquiry , and that the development

7   of the presentation should be considered when determining its purpose." McCreary. at 2728.

8      McCreary , decided within the last year, cited Edwards and Wallace with approval.

9   All three are United State Supreme Court cases. There are no cases dealing with

10   Establishment clause challenges, that hold differently. The City has in the past, cited  to cases

11   restricting inquiry into the motive or purpose as expressed by government agents but  those

12   cases are inapposite. As the Supreme Court informed us in McCreary:

13         "While heightened deference to legislatures is appropriate for the review of economic
            legislation, an approach that credits any valid purpose, no matter how trivial, has not
14        been the way the court has approached government action that implicates
            establishment." Id. at 2736.

15

16         "An implausible claim that government purpose has changed should not carry the day
            in a court of law any more than in a head of common sense.  The divisiveness of
            religion in current public life is inescapable.  This is no time to deny the precedence of
17        understanding the Establishment Clause to require the government to stay neutral on
            religious belief, which is reserved for the conscience of the individual."  Id. at 2742.

18

19      The court in the present case , is  required to do a thorough  examination of historical

20   context, legislative history, the events leading to enactment, public comments of government

21   officials and other traditional indicia of legislative purpose. Id. at 2734; *see also* Edwards v.

22   Aguillard, supra, at 594- 595 [in determining the legislative purpose of a statute, the Court

23   has also  considered the historical context of the statute and the specific sequence of events

24   leading to passage of the statute].  In particular, the court should look to the  *detailed public*

25   *comments of a bill's sponsor.*  Id..  The only way to efficiently ascertain what comments were

26   made, who made them and the context in which they were made is to ask the sponsors some

27   questions under oath.

28      The District Court in an earlier incarnation of this case has  relied heavily on

1   statements made by elected officials in finding that the City's first attempted sale of the cross
2   was an unconstitutional endorsement of religion. The court especially relied on the
3   statements of the then mayor of San Diego as evidence of the government's motive for the
4   first sale. That analysis was affirmed on appeal. Ellis, supra, 990 F. 2d 1527 (cite and quote
5   Prop F) Similarly in this case, the statements and conduct of the current Mayor who
6   supported the legislation authorizing the federal government to take the cross are pertinent
7   and may be significant in  this court's analysis of the government's motive under the purpose
8   prong of the Lemon test . In order to present evidence to this court regarding the
9   government's purpose for legislatively taking the cross, plaintiffs must be allowed to gather
10  the information by asking the questions to those government officials who initiated and
11  facilitated and this taking.  The depositions requested are crucial to plaintiffs' ability to
12  demonstrate why the federal government's taking of the cross owned by the City and the
13  City's acquiescence of that taking violates the Establishment Clause of the Constitution.

14         Buono v. Norton, 371 F.3d 543 (9th Cir. 2004) and Separation of Church and State v.
15  City of Eugene (SCSC), 93 F.3d 617 (9th Cir. 1996) establish that large Latin crosses on
16  public property are an unconstitutional endorsement of religion in violation of the
17  Establishment Clause of the U.S. Constitution.  Like the instant case, the crosses in Buono
18  and SCSC were designated as memorials to veterans.  Recently, the district court in Buono
19  issued an opinion on remand, finding that the history of the government's efforts to preserve
20  and maintain the Latin cross a significant factor in determining the government's purpose in
21  a proposed land transfer to a private party. (364 F.Supp.2d 1175, 1182 (C.D. Cal. 2005).)
22  The court enjoined the transfer citing the government's "herculean efforts" to save the cross
23  as proof that the proposed transfer was just another such attempt. Id.  In this case, the acts
24  and statements of  Representative Hunter and Mayor Sanders, which demonstrate the
25  government's "herculean efforts" to save the Latin cross on Mount Soledad, can only be fully
26  discovered through their depositions.

27         Representative Hunter, in sponsoring and supporting House Resolutions 5683 and
28  2229, has said..."[w]e cannot allow anti-religious groups, including the American Civil

13

1  Liberties Union (ACLU), to continue their campaign to remove crosses and other religious
2  symbols from war and veteran memorials.  Specifically, H.R. 2229 expressly stipulates that
3  the inclusion of religious symbols on war and veterans memorials is authorized by Congress.
4  Further, it limits the jurisdiction of the federal courts to hear or decide any questions
5  pertaining to the interpretation or validity of this authorization under the Constitution." (See
6  Ex.6)  On another occasion, Hunter blamed "liberal judges" and their interpretation of the
7  California Constitution for the pending removal of the cross from city property.  (See Exs. 9,
8  13)  In yet another press release apparently referring to the Mt Soledad cross, Hunter noted
9  "[i]t is important that we exhaust every possible option for preserving this revered Memorial
10  and ensuring its continued presence atop Mt. Soledad." (Ex. 13.)  As mentioned earlier, no
11  party, no court, no commentator has ever suggested that the walls, plaques or flag or any part
12  of the memorial other than the cross would be moved.  It is the 17 year long battle over the
13  location of the cross that is the issue.  In fact, the cross stood alone on Mt Soledad until 2002
14  so that prior to that time there was not any "revered memorial" except for the lone cross
15  dedicated on Easter Sunday and used as the backdrop for Easter sunrise services every year
16  until the litigation commenced.  Thus, Representative Hunter alludes to taking any action
17  necessary to preserve the cross's continued presence, which is not a neutral government
18  action as required by the Establishment Clause, but rather a government endorsement of
19  religion. The Ninth circuit has already established that the Mt Soledad cross is a powerful
20  sectarian symbol and that efforts to preserve it by the government are unconstitutional. The
21  U.S Supreme Court denied cert and that decision is final.

22                                              **IV.**

23  **EVIDENCE OF THE ACTS AND STATEMENTS OF GOVERNMENT OFFICIALS
    ARE RELEVANT, ADMISSIBLE AND PERHAPS DISPOSITIVE OF THE ISSUES
24  ESTABLISHING VIOLATIONS OF THE CALIFORNIA CONSTITUTION BY
    DEFENDANT CITY OF SAN DIEGO.**
25
26            The California Constitution guarantees the "[f]ree exercise and enjoyment of religion

27  without discrimination or preference."  Cal. Const. Art. I, § 4.  The Attorney General of this

28  state has observed that "[i]t would be difficult to imagine a more sweeping statement of the

   principle of governmental impartiality in the field of religion" than that found in the "no-

                                              14

preference" clause, and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee. Sands v. Morongo Unified School Dist., 53 Cal.3d 863 (1991) (*quoting* 25 Op.Cal.Atty.Gen. 316, 319 (1955) and *citing* Fox v. City of Los Angeles, 22 Cal.3d 792 (1978).) The California courts have interpreted the no preference clause to require that government action in question does not endorse the religious views or beliefs of a particular religion or give "favored status to religion in general." Barnes-Wallace v. Boy Scouts of America, 275 F.Supp.2d. 1259, 1276 (S.D. Cal. 2003). The no preference clause even prohibits the government from acts that create the **appearance** of preference. Hewitt v. Joyner, 940 F.2d. 1561, 1567, 1569 (9th Cir. 1991).

Article XVI, section 5 of the California Constitution, known as the "No Aid Clause," provides in pertinent part:

> "Neither the legislature, nor any county, city...shall...grant anything to or in aid of any religious sect, church, creed, or sectarian purpose...nor shall any grant or donation of personal property or real estate ever be made by the state, or any city...for any religious creed, church, or sectarian purpose whatever."

Cal. Const. art. XVI, § 5.

The scope of the No Aid Clause has been construed broadly. Paulson, supra, 294 F.3d at 1129-31. The California Supreme Court has held that the clause "bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." California Educ. Facilities Auth. v. Priest, 12 Cal. 3d 593, 607 n. 12 (1974). According to the California Supreme Court, this section was intended by its framers "to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." Paulson, at 1130 (*citing* Priest, 12 Cal. 3d at 605.) In addition, the California Constitution's No Aid provision "admits of no *de minimus* exception." Fox, supra.. In fact, the No Aid Clause is so broad that the City need not provide any financial benefit or tangible aid but violates the provision by doing no more than lending its prestige and power to a sectarian purpose. Feminist Women's Health Ctr., Inc. v. Philadelphia, 157 Cal.App.3d 1076, 1093

15

1  (1984).

2       The California Supreme Court has authorized a far reaching search to determine the

3  actual purpose of government legislation which was challenged as unconstitutional. Fox, 22

4  Cal. 3d at 794. The Court in Fox held, "[w]hile some of the resolutions adopted by the City

5  Council contain self-serving recitals...that the display of the cross is predicated upon it being

6  a symbol of the spirit of peace and good fellowship...on an inter-faith basis, other evidence,

7  including matter of common knowledge of which the Court can and does take judicial notice,

8  makes it clear that the real purpose is a religious one." Id. The Fox court then examined

9  letters and reports upon which the City Council's resolutions, among other evidence, to

10  determine that the primary purpose for the display was religious. Id.

11  

12       In order to aid the court in determining the actual purpose of the City of San Diego's

13  involvement in the transfer of the land and the cross from the City, plaintiffs need to inquire

14  into Mayor Sanders' actions and intent in facilitating the passage of this legislation.

15  Defendant City of San Diego has aided religion, engaged in repeated acts of preference and

16  has created the appearance of preference for the Christian religion often in its seventeen-year

17  quest to "save the cross" located on Mount Soledad. Most recently, the City, by and through

18  the acts of Mayor Sanders, has acted in concert with Defendant United States of America to

19  transfer the Latin cross to the federal government for the purpose of evading the lawful

20  inunction issued in 1989 which calls for the removal of the cross from Mount Soledad and

21  the more recent enforcement action calling for the cross to be removed within 90 days.

22  Throughout the seventeen-year protracted litigation over the constitutionality of the Mount

23  Soledad Latin cross, many courts have held that the City has not acted in a religiously neutral

24  fashion as required by both the United States and California Constitutions. Instead, the City

25  has repeatedly chosen to act in a way that demonstrates a preference for Christianity over

26  other religions or non-religions.

27  

28       Just a sampling of Mayor Sanders' acts and statements, as an employee and agent of

16

the Defendant City, allude to his preference for one religion, and appearance of a preference. In a May 11, 2006 letter to President Bush, Mayor Sanders wrote..."a Federal District Court has ordered that an important element of the Memorial, a cross, be taken down within 90 days...Duncan Hunter wrote to you recommending that the Federal Government take the property on which the Memorial is located by eminent domain. I commend Congressman Hunter for doing everything possible to preserve the integrity of this important shrine to fallen soldiers and support the Congressman's recommendation." (Ex.15). On yet another occasion, Mayor Sanders discuses the reasons for his impending trip to Washington, D.C., noting "[o]ne of the most important will be the preservation of this national war memorial." (Ex. 16) In a press release dated May 6, 2006, Mayor Sanders notes that he "will fight hard to keep Mount Soledad national war memorial as it is." (See Ex. 17) Is he really saying he will work hard to save the cross? It seems so but that can better be determined after asking him a few questions, under oath, about that statement. While Mayor Sanders later goes on to say "[t]his is not about a Christian symbol...The cross has been here for almost 100 years and the war memorial has been here for over 50 years. It's part of our social and cultural fabric," the cross stood alone on the hill until 2002, well after the litigation was initiated. Mayor Sanders has learned as have others such as Representative Hunter that speaking of saving the cross was anathema to the City's case. Instead, supporters of the cross speak in terms of saving the war memorial, however as mentioned earlier, the war memorial is not in need of being saved. (See Eisenberg, Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication, 52 N.Y.U. L. REV. 36, 163 (1977) ("Some legislators have learned their lessons well, becoming quite sophisticated in drafting legislation that does not smack of sectarian purposes.")

Through his efforts to have the Latin cross federalized in order to preserve the status and location of the cross on public land, Mayor Sanders abandoned the required governmental neutrality required by the California Constitution, and instead engaged in acts

17

of preference, as well as the appearance of preference, for the Christian religion. The efforts engaged in by Mayor Sanders to save the Latin cross, the preeminent symbol of Christianity, are relevant and admissible evidence which support a finding that the City has not acted religiously neutral, instead demonstrating its preference for one religion over all others. The conduct and statements of government officials like Mayor Sanders can and have been used as evidence of the government's preference for one religion and appearance of preference, as well as to demonstrate government aid to religion. Mayor Sanders' actions and statements demonstrating a preference for Christianity over all others religions and non-religions, as well as the appearance of preference for Christianity are dispositive in determining whether Defendant City Plaintiffs violated the "no preference clause" of the California Constitutions. It is therefore imperative that Plaintiffs have the opportunity to depose Mayor Sanders in order to establish his preference and appearance of preference for Christianity in his attempts to save the Latin cross. The No Aid Clause is so broad that the City need not provide any financial benefit or tangible aid but violates the provision by doing no more than lending its prestige and power to a sectarian purpose. Feminist Women's Health Ctr., supra, 157 Cal.App.3d at 1093.

## V.

## CONCLUSION

The United States Supreme Court has authorized , in fact it seems to require, that courts closely examine the context, history, development of the display, and specifically the comments of government officials who initiate or sponsor legislation that raises constitutional Establishment Clause issues (McCreary, Wallace and Edwards). The California Supreme Court is in accord (Fox) . Short depositions, at a time and place

18

convenient to the deponents, of Mayor Sanders and Representative Hunter will insure that the court is able to have the true facts before it regarding the purpose and intent of the government actions which have managed to preserve the cross on public property.

The scope of the questions will be limited and designed only to explore the deponents acts and statements as they relate to "purpose" , "intent" , "preference" and "aid" as those words are used in the cases cited above.

Dated: 2-22-07

LAW OFFICES OF JAMES E. McELROY

BY:

JAMES E. McELROY
Attorneys for Plaintiff

19

# EXHIBIT G

1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10

11   STEVE TRUNK and PHILIP K. PAULSON,   )   Case No. 06 CV 1597 J (WMc)
                                 )

12              Plaintiffs,         )   **ORDER**
                                 )

13   v.                           )
                                 )

14   CITY OF SAN DIEGO, UNITED STATES  )
    OF AMERICA, DONALD H. RUMSFELD,   )

15   Secretary of Defense and DOES 1 through   )
    100, Inclusive                  )

16                               )
            Defendants.       )

17                               )
    MOUNT SOLEDAD MEMORIAL        )

18   ASSOCIATION, Real Parties in interest.   )
                             )

19   JEWISH WAR VETERANS OF THE      )
    UNITED STATES OF AMERICA, INC.,     )

20   RICHARD A. SMITH, MINA SAGHEB, and  )
    JUDITH M. COPELAND,         )

21                               )
            Plaintiffs        )

22                               )
    v.                        )

23                               )
    DONALD H. RUMSFELD, Secretary of    )

24   Defense, in his official capacity,      )
                              )

25             Defendant.       )

26

27   ///

28   ///

The Court held a telephonic discovery conference on May 22, 2007.  Appearing for Plaintiff Trunk was James McElroy.  Appearing for the JWV Plaintiffs were Jonathan Siegelbaum, Lane Dilg and David Blair-Loy.  Appearing for Defendant, the United States, were Heidi Herrmann and Ryan Nelson.  Appearing for Defendant, the City of San Diego, was George Schaefer.

After hearing from counsel of record, the Court issues the following orders:

1.) Subject to the standard rules of evidence, discovery propounded in *Paulson v. City of San Diego, et al.* may be used as though propounded in *Jewish War Veterans of the United States of America v. Rumsfeld* and vice versa.

2.) Any party withholding documents based on a claim of privilege shall prepare a privilege log.  For further requirements concerning the format of an acceptable privilege log, the parties shall contact Judge McCurine's law clerk at (619) 557-6624.

The Court will hold a further *telephonic* Discovery Conference on **June 6, 2007 at 9:15 a.m.**  Attorney Heidi Herrmann is ordered to contact all opposing counsel and initiate a joint call to the Court at (619) 557-6624.

**IT IS SO ORDERED.**

DATED: May 22, 2007

Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court

COPY TO:

HONORABLE LARRY A. BURNS, U.S. DISTRICT JUDGE

ALL PARTIES AND COUNSEL OF RECORD

2

# EXHIBIT H

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 STEVE TRUNK and PHILIP K. PAULSON,

12                                                  Plaintiffs,

13          vs.

14 CITY OF SAN DIEGO, UNITED STATES OF AMERICA, DONALD H. RUMSFELD,

15 Secretary of Defense and DOES 1 through 100, inclusive,

16

17                                                  Defendants.
   _____

18 MOUNT SOLEDAD MEMORIAL ASSOCIATION,

19                     Real Parties in Interest.

20 _____

21 JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC.,

22 RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND,

23                                                  Plaintiffs,

24          vs.

25 DONALD H. RUMSFELD, Secretary of

26 Defense, in his official capacity,

27                                                  Defendant.
   _____

28

CASE NO. 06cv1597-LAB (WMc)
(Consol. w/06cv1728-LAB (WMc)

**ORDER TO SHOW CAUSE RE: JUSTICIABILITY**

1   On September 8, 2006, Plaintiffs Steve Trunk and Philip Paulson filed their First

2   Amended Complaint ("FAC") seeking declaratory and injunctive relief.  Specifically, Plaintiffs

3   seek a declaration that transfer of the land which is the subject of this litigation to the federal

4   government violates Plaintiffs' rights under the U.S. and California constitutions, and that the

5   statute authorizing it be declared void *ab initio*.  Plaintiffs sought both a preliminary and

6   permanent injunction prohibiting Defendants from displaying the cross on government

7   property.  Plaintiffs request the Court "[e]ncourage the parties to honor the settlement

8   agreement that was entered into . . . ."  Finally, Plaintiffs seek an award of fees and costs,

9   and any other relief the Court deems just and equitable.

10   The FAC was subject to a motion to dismiss for lack of jurisdiction, filed October 10,

11   2006.  Amicus Pacific Justice Institute filed a brief on October 13, 2006 in support of

12   Defendants' motion to dismiss.  The Court issued an order on November 7, 2006, noting the

13   amicus brief had raised the issue of Article III standing, and directed the parties to address

14   this issue either in their briefing on the motion to dismiss, or in a subsequent motion.  The

15   Court denied the motion to dismiss on November 29, 2006 by minute order following a

16   hearing.

17   On May 8, 2007, Judge Barry Moskowitz recused and the case was reassigned to

18   Judge Napoleon Jones, who in turn recused on May 15, 2007.  The case was then

19   reassigned to Judge Larry Burns.  In spite of the reassignment, it is not the Court's intention

20   at this time to revisit the issues briefed and ruled on previously.  However, upon reviewing

21   the record, questions present themselves regarding the standing of Plaintiffs Trunk and

22   Paulson, and about the Court's jurisdiction more generally.  These Plaintiffs seek, in addition

23   to other remedies, the Court's encouragement of the parties to honor the settlement

24   previously reached between the City of San Diego (the "City") and Plaintiffs Trunk and

25   Paulson; and avoidance of the transfer by invalidation of the federal statute which effected

26   it.  While it appears some of these issues have been addressed obliquely, it is not clear at

27   this point that they have been addressed as fully as is required.

28   / / /

1    Furthermore, it appears that the protracted litigation of related matters has muddied

2    the waters somewhat, and the briefing in this case has not always identified the relevant

3    issues, legal standards, or authorities.  This was noted by the Court previously when it

4    directed the parties to address the issue of Article III standing.  To the extent possible, the

5    Court wishes to direct the parties to address the relevant questions and to avoid needless

6    briefing on matters not at issue here.

7    **I.    Legal Standards**

8    Standing is a jurisdictional requirement, and a party invoking federal jurisdiction has

9    the burden of establishing it.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct.

10   2130, 2136, 119 L.Ed.2d 351 (1992).  Standing is a "threshold question in every federal

11   case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Federal courts are required to examine

12   jurisdictional issues including standing, even *sua sponte* if necessary.  *B.C. v. Plumas*

13   *Unified School Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).

14   Even if Plaintiffs Trunk and Paulson have standing under California law, standing

15   sufficient to meet federal standards is a jurisdictional requirement imposed by Article III of

16   the U.S. Constitution and takes priority.  *Lee v. American Nat'l Ins. Co.*, 260 F.3d 997,

17   999 –1000, 1001–02 (9th Cir. 2001). *Accord  Wheeler v. Travelers Ins. Co.*, 22 F.3d 534,

18   537 (3d Cir. 1994) (*citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct.

19   2965, 2970, 86 L.Ed.2d 628 (1985)) (holding that standing to bring an action in federal court

20   is determined under federal, not state law).

21   To show they have standing, Plaintiffs must establish three things:

22   First [they must have] suffered an injury in fact — an invasion of a legally
     protected interest which is (a) concrete and particularized, and (b) actual or
23   imminent, not conjectural or hypothetical. Second, there must be a causal
     connection between the injury and the conduct complained of . . . . Third,
24   it must be likely, as opposed to merely speculative, that the injury will be
     redressed by a favorable decision.
25

26   *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted).

27   / / /

28   / / /

1    **II.    Discussion**

2    As Plaintiffs Trunk and Paulson have framed it, their injury consists of the imminent

3    harm they will suffer if the property at issue is taken by the United States and operated as

4    a veterans' memorial with the large cross in place.  Their claimed injury does not consist

5    simply of the fact that a large cross is located on particular mountain, nor government

6    ownership or non-ownership of land on Mt. Soledad, nor mere efforts by officials or voters

7    who wished the cross to remain where it was.  The parties are directed in their briefing to

8    focus on the elements of an Establishment Clause claim.

9    **A.    Request for Encouragement to Abide by the Settlement Agreement**

10   While courts in the course of making and explaining their rulings do incidentally

11   advise, admonish, exhort, or encourage parties to take various actions, it is unclear why

12   Plaintiffs Trunk and Paulson have standing to seek the issuance of an "encouragement" from

13   the Court as one of their remedies, or why the Court would have jurisdiction to rule on this

14   issue.  Such an encouragement would have no force, and could not affect the parties' rights.

15   *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (holding that federal courts

16   lack the power to decide questions that cannot affect the rights of litigants in the case before

17   them) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)); *Duke Power Co. v. Carolina*

18   *Environmental Study Group, Inc.*, 438 U.S. 59, 79 (1978) (requiring a substantial likelihood

19   "that the judicial relief requested will prevent or redress the claimed injury").

20   **C.    Invalidation of the Transfer**

21   The briefing suggests the transfer of the land at issue here was effected by actions

22   taken by both the City, as part of its efforts to "save the Cross" and the United States, in

23   enacting H.R. 5683 as Public Law 190-272.  Should the requested relief be granted,

24   ownership of the land would presumably revert to the City.

25   **1.    Questions Regarding Justiciability**

26   The Court notes several apparent issues bearing on the issues of standing and

27   justiciability generally.  First, while the transfer was initially attempted by the City, the transfer

28   at issue here was apparently accomplished entirely by the United States when it enacted

1   Public Law 190-272, which effects a taking of the land.  Under the Supremacy Clause, no

2   action taken by the City can invalidate a federal statute.  Public Law 109-272 is an act of the

3   United States, not of the City.  *Paulson v. City of San Diego*, 475 F.3d 1047, 1049 (9th Cir.

4   2007) (holding that the passage of Public Law 109-272 was not attributable to the City)

5   (citing *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006)).  It

6   therefore appears the transfer at issue consists only of the taking effected by Public Law

7   190-272, and the propriety of the City's actions is not justiciable.  In addressing the question

8   of standing, the parties are specifically directed to focus on the U.S. government's actions

9   and not the actions of the City or other parties unless such briefing would be relevant or

10  provide needed explanatory background.

11      In enacting and enforcing its own statutes, the United States is of course not bound

12  by California law, including the California constitution.  *Paulson*, 475 F.3d at 1048 ("[T]he

13  United States is not subject to state constitutional authority.")  If Plaintiffs Trunk and Paulson

14  have standing to challenge the taking, it will be solely to vindicate their federal rights.

15  Therefore, when the parties address this issue, they should rely on the United States

16  Constitution and federal law, and need not address the hypothetical issue of whether the

17  U.S. government's taking of the property would have violated California's constitution.

18      At this stage, Plaintiffs Trunk and Paulson are attempting to challenge the United

19  States' taking of land.  What the United States may do with this land is to be addressed in

20  later stages of this action.  However, at this point, it is not yet clear why these Plaintiffs have

21  standing to challenge the taking itself, or why such a matter is justiciable at all.

22      Plaintiffs Trunk and Paulson identify themselves as veterans, and describe their

23  interest as ensuring that the veterans' memorial is operated in a nonsectarian manner.

24  These Plaintiffs have not, however, identified any interest in having the memorial operated

25  by the City rather than by the United States.

26      It seems clear Plaintiffs Trunk and Paulson would prefer to enforce the previously

27  issued injunction rather than litigate anew against the United States.  While efficiency of

28  litigation is a laudable goal and may be the subject of motions within a larger action, *see*

Fed. R. Civ. P. 1, the Court is unaware of any authority holding ease or convenience of litigation by itself is a legally protected interest such as could support Article III standing. *See Lujan*, 504 U.S. at 560.

Bearing in mind the injury these Plaintiffs have alleged, the taking puts an end to any California constitutional violation by the City. Obviously, these Plaintiffs would prefer that the violation was remedied by removing or altering the cross; but, as a matter of law, it appears any means by which the alleged violation is brought to an end will suffice. *Paulson*, 475 F.3d at 1048–49 (Plaintiffs' appeal became moot with the City's divestment of its interest in the memorial) (citation omitted). *See also Palmer v. Thompson*, 403 U.S. 217, 227 (1971) (declining to require city to continue to operate swimming pools after Constitutional problem of operating pools in a racially segregated manner was brought to an end by closing the pools)*; Evans v. Abney*, 396 U.S. 435, 447 (1970) (declining to intervene further after Constitutional violation was ended by state's decision to divest itself of park accepted on condition that it be operated in a racially segregated manner). Therefore, it appears Plaintiffs Trunk and Paulson have no legally protected interest in seeing that the memorial is operated by the City and is subject to California law, rather than being taken by the federal government

Assuming the taking is not invalidated, the United States will be required to abide by the same U.S. Constitutional requirements as would the City. Assuming that violations of the California constitution have ended and thus do not require redress, and any federal Constitutional violations are unaffected by the transfer, it is unclear how invalidating the transfer would redress any injury done to Plaintiffs Trunk and Paulson.

## 2. Political Question Doctrine

It does not appear Plaintiffs Trunk and Paulson have argued that the mere taking of land under the assumption that it will be used for a sectarian purpose, or the taking of land with a religious symbol on it amounts to an Establishment Clause violation. If these Plaintiffs do intend to raise this argument, however, the Court directs them to brief it, particularly addressing the jurisdictional issue of the political question doctrine — *i.e.*, whether this Court

1   has the power to interfere with the federal government's Constitutionally-granted power to

2   acquire property either because of an existing condition on the land, or because of the

3   proposed use for which the property was acquired. *See Koohi v. United States*, 976 F.2d

4   1328, 1332 (9th Cir. 1992) (holding that the political question doctrine goes to the court's

5   "power to entertain the plaintiffs' action").

6       The Court has three particular concerns in this regard: 1) that Plaintiffs Trunk and

7   Paulson are asking it to invalidate the taking because the property cannot be used as

8   Congress intended when the taking was authorized — in other words, that this was an

9   unwise decision, 2) that prohibiting the political branches from acquiring land on which

10  religious symbols already exist would impermissibly interfere with the power committed to

11  them under the Takings Clause, and 3) that invalidating the taking on the basis of alleged

12  improper motives expresses lack of the respect due to the Executive and Legislative

13  branches. *See Arakaki v. Lingle*, 477 F.3d 1048, 1066–67 (9th Cir. 2007) (outlining bases

14  for application of the political question doctrine) (citations omitted). Should Plaintiffs Trunk

15  and Paulson fail to brief this argument, the Court will consider it abandoned.

16  **III.    Conclusion and Order**

17      Plaintiffs Trunk and Paulson are therefore **ORDERED TO SHOW CAUSE** why their

18  requests for declaratory relief, for "encouragement" to abide by the settlement agreement,

19  and for invalidation of Public Law 190-272 should not be dismissed as non-justiciable.

20  Plaintiffs Trunk and Paulson may do so by filing a joint memorandum of points and

21  authorities, no longer than 15 pages in length, not counting any appended or lodged

22  material, no later than 21 calendar days from the date this Order is entered in the docket.

23  Defendants may, if they wish, file a joint reply memorandum subject to the same length

24  limitations, no later than 35 calendar days from the date this Order is entered in the docket.

25  The amicus Pacific Justice Institute may, if it wishes, file a reply no longer than 5 pages in

26  length within the time permitted for reply. The Court does not require briefing from the other

27  parties; they may, however, join in the other parties' briefing with the consent of those

28  parties.

06cv1597

While, as noted above, it is not the Court's intention to revisit its previous ruling, the Court has a continuing duty to examine its own jurisdiction. Therefore, the parties are admonished that, should the briefing disclose a basis for reconsidering the Court's previous order denying Defendants' motion to dismiss for lack of jurisdiction, the Court may do so *sua sponte*. Therefore, the parties should include all authority and arguments relevant to jurisdictional issues as previously briefed. The parties are particularly encouraged, however, to focus on the issues raised in this Order. Appended or lodged material should be kept to a minimum, its significance should be explained in the body of the memorandum, and precise citations should be given.

**IT IS SO ORDERED**.

DATED: June 1, 2007

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge