**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, Plaintiffs,<br><br>v.<br><br>ROBERT M. GATES, Secretary of Defense, in his official capacity,<br><br>Defendant. | Case No. 1:07-mc-00220 (JDB)<br>Case No. 1:07-mc-00221 (JDB)<br>Case No. 1:07-mc-00222 (JDB) |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO SUBPOENAS

The Oppositions to Plaintiffs' Motion show that the executive and legislative branches of the federal government hope to prevent the court that will decide this lawsuit from fully understanding how the United States came to acquire the Mt. Soledad Cross. By attempting to limit the definition of what is relevant to the lawsuit to little more than the carefully scrubbed statements posted on the Members' official websites or read into the Congressional Record, the Members and the Federal Defendants are trying to restrict the history and context that the court will consider to a sham record of secular purpose, carefully compiled for litigation ends.

The Potemkin village that the Members and the Federal Defendants hope to present to the court, however, is a far cry from reality. Plaintiffs respectfully ask this Court to allow the full factual record concerning the federal government's acquisition of the Cross to be considered by rejecting the relevance objections set forth in the Oppositions, as well as the Oppositions' meritless arguments that law of the case, collateral estoppel, and the Speech or Debate Clause excuse the Members from producing responsive documents within their possession.

I.    **THE MEMBERS HAVE NO BASIS FOR WITHHOLDING RESPONSIVE DOCUMENTS ON RELEVANCE GROUNDS.**

    A.    **The Members and Federal Defendants Advance an Inappropriately High Standard for Relevance at the Discovery Stage of Litigation.**

The Members and Federal Defendants face a heavy burden in attempting to resist discovery on relevance grounds. Under Fed. R. Civ. P. 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Relevance is "construed broadly to encompass any matter that bears on, *or that reasonably could lead to other matter that could bear on*, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (emphasis added). As this Court has recently held, "[t]he term relevance at the discovery stage is a broadly construed term and is given very liberal treatment." *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, No. 04-2201, 2007 WL 1020785, at *4 (D.D.C. Mar. 29, 2007).

Contrary to the Members' and Federal Defendants' suggestions, evidence need not necessarily be relevant *at trial* in order to be relevant for *discovery*. *See Kerr v. U.S. Dist. Court*, 511 F.2d 192, 196 (9th Cir. 1975) ("[T]he question of relevancy is to be more loosely construed at the discovery stage than at the trial."), *aff'd*, 426 U.S. 394 (1976). This rule reflects the principle that access to information should not be foreclosed at the threshold of a case, prior to a full understanding of the controversy. *See Smith v. Schlesinger*, 513 F.2d 462, 473 & n.37 (D.C. Cir. 1975) ("a party may discover information which is not admissible at trial if such information will have some probable effect on the organization and presentation of the moving party's case"); *see also* Advisory Committee's Notes on Fed. R. Civ. P. 26(b)(1) (1970 Amendments) ("Since decisions as to relevance to the subject matter of the action are made for discovery purposes well in advance of trial, a flexible treatment of relevance is required."). Thus, the Members and Federal Defendants are not only incorrect in asserting that Plaintiffs' discovery

requests do not factor into an Establishment Clause analysis, *see* Part I.B-I.D *infra*, they are also mistaken in assuming that the discovery sought would have to do so.

The documents Plaintiffs seek from the Members would bear directly on the Establishment Clause claims in the complaint. As primary actors behind the taking and display of the Cross, the Members are at the hub of the controversy. The Members' documents are potentially relevant to Plaintiffs' lawsuit in numerous ways: they may reflect the purpose for which the Cross is displayed, historical context, the sequence of events leading to the federal action, the effect of the taking and display of the Cross on the public, and the entanglement of government with religious institutions dedicated to preserving the Cross. The documents may also point Plaintiffs to further relevant facts and witnesses. Denying discovery from these central figures would undermine the "wide access to relevant facts [that] serves the integrity and fairness of the judicial process by promoting the search for the truth." *Rivera v. NIBCO, Inc.*, 384 F.3d 822, 824 (9th Cir. 2004).

**B.      The Members Attempt To Write the Well-Settled, Wide-Ranging Purpose Inquiry Out of Establishment Clause Jurisprudence.**

The Members inexplicably begin their argument by refusing to acknowledge the centrality of the inquiry into governmental purpose in the Supreme Court's Establishment Clause case law. They cite the *plurality* opinion in *Van Orden v. Perry*, 545 U.S. 677 (2005), to conclude that a court reviewing a "passive monument" need only peruse "the nature of the monument and … our Nation's history." Members' Opp. at 6-7. In the alternative, they suggest that a court should rely on a "display and context" standard from *Van Orden*'s concurring opinion. *Id.* at 7. Strangely, the Members fail to mention, much less address, the controlling legal test articulated by a majority of the Supreme Court on the same day as *Van Orden*. In *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844

(2005), which involved challenges to displays of the Ten Commandments on courthouse walls in two Kentucky counties, a *majority* of the Supreme Court emphatically rejected two county governments' efforts to "argu[e] that official purpose is unknowable and the search for it inherently vain," or to "limit the scope of the purpose enquiry so severely that any trivial rationalization would suffice." *Id.* at 859. Instead, the Court held "that purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context; an implausible claim [of] governmental purpose … should not carry the day in a court of law any more than in a head with common sense." *Id.* at 874. Even as it reaffirmed that "scrutinizing purpose does make practical sense," *id.* at 862, the *McCreary* Court also confirmed two other well-established principles:

- First, the "secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864 (citing *Santa Fe Indep. School Dist. v. Doe,* 530 U.S. 290, 308 (2000), and *Edwards v. Aguillard,* 482 U.S. 578, 586-87 (1987)).

- Second, to determine purpose, the Establishment Clause inquiry must look to the "plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [and] *the historical context of the statute, . . . and the specific sequence of events leading to [its] passage."* *Id.* at 862 (emphasis added) (quoting *Edwards,* 482 U.S. at 594-95).

The conclusion in *McCreary* that "a determination of the [government's] purpose is a sound basis for ruling on . . . Establishment Clause complaints," *id.* at 850, plainly controls this case.

Perhaps the Members wish to draw attention away from *McCreary* because their approach is so similar to the one that the Supreme Court forcefully rejected in that case. The governments in *McCreary* first "invit[ed the Court] to abandon concern with purpose wholesale" and then pursued the "alternative tack of trivializing the enquiry into it." *Id.* at 863. The Court criticized the governments for "read[ing] the cases as if the purpose enquiry were so naive that any transparent claim to secularity would satisfy it, and [for] cut[ting] context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of

current circumstances." *Id.* at 863-64. It also rejected the governments' invitation "to ignore perfectly probative evidence" rather than looking to "the history of the government's actions," "the specific sequence of events leading to" those actions, and "the history and context of the community and forum in which the religious display appears." *Id.* at 866 (quoting *Edwards*, at 595; and *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment)) (internal alterations omitted).

### C.    The Members' Documents Reflect Readily Discoverable Facts That Demonstrate Objective Purpose.

To their credit, the Federal Defendants – unlike the Members – do not attempt a complete dodge of *McCreary*'s preservation of the centrality of governmental purpose in Establishment Clause cases. They instead cite its self-evident declaration that a "secret motive" is irrelevant to the purpose inquiry. *See* Fed. Defs.' Opp. at 10 (citing *McCreary*, 545 U.S. at 863); *see also* Members' Opp. at 13 n.9 (citing same). According to this logic, the Members' documents are not relevant because they could only show the Members' well-hidden religious motives.

Plaintiffs recognize that the purpose inquiry must rely on "readily discoverable fact" rather than any "judicial psychoanalysis of a drafter's heart of hearts." *McCreary*, 545 U.S. at 862. But Plaintiffs have not sought to "put[] the three Members on a couch or in a deposition room," Members' Opp. at 12, and their document requests are not intended to reveal the "veiled psyche of government officers," *McCreary*, 545 U.S. at 863. To the contrary, Plaintiffs' requests seek documents reflecting the Members' outward words and deeds.[1] Communications with the press, constituents, activist organizations, and other governmental entities are by definition

---

[1]    While the Members and Federal Defendants contest only the relevance of the *Members'* statements and actions, the documents are also likely to reflect the statements and actions of others, including the City of San Diego, the City's lobbyist, the Mt. Soledad Memorial Association, executive branch officials, and activist organizations.

"unveiled" because they were made to others. The Members' efforts to shield their words and deeds represent an unacceptable effort to impede the court's inquiry into their objective purpose.

**1.    A "Broad-Ranging" Search to Determine Governmental Purpose Is Required In Establishment Clause Cases.**

The Members and the Federal Defendants inappropriately seek to limit Plaintiffs' ability to inquire into purpose by limiting the available types of evidence. They characterize any document not already a matter of public record as "secret" or "veiled" or merely evidence of the "subjective motives of individual legislators." *See* Members' Opp. at 10-14; Fed. Defs.' Opp. at 10-14. In essence, they argue that only the information selectively disclosed by the Members to the entire public is relevant to a court's inquiry. This cramped approach to the purpose inquiry cannot be squared with the relevant case law.

Applying the Supreme Court precedent reaffirmed in *McCreary*, the Court of Appeals for this Circuit has held that courts must reach beyond the crabbed set of source materials suggested by the Members and the Federal Defendants. In *United Christian Scientists v. Christian Science Board of Directors*, 829 F.2d 1152 (D.C. Cir. 1987), the D.C. Circuit held that courts embarking upon the inquiry into purpose "may examine the testimony not only of legislative sponsors, but also that of key witnesses, and of experts who 'participated in or contributed to the enactment of the law or its implementation.'" *Id.* at 1163 n.50 (citing *Edwards*, 482 U.S. at 594-95). Most importantly, the court of appeals made clear that "courts may look beyond formal legislative sources to the general historical context of the statute, including the sequence of events leading to its passage." *Id.* On its reading of the Supreme Court's Establishment Clause jurisprudence, the D.C. Circuit concluded that "*all sources illuminative of . . . purpose* may properly be consulted by a court undertaking *Lemon's* inquiry." *United Christian Scientists*, 829 F.2d at 1163 n.50 (emphasis added).

2.    **The Words and Deeds of Legislative Sponsors Are Relevant to Determining the Legislation's Purpose.**

For the proposition that the words and deeds of individual legislators are irrelevant, both the Members and the Federal Defendants cite yet another non-controlling plurality opinion, *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990). *See* Members' Opp. at 11-13; Fed. Defs.' Opp. at 6-10. The plurality opinion in *Mergens* simply notes that when legislators make conflicting statements regarding the purpose of a statute, the religious motivations of some legislators will not override a secular purpose apparent on the face of the statute. *See Mergens*, 496 U.S. at 248-49 (plurality). Conversely, the Act at issue here passed overwhelmingly in both houses, and was not accompanied by a committee report or by extensive floor debate. *Cf. Kenna v. U.S. Dist. Court,* 435 F.3d 1011, 1015 (9th Cir. 2006) ("[F]loor statements by the sponsors of the legislation are given considerably more weight than floor statements by other members and they are given even more weight where, as here, other legislators did not offer any contrary views.") (internal citation omitted).

Whatever the import of the *Mergens* plurality's comments, the Supreme Court has repeatedly turned to the statements of individual legislators to aid the determination of purpose. In *Edwards*, the Court "relied on the statute's text and *the detailed public comments of its sponsor,* when [it] sought the purpose of a state law requiring creationism to be taught alongside evolution." *McCreary,* 545 U.S. at 862 (citing *Edwards*, 482 U.S. at 586-88) (emphasis added). And in *Wallace v. Jaffree*, 472 U.S. 38 (1985), the Court relied on the district court testimony of a statute's lead sponsor as evidence of the statute's purpose. *See id.* at 57-58. By quoting the sponsor's words as part of its purpose inquiry, *id.*, the Court demonstrated that the statement of a

statute's sponsor is relevant to such inquiry.[2]   The Members' efforts to deprive Plaintiffs of similarly relevant statements they made to the press, to the public, or to other government officials, are yet another tactic to camouflage the religious *purpose* of the Act.

### 3.    The Establishment Clause Inquiry Into Purpose Is Not Limited to the "Official" Legislative Record.

Contrary to the Federal Defendants' bold claim that "extra-legislative statements by individual Members regarding legislation are not indicative of legislative purpose," *see* Fed. Defs.' Opp. at 8, the Supreme Court has never limited the Establishment Clause search to the pages of the Congressional Record.  In *Wallace v. Jaffree*, the Court looked to the in-court testimony of a state senator who had sponsored the challenged statute (most assuredly an extra-legislative statement), *see Wallace*, 472 U.S. at 56-57, and who testified that his purpose in sponsoring a moment-of-silence statute was to return prayer to the public schools.  *See id.*

The requested documents may reflect similar statements by the Members.  If one of the sponsoring Members told an activist group, his constituents, or his contributors that the purpose of the Act was to preserve the display of the Cross on public property, to preserve religious freedom, or to combat atheism, this statement would be probative of the Act's legislative purpose for Establishment Clause purposes.[3]

---

[2]    Such evidence is used by courts in a variety of contexts.  *Cf. News America Publ'g, Inc. v. FCC*, 844 F.2d 800, 817 n.13 (D.C. Cir. 1988) ("In identifying the underlying purpose of the Amendment, the statements of [the] sponsor of the Amendment, and [the] Senator . . . who provided primary impetus for it, must be given weight, particularly in the absence of a more complete legislative history.").

[3]    The Federal Defendants contend that any discovery directed at the Members is irrelevant because Plaintiffs have only challenged the display of the Cross.  *See* Fed. Defs.' Opp. at 13. This is incorrect.  Plaintiffs' Complaint clearly requests a "declaratory judgment that the taking of the Mt. Soledad Latin cross ... violates the Establishment Clause."  Even if Plaintiffs had only challenged the continued display of the Cross, the requested discovery would be crucial to the detailing the specific sequence of events that led to the Cross's presence on federal property.

The probative value of extra-legislative evidence was demonstrated in *Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993). There, the court rejected the city defendant's motion for summary judgment because "[t]he record show[ed] a widespread political movement, apparently driven by an upsurge of sectarian fervor, intent on driving Scientology from [the city]. It also show[ed] that various members of the [city] commission had made their affiliation with that movement known to the public in the plainest terms possible, *not only in the official legislative record* leading to adoption of the ordinances *but also in documents concerning unrelated government activity and in extemporaneous remarks*." Id. at 1531 (emphasis added). The court went on to base its reasoning on campaign statements by involved public officials, *id.* at 1533, and to reiterate that "'[n]o legislative recitation of a supposed secular purpose can blind us' to an enactment's 'pre-eminent purpose,'" *id.* at 1527 (quoting *Stone v. Graham*, 449 U.S. 39, 41 (1980)).

In the Members' ideal world, they, and not the courts, would be permitted to settle once and for all the purpose determination through shrewd drafting of floor statements and "whereas" clauses in preambles to legislation. They ask the court to accept their handiwork by deferring to any "plausible secular purpose" and insisting that "attribut[ing] unconstitutional motives" to their actions is beyond the pale. Members' Opp. at 11 (citing *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983)). As the Supreme Court has recently held, however, "[w]hile heightened deference to legislatures is appropriate for the review of economic legislation, an approach that credits any valid purpose, no matter how trivial, has not been the way the Court has approached government action that implicates establishment." *McCreary*, 545 U.S. at 865. Instead, heightened scrutiny of official statements is required because of "the duty of the courts to 'distinguis[h] a sham

secular purpose from a sincere one.' " *Santa Fe*, 530 U.S. at 308 (quoting *Wallace*, 472 U.S. at 75 (O'Connor, J., concurring in judgment)).

Moreover, the statements of sponsors are not the only words relevant to the Establishment Clause examination. Plaintiffs have requested documents reflecting the Members' communications with constituents, special interest groups, and other government officials regarding Mt. Soledad. As the D.C. Circuit has made clear, the words "not only of legislative sponsors, but also th[ose] of key witnesses, and of experts who participated in or contributed to the enactment of the law or its implementation," are relevant. *United Christian Scientists,* 829 F.2d at 1163 n.50 (internal quotation marks omitted). The Members' documents are likely to reflect the statements of private parties "who participated in or contributed to the enactment of the law." For instance, Charles LiMandri, an attorney for the Thomas More Law Center (an organization devoted to defending religious speech by governments), worked closely with the Members' offices and attended the White House signing ceremony. The Christian Defense Coalition sponsored a prayer vigil outside the White House to save the Cross. Other religious organizations such as the Christian Coalition and Focus on the Family petitioned to save the Cross. The Federal Defendants' efforts to short-circuit the courts' "look beyond formal legislative sources to the general historical context of the statute, including the sequence of events leading to its passage," *id.* at 1163 n.50, are a transparent effort to rewrite that context.

### 4.   The Members' Actions Define the History, Context, and Sequence of Events Leading to the Passage of the Act Federalizing the Cross.

As the Court reaffirmed in *McCreary*, an Establishment Clause challenge requires a court to examine closely "the historical context" and "specific sequence of events leading to" a government action. *McCreary*, 545 U.S. at 862 (quoting *Edwards*, 482 U.S. at 594-95). The Members and the Federal Defendants, however, seek to blind the court to the full historical

context by limiting its review to what they deem to be "matters of public record," Fed. Defs.'
Opp. at 10, or to "public events that are widely known and reported," Members' Opp. at 14.
Limiting review to this exceptionally narrow universe of evidence would, in effect, create two
histories: the actual history, informed by the records of those creating it, and a shadow "official
history" created by those who draft press releases and floor statements to suit best their future
litigating positions.

The Members indisputably were central figures in forging the history, context, and
specific sequence of events leading to the federal taking and display of the Cross. News articles
state that Rep. Hunter met with Vice President Cheney and that one of his staff members met
with White House officials in the effort to have the federal government take the Cross before the
Act was introduced.[4]  Under the analysis urged by the Members and the Federal Defendants, the
widely known and reported fact that those meetings occurred is sufficient to determine
governmental purpose; in their view, it is not relevant *what* was discussed, *how* the government
considered the taking, or *why* there was such urgency to take the Cross from the City.

Rather than examining the "*specific* sequence of events," *Edwards*, 482 U.S. at 594-95,
leading to the taking and display of the Cross, the Members and Federal Defendants believe that
a general overview cherry-picked from newspapers (and the Members' own press statements) is
sufficient.  This hamstrung approach to analyzing historical context is particularly inappropriate
given the Supreme Court's long-standing concern for uncovering sham expressions of secular
purpose.  By limiting the review of context and history to "widely known and reported" facts,
government officials' efforts to advance religion may be hidden from the court's review even as

---

[4]      Even though the fact that these meetings occurred is known to the Plaintiffs without the
requested discovery, that information may not be admissible.  To ensure that the Plaintiffs can
prove the basic historical and contextual facts behind the federal taking and display of the Cross,
they must be permitted to discovery primary documents that only the Members may possess.

they are apparent to everyone else. Those officials may freely signal to other government officials, individual constituents, and select groups of religious adherents that their efforts are intended to advance religion, so long as the official recordings of legislative proceedings and their press releases are scrubbed of religious references. The Supreme Court's precedents, however, make clear that this is not how courts ought to decide Establishment Clause cases.

**D.     Apart From the Purpose Inquiry, The Members' Statements and Actions Are Also Crucial to Determining the Effect of Federal Actions Relating to the Cross, and Whether the Government Is Excessively Entangled with Religion.**

Even if the court were to accept Defendants' unduly narrow view of the governmental-purpose inquiry, Plaintiffs' motion to compel is supported by two additional grounds. First, the Members' statements are central to deciding whether "the statute['s] . . . principal or primary effect [is] one that neither advances nor inhibits religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Second, the Members statements are relevant to whether "the statute . . . foster[s] an excessive government entanglement with religion." *Id.*

**1.     Effect**

Notwithstanding the Federal Defendants' attempts to confine the evaluation of their actions to a carefully scrubbed record, the effect of the state's action in advancing religion is measured in the real world. *See Santa Fe,* 530 U.S. at 307. In *Santa Fe*, the Court invalidated, on grounds that it had an impermissible religious effect, a school policy that permitted student-led prayer at home football games. *Id.* at 297-98, 301. In so holding, the Court emphasized that "[t]he actual or perceived endorsement of the message . . . is established by factors beyond just the text of the policy," such as the circumstances in which the prayer was allowed. *Id.* at 307. Just as the Court concluded that the actions of students and spectators contributed to the pro-religious effect of public prayer in *Santa Fe, id.* at 307-08, 312, the Members' outward

statements and actions are directly relevant to assessing the effect of the government's actions on a reasonable observer.

Plaintiffs seek to show that the Members' words and deeds made it more likely that "the challenged governmental action [wa]s sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *County of Allegheny v. ACLU*, 492 U.S. 573, 597 (1989). Plaintiffs contend that, as the primary sponsors of the legislation to take the Cross and display it on federal land, the Members outwardly characterized the government's actions as a symbol of support for religious observance in public life. To argue that this message could not possibly have had any effect, *see* Members' Opp. at 15, defies both common sense and the Court's admonishment that the dictates of the Establishment Clause are informed by an objective observer, not an ignorant one. Defendants' attempts to ensure that this Court act as an "absentminded objective observer," *McCreary*, 545 U.S. at 866, are particularly specious at the discovery stage, where rejecting Plaintiffs' Motion to Compel would amount to a ruling, *as a matter of law*, that it is conceptually impossible for the primary sponsors of legislation to influence its real-world effect.

## 2.    Entanglement

Similarly, the Plaintiffs are entitled to the requested documents to prove their allegations under *Lemon*'s excessive-entanglement prong. The Federal Defendants contend that *Lemon*'s excessive-entanglement prong is not relevant here because it only arises in cases "involving government 'programs.'" Fed. Defs.' Opp. at 12 (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 393 (1990). But as the Members point out, the Supreme Court applied the excessive-entanglement analysis in *Lynch v. Donnelly*, 465 U.S. 668 (1984), a case

involving a local government's display of a nativity scene.  *See id.* at 684-85.  To find "administrative entanglement" in that scenario, the Court looked for "evidence of contact with church authorities concerning the content or design of the exhibit prior to or since [the government]'s purchase of the crèche," "expenditures for maintenance of the crèche," and any "ongoing, day-to-day interaction between church and state."  *Id.* at 684.

Here, the Act requires the federal government to enter into a memorandum of understanding with the Mt. Soledad Memorial Association ("MSMA") for the continued maintenance of the Cross and surrounding memorial walls.  Pub. L. 109-272, 120 Stat. 770, § 2(c).  Though the MSMA is not a church, it has a long history of religious affiliation:  for decades, the MSMA's primary function was sponsoring religious Easter Sunday services at the Cross at which the president of the MSMA extended Easter greetings to throngs of worshippers before the delivery of sermons and hymns such as "Jesus Christ Is Risen Today," "He Lives," and "Christ Arose."  In recent years, the MSMA has refrained from conducting Easter services in response to the ongoing litigation.  But others, like the Mission Valley Christian Fellowship and The Rock Church, have continued to use the foot of the Cross as a site for religious rallies, celebrations, and services.  As owner of the Cross, the federal government will now have to accommodate these issues as part of any negotiated memorandum of understanding with the MSMA.  The federal government also will have a say over how the MSMA is permitted to present or alter the "content or design" of a symbol the MSMA has called "a reminder of God's promise to man of everlasting life," and will be able to dictate whether the MSMA (or others in the community) may celebrate Jesus's resurrection on Easter Sunday at the foot of the Cross.  And as owner of the Cross, the federal government may now be forced to incur "expenditures for [its] maintenance."  *See Lynch*, 465 U.S. at 684.  The Members' documents likely shed light on

the factors relevant to the excessive-entanglement prong.   Any documents reflecting these

activities are responsive to Plaintiffs' requests, and must be produced.

**II.    PLAINTIFFS' MOTION IS NOT BARRED BY LAW OF THE CASE DOCTRINE OR COLLATERAL ESTOPPEL.**

**A.    The Magistrate Judge's Decision Is Not Law of the Case in this Court.**

The Members' claim that the Hunter Deposition Decision denying the request to take the

deposition of Rep. Hunter is law of the case, *see* Members' Opp. at 8, is, to quote this Circuit,

"meritless."  *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439

F.3d 740, 749 (D.C. Cir. 2006).  As the D.C. Circuit held in that case, the law of the case

doctrine does not cover a subpoena enforcement action when the "law of the case" was created in

the original action for which the subpoena was issued, as is the circumstance here.  *See id.*

**B.    The Magistrate Judge's Decision in the Underlying Suit Does Not Collaterally Estop Plaintiffs in This Court.**

The Federal Defendants' related claim that collateral estoppel bars Plaintiffs' motion, *see*

Fed. Defs.' Opp. at 14-16, also is off-base.  Collateral estoppel "binds the parties in a subsequent

action" when "an issue of fact or law [is] actually litigated and resolved by a valid final

judgment." *Baker v. General Motors Corp.*, 522 U.S. 222, 233 n.5 (1998).  For the Magistrate

Judge's decision to have collateral estoppel effect in this Court, "the same issue now being raised

must have been contested by the parties and submitted for judicial determination in the prior

case," "the issue must have been actually and necessarily determined by a court of competent

jurisdiction in that prior case," and "preclusion in the second case must not work a basic

unfairness to the party bound by the first determination." *In re Subpoena*, 439 F.3d at 743.

Moreover, collateral estoppel cannot be invoked against a party that did not participate in the

prior proceeding. *Baker*, 522 U.S. at 238 n.11. As discussed below, these prerequisites do not obtain in this case.[5]

> **1.     Plaintiffs Did Not Participate in the "Proceeding" Leading to the Magistrate Judge's Decision.**

For a prior judgment to estop a party, that judgment must be a party to the adjudication. *See In re Subpoena*, 439 F.3d at 743. In this case, it is simply not true that the *JWV* Plaintiffs made the deposition request, nor did they join in the motion to compel it. Only Plaintiff Trunk – the plaintiff in a case consolidated with this one – sought (by motion in advance of notice) to depose Rep. Hunter. *See* Members' Opp. Ex. MC6. That Plaintiffs did not join Trunk's motion is apparent in a letter from Plaintiffs' counsel to the magistrate judge, which explains that "the City of San Diego's opposition papers . . . falsely suggest that *JWV Plaintiffs' failure to join Trunk's motions* is an indication that we believe Trunk's position to be without legal merit." *See* Fed. Defs' Opp. Ex. E (emphasis added). Since Plaintiffs did not join the motion to compel the Hunter deposition, they are not bound by it. *Cf. United States v. Marin-Canales,* Nos. 98-1919, 98-1920, 2000 WL 543967, at \*7 (1st Cir. Apr. 14, 2000) (defendant not a party to a motion to suppress "cannot appeal its denial").

> **2.     The Magistrate Judge's Decision Is Not "Final."**

The Federal Defendants' collateral estoppel argument also fails because, contrary to the Defendant's representations, discovery decisions by magistrate judges are not final orders that estop subsequent decisions. Collateral estoppel is triggered only by a "valid final judgment." *Baker*, 522 U.S. at 233 n.5. Under 28 U.S.C. § 636(b)(1)(A), which authorizes magistrate judges

---

[5]     The Federal Defendants' insinuation that "Plaintiffs' repacked discovery request ... is nothing more than an attempt to end-run the prior Magistrate's decision," *see* Fed. Defs.' Opp. at 2, is way off the mark. Plaintiffs made these document requests *before* the magistrate judge in the Southern District of California considered Plaintiff Trunk's motion to compel Rep. Hunter's deposition. *Compare* Members' Opp. Ex. MC8 (subpoenas served on Members on March 21, 2007) *with* Members' Opp. Ex. MC7 (magistrate judge's decision issued April 2, 2007).

to "hear and determine any pretrial matter," the district court judge may review any magistrate judge's decision to see if it is "clearly erroneous or contrary to law." The reviewability of magistrate judges' decisions argues against their classification as final orders.[6] In *In re Subpoena Issued to Commodity Futures Trading Commission*, 370 F. Supp. 2d 201 (D.D.C. 2005), *aff'd*, 439 F.3d 740 (D.C. Cir. 2006) (cited in Fed. Defs.' Opp at 15 n.5), the Court expressed "serious doubts whether a discovery order of a Magistrate Judge – even when, as here, no party has filed a motion to reconsider the order – is a 'final judgment' or 'prior holding' for purposes of this Circuit's collateral estoppel rule." *Id.* at 205.

### 3.    The Magistrate Judge Did Not Previously Decide the Relevance Issue Now Before the Court.

Finally, for a decision to have collateral estoppel effect, "the issue must have been actually and necessarily determined . . . in th[e] prior case." *In re Subpoena*, 439 F.3d at 743. In this instance, a simple comparison of the deposition request that the magistrate judge considered with the document requests at issue here demonstrates that the issues related to the document request were not "actually and necessarily determined," and that, accordingly, the magistrate judge's decision on relevance has no bearing on Plaintiffs' motion. Plaintiff Trunk only asked "to elicit testimony from [Rep.] Hunter which will tend to confirm that the purpose of legislation he sponsored, culminating in House Resolution 5683 which authorized the federal government to take the cross and the land beneath it by eminent domain, was to preserve the presence of the Mount Soledad Latin cross on public property." Members' Opp. Ex. MC6, at 1-2. In contrast, Plaintiffs request a much wider category of information related not only to purpose, but also

---

[6]    *See Brown v. Garrett*, No. 91-5425, 1992 WL 308591, at *1 (D.C. Cir. Oct. 6, 1992) ("[A] district court retains general supervisory power to review any action taken by a federal magistrate judge. 28 U.S.C. § 636(b). Thus, to be a final order of the district court ... the magistrate judge's decision must have been reviewed by the district court.").

historical context, the events surrounding the bill's passage, communications with the public, and the work of religious organizations in the attempts to save the Cross. Documents reflecting these activities are related to all facets of the Establishment Clause inquiry – not just purpose. *See* Pls.' Mem. at 13–17; *see supra* Part I.D. The documents Plaintiffs seek therefore reflect a much wider range of issues than those Plaintiff Trunk proposed to cover in his deposition of Rep. Hunter and the issue, therefore, cannot be considered to have been "actually and necessarily determined." *In re Subpoena*, 439 F.3d at 743.

### III.   THE MEMBERS' ASSERTIONS OF SPEECH OR DEBATE CLAUSE PROTECTION FOR DOCUMENTS REQUESTED BY PLAINTIFFS ARE OVERBROAD AND UNWARRANTED.

The Members' Opposition dramatically overstates the scope of the Speech or Debate Clause protection that applies to the documents Plaintiffs seek in their document requests. The Members' argument that many of the documents covered by Request Nos. 3, 5, 7 and 9 are privileged from disclosure under the Speech or Debate Clause,[7] *see* Members' Opp. at 19, misses the mark on several levels. First, a significant number of the documents responsive to those requests are likely to reflect the Members' efforts to persuade the Administration to use *existing legal authority* to condemn the Cross. Under Supreme Court precedent, such documents are not protected from disclosure under the Speech or Debate Clause. Second, some documents in the Members' possession from the time period when Congress was considering legislation to acquire the Cross are undoubtedly of a purely political nature, given that each of the Members undertook high-profile political activities to rally support for the Act. Because these political activities also

---

[7]     As the Members note, the parties do not dispute the scope of the Speech or Debate protection afforded intralegislative documents that are responsive to Request Nos. 3, 5, 7, and 9. *See* Members' Opp. at 19. Likewise, following the Members' concession that documents sought in Request Nos. 1, 2, 4, 6, and 8 are not Speech or Debate protected, *see id.* at 18-19 & n.14, we do not address those requests in this Reply.

are not considered "legislative" for Speech or Debate Clause purposes, they must be produced. Third, even many of the documents that the Members characterize as the fruits of their "information gathering" about the Cross are not entitled to Speech or Debate Clause protection because they have an insufficient nexus to legislative activity. Finally, the Members' claim that documents responsive to Request Nos. 3, 5, 7, and 9 are protected on the grounds that they relate only to the "motives" of the Members is incorrect. As discussed below, the requests, among other things, seek evidence of legislative *purpose, i.e.,* the Act's desired legislative outcome, not the subjective *motives* of the Members for attempting to bring about that outcome.

A. **The Speech or Debate Clause Does Not Protect Documents Reflecting Efforts by the Members To Persuade the Executive Branch To Use Existing Law to Acquire the Cross.**

It is beyond dispute that documents reflecting efforts by members of Congress to convince the Administration to use existing legal authority to acquire Mt. Soledad are not protected from discovery on Speech or Debate grounds. The Members do not quibble with this point; they note the Supreme Court's repeated holdings that "communications with the executive branch regarding the administration or implementation of existing statutes are not legislative activities" within the ambit of the Speech or Debate Clause. Members' Opp. at 28-29.[8]

What the Members fail to acknowledge is that a broad category of documents reflecting efforts to persuade the executive branch to take action – documents that almost certainly are in the Members' possession – are not entitled to *any* Speech or Debate Clause protection under this rule. As Plaintiffs noted in their Motion to Compel, the Members tried to get the Administration to take unilateral action with respect to the Cross soon after a federal judge ordered the City to

---

[8]    *See Doe v. McMillan*, 412 U.S. 306, 313 (1973); *Gravel v. United States*, 408 U.S. 606, 625 (1972); *United States v. Brewster*, 408 U.S. 501, 512 (1972); *United States v. Johnson*, 383 U.S. 169, 172 (1966).

pay substantial fines if it did not remove the Cross promptly.  On May 10, 2006 – over a month and a half before the Act was introduced – Rep. Hunter wrote President Bush to ask him to "use the [preexisting] authority found in 40 U.S.C. 3113 to begin immediate condemnation proceedings and bring [Mt. Soledad] into the federal park system." *See* Ex. 1 (letter from Rep. Hunter to President Bush).  Rep. Hunter's May 10, 2006 letter makes no mention of the possibility of federal legislation to accomplish the same goal.  That letter was followed by a May 22, 2006 meeting at the White House, attended by Rep. Hunter's legislative assistant, where the issue of condemnation of the Cross was reportedly the topic of conversation.[9]  And according to the recent deposition testimony of J. Brent Eidson, the Assistant Director of Intergovernmental Relations for the City of San Diego and the City's self-described "point person" with the Members on the Mt. Soledad issue, *see* Ex. 2 (excerpts of J. Brent Eidson Deposition, May 31, 2007) at 17:22, Rep. Hunter did not begin to act on legislation with respect to the Cross until the White House Counsel's office concluded in early June 2006 that it did not have the authority to take the Cross under 40 U.S.C. § 3113.[10]  *Id.* at 74:2 – 78:15.  Given this evidence of the Members' substantial efforts to convince the Administration to take the Cross even before legislation to acquire the Cross was introduced or publicly discussed, it stands to reason that there are many documents in the Members' possession that relate to these efforts.  Any such

---

[9]    *See* "U.S. Deal on Cross Is Termed Difficult," *San Diego Union-Tribune*, May 23, 2006, at B1 (attached as Ex. 3) (quoting San Diego Mayor Jerry Sanders as saying that the White House is "willing to move in th[e] direction [of acquiring the Cross by eminent domain], but they're still exploring how to get this done in the most expeditious way. I think eminent domain is difficult from anybody's perspective, and they want to make sure they're on sound legal ground before they move in that direction.").

[10]    While Mr. Eidson testified that it was his understanding that Rep. Hunter had previously been "considering" legislation taking the Cross, *see* Ex. 2 at 55:20 – 56:9, he also testified that that consideration did not ripen into action until the White House had decided not to act under its eminent domain power.  *Id.* at 75:11 – 75:17.  The Speech or Debate Clause protects Members' "legislative *acts*," *see Gravel*, 408 U.S. at 625 (emphasis added), not their legislative *ideas*.

documents – including communications or meetings with the Administration, private parties, or the City – are not privileged from disclosure under the Speech or Debate Clause.[11] *See Gravel v. United States*, 408 U.S. 606, 625 (1972) ("cajol[ing]" and "exhort[ing]" the executive branch to enforce an existing statute "is not protected legislative activity").

> **B.    The Speech or Debate Clause Does Not Protect from Disclosure Documents Reflecting the Members' Actions During the Legislative Process If the Actions Are Non-Legislative in Nature.**

Beyond the category of documents that reflect the Members' efforts to coax the Executive to use existing legal authority to take the Cross, the Members are simply wrong that most documents responsive to Request Nos. 3, 5, 7, and 9 can be withheld either as information gathered in furtherance of present or future legislative activities. As discussed below, some of these documents likely reflect pure political activities, and others likely reflect activities only "related" to legislative acts. Neither category is protected by the Speech or Debate Clause.

During the time that a bill is being drafted or is under consideration by Congress, Members can and often do engage in communications of a non-legislative (i.e., political) nature with other branches of government (both federal and non-federal), and with the public, to increase the chances that the bill will become enacted. None of these activities is entitled to Speech or Debate Clause protection. *Brewster*, 408 U.S. at 512; *see also Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979) (while "the duty of Members to tell the public about their

---

[11]    To the extent that documents in the Members' possession contain information about both the issue of executive condemnation *and* legislation regarding the taking of the Cross – and to the extent the information about legislative activity is covered by the Speech or Debate Clause – it is up to the Members to assert privilege as to the appropriate portions of those documents. *See In re Search of Rayburn House Office Bldg. Room No. 2113*, 432 F. Supp. 2d 100, 115 (D.D.C. 2006) ("The claim . . . that the Constitution does not allow a document-by-document review by the judiciary [of allegedly protected materials] fails."); *see also In re Possible Violations of 18 U.S.C. §§ 201, 371,* 491 F. Supp. 211, 213-14 (D.D.C. 1980) (ordering *in camera* hearing to determine whether documents were Speech or Debate protected).

activities" may be "[v]aluable and desirable . . . in broad terms, the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process"). And in this case, the record reflects that each of the Members did indeed undertake significant political efforts to ensure the passage of the Act. *See* Pls.' Mem. at 9 (describing public efforts of each of the three Members). It is likely that the Members possess responsive documents memorializing those efforts. If so, the Members must produce them.

The Members' argument that all documents reflecting informal information gathering have been protected from disclosure by "every court that has seriously considered the issue," *see* Members' Opp. at 25, simply is wrong.[12] In *Bastien v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301 (10th Cir. 2004), the court distinguished the information gathering that the Supreme Court found to be protected in *Doe v. McMillan*, *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975), and *Hutchinson*, on the grounds that "[i]n each of [those] cases . . . the information gathering being addressed was in the course of formal committee action, when the committee had subpoenaed witnesses or disclosed information. No Supreme Court opinion indicates that Speech or Debate Clause immunity extends to informal information gathering by individual members of Congress." *Bastien*, 390 F.3d at 1316. The court went on to state that "[t]o extend protection to informal information gathering . . . would be the equivalent of extending Speech or Debate Clause immunity to debates before local radio stations or Rotary Clubs." *Id.* Accordingly, the court held that "the everyday task of gathering

---

[12]    *Cf. Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 (D.C. Cir. 2006) (en banc) (describing "legislative process" as "includ[ing] delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and introducing material at Committee hearings"; informal information gathering by members not listed) (internal quotation marks omitted), *appeal dismissed sub nom. Office of Sen. Mark Dayton v. Hanson*, 127 S. Ct. 2018 (2007).

views and information from constituents and others through informal contacts" is not an activity under the Speech or Debate Clause. *Id. Bastien* is entirely in keeping with the Supreme Court's admonition that "wide-ranging inquiries by individual Members on subjects of their choice" are not covered by the Clause, *see Hutchinson*, 443 U.S. at 132, and that only information gathering, accomplished through subpoenas or in the context of *formal* activities conducted by a committee or a full house of Congress, is entitled to Speech or Debate Clause protection.[13]

The two D.C. Circuit cases that the Members cite for the proposition that all information gathering in furtherance of current or even planned legislative activities is covered by the Speech or Debate Clause, *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995), and *McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) (en banc), *see* Members' Opp. at 24-27, do not support their position. In *Brown & Williamson*, there was specific evidence that the requested documents were provided to, and used by, a subcommittee of the House Energy and Commerce Committee in connection with its ongoing investigation into the effects of tobacco products. 62 F.3d at 412. And the statement in *McSurely* about the protection afforded to "acquisition of knowledge through informal sources," 553 F.2d at 1287, did not command a majority of the en banc Court. *See id.* at 1280 (noting that the part of the opinion addressing the use of investigative materials was an "[a]ffirm[ance] by an equally divided vote" of the district court's opinion).[14]

---

[13]    *See, e.g., Gravel*, 408 U.S. at 620 (noting Court's refusal to "extend[] the Clause . . . beyond that [conduct] essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings"); *see also Eastland*, 421 U.S. at 504 ("Issuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."); *Doe v. McMillan*, 412 U.S. at 313 (Clause covers "acts of authorizing an investigation pursuant to which . . . materials were gathered").

[14]    *See also McSurely v. McClellan*, 753 F.2d 88, 96 (D.C. Cir. 1985) ("the opinions of an equally divided court may not be cited for precedential value in this circuit").

- 23 -

Finally, as a practical matter, it is likely that the "information gathering" for which the Members claim Speech or Debate Clause protection was unusually limited with respect to this particular piece of legislation. The Act was not the subject of any committee reports, there was limited floor debate on its passage, and the legislation passed overwhelmingly in the House. And given that the acquisition of the Cross was neither a complicated nor novel subject of legislation for the House – under legislation passed only two years earlier, the same property had been designated as a national memorial, pending contribution of the property by the City of San Diego, *see* Pub. L. No. 108-447, § 116, 118 Stat. 3346, *codified* at 16 U.S.C. § 431 *note* – the Members' claims that they engaged in substantial information gathering before sponsoring and shepherding the Act are dubious. In any event, to the extent that such documents exist, and to the extent that they reflect activities "integral" to the legislative process, *Gravel*, 408 U.S. at 625, the Members must assert Speech or Debate Clause claims on a document-by-document basis. *In re Search of Rayburn House Office Bldg. Room No. 2113*, 432 F. Supp. 2d at 115.

**C.    The Members Wrongly Characterize Plaintiffs' Requests as Seeking Privileged Evidence of the Members' Legislative "Motives."**

Finally, the Members' half-hearted assertion that Plaintiffs' requests need not be answered because they allegedly "inquir[e] into legislators' motives for legislative activities," *see* Members' Opp. at 26-27, is incorrect for at least two reasons. First, the Members have conflated legislative "purpose" with legislative "motives." As they themselves emphasize in another section of their own Opposition, these are very different things. *See* Members' Opp. at 11 (citing *Mergens*, 496 U.S. at 249 (plurality), for the proposition that "the legislative purpose of [a] statute" is distinct from "the possibly religious motives" of those who voted for it); *see also Glassroth v. Moore*, 229 F. Supp. 2d 1290, 1316 (M.D. Ala. 2002) ("there is a difference between [legislative] motive and purpose"), *aff'd*, 335 F.3d 1282 (11th Cir. 2003). And as

- 24 -

Plaintiffs have made clear, their requests are focused on ascertaining the *purpose* of the Act –
i.e., whether Congress' intended outcome was preservation of a religious symbol or honoring of
veterans – rather than Members' subjective motives for facilitating that outcome. *See McCreary*,
545 U.S. at 862 (noting the Court's "reli[ance] on . . . the detailed public comments of [the]
sponsor" to find purpose in *Edwards*). Second, as Plaintiffs also have made clear, their requests
relate not just to purpose, but to all three prongs of the *Lemon* test. *See* Part I.D, *supra*.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to order the Members to provide
documents responsive to Plaintiffs' document requests.

Respectfully submitted,

T. Jeremy Gunn (Bar No. 417222)
Daniel I. Mach (Bar No. 461652)
ACLU PROGRAM ON FREEDOM OF
    RELIGION AND BELIEF
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St., N.W., Suite 600
Washington, D.C.  20005
Telephone:  (202) 675-2330
Facsimile:  (202) 546-0738

A. Stephen Hut, Jr. (Bar No. 192856)
Jonathan H. Siegelbaum (Bar No. 474837)
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs*

June 25, 2007

# EXHIBIT 1

DUNCAN HUNTER
52D DISTRICT, CALIFORNIA

CHAIRMAN
COMMITTEE ON ARMED SERVICES



2265 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-0552
(202) 225-5672
FAX: (202) 225-0235

1400 CORDELL COURT, #204
EL CAJON, CA 92020
(619) 448-5201
FAX: (619) 449-2251

## U.S. House of Representatives
## Washington, DC 20515-0552

May 10, 2006

President George W. Bush
The White House
1600 Pennsylvania Ave
Washington, DC 20500

Dear Mr. President:

I am writing to request your urgent assistance. Since 1954, the Mt. Soledad Memorial, honoring casualties and veterans of both World Wars and the Korean War, has stood atop Mount Soledad in San Diego California. Part of this Memorial is a graceful 29-foot cross that can be seen as a welcoming symbol to sailors as they return to their homeport at North Island, just outside the city.

Unfortunately, this beloved Memorial has been under siege by a single individual and his team of lawyers who have ignored the broader historical context and community support for the Memorial in order to make a political point. He has sued repeatedly to remove the Memorial's centerpiece cross due to its location on City of San Diego property. The City has taken every step possible to meet the court's demands, while still protecting the integrity of the Memorial. However, despite these efforts, liberal judges have continued to rely on their interpretation of the California State Constitution to justify the removal of this historic Memorial.

In order to protect the Memorial for future generations of veterans and San Diego visitors and residents, Congress passed and you signed into law a provision that designated the Mt. Soledad Veterans Memorial as a national veterans memorial. Upon the City's donation of the land, the Secretary of Interior was tasked with accepting the Memorial and working with the local community to administer its upkeep. Sadly, the then-City Council voted against donating the property. The citizens of San Diego were outraged and quickly demanded a city-wide referendum on donating the property. An unprecedented 76% of San Diego residents voted to donate the land to the Department of Interior, only to have a California State judge declare the vote a violation of the State Constitution.

The residents of San Diego have clearly indicated their desire to adhere to the

legislative mandate and they need your help to comply. Please use the authority found in 40 U.S.C. 3113 to begin immediate condemnation proceedings and bring this national Veterans' Memorial into the federal park system. This matter deserves your urgent attention as a District Judge recently ruled that the Mt. Soledad Memorial Cross must be removed from City property within 90 days, or the City will face a daily fine of $5,000.

Thank you for your time and attention to this very important matter. It would be a national travesty to have this veterans' memorial dismantled against the wishes of the overwhelming majority of San Diego residents and federal legislative intent. I have enclosed a copy of the Mt. Soledad Memorial chronology and I look forward to working with you to save this national memorial.

Sincerely

Duncan Hunter
Member of Congress

Enclosure

cc: The Honorable Jerry Sanders, Mayor of San Diego

# EXHIBIT 2

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVE TRUNK and PHILIP K. PAULSON,      )
                                        )
          Plaintiffs,                   )
                                        )
     vs.                                )  Case No. 06CV 1597BTM(WMc)
                                        )  consolidated with 06cv1728
CITY OF SAN DIEGO, UNITED STATES        )
OF AMERICA and DOES 1 through 100,      )
inclusive,                              )
                                        )
          Defendants.                   )
                                        )
MOUNT SOLEDAD MEMORIAL ASSOCIATION,     )
                                        )
        Real Parties in Interest.       )
                                        )
JEWISH WAR VETERANS OF THE UNITED       )
STATES OF AMERICA, INC., RICHARD A.     )
SMITH, MIONA SAGHEB and JUDITH M.       )
COPELAND,                               )
                                        )
          Plaintiffs,                   )
                                        )
     vs.                                )
                                        )
ROBERT M. GATES, Secretary of           )
Defense, in his official capacity,      )
                                        )
          Defendant.                    )
_____)

DEPOSITION OF BRENT EIDSON

San Diego, California

May 31, 2007

Reported By:  Mary Beth Harris
              CSR No. 8732

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 15

1    BY MR. SIEGELBAUM:

2        Q    Anything else in the last 12 months that you

3    have worked on with the Mayor, directly with the Mayor?

4        A    Yes.

5        Q    And they would be?

6        A    I attended numerous events locally.  Would you

7    like specific events?

8        Q    What you can recall.

9        A    Well, most recently budget town hall meetings

10   where he goes out to the community and talks about his

11   budget.  Presentations.  Public presentations such as

12   one to the Sheriff's Association last year.

13           Then, from a policy perspective, state

14   legislation.  We, as a City, are sponsoring a number of

15   bills, so I keep the Mayor updated regularly.

16       Q    Okay.

17       A    Again, one gang related bill.  We also have

18   some legislation that has to do with legal defense funds

19   for candidates.  Also, state budget related items.  We

20   have an issue with what's called the booking fee

21   reimbursement program, which is a state program

22   reimbursing local governments for the costs for booking

23   prisoners.

24           A charter review committee is a committee

25   that's underway right now, and I am also staffing the

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 16

1    committee.  So we're looking at reforming our charter,

2    so we're working with the Mayor directly on those

3    issues.

4         Q    While in your current position as Assistant

5    Director of Intergovernmental Relations, have you ever

6    worked on issues related to Mount Soledad?

7         A    Yes.

8         Q    When was the first time you were asked to work

9    on Mount Soledad?

10        A    I don't recall the specific date.

11        Q    Just roughly.  Was it in 2006?

12        A    It was in 2006.

13        Q    It was --

14        A    Not prior to 2006.

15        Q    It was not prior to 2006?

16        A    Correct.

17        Q    Can you explain or describe the circumstances

18   that led you to start working on the Mount Soledad

19   case -- sorry -- issues related to Mount Soledad?  What

20   were the circumstances that led you to start working on

21   Mount Soledad?

22        A    Can you clarify for me?

23        Q    Yes.  How did it come to be that you started

24   working on issues related to Mount Soledad?

25        A    Primarily, my role as Assistant Director has me

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 17

1    focusing on federal related issues.

2        Q    Okay.

3        A    And so I was directed to the Mount Soledad was

4    one that I would be assisting the Mayor on.

5        Q    Directed by whom?

6        A    In this case, it was Kris Michelle.

7        Q    Can you spell Kris' last name?

8        A    Sure.  Kris is a female, so that's K-r-i-s.

9    And her last name is Michell, M-i-c-h-e-l-l.

10       Q    And what's her title?

11       A    She's Deputy Chief Operating Officer for

12   Community and Legislative Services.

13       Q    And what was -- do you recall the conversation

14   that you had with Ms. Michell about Mount Soledad the

15   first time you were asked to work on it?

16       A    From what I recall, it was not a conversation.

17   It was simply a statement.

18       Q    What was the statement?

19       A    That Mount Soledad is now my issue.  There was

20   no direction or anything given to me at that point

21   except that I would be the point person on the issue.

22       Q    You would be the point person on the issue?

23       A    Um-hum.

24       Q    And do you recall which month in 2006 this

25   communication took place?

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 18

1       A    I do not.

2       Q    Was it -- do you recall whether it was before

3  or after Judge Thompson issued the order requiring the

4  City to take the cross down?

5       A    I don't recall.

6       Q    Do you recall whether it was maybe in the

7  spring of 2006?

8       A    I do recall it was in the spring, but I can't

9  pinpoint the date.

10      Q    How do you recall it was in the spring?

11      A    I do remember that that was the time when the

12  Congressman was attempting to make some changes

13  federally, and that's coincides with the time that I got

14  involved.

15      Q    Okay.  Anything else you remember about that

16  time frame when this happened?

17      A    No, not specifically.

18      Q    Okay.  Who are some of the other City employees

19  that have worked with you on Mount Soledad since then?

20      A    There's one employee who is no longer with the

21  City.  He was also in the Intergovernmental Relations

22  Department.  His name is Erik, E-r-i-k, Bruvold,

23  B-r-u-v-o-l-d.  And at the time, he was the Associate

24  Director of Intergovernmental Relations.  And he was

25  there during this time period.

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 19

1    There was also the Mayor's Director of
2    Communications, Fred Sainz.  And that's S-a-i-n-z.
3        Q    Anyone else?
4        A    Um-hum.  Sure.  Julie Dubick, as I've mentioned
5    before, Director of Policy, and Kris Michell.
6        Q    Was the Mayor involved in Mount Soledad during
7    that time?
8        A    Yes, he was.
9        Q    Okay.  Did you have any interactions with
10   anybody from the City Attorney's office about Mount
11   Soledad during that time?
12       A    One brief introduction with an attorney.  I
13   believe his name is David Karlin, but I didn't work with
14   him.  I met him one time.
15       Q    Did you have any interactions with somebody
16   named Charles LiMandri?
17       A    I did.
18       Q    Can you describe the interactions you had with
19   him?
20       A    Sure.  The interaction I had -- and it was
21   really limited to two days -- with Mr. LiMandri revolved
22   around a meeting at the White House that the Mayor was
23   scheduled to attend.  And I was the one that was tasked
24   to inform Mr. LiMandri that he was not going to be
25   invited to attend the meeting.  And that was my -- that

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 53

1    discuss Mount Soledad?
2        A    You know, I don't know.  I didn't follow up
3    with Lorissa to find out.
4        Q    And you didn't hear from anyone else whether
5    that meeting ever took place?
6        A    No, I didn't.
7        Q    Who would be the person who would know whether
8    that meeting ever took place?
9        A    Lorissa Bounds.
10       Q    No one else in the City's office would have
11   known that?
12       A    Not that I know of.
13       Q    I'll just read the rest of the e-mail.
14           "However, it does throw out a wrench in a WH
15   meeting on Tuesday morning.  Does the Mayor have any
16   flexibility in his schedule?  Could he stay a little
17   longer and we could try to set up a meeting either
18   Tuesday late afternoon/evening or Wednesday morning?  My
19   first goal is to have both of them go in for the
20   meeting.  If the Mayor's schedule is not flexible then
21   we can try to set up a meeting with the Mayor and WH
22   staff.  What do you guys think?"
23           Did you respond to this e-mail from Ms. Bounds?
24       A    Yes, I did.
25       Q    What did you say in response?

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 54

1      A    I don't recall what I said.  I know the end
2   result, but I don't recall what I said at this time.
3      Q    What was the end result?
4      A    The end result was the meeting with the Mayor
5   at the White House.  And I don't have the date, but it
6   is an exhibit under his final trip calendar.  And the
7   meeting did occur, and it occurred without Congressman
8   Hunter.
9      Q    Do you recall who else attended that meeting?
10     A    I wasn't there, but I do know that Lorissa
11  Bounds was in attendance, Marek Gootman was in
12  attendance, Alejandra Gavaldon, and, obviously, the
13  Mayor.
14          MR. SIEGELBAUM:  We'll get to that more in a
15  little bit, but let's just go to the next exhibit.
16          Do you want to take a break?
17          MR. SCHAEFER:  We'll recess for a short break.
18          (Recess.)
19          MR. SIEGELBAUM:  We'll go to Plaintiffs' 8.
20          (Exhibit 8 was marked for identification by the
21          reporter.)
22  BY MR. SIEGELBAUM:
23     Q    Are you familiar with this document?
24     A    Yes, I am.
25     Q    What is this document?

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 55

1      A    This is a one-page briefing document on the

2    issues of the Mount Soledad National War Memorial that I

3    provided for the Mayor.

4      Q    So you --

5      A    I am the author of this document.

6      Q    You wrote this document?

7      A    Yes.  And I misspelled "condemnation" again.

8           MR. SCHAEFER:  Stop pointing out your errors.

9           THE WITNESS:  I didn't edit well.

10   BY MR. SIEGELBAUM:

11     Q    At the bottom "Actions," there are two bullets.

12   The first says, "Request White House Counsel find sound

13   legal basis for condemnation to begin."

14          The second one is, "Request the President's

15   support for legislation, if passed by Congress, to

16   provide authority for immediate taking or condemnation."

17     A    Yes.

18     Q    We have discussed the first proposed action,

19   which was the proposed condemnation.

20          What was the source of the idea contained in

21   the second bullet, to have legislation to have the

22   Federal Government acquire this property?

23     A    Again, Mr. Hunter's staff, Lorissa Bounds, had

24   mentioned that that was a possibility that he was

25   considering.

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 56

1      Q    And why did he feel it was necessary to -- do
2    you know why he felt it was necessary to consider the
3    second option at this point?
4      A    It was my belief that if Bullet No. 1 was not
5    going to be successful, then there needed to be -- that
6    the Congressman believed there was another option --
7           MS. ALLAIRE:  Objection.  Hearsay.
8           THE WITNESS:  -- and that option would be
9    legislation.
10   BY MR. SIEGELBAUM:
11     Q    Do you know which -- which of these two options
12   did the Mayor prefer?
13     A    To my recollection, he preferred option number
14   one as that was -- that at this time there was no
15   legislation, so there was an option on the table.  So he
16   preferred that would be the method in which this was
17   resolved.
18     Q    So it was the fact that -- did his preference
19   for option one have anything to do with the speed with
20   which -- the fact that this could be done presumably
21   immediately whereas the second one would require the
22   introduction of legislation?
23          MS. ALLAIRE:  Objection.  Calls for
24   speculation.
25          THE WITNESS:  In part, but also you'd never

VERBATIM REPORTING SERVICE   (619) 232-3376

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 57

1    know what the outcome of the legislation will be.  So it
2    wasn't just for expediency.  It was for the manner in
3    which assuring that it would occur.
4    BY MR. SIEGELBAUM:
5        Q    So under the first option, you sort of knew
6    what was going to happen, where, if the second one
7    implicated the legislative process, then it was more
8    unpredictable?
9        A    Correct.
10            MR. SIEGELBAUM:  Plaintiffs' 9.
11            (Exhibit 9 was marked for identification by the
12            reporter.)
13   BY MR. SIEGELBAUM:
14       Q    This is the intinerary for the Mayor's trip to
15   Washington, D.C.?
16       A    Correct.
17       Q    Who went on this trip?
18       A    From the Mayor's staff and including the Mayor
19   was Alejandra Gavaldon and Fred Sainz.  And then, of
20   course, the Mayor also has personal protection through
21   the police department that attends, but they are
22   strictly security.
23       Q    Did -- you did not attend?
24       A    I did not go on this trip.
25       Q    Why did you not go on this trip?

VERBATIM REPORTING SERVICE    (619) 232-3376

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 58

1     A     The focus of this trip was binational issues

2  with the Governor of Baja California.  And Alejandra

3  Gavaldon is the lead for binational issues.  And because

4  of the expense involved in this trip, it didn't justify

5  me attending as well.

6     Q     You had mentioned earlier that you were the

7  point person for Mount Soledad --

8     A     Correct.

9     Q     -- is that correct?

10    A     Correct.

11    Q     Who was standing in your stead on this trip as

12  the point person for Mount Soledad?

13    A     There was nobody standing in my stead.  The

14  Mayor was on his own as it relates to any policy issues

15  that came up around Mount Soledad.

16    Q     Did you brief the Mayor prior to this trip

17  about Mount Soledad?

18    A     Yes.  And that was the document that we just

19  talked about was the basis for that briefing.

20    Q     Did you have follow-up conversations or

21  communications about Mount Soledad before he went on

22  this trip?

23    A     No, just the initial policy briefing about his

24  whole agenda.  And when we got to the White House

25  meeting, I gave him the brief.

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 72

1    Do you know what Mr. Sainz meant by "very
2    supportive"?
3    A    The President's press secretary had made public
4    statements during his press briefings at the White House
5    on the issue.  So it wasn't any direct communication.
6    We were basing that statement off of press statements by
7    his press secretary.
8    Q    Was it related at all to what you heard -- what
9    the San Diego delegation heard in that meeting at the
10   White House?
11   A    I don't recall the specifics of what Mr. Snow
12   told the press.  I just remember that generally he was
13   supportive of --
14   Q    Do you know if Mr. Snow made any comments on
15   this issue before this, before June 2nd, 2006 when these
16   talking points were --
17   A    I don't recall.
18   Q    -- authored?
19   A    I don't recall.
20   MR. SIEGELBAUM:  Plaintiffs' 14.
21   (Exhibit 14 was marked for identification by
22   the reporter.)
23   BY MR. SIEGELBAUM:
24   Q    This is a June 9th, 2006 e-mail from Lorissa
25   Bounds to you, Mr. Gootman, two e-mail addresses that

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 73

1    seem to -- I see a cslimandri@aol.com, and then Charles

2    S. Limandri.  And then someone named Teresa Mendoza at

3    LiMandri -- tmendoza@limandri.com.

4            "Subject:  Mt. Soledad."

5            Do you know who Teresa Mendoza is?

6        A    No, I do not.

7        Q    Do you know why Mr. LiMandri was included on

8    this e-mail?

9        A    No, I do not.

10       Q    Do you know whether Ms. Bounds had any

11   communications with Mr. LiMandri directly about Mount

12   Soledad?

13       A    (No audible response.)

14       Q    Other than this e-mail.

15       A    Well, sure.  Going back to our previous

16   exhibits, I think she had mentioned in an e-mail to me

17   that he was already more frustrated with her.

18       Q    Right.

19       A    So that leads me to believe that they had

20   communicated, but I don't know for a fact that they had.

21       Q    Do you know why Mr. LiMandri and Ms. Bounds

22   were communicating about this issue, about the Mount

23   Soledad issue?

24       A    I believe because Mr. LiMandri has an interest

25   in the war memorial staying as it is.  That's all, the

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 74

1    only knowledge I have about their relationship.

2        Q    I'll read the first sentence of the text of the

3    e-mail.  "Sorry to be the bearer of bad news, but our

4    language didn't make it in the Supp..."  S-u-p-p.

5            Do you know what Supp -- do you know what that

6    refers to?

7        A    Yes.  I'm sorry if I chuckled.  I was wondering

8    if you needed me to translate this e-mail.

9            Supplemental spending bill.

10       Q    Okay.

11       A    And so Mr. Hunter was attempting to add

12   legislative language into the supplemental spending

13   bill.

14       Q    So at this point, a decision had been made

15   to -- to go -- to take the legislative route?

16       A    Yes.

17       Q    Had something happened -- Plaintiffs'

18   Exhibit 13 was June 2nd, 2006.  And we talked about

19   that --

20       A    What was the date?

21       Q    June 2nd, 2006.  I think you had mentioned that

22   there were several legal options on the table, one of

23   which was having the Executive Branch take the --

24       A    I don't recall saying several.  I think that

25   was the option on the table was the legal --

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 75

1       Q     Examine all legal remedies.  One of the legal
2    remedies on the table was having the Executive Branch
3    take --
4       A     And, again, I did not author the press
5    statement.
6       Q     Understood.  I --
7       A     My understanding was --
8            MR. McELROY:  Wait, guys.  You've got to talk
9    one at a time because the court reporter can't take you
10   both down.
11           THE WITNESS:  So it was my understanding that
12   there was actually only one legal question outstanding,
13   and that was whether or not the Federal Government
14   believed they had legal authority to take the property.
15           So the fact that the press statement has it
16   plural, I didn't -- I didn't recognize there being more
17   than one option.
18   BY MR. SIEGELBAUM:
19      Q     So do you know whether the fact that they
20   were -- there was discussion in this June 9th e-mail
21   about trying to accomplish the taking of Mount Soledad
22   by legislation meant that the question about whether the
23   Executive Branch had the authority to take this by
24   condemnation had been resolved in the negative?
25      A     I don't recall the dates in which that

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 76

1    occurred, but I do recall that being the -- the position
2    that was communicated to us from the White House that
3    they did not believe they had the legal authority, but I
4    don't recall which -- when that happened.
5        Q    Who from the White House communicated that
6    decision?
7        A    I don't know because I didn't hear it directly
8    from the White House.
9        Q    Who did you hear it directly from?
10       A    I heard it from Marek Gootman.
11       Q    From Marek Gootman?
12       A    Right.
13       Q    And do you know who he heard it from?
14       A    I don't know for a fact, but I believe it was
15    Lorissa Bounds.
16       Q    Lorissa Bounds is not -- Lorissa Bounds being
17    the representative from Hunter's office?
18       A    Correct.
19       Q    So you're saying that someone from the White
20    House conveyed it to Ms. Bounds who conveyed it to
21    Mr. Gootman who conveyed it to you?
22       A    Yes, which would be the normal course of action
23    since Mr. Hunter is the one that requested the action.
24    So the White House would naturally be responding to
25    Mr. Hunter, not to any one of us at the City.

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 77

1      Q    So there was -- you didn't learn -- neither you

2    nor anyone else in the Mayor's office learned who the

3    White House --

4      A    I did not.  I can't speak for others, but

5    nobody else in the Mayor's office told me of that fact.

6    I learned it from Marek Gootman.

7      Q    Going back to this e-mail, the end of the

8    second line, beginning of the third line, "On to plan

9    B...which, you will be pleased to know, I'm already

10   working on."

11         What did you understand Plan B to be?

12     A    At that point, Ms. Bounds had not shared with

13   us what Plan B was.

14     Q    Is it your understanding that it was some other

15   legislative vehicle to get this --

16     A    That would -- that was my assumption, but she

17   did not tell us that at that point.

18     Q    The second to last sentence, "I need to put it

19   together and run it past some people before I get

20   anyone's hopes up.  Thank you for your patience."

21         When she says "some people," do you know what

22   she's referring to there?

23     A    I do not.

24     Q    What did Mr. Gootman tell you about the White

25   House decision not to act by -- to take the property by

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 78

1    condemnation?

2              MS. ALLAIRE:  Objection.  Hearsay.

3              THE WITNESS:  Marek informed me that the White

4    House Counsel believed that they didn't have strong

5    legal reasons to take the property.

6    BY MR. SIEGELBAUM:

7        Q    Did he tell you why the White House believed

8    that to be the case?

9        A    No, not to my recollection.  We didn't go into

10   that detail.

11       Q    Did he tell you anything else about the

12   conversation?

13       A    No.

14       Q    No?

15       A    (Witness shakes head.)

16             MR. SIEGELBAUM:  Plaintiffs' Exhibit 15.

17             (Exhibit 15 was marked for identification by

18             the reporter.)

19   BY MR. SIEGELBAUM:

20       Q    This is a "Statement by Mayor Jerry Sanders,"

21   June 21st, 2006 entitled, "Sanders 'Disappointed' with

22   Appeals Court Ruling on Stay Regarding Mt. Soledad War

23   Memorial;" is that correct?

24       A    Yes.

25       Q    If you look at the second paragraph, four

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 79

1    lines -- four lines from the top, "That order requires

2    the City to take down the cross atop the Mt. Soledad War

3    Memorial on August 1, 2006 or face fines of $5,000 per

4    day."

5            This is referring to Judge Thompson's order in

6    the litigation?

7        A    Yes.

8        Q    Okay.  Did the Mayor ever consider just paying

9    the fines to keep the cross up as it was?

10            MS. ALLAIRE:  Objection.  Calls for

11    speculation.

12            THE WITNESS:  Did he ever consider it?

13            MR. SIEGELBAUM:  Yes.

14            THE WITNESS:  Yes.

15    BY MR. SIEGELBAUM:

16        Q    Did he ever discuss that with you, that course

17    of action with you?

18        A    Yes.

19        Q    What did he say?

20            MS. ALLAIRE:  Objection.  Hearsay.

21            THE WITNESS:  He considered it and believed

22    that paying the fine is not an option for the City.

23    BY MR. SIEGELBAUM:

24        Q    Why was that not an option for the City?

25        A    Two reasons, really.  One is that would be a

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 80

1    violation of the court order, and that was first and

2    foremost.  And, secondly, the City just flat out can't

3    afford it.

4                 MR. SIEGELBAUM:  Moving on to the next one,

5    Plaintiffs' Exhibit 16.

6                 (Exhibit 16 was marked for identification by

7                 the reporter.)

8    BY MR. SIEGELBAUM:

9        Q    This is another press release from Mayor Jerry

10   Sanders on the same -- sorry -- the next day, June 22nd,

11   2006 entitled "Sanders Orders Supreme Court Appeal on

12   Mt. Soledad Case;" is that correct?

13       A    Yes, it is.

14       Q    Were you involved in the conversations that led

15   Mayor Sanders to decide to authorize the Supreme Court

16   appeal?

17       A    No.

18       Q    Do you know who was?

19       A    No, I don't.

20       Q    If you look at the first paragraph, the fourth

21   line up from the bottom, "Mr. Aguirre expects the

22   Petition to be filed by his office Tuesday of next week

23   at no additional cost to the City."

24                 Do you have an understanding of why that appeal

25   would be at no additional cost to the City?

439d8869-708d-4276-ad56-bb41e62879ba

# EXHIBIT 3

ER SENTENCED: Plea deal gives him work furlough, probation in sexual assault / **B3**

# N DIEGO

TUESDAY
May 23, 2006

Ⓑ

THE SAN DIEGO
UNION-TRIBUNE

**ITY • COUNTY EDITION**

## sign off on sabbatical pay

re
llor

out a
San
 re-
said

Uni-
eek
the
rec-

edented practice for the university — appears to have lacked ultimate approval by the university.

UC administrators said the university's practice is to honor the sabbatical credits earned at previous institutions for certain recruited administrators. That means providing them with the opportunity to take a year's sabbatical to conduct research and be paid the appropriate amount during that time.

"My impression is this was a misunderstanding," said Larry Hershman, UC's vice president for budget. "Normally they don't get that money until they take the sabbatical."

The confusion surrounding Fox's sabbatical payment, which several UC officials said they did not know about until *The San Diego Union-Tribune* reported the story in January, highlights the extent of the miscommunication and lack of oversight surrounding compensation practices for the 10-campus system.

It's unclear exactly what Fox and UC President Robert Dynes negotiated. In his offer letter to Fox dated June 8, 2004, Dynes wrote that he had "approved funds to honor the sabbatical leave earned but not yet taken."

SEE **Sabbatical, B4**



UC San Diego Chancellor
Marye Anne Fox was paid
for a sabbatical but has not
taken the time off.

## U.S. deal on cross is termed difficult

### Sanders reports on White House talks

By Dana Wilkie
COPLEY NEWS SERVICE

WASHINGTON — White House officials told Mayor Jerry Sanders they are sympathetic to his call for federal action to keep the cross on Mount Soledad, but President Bush's lawyers warned that such a move would be legally tricky.

Sanders, who is back in the nation's capital for the third time in two months, participated in a 40-minute lunchtime meeting with Ruben Barrales, Bush's director for intergovernmental affairs, as well as White House lawyers and policy staffers, about how to put Mount Soledad property into federal hands to preserve the white cross that towers over the memorial there.

"They indicated it's going to be tough to get this done and we're going to have to work real hard and they'll give us as many options as they can," Sanders said in an interview.

The memorial at Mount Soledad was built in the early 1950s to commemorate the service of Korean War veterans. But for the past 17 years, the cross has been subject to lawsuits, public debates and three public votes.

SEE **Sanders, B8**

## ous science lesson



Sumanga prepared microscope slides while talking with her mentor, post-doctoral researcher Barbara Garmy-Susini, at the
 researched cancer, which killed her father in 2004, for her science project.    *John Gastaldo / Union-Tribune*

## Council testy over Aguirre's legal bills

By Jennifer Vigil
STAFF WRITER

San Diego's legal bills contin-

the central pension system which Aguirre is attempting to eliminate benefit increases he argues are illegal.

Aguirre has offered a Superior Court judge proof that he has authority to pursue the suit. Council members will discuss today whether to offer the court confidential transcripts that could contradict the city attorney's stance.

The pension system has a shortfall of $1.39 billion, a problem that has led to federal investigations, legal and political strife and numerous fiscal hurdles for the city.

Eight former pension system officials face charges so far, and at least a dozen civil cases have been filed.

*Jennifer Vigil; (619) 718-5069;*
*jennifer.vigil@uniontrib.com*

last December and $70 million in 2003.

Talkshow host Merv Griffin, who accompanied Reagan to the celebration, was a natural at the mike as emcee. Natalie Cole (singing "Unforgettable") and Rod Stewart ("As Time Goes By") were the featured entertainment, along with a patriotic performance by the Wayne Foster Orchestra.

Reagan gave Pickens a miniature saddle that had been a gift to her late husband exactly 20 years ago. It was one of the few things the president had purchased from the government to take with him when he left the White House. She said it was mounted on wood from the Oval Office floor. The former first lady sat beside Pickens, a longtime friend, throughout the evening.

## Congressional ties

San Diego Rep. Bob Filner went to Meridian, Miss., last Tuesday for the funeral of former Rep. Gillespie "Sonny"

time I had a police escort. The other good news: Filner says, unlike 1961, he saw many black cops on his return trip.

## Tennis parents

Local real estate agent Gary Kent was dining with his family at Cafe Japengo on Saturday when two kids at a nearby table began playing with black stones in the table decor. A couple of stones bounced against Kent's booth. When the family got up to leave, the father approached Kent and graciously apologized.

"He was none other than my hero and tennis great, Andre Agassi," says Kent, who had just played two hours of tennis with his son, Tim. Agassi, who has had to lay off tennis due to a bad back, was there with his equally well-known wife, Steffi Graf.

## It's a small world

*Rod Smith of the San Diego Food Bank*

## About this print

When Girl Scout cookie deliveries got under way, one *U-T* reader was surprised to find trans fats listed on the content label. "Good grief, I just checked my Do-Si-Dos and, sure enough, 2 grams trans fat," wrote David Twomey. "Wouldn't you think the last place you would expect to find trans fat would be in Girl Scout cookies?"

Local Girl Scout council spokeswoman Mary Doyle told me that, except for one variety, the manufacturers hadn't found a trans fat-free formula that kept the cookies fresh. But good news is on the horizon. Doyle has just learned that, in 2007, all the Girl Scout cookies will be trans fat-free.

*Diane Bell's column appears Tuesdays, Thursdays and Saturdays. Fax items to (619) 260-5009; call (619) 293-1518; e-mail to diane.bell@uniontrib.com; or mail to The San Diego Union-Tribune, Box 120191, San Diego 92112-0191.*

---

▶ **SANDERS**
CONTINUED FROM PAGE B1

## Mayor lobbies for expanding port of entry

Last July, nearly 76 percent of city voters embraced Proposition A, a ballot measure that would have allowed the city to transfer the cross to the federal government. But San Diego Superior Court Judge Patricia Yim Cowett ruled in October that the proposition violated the state constitution.

This month, U.S. District Judge Gordon Thompson Jr. gave the city 90 days to remove the cross or face a daily fine of $5,000.

Nearly two weeks ago, Rep. Duncan Hunter, R-Alpine, asked the president to have the federal government seize the property by eminent domain. Sanders immediately supported the plan.

Critics have said the cross would still violate church-state separation principles, even if it were under federal jurisdiction.

While White House officials indicated yesterday that Bush is "supportive in concept" and "appreciates the importance of the monument," lawyers from the White House counsel's office discussed the legal impediments they might encounter, according to Sanders spokesman Fred Sainz.

Said Sanders: "I do think they're willing to move in that direction, but they're still exploring how to get this done in the most expeditious way. I think eminent domain is difficult from anybody's perspective, and they want to make

sure they're on sound legal ground before they move in that direction."

The San Diego City Council today is scheduled to decide whether to appeal the judge's order to remove the cross from city property before Aug. 1.

The White House and the Interior Department yesterday gave the impression that little so far has been done, or even communicated, about Sanders' request to seize the Mount Soledad land. A White House spokeswoman referred media calls about the Mount Soledad issue to the Interior Department.

But Interior spokesman Shane Wolfe said he had not yet seen Hunter's or Sanders' letters to the president. Presented with copies of the letters by a reporter, he later referred

calls to the Department of Justice, where a spokesman would not comment on the matter.

Hunter spokesman Joe Kasper said Hunter and Sanders are working "directly with the White House."

"It is my understanding that the meeting was very productive and the conversation was focused on the importance and future of the war memorial," said Kasper, who said a Hunter staffer was at yesterday's meeting.

Meanwhile, Sanders said he also had a productive meeting with Homeland Security officials on San Diego's attempt to stay on the priority list for anti-terrorism grants under the Urban Areas Security Initiative.

But he said it would likely be next spring before there is word on San Diego's eligibility

for future grants.

San Diego has been told it will not be permitted to apply for these grants because it is no longer among the nation's high-risk areas.

Sanders, county supervisors, Gov. Arnold Schwarzenegger and the region's congressional delegation have asked the Department of Homeland Security to reconsider San Diego's eligibility. Homeland Security officials have agreed to analyze the data that were used to drop San Diego from the list.

San Diego was awarded $15 million under the program last year.

The mayor also met yester-

day with Debbie Spero, acting commissioner of Customs and Border Protection, and with Gianne Conrad, national director of the General Services Administration, to lobby for more funding to expand the 24-lane San Ysidro Port of Entry.

Sanders was joined by Baja Gov. Eugenio Elorduy Walther and business leaders and government officials from Mexico and San Diego.

Sanders plans to discuss similar issues in meetings today with California Sens. Dianne Feinstein and Barbara Boxer, both Democrats, and with San Diego Reps. Bob Filner and Susan Davis, also Democrats.

---

Subscribe to *The San Diego Union-Tribune.* Call 1-800-533-8830.

## Help find a home for a pet like Elmer.



Elmer, Black & White, Male, 2 yr.,
National Cat Protection (619) 469-8771

## Sponsor a pet in the Union-Tribune's Adopt-A-Pet section.

1 column x 1" photo with
"Sponsored by
(Your Name)" = $32.50

"Save A Life ...
Adopt A Pet"
Wed., June 14, 2006

Four times each year, the Union-Tribune's "Save A Life ... Adopt A Pet" pages feature photos of animals who need homes. With that kind of exposure, thousands have been adopted. By sponsoring a pet, you're ensuring it gets a second chance!

...ber's wife pleads guilty

...informants and other cartel enemies in Mexico.

Prosecutors are seeking Camacho's extradition.

**DUI & CRIMINAL**
EXPERT LEGAL DEFENSE FOR ALL CRIMES
**LITTLE or SO DOWN**
EXPERIENCED AGGRESSIVE
TRIAL ATTORNEYS

**What you think are SUN SPOTS may really be ACTINIC KERATOSIS** which is an **ADVANCED WARNING** that your sun related could be **SKIN CANCER**

DO YOU HAVE 4-15 SPOTS ON YOUR FACE OR SCALP AREA THAT ARE:
- ROUGH
- SCALY
- RED, PINK OR BROWNISH IN COLOR
- ITCH, BURN or STING

...greatly needed to evaluate an investigational treatment for Actinic Keratosis. Qualified participants will receive investigational study cream at no cost. Compensation is also provided in exchange for your time.

Call Dermatology Specialists, located across from Tri-City Hospital in Vista Now.
**760-724-7171 Ext. 115**