**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES)<br>OF AMERICA, INC., RICHARD A. SMITH, MINA)<br>SAGHEB, and JUDITH M. COPELAND, )<br>                       Plaintiffs, )<br> )<br>v.                             )<br> )<br>ROBERT M. GATES, )<br>Secretary of Defense, in his official capacity, )<br> )<br> )<br>                Defendant. )<br> )<br> ) | Case No. 1:07-mc-00220 (JDB)<br>Case No. 1:07-mc-00221 (JDB)<br>Case No. 1:07-mc-00222 (JDB) |

<u>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO NOTICE DESCRIBING CERTAIN
DOCUMENTS IN MEMBERS' POSSESSION**</u>

       Pursuant to the Court's July 31, 2007 Order in the above-captioned dockets, Plaintiffs

Jewish War Veterans of the United States of America, Inc., Richard A. Smith, Mina Sagheb, and

Judith M. Copeland ("Plaintiffs") hereby respond to the Notice Describing Certain Documents in

Members' Possession ("Notice"), submitted on August 8, 2007 by Congressmen Duncan Hunter,

Darrell Issa, and Brian Bilbray ("Members").

       After reviewing the Notice and the documents described therein, Plaintiffs remain

convinced that documents responsive to Specification Nos. 1, 2, 4, and 6 are relevant to

Plaintiffs' underlying lawsuit, and that the Members have no basis for withholding them.[1] Based

on the Members' descriptions, it appears that virtually all of the documents reflect events and

communications comprising "the historical context" of, and "the specific sequence of events

leading to," the federal government's acquisition and display of the Mt. Soledad Cross, *see*

---

[1]      The Members assert that they have no documents responsive to Specification No. 8, *see*
Notice n.1, and Plaintiffs accept that representation.

*McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987)), or, at the very least, could lead to other evidence that will bear upon the Establishment Clause issues in the underlying litigation. As such, these documents are discoverable under Rule 26(a)(1) of the Federal Rules of Civil Procedure, and the Members should be required to produce them.

## ARGUMENT

Relevance for Rule 26 purposes is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978); *see Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 6 (D.D.C. 2007) ("The term relevance at the discovery stage is a broadly construed term and is given very liberal treatment.").[2] And because "a party may discover information which is not admissible at trial if such information will have some probable effect on the organization and presentation of the moving party's case," *see Smith v. Schlesinger*, 513 F.2d 462, 473 & n.37 (D.C. Cir. 1975), a party should not be required to provide a definitive characterization of how it plans to use the requested documents on the merits as a prerequisite for obtaining those documents. However, based on the Members' descriptions of documents in their possession that are responsive to Specification Nos. 1, 2, 4, and 6, Plaintiffs fully expect that many of these documents will play an important role in the summary judgment briefs that they will be filing shortly with the court in San Diego.

---

[2]    *See also* Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Compel Production of Documents Responsive to Subpoenas (filed May 23, 2007) ("Motion to Compel"), at 11-13; Plaintiffs' Reply Memorandum in Support of Motion to Compel Production of Documents Responsive to Subpoenas (filed June 25, 2007) ("Reply Memorandum"), at 2-3.

**_Specification Nos. 1, 2, and 4_**

Plaintiffs' Specification Nos. 1, 2, and 4 ask for documents relating to public and/or political statements that the Members have made about the Mt. Soledad Cross. Because the Members played a central role in the federal government's acquisition and display of the Cross through their years-long, high-profile campaign to have the Cross transferred to the federal government, _see_ Motion to Compel at 5-10, their Mt. Soledad-related documents are bound to reflect the "specific sequence of events" relating to that acquisition and display. _See McCreary_, 545 U.S. at 862; _see also Bonham v. D.C. Library Admin._, 989 F.2d 1242, 1244-45 (D.C. Cir. 1993) ("In determining the legislative purpose of a law or government practice, courts generally look to ... testimony of parties who participated in the enactment or implementation of the challenged law or practice, historical context, and the sequence of events leading to the passage of the law or the initiation of the practice. _The district court must permit discovery . . . regarding these factors_.") (emphasis added and citation omitted). Moreover, because the Members all sponsored the legislation taking the Cross, their documents related to that effort also may be directly probative of impermissible governmental purpose. _See, e.g._, _McCreary_, 545 U.S. at 862 (deeming it appropriate to rely on "detailed public comments of [a statute's legislative] sponsor" to find impermissible sectarian purpose) (citing _Edwards_, 482 U.S. at 586-88); _Epperson v. Arkansas,_ 393 U.S. 97, 107-109 & n.16 (1968) (examining advertising campaign by statute's supporters to determine purpose of statute); _Staley v. Harris County, Tex._, 461 F.3d 504, 514 (5th Cir. 2006) (where judge who "premised his political campaign on putting Christianity back in government" was involved in subsequent efforts to refurbish Christian Bible contained in statue outside local courthouse, tenor of that campaign was one of "the circumstances . . . indicat[ing] an almost exclusively religious purpose for the restoration of the monument"), _dismissed as_

- 3 -

*moot*, 485 F.3d 305 (5th Cir. 2007) (en banc), *petition for cert. filed* (U.S. July 23, 2007) (No. 07-100).  And such documents also may bear heavily on the "effects" prong of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to the extent that they show that "the challenged governmental action [wa]s sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement . . . of their individual religious choices."  *County of Allegheny v. ACLU*, 492 U.S. 573, 597 (1989).

The Notice identifies many documents responsive to Specifications No. 1, 2, and 4 that fall into one or more of these categories.  As an initial matter, many of the documents are from May, June, and July 2006 – the critical period when the Members devoted significant public and private efforts to convince the executive branch to use its eminent domain powers to condemn the Cross, and then sponsored and secured enactment of legislation accomplishing the same purpose after the executive branch concluded it did not have preexisting authority to condemn the Cross.  For instance, the first two documents listed in Rep. Hunter's Specification No. 1, relating to press communications in early May 2006 about Mt. Soledad, seem likely to contain information about his reaction to the federal court ruling ordering the removal of the Cross, and about steps that he planned to take in response to that ruling.  The third document in Rep. Issa's Specification No. 1 listing, a May 22, 2006 email from an Issa staffer to a reporter that was sent the day of the meeting at the White House regarding federal government action on the Cross, appears likely to contain information about that meeting or about the steps that the Members and the executive branch were planning to take.  And the seventeenth document in Rep. Bilbray's Specification No. 4 listing, identified as July 19, 2006 talking points regarding H.R. 5683, is bound to reveal what aspects of the Mt. Soledad issue Rep. Bilbray wanted to emphasize to the

press.[3]  Such documents certainly are part of, and/or relate to, the sequence of events leading up

to the federal government's taking and ownership of the Cross.  *See McCreary*, 545 U.S. at 862.

The Notice also describes a number of documents that would likely help "the courts to

distinguish[] a sham secular purpose from a sincere one."  *See id.* at 864 (citation omitted).  For

instance, the thirtieth document in Rep. Hunter's Specification No. 4 listing, a March 24-25,

2005 email chain between staffers for Rep. Hunter and former Rep. Randy "Duke" Cunningham

that discusses "encouraging support for a referendum campaign," may reveal why two members

of Congress took an interest in a local San Diego referendum related to Mt. Soledad.  Similarly,

the eighteenth and nineteenth documents in Rep. Hunter's Specification No. 4 listing – relating

to the "War Memorial Preservation Act of 2005," legislation sponsored by Reps. Hunter and Issa

(along with two other California congressmen) to "ensure that memorials commemorating the

service of the United States Armed Forces may contain religious symbols"[4] – may explain why

Reps. Hunter and Bilbray were seeking a similar outcome in H.R. 5683.  *Cf. Tequila Centinela*,

242 F.R.D. at 7 ("other incidents of the same type or [instances] involving the same product" are

among types of information that may not be directly pertinent to merits of case, but that may be

relevant for discovery purposes) (citing Fed. R. Civ. P. 26 Advisory Committee Notes, 2000

Amendment).  And the eleventh and twelfth documents in Rep. Hunter's Specification No. 4

contain fliers for Rep. Hunter's re-election and presidential campaigns that tout Rep. Hunter's

efforts to "save [the] Mt. Soledad Memorial."  Rep. Hunter has used such fliers to draw attention

to the fact that "the Christian Coalition of America [has] commend[ed] the great efforts of

---

[3]     Plaintiffs have received similar talking points in discovery from San Diego Mayor Jerry
Sanders, and have used information in those talking points as the basis for questions in several
depositions in this case.  *See, e.g.*, Ex. A, at 70:21 – 72:19 (May 31, 2007 deposition transcript of
J. Brent Eidson, Assistant Director of Intergovernmental Relations for City of San Diego).

[4]     *See* <http://thomas.loc.gov/cgi-bin/bdquery/z?d109:h.r.02229:>.

Chairman Duncan Hunter in saving this historic symbol of Christianity in America." *See* Exh. B. Such political statements are relevant to proving that the secular purpose asserted by the federal government is not genuine. *See, e.g.*, *Staley*, 461 F.3d at 514.

Finally, a number of documents specified in the Notice may have a significant bearing on Plaintiffs' claim that the federal government's acquisition and display of the Cross violates the "effects" prong of *Lemon*. For instance, at least two of the Members have identified two different form letters – one sent to supporters of the federal acquisition of the Cross, and another sent to opponents of that acquisition.[5] And to the extent that the anonymous "interest group" and "professional organization" to which Rep. Bilbray was invited to speak about Mt. Soledad[6] are religiously based, that fact could very well bear upon Plaintiffs' claim that the federal government's efforts with respect to Mt. Soledad have an impermissible sectarian effect. *See County of Allegheny*, 492 U.S. at 597.

### *Specification No. 6*

Plaintiffs' Specification No. 6 seeks documents relating to the federal government's implementation of H.R. 5683, an issue directly related to Plaintiffs' claim that the federal government's display of the Cross violates the Establishment Clause. Because the Notice shows that Rep. Hunter (and, to a lesser extent, Rep. Bilbray) possess documents reflecting events related to Mt. Soledad even after H.R. 5683 became law, it is hard to understand how those documents are irrelevant. Among the documents contained in Rep. Hunter's Specification No. 6 are e-mails reflecting meetings between Rep. Hunter's staff, the Department of Defense, and the Mt. Soledad Memorial Association ("MSMA") concerning the development of a memorandum

---

[5]    *See* Notice, Rep. Hunter Specification No. 4, Documents 23, 26; Rep. Bilbray Specification No. 4, Documents 8-9.

[6]    *See* Notice, Rep. Bilbray Specification No. 4, Documents 4-6.

of understanding that, among other things, would allow the MSMA to sell memorial plaques to veterans and their families.[7]  These documents are likely to contain information about how the Department of Defense intends to manage and display the Cross, and could potentially explain the Department of Defense's plans for allowing religious ceremonies at the Cross.  As such, these documents, too, are directly related to Plaintiffs' Establishment Clause claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs believe that the documents described in the Notice are relevant to claims and defenses in the action, Fed. R. Civ. P. 26(a), and ask the Court to order the Members to produce them.

Respectfully submitted,

T. Jeremy Gunn (Bar No. 417222)
Daniel I. Mach (Bar No. 461652)
ACLU PROGRAM ON FREEDOM OF
    RELIGION AND BELIEF
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
915 15th St., N.W., Suite 600
Washington, D.C.  20005
Telephone:  (202) 675-2330
Facsimile:  (202) 546-0738

A. Stephen Hut, Jr. (Bar No. 192856)
Jonathan H. Siegelbaum (Bar No. 474837)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
*Attorneys for Plaintiffs*

August 13, 2007

---

[7]    *See* Notice, Rep. Hunter Specification No. 6, Documents 3-6, 8.

- 7 -

# Exhibit  A

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STEVE TRUNK and PHILIP K. PAULSON, )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       )  Case No. 06CV 1597BTM(WMc)
                                   )  consolidated with 06cv1728
CITY OF SAN DIEGO, UNITED STATES   )
OF AMERICA and DOES 1 through 100, )
inclusive,                         )
                                   )
              Defendants.          )
                                   )
MOUNT SOLEDAD MEMORIAL ASSOCIATION,)
                                   )
         Real Parties in Interest.)
                                   )
JEWISH WAR VETERANS OF THE UNITED  )
STATES OF AMERICA, INC., RICHARD A.)
SMITH, MIONA SAGHEB and JUDITH M.  )
COPELAND,                          )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       )
                                   )
ROBERT M. GATES, Secretary of      )
Defense, in his official capacity, )
                                   )
              Defendant.           )
_____)

DEPOSITION OF BRENT EIDSON

San Diego, California

May 31, 2007

Reported By:  Mary Beth Harris
             CSR No. 8732

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 69

1    importance on us knowing or seeing that analysis as it's

2    the Congressman's -- his own legislative intent, not

3    ours.  So I wouldn't expect to see that analysis.  I

4    don't know if Marek would.

5        Q    Was it typical for Ms. Bounds to share things

6    that she received from the White House with Mr. Gootman?

7        A    No.

8            MR. SIEGELBAUM:  Plaintiffs' 12.

9            (Exhibit 12 was marked for identification by

10           the reporter.)

11   BY MR. SIEGELBAUM:

12       Q    This is a June 2nd, 2006 Fact Sheet titled

13   "Sanders, Aguirre" -- A-g-u-i-r-r-e.  Did I pronounce

14   that right?

15       A    Yes.

16       Q    -- "Announce Filing of Stay & Appeal in

17   Mt. Soledad National War Memorial Case."

18           Do you know who authored this document?

19       A    I do know who authored it.

20       Q    Who authored it?

21       A    Fred Sainz.

22       Q    Fred Sainz authored it?

23       A    This is a press release, not a policy statement

24   or not a policy paper that we would author.

25       Q    So you had no prior knowledge of the decision

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 70

1    to file a stay before it was actually -- before the stay
2    was actually filed?
3         A    That is correct.
4         Q    Were you typically kept abreast of the
5    developments in the legal case while they took place
6    during this time period?
7         A    No.  My focus, again, was on the legislative
8    process and federal regulatory process.
9         Q    But isn't it true that the legislative process
10   was driven to a certain degree by the timetable that the
11   judge had set in the case?
12        A    I believe Mr. Hunter felt so, yes.
13        Q    Did the Mayor feel pressure to get this done
14   before the August 1st deadline that Judge Thompson had
15   set?
16             MS. ALLAIRE:  Objection.  Calls for hearsay.
17             THE WITNESS:  I don't know if he felt pressure,
18   but I did make him aware that there was an August
19   deadline, but I don't know what his feelings on that
20   deadline were.
21             MR. SIEGELBAUM:  Plaintiffs' 13.
22             (Exhibit 13 was marked for identification by
23             the reporter.)
24   BY MR. SIEGELBAUM:
25        Q    These are talking points for Mayor Jerry

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 71

1    Sanders dated June 2nd, 2006?

2        A    Correct.

3        Q    And, again, the talking points were typically

4    authored by someone in Mr. --

5        A    Correct.

6        Q    -- Sanders' office?

7        A    In the communications department.

8        Q    Sainz?  Sainz?

9        A    Sainz.

10       Q    Sainz.  I keep getting that wrong.

11           The second page, the second to last bullet, "As

12    late as yesterday, the White House Counsel's office was

13    still working with the U.S. Department of Justice to

14    examine all legal remedies that may be available to

15    preserve the Memorial."

16           Is it your understanding that all legal

17    remedies that were being considered at this point were

18    the same ones that we were discussing earlier?

19       A    That's my understanding.  And I would have

20    shared with Mr. Sainz the information on the other

21    exhibit that we talked about, which was actually two

22    days prior.  So this press statement is accurate, that

23    they were still reviewing.

24       Q    The next bullet, "President Bush and his

25    administration have been very supportive of this issue."

VERBATIM REPORTING SERVICE    (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 72

1    Do you know what Mr. Sainz meant by "very
2  supportive"?
3    A    The President's press secretary had made public
4  statements during his press briefings at the White House
5  on the issue.  So it wasn't any direct communication.
6  We were basing that statement off of press statements by
7  his press secretary.
8    Q    Was it related at all to what you heard -- what
9  the San Diego delegation heard in that meeting at the
10 White House?
11   A    I don't recall the specifics of what Mr. Snow
12 told the press.  I just remember that generally he was
13 supportive of --
14   Q    Do you know if Mr. Snow made any comments on
15 this issue before this, before June 2nd, 2006 when these
16 talking points were --
17   A    I don't recall.
18   Q    -- authored?
19   A    I don't recall.
20        MR. SIEGELBAUM:  Plaintiffs' 14.
21        (Exhibit 14 was marked for identification by
22        the reporter.)
23 BY MR. SIEGELBAUM:
24   Q    This is a June 9th, 2006 e-mail from Lorissa
25 Bounds to you, Mr. Gootman, two e-mail addresses that

439d8869-708d-4276-ad56-bb41e62879ba

Brent Eidson, 5/31/2007
Trunk v. City of San Diego

Page 73

1    seem to -- I see a cslimandri@aol.com, and then Charles

2    S. Limandri.  And then someone named Teresa Mendoza at

3    LiMandri -- tmendoza@limandri.com.

4            "Subject:  Mt. Soledad."

5            Do you know who Teresa Mendoza is?

6    A    No, I do not.

7    Q    Do you know why Mr. LiMandri was included on

8    this e-mail?

9    A    No, I do not.

10    Q    Do you know whether Ms. Bounds had any

11    communications with Mr. LiMandri directly about Mount

12    Soledad?

13    A    (No audible response.)

14    Q    Other than this e-mail.

15    A    Well, sure.  Going back to our previous

16    exhibits, I think she had mentioned in an e-mail to me

17    that he was already more frustrated with her.

18    Q    Right.

19    A    So that leads me to believe that they had

20    communicated, but I don't know for a fact that they had.

21    Q    Do you know why Mr. LiMandri and Ms. Bounds

22    were communicating about this issue, about the Mount

23    Soledad issue?

24    A    I believe because Mr. LiMandri has an interest

25    in the war memorial staying as it is.  That's all, the

VERBATIM REPORTING SERVICE   (619) 232-3376

439d8869-708d-4276-ad56-bb41e62879ba

# Exhibit  B

## Christian Coalition of America Washington Weekly Review

Saturday, December 2, 2006     http://www.cc.org/content.cfm?id=366

"...three judges dictated to the city of San Diego, that the cross must be destroyed: first, U.S. District Judge Gordon Thompson Jr. in 1991; then Judge Patricia Yim Cowett, and finally this past May, Federal Judge Gordon Thompson Jr. dictated to the city of San Diego that they must destroy the cross by August 1st, or be fined $5,000 per day, ignoring the wishes of 76% of the San Diego voters who voted last year to preserve the Mount Soledad National War Memorial.

"President George W. Bush signed a bill authored by the Chairman of the United States House of Representatives Armed Services Committee, Congressman Duncan Hunter, (R-CA), to save the 29-foot Mount Soledad Cross overlooking the city of San Diego, California. The Hunter bill passed the House of Representatives by a margin of 379-74 and the United States Senate actually unanimously passed it. The Mt. Soledad Cross was installed during Easter 1954 as a Korean War memorial. The Duncan Hunter bill transferred ownership of the cross by eminent domain to the federal government.

"Chairman Hunter commenting about these judges legislating from the bench and bypassing the voters of San Diego: 'Liberal judges have continued to rely on their interpretation of the California State Constitution to justify the removal of this historic memorial,' Christian Coalition of America commends the great efforts of Chairman Duncan Hunter in saving this historic symbol of Christianity in America."

Congressman
**Duncan Hunter**
(R) San Diego

**Ratings:**
100% Christian Coalition
100% National Right to Life
100% Concerned Women
for America
100% Eagle Forum
92% American Conservative
Union Lifetime rating
100% Campaign for Working
Families
100% FAIR
A+ National Rifle
Association

NARAL Pro-Choice America
Lifetime Rating 1981–2006
**0%**

**ACLU Lifetime Ratings**
Congressman Duncan Hunter 4%
Congressman Tom Tancredo 7%
Senator Sam Brownback 19%
Senator John McCain 26%
Congressman Ron Paul 62%
(http://scorecard.aclu.org)

Duncan
**Hunter** for President '08
www.gohunter08.com
9340 Fuerte Drive, Suite 302 • La Mesa, CA 91941 • 1-888-344-8708     Paid for by Hunter for President, Inc.