**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND,  )  Plaintiffs,  )  v.  )  ROBERT M. GATES, Secretary of Defense, in His Official Capacity,  )  Defendant.  ) | Case No. 1:07-mc-00220 (JB) Case No. 1:07-mc-00221 (JB) Case No. 1:07-mc-00222 (JB) |

**REPLY OF CONGRESSMEN DARRELL E. ISSA, BRIAN P. BILBRAY**
**AND DUNCAN HUNTER TO PLAINTIFFS' OPPOSITION TO**
**MOTION FOR STAY PENDING APPEAL**

Congressmen Duncan Hunter, Darrell Issa and Brian Bilbray respectfully reply to

Plaintiffs' Opposition to the Motion of [the Three Members] for Stay Pending Appeal (filed Oct.

16, 2007) ("Opposition").

**DISCUSSION**

**I.    The Members Have a Strong Likelihood of Success on the Merits.**

**A.    Speech or Debate Issues.**

We explained in our Memorandum . . .  in Support of Motion of [the Three Members] for

Stay Pending Appeal at 3-9 (filed Oct. 10, 2007) ("Members' Memorandum"), that there are

three principal errors in the Court's Memorandum Opinion, *Jewish War Veterans of the United*

*States v. Gates*, __ F. Supp. 2d __, 2007 WL 2702012 (D.D.C. Sept. 18, 2007), that relate to the

Speech or Debate Clause.

1. In Camera Review.  With respect to the Court's arrogation to itself of authority to

review Member legislative documents *in camera*, we have already explained in some detail that

the Court's reliance on *U.S. v. Rayburn House Office Bldg.*, 497 F.3d 654 (D.C. Cir. 2007),

*petition for reh'g en banc pending*, was misplaced.  *See* Members' Memorandum at 3-7.

Because the JWV Plaintiffs have chosen not to address our arguments, Opposition at 5-6, we

need say nothing more on this issue, except to note in particular that they implicitly acknowledge

by their silence that such a review will in fact be forthcoming in light of the factors articulated in the Members' Memorandum at 3-4.

2. <u>Documents That Reflect Legislative Purpose</u>. The JWV Plaintiffs say the Court permitted them "'access to documents (or portions thereof) dealing with overall legislative purpose that are both relevant and not covered by the Speech or Debate Clause.'" Opposition at 6 (quoting 2007 WL 2702012 at *28). The problem with that argument is that the language on *28 conflicts with language elsewhere in the opinion that directs the Members to produce all "documents that reflect legislative purpose." 2007 WL 2702012 at *22. That much broader language, in turn, is clearly erroneous for at least three reasons.

First, the subpoenas to the three Members do not specify documents that reflect legislative purpose. Instead, they specify:

> 1. All documents concerning or relating to your contacts, communications, discussions, or interactions with any news organization or reporter regarding Mt. Soledad or the Mt. Soledad Latin Cross.
>
> 2. All documents concerning or relating to any press conference regarding Mt. Soledad or the Mt. Soledad Latin Cross.
>
> 3. All documents concerning or relating to your contacts, communications, discussions, lobbying of, financial contributions to or received, or interactions with [various organizations] regarding Mt. Soledad or the Mt. Soledad Latin Cross.
>
> 4. All documents concerning or relating to your speeches, public statements, newsletters, letters to constituents, fundraising, or political campaign materials regarding Mr. Soledad or the Mt. Soledad Cross . . . .
>
> 5. All documents concerning or relating to your arrangement, scheduling, or coordination of meetings or appointments between any person or entity and any other person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.
>
> 6. All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding the administration or implementation of H.R. 5683.
>
> 7. All documents concerning or relating to your contacts, communications, discussions, or interactions with any person in the Executive Branch of the United States Government regarding Mt. Soledad or the Mt. Soledad Latin Cross.
>
> 8. All documents concerning or relating to your contacts,

communications, discussions, or interactions with the City of San Diego regarding the administration or implementation of H.R. 5683.

9.  All documents concerning or relating to your contacts, communications, discussions, or interactions with the City of San Diego regarding Mt. Soledad or the Mt. Soledad Latin Cross.

Obviously, the JWV Plaintiffs justify these various specifications on the ground, among others, that they are trying to prove "legislative purpose," but that is not how they describe the documents they seek.

Second, it is not clear how the Members would determine what documents "reflect legislative purpose" or, more specifically, through whose eyes they would make that determination.

Third, and most importantly, the language on *22 improperly imports into the Speech or Debate context a legal construct – "legislative purpose" – that has validity in the First Amendment, Establishment Clause, context.  However, the Speech or Debate Clause is not the First Amendment.  It simply does not matter for Speech or Debate purposes what particular documents may prove or how the JWV Plaintiffs justify the various specifications in their subpoenas.  The documents in the Members' possession that are protected by the Speech or Debate Clause are all those that reflect activities that are "'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation . . . .'" Members' Memorandum at 7-8 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (quoting *Gravel v. U.S.*, 408 U.S. 606, 625 (1972))).  That is the applicable standard and the Court erred by directing the Members to produce documents – "documents that reflect legislative purpose" – that satisfy that standard.[1]

---

[1]  The JWV Plaintiffs are incorrect in asserting that we said that "*all* documents that reflect legislative purpose . . . are necessarily covered by the Speech or Debate Clause."  Opposition at 6 (emphasis in original).  We did not say that.  What we did say is that the Court's focus on what particular documents may prove is erroneous and inconsistent with Supreme Court case law.

The Court's error here is similar to an error committed by the District Court in the *Rayburn* case.  There, the District Court improperly conflated the Speech or Debate Clause with

(continued...)

3. <u>Political Activities</u>. The JWV Plaintiffs say that they "do not read the Order as allowing discovery of every document that relates to anything that might be construed as having 'some political component.'" Opposition at 7. We are not certain, as we indicated earlier, what the Court intended. *See* Members' Memorandum at 8-9. However, if the Court intended to hold that documents that reflect activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation . . . " are not Speech or Debate covered just because they have some "political" component, then the Court erred. *See* Members' Memorandum at 8-9.

In addition, the Court's limitation of the reach of the Speech or Debate Clause only to activities that "lead directly to legislation," 2007 WL 2702012 at *21, is also plainly erroneous. The Speech or Debate Clause is not so narrowly confined. *See, e.g.*, *Eastland*, 421 U.S. at 509 ("[T]he legitimacy of a congressional inquiry [is not] defined by what it produces. The very nature of the investigative function – like any research – is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result.").

**B.     Relevance Issue.**

The JWV Plaintiffs do not deny – because they cannot – that the House Rule VIII "materiality" standard is higher than the normal relevance standard, nor do they deny that this Court completely ignored that standard.[2] Indeed, the JWV Plaintiffs do not even contend that the documents the Court directed the Members to produce are "material" to their litigation, that is, "reasonably likely to influence the tribunal in making a determination required to be made."

---

[1](...continued)
the Fifth Amendment in holding that the Clause only protects against "testimony" or "testimonial inferences," but not against the disclosure of legislative records as such. *See In Re Search of the Rayburn House Office Bldg.*, 432 F. Supp. 2d 100, 111-12 (D.D.C. 2006) (citing two Fifth Amendment cases, *Andresen v. Maryland*, 427 U.S. 463 (1976), and *Johnson v. U.S.*, 228 U.S. 457 (1913)). The Court of Appeals explicitly rejected the District Court's holding. *See Rayburn House Office Bldg.*, 497 F.3d at 654, 659-61.

[2] The Rules of the 110th Congress (2007-08) are available on-line at http://www.gpoaccess.gov/hrm/browse_110.html.

*Weinstock v. U.S.*, 231 F.2d 699, 701 (D.C. Cir. 1956).

Instead, what the JWV Plaintiffs do say is that this is a new argument the Members did not raise below. Opposition at 8. This is incorrect. The argument was certainly raised – even if not emphasized because of our belief that the JWV Plaintiffs do not even satisfy the more minimal relevance standard – and therefore has not been waived. *See* Consolidated Opposition of Congressmen . . . to Plaintiffs' Motions to Compel Production of Documents at 5 (filed June 13, 2007).[3]

The JWV Plaintiffs also say that the Members are trying to exempt themselves from Federal Civil Rule 26. This is also incorrect. The Members do not contend that Rule 26 does not apply, but only that House Rule VIII creates an additional, judicially enforceable, standard that must be satisfied when discovery is sought from Members of the House.[4] The JWV Plaintiffs citation to *U.S. v. Rostenowski*, 59 F.3d 1291, 1305 (D.C. Cir. 1995), Opposition at 9, does not help them in this regard. Indeed, quite the opposite. *Rostenkowski* acknowledged that congressional rules are "judicially cognizable," 59 F.3d at 1305 (quoting *Yellin v. U.S.*, 374 U.S.

---

[3] We raised this issue at least to the same degree the JWV Plaintiffs raised the issue of *in camera* review which they only alluded to in a footnote in their reply brief. *See* Plaintiffs' Reply Memorandum in Support of Motion to Compel at 21 n.11 (filed June 25, 2007).

[4] This is hardly the only instance in which standards different from those provided in the Federal Rules apply to discovery sought from Members of Congress. For example, Members may not be deposed or required to provide trial testimony at all, absent exceptional circumstances, a standard that does not appear in the federal rules and does not apply to ordinary witnesses. *See, e.g.*, *Cano v. Davis*, No. CV 01-08477, Order Granting Motions to Quash Subpoenas Ad Testificandum and Duces Tecum Served on Congressmen Berman, Filner, and Sherman at 2, 3 (C.D. Cal. March 28, 2002) ("exceptional circumstances" necessary to compel discovery from Members of Congress), attached as Exhibit MC-1; *Bardoff v. U.S.*, 628 A.2d 86, 90 (D.C. 1993) (affirming trial court order quashing subpoenas to Senators and Senate Committee counsel on ground, among others, that defendants "failed to proffer any reason why others present who did not hold such high office could not provide the testimony"); *Springfield Terminal Ry. Co. v. United Transp. Union*, No. 89-0073, 1989 WL 225031 at *2 (D.D.C. May 18, 1989) (refusing to compel Congressman to submit to deposition or produce documents because discovery would "disrupt [his] work as the ranking Minority Member of the House Appropriations Committee"). These "exceptional circumstances" include: (i) that the information sought not be obtainable elsewhere; (ii) that the information sought be essential (not merely relevant) to the party's case; and (iii) that provision of the testimony not interfere with the Member's official responsibilities. *See, e.g.*, *In re FDIC*, 58 F.3d 1055, 1062 (5th Cir. 1995); *Hankins v. City of Philadelphia*, No. 95-1449, 1996 WL 524334 at *1 (E.D. Pa. Sept. 12 1996).

109, 114 (1963)), which is what we are arguing here.[5]

Finally, the JWV Plaintiffs completely miss the significance of *Goland v. Central Intelligence Agency*, 607 F.2d 339 (D.C. Cir. 1978). They cavalierly dismiss that D.C. Circuit decision on the ground that it did not mention the Rulemaking Clause. Opposition at 9 n.2. However, *Goland* expressly held that "Congress has undoubted authority to keep its records secret, authority rooted in our Constitution, longstanding practice, and current congressional rules," 607 F.2d at 346, and "congressional rules," quite obviously, are enacted pursuant to the Rulemaking Clause. The JWV Plaintiffs also point out, correctly, that *Goland* involved a FOIA request. However, that is not significant because, if it is appropriate for the courts to take congressional rules into account in construing FOIA, as it is, it is also appropriate for the courts to take congressional rules into account in applying civil discovery rules. The rules of civil discovery do not stand on a higher plane than federal statutes.

## II.      The Members Will Suffer Irreparable Harm.

The JWV Plaintiffs do not deny that the protections afforded to Members under the Speech or Debate Clause of the Constitution are of critical importance to the legislative branch of government, or that the Members will suffer immediate and irreparable harm if the Court's Order encompasses documents that are covered by the Clause. Instead, they simply deny that that is what the Court's Order does. That argument seems to turn on the circular assumption that whatever the Court ordered produced is not privileged. The problem is, as we have discussed above and in the Members' Memorandum at 7-9, that the Court's Order, on its face, appears to direct the Members to produce at least some documents that, under the Members' reading of the relevant case law, are constitutionally privileged (and it plainly contemplates Court review of some such documents). And once those documents are produced (or reviewed), the harm the Members seek to protect against will have occurred, and that harm will not be reparable.

With respect to non-privileged documents, the Members will also suffer irreparable harm

---

[5]  *Rostenkowski* held elsewhere that sufficiently ambiguous congressional rules are non-justiciable. *See* 59 F.3d at 1306 ("judicial interpretation of an ambiguous House rule" intrudes into the authority reserved to Congress under the Rulemaking Clause). However, we do not contend, and we do not read the JWV Plaintiffs as contending, that "relevant and material" is so ambiguous as to preclude judicial application.

if a stay is not entered.  As we pointed out earlier, House Rule VIII authorizes Members to comply with a judicial subpoena only if, among other things, the information sought is "material and relevant."  The Members have already determined that the records sought in this proceeding are not "material," and this Court has not disagreed with that determination.  If a stay is not entered, therefore, the Members will be compelled to violate House Rule VIII.  And that, in turn, could potentially expose them to sanctions since the Members are specifically admonished under House Rule XXIII (the "Code of Official Conduct") to "adhere to the spirit and the letter of the Rules of the House . . . ."  House Rule XXII.1.  *See also* House Rules X.1(q), XI.3 (vesting Committee on Standards of Official Conduct with authority, in first instance, to police and enforce the Code of Official Conduct).[6]

## III.    The JWV Plaintiffs Will Not Be Injured.

The JWV Plaintiffs' argument that they will be injured if a stay is granted is undercut by their own candid admission that "[t]he evidence in the San Diego case is not substantially in dispute," Opposition at 10, and by the following additional factors.

First, the District Court in San Diego has made clear that the plaintiffs already have adequate amounts of evidence available to them for *Lemon* test purposes.

> [A] significant amount of alternative source material . . . is available for Plaintiff to reference with respect to his claims. . . . [C]ourts determine the improper purpose behind a statute by evaluating the plain language of the statute on its face, its contemporaneous legislative history and the historical context of the statute – all of which is available to Plaintiff. . . . Plaintiff's exhibits . . . demonstrate that he has a significant amount of source material available to him on the issue of legislative purpose . . . . Accordingly, the information Plaintiff seeks through deposition will be unnecessarily duplicative.

Order Denying Plaintiff's Request to Compel the Depositions of . . . Representative Duncan Hunter at 9-10 (April 2, 2007) ("April 2 Order").[7]

---

[6]  The jurisdiction exercised by the Standards Committee derives from the authority the Constitution vests in each house of Congress to "punish its Members for disorderly Behaviour." U.S. Const. art. I, § 5, cl. 2.

[7]  This Court suggested that the April 2 Order was not final because it was issued by a Magistrate Judge.  2007 WL 2702012 at *8.  District Judge Burns has since made clear that he

(continued...)

Second, the District Court in San Diego has made clear that it does not consider relevant for *Lemon* test purposes information about Members' motivations and strategies. *Id*. at 7-9.

Third, the JWV Plaintiffs' recently filed summary judgment motion in the San Diego District Court was supported by *125 exhibits*. *See* Declaration of Matthew T. Jones Including Table of Contents of Exhibits Referenced in Memorandum of Points and Authorities in Support of JWV Plaintiffs' Motion for Summary Judgment (Oct. 12, 2007), attached as Exhibit MC-3. In light of the wealth of information the JWV Plaintiffs obviously already have available to them – a wealth that is not surprising in light of the fact that the litigation "has proceeded in various forms for nearly twenty years," Opposition at 11 – their coy suggestion that non-privileged records in the Members' files are "potentially crucial to the key First Amendment inquiry in this case," *id* at 10, cannot be taken seriously.

Fourth, many of the subpoenaed documents which we concede are non-privileged are public documents available to the JWV Plaintiffs outside the discovery process, including Member press releases – *see* http://www.house.gov/hunter/news.shtml (Hunter); http://issa.house.gov/index.cfm?FuseAction=PressOffice.List&ContentRecordType_id=1&CFID=1022278&CFTOKEN=75630209 (Issa); and http://www.house.gov/bilbray/releases.shtml (Bilbray) – and information about contributions made by *individuals* associated with various organizations identified in the subpoenas. *See* http://www.fec.gov/disclosure.shtml, http://www.fec.gov/ans/answers_disclosure.shtml#who_contributed_to_my_Rep. Those records have been, and will continue to be, available to the JWV Plaintiffs even if a stay is granted.

Fifth, while this Court rested its relevance determination in part on the possibility that the JWV Plaintiffs might depose Charles LiMandri, 2007 WL 2702012 at *17 n.8, the District

---

[7](...continued)

disagrees. "[T]he order of April 2, 2007 is this Court's own order." Order Overruling Plaintiff Smith's Objection to Order Granting Non-Party Charles LiMandri's Motion to Quash and for Protective Order at 10 (Oct. 10, 2007) ("October 10 Order"), attached as Exhibit MC-2.

This Court also expressed doubt that the JWV Plaintiffs had participated in the litigation that led to Magistrate Judge McCurine's issuance of the April 2 Order. District Judge Burns has since made clear that he also disagrees with that suggestion. *See* October 10 Order at 10 ("The JWV Plaintiffs had a full and fair opportunity to litigate the issue of whether a deposition of Rep. Hunter was proper.").

Court in San Diego has since quashed LiMandri's deposition subpoena. *See* October 10 Order (overruling JWV Plaintiffs' objections to Magistrate Judge McCurine's Order Granting Non-Party Charles LiMandri's Motion to Quash and for Protective Order (Sept. 13, 2007)). So, the JWV Plaintiffs cannot be injured by being denied documents they cannot in any event use to depose Mr. LiMandri.

Sixth, discovery has long since closed in the San Diego litigation, so the JWV Plaintiffs cannot contend that they are injured by being deprived of documents that might lead to the discovery of other admissible evidence.

In short, the JWV Plaintiffs will not be injured if a stay is granted. And any harm they might conceivably suffer is not irreparable because it can be alleviated by their moving the San Diego District Court to postpone its ruling on the summary judgment motions pending a ruling by the Court of Appeals in this case.

**IV.    Granting a Stay Is in the Public Interest.**

The public does not have any particularly strong interest in the resolution of the JWV Plaintiffs' claims in the San Diego District Court. Moreover, there is no serious potential for a "waste of judicial resources" as the JWV Plaintiffs suggest, Opposition at 11, and any potential that does exist can be alleviated by the JWV Plaintiffs moving the San Diego District Court to postpone its ruling on the summary judgment motions pending a ruling by the Court of Appeals in this case.

On the other hand, the public most certainly has a strong and overriding interest in not having the Speech or Debate Clause breached. *See, e.g.*, *U.S. v. Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980) ("[T]he Speech or Debate Clause . . . serves as a vital check upon the Executive and Judicial Branches to respect the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen."). And that part of the public that comprises the constituencies of Congressmen Hunter, Issa and Bilbray – nearly two million people in total – has a strong interest in not having its representatives in Congress distracted from their legislative and representational responsibilities.

Maintaining the status quo, therefore, is manifestly in the public interest.

**V.    The Issues the Members Will Raise on Appeal Are Serious.**

The JWV Plaintiffs do not deny that the issues the Members intend to raise on appeal are serious and substantial.  *See* Members' Memorandum at 14-15.  Under the law of this Circuit, *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977), that fact counsels strongly in favor of a stay.

**VI.    Appellate Jurisdiction Is Not an Issue Here.**

The JWV Plaintiffs spend a considerable amount of time arguing, on the basis of one Third Circuit decision, that a stay should not be entered because this Court's September 18 Order is not appealable.  Opposition at 2-4 (citing *U.S. v. Fiumara*, 605 F.2d 116, 117 (3d Cir. 1979).  However, *Fiumara* is not the law of this Circuit; the appellate jurisdiction issue is not pertinent to the stay issue here; and this Court has no authority to decide whether the Court of Appeals has jurisdiction over the Members' appeal.  Moreover, and in any event, the JWV Plaintiffs are wrong.

*McSurely v. McClellan*, 521 F.2d 1024 (D.C. Cir. 1975), *reh'g granted*, 553 F.2d 1277 (D.C. Cir. 1976) (en banc), *cert. granted*, 434 U.S. 888 (1977), *cert. dismissed. sub nom. McAdams v. McSurely* 438 U.S. 189 (1978) – which JWV Plaintiffs dismiss as "old," Opposition at 4 – is directly on point and is the law of this Circuit.[8]  And its square holding that a Member of Congress need not go into contempt in order to obtain appellate jurisdiction to challenge a denial of his invocation of the Speech or Debate privilege, 521 F.2d at 1031-33, is hardly "dicta" as the JWV Plaintiffs suggest.  Opposition at 4.  *See also Rostenkowski*, 59 F.3d at 1297 ("We clearly have jurisdiction to review the order of the district court denying Rostenkowski's motion to dismiss [on Speech or Debate grounds].").

Furthermore, there is no constitutional distinction between the immunity from trial that Senator McClellan, and Congressman Rostenkowski, stood to lose in those cases and the privilege against non-disclosure that Congressmen Hunter, Issa and Duncan stand to lose here.

---

[8]  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), is also "old," but not less binding and not less important on account of its age, as we think even the JWV Plaintiffs would admit.

*See, e.g.*, Order at 1, in *U.S. v. McDade*, No. 96-1508 (3d Cir. 1996), attached as Exhibit MC-4.[9]

*In re Kessler*, 100 F.3d 1015 (D.C. Cir. 1996), which the JWV Plaintiffs cite, Opposition at 4, is not relevant here. The *Kessler* Court simply held it did not have jurisdiction to review a non-final discovery order directed at an executive branch political appointee. The Court expressly distinguished interlocutory appeals taken to protect the Speech or Debate privilege. 100 F.3d at 1017 n.2. Furthermore, *Kessler* does not speak to the issue of whether mandamus jurisdiction under the All Writs Act, 28 U.S.C. §1651, will lie as to otherwise nonappealable discovery orders directed at Members of Congress who, like the President, are constitutional officers. *See* 100 F.3d at 1017.

We will address this issue in more detail if and when the JWV Plaintiffs move in the Circuit Court to dismiss the Members' appeal on jurisdictional grounds.

---

[9] In the *McDade* case, the trial court ordered the House Standards Committee to produce certain Speech or Debate privileged documents to the Justice Department for the latter's use in connection with a criminal prosecution of a Member of Congress. *See* Order at 3 n.** in *U.S. v. McDade*, No. 92-249 (E.D. Pa. June 5, 1996), attached as Exhibit MC-5. The Standards Committee appealed mid-trial; the Justice Department, in defending against the appeal, acknowledged that the appellate court had jurisdiction; and the Third Circuit, in reversing the District Court, necessarily agreed that it had jurisdiction.

**CONCLUSION**

For all the reasons given above and in the Members' Memorandum, the Motion for Stay should be granted. However, in the event the Court denies our stay motion in whole or in part, we request that the Court allow us 10 business days to either comply with any production order or seek further relief from the Court of Appeals pursuant to Rule 8(a)(2) of the Federal Rules of Appellate Procedure.

Respectfully submitted,

GERALDINE R. GENNET, General Counsel
(DC Bar #213439)
s/Kerry W. Kircher
KERRY W. KIRCHER, Deputy General Counsel
(DC Bar #386816)
DAVID PLOTINSKY, Assistant Counsel
CHRISTINE DAVENPORT, Assistant Counsel
JOHN FILAMOR, Assistant Counsel
(DC Bar #476240)

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700 (telephone)
E-mail: kerry.kircher@mail.house.gov

Counsel for Congressmen Darrell E. Issa, Brian P. Bilbray and Duncan Hunter

October 19, 2007

## CERTIFICATE OF SERVICE

I certify that on October 19, 2007, I served the foregoing Reply of Congressmen Darrell

E. Issa, Brian P. Bilbray and Duncan Hunter to Plaintiffs' Opposition to Motion for Stay Pending

Appeal, through the electronic case filing system and by .pdf email on the following:

> Ryan Phair, Esq.
> Wilmer Cutler Pickering Hale and Dorr
> 1875 Pennsylvania Avenue, NW
> Washington, D.C.  20006
> Email: ryan.phair@wilmerhale.com
>
> Ryan Nelson
> U.S. Department of Justice, ENRD
> Natural Resources Section
> 601 D Street, NW
> P.O. Box 663
> Washington, D.C.  20004-0663
> Email: ryan.nelson@usdoj.gov
>
> Heide Herrmann
> U.S. Department of Justice, ENRD
> Natural Resources Section
> 601 D Street, NW
> P.O. Box 663
> Washington, D.C.  20044-0663
> Email: Heide.Herrmann@usdoj.gov

> s/Kerry W. Kircher
> Kerry W. Kircher
> E-mail: kerry.kircher@mail.house.gov

Exhibit MC-1

UNITED STATES DISTRICT COURT        P SEND
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.: CV 01-08477 MMM (RCx)        Date: March 28, 2002

Title: *Cano, et al. v. Davis, et al.*

---

**DOCKET ENTRY**

---

**PRESENT:**

HONORABLE STEPHEN REINHARDT, UNITED STATES CIRCUIT JUDGE;
HONORABLE CHRISTINA SNYDER, UNITED STATES DISTRICT JUDGE;
HONORABLE MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

Anel Huerta                              N/A
Deputy Clerk                       Court Reporter

Attorneys Present for Plaintiff(s):        Attorneys Present for Defendant(s):
None                                               None

PROCEEDINGS:   Order Granting Motions To Quash Subpoenas Ad Testificandum And
Duces Tecum Served On Congressmen Berman, Filner, And Sherman

Pursuant to the stipulation of counsel, Local Rule 7-15 and Rule 78 of the Federal Rules of Civil Procedure, the court vacated the March 26, 2002 hearing on the motions of Congress Members Howard Berman, Brad Sherman and Bob Filner to quash the subpoenas ad testificandum and duces tecum served on them by plaintiffs, and found the matter suitable for decision without oral argument. Having considered the briefs submitted by counsel, the court grants the motions as set forth below.

On February 13, 2002, plaintiffs served a staff member in Congress Member Sherman's Woodland Hills office with subpoenas compelling him to appear for deposition and produce documents.[1] The subpoena ad testificandum noticed Sherman's deposition in Los Angeles on March 14, 2002, when Sherman was scheduled to be in Washington D.C.[2] The subpoena duces tecum required production by Sherman, his agents and staff of a broad range of documents

---

[1] See Memorandum of Law In Support of motion to Quash Third Party Subpoenas to Congressman Brad Sherman ("Sherman Mot.") at 3:16-19.

[2] See *id.* at 4:34; Ex. A.

APR - 4 2002

PR (196)

regarding the 2000-2001 redistricting process.[3]   On February 14, 2002, plaintiffs served subpoenas on Congress Member Berman's District Office in Mission Hills.   While plaintiffs notified the parties that they planned to serve subpoenas on Congress Member Filner, such service has not been effected to date.[4]

"Exceptional circumstances" are necessary to compel discovery from high ranking government officials. See *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993) (per curiam) (holding that high ranking government officials ". . . 'should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions.'. . . [They] have greater duties and time constraints than other witnesses . . . ," quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985)). See also *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (affirming "a settled rule . . . that 'exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted,'" quoting *In re Officer of Inspector General*, 933 F.2d 276, 278 (5th Cir. 1991)); *Kyle Engineering Company v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) ("Heads of government agencies are not normally subject to deposition").

Courts have articulated a variety of factors relevant in assessing whether exceptional circumstances are present.  Among the factors courts examine is whether the high ranking official "possess information essential to [the] case which is not obtainable from another source . . . ." *In re United States (Reno)*, 197 F.3d 310, 314 (8th Cir. 1999) (citing *In re FDIC*, *supra*, 58 F.3d at 1062).  The Eighth Circuit, in fact, has gone so far as to state that the party seeking discovery must "show an entitlement to the relief sought in the case." *In re United States (Reno)*, *supra*, 197 F.3d at 314.  See also *In re FDIC*, *supra*, 58 F.3d at 1062 (denying defendants the right to depose high ranking officials of the FDIC after the agency brought a declaratory relief action because there was not "a strong showing of bad faith or improper behavior" in the record, "notwithstanding Pacific Union's allegations of misconduct (including conspiracy and cover-up) and assertions of gross abuse of power by government agencies and officials").

Plaintiffs assert that the Congress Members possess evidence relevant to the California Legislature's intent in enacting the redistricting plan, and that such evidence is relevant both to their Fourteenth Amendment and Voting Rights Act claims. It is clear, however, that with respect to both species of claim, plaintiffs must, in addition to proving intent, also prove that the Legislature's redistricting plan had a discriminatory effect on Latino voters. See, e.g., *Voinovich v. Quilter*, 507 U.S. 146, 155 (1993) ("Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter"); *Davis*

---

[3]See *id.* at 4:5-8; Ex. B.

[4]See Memorandum in Support of Motion of Congressmen Filner and Berman to Quash Subpoenas ("Berman/Filner Mot.") at 5:14-24.  Neither the Berman nor the Sherman subpoena was properly served as required by Rule 45 of the Federal Rules of Civil Procedure.

*v. Bandemer*, 478 U.S. 109, 127 (1986) (to prevail on Fourteenth Amendment vote dilution claim, plaintiffs must prove intentional discrimination against an identifiable political group; and an actual discriminatory effect on that group); *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) ("Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result").

The Senate defendants have filed motions for summary judgment asserting that plaintiffs cannot raise a triable issue of fact regarding the discriminatory effect of the redistricting plan in the challenged State Senate and Congressional districts. Defendants' motions also challenge, *inter alia*, the legal merit of plaintiffs' claim under *Shaw v. Reno*, 509 U.S. 630 (1993). The Congress Members argue that, until these motions are decided, and it is determined both that plaintiffs have adduced sufficient evidence of discriminatory effect to move beyond summary judgment, and that plaintiffs' *Shaw* claim is legally tenable,[5] they cannot demonstrate that the Congress Members' deposition testimony is "essential" to their case. They argue further that plaintiffs cannot make a sufficient showing of entitlement to relief on the merits to warrant compelling the discovery under the "exceptional circumstances" standard applicable to high ranking officials.

The Supreme Court has cautioned that district courts adjudicating legislative redistricting claims must be mindful of "the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at various stages of litigation and determining whether to permit discovery or trial to proceed." *Miller v. Johnson*, 515 U.S. 900, 916-17 (1995). Coupled with the "exceptional circumstances" standard applicable to depositions and discovery requests served on high ranking government officials, *Miller* counsels that the present subpoenas be quashed until such time following disposition of defendants' summary judgment motions as the court determines that discovery regarding issues of intent is appropriate.[6]



Initials of Deputy Clerk___

cc:    **Counsel of record (or parties)**

---

[5]Defendants have raised substantial questions as to whether the challenged districts are of the type that can be the subject of a successful *Shaw* claim. The court believes it prudent to resolve that legal issue before addressing the factual merits of the claim or authorizing discovery relevant to it.

[6]It is true, as plaintiffs note, that the court, in its order denying plaintiffs' application for temporary restraining order, stated that it believed plaintiffs presented sufficiently serious questions to make the case a fair ground for litigation. The court also stated, however, that it could not conclude on the limited record before it that plaintiffs would probably succeed on the merits of their claims. It is precisely the limited nature of the temporary restraining order record that leads the court to conclude that any assessment as to whether the Congress Members' testimony is "essential" should await resolution of the pending summary judgment motions.

Exhibit MC-2

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                 **SOUTHERN DISTRICT OF CALIFORNIA**
10
11   STEVE TRUNK and PHILIP K.              CASE NO. 06cv1597-LAB (WMc)
     PAULSON,                               (Consol. w/06cv1728-LAB (WMc)
12
                               Plaintiffs,  **ORDER OVERRULING**
13                                          **PLAINTIFF SMITH'S OBJECTION**
             vs.                            **TO ORDER GRANTING NON-**
14                                          **PARTY CHARLES LIMANDRI'S**
                                            **MOTION TO QUASH AND FOR**
15   CITY OF SAN DIEGO, UNITED STATES       **PROTECTIVE ORDER**
     OF AMERICA, DONALD H. RUMSFELD,
16   Secretary of Defense and DOES 1        [Dkt. No. 172.]
     through 100, inclusive,
17
                               Defendants.
18   _____
19   MOUNT SOLEDAD MEMORIAL
     ASSOCIATION,
20
                  Real Parties in Interest.
21   _____
22   JEWISH WAR VETERANS OF THE
     UNITED STATES OF AMERICA, INC.,
23   RICHARD A. SMITH, MINA SAGHEB,
     and JUDITH M. COPELAND,
24
                               Plaintiffs,
25
             vs.
26
     DONALD H. RUMSFELD, Secretary of
27   Defense, in his official capacity,
28                             Defendant.
     _____

06cv1597

1      On July 16, 2007, non-Party Charles LiMandri ("LiMandri") filed a motion to quash
2   and for a protective order regarding a deposition subpoena and notice served on him by
3   counsel for, collectively, Jewish War Veterans of the United States of America, Inc., Richard
4   A. Smith, Mina Sagheb, and Judith M. Copeland (the "JWV Plaintiffs"). LiMandri, a San
5   Diego attorney, was active in seeking government action to have the property at issue in this
6   case transferred from the City of San Diego (the "City") to the federal government, and who
7   also advised members of Congress regarding proposed legislation.

8      LiMandri sought to quash the subpoena, citing, among other authorities, Fed. R. Civ.
9   P. 45(c)(3), which provides that on motion by a person served with a subpoena, a court will
10  quash or modify the subpoena if it requires disclosure of privileged or protected matters, or
11  subjects the person to undue burden. LiMandri also cited Fed. R. Civ. P. 26(b)'s provisions
12  for the protection of persons from whom discovery is sought.

13     On September 13, 2007, Magistrate Judge McCurine, to whom discovery had been
14  referred, after briefing and oral argument, granted LiMandri's motion. Ten court days later,
15  the JWV Plaintiffs filed objections to Judge McCurine's order, and requested oral argument.
16  Fed. R. Civ. P. 72 provides for the filing of objections to a magistrate judge's ruling on a non-
17  dispositive matter, but neither this rule, nor the Magistrates Act, 28 U.S.C. § 636, contains
18  "specific procedures or timetables for raising objections to the magistrate's rulings on
19  nondispositive matters." Fed. R. Civ. P. 72(a) advisory committee's note. Paragraph 9(a)
20  of Court's own standing order, however, provides that, upon receipt of objections to non-
21  dispositive matters pursuant to 28 U.S.C. § 636(b)(1)(B), the Court will set a briefing
22  schedule and set a hearing date, if appropriate. The Court has considered the JWV
23  Plaintiffs' lengthy objections, however, and finds no additional briefing or oral argument is
24  necessary or appropriate.

25     Plaintiffs previously sought, and were denied, an order compelling the depositions of
26  San Diego Mayor Jerry Sanders and U.S. Representative Duncan Hunter (Order of April 2,
27  2007).

28  ///

## I.    Legal Standards

Pursuant to Fed. R. Civ. P. 72(a), aggrieved parties may, within ten days, file objections to the rulings of a magistrate judge in non-dispositive matters. Such objections are sustained if the magistrate judge's order is "found to be clearly erroneous or contrary to law." Therefore, the standard applied in a review of a discovery matter such as this is the "clearly erroneous or contrary to law" standard. *Haines v. Liggett Group Inc.*, 975 F.2d 81, 92 (3d Cir. 1992) (noting that the proper standard for review of discovery orders is the "clearly erroneous or contrary to law" standard).

The "clearly erroneous" standard applies to the magistrate judge's findings of fact; legal conclusions are freely reviewable *de novo* to determine whether they are contrary to law. *Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 422 (1999). Discretionary orders, including orders denying discovery, will be overturned only if the district court is left with the definite and firm conviction that a mistake has been made. *Center for Biological Diversity v. Federal Highway Admin.*, 290 F. Supp.2d 1175, 1199–1200 (S.D.Cal. 2003) (quoting *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997)).

## II.    Discussion

The JWV Plaintiffs contend Judge McCurine's order erred in three respects, arguing: 1) Judge McCurine erroneously required the information sought to be relevant, whereas the standard they urge is "that discovery need only be calculated to lead to relevant evidence"; 2) Judge McCurine erroneously relied on the U.S. Constitution's Speech or Debate clause; and 3) Judge McCurine erroneously relied on attorney-client privilege. In the case of the latter two, the JWV Plaintiff contend that, even if some areas of inquiry might have been precluded, not all relevant areas would have been. (Obj. at 13:13–17:4.)

The JWV Plaintiffs identify LiMandri's advocacy, lobbying, and advisory efforts as the basis for the deposition. (Obj. at 2:1–6:17; *see also id* at 6:19–22 ("In light of Mr. LiMandri's ubiquity in the series of events that led to the transfer of title to the United States and its continued display, Plaintiffs served a deposition subpoena on him on July 6, 2007.")) They represent they do not seek information regarding the motivations of members of Congress

1  in enacting Public Law 109-272 (*id.* at 8:9–17), but rather about Congressional purpose.
2  (*Id.* at 8:19–25.)  In support of this, they cite a recently issued memorandum opinion
3  compelling the production of certain documents by the members of Congress who
4  sponsored Public Law 109-272, *Jewish War Veterans of the U.S., Inc. v. Gates*, ___ F.
5  Supp.2d ___, 2007 WL 2702012, slip op. at *27–*28 (D.D.C., Sept. 18, 2007) ("*JWV v.*
6  *Gates*").

7      **A.    Relevance Inquiry**

8          The land at issue was taken and designated as a veterans' memorial by Public Law
9  109-272. Previous litigation of the issues presented here has established the fact that the
10 transfer of land at issue here was accomplished unilaterally by legislative action of the
11 federal government, without any required involvement by the City of San Diego. *Paulson v.*
12 *City of San Diego*, 475 F.3d 1047, 1048–49 (9th Cir. 2007). The Ninth Circuit has also made
13 clear that any lobbying action cannot, from a legal standpoint, be viewed as "causing" the
14 legislation that resulted in the transfer of land. *Id.* (quoting *Chem. Producers & Distribs.*
15 *Ass'n v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006)). Therefore, whatever Constitutional
16 violation may have occurred was accomplished solely by the federal government, without
17 regard for any action by the City or any lobbying action by LiMandri or any other person or
18 entity. The relevance in this case of anything the City may have done is therefore minimized.

19         Furthermore, the City's involvement in this controversy has been the subject of
20 extensive and well-publicized litigation.  It thus appears little, if any, relevant evidence
21 regarding the City's role in this controversy remains to be unearthed. As Judge McCurine's
22 order recognized, the JWV Plaintiffs are already in possession of a large amount of historical
23 and contextual information, and have little need for the small amount they might obtain as
24 a result of deposing LiMandri. (Order of Sept. 13, 2007, at 12:2–8.)

25         As for the federal government's activities, the JWV Plaintiffs first focus on LiMandri's
26 contact with Public Law 109-272's lead sponsors, U.S. Representatives Hunter, Bilbray, and
27 Issa. They cite *JWV v. Gates* as their sole authority for the principle that "the activities of the
28 lead sponsors of the legislation" are uniquely relevant. (Obj. at 9:1–9 (citing *JWV v. Gates*,

1   2007 WL 2702012, slip op. at *18).) That ruling, however, dealt with the question of whether

2   documents in the possession of Public Law 109-272's lead sponsors, Reps. Hunter, Bilbray,

3   and Issa, might be relevant. As that court explained, the lead sponsors could reasonably

4   expect their actions and communications would be scrutinized, 2007 WL 2702012, slip op.

5   at *18, and the documents they could provide might be uniquely valuable. While the Court

6   recognizes documents in the possession of members of Congress might constitute, or lead

7   to the discovery of, relevant evidence, the same cannot be said for any anecdotal non-

8   privileged information LiMandri might provide about those members of Congress, or about

9   any other federal officials, or their activities.

10      Second, the JWV Plaintiffs also argue they wish to uncover LiMandri's own "interests

11  in, motivations behind or activities in support of" Public Law 109-272, contending "this inquiry

12  is highly relevant to the Establishment Clause determination." (Obj. at 9:11–18; *but see id.*

13  at 12:6–19 (recognizing LiMandri's feelings about the cross are irrelevant).) In support of

14  this, they cite *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844,

15  862 (2005) and *Edwards v. Aguillard*, 482 U.S. 578, 594–95 (1987). These authorities do

16  not, however, stand for the principle that the actions of private activists are particularly

17  relevant to the inquiry of legislative purpose. In explaining that the "specific sequence of

18  events leading up the challenged decision . . . may shed some light on the decisionmaker's

19  purposes," these cases focus on events tending to show the officials' own purposes, not the

20  purposes of outsiders such as LiMandri.

21      Third, the JWV Plaintiffs argue information they might uncover during the deposition

22  of LiMandri will likely lead to other relevant and admissible information. (Obj. at 10:16–11:3.)

23  They base this argument on their observation that "LiMandri has interacted extensively with

24  every governmental actor responsible for the continued presence of the Cross atop Mt.

25  Soledad and its transfer to federal control . . . ." (*Id.* at 11:1–2.)

26      In connection with their relevance argument, the JWV Plaintiffs focus primarily on

27  LiMandri's public activism and his interaction with the City and with members of Congress.

28  As noted, inquiry into non-privileged matters in this regard is not reasonably likely to lead to

1   relevant and admissible evidence. The JWV Plaintiffs also mention officials in the Executive
2   Branch but, with the exception of LiMandri's presence at the signing of Public Law 109-272
3   by President Bush, only in terms of LiMandri's correspondence with them. (Obj. at 3:8–12
4   (discussing letter to President Bush); 5:5–21 (discussing letter to President Bush and
5   correspondence with other Executive Branch officials); 6:12–18 (mentioning LiMandri's
6   presence at the Oval Office signing ceremony and his statements to the press afterwards).)
7   The JWV Plaintiffs' citations make plain they are in possession of these pieces of
8   correspondence. Although the JWV Plaintiffs in other sections mention in passing
9   LiMandri's communications with Executive Branch officials and agencies (*id.* at 9:26–10:4;
10  15:11–12), they have not shown a deposition of LiMandri would be reasonably calculated
11  to uncover relevant, admissible evidence regarding President Bush's role in enacting this
12  legislation.

13      The JWV Plaintiffs repeatedly mention LiMandri's own activism and the advocacy
14  efforts of the Thomas More Law Center, for which LiMandri serves as West Coast Regional
15  Director, apparently suggesting these may be important areas of inquiry at the deposition.
16  (Obj. at 2:2–23, 5:1–7; *see also id.* at 12:19–23 (". . . JWV Plaintiffs seek to depose Mr.
17  LiMandri because his communications and activities comprise a key part of the context that
18  determines the effect of the government's actions upon a reasonable observer."))

19      The Supreme Court has explained that, as part of the inquiry into the Constitutionality
20  of religious symbols on public land, the point of view of a "reasonable observer" should be
21  considered. *McCreary County,* 545 U.S. at 866 (citing *Capitol Square Review and Advisory*
22  *Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'CONNOR, J., concurring in part and concurring
23  in judgment) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware
24  of the history and context of the community and forum in which the religious display
25  appears.")) A reasonable observer is considered to be aware of such facts as the ownership
26  of the land and the efforts of the government to maintain the symbol on it. *Pinette* at
27  780–81; *Buono v. Kempthorne*, ___ F.3d ___, 2007 WL 2493512, slip op. at *14 (9th Cir.
28  Sept. 6, 2007).

1    The JWV Plaintiffs have not, however, cited any authority, nor is the Court aware of

2    any, for the principle that a reasonable observer would take into account the views of various

3    citizens or advocacy groups with no power to control the land or what was done with it.

4    Furthermore, a "reasonable observer" cannot be expected to be aware of private information

5    the JWV Plaintiffs believe has not yet come to light.

6    At the outside, Rule 26(b) provides that relevant information should "appear[ ]

7    reasonably calculated to lead to the discovery of admissible evidence." While there is some

8    chance the deposition of LiMandri might eventually lead to admissible evidence, the JWV

9    Plaintiffs have not shown that information revealed in the deposition would be "reasonably

10   calculated" to do so. Accordingly, the Court holds the deposition of LiMandri is not

11   reasonably calculated to lead to the discovery of relevant, admissible evidence.

12       **B.    Speech or Debate Clause, Attorney-Client Privilege**

13   The JWV Plaintiffs have also briefed the Speech or Debate Clause and attorney-client

14   privilege issues. While they concede these would limit the scope of the deposition, they

15   contend some lines of questioning would still be permissible. Judge McCurine, by contrast,

16   specifically pointed out the paucity of available lines of questioning:

17       Even if JWV Plaintiffs' counsel were able to craft a few relevant and
         meaningful deposition questions that did not run afoul of the timing of Mr.
18       LiMandri's attorney-client relationships and their attendant privileges (and
         the Court does not think such a feat is possible), the extremely limited
19       amount of historical information JWV Plaintiffs might acquire does not tip
         the balance in favor of allowing Mr. LiMandri's deposition.

20

21   (Order of Sept. 13, 2007, at 11:22–26.)

22   The JWV Plaintiffs were thus put on notice that it was doubtful they had any

23   meaningful questions to ask at the deposition. Even so, they did not rebut this by providing

24   satisfactory examples of specific questions or areas of inquiry. The examples they provide

25   of possible areas for questioning are, for the most part, either vague or irrelevant. (Obj. at

26   14:1–5 (arguing the Speech or Debate Clause does not bar questioning LiMandri about "his

27   own direct contacts with the White House, his interactions with federal agencies, and his

28   efforts in San Diego"); 15:7–12 (listing, as examples of matters not subject to attorney-client

1  privilege, LiMandri's involvement with Proposition K, his efforts to lobby Reps. Cunningham,

2  Hunter, and Issa, and "his interactions with the White House and federal agencies").)

3    The JWV Plaintiffs incorporate by reference thirteen pages of their opposition to the

4  motion to quash, without citing any particular portion of that discussion. (Obj. at 13:9–10

5  (citing Opp'n at 15–28).) This provides the only specific example of a potentially valuable

6  area of questioning not covered by the Speech or Debate Clause, namely, the efforts by

7  members of Congress to influence Executive Branch officials to use existing legal authority

8  to acquire the land at issue. (Opp'n at 26:3–6.) However, even this area of inquiry is

9  tangential, because the land was acquired through legislative action, not the hypothetical

10  method mentioned there. The only specific information mentioned as being outside the

11  protection of the Speech or Debate Clause and not subject to attorney-client privilege is

12  therefore only marginally relevant. The only potentially relevant information the JWV

13  Plaintiffs might uncover is historical background which, Judge McCurine found, the JWV

14  Plaintiffs already have in abundance. (Order of Sept. 13, 2007, at 11:22–26, 12:2:5.)

15    The Court's examination of the relevance of the information sought makes clear the

16  Court need not reach the Speech or Debate Clause or attorney-client privilege issues.

17  Nevertheless, out of an abundance of caution the Court has reviewed Judge McCurine's

18  Speech or Debate and attorney-client privilege analysis and finds it not contrary to law.

19    **C. Additional Considerations**

20     **1. Protection of Non-Party**

21    As a non-party, LiMandri is entitled to broader protection under Rule 26(c). *Dart*

22  *Indus. Co. v. Westwood Chemical Co.*, 649 F.2d 646, 649 (9th Cir. 1980). The Court is

23  obliged to weigh the burden to LiMandri against the value of potential information to the JWV

24  Plaintiffs, considering other possible sources of information. *Moon v. SCP Pool Corp.*, 232

25  F.R.D. 633, 637–38 (C.D.Cal. 2005) (citations omitted).

26    Judge McCurine found the JWV Plaintiffs "have a wealth of historical and contextual

27  information from other documentary and testimonial sources as demonstrated by the instant

28  motion and as attested to by counsel for JWV Plaintiffs at oral argument." (Order of Sept.

13, 2007, at 12:2–5.)   Judge McCurine therefore concluded any historical information LiMandri might provide would be cumulative. The JWV Plaintiffs have not shown this finding to be clearly erroneous.

As noted, LiMandri has been a prominent advocate of efforts to preserve the existing cross on Mt. Soledad, whose removal they now seek. LiMandri was also counsel for San Diegans for the Mt. Soledad National War Memorial in a related state case, *Paulson v. Abdelnour*, 145 Cal.App.4th 400 (Cal.App. 4 Dist. 2006), in which the City's donation of the land to the federal government was challenged. In that case, LiMandri's client's party opponent was the former co-Plaintiff Paulson (now deceased), who was represented by the same counsel as is Plaintiff Trunk. In both litigation and politics, LiMandri has been on the opposite side of this controversy from Plaintiffs, and as they make clear, he has been one of their most active opponents.

Judge McCurine's order quashing the subpoena relied in part on Fed. R. Civ. P. 26(c)(4)'s provisions to protect persons from annoyance, embarrassment, oppression, and undue burden or expense. (Order of Sept. 13, 2007, at 6:18–24, 12:8.) As part of its Speech or Debate clause analysis, the order also found LiMandri had served as an advisor to the three members of Congress (*id.* at 9:21–23), and mentioned the importance of protecting legislators and their aides or assistants from intimidation. (*Id.* at 7:13–8:9.) In this type of situation, the Court must be particularly vigilant to accord non-party activists and political opponents such as LiMandri the broad protection the Ninth Circuit has held they are entitled to, to prevent the possible misuse of deposition subpoenas as tools of oppression, intimidation, or harassment.

While Judge McCurine did not expressly find the deposition subpoena was issued for an improper purpose, his order suggests this was a consideration in his decision to quash the subpoena. (Order of Sept. 13, 2007, at 12:5–8 ("The minimal benefit that would be derived from allowing JWV Plaintiffs to depose Mr. Limandri for the supposed purpose of gleaning cumulative historical information would is outweighed by the need to . . . protect against annoyance and undue burden."))

## 2.   Reconsideration of the Court's Own Order

It is also worth noting that this Court has previously denied Plaintiffs' request for an order compelling the deposition of Rep. Hunter, explaining that such a deposition was barred by the Speech or Debate Clause, and also that the anticipated testimony would be irrelevant. The JWV Plaintiffs repeatedly cite *JWV v. Gates* for its analysis of relevance. That opinion, however, after much analysis, consciously declined to consider this Court's order preclusive. 2007 WL 2702012, slip op. at *6–*9. While this Court does not disagree with the analysis set forth there, the order of April 2, 2007 is this Court's own order. The JWV Plaintiffs' objections, in this sense, represent either very late objections to the Court's order, or else a request to this Court for reconsideration.

While this Court has discretion to reconsider its own decision at any time, *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888–89 (9th Cir. 2001), the JWV Plaintiffs have not given the Court any adequate reason to do so. Rather, as Judge McCurine correctly pointed out, they are attempting to circumvent that order. (Order Quashing LiMandri Subpoena, at 9:17–20.)   The JWV Plaintiffs had a full and fair opportunity to litigate the issue of whether a deposition of Rep. Hunter was proper, *JWV v. Gates*, 2007 WL 2702012, slip op. at *6, but did not challenge it then. To the extent the JWV Plaintiffs now seek information about Reps. Hunter, Bilbray, and Issa, to whom LiMandri served as an advisor, deposing LiMandri would be equivalent to deposing those Representatives. *See United States v. Gravel*, 408 U.S. 606, 617–18 (1972) (reasoning that implementing the Speech or Debate Clause's protections required application of those protections not only to members of Congress, but to their aides as well). *See also Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 529-030 (9th Cir. 1983) (examining the breadth of the Speech or Debate privilege, and specifically noting questions about the motive for or purpose of legislative acts are proscribed).

## III.   Conclusion and Order

In sum, the information the JWV Plaintiffs might uncover by deposing LiMandri is of minimal value. LiMandri's own private activism and beliefs are irrelevant to this case. His

1  interaction at the municipal level is of only marginal relevance and in any event the City's

2  involvement in this controversy is well documented.  His interaction with members of the

3  Executive branch, according to the JWV Plaintiffs' representations, consisted for the most

4  part of correspondence, of which the JWV Plaintiffs have copies.  And his interaction with

5  members of Congress is curtailed as an area of inquiry by both the Speech or Debate clause

6  and attorney-client privilege to the point where any additional relevant information the

7  deposition might lead to would be cumulative.  Though Judge McCurine's order pointed out

8  the limited character of any questions the JWV Plaintiffs might be able to ask at the

9  deposition, they have not attempted to provide any specific lines of questioning they might

10  pursue at the deposition that are reasonably calculated to lead to admissible evidence.

11      In addition, the potential for improper use of the deposition, and the absence of any

12  reason to reconsider the Court's own previous ruling counsel against sustaining the JWV

13  Plaintiffs' objections.

14      For these reasons, the JWV Plaintiffs' objections to Judge McCurine's order of

15  September 13, 2007 are hereby **OVERRULED**.

16      **IT IS SO ORDERED**.

17  DATED:  October 10, 2007

18                    *Larry A Burns*

19                  **HONORABLE LARRY ALAN BURNS**
                United States District Judge

20

21

22

23

24

25

26

27

28

Exhibit MC-3

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE TRUNK and PHILIP K. PAULSON, | ) ) Case No. 06-CV-1597 LAB (WMc) |
| Plaintiffs, | ) (consolidated with 06cv1728) ) |
| v. | ) ) |
| CITY OF SAN DIEGO, THE UNITED STATES OF AMERICA, et al., | ) ) ) |
| Defendants, | ) ) **DECLARATION OF** |
| MOUNT SOLEDAD MEMORIAL ASSOCIATION, Real parties in interest. | ) **MATTHEW T. JONES** ) ) |
| JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, INC., RICHARD A. SMITH, MINA SAGHEB, and JUDITH M. COPELAND, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ROBERT M. GATES, Secretary of Defense, in his official capacity, | ) ) ) |
| Defendant. | ) ) |

### DECLARATION OF MATTHEW T. JONES INCLUDING TABLE OF CONTENTS OF EXHIBITS REFERENCED IN MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *JWV* PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Matthew T. Jones, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney at the law firm of Wilmer Cutler Pickering Hale & Dorr LLP, counsel for Plaintiffs Jewish War Veterans of the United States of America, Inc., Richard A. Smith, Mina Sagheb, and Judith M. Copeland.

06-CV-1597 LAB (WMc)

2.     I submit this Declaration in support of *JWV* Plaintiffs' Motion for Summary Judgment in the above-captioned matter, and to satisfy CivLR 5.1(e)'s requirement of a Table of Contents of exhibits filed in support of a motion.

3.     Attached hereto are true and correct copies of the following documents that are referenced in the Memorandum of Points and Authorities in Support of *JWV* Plaintiffs' Motion for Summary Judgment.

| EXHIBIT NO. | EXHIBIT DESCRIPTION | PAGE NO. |
|---|---|---|
| **EXHIBIT 1.** | **Letter from Jonathan H. Siegelbaum to Jennifer L. Allaire (September 21, 2007).** Exhibit 1 is a true and correct copy of a letter sent by electronic mail from Jonathan H. Siegelbaum, counsel for *JWV* Plaintiffs, to Jennifer L. Allaire, counsel for the Federal Defendants in the above-captioned matter, on September 21, 2007. | 1 |
| **EXHIBIT 2.** | **Excerpt from LYNN HANEY, GREGORY PECK: A CHARMED LIFE (2003).** Exhibit 2 is a true and correct copy of an excerpt from a publicly available biography of Gregory Peck. | 3 |
| **EXHIBIT 3.** | **Michael Bunch, *Vivid, Vital Memories Brighten the Fading Past,* SAN DIEGO UNION-TRIBUNE (February 28, 1994).** Exhibit 3 is a true and correct copy of a news article, and is publicly available on LexisNexis, a commercial database. | 5 |
| **EXHIBIT 4.** | **Undated Document from Mt. Soledad Memorial Association Files.** Exhibit 4 is a true and correct copy of an undated document produced by the Mt. Soledad Memorial Association in this case. | 8 |
| **EXHIBIT 5.** | ***Soledad Sunrise Service Planned* (Undated Newspaper Article).** Exhibit 5 is a true and correct copy of an undated news article publicly available at the La Jolla Public Library. | 9 |
| **EXHIBIT 6.** | **1983 Annual Easter Sunrise Service Program (April 3, 1983).** Exhibit 6 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. | 10 |
| **EXHIBIT 7.** | **Summary of Report of Acting President of Mt. Soledad Memorial Association (June 30, 1953).** Exhibit 7 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. | 12 |

06-CV-1597 LAB (WMc)

**EXHIBIT 8.**    Jim Muskewitz, *Yesterday and Today*, LA JOLLA SUN (April 7, 1982). Exhibit 8 is a true and correct copy of a news article produced by the Mt. Soledad Memorial Association in this case.    16

**EXHIBIT 9.**    City of San Diego, California Building and Structure Record (February 7, 1950). Exhibit 9 is a true and correct copy of a document produced by the City of San Diego in this case.    17

**EXHIBIT 10.**    Letter from Richard C. Adams to Donald Campbell (March 18, 1952). Exhibit 10 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in this case.    18

**EXHIBIT 11.**    Resume of Minutes -- 1952-1953. Exhibit 11 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    19

**EXHIBIT 12.**    Mt. Soledad Memorial Association Articles of Incorporation (April 29, 1952). Exhibit 12 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    23

**EXHIBIT 13.**    Letter from Mt. Soledad Memorial Association to San Diego City Council (May 1, 1952). Exhibit 13 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in this case.    27

**EXHIBIT 14.**    Letter from Bradley Geist to A.E. Ingersoll (August 7, 1952). Exhibit 14 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in this case.    28

**EXHIBIT 15.**    Memo. re Mt. Soledad Assn. (May 7, 1953). Exhibit 15 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    29

**EXHIBIT 16.**    Paul of Corinth Program (September 28, 1952). Exhibit 16 is a true and correct copy of a program publicly available at the La Jolla Public Library.    30

**EXHIBIT 17.**    Bids Requested for Mt. Soledad Cross. Exhibit 17 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    31

**EXHIBIT 18.**    Mt. Soledad Memorial Association Press Release (February 4, 1954). Exhibit 18 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    33

06-CV-1597 LAB (WMc)

**EXHIBIT 19.** *Cross to Be Dedicated Tomorrow*, SAN DIEGO UNION (April 17, 1954). Exhibit 19 is a true and correct copy of a news article produced by the Mt. Soledad Memorial Association in this case. — 34

**EXHIBIT 20.** **Mt. Soledad Memorial Cross Dedication Program (April 18, 1954).** Exhibit 20 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 35

**EXHIBIT 21.** **1955 Annual Easter Sunrise Service Program (April 10, 1955).** Exhibit 21 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 37

**EXHIBIT 22.** **1961 Annual Easter Sunrise Service Program (April 2, 1961).** Exhibit 22 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 39

**EXHIBIT 23.** **1962 Annual Easter Sunrise Service Program (April 22, 1962).** Exhibit 23 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 41

**EXHIBIT 24.** **1963 Annual Easter Sunrise Service Program (April 14, 1963).** Exhibit 24 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 43

**EXHIBIT 25.** **1966 Annual Easter Sunrise Service Program (April 10, 1966).** Exhibit 25 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 45

**EXHIBIT 26.** **1968 Annual Easter Sunrise Service Program (April 14, 1968).** Exhibit 26 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 47

**EXHIBIT 27.** **1972 Annual Easter Sunrise Service Program (April 2, 1972).** Exhibit 27 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 49

**EXHIBIT 28.** **1975 Annual Easter Sunrise Service Program (March 30, 1975).** Exhibit 28 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 51

**EXHIBIT 29.** **1977 Annual Easter Sunrise Service Program (April 10, 1977).** Exhibit 29 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 53

06-CV-1597 LAB (WMc)

**EXHIBIT 30.** **1978 Annual Easter Sunrise Service Program (March 26, 1978).** Exhibit 30 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  55

**EXHIBIT 31.** **1979 Annual Easter Sunrise Service Program (April 15, 1979).** Exhibit 31 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  57

**EXHIBIT 32.** **1980 Annual Easter Sunrise Service Program (April 6, 1980).** Exhibit 32 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  59

**EXHIBIT 33.** **1982 Annual Easter Sunrise Service Program (April 11, 1982).** Exhibit 33 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  61

**EXHIBIT 34.** **1992 Annual Easter Sunrise Service Program (April 19, 1992).** Exhibit 34 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  63

**EXHIBIT 35.** **1994 Annual Easter Sunrise Service Program (April 3, 1994).** Exhibit 35 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  65

**EXHIBIT 36.** **1995 Annual Easter Sunrise Service Program (April 16, 1995).** Exhibit 36 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.  67

**EXHIBIT 37.** **1987 Annual Easter Sunrise Service Program (April 19, 1987).** Exhibit 37 is a true and correct copy of a document produced by the City of San Diego in this case.  69

**EXHIBIT 38.** **Letter from Donald Campbell to Frederic C. Auforth (August 21, 1963).** Exhibit 38 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in this case.  71

**EXHIBIT 39.** **Letter from Millard W. Smith, Mt. Soledad Memorial Association, to the Internal Revenue Service (July 30, 1964).** Exhibit 39 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in this case.  72

**EXHIBIT 40.** Excerpts of the Deposition of William J. Kellogg (June 12, 2007 and July 12, 2007). Exhibit 40 is excerpts of the transcript of the deposition testimony of William J. Kellogg from June 12, 2007 and July 12, 2007.    73

**EXHIBIT 41.** Mike Krey, *Mount Soledad Sign May Be Only Beginning of Things to Come,* LA JOLLA LIGHT (February 23, 1984). Exhibit 41 is a true and correct copy of a news article publicly available at the La Jolla Public Library.    97

**EXHIBIT 42.** Eric Bailey, *Atheists Group Tired of Bearing County Crosses,* L.A. TIMES (November 14, 1988). Exhibit 42 is an archived news article obtained from LexisNexis, a publicly available electronic database.    98

**EXHIBIT 43.** Mt. Soledad Memorial Association Minutes (September 5, 1989). Exhibit 43 is a true and correct copy of a document produced by the City of San Diego in this case.    101

**EXHIBIT 44.** Mt. Soledad Memorial Association Minutes (March 29, 1990). Exhibit 44 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    103

**EXHIBIT 45.** Memorandum from Ron Buckley, Secretary to the City Historical Site Board (January 24, 1991). Exhibit 45 is a true and correct copy of a document publicly available from the San Diego Historical Society.    107

**EXHIBIT 46.** 1993 Annual Easter Sunrise Service Program (April 11, 1993). Exhibit 46 is a true and correct copy of a document produced by the City of San Diego in this case.    108

**EXHIBIT 47.** 1988 Annual Easter Sunrise Service Program (April 3, 1988). Exhibit 47 is a true and correct copy of a document produced by the City of San Diego in this case.    112

**EXHIBIT 48.** 1990 Annual Easter Sunrise Service Program (April 15, 1990). Exhibit 48 is a true and correct copy of a document produced by the City of San Diego in this case.    114

**EXHIBIT 49.** Mt. Soledad Memorial Association Purchase Proposal for the Mt. Soledad Memorial Site (August 3, 1998). Exhibit 49 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    116

**EXHIBIT 50.** San Diego Ordinance O-18586 (September 29, 1998). Exhibit 50 is a true and correct copy of a document produced by the City of San Diego in this case.    147

06-CV-1597 LAB (WMc)

**EXHIBIT 51.** **Permit for Mt. Soledad Memorial Wall Dedication (May 23, 2001).** Exhibit 51 is a true and correct copy of a document produced by the City of San Diego in this case. — 150

**EXHIBIT 52.** **Mt. Soledad Memorial Association,** *About the Memorial.* Exhibit 52 is a true and correct copy of an Internet page maintained by the Mt. Soledad Memorial Association, and is available at http://www.soledadmemorial.com/web/pages/about_the_memorial.htm. — 151

**EXHIBIT 53.** **Permit for "Celebration for the Cross" (March, 30, 1997).** Exhibit 53 is a true and correct copy of a document produced by the City of San Diego in this case. — 154

**EXHIBIT 54.** **Permit for Sunrise Service (March 30, 1997).** Exhibit 54 is a true and correct copy of a document produced by the City of San Diego in this case. — 155

**EXHIBIT 55.** **Permit for Sunrise Service (March 7, 1999).** Exhibit 55 is a true and correct copy of a document produced by the City of San Diego in this case. — 156

**EXHIBIT 56.** **Permit for Sunrise Service (March 22, 2000).** Exhibit 56 is a true and correct copy of a document produced by the City of San Diego in this case. — 157

**EXHIBIT 57.** **Report from Casey Gwinn, City Attorney, to Mayor and City Council of San Diego (June 28, 2004).** Exhibit 57 is a true and correct copy of a report produced by the City of San Diego in this case. — 158

**EXHIBIT 58.** **Draft Settlement Agreement (July 2004).** Exhibit 58 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. — 166

**EXHIBIT 59.** **Excerpts of San Diego City Council Meeting Minutes (July 27, 2004).** Exhibit 59 is excerpts of the minutes of the July 27, 2004 meeting of the San Diego City Council, which are publicly available on an Internet page maintained by the City of San Diego at http://www.sandiego.gov/citycouncil. — 169

**EXHIBIT 60.** **City Ordinance O-19306 (July 27, 2004).** Exhibit 60 is a true and correct copy of a document produced by the City of San Diego in this case. — 175

**EXHIBIT 61.** *Paulson v. Abdelnour*, **GIC 849667, slip op. (Cal Super. Ct. October 7, 2005).** Exhibit 61 is the slip opinion in *Paulson v. Abdelnour*, GIC 849667. — 181

06-CV-1597 LAB (WMc)

**EXHIBIT 62.** *The Cross, the Memorial Walls and Proposition K* (September 8, 2004). Exhibit 62 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. 218

**EXHIBIT 63.** **Proposition K Ballot Argument.** Exhibit 63 is a true and correct copy of the ballot argument for Proposition K, which is publicly available on an Internet page maintained by the City of San Diego at http://www.sandiego.gov/city-clerk/pdf/propksoledad.pdf. 221

**EXHIBIT 64.** **Thomas More Law Center,** *About Us.* Exhibit 64 is a true and correct copy of an Internet page maintained by the Thomas More Law Center, and is publicly available at http://www.thomasmore.org/about.html. 225

**EXHIBIT 65.** **Charles S. LiMandri,** *Vote Yes to Keep the Cross on Mt. Soledad,* SAN DIEGO UNION-TRIBUNE (October 6, 2004). Exhibit 65 is a true and correct copy of an editorial authored by Charles LiMandri obtained from the Library of Congress's publicly available newspaper archives. 227

**EXHIBIT 66.** **Letter from Mark A. Ginella to Charles Berwanger** *et al.* (October 26, 2004). Exhibit 66 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. 228

**EXHIBIT 67.** **Permit to Mission Valley Christian Fellowship (November 1, 2004).** Exhibit 67 is a true and correct copy of a document produced by the City of San Diego in this case. 230

**EXHIBIT 68.** **Mission Valley Christian Fellowship Press Release,** *Mt. Soledad Prayer Vigil – A Religious Freedom Rally* (November 1, 2004). Exhibit 68 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case. 231

**EXHIBIT 69.** **Pauline Repard & Matthew Hall,** *Hundreds Rally in Support of Cross Measure,* SAN DIEGO-UNION TRIBUNE (November 2. 2004). Exhibit 69 is a true and correct copy of a news article obtained from an Internet site maintained by the San Diego Union-Tribune, and is publicly available at http://www.signonsandiego.com/news/politics/20041102-9999-1m2cross.html. 233

**EXHIBIT 70.** **Letter from Charles S. LiMandri to Reps. Cunningham, Hunter, and Issa** (November 8, 2004). Exhibit 70 is a true and correct copy of a document produced by the City of San Diego in this case. 235

06-CV-1597 LAB (WMc)

**EXHIBIT 71.** Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, § 116, 118 Stat. 2809, 3346-47 (codified at 16 U.S.C. § 431 (note) (2004). Exhibit 71 is a true and correct copy of a document obtained from Westlaw, a publicly available commercial database.    242

**EXHIBIT 72.** Congressman Darrell Issa Washington Update (January 2005). Exhibit 72 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    248

**EXHIBIT 73.** Thomas More Law Center, *U.S. Congress Acts to Save the Mt. Soledad Cross* (November 23, 2004). Exhibit 73 is a true and correct copy of a press release obtained from an Internet site maintained by the Thomas More Law Center, and is publicly available at http://www.thomasmore.org/show_news.html?NewsID=255.    252

**EXHIBIT 74.** Matthew T. Hall, *Group Presses for Decision on Cross*, SAN DIEGO-UNION TRIBUNE (February 9, 2005). Exhibit 74 is a true and correct copy of a news article obtained from an Internet site maintained by the San Diego Union-Tribune, and is publicly available at http://www.signonsandiego.com/uniontrib/20050209/news_7m9soledad.html.    253

**EXHIBIT 75.** Letter from Robert Cobb, Administrator, Mission Valley Christian Fellowship, to Mayor Dick Murphy (March 1, 2005). Exhibit 75 is a true and correct copy of a letter produced by the City of San Diego in this case.    255

**EXHIBIT 76.** Memorandum of Law from Michael J. Aguirre, City Attorney, to Mayor Dick Murphy (February 24, 2005). Exhibit 76 is a true and correct copy of a memorandum produced by the City of San Diego in this case.    256

**EXHIBIT 77.** Report from Michael J. Aguirre, City Attorney, to San Diego Mayor and City Council (May 13, 2005). Exhibit 77 is a true and correct copy of a report produced by the City of San Diego in this case.    264

**EXHIBIT 78.** Alliance Defense Fund, *Defending Religious Freedom*. Exhibit 78 is a true and correct copy of a document obtained from an Internet site maintained by the Alliance Defense Fund, and is publicly available at http://www.alliancedefensefund.org/issues/religiousfreedom/Default.aspx.    274

**EXHIBIT 79.** Letter from Robert H. Tyler, Alliance Defense Fund, to Mayor and City Council (March 8, 2005). Exhibit 79 is a true and correct copy of a letter produced by the United States in this case.    277

**EXHIBIT 80.** Referendary Petition Against City Council Resolution R-300207 (May 17, 2005). Exhibit 80 is a true and correct copy of a petition produced by the City of San Diego in this case. — 279

**EXHIBIT 81.** Office of the City Clerk Report (May 12, 2005). Exhibit 81 is a true and correct copy of a report produced by the City of San Diego in this case. — 281

**EXHIBIT 82.** Karen Kucher, *The Spirit of Easter,* SAN DIEGO UNION-TRIBUNE (March 28, 2005). Exhibit 82 is a true and correct copy of a news article obtained from an Internet site maintained by the San Diego Union-Tribune, and is publicly available at http://www.signonsandiego.com/uniontrib /20050328/news_1m28easter.html. — 283

**EXHIBIT 83.** Jennifer Vigil, *Signature Drive for Cross Gets Push at Holiday Events,* SAN DIEGO UNION-TRIBUNE (March 27, 2005). Exhibit 83 is a true and correct copy of a news article obtained from an Internet site maintained by the San Diego Union-Tribune, and is publicly available at http://www.signonsandiego.com/uniontrib/20050327/news_1m27cross.html. — 286

**EXHIBIT 84.** City Council Resolution R-300437 (May 17, 2005). Exhibit 84 is a true and correct copy of a resolution produced by the City of San Diego in this case. — 288

**EXHIBIT 85.** City Council Ordinance O-19378 (May 17, 2005). Exhibit 85 is a true and correct copy of an ordinance produced by the City of San Diego in this case. — 290

**EXHIBIT 86.** Jennifer Vigil, *Council Rescinds Decision on Cross,* SAN DIEGO UNION-TRIBUNE (May 18, 2005). Exhibit 86 is a true and correct copy of a news article obtained from an Internet site maintained by the San Diego Union-Tribune, and is publicly available at http://signonsandiego.com/news/metro /20050518-9999-1n18cross.html. — 294

**EXHIBIT 87.** *Judge's Order to Remove the Mt. Soledad Cross is Not the End of the Story,* Thomas More Law Center (May 8, 2006). Exhibit 87 is a true and correct copy of a press release obtained from an Internet site maintained by the Thomas More Law Center, and is publicly available at http://www.thomasmore.org/show_news.html?NewsID=415. — 297

**EXHIBIT 88.** Letter from Rep. Duncan Hunter to President George W. Bush (May 10, 2006). Exhibit 88 is a true and correct copy of a letter produced by the United States in this case. — 299

**EXHIBIT** Thomas More Law Center, *National Petition Drive Launched to Save Mt.* — 301

06-CV-1597 LAB (WMc)

89.  *Soledad Cross* (May 11, 2006).  Exhibit 89 is a true and correct copy of a press release obtained from an Internet site maintained by the Thomas More Law Center, and is publicly available at http://www.thomasmore.org /show_news.html?NewsID=418.

**EXHIBIT 90.**  **E-mail from Charles S. LiMandri to Lorissa Bounds, *et al.* (May 21, 2006).**  Exhibit 90 is a true and correct copy of a document produced by the United States in this case.  302

**EXHIBIT 91.**  **American Family Association, *Help Save the Cross!* (May 6, 2006).**  Exhibit 91 is a true and correct copy of a document obtained from the publicly available Internet site at http://www.christianscorner.com/forum/lofiversion /index.php/t2472.html.  A similar copy of the petition is publicly available at the American Family Association's Internet site at http://www.afa.net /soledad.asp.  303

**EXHIBIT 92.**  **American Center for Law & Justice, *Petition to Save San Diego's Mount Soledad Cross.***  Exhibit 92 is a true and correct copy of a document obtained from an Internet site maintained by the American Center for Law & Justice, and is publicly available at http://www.aclj.org/Petition /Printable.aspx?AC=1&SC=3163&zip=.  305

**EXHIBIT 93.**  **Fidelis, *Fidelis Urges White House Action to Save Mt. Soledad Cross* (June 23, 2006).**  Exhibit 93 is a true and correct copy of a press release from Fidelis, and was obtained from the Internet site at http://Christiannewswire.com/news/26382401.html.  306

**EXHIBIT 94.**  **Christian Defense Coalition, *Prayer Vigil in Front of White House in Support of Mt. Soledad Cross and Religious Expression in the Public Square* (June 14, 2006).**  Exhibit 94 is a true and correct copy of a press release from the Christian Defense Coalition, and was obtained from the Internet site at http://www.christiannewswire.com/news/2638401.html.  308

**EXHIBIT 95.**  **Charles S. LiMandri, *Thomas More: "A Man for This Season,"* Ad Veritatem (October 2006).**  Exhibit 95 is a true and correct copy of an article from the October 2006 edition of Ad Veritatem, a publication of the St. Thomas More Society of Orange County, and was obtained from the St. Thomas More Society's Internet site, which is publicly available at http://www.stthomasmore.net/NewLetters/2006/OctoberAdVeritatem2006.pdf.  310

**EXHIBIT 96.**  **House Resolution 5683.**  Exhibit 96 is a true and correct copy of a document obtained from Westlaw, a commercial database.  314

| | | |
|---|---|---|
| **EXHIBIT 97.** | Family Research Council, *Victories: Life, Marriage, Pledge, Cross, Child Protection & More* **(July 22, 2006).** Exhibit 97 is a true and correct copy of a document obtained from an Internet site maintained by the Family Research Council, and is publicly available at http://www.frc.org/get.cfm?i=PW06G07&v=PRINT. | 317 |
| **EXHIBIT 98.** | Thomas More Law Center, *Thomas More Law Center Applauds Senate Passage of Bill to Preserve the Mt. Soledad Cross and Veterans Memorial,* **(August 2, 2006).** Exhibit 98 is a true and correct copy of a press release obtained from an Internet site maintained by the Thomas More Law Center, and is publicly available at http://www.thomasmore.org/show_news.html?NewsID=442. | 319 |
| **EXHIBIT 99.** | **Email from Jeremiah Denton to Rick Dearborn** *et al.* **(July 5, 2006).** Exhibit 99 is a true and correct copy of a document obtained on March 8, 2007 from an Internet site maintained by the Admiral Jeremiah Denton Foundation, where this document was then publicly available at http://dentonfoundation.org/SoledadCrossemail3.pdf. | 320 |
| **EXHIBIT 100.** | **Email from Rick Dearborn to Jeremiah Denton (July 25, 2006).** Exhibit 100 is a true and correct copy of a document obtained on March 8, 2007 from an Internet site maintained by the Admiral Jeremiah Denton Foundation, where this document was then publicly available at http://dentonfoundation.org/SoledadCrossemail2.pdf. | 323 |
| **EXHIBIT 101.** | White House, *President Signs H.R. 5683, S. 250, H.R. 3682, and S. 3693* **(August 14, 2006).** Exhibit 101 is a true and correct copy of a document obtained from an Internet site maintained by the White House, and is available at http://www.whitehouse.gov/news/releases/2006/08/20060814-4.html. | 324 |
| **EXHIBIT 102.** | Christian Coalition of America, *Washington Weekly Review* (August 18, 2006). Exhibit 102 is a true and correct copy of a document obtained from an Internet site maintained by the Christian Coalition of America, and is publicly available at http://www.cc.org/content.cfm?id=354. | 325 |
| **EXHIBIT 103.** | **Excerpts of the Deposition of Karen Ringel (July 12, 2007).** Exhibit 103 is excerpts of the transcript of the deposition testimony of Navy employee Karen Ringel from July 12, 2007. | 330 |
| **EXHIBIT 104.** | **Email from Esther Ewell, Navy, to Frank Kotarski, Navy (January 23, 2007).** Exhibit 104 is a true and correct copy of a document produced by the United States in this case. | 343 |

06-CV-1597 LAB (WMc)

**EXHIBIT 105.** National Day of Prayer Task Force, *NDP 2007 Community Prayer Events.* Exhibit 105 is a true and correct copy of a document obtained from an Internet site maintained by the National Day of Prayer Task Force for San Diego County, and is publicly available at http://www.ndpsandiego.org/tiki-index.php?page=2007%20Community%20Events.    344

**EXHIBIT 106.** U.S. Department of Veterans Affairs, *Available Emblems of Belief for Placement on Government Headstones and Markers.* Exhibit 106 is true and correct copy of a document obtained from an Internet site maintained by the U.S. Department of Veterans Affairs, and is publicly available at http://www.cem.va.gov/cem/hm/hmemb.asp    353

**EXHIBIT 107.** E-mail from Amy Cheshire to William J. Kellogg (April 22, 2003). Exhibit 107 is a true and correct copy of a document produced by the Mt. Soledad Memorial Association in this case.    360

**EXHIBIT 108.** Letter from Mark A. Ginella to William J. Kellogg (July 24, 2004). Exhibit 108 is a true and correct copy of a document produced electronically by the Mt. Soledad Memorial Association in this case.    361

**EXHIBIT 109.** Mission Valley Christian Fellowship, *The Message We Share Is Simple.* Exhibit 109 is a true and correct copy of a document obtained from an Internet site maintained by the Mission Valley Christian Fellowship, and is publicly available at http://www.mvcf.com/special_events/BeliefsMVCF.asp    363

**EXHIBIT 110.** Letter from Barron Beshoar to Roger Revelle (February 4, 1956). Exhibit 110 is a true and correct copy of a letter obtained from the Roger Revelle papers at the Scripps Institute of Oceanography Archives.    364

**EXHIBIT 111.** Miles Corwin, *La Jolla Symbolizes Progress,* L.A. TIMES (April 15, 1984). Exhibit 111 is a true and correct copy of a news article obtained from the San Diego Historical Society's archives.    366

**EXHIBIT 112.** Mary Ellen Stratthaus, *Flaw in the Jewel: Housing Discrimination Against Jews in La Jolla, in* 84 AMERICAN JEWISH HISTORY 3 (1996) 189-219.    369

**EXHIBIT 113.** Hael Granberry, *Council OKs Sale of Mt. Soledad Cross Site,* L.A. TIMES (February 25, 1992). Exhibit 113 is a true and correct copy of an archived news article obtained from Westlaw, a commercial database.    401

**EXHIBIT 114.** Program, First Annual Veterans Tribute (November 11, 1972). Exhibit 114 is a true and correct copy of a document produced by the Mt. Soledad    405

06-CV-1597 LAB (WMc)

Memorial Association in this case.

**EXHIBIT 115.** **Program, Veterans Day Tribute (November 11, 1973).** Exhibit 115 is a true and correct copy of a document obtained from the United States in this case. 406

**EXHIBIT 116.** **1991 Annual Easter Sunrise Service Program (March 31, 1991).** Exhibit 116 is a true and correct copy of a document produced by the City of San Diego in this case. 407

**EXHIBIT 117.** **Statement of Administration Policy,** *H.R. 5683 – Acquisition of Mt. Soledad Veterans Memorial.* Exhibit 117 is a true and correct copy of a document obtained from an Internet site maintained by the Office of Management and Budget within the Executive Office of the President, and is publicly available at http://www.whitehouse.gov/omb/legislative/sap/109-2/hr5683sap-h.pdf. 409

**EXHIBIT 118.** *Sen. Jeff Sessions Calls On Senate Democrats To Stop Blocking Mount Soledad Veterans Memorial Legislation* **(July 27, 2006).** Exhibit 118 is a true and correct copy of a document produced by the United States in this case. 410

**EXHIBIT 119.** **Hunter for President Flyer.** Exhibit 119 is a true and correct copy of a document obtained from an Internet site, and is publicly available at http://timereallymatters.com/mount-soledad/dh-mount-soledad-print.png. 413

**EXHIBIT 120.** **Letter from the American Jewish Committee to the Honorable Barbara Boxer** *et al.* **(June 27, 2006).** Exhibit 120 is a true and correct copy of a letter produced by the City of San Diego in this case. 414

**EXHIBIT 121.** *Little Notes July/August 2006,* SAN DIEGO NEWS NOTES **(July/August 2006).** Exhibit 121 is a true and correct copy of a document obtained from an Internet site maintained by San Diego News Notes, and is publicly available at http://www.sdnewsnotes.com/ed/notes/2006notes/0607note.htm 416

**EXHIBIT 122.** **Gregory Tomlin,** *San Diego Voters Approve Measure to Save Memorial Cross, But Challenges Are Ahead,* BAPTIST PRESS **(July 27, 2005).** Exhibit 122 is a true and correct copy of a news article obtained from an Internet site maintained by the Baptist Press, and is publicly available at http://www.bpnews.net/bpnews.asp?ID=21289. 423

**EXHIBIT 123.** **Undated Letter from the MSMA to the Public.** Exhibit 123 is a true and correct copy of a letter produced by the Mt. Soledad Memorial Association in 426

this case.

| EXHIBIT 124. | **March 8, 2005 City Council Meeting Transcript.** Exhibit 124 is, pursuant to Standing Order 4(d), a certified transcript of excerpts of a March 8, 2005 public hearing conducted by the San Diego City Council, the electronic audio and video recording of which is publicly available at http://granicus.sandiego.gov/ViewPublisher.php?view_id=3. | 427 |
|---|---|---|
| EXHIBIT 125. | **Radio Interview with Charles S. LiMandri.** Exhibit 125 is, pursuant to Standing Order 4(d), a certified transcript of a radio interview with Charles S. LiMandri conducted September 16, 2006, the electronic audio recording of which is publicly available at http://www.wsradio.com/internet-talk-radio.cfm/shows/Christian-Water-Cooler/archives/date/selected/09-16-2006.html. | 496 |

4.      I declare under penalty of perjury that the foregoing is true and correct.


Executed:      Washington, D.C.
               October 11, 2007


                                    Matthew T. Jones
                                    Attorney for *JWV* Plaintiffs


06-CV-1597 LAB (WMc)

Exhibit MC-4

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO.  96-1508

UNITED STATES OF AMERICA,

Appellee
v.

JOSEPH M. McDADE,

Defendant

CUSTODIAN OF RECORDS,
COMMITTEE ON STANDARDS OF OFFICIAL CONDUCT,
UNITED STATES HOUSE OF REPRESENTATIVES,
Appellant

ON APPEAL FROM THE ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA DIRECTING THE PRODUCTION OF RECORDS
PURSUANT TO FED.R.CRIM.P. 17(c), AT CRIMINAL NO. 92-249

ARGUED:  July 12, 1996
BEFORE:  Becker, Stapleton and Greenberg, <u>Circuit Judges</u>.

ORDER

It appearing to the Court that:

(1).  The district court has ruled that the documents at issue are protected by the privilege conferred by the Speech or Debate Clause, and that ruling has not been challenged before us;

(2).  With this determination made, our decision in <u>In re: Grand Jury Proceedings</u>, 587 F.2d 589 (3d. Cir. 1977) ("<u>Eilberg</u>") neither required nor authorized disclosure to the government;

(3).  It was error for the district court to require production of the documents at issue to the government at the time of the district court's order;

It is hereby ORDERED that the portions of the district court's order of June 5, 1996 appealed from are VACATED.*

BY THE COURT:

_____
            Circuit Judge

DATED:   JUL 1 2 1996

---

*.   If in the course of future proceedings, the district court determines that a legitimate issue exists as to whether there has been a valid waiver of the Committee's privilege, nothing here said is intended to preclude the district court from ordering the documents at issue produced for its inspection <u>in camera</u> in connection with the resolution of that issue.

Exhibit MC-5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :     CRIMINAL ACTION

         v.     :     NO. 92-249

JOSEPH M. McDADE,
      Defendant

## O R D E R

AND NOW, this 5ᵗʰ day of June, 1996, it is hereby
ORDERED as follows:

(1)     The defendant's Motion for Disclosure of Unlawful Acts
is DENIED.

(2)     Because the indictment does not allege that the
defendant accepted gifts in the form of cash, his
Motion to Correct the Record is GRANTED, as follows:

    (a)     In its opinion of May 6, 1993, the court stated,
"Rather, the charges are that he accepted gifts
such as cash . . ." This excerpt, which appears
on page 28 of the slip opinion, and at 827 F.
Supp. 1153, 1171 (E.D. Pa. 1993), is hereby
amended to read, "Rather, the charges are that he
accepted gifts such as money . . ."

    (b)     In its opinion of August 7, 1995, the court
stated, "Counts One and Two allege that Mr. McDade
accepted cash . . . Counts Three and Four allege
that Mr. McDade accepted cash . . ." This
excerpt, which appears on page 2 of the slip
opinion, and at 1995 WL 476230, at *1 (E.D. Pa.
1995), is hereby amended to read, "Counts One and
Two allege that Mr. McDade accepted money . . .
Counts Three and Four allege that Mr. McDade
accepted money . . ."

(3)     The Custodian of Records, United States House of
Representatives, Committee on Standards of Official
Conduct's Motion for Clarification or, in the
alternative, Reconsideration of the court's order of
August 4, 1995 (Doc. No. 138) is GRANTED IN PART and
DENIED IN PART. The Committee is ordered to produce
the documents under subpoena.

A-10

(4)     The prosecution having represented to the court that it
has fully complied with the court's order of August 4,
1995 (Doc. No. 137), and the defendant having failed to
present to the court any evidence to the contrary, the
defendant's Motion to Compel Prosecution to Comply with
the Court's Order of August 4, 1995, is DENIED AS MOOT.

BY THE COURT:

Robert S. Gawthrop, III, J.

---

*       The defendant has requested, pursuant to 18 U.S.C. §
3504(a), that the prosecution disclose whether it has used any
electronic device to procure evidence illegally.  In particular,
he says that he suspects that government investigators illegally
used wire taps in several circumstances, and he thus asks that
the prosecution confirm or deny his suspicions in this regard.

Section 3504 does not entitle him to such information.
When a defendant claims that "evidence is inadmissible because it
is the primary product of an unlawful act or because it was
obtained by the exploitation of an unlawful act, the
[prosecution] shall affirm or deny the occurrence of the alleged
unlawful act." 18 U.S.C. § 3504(a)(1).  By its own terms,
Section 3504 does not come into play unless the prosecution seeks
to have admitted into evidence an item which the defendant claims
was the product of an unlawful act.  But there must be a
particular item of evidence sought to be admitted.  Section 3504
does not entitle the defendant to impel the prosecution to affirm
or deny whether it illegally used an electronic device,
generally.  United States v. Robins, 978 F.2d 881, 887 (5th Cir.
1992); In re Dellinger, 357 F. Supp. 949, 961 (N.D. Ill. 1973),
aff'd, 502 F.2d 813 (7th Cir. 1974), cert. denied, 420 U.S. 990
(1975).  Thus, the defendant's motion must be denied.

**      In the August 4th order, the court granted the
Committee's oral motion to quash the prosecution's subpoena for
all committee records related to the defendant.  The court held
that the defendant's requests to the Committee for advisory
opinions were not privileged under the Speech or Debate Clause,
but that the advisory opinions that the Committee sent to the
defendant were so privileged.  The Committee now seeks a
clarification of that order with respect to 14 internal Committee
memoranda.  Portions of these memoranda contain a Committee staff
person's identification of telephonic inquiries received from the
defendant or his staff.  The prosecution contends that, as per
the August 4th order, these portions of the memoranda are not
protected under the Speech or Debate Clause.  The Committee

- 2 -

A-11

counters that the entirety of these memoranda are advisory opinions and thus privileged. Because I agree with the Committee, I today grant its motion for clarification, and thus deny as moot its motion for reconsideration.

As mentioned in the August 4th order, the Speech or Debate Clause protects acts that are an integral part of the deliberative and communicative processes by which members participate in committee or House proceedings. <u>Gravel v. United States</u>, 408 U.S. 606, 625 (1975). When the Committee memorialized the defendant's telephonic request for an advisory opinion it performed an integral part of those processes. The Committee functions, at least in part, to render advisory opinions to members of Congress upon their requests. The act of recording the inquiry, with or without interpretive gloss, is the performance of an official duty integral to the Committee's deliberative and communicative processes. By the time the Committee records a congressman's request for an advisory opinion, the Committee has begun to perform its official duty. The memorialization of that request in an internal Committee document is an essential part of those processes and is thus protected by the Speech or Debate Clause.

As mentioned in the August 4th order, because the Speech or Debate Clause privilege is "not one of nondisclosure but of nonevidentiary use," <u>In re Grand Jury Proceedings</u>, 563 F.2d 577, 584 (3d Cir. 1977), the Committee is nonetheless ordered to produce the privileged documents. It must be disclosed, but whether it will be admitted into evidence at trial shall have to abide that event.

A-12
- 3 -